# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

IVAN ANTONYUK, *et al*.,

               Plaintiffs-Appellees,

v.

STEVEN A. NIGRELLI, and MATTHEW J. DORAN       No. 22-2908

               Defendants-Appellants,

WILLIAM FITZPATRICK, *et al*.,

               Defendants.

_____


## RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS'
## MOTION FOR A STAY PENDING APPEAL AND AN ADMINISTRATIVE
## STAY PENDING RESOLUTION OF THE MOTION

Stephen D. Stamboulieh      Robert J. Olson
Stamboulieh Law, PLLC      William J. Olson, PC
P.O. Box 428              370 Maple Ave. West, Suite 4
Olive Branch, MS  38654      Vienna, VA 22180-5615
(601) 852-3440             703-356-5070
stephen@sdslaw.us         wjo@mindspring.com
*Attorneys for Appellees*

**Dated: November 19, 2022**

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Statement ............................................................................................... 1

Argument ............................................................................................... 5

    I.    The Preliminary Injunction Should Not Be Stayed Pending Appeal .........5

        A.   The Equitable Factors Do Not Support a Stay ................................7

           1.  Appellants Will Suffer No Harm Without a Stay ............7

           2.  The Public Interest Does Not Support a Stay ............... 10

           3.  A Stay Will Cause Appellees Serious and Irreparable Harm ........................................................... 15

        B.   The District Court's Merits Determinations Withstand Review .....16

    II.   The District Court Properly Provided Statewide Relief ..........................20

Conclusion ........................................................................................... 21

Certificate of Compliance ......................................................................22

# TABLE OF AUTHORITIES

## Cases

*ACC Bondholder Group v. Adelphia Communs. Corp.*, 361 B.R. 337
(S.D.N.Y. 2007)...................................................................................7

*Antonyuk v. Bruen*, No. 22-cv-734, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y.
Aug. 31, 2022) (*Antonyuk I*) ................................................. 4, 8, 9, 10, 12, 15, 20

*Antonyuk v. Hochul*, No. 22-cv-986 Slip Op (N.D.N.Y. Nov. 7, 2022)
(*Antonyuk II*).................................................................................*passim*

*Baretta v. Wells Fargo Bank, N.A.*, 693 Fed. Appx. 26 (2d Cir. 2017).....................7

*D.C. v. Heller*, 554 U.S. 570 (2008) ................................................. 14, 16

*Hardaway v. Nigrelli*, 22-cv-771 (W.D.N.Y. Nov. 3, 2022)...................................20

*In re Sabine Oil & Gas Corp.*, 548 B.R. 674 (Bankr. S.D.N.Y. 2016) ....................7

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ....................................................18, 19

*Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174 (2d Cir. 2018) ......6

*McDonald v. Chicago*, 561 U. S. 742 (2010) ...........................................................14

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ............... 13, 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .................. *passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................6

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ................................6

*Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1998).......................15

*Russman v. Bd. of Educ.*, 260 F.3d 114 (2d Cir. 2001)..........................................20

*Thapa v. Gonzales*, 460 F.3d 323 (2d Cir. 2006)......................................................6

*Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41 (2d Cir. 2020).............5, 6

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)......................................................14

**Statutes**

18 U.S.C. § 922(g) ................................................................................10

N.Y. Fam. Ct. Act § 842-a .....................................................................10

**Miscellaneous**

W. English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned," Georgetown McDonough School of Business Research Paper No. 4109494, Georgetown University, May 18, 2022 .......................13

**STATEMENT**

This case involves a challenge to New York's most recent attempt to infringe the Second Amendment rights of its residents. In response to the U.S. Supreme Court's recent vindication of the right to keep and bear arms in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the state hastily enacted a poorly named and ineptly drafted statute called the "Concealed Carry Improvement Act" ("CCIA"). Rather than following *Bruen* and respecting the Second Amendment's mandate, the CCIA defied the Supreme Court, making concealed carry of firearms far more restrictive, and the licensing process far more onerous, than before the Supreme Court's decision.

Plaintiffs-Appellees ("Appellees") filed suit seeking to enjoin many of the CCIA's patently unconstitutional provisions, seeking both a temporary restraining order and a preliminary injunction. Complaint for Declaratory and Injunctive Relief ("Complaint"), ECF #1 (Sept. 20, 2022); Plaintiffs' Motion for a Temporary Restraining Order ("Motion for TRO"), ECF #6 (Sept. 22, 2022). After providing Defendants-Appellants ("Appellants") the opportunity to submit briefing and to participate in oral argument, the district court issued a temporary restraining order enjoining certain parts of the CCIA, while allowing others to remain in effect, and granting Appellants' request for a three-business-day stay to seek review by this Court. Response in Opposition to Plaintiffs' Emergency Motion for Temporary

Restraining Order, ECF #18 (Sept. 28, 2022); Transcript of Proceedings, ECF #23 (Sept. 29, 2022); Decision and Temporary Restraining Order ("TRO"), ECF #27 (Oct. 6, 2022). Appellants sought from this Court (1) a stay pending appeal of the district court's decision, along with (2) what they styled an "emergency … interim … administrative stay" while the Court considered their motion. Docket No. 22-2379, Motion for a Stay, Doc. #16 at 1. On October 11, 2022, Appellees filed a Response explaining, *inter alia*, that appeal of a TRO is improper, and the district court's forthcoming decision on Plaintiffs' preliminary injunction would render the appeal moot. Opposition to Motion, Doc. #22. On October 12, 2022, Judge Lee granted Appellants' request for "an interim stay of the Temporary Restraining Order pending decision by the motions panel." Order, Doc. #39.

The case continued in district court, with Appellants filing their Opposition to Plaintiffs' Motion for a Preliminary Injunction on October 13, 2022. Response in Opposition, ECF #48. On October 22, 2022, Appellees filed their Reply. Reply to Response, ECF #69. On October 25, 2022, the district court heard oral argument on Appellees' Motion. Transcript of Proceedings, ECF #72. On November 7, 2022, the district court issued a limited preliminary injunction ("PI"), supported by a 184-page opinion. Decision and Preliminary Injunction, ECF #78 ("Op."). The district court's opinion denied Appellants' request for a three-day stay, and the PI took effect immediately. Their TRO appeal mooted, Appellants, with Appellees' consent,

withdrew that appeal on November 9, 2022. Stipulation of Voluntary Dismissal, Doc. #74 (Docket No. 22-2379).

On November 8, 2022, Appellants appealed the district court's grant of the PI, and on November 12, 2022, filed a similar motion in this Court, seeking a stay pending appeal and an "administrative stay" pending resolution of their Motion. Docket No. 22-2908, Motion to Stay ("Motion"), Doc. #18. Although having requested three days in which to seek a stay from this Court, Appellants waited *five* days to file this Motion.

While the cover sheet (Form T-1080) describes Appellants' filing as a "motion for emergency interim stay," their motion is not captioned as an "Emergency Motion," nor does it use the word "emergency" at all. Nor does it comply with this Court's rule requiring that it "state the date by which the movant believes the court must act." *See* L.R. 27.1(d)(2) and (4). *Cf.* Appellants' filing in Docket No. 22-2379, Motion for a Stay, ECF #16, cover sheet ("request that an interim administrative stay be granted by the end of the day on Tuesday (10/11)."). Nor does Appellants' motion provide any explanation of "the nature of the emergency and the harm that the movant will suffer if the motion is not granted" (L.R. 27.1(d)(3)), alleging only that the district court's order "risks substantial harm." Motion at 15. *Cf.* Docket 22-2379, Motion for a Stay at 2, 3, 20 (alleging

"serious risk of irreparable harm," "substantial risks to public safety," and "imminent risk to public safety.").

Despite those deficiencies, a three-judge panel of this Court – without response from or notice to Appellees[1] – granted a "temporary stay" on November 15, 2022. Doc. #32. Problematically, that Order *provides Appellants broader relief than they sought*, granting a "temporary stay … of the preliminary injunction issued by the district court." *Id*. In contrast, Appellants' Motion made clear that they are *not seeking to stay* every part of the district court's injunction. *See* Motion at 13 n.5 (seeking a stay for churches "*except as to* persons who have been tasked with the duty to keep the peace," "Appellants *do not seek a stay* as to airports" and "private buses.") (emphasis added).

Rather than waiting to hear from Appellees, the Court *sua sponte* stayed injunctive relief even as to matters *where no stay was requested*. Moreover, in issuing this broad administrative stay, this Court *altered the status quo* in New York

---

[1] This Court's administrative stay was issued notwithstanding that undersigned counsel inquired on November 14, 2022 as to whether the Court would be treating Appellants' Motion as an "emergency" motion, and notwithstanding the fact that there was no mention of any emergency in the body of Appellant's actual Motion. Contrast treatment of this motion with the prior "emergency" request from Appellees (22-2379) where, within hours of filing, the Clerk's office contacted undersigned counsel on a federal holiday (October 10, 2022) and requested that Appellees file a response by noon that next day (October 11, 2022), so the Court would have Appellees' response prior to deciding the administrative stay. No such instruction was given to Appellees in this appeal, and undersigned's voicemail was not returned.

(*see* Motion at 14), allowing non-appealed provisions of the CCIA back into effect thereby causing the very harm of which Appellants complain. *See id.* at 2 (alleging "confusion … resulting from the frequent changes in the applicable provisions of law….").

**Appellees oppose both stays** sought by Appellants (including the administrative stay already issued), and ask this Court to deny Appellants' Motion in its entirety. In their Motion, Appellants generally malign the district court's preliminary injunction, but fail to note that the CCIA is no ordinary law – breathtaking in both its scope and its blatant unconstitutionality. The district court was correct to enjoin enforcement of many of the CCIA's patently unconstitutional provisions, and this Court should (i) decline Appellants' invitation to be the first circuit court to bless a statute specifically enacted to defy *Bruen*, (ii) vacate its improvidently granted administrative stay, and (iii) deny Appellants' Motion.

## ARGUMENT

### I.    The Preliminary Injunction Should Not Be Stayed Pending Appeal

When considering an application for a stay, this Court utilizes a four-factor test, with the first two being the "most critical." *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020). The relevant factors to be considered are

"[i] the applicant's strong showing that [they are] likely to succeed on the merits,[2] [ii] irreparable injury to the applicant in the absence of a stay, [iii] substantial injury to the nonmoving party if a stay is issued, and [iv] the public interest." *Id.* A stay "is not a matter of right, *even if* irreparable injury might otherwise result;" rather "it is an exercise of judicial discretion, and [t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (emphasis added). Finally, where (as here) an applicant is "totally lacking" a strong showing of likelihood of success, "the aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a stay." *Id.* at 49.[3] Appellants fail all four factors.

---

[2] The district court expressly found that *Appellees* are likely to prevail on the merits of several (but not all of) their claims. Op. at 87-122. To find that the merits inquiry here actually swings in favor of *Appellants*, this Court would be required to find that the district court erred on each of those findings (as well as ignoring Appellants' apparent concession that the district court *did not err* on at least some issues, *see* Motion at 13 n.5). A "grant of a preliminary injunction is reviewed on appeal for abuse of discretion ... which will be found if the district court 'applies legal standards incorrectly or relies upon clearly erroneous findings of fact' ... or 'proceeds on the basis of an erroneous view of the applicable law.'" *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 398 (2d Cir. 2004) (citations omitted). At bottom, "[a]buse of discretion is a high standard." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 194 (2d Cir. 2018).

[3] Appellants rely on *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) for the proposition that the "required chance of success on the merits [is] inversely proportional to the strength of the equities for a stay." Motion at 13-14. However, *Thapa* was decided prior to *Nken v. Holder*, 556 U.S. 418 (2009), which **requires** a "strong showing" that the applicant is "likely to succeed on the merits." *Nken* at 434. Appellants have not made this showing, instead relying on the purported strength of their arguments under the "three equitable criteria..." Motion at 14.

## A.     The Equitable Factors Do Not Support a Stay.

Even though their likelihood of success is the "most critical" issue, Appellants address it last, preferring to focus on the three equitable factors, blending them as a group and **entirely omitting** any discussion of factor (3), the risk of "substantial injury to [Appellees] if a stay is issued."[4]  *See* Motion at 13-19.  Appellants' failure not only to demonstrate, but even to allege, that their speculative harms outweigh the real and concrete risk of irreparable harm to Appellees, should be fatal to Appellants' Motion.[5]

### 1.  Appellants Will Suffer No Harm Without a Stay.[6]

---

[4] Appellants' only mention of harm to Appellees is when they state that the district court "found that plaintiffs' … established their own irreparable injury."  Motion at 17.

[5] *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674 (Bankr. S.D.N.Y. 2016) (explaining that, as of 2016, "Certain courts in this Circuit have held that the inquiry involves a balancing of the four factors and '[t]he lack of any one factor is not dispositive to the success of the motion,' while others have held that, to be successful, the party must show 'satisfactory evidence on all four criteria.'"); *but see Barretta v. Wells Fargo Bank, N.A.*, 693 Fed. Appx. 26, 27 (2d Cir. 2017) ("When deciding a motion for a stay pending appeal, a court **must consider** four factors….") (emphasis added); *see also ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, 361 B.R. 337, 349, n. 47 (S.D.N.Y. 2007) ("In addition to showing irreparable harm, the party seeking a stay must also establish that the non-moving party or other parties will not suffer substantial harm if the stay is granted.")

[6] Although Appellants acknowledge they must show that harm "will be *certain* and irreparable," they do not even bother to make such an allegation, claiming only that the district court's injunction "*risks* substantial harm," and that licenses "*may* be granted" to people lacking good moral character.  Motion at 14-16 (emphasis added).

The district court's order will cause no harm to Appellants, as many of the CCIA's provisions – which have been in effect barely over two months – are entirely novel in New York law, as well as lacking any historical analogue. For example, prior to September 1, 2022, those with valid carry licenses could *and did* carry concealed handguns in most of the locations that the CCIA now declares verboten. Indeed, even under the PI, not anyone may carry a firearm in such locations, but only those who have gone through a significant screening process to obtain a carry license. This is the same group of persons who *have always carried* in these locations, and who *have already demonstrated* to the state's satisfaction that they are law-abiding, trained, responsible gun owners. The sky did not fall prior to the CCIA's enactment, and the sky is not falling now. Rather, the PI merely returns the state of the law to what it was just over two months ago.

Focusing on fantastically speculative claims of harm to themselves and the public, Appellants first assert that "public agencies" – presumably including entities who are *not* litigants in this case and who are *not* appellants here – "have devoted significant effort to implementing the law and informing the public about it." Motion at 15. Yet Appellants identify no "efforts" whatsoever taken by Appellants Acting-Superintendent Nigrelli or Judge Doran, but instead rely on "efforts" by (i) New York State (not a defendant here) by construction of a website listing frequently asked questions; (ii) New York City (also, not a defendant here) by issuing a press

release; and (iii) New York City's (again, not a defendant here) by using laminated paper and zip ties to put up some "gun free zone" signs around Times Square.[7] Motion at 15, n.6. Appellants claim that, "if the injunction remains operative, **these agencies**" will need to communicate with the public "that guns are allowed in many places where the public was just told guns are *not* allowed." *Id*. at 15 (emphasis added). These allegations hardly suffice to show that irreparable harm will befall Appellants if the district court's injunction remains in effect.

First, this Court's standard for a stay requires a showing of "irreparable harm **_to the movant_**, not speculative harm to *other entities* who are not even parties in the case. Second, even if Appellants had alleged any sort of harm *to themselves*, the minor inconvenience associated with communicating to the public that an unconstitutional law has been enjoined – and that the status quo has returned to how things have always been in New York – hardly constitutes *irreparable* harm justifying a stay. Third, nothing in the district court's preliminary injunction required Appellants to do anything, but only to stop enforcing an unconstitutional law. Op. at 182-184. Fourth, to the extent that Appellants chose to *voluntarily* "harm" themselves by communicating with the public about the legality of concealed carry following the district court's order (which they do not even allege

---

[7] Yet the district court *did not enjoin* the CCIA's ban on firearms in Times Square, so the City's paper signs and zip ties can remain in place. Op. at 80-81.

that they have done), self-inflicted harm does not suffice. Fifth, the district court's order was in effect for over a week (before it was administratively stayed by this Court), meaning Appellants ostensibly would have *already* suffered the alleged harm of having to tell New Yorkers that the CCIA is unconstitutional – and harm *which has already occurred* is no basis for a future stay of the district court's injunction. Thus having failed entirely to allege that *they themselves* will suffer any harm at all, Appellants fail this factor.

### 2. The Public Interest Does Not Support a Stay.

Regarding public interest, Appellants first claim that the "injunction risks substantial harm" because they no longer may enforce the requirement that a person demonstrate his "'good moral character'" to the satisfaction of government officials prior to exercising an enumerated right. Motion at 15. Appellants claim that "good moral character … has supported the disqualification of domestic abusers and individuals subject to orders of protection," but that now "concealed-carry licenses may be granted to people lacking" such character. *Id*. at 15-16; *see also* at 1-2 ("will require the issuance of licenses to people with a demonstrated propensity to misuse firearms"). Of course, "domestic abusers" and those under "orders of protection" are *already* prohibited by both state and federal law from possessing firearms, prohibitions unaffected by the district court's injunction. *See* 18 U.S.C. § 922(g)(8) and (9); *see also* N.Y. Fam. Ct. Act § 842-a. Moreover, as the district court opined,

a statute which denied licenses to those "who have been found, based on their past conduct, to be likely to use the weapon in a manner that would injure themselves or others" would be an "objective … standard … easily applied." Op. at 103. Even if that was so, the CCIA is not such a statute. Appellants' rampant speculation about the parade of evils that will follow elimination of the CCIA's grant of open-ended discretion to government officials to adjudge the "good moral character" of otherwise law-abiding persons finds no support in law or fact.

Second, Appellants claim that the district court's injunction halting enforcement of some of the CCIA's ban on firearm possession in ordinary, everyday locations (such as grocery stores, restaurants, vast and uninhabited expanses of wilderness, and even private homes and property) will "increas[e] the chance that someone … will carry a loaded gun into a park, bar, restaurant, theater, or political protest." Motion at 16. But regardless of New York's disdain for the Second Amendment, the mere presence of "the people … bear[ing] arms" (*i.e.*, exercising a constitutional right) cannot possibly be deemed a public safety threat.

Third, Appellants claim that more firearms lawfully carried in public[8] creates some mathematically measurable, statistical potential to cause a "shooting death

---

[8] Even in the absence of the CCIA's unconstitutional ban on firearms in entirely ordinary and non-sensitive places, property owners (businesses, homeowners, *etc.*) continue to possess complete control as to the bearing of arms on their property. Appellants admit as much. Motion at 23 ("In New York, it has long been a crime to remain in a building with an operable firearm after a direction to leave.").

(intentional or inadvertent).…"[9]  Motion at 16; *see also* at 17 ("[e]xposing eighteen million New Yorkers to a heightened risk of gunfire").  Appellants do not allege that such an event is certain or even likely to occur, but only that it is *theoretically possible*.  Notably, Appellants *do not allege* that there is any measurable risk of harm to public safety caused by *law-abiding gun owners* (who have been stringently vetted and licensed) – millions of whom routinely carry their firearms throughout the country every day, while peaceably going about their daily lives.

Nor do Appellants explain how any of the CCIA's prohibitions on firearm possession will stop any *actual* criminal from committing a violent act, ignoring that criminals do not obey the law, and that for New York's entire history prior to the Supreme Court's ruling in *Bruen*, permit holders routinely carried firearms into the places that are suddenly now deemed "sensitive."  Nor, unsurprisingly, do Appellants address the flip side of the coin, including the beneficial effects on public safety of widespread gun ownership, such as explained in a recent study which "estimates that guns are used defensively by firearms owners in approximately 1.67

---

[9]  Appellants claim that "the district court previously acknowledged … an 'associational relationship between some lenient right-to-carry laws and violent crime.'"  Motion at 16.  On the contrary, the district court merely noted that "Defendant's supporting amicus briefs … seem to establish" such a relationship, yet reached quite the opposite conclusion – that "the undersigned is left with a strong sense of the safety that a licensed concealed handgun regularly provides," and that this enhanced public safety "would tip the scales in favor of granting Plaintiffs' motion…."  *Antonyuk v. Bruen* ("*Antonyuk I*"), No. 22-cv-734 (N.D.N.Y.), Decision and Order, ECF #48 at 77-78.

million incidents per year."[10]  Of course, either way "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications." *Bruen* at 2126 n.3.[11]  Enjoining an unconstitutional statute is *always* in the public interest,[12] notwithstanding that the state may be upset that its new law has been declared unconstitutional.

Fourth, Appellants grouse that the district court issued its preliminary injunction "on a truncated timeframe…."  Motion at 17-19.  It is entirely unclear what relevance the district court's briefing schedule has to the three "equitable factors," but even so, that harm is in the past, not occurring now or likely to occur in the future.  Nevertheless, Appellants object that they had "less than three weeks in total" to mount their defense.  On the contrary, as Appellants (with their army of 650 lawyers and 1,700 staff)[13] acknowledge, the original complaint in *Antonyuk I* was filed "[t]en days after the CCIA's enactment," on July 11, 2022.  Motion at 6.  Appellants thus have had *more than fifteen weeks* (106 days) to craft their defense prior to the district court's hearing on Appellees' preliminary injunction motion on

---

[10] W. English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned," Georgetown McDonough School of Business Research Paper No. 4109494, Georgetown University, May 18, 2022.

[11] *Bruen* at 2158 n.1 (Alito, J., concurring) (citing studies finding that "'[t]he overwhelming weight of statistical analysis on the effects of [right-to-carry] laws on violent crime concludes that RTC laws do not result in any statistically significant increase in violent crime rates.'").

[12] *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

[13] https://ag.ny.gov/bureaus.

October 25, 2022. In comparison, the New York legislature took *only eight days* to draft, finalize, and enact the CCIA, and Governor Hochul promised enactment occurred only after "a close review of the *NYSRPA vs. Bruen* decision and extensive discussions with constitutional and policy experts, advocates, and legislative partners…."[14] The district court's briefing schedule below provides zero justification for a stay of its preliminary injunction now.

*Even if* Appellants had articulated some possible public safety benefit to enforcing their unconstitutional new legislation, it would come at the unacceptably high cost of disarmament of law-abiding gun owners. *See McDonald v. Chicago*, 561 U.S. 742, 783 (2010). Enumerated rights cannot be balanced away by legislators or judges, because "the Second Amendment is … the very product of an interest balancing by the people…." *D.C. v. Heller*, 554 U.S. 570, 635 (2008). Nor can Appellants plausibly claim irreparable harm from enjoining enforcement of an unconstitutional law: "the public consequences in employing the extraordinary remedy of [injunctive relief]" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment. *Yang v. Kosinski*, 960 F.3d 119, 135-136 (2d Cir. 2020). Indeed, it is *always* in the public interest to enjoin an unconstitutional law. *See, e.g., N.Y. Progress & Prot. PAC v. Walsh* at 488.

---

[14] https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

### 3. A Stay Will Cause Appellees Serious and Irreparable Harm.

Appellants ignore this factor, as it weighs decidedly against them, yet there are numerous irreparable harms that are likely to befall Appellees if the district court's order is stayed pending appeal. Plaintiff Mann, for example, lives on church property in a parsonage owned by and physically connected to the church. ECF #1-9, ¶12. The CCIA, however, makes it a felony for the Pastor to keep a handgun for self-defense in *his own home*, and the only way to comply is for Pastor Mann *to hand over his guns to the government*. Next, Plaintiff Terrille is unable to travel with a firearm in his checked luggage (ECF #1-10, ¶9), as the CCIA makes airports off limits to firearms, even when travelers comply with federal law and TSA regulations. Finally, Plaintiff Johnson will be committing a felony if he so much as sits down at a restaurant that serves alcohol (ECF #1-3, ¶11), something entirely routine and commonplace in New York before the CCIA's repudiation of *Bruen*. If any of these or the other Plaintiffs in this case engage in any of these quite reasonable and previously lawful behaviors, they will be committing *felonies*, run the risk of likely arrest and prosecution by authorities, and the accompanying loss of the very Second Amendment rights they seek to exercise.[15]

---

[15] The "irreparability of harm may not be casually suspended pending appeal." *Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1998). Thus, "the grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm…." *Id.*

**B. The District Court's Merits Determinations Withstand Review.**

Addressing the likelihood of success factor last, Appellants make several claims. First, Appellants continue to assert that Appellees failed to make the required showing under *Bruen* that "the Second Amendment's plain text covers [their] conduct" and thus that "the Constitution presumptively protects that conduct." *Bruen* at 2126; Motion at 19, 22, 25. But Appellees have fully explained how they, their firearms, and their activities are unambiguously within the scope of the Second Amendment, as the *Heller* and *Bruen* decisions unequivocally demonstrate (i) that "the People" includes the law-abiding, adult plaintiffs here; (ii) that "arms" unequivocally includes Appellees' handguns, and (iii) that "bear[ing] arms" unequivocally includes concealed carrying handguns in public for self-defense. Complaint ¶¶37-40, 235-237; Motion for TRO at 33 n.36. Likewise, the district court concluded that "the Second Amendment's plain text covers the conduct in question" in a variety of instances. Op. at 90, 123, 129, 135, 144, 146, 151, 155, 159. The simplicity and brevity of the analysis does not mean it is erroneous or insufficient. Indeed, the Supreme Court has conclusively held that ordinary citizens have a right to carry "handguns publicly for self-defense." *Bruen* at 2134.

Thus recognizing that they cannot hope to meet their burden to justify the CCIA under *Bruen*, Appellants wrongly conflate their burden with, and attempt to shift their burden to, Appellees – arguing Appellees must prove that the Second

Amendment specifically protects each and *every* place they wish to carry before the government can be required to provide historical analogues justifying *any* restriction. Motion at 22 ("carrying weapons onto private property without affirmative consent"); at 25 ("plausibly encompassed any of the challenged sensitive locations"). According to Appellants, for example, until Appellees prove conclusively that the Second Amendment extends to carrying a firearm *into a restaurant*, the state need not provide historical analogues justifying the CCIA's ban on firearms in restaurants. That is obviously not how *Bruen* works.

On the contrary, it is enough that the CCIA deprives law-abiding members of "the people" the right to "bear" (carry on their person) handguns that are quintessential self-defense "arms." No further showing is required. *Bruen* at 2126. Requiring Appellees to demonstrate the negative (that there is no historical analogue) before requiring Appellants to show that there are analogues puts the *Bruen* cart before the horse.

Second, Appellants cast various aspersions against the district court's determinations as to standing. Motion at 20, 24. But the district court's careful, lengthy (184-page) opinion speaks for itself, going into elaborate detail as to the standing for *each particular plaintiff* with respect to *each particular provision* of the CCIA, and ultimately finding standing with respect to several challenged provisions, and a lack of standing with respect to others. It is simply beyond the pale for

Appellants to demand that this Court use an axe where the district court carefully used a scalpel, upsetting the trial court's extensive factual findings and nuanced legal conclusions.

Third, Appellants claim that the provisions of the CCIA are generally constitutional and "fully comport[] with *Bruen*," on the audacious theory that they mirror "several of the 'shall-issue' regimes that ***Bruen* endorsed**...." Motion at 21 (emphasis added). But *Bruen* did not "*endorse*" any law from any state, as the case ruled on only a narrow challenge to one aspect of New York's concealed carry regime (which was struck down), and provided a framework to be used in future Second Amendment cases. While *Bruen* certainly cautioned that its holding should not "be interpreted to suggest the ***un***constitutionality" of the laws of other states (*id.* at 2138 n.9), it certainly did not thereby "endorse" the ***constitutionality*** of any other statute (none of which was before the Court). As the district court noted, Appellants' claim that *Bruen* "endorsed" the CCIA "is just disingenuous." PI Tr. 60:10-15. Nevertheless, Appellants continue to peddle this "disingenuous" claim here.

Fourth, Appellants rely on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) for the proposition that a "'legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety.'" Motion at 21. Remarkably, Defendants omit Judge Barrett's previous points – first, "that power extends only to people who

are dangerous … [f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons," and second, that there is no "evidence the founding-era legislatures imposed virtue-based restrictions on the right." *Kanter* at 451. Read in context, Judge Barrett's statements undercut Defendants' position.

Fifth, Appellants generally express disagreement with the district court's legal conclusions (applying the *Bruen* framework) that the majority of the CCIA's provisions have no sufficient historical analogues and therefore are unconstitutional. Motion at 21, 23, 25-26. With little rebuttal or analysis, Appellants generally claim that the district court "repeatedly discard[ed] relevant historical precedents" and "invent[ed] a metric of representativeness and rel[ied] on speculative hypotheticals."[16] Motion at 25. Appellants' criticism is that the district court did not provide sufficient leeway in permitting Appellants to justify the CCIA's restrictions based on (1) one or two transient laws of non-state territories, (2) the ordinances of a few cities with statistically insufficient geography and population, and (3) laws based racial or religious animus that disarmed *select categories* of disfavored persons, but were never applied to the population at large. Motion at 21,

---

[16] Appellants claim that they were deprived of a "fair opportunity to address the methodology or interpretation of census data." Motion at 26. Yet both the *Bruen* majority and the dissent utilized such data as a metric. *See Bruen* at 2154, 2156 and dissent at 2168, 2173. Appellants' claim of surprise demonstrates their unfamiliarity with *Bruen*.

23, 25-26. Indeed, when the district court rejected Appellants' purported analogues it was because *Bruen* had explicitly rejected them – in fact, the Supreme Court *specifically rejected* some of the *exact same* historical sources on which New York again seeks to rely. The district court's faithful application of *Bruen* is hardly justification for a stay pending appeal.

## II.     The District Court Properly Provided Statewide Relief.

As an alternative argument, Appellants propose that the district court's order "should be narrowed to apply only to plaintiffs, which would suffice to prevent any alleged harms for which they have standing." Motion at 27. On the contrary, Appellants' proposal would not provide full relief *even to Appellees*, such as Plaintiff Terrille, whose flight to Tennessee may encompass other federal districts within the state (ECF #1-10 ¶9), and Plaintiff Johnson, who has planned an upcoming trip to various state parks across New York. ECF #1-3 ¶9. Indeed, Appellees need complete relief from the CCIA's unconstitutional provisions, which means relief across the State. *See Russman v. Bd. of Educ.*, 260 F.3d 114, 120 (2d Cir. 2001). Since the district court found that many of the CCIA's provisions are facially unconstitutional (in every application), they should be enjoined everywhere. *See also Hardaway v. Nigrelli*, 22-cv-771 (W.D.N.Y. Nov. 3, 2022) (issuing statewide injunction, on appeal to this Court in 22-2933).

## CONCLUSION

Appellants' requests for a stay and administrative stay should be denied.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com


Dated: November 19, 2022

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of Microsoft Word 365, the document contains 5,197 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh