# 22-2908(L)

## 22-2972(Con)

# United States Court of Appeals for the Second Circuit

---

IVAN ANTONYUK,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendants-Appellants.*

---

(Caption continues inside front cover.)

---

On Appeal from the United States District Court
for the Northern District of New York

---

**JOINT APPENDIX**
**Volume 3: Pages 519-end**

---

STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440

WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Ste. 4
Vienna, VA 22180
(703) 356-5070

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-8020

*Attorney for Appellants Nigrelli and Doran*

SUSAN R. KATZOFF
  *Corporation Counsel*
  *City of Syracuse*
233 East Washington Street
300 City Hall
Syracuse, NY 13202
(315) 448-8400

*Attorneys for Appellees*                    *Attorney for Appellant Cecile*

(*Caption continues from front cover.*)

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants*.

# TABLE OF CONTENTS

**Page**

**Volume 1**

Docket sheet ...................................................................................................1

Complaint, dated Sept. 20, 2022 .................................................... 17

Declaration of Stephen D. Stamboulieh, dated Sept. 20, 2022 ...................... 90

    Ex. 1  - Bill, N.Y. Legislative Bill Drafting Commission
            No. 12053-04-02 .............................................................. 92

    Ex. 2  - Declaration of Corey Johnson, dated Sept. 14, 2022 ................ 134

    Ex. 3  - Declaration of Lawrence Sloane, dated Sept. 19, 2022 ............ 143

    Ex. 4  - Declaration of Leslie Leman, dated Sept. 19, 2022 .................. 152

    Ex. 5  - Letter from City of N.Y., License Division, to "Licensee,"
            dated Aug. 31, 2022 ...................................................... 160

    Ex. 6  - N.Y.C. Police Department, Office of Deputy Commissioner-
            Legal Matters, "New York State Restrictions on Carrying
            Concealed Firearms," Legal Bureau Bulletin, vol. 51, no. 2
            (Aug. 2022) ................................................................. 161

    Ex. 7  - Declaration of Ivan Antonyuk, dated Sept. 19, 2022................ 166

    Ex. 8  - Declaration of Pastor Joseph Mann, dated Sept. 19, 2022........ 174

    Ex. 9  - Declaration of Alfred Terrille, dated Sept. 19, 2022.................. 186

Motion for a Temporary Restraining Order, Preliminary Injunction,
and/or Permanent Injunction, dated Sept. 22, 2022..................................... 197

Declaration of Todd M. Long [in Opposition], dated Oct. 13, 2022............... 213

    Ex. 1  - Property Description Report For: 201 Coleridge Ave,
            Municipality of City of Syracuse................................................ 217

i

# TABLE OF CONTENTS

**Page**

**Volume 1**

Declaration of Todd M. Long [in Opposition] (*continued*)

Ex. 2 - County of Onondaga tax map for Tax ID 098.2-01-02.1............ 220

Ex. 3 - Onondaga County Parks, *Parks* (2022) (webpage
downloaded Oct. 12, 2022)........................................... 222

Ex. 4 - Onondaga County Parks, *Park Rangers* (2022) (webpage
downloaded Oct. 12, 2022)........................................... 225

Ex. 5 - Image from Longhorn Steakhouse, *Restaurant Locations*
(2022) (webpage search result for "Syracuse, New York,
United States," Oct. 12, 2022)..................................... 231

Ex. 6 - Douglass Dowty, *Syracuse DA, police chief: We won't target
gun owners under new law, but will take guns*, Post-
Standard (Syracuse.com) (Sept. 2, 2022).................................... 233

Ex. 7 - City of Syracuse Zoning Atlas Map #5 (updated Aug. 2021)..... 245

Declaration of Julie LaFave [in Opposition], dated Oct. 11, 2022............... 247

**Volume 2**

Declaration of James M. Thompson [in Opposition], dated Oct. 13, 2022 ... 249

Ex. 1 - *The Laws and Liberties of Massachusetts* (Harvard Univ.
Press 1929) (1648)........................................................ 261

Ex. 2 - Ch. 506 (1763), *in 6 Penn. Stat. at Large from 1682-1801*, at
319 (J.T. Mitchell & H. Flanders, comp., 1899) ........................ 272

Ex. 3 - Act No. 23 (1619), 1 *Virginia Statutes at Large* 255
(W. W. Hening, ed., 1823)............................................ 276

ii

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 4 - Ch. No. 4 (1756), 7 *Virginia Statutes at Large* 35
(W. W. Hening, ed., 1823)............................................................ 279

Ex. 5 - Order No. 354 (Nov. 20, 1637), 1 *Records of the
Governor and Company of the Massachusetts Bay* 211
(N. B. Shurtleff ed., 1853)........................................................ 285

Ex. 6 - City of London Militia Act (1662), 14 Car. II c. 3,
5 Statutes of the Realm 358 (1819)........................................... 289

Ex. 7 - Ch. 7, 1776 Mass. Acts [31], 32 (Mar. Sess.) ........................... 297

Ex. 8 - Ch. 21, 1777 Pa. Laws 61 ....................................................... 303

Ex. 9 - Ch. 20 (Oct. Sess. 1777), *Laws of Maryland, Made Since*
[*1763*] [n.p.] (A. Hanson ed., 1787)........................................ 309

Ex. 10 - Ch. 6 (1777), 1 *Public Acts of the General Assembly of
North Carolina* 229 (F.-X. Martin revisor, 1804)..................... 314

Ex. 11 - Ch. 3 (May Sess. 1777), 9 *Statutes at Large of the Laws of
Virginia* 281 (W.W. Henig ed., 1821)....................................... 318

Ex. 12 - Order (Mar. 27, 1776), 1 *Journals of the Provincial
Congress, Provincial Convention, Committee of Safety, and
Council of Safety of the State of New York* [388], 389 (1842) .... 321

Ex. 13 - Ch. 25 (9th Sess. 1786), 1 *Laws of the State of N.Y.* 227
(T. Greenleaf ed., 1792) .......................................................... 322

Ex. 14 - Ch. 55 (1780), 1 *Laws of the State of New York* 237
(Weed, Parsons & Co. printer, 1886) ...................................... 332

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 15 - Ch. 27 (1782), 1 *Laws of the State of New York* 440
(Weed, Parsons & Co. printer, 1886) ........................................ 344

Ex. 16 - Ch. 187, 1806 N.J. Laws 536.................................................... 361

Ex. 17 - Ch. 274 (1822), *General Laws of Pennsylvania* 316
(J. Dunlop comp., 1846) ............................................... 394

Ex. 18 - Ch. 159, 27 Stat. 116 (1892) ...................................... 430

Ex. 19 - N.Y.C. Ordinance, Ch. 8, art. 27, *Ordinances of the Mayor,
Aldermen and Commonalty of the City of New York, In
Force January 1, 1881* (E.F. Shepard & E.B. Shafer
revisors, 1881) .............................................................. 433

Ex. 20 - Legislative history for N.Y.C. General Ordinance 43 (1878),
149 *Proceedings of the Board of Aldermen of the City of New
York* 59-60, 367-69, 460-63, 612-16............................................ 437

Ex. 21 - *Liber Albus: The White Book of the City of London*
(H.T. Riley trans., 1861) (1419)................................................... 452

Ex. 22 - William Hawkins, 1 *A Treatise of the Pleas of the Crown*
134-40 (1716) .............................................................. 456

Ex. 23 - Act of June [21], 1879 Ohio Laws 191 ...................................... 464

Ex. 24 - Ch. 186, 1879 Tenn. Pub. Acts 231 (1st Sess.) ........................... 466

Ex. 25 - Ch. 52 (1875), Wyo. Compiled Laws 352 (1876)........................ 468

Ex. 26 - Act No. 96, 1881 Ark. Acts 191 ................................................. 469

Ex. 27 - Ch. 34, 1871 Tex. Gen. Laws 25 (1st Sess.)................................ 471

iv

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 28 - Brooklyn, N.Y., Ordinance to Regulate the Carrying of Pistols (Oct. 19, 1880), *in Brooklyn Daily Eagle*, Oct. 26, 1880, [n.p.] ..... 474

Ex. 29 - Ch. 105, 1891 N.Y. Laws 127 .................................................... 476

Ex. 30 - Elmira, N.Y., Ordinance (July 18, 1892), *in Elmira Gazette*, July 28, 1892, [n.p.] ..................................................... 480

Ex. 31 - Syracuse, N.Y., Ch. 509 (1892), Charter & Ordinances of City of Syracuse (N.Y.) 242 (1894 Supp.) ................................... 483

Ex. 32 - Troy, N.Y., Ordinance Regulating the Carrying of Loaded Firearms, 1905 Mun. Ordinances 425 ....................................... 486

Ex. 33 - Lockport, N.Y., Penal Ordinance No. 35 (1909*),* Revised Charter & Ordinances 336 (1913) ............................................. 489

Ex. 34 - Albany, N.Y., Ch. 72 (1905), Mun. Code 849 (1910) ................. 492

Ex. 35 - Ch. 55 (1780), 1 *Laws of the State of New York* 237 (Weed, Parsons & Co. printer, 1886) (*reproduced at JA332-343*)

Ex. 36 - Omaha, Neb., Ch. 31, Comp. Ordinances 69 (1881) ................. 495

Ex. 37 - Ch. 33, 1 Stat. 271 (1792) ........................................................ 498

Ex. 38 - Ch. 187, 1806 N.J. Laws 536 (*reproduced at JA361-393*)

Ex. 39 - Ch. 1 (1785), 12 *Virginia Statutes at Large* 9 (W. W. Hening, ed., 1823) ............................................................ 502

# TABLE OF CONTENTS

**Page**

**Volume 3**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 40 - Texas H.R. Investigative Comm. on the Robb Elementary
Shooting, *Interim Report*, 88th Leg. (2022) ............................... 519

Ex. 41 - Ch. 46, 1870 Tex. Gen. Laws 63 (Called Sess.) ......................... 601

Ex. 42 - Ch. 22, 1869 Tenn. Pub. Acts 23 (36th Assembly, 1st Sess.) .... 604

Ex. 43 - Act No. 285, 1870 Ga. Laws 421 ................................................ 607

Ex. 44 - Act re Concealed Weapons, 1883 Mo. Laws 76 ........................ 610

Ex. 45 - Idaho Penal Code § 4781 (1901) ................................................ 612

Ex. 46 - Act No. 13, 1889 Ariz. Terr. Sess. Laws 16 ............................... 615

Ex. 47 - Okla. Terr. Stat. ch. 25, art. 47 (1891) ...................................... 619

Ex. 48 - Del. Const. art. 28 (1776) ........................................................... 622

Ex. 49 - Ch. 1 (1787), 2 *Laws of the State of New York* 344
(Weed, Parsons & Co. printer, 1886) ......................................... 623

Ex. 50 - Act No. 810, 1873 Pa. Stat. 735 ................................................. 625

Ex. 51 - Ch. 7, 1877 Va. Acts [301], 304-06 (1877-1878 Assembly,
2d Sess.) ...................................................................................... 628

Ex. 52 - Ch. 46, 1878 Miss. Laws 175 ..................................................... 632

Ex. 53 - Ch. 240 (1837), Mass. Rev. Stat. 54
(Dutton & Wentworth printer, Supp. 1844) ............................... 635

Ex. 54 - Ch. 276, 1837 Me. Pub. Laws [421], 423-25 ............................. 639

vi

# TABLE OF CONTENTS

**Page**

**Volume 3**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 55 - Act to Regulate the Militia, 1843 R.I. Pub. Laws app. 1 (June Sess.) ................................................................ 644

Ex. 56 - Ch. 49, 1786 Va. Acts 35 ............................................. 670

Ex. 57 - Central Park Bd. of Comm'rs (N.Y.C.), *Fourth Annual Report* 106 (Jan. 1861) ................................................ 671

Ex. 58 - Comm'rs of Fairmount Park (Phila.), *First Annual Report* (1869) ......................................................................... 673

Ex. 59 - City of St. Paul, Minn., City Officers & City Bds., *Annual Report: Fiscal Year Ending Dec. 31, 1888* (1889) ......... 679

Ex. 60 - Local Act No. 436, 1895 Mich. Pub. Acts 591 ............................ 681

Ex. 61 - Ch. 12, 1867 Kan. Sess. Laws 25 ................................... 690

Ex. 62 - Wis. Stat. § 4397b (1889) ........................................... 692

Ex. 63 - Ch. 246 (1721), 3 *Pennsylvania Statutes at Large* 254 (J.T. Mitchell & H. Flanders comp., 1896) ................................ 695

Ex. 64 - Ch. 26 (1715), 1 *Maryland Laws* 88 (V. Maxcy ed., 1811) ......... 700

Ex. 65 - Ch. 1233 (1763), 2 *Laws of New York from 1691–1773*, at 441 (1774) .................................................................. 704

Ex. 66 - Ch. 35 (1722), *Acts of the General Assembly of New Jersey* 100 (S. Nevill comp., 1752) ........................................ 708

Ex. 67 - Ch. 540 (1771), *Acts of the General Assembly of New Jersey* [343], 344 (S. Alinson comp., 1776) ............................ 712

vii

# TABLE OF CONTENTS

**Page**

**Volume 3**

Declaration of James M. Thompson [in Opposition] (*continued*)

Ex. 68 - Act No. 10, 1865 La. Acts 14 (Extra Sess.) ................................ 719

Ex. 69 - Tex. Code § 6510, 2 Paschal's Digest 1321 (4th ed. 1874) ......... 725

Ex. 70 - Act of Feb. 20, 1893 Or. Laws 79 .............................................. 739

Ex. 71 - Ch. 7 (1728), 1 *The Laws of Maryland* 186
(V. Maxcy ed., 1811)....................................................................... 740

Ex. 72 - Ch. 127, 1875 Tenn. Pub. Acts 213 ........................................... 743

Ex. 73 - Ill. Rev. Stat. ch. 61, §§ 11-13 (1889) ........................................ 747

Ex. 74 - Chicago Muni. Code art. 43 (1881) ............................................ 748

Ex. 75 - Salt Lake City, Revised Ordinances ch. 27 (1888).................... 753

Ex. 76 - Tower Grove Park Bd. of Comm'rs, Rules and Regulations,
*in* David H. MacAdam, *Tower Grove Park of the City of
St. Louis* (1883) ............................................................................ 757

Ex. 77 - Pittsburgh Gen. Ordinances, *Bureau of Parks*, p. 496
(2d ed. 1897) ............................................................................... 761

Ex. 78 - Ch. 22, 1778 N.J. Laws 42 (2nd Assembly) ............................... 767

Ex. 79 - Ch. 1, 1775 Mass. Acts 15........................................................... 782

Notice of Appeal (Nigrelli and Doran), dated Nov. 8, 2022 ......................... 790

Notice of Appeal (Cecile), dated Nov. 18, 2022 ............................................ 792



# Texas House of Representatives

## Investigative Committee
### *on the* Robb Elementary Shooting

**Representative Dustin Burrows,** Chair
**Representative Joe Moody,** Vice Chair
**The Honorable Eva Guzman,** Member



July 17, 2022

**HOUSE INVESTIGATIVE COMMITTEE
ON THE ROBB  ELEMENTARY SHOOTING
TEXAS HOUSE OF REPRESENTATIVES
INTERIM REPORT 2022**

**A REPORT TO THE
HOUSE OF REPRESENTATIVES
88TH TEXAS LEGISLATURE**

**DUSTIN BURROWS
CHAIR**

**COMMITTEE CLERK
PAIGE HIGERD**



Investigative Committee On
the Robb Elementary Shooting

July 17, 2022

Dustin Burrows                                                                P.O. Box 2910
Chair                                                              Austin, Texas 78768-2910

The Honorable Dade Phelan
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The Investigative Committee on the Robb Elementary Shooting of the Eighty-seventh Legislature hereby submits its interim report for your consideration.

Respectfully submitted,

Rep. Dustin Burrows

Rep. Joe Moody                                                 Justice Eva Guzman

Vice-Chairman: Joe Moody
Members: Justice Eva Guzman

**JA521**

# TABLE OF CONTENTS

Preface --------------------------------------------------------------------------------------1

Acknowledgments --------------------------------------------------------------------1

Dedication -----------------------------------------------------------------------------1

1 | Introduction & Executive Summary -------------------------------------- 5

    The School ---------------------------------------------------------------------- 5

    The Responders ---------------------------------------------------------------7

2 | Background & History of Investigation ---------------------------------- 10

3 | Robb Elementary School Security & Facilities Overview --------------- 13

    Uvalde CISD Police Department ------------------------------------------13

    Active Shooter Plan ------------------------------------------------------14

    ALERRT Standard for Active Shooter Training ----------------------17

    Rise of "Bailout" Security Incidents------------------------------------22

    Raptor Alert System -------------------------------------------------------23

    Uvalde CISD Facilities & Maintenance -----------------------------------24

    Robb Elementary Facilities & Management-------------------------------24

    Policies for Locking Doors ---------------------------------------------25

    Maintenance of Doors & Keys--------------------------------------------27

4 | The Attacker ---------------------------------------------------------------- 29

    Family & Early Life ------------------------------------------------------29

    School------------------------------------------------------------------------30

    The Year Before------------------------------------------------------------32

    The Last Days --------------------------------------------------------------34

5 | May 24 Incident & Law Enforcement Response ----------------------- 39

    Coach Silva Alerts the School -----------------------------------------41

    Law Enforcement Responds to Robb Elementary-----------------------41

    Robb Elementary School Locks Down ----------------------------------44

    The Attacker Enters the West Building ----------------------------------46

    The Attacker Enters Rooms 111 & 112 ----------------------------------46

    First Law Enforcement Approaches & Enters ----------------------------48

    What Happened for the Next 73 Minutes?------------------------------52

    On the South … ----------------------------------------------------------52

    On the North …------------------------------------------------------------58

    On the Outside …---------------------------------------------------------62

    What Didn't Happen in Those 73 Minutes? ------------------------------62

    Law Enforcement Responder Headcount --------------------------------64

6 | Information Flow ---------------------------------------------------------- 66

    The First Reports --------------------------------------------------------66

    ALERRT Report--------------------------------------------------------------67

    Video Evidence------------------------------------------------------------68

    Compromised Trust------------------------------------------------------69

7 | Factual Conclusions -----------------------------------------------------70

# P R E F A C E

This is the interim report of the Investigative Committee on the Robb Elementary Shooting of the Texas House of Representatives.

Conscious of the desire of the Uvalde community and the public at large to receive an accurate account of the tragedy at Robb Elementary School, the Committee has worked diligently and with care to issue this interim report of its factual findings. The Committee's work is not complete. We do not have access to all material witnesses. Medical examiners have not yet issued any reports about their findings, and multiple other investigations remain ongoing. The Committee believes this interim report constitutes the most complete telling to date of the events of and leading to the May 24, 2022, tragedy.

This Committee has prioritized factual accuracy, as will be evident from our attention to conducting our own interviews and documenting our sources of information. Still, based on the experiences of past mass-shooting events, we understand some aspects of these interim findings may be disputed or disproven in the future.

The Committee issues this interim report now, believing the victims, their families, and the entire Uvalde community have already waited too long for answers and transparency.

# A C K N O W L E D G M E N T S

The Committee gratefully acknowledges the assistance of all who helped with its investigation and the preparation of this interim report, including Clement Abbondandolo, Margo Cardwell, Courtney Chaplin, Matthew Crow, Casey Garrett, Harrison Garrett, Paige Higerd, Ted Liggett, Michael Massengale, Kolton McDougald, and Ellic Sahualla.

# D E D I C A T I O N

The Committee submits this report with great humility and the deepest respect for the victims and their families. It is the Committee's sincere hope that this brings some clarity for them as to the facts that happened. This report is meant to honor them.

You will notice the name of the attacker is not mentioned. We also will not use his image, so as not to glorify him.

## Nevaeh Alyssa Bravo

Nevaeh is remembered as a playful girl who put a smile on the faces of everyone around her. Her family meant the world to her, and she often helped her father around the house. Nevaeh loved the colors pink and purple and enjoyed playing softball and riding her bike.

## Jacklyn "Jackie" Jaylen Cazares

Jackie is remembered as a caring girl who enjoyed singing and making TikTok videos. Jackie loved animals (especially her four dogs) and wanted to become a veterinarian; she also dreamt of visiting Paris. Jackie was known as someone who would go out of her way to help anyone.

## Makenna Lee Elrod

Makenna is remembered as the light in the lives of those who knew her. She loved the color purple, softball and gymnastics, and spending time with her family—especially time on the ranch with her dad. Her smile lit up rooms, and she liked to leave hidden notes for her family to find.

## Jose Manuel Flores, Jr.

Jose is remembered as loving and kind. He was an honor roll student who wanted to be a police officer when he grew up to help protect other people. Jose was an amazing big brother who looked out for his siblings, and his parents called him "a helper" because he was always pitching in at home.

## Eliahna "Ellie" Amyah Garcia

Ellie is remembered as a gentle, kindhearted girl who loved spending time with her family and was very close with her grandparents. She enjoyed playing basketball and wanted to be a cheerleader one day. Ellie adored the colors pink and purple and loved a nice bowl of ramen noodles. She was a long-term planner who was already picking dresses and dances for her quinceañera five years away.

## Irma Garcia

Irma is remembered as courageous and selfless—a wife and mother of four who was always willing to lend a helping hand to anyone who needed one. She was a 23-year teacher. Irma died protecting her students, and her heroism will be remembered forever.

## Uziyah Sergio Garcia

Uziyah is remembered as an outgoing boy who loved his family as well as his "cousins and brothers from another mother." He was always fair and full of life, and he enjoyed running, swimming, football, and playing his Nintendo Switch and Oculus.

## Amerie Jo Garza

Amerie is remembered as considerate and fun-loving. She was protective of her three-year-old brother and would kiss him every morning before she went to school. Amerie loved swimming, drawing, and vanilla bean frappés from Starbucks. She dreamt of becoming an art teacher one day.

## Xavier James Lopez

Xavier is remembered as an active boy who loved swimming and playing little league baseball for his team, the Blue Jays. He was lively, energetic, and always eager to dance, especially the cumbia with his grandmother. Xavier was known for wearing stylish clothes and had a smile that could cheer anyone up.

## Jayce Carmelo Luevanos

Jayce is remembered as a happy, thoughtful boy with many friends who always seemed to be running around his yard with him. He made his grandparents a pot of coffee every morning and would leave notes saying that he loved them. Dinosaurs were one of his favorite things.

## Tess Marie Mata

Tess is remembered as a natural athlete who enjoyed softball, soccer, and gymnastics—she especially loved doing backbends in gymnastics. Tess was a fan of the Houston Astros and even played the same position as her favorite player, José Altuve, in softball. She was saving up money for a family vacation to Disney World.

## Maranda Gail Mathis

Maranda is remembered as smart and nice, a shy tomboy who loved the color purple, especially when it was on unicorns and mermaids. Maranda also enjoyed spending time outdoors and had an incredible imagination.

## Eva Mireles

Eva is remembered as dedicated and vibrant. She enjoyed CrossFit, hiking, spending time with her dog, Kane, and being with her family. Her smile was bright and her commitment to her students was still unwavering after 17 years as an educator. She was a hero who never gave up throughout an impossible ordeal.

## Alithia Haven Ramirez

Alithia is remembered as talented and bighearted. She was a gifted artist who wanted to go to art school in Paris one day. She was also a mature role model to her siblings and was always thoughtful about helping those in need.

**JA525**

## Annabell Guadalupe Rodriguez

Annabell is remembered as empathetic and loyal. She enjoyed spending time with her sisters and watching TikToks. Her favorite color was blue—especially blue found on butterflies. Annabell was on the honor roll and known for being a sharp student.

## Maite Yuleana Rodriguez

Maite is remembered as sweet and competitive. She loved learning about animals and the ocean, especially dolphins, whales, and dogs. She was an honor student who dreamt of attending Texas A&M to become a marine biologist. Her favorite color was green, and she enjoyed a #13 from Whataburger—always with a side of sliced jalapenos.

## Alexandria "Lexi" Aniyah Rubio

Lexi is remembered as intelligent and driven. She had a contagious smile and enjoyed playing softball and basketball, which she excelled at. Lexi was an all-A student who wanted to become a lawyer one day, and she was interested in social and political issues because she wanted to make a difference.

## Layla Marie Salazar

Layla is remembered as witty and lively. She loved singing with her parents while coming to and from school and going with her grandparents for tacos. She was also an avid swimmer, dancer, and runner who'd won six races at a recent field day.

## Jailah Nicole Silguero

Jailah is remembered as a joy to be around, a pure delight who enjoyed making TikToks to show off to her family and friends. Jailah was always dancing and liked to spend time outdoors as well.

## Eliahna Torres

Eliahna is remembered as loving and compassionate. She enjoyed making other people laugh and was a "master of jests." She was also an amazing softball player up for a spot on the city's all-star team. Eliahna was a natural leader who was also known for her warmth and selflessness.

## Rojelio Fernandez Torres

Rojelio is remembered as a clever, positive boy who enjoyed being outdoors in his free time as well as playing football and videogames like Pokémon. Rojelio was always eager to help others and had a real love for life.

# 1 | INTRODUCTION & EXECUTIVE SUMMARY

There is nothing we can do to heal the wounds suffered by the Uvalde community, nothing that can redress the loss of 21 souls stolen from their families and friends. We must critically examine the contributing factors to the horrific massacre at Robb Elementary School to try to provide answers and prevent similar tragedies in the future. A safer environment for all Texas children is one of the ways we can honor the memory of the students and teachers murdered in Uvalde.

Across our state, men and women who work in the fields of education and law enforcement exemplify both service and sacrifice. Teachers dedicate themselves to the betterment of society through the promise of a new generation. Police officers see danger and run to meet it, knowing the cost and stepping forward to pay it. In pursuing these high callings, teachers and police officers live in the public square—nurturing, encouraging, protecting, preserving. They render this service on behalf of us all, but especially for children, who are the most innocent and vulnerable among us. Like the rest of us, educators and law enforcement officers sometimes fail at crucial moments. When they do, that does not diminish the good work and sacrificial service of their professions as a whole.

Of necessity, this report will describe shortcomings and failures of the Uvalde Consolidated Independent School District and of various agencies and officers of law enforcement. At the outset, we acknowledge that those same shortcomings could be found throughout the State of Texas. We must not delude ourselves into a false sense of security by believing that "this would not happen where we live." The people of Uvalde undoubtedly felt the same way. We must all take seriously the threats to security in our schools and the need to be properly prepared to confront active shooter scenarios.

Other than the attacker, the Committee did not find any "villains" in the course of its investigation. There is no one to whom we can attribute malice or ill motives. Instead, we found systemic failures and egregiously poor decision making. We recognize that the impact of this tragedy is felt most profoundly by the people of Uvalde in ways we cannot fully comprehend.

## The School

With hindsight we can say that Robb Elementary did not adequately prepare for the risk of an armed intruder on campus.

The school's five-foot tall exterior fence was inadequate to meaningfully impede an intruder. While the school had adopted security policies to lock exterior doors and internal classroom

doors, there was a regrettable culture of noncompliance by school personnel who frequently propped doors open and deliberately circumvented locks. At a minimum, school administrators and school district police tacitly condoned this behavior as they were aware of these unsafe practices and did not treat them as serious infractions requiring immediate correction. In fact, the school actually suggested circumventing the locks as a solution for the convenience of substitute teachers and others who lacked their own keys.

The school district did not treat the maintenance of doors and locks with appropriate urgency. In particular, staff and students widely knew the door to one of the victimized classrooms, Room 111, was ordinarily unsecured and accessible. Room 111 could be locked, but an extra effort was required to make sure the latch engaged. Many knew Room 111's door had a faulty lock, and school district police had specifically warned the teacher about it. The problem with locking the door had been reported to school administration, yet no one placed a written work order for a repair.

Another factor contributing to relaxed vigilance on campus was the frequency of security alerts and campus lockdowns resulting from a recent rise of "bailouts"—the term used in border communities for the increasingly frequent occurrence of human traffickers trying to outrun the police, usually ending with the smuggler crashing the vehicle and the passengers fleeing in all directions. The frequency of these "bailout"-related alarms—around 50 of them between February and May of 2022—contributed to a diminished sense of vigilance about responding to security alerts.

Other factors delayed the reporting of the threat to the campus and to law enforcement. Low-quality internet service, poor mobile phone coverage, and varying habits of mobile phone usage at the school all led to inconsistent receipt of the lockdown notice by teachers. If the alert had reached more teachers sooner, it is likely that more could have been done to protect them and their students.

In violation of school policy, no one had locked any of the three exterior doors to the west building of Robb Elementary. As a result, the attacker had unimpeded access to enter. Once inside, the attacker continued into the adjoining Rooms 111 and 112, probably through the door to Room 111, and apparently completely unimpeded. Locking the exterior and interior doors ultimately may not have been enough to stop the attacker from entering the building and classrooms. But had school personnel locked the doors as the school's policy required, that could have slowed his progress for a few precious minutes—long enough to receive alerts, hide children, and lock doors; and long enough to give police more opportunity to engage and stop the attacker before he could massacre 19 students and two teachers.

Because of these failures of facilities maintenance and advance preparation, the attacker fired most of his shots and likely murdered most of his innocent victims before any responder set foot in the building. Of the approximately 142 rounds the attacker fired inside the building, it is almost certain that he rapidly fired over 100 of those rounds before any officer entered.

T h e   R e s p o n d e r s

Since the 1999 Columbine tragedy, the law enforcement community has recognized the critical importance of implementing active shooter training for all officers, regardless of specialty. Also, all officers must now acknowledge that stopping the killing of innocent lives is the highest priority in active shooter response, and all officers must be willing to risk their lives without hesitation.

At Robb Elementary, law enforcement responders failed to adhere to their active shooter training, and they failed to prioritize saving the lives of innocent victims over their own safety.

The first wave of responders to arrive included the chief of the school district police and the commander of the Uvalde Police Department SWAT team. Despite the immediate presence of local law enforcement leaders, there was an unacceptably long period of time before officers breached the classroom, neutralized the attacker, and began rescue efforts. We do not know at this time whether responders could have saved more lives by shortening that delay. Regardless, law enforcement committed numerous mistakes in violation of current active shooter training, and there are important lessons to be learned from each faulty assumption and poor decision made that day.

The Uvalde CISD's written active shooter plan directed its police chief to assume command and control of the response to an active shooter. The chief of police was one of the first responders on the scene. But as events unfolded, he failed to perform or to transfer to another person the role of incident commander. This was an essential duty he had assigned to himself in the plan mentioned above, yet it was not effectively performed by anyone. The void of leadership could have contributed to the loss of life as injured victims waited over an hour for help, and the attacker continued to sporadically fire his weapon.

A command post could have transformed chaos into order, including the deliberate assignment of tasks and the flow of the information necessary to inform critical decision making. Notably, nobody ensured that responders making key decisions inside the building received information that students and teachers had survived the initial burst of gunfire, were trapped in Rooms 111 and 112, and had called out for help. Some responders outside and inside the building knew that information through radio communications. But nobody in

command analyzed this information to recognize that the attacker was preventing critically injured victims from obtaining medical care. Instead of continuing to act as if they were addressing a barricaded subject scenario in which responders had time on their side, they should have reassessed the scenario as one involving an active shooter. Correcting this error should have sparked greater urgency to immediately breach the classroom by any possible means, to subdue the attacker, and to deliver immediate aid to surviving victims. Recognition of an active shooter scenario also should have prompted responders to prioritize the rescue of innocent victims over the precious time wasted in a search for door keys and shields to enhance the safety of law enforcement responders.

An effective incident commander located away from the drama unfolding inside the building would have realized that radios were mostly ineffective, and that responders needed other lines of communication to communicate important information like the victims' phone calls from inside the classrooms. An offsite overall incident commander likely could have located a master key more quickly—several people on campus had one. An offsite overall incident commander may have suggested checking to see if officers could open the door without a key—in hindsight, they probably could have. An offsite overall incident commander who properly categorized the crisis as an active shooter scenario should have urged using other secondary means to breach the classroom, such as using a sledgehammer as suggested in active shooter training or entering through the exterior windows.

Uvalde CISD and its police department failed to implement their active shooter plan and failed to exercise command and control of law enforcement responding to the tragedy. But these local officials were not the only ones expected to supply the leadership needed during this tragedy.

Hundreds of responders from numerous law enforcement agencies—many of whom were better trained and better equipped than the school district police—quickly arrived on the scene. Those other responders, who also had received training on active shooter response and the interrelation of law enforcement agencies, could have helped to address the unfolding chaos.

Yet in this crisis, no responder seized the initiative to establish an incident command post. Despite an obvious atmosphere of chaos, the ranking officers of other responding agencies did not approach the Uvalde CISD chief of police or anyone else perceived to be in command to point out the lack of and need for a command post, or to offer that specific assistance. Several will suggest they were misled by false or misleading information they received as they arrived; however, the "chaos" described by almost all of them demonstrates that at a

minimum, responders should have asked more questions. This suggests a training deficiency, in that responding officers failed to adequately question the absence of command. Other responders failed to be sufficiently assertive by identifying the incident commander and offering their assistance or guidance, or by assuming command in the absence of any other responder having expressly done so. In this sense, the entirety of law enforcement and its training, preparation, and response shares systemic responsibility for many missed opportunities on that tragic day.

## 2 | Background & History of Investigation

On June 3, 2022, Speaker of the Texas House of Representatives Dade Phelan created by proclamation the Investigative Committee on the Robb Elementary Shooting, pursuant to Rule 1, Section 17, and Rule 4, Sections 57 and 58, of the Rules of the House of Representatives. Three members were appointed to the Committee: Representative Dustin Burrows, Chair; Representative Joe Moody, Vice-Chair; and the Honorable Eva Guzman, Public Member. The Speaker gave the Committee the same authority and duties conferred on standing committees under the rules, and the Committee is set to expire on the date the 88th Legislature convenes.

Speaker Phelan charged the Committee with the duty to "conduct all inquiries into the actions of any State or local officer, employee, department, agency, institution, or instrumentality and any political subdivision needed to make a complete and thorough examination of the facts and circumstances of the events relating to the violent acts, shootings, and murders at Robb Elementary School in Uvalde." In the conduct of its investigation, the Speaker charged the Committee to "examine the evidence developed by all law enforcement authorities" and to "acquire and analyze additional evidence as needed to make comprehensive findings." The Committee has the additional duty of providing assistance to the Select Committee on Youth Health and Safety and the Committee on Homeland Security and Public Safety in the consideration of their joint charges on mass violence prevention and community safety. This Committee "shall submit a final report in the same manner as an interim study committee under Rule 4, Section 61, Rules of the House of Representatives."

Put more simply, this is a fact-finding committee. The Speaker has tasked other legislative committees with the difficult but critical responsibility of proposing policy in response to the tragedy at Robb Elementary School.

The Committee held its first meeting on June 9, 2022, in Austin, Texas. In an extensive briefing in executive session, Col. Steven C. McCraw, Director of the Texas Department of Public Safety, provided the Committee an overview of the status of the ongoing DPS investigation, including the attacker's background, the incident timeline, and the response by law enforcement. The Committee reviewed a composite video recording of the attacker's approach to the school and law enforcement's response. The meeting concluded with DPS agreeing to provide its evidence to the Committee.

The Committee then heard three days of testimony on June 16th, 17th, and 20th in Uvalde, Texas. Testifying witnesses included employees of the Uvalde CISD (including Robb

Elementary School staff), the Uvalde CISD Police Department, the Uvalde Police Department, the Department of Public Safety, and members of the attacker's family. On June 17th, all three members of the Committee visited the Robb Elementary School campus accompanied by Uvalde CISD Superintendent Dr. Hal Harrell, and the Committee paid its respects to the victims and to the community by laying a floral wreath at the school memorial.

Uvalde CISD Police Chief Pete Arredondo testified before the Committee in Austin, Texas, on June 21st followed by Sgt. Thomas Calabro with the Houston Police Department, who provided information about training and standard practices for law enforcement responses to active shooter scenarios and for the command and coordination of multiple responding law enforcement agencies.

The Committee returned to Uvalde on June 29th and 30th. On June 29th, the Committee interviewed Uvalde Mayor Don McLaughlin, four Robb Elementary School fourth grade teachers, and five employees of the Uvalde Police Department, including a dispatcher. The next day, June 30th, the Committee interviewed Uvalde CISD employee Becky Reinhardt, Uvalde County Precinct One Constable Johnny Field (by videoconference), and two peace officers who responded to the incident from the Department of Public Safety (a special agent and a lieutenant). That day, the Committee's investigators also interviewed Robb Elementary School teacher Arnulfo Reyes, the teacher in Room 111 who is still recovering from his injuries. The Committee received a report and an audio recording of the interview of Mr. Reyes.

On July 11th, the Committee reconvened in Austin to interview ALERRT Assistant Director John Curnutt and Uvalde County Sheriff Ruben Nolasco, both by videoconference. The Committee also conducted a follow-up interview of DPS Director McCraw.

The Committee interviewed all 35 witnesses in executive session, meaning that the sessions were closed to the public. Despite public expressions of frustration and even criticism that these meetings were conducted behind closed doors, the Committee is confident that its method served the goal of an objective fact-finding process. The Committee was able to engage witnesses in candid discussions that may not have been possible in public hearings or other settings.

In addition to the witnesses who appeared before the Committee in executive session, the Committee's investigators conducted at least 39 independent informal interviews, The Committee and its investigators have reviewed hundreds of crime-scene photos and dozens of audio and video recordings from the incident, including surveillance camera footage, mobile-phone video, 911 calls, radio transmissions, and body-worn camera footage. They reviewed recordings and summaries of witness interviews conducted and recorded by law

enforcement agencies. Documentation received from the Department of Public Safety and reviewed by the Committee included an enormous trove of digital evidence, including data from mobile phones, cloud storage, and social media messages. The Committee received and reviewed thousands of pages of documents received from numerous agencies including ALERRT, ATF, Texas DPS, FBI, Texas School Safety Center, and Uvalde CISD. These documents included school audits and safety plans, school disciplinary records, employment records, criminal-history reports, dispatch logs, ballistics reports, firearms traces, gun store records, information about the victims, and various diagrams, sketches, and timelines. The Committee also invited and received suggestions from witnesses about how to improve policies relating to school safety, firearm safety, law enforcement training and resources, and active shooter response. The Committee genuinely appreciates the input from all witnesses, and it will be shared with the House committees formed to evaluate and propose policies to address mass violence prevention and community safety.

# 3 | ROBB ELEMENTARY SCHOOL SECURITY & FACILITIES OVERVIEW

The Committee has great respect for teachers and all who dedicate their lives to the education of children.

As of the fall of 2020, there were 5,371,586 students in Texas schools. There are 1,204 school systems, most of which are independent school districts. The largest independent school district in Texas is in Houston, with 196,943 students enrolled for the 2020–21 school year. The smallest district is San Vicente ISD, which had five students for 2020–21.[1]

Most school districts have multiple campuses with multiple buildings. It is estimated that there could be as many as 80,000 buildings in the State of Texas that house children at various times during the school year. These are important facts to remember in the context of discussing policy related to school-hardening measures.

Uvalde CISD serves a rural community of 15,217 citizens.[2] The district's schools include Uvalde High School, Morales Junior High, Anthon, Flores, Robb, and Dalton elementary schools, and several alternative education programs.[3] The campus buildings range from over 100 years in age to the newest school, Uvalde High School, which was opened nearly four decades ago in 1983.[4] Uvalde CISD constructed many of those older buildings during times when the potential threats to students were much different than those faced today.[5] While no school could ever be built to prevent every conceivable threat, they can be built and operated in ways to better mitigate risk and impede potential threats from outside attackers.

## Uvalde CISD Police Department

Until recently, the Uvalde Police Department was responsible for security in the Uvalde public schools. In 2018, Uvalde CISD established its own police department, headquartered at Uvalde High School. With nine different schools and a budget for six police officers, Uvalde CISD oversees more campuses than it has officers, and it has assigned no officer specifically to Robb Elementary. Instead, officers would regularly visit the Robb campus for a walk-through several

---

[1] Source: Texas Education Agency.

[2] 2020 Census, https://data.census.gov/cedsci/all?q=Uvalde%20city,%20Texas.

[3] *See generally* www.ucisd.net.

[4] Committee testimony of Rodney Harrison, UCISD Maintenance and Operations Director (June 16, 2022).

[5] Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

times per week, usually lasting from 15–45 minutes.[6] Uvalde CISD Police Chief Pete Arredondo and his second-in-command, Lt. Mike Hernandez, also testified that they visited campuses and walked halls to "rattle doors" to confirm they were locked.[7]

Uvalde CISD police officers commonly carried two radios: one for the school district, and another "police radio" which transmitted communications from various local law enforcement agencies. While the school district radios tended to work reliably, the police radios worked more intermittently depending on where they were used.[8]

### A c t i v e   S h o o t e r   P l a n

As directed by state legislation enacted in 2019,[9] Uvalde CISD adopted a policy for responding to an active shooter emergency. And Uvalde CISD deserves credit for having done so—they are one of the few Texas school districts recognized by the School Safety Center as having submitted a viable active shooter policy.[10]

Uvalde CISD Police Chief Arredondo and Director of Student Services Kenneth Mueller prepared a document titled "Annex 1 Active Shooter" and adopted it on April 15, 2020.[11] The document identified its purpose as seeking to "outline the local organization, operational concepts, responsibilities, and procedures to accomplish coordinated Administration,

---

[6] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022) (couple times per week, approximately 15 minutes per visit); *see also* Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022) (usually took 30-45 minutes to walk Robb Elementary); Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022) (about once per day, usually for less than an hour unless dealing with a problem); Committee testimony of Kenneth Mueller (June 16, 2022) (officers would float, visiting all elementary-school campuses). Uvalde CISD police officer Ruby Gonzalez described how she and her colleagues would rotate shifts based at the high school. The 7:00 a.m.–4:00 p.m. shift would begin with traffic control and watching the courtyard at the high school, followed by rounds to check in at other campuses, walk halls, and check doors. Similarly, the officer working the 9:00 a.m.–6:00 p.m. shift would visit various campuses in the afternoon. Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[7] Testimony of Pete Arredondo, USCID police chief (June 21, 2022); Testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022).

[8] Committee testimony of Adrian Gonzalez, UCISD police officer (June 20, 2022).

[9] Tex. H.B. 2195, § 1, 86th Leg., R.S. (2019) ("A school district shall include in its multihazard emergency operations plan a policy for responding to an active shooter emergency. The school district may use any available community resources in developing the policy described by this subsection."), codified as Tex. Educ. Code § 37.108.

[10] *Cf.* Texas School Safety Center, 2017-2020 DAR Report: Findings on Safety and Security in Texas School Districts, *available* at https://txssc.txstate.edu/research/technical-reports/dar-2020/ ("[T]he EOP review indicated that of the 1,022 districts reviewed, only 200 had a viable active shooter policy. Of the remaining 822 districts, 626 districts did not have a policy in place and 196 districts had an insufficient policy.").

[11] *See* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ I ("The Uvalde CISD police department along with the Director of Student Services makes recommendations and creates plans to develop a safe environment and to lead the District to Mitigate, Prevent, Prepare, Respond, and Recover from potential active shooter situations.").

Teachers, District police officers, local law enforcement and first responders to Prevent, Prepare, Respond, and Recover from the possibility of an active shooter entering any of the District campuses."[12]

The plan called for utilization of "the National Incident Management System (NIMS) during an emergency to coordinate response efforts."[13] It further stated that "[t]he District's police officers, administrators, and teachers and support staff, along with the students have the daily responsibility to mitigate and prevent an active shooter situation," and that "[a]ll staff members and student[s] will know the proper procedures to follow if a suspected shooter is on the campus."[14]

With respect to securing doors, the active shooter policy stated:

> Staff will conduct inspections of classrooms to make sure doors and windows can be secured … .Doors to all classrooms will remain locked during instruction and the campuses will have one main entry point to the school. *Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.*[15]

The active shooter policy outlined a series of preventative safety measures that served as the "primary preventative strategy" to address "problems of violence, vandalism, disruptions and fear."[16] As applicable to Robb Elementary, these preventative measures included:

> POLICE OFFICERS – The district employs 4 officers. This includes a Chief, a detective, and two officers.[17]
>
> PARTNERSHIPS WITH LOCAL LAW ENFORCEMENT. Local law enforcement agencies are invited to come to any of our campuses while they are on patrol. UCISD provides free breakfast or lunch to any law enforcement personnel visiting our campuses.[18]
>
> THREAT ASSESSMENT TEAMS – Every campus employs an interdisciplinary team of trained professionals that convene to identify, evaluate, classify and address threats or potential threats to school security. Following assessment, this team determines

---

[12] *Id.* ¶ II.

[13] *Id.* ¶ IV.A.1; *see also id.* ¶ V.B ("All personnel assigned responsibilities in this plan are trained on NIMS concepts, procedures and protocols."). Regarding NIMS, the, training that defines operational systems that guide how personnel work together to prevent, protect against, mitigate, respond to and recover from incidents see generally https://training.fema.gov/nims/.

[14] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.A.2.

[15] *Id.* ¶ IV.B.1.b (emphasis supplied).

[16] *Id.* ¶ IV.B.2.a.

[17] *Id.* ¶ IV.B.2.b. Uvalde CISD later hired two additional officers to bring its total force to six, though at the time of the attack on Robb Elementary there were only five officers employed.

[18] *Id.* ¶ IV.B.2.c.

appropriate response and intervention. This includes notification and involvement of parents, a suicide risk assessment, and the development of a written safety plan.[19]

SOCIAL MEDIA THREATS – UCISD utilizes Social Sentinel to monitor all social media with a connection to Uvalde as a measure to identify any possible threats that might be made against students and or staff within the school district.[20]

PERIMETER FENCING – Dalton, Anthon, and Robb have fencing that encloses the campus is designed to limit [*sic*] and/or restrict access to individuals without a need to be on the campus.[21]

RADIOS – Key staff have been provided radios to support campus communication processes.[22]

LOCKED CLASSROOM DOOR POLICY – Teachers are instructed to keep their classroom doors closed and locked at all times. Barriers are not to be used. Substitutes shall follow the same policy, with campuses ensuring they have access to the classrooms they need throughout the day. The Standard Response Protocol procedures are on the back of all of our badges issued to substitute teachers.[23]

STAFF TRAINING – All staff members are trained annually in emergency protocols for the campus. Key campus personnel are CPI-trained.[24]

STUDENT TRAINING & DRILLS – Students receive training on the Standard Response Protocol for lockout, lockdown, evacuate, shelter, and hold. In addition, drills are held for each of these emergency actions on a regular basis … .[25]

THREAT REPORTING SYSTEM – Students, parents, staff, and community members are encouraged to share information with us that is deemed troubling, so that we may take appropriate action. This includes information about weapons, threats, fights, drugs, self-harm, suicide or disclosures made that are concerning. Reports may be made online at ucisd.net, by contacting any campus administrator, district administrator or UCISD Police Officers.[26]

In the event of an active shooter incident, the policy expressly provided that upon verification of an active shooter, "the District police department Chief will become the person in control of the efforts of all law enforcement and first responders that arrive at the scene."[27] The response was to include, if possible, "secur[ing] the administration office as a command post

---

[19] *Id.* ¶ IV.B.2.g.

[20] *Id.* ¶ IV.B.2.g.

[21] *Id.* ¶ IV.B.2.l. The Uvalde CISD director of maintenance and operations, Rodney Harrison, confirmed for the Committee that the fence around Robb Elementary was five feet high.

[22] *Id.* ¶ IV.B.2.p.

[23] *Id.* ¶ IV.B.2.r.

[24] *Id.* ¶ IV.B.2.s. "CPI" refers to the Crisis Prevention Institute, an international training organization that specializes in the safe management of disruptive and assaultive behavior. *See* https://www.crisisprevention.com/About-Us.

[25] *Id.* ¶ IV.B.2.t.

[26] *Id.* ¶ IV.B.2.v.

[27] *Id.* ¶ IV.B.4.b.

and retriev[ing] the critical information and data about the school's emergency systems, including communications, staff and student's locations, detailed floor plans and other important information, documents, items, and supplies that are prepared and readily available for use during the incident."[28]

The active shooter policy recognized that "[t]he district has primary responsibility for the health and safety of students, staff, substitute teachers, and visitors while on district property," and that "[d]uring an emergency *the district should coordinate law enforcement, health and medical services with other local first responders.*"[29] The school district's police department was assigned the responsibility for "the Incident Command Center" and for being "first on scene to prevent or stop an active shooter,"[30] while the policy assigned to other "[l]ocal law enforcement and first responders" the function and responsibility to "follow the direction of the ICS leader to ensure proper procedures are followed" and to "[a]ccept assigned roles of ICS leader."[31]

Under a section titled "Direction and Control," the policy laid out a specific "line of succession":

> 1. Uvalde CISD police department – Chief Pete Arredondo
> 2. Uvalde CISD police department – Lt. Mike Hernandez
> 3. Director of Student Services – Kenneth Mueller[32]

The policy calls for the district to conduct a "post incident review … to analyze the process and make any corrective action as determined."[33]

### ALERRT Standard for Active Shooter Training

Before joining the Uvalde CISD Police Department, Chief Arredondo received active shooter training from the ALERRT Center,[34] which the FBI has recognized as "the National Standard

---

[28] *Id.* ¶ IV.B.4.f.

[29] *Id.* ¶ V.A.1 (emphasis supplied).

[30] *Id.* ¶ V.B.

[31] *Id.* ¶ V.B. "ICS" is not defined in Uvalde CISD's active shooter plan, but it refers to "Incident Command System." *See, e.g.*, Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 2-27 (v. 7.2, 2020) (noting that "[a] list of incident command courses can be found on the FEMA training web page at https://training.fema.gov/emiweb/is/icsresource/trainingmaterials.htm").

[32] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ VI.C.

[33] *Id.* ¶ VIII.C.

[34] Committee testimony of Pete Arredondo, UCISD Chief of Police (June 21, 2022). Chief Arredondo received the ALERRT training while working for the Laredo ISD police department, between his retirement from the Webb County Sheriff's Office in 2017 and his hiring as chief of the Uvalde CISD police in March 2020. *See id.* Uvalde Police Sgt. Daniel Coronado, who responded to Robb Elementary as well, also acknowledged receiving ALERRT training. Committee testimony of Sgt. Daniel Coronado, Uvalde Police Department (June 20, 2022).

in Active Shooter Response Training."[35] Every school district peace officer in Texas must be trained on how to respond in active shooter scenarios.[36] Not all of them get ALERRT training, but Chief Arredondo and other responders at Robb Elementary did.

ALERRT's training program identifies the challenge for law enforcement responders of possibly having to work "with a small ad hoc team of individuals they may have never trained with before," such that "the only way to swing the tactical advantage back in favor of the [law enforcement] responder is through the use of effective teamwork and tactics."[37] The training identifies lessons to be learned from past active shooter incidents. From the Columbine tragedy in 1999, one lesson was that responders must have tools and training to immediately make entry and neutralize an active shooter threat.[38] Another Columbine lesson was the "Priority of Life Scale": innocent civilians come before law enforcement and other responders.[39] After Columbine, "[w]hile protecting the lives of officers remained a high priority, Stopping the Killing of innocent civilians took first priority. From that moment forward, every law enforcement officer was expected to be willing to risk his or her life without hesitation."[40] "Law enforcement officers were expected to distract, isolate, and neutralize the threat, even in tactically complex situations and when they lacked special training."[41]

A lesson from the Navy Yard Building 197 incident in 2013 was that "[t]he earlier an Incident Command structure can be established, the better," and this tragedy prompted an "Initial Incident Command" block to be added to the ALERRT Level 1 course.[42] The Pulse Nightclub

---

But not all law enforcement officers receive this training, and several other law enforcement officers interviewed by the Committee stated they had not received ALERRT training. *E.g.*, Testimony of Sgt. Eduardo Canales, Uvalde Police Department (June 29, 2022) (none of UPD SWAT team has received ALERRT training); Committee testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[35] *See generally* https://alerrt.org/about ("The ALERRT Center at Texas State University was created in 2002 as a partnership between Texas State University, the San Marcos, Texas Police Department and the Hays County, Texas Sheriff's Office to address the need for active shooter response training for first responders.").

[36] Tex. H.B. 2195, § 2, 86th Leg., R.S. (2019) ("A school district peace officer or school resource officer shall complete an active shooter response training program approved by the Texas Commission on Law Enforcement."), codified as Tex. Educ. Code § 37.0812.

[37] Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 1-9 (version 7.2, 2020).

[38] *Id.* at STU 2-6.

[39] *Id.*

[40] *Id.* at STU 2-7.

[41] *Id.*

[42] *Id.* at STU 2-10; *see also id.* at STU 2-13 (Rt. 91 Harvest Music Festival incident in 2017 taught lesson of establishing unified command early on). The Incident Command module teaches: "Ideally, Incident Command will be established as the first [law enforcement] responder arrives on-scene, provides dispatch with a brief LCAN [i.e. Location, Condition, Actions, and Needs] size-up report, and assumes command." *Id.* at STU 7-6. The

incident from 2016 taught the importance of awareness of the distinction between hostage/barricade and active shooter scenarios.[43] The Marjory Stoneman Douglas High School incident in 2018 taught the importance of incident command structure for appropriate management of resources and that law enforcement responders must be prepared to use word-of-mouth communication when radio communications are overloaded.[44]

On the subject of communicating effectively, the ALERRT course teaches that effective communication is necessary for successful teamwork.[45] "Regional law enforcement agencies should continually train together to establish radio protocols for use during multi-agency active shooter response."[46] "Law Enforcement responders should be familiar with their regional communications plan but also be prepared to respond effectively without reliable radio communications."[47] "After giving a message, [law enforcement] responders should look for confirmation that the intended party received and understood the message."[48] "If radio communications are unreliable, it may be necessary to use runners to deliver messages."[49]

With respect to establishing incident command, law enforcement responders are encouraged to complete Incident Command System (ICS) and National Incident Management System (NIMS) courses as early as possible in their careers.[50] The ALERRT training advises that "[t]he initial [law enforcement] responder to arrive at an active shooter scene becomes the Initial Incident Commander by default…."[51] Further, "[a]s soon as [a law enforcement] responder notices that there appears to be sufficient officers hunting for the attacker, that responder

---

training acknowledges that "sometimes this is difficult because the first [law enforcement] responder to arrive on-scene may find him or herself immediately involved in a gunfight," and "[s]urviving and winning the gunfight should always take priority over considering Incident Command matters." *Id.* But "[a]s soon as immediate threats have been neutralized," law enforcement responders need to ensure that they communicate critical information to dispatch, including the assumption of command. *Id.*

[43] *Id.* at STU 2-12.

[44] *Id.* at STU 2-14.

[45] *Id.* at STU 2-23.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.* at STU 2-27.

[51] *Id.* at STU 2-28.

should find a secure location, take out their Active Shooter Response Card, assume Initial Incident Command, and begin completing tasks listed on the card."[52]



## Slide 2-32. Active Shooter Response Card

*Excerpt from ALERRT, Active Shooter Response—Level 1.*

A later, more in-depth module on incident command describes the ICS process:

**Take Command**

The first step in the ICS process is for the first [law enforcement] responder who arrives on the scene … to simply take command. Command is passed up the chain as the scene or situation grows larger. As more officers arrive on-scene, command is passed on and assumed by higher levels, building the ICS tree. All active shooter Incident Command structures will grow. This is a fact, and they will continue to grow for the next several days after the shooter is down.

Taking command is as simple as saying "I have command." … This allows all oncoming resources to receive information and report to one person. Taking command is important because it will help stop freelancing and possible blue-on-blue scenarios.

**Provide an LCAN Report**

Next, the first [law enforcement] responder in should give a size-up report, or LCAN report. This is simply a Location, Condition, Actions, and Needs report telling follow-up units where the officer is at, what he or she sees on arrival, what he or she is doing or plans on doing, and what he or she needs to complete the mission … .LCAN reports

---

[52] *Id.* ALERRT training teaches that every law enforcement responder, "even those recently hired, should carry the Active Shooter Response Card with them at all times," and "[t]hey should be prepared to assume command and start completing the tasks listed on the card within the first few minutes." *Id.* at STU 7-7; *see also id.* at STU 8-2 – 8-4(module 8.1, Incident Command System Instructor Walk-Throughs).

should be updated as more actions are needed to give follow-on responders updated information as they are coming in. This will help with overconvergence and allow the ICS system to begin to set up … .The LCAN report should continue to be updated as the situation changes.

**Assume Command**

As more [law enforcement] responders arrive on the scene, someone should assume command of the outside of the building. This person could be a higher-ranking officer or any responder who sees enough personnel are inside and realizes that things need to be taken care of on the outside of the building (e.g., perimeter control, ambulance exchange areas, staging for all to set up, more contact teams).

Command will be passed from the interior commander … to the command person outside who can begin getting control of the chaos of the emergency. Eventually, this person will be relieved of his or her position and an overall commander will take charge of the situation during the next several stages of the event. As the incident stabilizes, command will downsize and the situation will move into an investigative phase. Units will be released to service and cut loose.

The main points to remember about ICS are that the first [law enforcement] responder must take command. This [law enforcement] responder must also give an LCAN report for oncoming units. Someone else on the outside of the building must then assume command from the first [law enforcement] responder and begin to help gain control of the chaos.[53]

The ALERRT training includes a module on "Entering Locked Buildings Quickly, Discreetly, and Safely," advising that "[r]esponders should be creative and make use of improvised tools to get inside the building however they can."[54] With respect to using keys, ALERRT teaches that "[o]ften, the quickest, most discreet, and safest method of entering a locked building is to locate a key—as long as keys can be located immediately," but "if a key cannot be located quickly, [law enforcement] responders should use another technique to enter the area without delay."[55] The training also suggests sledgehammers and pry tools as reliable, practical, and affordable breaching tools,[56] and a separate module anticipates the challenge of breaching closed and locked outward-opening interior doors, noting that "[m]any public buildings are required by law to have outward-opening doors with self-closing mechanisms for all high-occupancy rooms," and that law enforcement responders "should be prepared to encounter this type of door during an active response."[57]

---

[53] *Id.* at STU 8-2 – 8-3 (emphasis in original).

[54] *Id.* at STU 3-8.

[55] *Id.* at STU 3-9.

[56] *Id.* at STU 3-11 – 3-12.

[57] *Id.* at STU 4-22.

### Rise of "Bailout" Security Incidents

Uvalde CISD police officers visit school campuses in the event of lockdowns, which occurred relatively frequently at Robb Elementary due to its proximity to the intersection of Highway 83 and Highway 90. Chief Arredondo described a rise in bailouts: to avoid being stopped by law enforcement, vehicles loaded with undocumented immigrants traveling along highways leading from the border towns of Del Rio and Eagle Pass lead officers on high-speed chases that often end by crashing the vehicle and allowing the occupants to scatter.[58]



*Uvalde, at the intersection of Hwy. 83 & Hwy. 90.*    *Robb Elementary, near intersection of Hwy. 83 & Hwy. 90.*

Numerous witnesses testified to the Committee that there has been an increase in bailout activity over the past 18 months.[59] Uvalde CISD Director of Student Services Kenneth Mueller testified that since February 2021, high-speed chases have been a daily event in the Uvalde area, causing Uvalde CISD schools to be secured or locked down frequently, with 47 "secure" or "lockdown" events happening since late February 2022, and approximately 90% of those

---

[58] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 29-30 (June 21, 2022).

[59] *See, e.g.,* Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022) (confirming the frequency of bailouts in the neighborhood surrounding Robb Elementary). Regarding the impacts of bailouts on the Uvalde community, *see, e.g.,* Carine Hajjar, National Review, *Human-Smuggler 'Bailouts' Are Endangering Border Communities* (Apr. 12, 2022), available at https://www.nationalreview.com/corner/human-smuggler-bailouts-are-endangering-border-communities/ (featuring pre-tragedy interview of Uvalde Mayor Don McLaughlin, specifically identifying the risk to school-age residents of Uvalde).

being attributed to bailouts.[60] Uvalde CISD parents became so concerned about the number of bailouts occurring near the elementary-school campuses that they offered to hire off-duty police to supplement the Uvalde CISD police presence.[61]

Raptor Alert System

School district witnesses also testified to another effect of the rising prevalence of bailouts. The alert system does not differentiate its signals between bailouts and other kinds of alerts, such as an active shooter situation. The series of bailout-related alerts led teachers and administrators to respond to all alerts with less urgency—when they heard the sound of an alert, many assumed that it was another bailout.



*Raptor Alert application.*

Raptor Technologies supplied the alert system Uvalde CISD used. Uvalde CISD had used Raptor's software to screen campus visitors for approximately 10 years. In the fall of 2021, Mueller viewed a presentation on Raptor's emergency management alert system, and he gathered the Uvalde CISD principals, who agreed that they needed it. Uvalde CISD purchased the software in October 2021, and the first Raptor alert occurred on February 8, 2022.[62]

By March 2022, as Uvalde CISD was implementing the Raptor alert system, there was a high volume of alerts. By utilizing the Raptor mobile phone application,[63] any Uvalde CISD employee could activate an alert. Staff at a school campus typically would first learn about a bailout from an external source. Then they would decide, depending on the proximity of the threat to the school, whether to initiate a "secure" or a "lockdown" alert.[64]

[60] Committee testimony of Kenneth Mueller (June 16, 2022); *see also* Committee testimony of Lynn Deming, Robb Elementary fourth-grade teacher (June 29, 2022) (describing how most Raptor alerts have been for bailouts, and one happened on the Robb Elementary campus near the bus lane).

[61] Committee testimony of Kenneth Mueller (June 16, 2022).

[62] *Id.*; *see* https://raptortech.com/raptor-alert/.

[63] Raptor Emergency Management Brochure, available at https://raptortech.com/wp-content/uploads/2021/09/Raptor-EmergencyManagement-Brochure.pdf?emergency-management-software-for-schools.

[64] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

Chief Arredondo explained it was important to notify schools in the vicinity of the highways about bailouts because the passengers would scatter everywhere, and the school district police did not want them coming on campus. While there have been no incidents of bailout-related violence on Uvalde CISD school grounds, there have been examples of high-speed driving that sometimes crossed school parking lots and reports of some bailout incidents involving firearms in the surrounding neighborhoods.[65]

The Committee received evidence that Uvalde CISD employees did not always reliably receive the Raptor alerts. Reasons included poor wi-fi coverage, phones that were turned off or not always carried,[66] and employees who had to log-in on a computer to receive a message.

### Uvalde CISD Facilities & Maintenance

Uvalde CISD has a Maintenance & Operations Department overseen by director Rodney Harrison, who testified before the Committee. Harrison expressed his view that Uvalde CISD's buildings are in fairly good shape. To facilitate taking care of each campus, the Maintenance & Operations Department employs 14 full-time employees supplemented by six students employed to help move furniture. Harrison stated that it is difficult to keep his department staffed, and he has recently lost employees to two retirements during the COVID pandemic, one death, and another employee moving away.[67]

### Robb Elementary Facilities & Management

Robb Elementary School was built in 1955. Most recently, it served as the primary Uvalde CISD school for students in second through fourth grades.[68] "New" buildings were constructed at the elementary schools, including the west building at Robb, 22 years ago.[69]

Robb Elementary had a new principal beginning with the 2021–22 school year. Principal Mandy Gutierrez has worked for Uvalde CISD for over two decades, starting as a fourth grade

[65] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 30 (June 21, 2022); Committee testimony of Kenneth Mueller (June 16, 2022).

[66] Committee testimony of Kenneth Mueller (June 16, 2022).

[67] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[68] The only other option for second to fourth grades is the Uvalde Dual Language Academy. Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Uvalde CISD informed the Investigatory Committee that it intends to turn the former Robb Elementary School campus into a park dedicated to the memory of the students and teachers killed in the shooting tragedy. Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

[69] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Dr. Hal Harrell, Uvalde CISD superintendent (June 16, 2022).

teacher at Robb in 2008. In 2018, she became assistant principal, and she served in that position until becoming the principal in 2021.[70]

Uvalde CISD had assigned two full-time custodians to Robb Elementary.[71] The lead custodian was Jaime Perez.

In 2019, Uvalde CISD received a state-funded grant to upgrade school security. The school district used its funds to add video cameras to various campuses, build a fence surrounding Flores Elementary School, and install magnetic entryways at some campuses.[72]

### Policies for Locking Doors

Robb Elementary's principal testified that the school's west building has three exterior doors, two of which policy required to remain locked. Each classroom in the west building had a door to a hallway, which policy required to remain locked at all times.[73] The interior classroom doors also were required to remain closed and locked at all times.[74] The interior doors were solid metal with a small pane of glass and could only be locked from the outside using a key.[75]

The school district's police officers conducted walk-throughs, during which they would check for locked doors.[76] When they found doors unlocked the officers would remind teachers to keep the doors locked, and in the event of repeat offenders, they would document the violations.[77]

Multiple witnesses reported to the Committee that people at Robb Elementary commonly left doors unlocked—as did people at all the other Uvalde CISD schools as well.[78] Teachers would use rocks to prop open exterior doors,[79] and they used door stops, wedges, and magnets to

---

[70] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[71] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[72] *Id.*

[73] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* Committee testimony of Pete Arredondo, Chief of Uvalde CISD Police Department (June 21, 2022) (assumed Rooms 111 and 112 were locked because the policy was for them to be locked at all times, particularly during a lockdown).

[74] Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times.").

[75] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[76] *Id.*; Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[77] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[78] *E.g.*, Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[79] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

prevent interior door locks from latching.[80] Due to a key shortage, Robb Elementary School substitute teachers often were instructed to use the "magnet system" to circumvent the locks in violation of school district policy.[81]

Uvalde CISD Police Officer Adrian Gonzalez testified that when an officer was walking the floors and checking doors, the teachers would notify each other, and they would lock their doors.[82] The officers would speak to the teachers and to their supervisors, and they tried to discourage the use of magnets.[83] Common responses from teachers would include that they did not have a key (particularly in the case of substitute teachers) and that it was just temporary while a child was using the restroom.[84] For some teachers, the inconveniences of keeping up with a key outweighed their perception of the risk of leaving doors unlocked. Other teachers were "rule followers," always locking their doors.

At the time of the incident, all the doors in the building had been recently painted.[85] In March 2022, around spring break, school administrators received a report from the teacher in Room 111 that his classroom door was not always locking.[86] According to numerous witnesses who testified before the Committee, the door to Room 111 could lock, although it took some extra effort, and if the door closed softly it might not lock. But the head custodian at Robb Elementary testified that he never heard about any problems with the doors for Rooms 111 or 112, and if he had, he would have created a work order.[87] Robb Elementary maintenance records confirm the lack of any written work order to repair the door for Rooms 111 or 112 during the 2021–22 school year. Although Uvalde CISD policy required each staff member to

---

[80] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022); Testimony of Rodney Harrison, Uvalde CISD Maintenance and Operations Director (June 16, 2022). Assistant principal Shawna Wolbert, who was not present on campus during the incident, told the Department of Public Safety that there was a "magnet system" with magnets provided to substitutes to keep doors from locking. DPS interview of Robb Elementary Assistant Principal Shawna Wolbert (May 28, 2022). Principal Gutierrez said the same thing in her statement to DPS. DPS interview of Robb Elementary Principal Mandy Gutierrez (May 28, 2022).

[81] *See* DPS interviews of Robb Elementary administrators (May 28, 2022); *see also* Uvalde Consolidated ISD, *Annex 1: Active Shooter* ¶ IV.B.2.r. ("Teachers are instructed to keep their classroom doors closed and locked at all times. *Barriers are not to be used. Substitutes shall follow the same policy,* with campuses ensuring they have access to the classrooms they need throughout the day." (emphasis supplied)).

[82] Committee testimony of Adrian Gonzalez, Uvalde CISD police officer (June 20, 2022).

[83] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[84] Committee testimony of Ruby Gonzalez, Uvalde CISD police officer (June 17, 2022).

[85] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[86] *See, e.g.*, Committee investigators' interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[87] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

know the procedures to follow to request repairs for a door that would not lock,[88] Robb Elementary teachers testified to the Committee that instead of requesting a work order themselves, they would call school administrators who were responsible for making the requests.

Maintenance of Doors & Keys

Considering the district's policies about keeping doors locked, it was important that doors and locks be properly maintained. The manufacturer discontinued production of the door locks used at Robb Elementary. While the school district had acquired a supply of key blanks at the time the locks were purchased, that supply was gone by May 2022.[89]

The director of maintenance and operations, Mr. Harrison, testified that people frequently lose, forget, or simply do not want to carry school keys. As a result, the custodians spend a lot of time opening doors. The maintenance and operations department has one employee who specializes in door repairs, but it relies on YouTube instruction videos, online diagrams, and the help of a local locksmith to work on locks. Harrison testified that unless there is a work order notifying his department of a problem, his employees do not regularly check doors.[90]

There were numerous different master keys that worked with different sets of locks at the Robb Elementary School campus. People who had master keys included Harrison, Principal Gutierrez, Assistant Principal Shawna Wolbert, Robb Instructional Coach Rebecca Guzman, Principal Gutierrez's secretary, Janette Martinez, and lead custodian Jaime Perez.[91] Both Uvalde CISD Police Chief Arredondo and Lt. Mike Hernandez possessed a large number of keys to Uvalde CISD buildings. Chief Arredondo kept a number of keys in his car, but he was not sure whether he had master keys for Robb Elementary. He knew he did not have a key to every building, though he testified that he had requested a complete set for himself.[92] Of the over 50 keys that he carried with him, Lt. Hernandez testified that he had a Robb Elementary master

---

[88] Uvalde CISD, *Annex 1: Active Shooter* ¶ IV.B.1.b ("Doors to all classrooms will remain locked during instruction … . Each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.").

[89] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022).

[90] *Id.*

[91] Committee testimony of Rodney Harrison, Uvalde CISD Maintenance & Operations Director (June 16, 2022); Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

[92] Committee testimony of Pete Arredondo, USCID police chief (June 21, 2022).

key that had worked, although sometimes he had to jiggle keys to make them work. Additionally, sometimes staff would change locks without notice to him.[93]

Arnulfo Reyes, the fourth grade teacher in Room 111 stated in an interview that teachers and students in his building widely knew that the door to his classroom frequently did not lock, and he had gotten in "trouble" several times when Uvalde CISD police officers found the door unlocked. He stated that, on multiple occasions, he reported the malfunctioning lock to school administrators, who stated that the request had been turned in. As was the apparent practice among Robb Elementary teachers, Reyes never submitted a work order to repair the door lock for Room 111 himself.[94] Principal Gutierrez, in her testimony, confirmed that school administration knew about the issues with that door, stating that it was reported around spring break of 2022.[95]

---

[93] Committee testimony of Lt. Mike Hernandez, Uvalde CISD Police (June 17, 2022). Lt. Hernandez's keys were sent into the west building in response to the request for a master key during the May 24, 2022, incident, but officers inside the building were unable to identify the correct key from among the dozens of keys on his key rings.

[94] DPS interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[95] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

# 4 | THE ATTACKER

One motive that drove the man behind the massacre at Robb Elementary School was a desire for notoriety and fame. The Committee refuses to perpetuate his memory in that way; our focus is to ensure that Texas never forgets the children and beloved teachers who have been lost and the lessons this tragedy can teach. So, instead of naming him, we call him by a generic term used in active shooter training: "the attacker." In consultation with the local community in Uvalde, the Committee arranged to show victims' families, in advance of public release, a prudently edited version of Robb Elementary's hallway surveillance video that did not include images of him.[96] We regret that others, under cover of anonymity and for their own motives, have sensationalized evidence of this horrible tragedy at the risk of glorifying a monster.[97]

## Family & Early Life

The attacker was born in Fargo, North Dakota on May 16, 2004, the second child born to the mother, Uvalde native A.R., and her then-boyfriend, S.R. The couple split shortly after the attacker's birth, and A.R. returned to Uvalde with the two children. The father had limited and inconsistent involvement in his children's lives from that point onward.[98]

Mother A.R. was known to several witnesses who testified before the Committee from her work as a server at local Uvalde restaurants. A.R. was involved in the attacker's early life, but over time, her relationship with both her children became strained.[99] A.R. struggled with a long history of drug use and other personal issues, though her only criminal history was a 2005 misdemeanor theft that ended in probation and a dismissed 2007 charge of misdemeanor family-violence assault.[100] The FBI interviewed a former girlfriend of the attacker who

---

[96] The Committee incorporates into its report, by reference, the edited videorecording of the May 24, 2022, law enforcement response at Robb Elementary uploaded at https://www.youtube.com/watch?v=vYjDc5sDZyU. This video is considered part of this report.

[97] Tragically, there is evidence that national media coverage of mass shootings has played a role in increasing their frequency. *See generally* https://www.dontnamethem.org/.

[98] The evidence shared by other law enforcement agencies includes the attacker's birth certificate and school records as well as notes from interviews of both of his parents.

[99] In addition to various interviews of family members conducted by law enforcement agencies in the wake of the Robb Elementary tragedy, the Committee heard testimony from an aunt and a cousin of the attacker. Also, the Committee learned many details in this section from a review of the attacker's mobile phones and cloud-based data storage, which were imaged by law enforcement and provided to the Committee.

[100] Records of the mother's criminal history were provided to the Committee.

believed one of A.R.'s boyfriends sexually assaulted him at an early age, but that A.R. didn't believe his outcry.[101]

The attacker and his family had some support from extended family, most notably A.R.'s mother, C.G. Testimony before the Committee portrayed C.G. as well-known and well-regarded in the Uvalde community, particularly within the local school district, from which she retired after twenty-seven years. C.G. took on the role of a maternal figure in the lives of both the attacker and his sister, especially as they grew older.

Relatives described the attacker as shy and quiet. The Committee heard testimony that he was reluctant to interact with peers because of a speech impediment. Poverty is not an unfamiliar circumstance in Uvalde—86% of the children in the school district may be economically disadvantaged.[102] The attacker often wore the same clothing day after day.

### School

Records from the attacker's early school years reveal varied accounts of his character and school performance. His pre-K teacher's report described him as "a pleasure to have … a wonderful student … always ready to learn," and it praised his "hard work and positive attitude in the classroom." Yet early assessments showed he was behind other students academically, and by third grade, school officials already had identified him as "at-risk" due to consistently poor test results. School records reveal that someone may have requested speech therapy for the attacker, and his later internet searches show he himself sought information on dyslexia. Ultimately, he received no special education services.[103]

The attacker's fourth grade year at Robb Elementary School was significant to him. The shooting took place in his former fourth grade classroom, and he discussed bad memories of fourth grade with an acquaintance just weeks beforehand. In testimony before the Committee, two different narratives have emerged.

The attacker's fourth grade teacher testified before the Committee. Not only did she know the attacker from having been his teacher, but she was also in Robb Elementary's fourth grade building, in a different classroom, at the time of the attack. This teacher told the Committee she knew the attacker needed extra help in her class because he claimed to be a victim of bullying. She testified that she met with the attacker's mother, A.R., over the mother's concerns about bullying, and that she had promised A.R. that her son would have a good fourth grade

---

[101] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

[102] Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

[103] *Id.*

year. According to the teacher, it was a good year for the attacker. She said she believed her classroom was a safe place for him and that he made friends there.

Members of the attacker's family, however, reported to the Committee their belief that other students still bullied the attacker throughout his fourth grade school year over his stutter, clothing, and short haircut. A cousin of the attacker said she was in the same fourth grade class with him, and she corroborated this version of his experience that year. She reported an incident in which another girl in the class tied the attacker's shoelaces together, resulting in him falling over and injuring his face. The family also reported their belief that some teachers also picked on the attacker and his cousin.

Despite the accounts that suggest bullying of the attacker had become a concern by the fourth grade, in notes found on his phone, he described them as beginning in middle school. It is not known to the Committee whether the attacker ever shared these notes with anybody.

Records show the attacker had declining attendance, with more than one hundred absences annually beginning in 2018, along with failing grades and increasingly dismal performance on standardized and end-of-course exams. While Uvalde CISD "school success officers" do try to bring truant children back to school, many Uvalde students have spotty attendance, and the local judicial system reportedly does not consistently enforce truancy rules.[104] It is unclear whether any school resource officers ever visited the home of the attacker.

Despite his absences, or perhaps because of them, the attacker had almost no disciplinary history at school. The single infraction on his school record is for "mutual combat" with another student in a hallway in late 2018, resulting in a three-day suspension.

By 2021, at age seventeen, the attacker had only completed the ninth grade. On October 28, 2021, Uvalde High School involuntarily withdrew him, citing poor academic performance and lack of attendance.[105]

---

[104] Id.

[105] There has been some public reference to a Uvalde High School teacher, identified in FBI investigative reports as Rhiannon Bates, who was identified by yet another teacher as having purportedly stated in the past that the attacker was the one student of whom she was afraid, and that "if any student was going to become a school shooter, it would be him." FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP). The Committee's investigators interviewed Ms. Bates, and she categorically denies this account, specifically denying any knowledge about the attacker. In her testimony to the Committee, Uvalde CISD administrator Dr. Becky Reinhardt confirmed that the attacker had not been one of Bates's students, and there is no indication that she ever had any interaction with him. Committee testimony of Dr. Becky Reinhardt, Uvalde CISD (June 30, 2022).

## The Year Before

In a year distinguished by the general school-age population's return to school in Uvalde and elsewhere after the COVID pandemic, the attacker dropped out of school and turned down a dark path. While in earlier years, notes in his phone reflect that he unsuccessfully sought to fit in (including a fixation with weight and fitness that resulted in an eating disorder), in 2021 he appears to have increasingly withdrew and isolated himself.

An ex-boyfriend of his mother A.R. described the attacker to an investigating Texas Ranger as a loner who punched holes in the walls of his room after arguments with her. By this time the attacker's sister already had graduated and left home, and his best (perhaps only) friend was living in San Antonio. The attacker had no driver's license or vehicle. Family members told the Committee and other investigators that a group of the attacker's former friends "jumped" him early in the year. The attacker began trying to teach himself boxing and mixed martial arts with a punching bag in his room at home.

In mid-2021, his relationship with the girlfriend later interviewed by the FBI ended. She described the attacker as lonely and depressed, constantly teased by friends who called him a "school shooter." She said he told her repeatedly that he wouldn't live past eighteen, either because he would commit suicide or simply because he "wouldn't live long."[106] The attacker responded to the breakup by harassing the girl and her friends.

The attacker began wearing black clothes, combat boots, and long, unkempt hair. He was active on several social media platforms, including TikTok, Instagram, YouTube, and the French livestreaming platform Yubo. He networked with local peers in ongoing group chats on Snapchat, and he played a range of videogames, including the Call of Duty and Grand Theft Auto series. Most of his usernames and even his email address reflected themes of confrontation and revenge.

The attacker began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like, as well as sending unexpected explicit messages to others online. Those with whom he played videogames reported that he became enraged when he lost. He made over-the-top threats, especially towards female players, whom he would terrorize with graphic descriptions of violence and rape.

His online interactions grew more manipulative and controlling as the year wore on, and he presented a more commanding personality online than he did in person. He pretended to a

---

[106] FBI San Antonio, Situational Report (May 30, 2022) (SITREP #11, final SITREP).

greater level of maturity than he had, searching the internet for information on sexual practices mentioned by others in conversation. The attacker wrote about his difficulty connecting to other people or feeling empathy for them; he said he was "not human," and he called others "humans," apparently intending it as an insult. Later internet usage suggests he may have wondered if he was a sociopath and sought out information on the condition. His internet research resulted in him receiving an email about obtaining psychological treatment for sociopathy.

The attacker became focused on achieving notoriety. He believed his TikTok and YouTube channels would be successful. The small number of views he received led him to tell those with whom he interacted that he was "famous," that they were mere "randoms" by comparison, and that they were lucky to interact with him.

On Yubo, the attacker spoke enviously of publicity given to a murderer and animal abuser whose story became widely known after a Netflix documentary. In late 2021, he shared a video online that showed him driving around with "someone he met on the internet" holding a clear plastic bag that contained a dead cat, which he discarded in the street and spit on while his driver laughed. The video then showed the attacker wearing a tactical plate carrier, went on to show him dryfiring BB guns at people, and ended with footage of emergency services responding to a serious car accident, which he claimed his driver had caused.

The attacker got a job in late 2021. He first worked at Whataburger, where a friend's grandmother saw him. She snapped a picture and sent it to her grandson, warning that it was "an example of what your life will be if you quit school"—a sentiment some of his peers expressed to him directly. His employer fired him after a month for threatening a female coworker, and he fared similarly at his next job at Wendy's. A coworker there described him as "not a good person" and "troubled," someone who "put himself in a box and would not talk or associate with anyone he worked with." An exception to that approach was when he tried discussing guns with another employee. When the other employee received the discussion negatively, the attacker challenged him to a fight. The attacker also occasionally worked with his grandfather, who had an air conditioning business and paid him in cash.

Living at home, the attacker had no real expenses and hoarded money, telling acquaintances that he was "saving for something big" and that they would all see him in the news one day. Family members believed he was saving money for his own apartment or car, but clues to his real plans surfaced near the end of 2021. That is when he ordered rifle slings, a red dot sight, and shin guards, as well as the body armor carrier worn in both the video he shared and on the day of the Robb Elementary massacre. Still seventeen at the time, the attacker asked at

least two different people to buy guns for him,[107] which they both refused to do. Interviews conducted by other investigators indicate that family members and friends were aware of his efforts to buy guns before he was legally permitted to do so.

Finally, the attacker developed a fascination with school shootings, of which he made no secret. His comments about them coupled with his wild threats of violence and rape earned him the nickname "Yubo's school shooter" on that platform. Those with whom he played games taunted him with a similar nickname so often that it became a running joke. Even those he personally knew in his local chat group began calling him "the school shooter" after he shared pictures of himself wearing the plate carrier he'd bought and posing with a BB gun he tried to convince them was real. None of his online behavior was ever reported to law enforcement, and if it was reported by other users to any social media platform, it does not appear that actions were taken to restrict his access or to report him to authorities as a threat.

### The Last Days

While a vague idea for a school shooting appears to have been in the attacker's mind as early as late 2021, he began to pursue his evil plan in early 2022 after a falling-out with his mother. A blowout argument between them was livestreamed on Instagram, and several members of their family viewed it. Although sheriff's deputies responded to a call, they made no arrests. Soon afterwards, the attacker left home and moved in with his grandmother, just blocks away from Robb Elementary School.

His relationship with his mother never improved. He retained similar antipathy toward his father, who last saw him about a month before the shooting. The father felt his son had no love left for him. He noticed that the attacker had cuts on his own face that appeared to be self-inflicted (something other witnesses had observed on prior occasions), and he claimed he was "doing something" soon.

The attacker had moved into his grandmother's small home, where he had no room of his own and slept on the living-room floor. A few days before the shooting, he confided in an older cousin who was also staying there, telling her that he did not want to live anymore. After

---

[107] The straw purchase of a firearm as proposed by the attacker would violate federal law. *See* 18 U.S.C. § 922(a)(6) ("It shall be unlawful— for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a … licensed manufacturer, [or] licensed dealer … knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such … manufacturer, [or] dealer … with respect to any fact material to the lawfulness of the sale … under the provisions of this chapter"). Additionally, Texas law provides that "A person commits an offense if the person …  intentionally or knowingly sells, rents, leases, or gives or offers to sell, rent, lease, or give to any child younger than 18 years of age any firearm … ." Tex. Pen. Code § 46.06(a)(2).

a lengthy heart-to-heart, the cousin believed she'd gotten through to him. The attacker's uncle also recalled having similar discussions with him.

Meanwhile, the attacker's planning and preparation became more focused. The Committee received extensive documentation compiled and created by the Bureau of Alcohol, Tobacco, Firearms and Explosives in the course of its investigation of the attacker's purchases. He began buying more firearms accessories beginning in February 2022, including 60 30-round magazines, a holographic weapon sight, and a Hellfire Gen 2 snap-on trigger system.

On March 23, 2022, a suspicious person dressed in all black with a backpack was seen canvasing Robb Elementary, but no one ever identified the person.

As soon as the attacker turned eighteen on May 16, 2022—just one week before the shooting on May 24, 2022—he was finally able to purchase guns and ammunition. An online retailer shipped 1,740 rounds of 5.56mm 75-grain boat tail hollow point to his doorstep, at a cost of $1,761.50. He ordered a Daniel Defense DDM4 V7 (an AR-15-style rifle) for shipment to a gun store in Uvalde, at a cost of $2,054.28 (including tax and transfer fee). On May 17, 2022, he bought a Smith and Wesson M&P15 (also an AR-15-style rifle) at the same store in Uvalde, at a cost of $1,081.42. He returned the next day for 375 rounds of M193, a 5.56mm 55-grain round with a full metal jacket, which has a soft core surrounded by a harder metal. He returned again to pick up his other rifle when it arrived on May 20, 2022, and he had store staff install the holographic sight on it after the transfer was completed.[108]



*The attacker's rifles; the leftmost was used at Robb.*

The owner of the gun store described the attacker as an "average customer with no 'red flags' or suspicious conditions"—just that he was always alone and quiet. The owner of the store remembered asking how an 18-year-old could afford such purchases (the rifles alone were over $3,000), and the attacker simply said he had saved up. Patrons of the store who saw him told

---

[108] The exact cost of all magazines, sights, and other accessories in addition to the amounts listed above likely ranged from $1,500–2,000 based on market value and the amounts the attacker reported to those he told about the purchases.

a different story in FBI interviews, saying after the tragedy that the attacker was "very nervous looking" and that he "appeared odd and looked like one of those school shooters"; another described his all-black clothing as simply giving off "bad vibes."

A background check was conducted, and the attacker qualified for the purchases. While multiple gun sales within such a short period are and were reported to the ATF, the law only requires purchases of handguns to be reported to the local sheriff. Here, the information about the attacker's gun purchases remained in federal hands.

The attacker's uncle drove him to the gun store twice. He said he did not know they were going to pick up a rifle the first time; the store is connected to a popular restaurant, and the attacker said he was hungry. When he returned with a long box and no food, it was obvious he had purchased a rifle. The Committee has not learned who took the attacker to the gun store on May 18th, but the uncle drove him back on May 20th after the attacker falsely told him he needed to pick up ammunition purchased online. The uncle said he did not see what was in the attacker's package, and he was too unfamiliar with firearms to know what might have been inside. It is now known that the package contained the second, more expensive rifle used in the shooting.

The attacker's grandmother and cousin both told him he could not have a gun in the home, so the uncle agreed to store the first rifle at his house. He believes the attacker snuck it out after staying the night a few days later. The attacker apparently hid the second rifle outside his grandmother's house until he brought it in the night before the shooting, as he related to an acquaintance by text messages.

The attacker had no experience with firearms, and based on other investigators' interviews of friends and family, the shooting was likely the first time he fired one. The uncle recalled the attacker attempting to seat a magazine in the rifle and the magazine repeatedly falling out onto the floor. Internet search history shows the attacker sought out ranges but was unable to get to one that allowed long guns before the shooting. He also searched the internet for basic information such as what kind of ammunition an AR-15 fires and whether a magazine can be reused after being emptied, and he looked for information on how to buy "juggernaut armor," a fictional armor system depicted in videogames.

Online interactions involving the attacker continued to foreshadow a tragedy. In March 2022, in an Instagram group conversation, a student told him that "people at school talk [expletive] about you and call you school shooter." Later, the attacker began referencing a timeline. On April 2nd, he asked in a direct message on Instagram, "Are you still gonna remember me in 50 something days ?" After the answer, "probably not 💀," he retorted with, "Hmm alright

Case 2:22-cv-20908, CTS-CFH 9 Document 49-20, Filed 10/13/25 Page 41 of 82

we'll see in may 👍." The attacker often connected those dates with doing something that would make him famous and put him "all over the news," and many of those with whom he chatted suspected his cryptic deadlines meant violence. For example, in a May 14th conversation he simply wrote "10 more days," leading to immediate speculation that he meant he'd "shoot up a school or something" or commit "mass murder" on that date. On May 17th, a friend told him that an acquaintance of theirs was "telling everyone u shooting up the school."

The attacker also began sharing photos of his rifles, including with total strangers. Those in his Snapchat group claimed they believed the guns were fake (despite the attacker posting the receipt) because he had tried to pass off a BB gun as real the year before. For those with no reason for doubts, the context often made the shared images disturbing, such in late April when a friend proposed visiting the attacker in Uvalde:



After the attacker sent a picture of the rifle he intended to buy—to great approval—their discussion continued just after his birthday when he made his first gun and ammo purchases:



In the last days before the shooting, the attacker saved news stories and other information about the mass shooting in a Buffalo, N.Y. supermarket on May 19, 2022. He also spent time with his cousin's son, who attended Robb Elementary. After playing the children's videogame Roblox, the attacker elicited from him details about his schedule and how lunch periods worked at the school.

On the eve of the shooting, the attacker began contacting numerous people with vague but ominous messages about doing something the next day. In one Snapchat exchange with a German teenager he had befriended, he commented: "I got a lil secret 🙄 😶." When she became curious, he told her it was "impossible for today" because he was still waiting for something "being delivered Monday 23 by 7 pm." His order of 1,740 hollow points arrived later that day.

Prior to the shooting, the attacker had no criminal history and had never been arrested. He is not known to have espoused any ideology or political views of any kind. Private individuals alone knew the many warning signals.

# 5 | May 24 Incident & Law Enforcement Response

May 24, 2022, marked the beginning of the end of the 2022 school year at Robb Elementary School. Parents, teachers, and students came to school that day ready to celebrate the students' accomplishments and awards and to look forward to another peaceful Uvalde summer. The students had completed all their tests and school instruction was over for the year. It was awards day, and parents were coming to school to see their children's ceremonies. Many students anticipated going home early or remaining with their classmates to watch a movie.

In a nearby neighborhood, a former Robb Elementary student and Uvalde High School dropout had made other grim plans for that now-fateful day. In private messages, the Robb Elementary School attacker had indicated to acquaintances that he had chosen this date in advance for a significant event. Some in the Uvalde community have speculated that the attacker intended to choose the date when, carrying out a local tradition, the Class of 2022 seniors would return to Robb Elementary to walk the halls at lunchtime. If the attacker's former classmates were his intended targets, they were spared because the seniors' visit occurred on May 23, 2022, the day before the tragic attack.

The attacker was at home with his grandparents on the morning of May 24th when he sent eerie online messages, including to an Instagram model he'd never met whom he had tagged in pictures of his guns the week before. "I'll text you in an hour," he wrote, "But you HAVE TO RESPOND. I got a lil secret. I wanna tell u 😊."

Evidence shows that the attacker had been getting in increasing conflicts with his grandmother, and she had threatened to remove him from her mobile phone plan. On the morning of May 24th, she called customer service to do just that. After a nearly hour-long FaceTime conversation with his online acquaintance in Germany, the attacker began texting her live updates:

While these text messages have been circulated in media reports, those reports do not include a message deleted by the attacker's correspondent before the screenshot was taken. Just twenty-eight seconds after the attacker informed her that he



had shot his grandmother and intended to "shoot up" an elementary school, the German teenager replied with a single word: "Cool."[109]

The attacker actually did shoot his grandmother in her face. Despite not having a driver's license, he then proceeded to steal her truck, abandoning her to seek help from a neighbor as he set out to complete his plan.

Driving toward Robb Elementary on South Grove Street, the attacker apparently lost control of the truck while approaching Geraldine Street, crashing the vehicle into a ditch.



*Truck crashed by attacker near Robb Elementary.*

Surveillance cameras at the nearby Hillcrest Memorial Funeral Home captured the crash on video at approximately 11:28 a.m. Two men saw the crash and began to walk from the funeral home, across Geraldine Street, to the location of the truck. The attacker emerged from the wreckage and began shooting toward the two men, who turned and fled back toward the funeral home. Immediately, a report was made to 911 about a man at that location shooting a gun.

---

[109] The above depiction of the text messages is one that has been posted by news outlets—an image of the teenager's phone taken after the shooting. The Committee reviewed data from the attacker's phones, which contained an additional message that appears to have been deleted in the image shared by the teenager.



*Robb elementary and surroundings.*

The attacker proceeded to advance toward Robb Elementary School. There was a five-foot fence around the perimeter of the school property. The attacker tossed a backpack over the fence, then he climbed over it, as documented on the funeral home's surveillance camera.

### Coach Silva Alerts the School

Robb Elementary Coach Yvette Silva was outdoors at that time with a group of third graders, and she spotted the backpack being tossed over the fence followed by a person dressed in black climbing over it. She then saw the person raise a gun and begin to shoot. Coach Silva thought the attacker was shooting at her, and she ran from the field toward her classroom. She used her school radio to report: "Coach Silva to office, somebody just jumped over the fence and he's shooting." She ran toward a group of third graders on the school playground to tell them to lock down. She expected to then hear an announcement of a lockdown, but she did not hear one right away.[110] Meanwhile, the attacker proceeded to the fourth grade teachers' parking lot, continuing to fire his gun.

### Law Enforcement Responds to Robb Elementary

While this was unfolding, Uvalde Police Department dispatch communicated to local law enforcement the initial 911 report from the funeral home about the vehicle crash. Numerous officers immediately began to respond in the direction of Robb Elementary School.

---

[110] Committee testimony of Coach Yvette Silva, Robb Elementary (June 16, 2022).

Uvalde Police SSgt. Eduardo Canales, commander of the SWAT team, had been at Robb Elementary just an hour before for his son's end-of-year school ceremonies. While working at his office, other officers ran down the hallway and said there had been a vehicle accident with shots fired. He followed Lt. Mariano Pargas, the acting chief of the Uvalde Police. (Uvalde Police Chief Daniel Rodriguez was out of town that day, and on this occasion, Lt. Pargas had been designated as acting chief.) On arrival at the school, SSgt. Canales saw cars stopped and a man shooting a gun. He grabbed his rifle, put a magazine into it, and grabbed an extra magazine. He saw people at the funeral home pointing in the direction of the school, and he heard somebody say the attacker was in or near the building. SSgt. Canales entered an open gate where he met Lt. Javier Martinez, also of the Uvalde Police.[111]

Lt. Martinez also heard the report of a vehicle accident with shots fired. He drove toward the intersection of Geraldine and South Grove, and as he arrived, he saw a man on the side of the road pointing. He jumped out of his car, popped the trunk to get his vest, then proceeded toward the west side of the school's west building.[112]

At around the same time, another Uvalde Police officer, Sgt. Daniel Coronado, also arrived on the scene. He wore his uniform and a vest, but he had no rifle plates for protection. Sgt. Coronado first stopped his patrol vehicle at the south end of South Grove Street where it dead-ends into Geraldine Street. He saw two Uvalde Police officers at the intersection who had arrived before him. Sgt. Coronado exited his vehicle, heard gunfire, and asked where the shooting was occurring. At first, the other officers said they did not know, and they could not see the attacker.[113]

One of those officers testified to the Committee that, based on the sound of echoes, he believed the shooter had fired in their direction.[114] That officer saw children dressed in bright colors in the playground, all running away. Then, at a distance exceeding 100 yards, he saw a person dressed in black, also running away. Thinking that the person dressed in black was the attacker, he raised his rifle and asked Sgt. Coronado for permission to shoot.[115]

---

[111] Committee testimony of SSgt. Eduardo Canales, Uvalde Police (June 29, 2022).

[112] Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022).

[113] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[114] The Committee is unaware of any public reporting about this episode that has identified the police officer by name. The officer testified before the Committee. In light of the Committee's determination that the description of this episode by ALERRT—then widely reported by the media—is likely incorrect, we likewise decline to identify him by name for purposes of this report.

[115] *See, e.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

Sgt. Coronado testified he heard the request, and he hesitated. He knew there were children present. He considered the risk of shooting a child, and he quickly recalled his training that officers are responsible for every round that goes downrange.[116]

According to the officer who made the request, there was no opportunity for Sgt. Coronado to respond before they heard on the radio that the attacker was running toward the school. The officers testified to the Committee that it turned out that the person they had seen dressed in black was not the attacker, but instead it was Robb Elementary Coach Abraham Gonzales.[117] Coach Gonzales had been on his way to the parking lot to leave the school after his lunch duty when he heard a gunshot and then Coach Garcia's report about the attacker over the radio. He told the children around him to run away.[118] Robb Elementary fourth grade teachers Lynn

---

[116] *Id.*

[117] Part 1 of the ALERRT report, included the following narrative in its timeline:

> Prior to the suspect's entry into the building at 11:33:00, according to statements, a Uvalde Police Officer on scene at the crash site observed the suspect carrying a rifle outside the west hall entry. The officer, armed with a rifle, asked his supervisor for permission to shoot the suspect. However, the supervisor either did not hear or responded too late. The officer turned to get confirmation from his supervisor and when he turned back to address the suspect, he had entered the west hallway unabated. (OS per investigating officer interview).

ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations*, at 4 (July 6, 2022). The ALERRT report appears to rely on an interview conducted by Texas Ranger Michael Schraub, who interviewed the officer in question on May 27, 2022. That report stated:

> While in route to the scene Officer [A] advised Officer [B] located the shooter. However, the shooter was located a couple blocks away from the dispatch location. Officer [A] advised upon arrival, the shooter was shooting at Officer [B]. Officer [A] advised he positioned his patrol vehicle while ducking down and grabbing his rifle between the shooter and Officer [B]. Officer [A] advised the purpose was to protect Officer [B] while he exited his patrol vehicle. Officer [A] advised his vehicle was not struck by any projectiles.
>
> Officer [A] advised upon exiting his patrol vehicle he observed the shooter in the distance. When he observed the shooter, Officer [A] advised there were kids in the background. Therefore, Officer [A] advised he hesitated shooting at the suspect. Officer [A] advised he requested permission to shoot, looked back very briefly at Sergeant Coronado, but never received a response. Upon looking back the direction of the shooter Officer [A] advised the shooter was gone.

DPS interview (May 27, 2022). In a subsequent DPS interview, the officer in question described the person he saw not as "the shooter" but as "a person in black toward the back of the school, but kids were behind that individual." DPS interview (June 13, 2022). These DPS interview reports do not include or support the detail suggested in the ALERRT report that a Uvalde police officer "observed the suspect carrying a rifle *outside the west hall entry*." Based on its review of evidence to date, this Committee concludes that it is more likely that the officer saw Coach Gonzales dressed in black near a group of schoolchildren than that there was an actual opportunity to shoot the attacker from over 100 yards away, as assumed by ALERRT's partial report.

[118] DPS interview of Coach Abraham Gonzales (May 28, 2022).

Deming and Sasha Martinez each testified that Coach Gonzales yelled at their children to lock down as the attacker approached.[119]

Sgt. Coronado saw people at the funeral home also indicating the attacker was running toward the school. He returned to his car and drove east down Geraldine Street to attempt to flank and engage the attacker. He parked his car on the northeast corner of the campus and saw Uvalde CISD Police Chief Pete Arredondo arrive.[120]

Just minutes before, Chief Arredondo had been in his office at Uvalde High School when he heard "shots fired" on the radio. He rushed out, heard something about Robb Elementary School, and drove toward the school. He arrived with his radios, but as he exited his vehicle, he was fumbling with them and they bothered him, so he dropped them by the school fence knowing that Sgt. Coronado, the sergeant on patrol, was there and "fully uniformed" with his radio.[121]

## Robb Elementary School Locks Down

As the attacker approached the school and as law enforcement responders were arriving, staff at Robb Elementary were beginning to lock down, based mostly on word-of-mouth reports of an armed man on campus.

Principal Mandy Gutierrez had just finished an awards ceremony and was in her office when she heard Coach Silva's report over the radio. She attempted to initiate a lockdown on the Raptor application, but she had difficulty making the alert because of a bad wi-fi signal.[122] She did not attempt to communicate the lockdown alert over the school's intercom. By phone, she called and spoke with Chief Arredondo, who told her, "shut it down Mandy, shut it down."[123] She told head custodian Jaime Perez to ensure that all the doors were locked. She initially locked down in her own office, but she later moved to the cafeteria.[124]

---

[119] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022); Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022).

[120] Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[121] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[122] DPS interview of Mandy Gutierrez, Robb Elementary Principal (May 27, 2022).

[123] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022). Chief Arredondo told the Committee he had no recollection of talking to Principal Gutierrez. Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 161 (June 21, 2022).

[124] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022).

Perez was in the cafeteria when he also heard Coach Silva's report on the radio. He immediately started to implement a lockdown, starting to lock doors from the outside. He heard shots and returned to the cafeteria where he remained for the duration of the incident.[125]

In the west building, the fourth grade teachers in and around the building also started to initiate lockdown procedures upon hearing about the approaching attacker. Sasha Martinez taught a fourth grade class in Room 110. She and her class had left their classroom ahead of schedule for recess. They were on their way to the playground when they heard a coach yelling, pointing at the roof, and telling them to run. Martinez started to hear gunshots, and her students started running, some toward the cafeteria, others joining her toward the direction of their classroom in the west building. She then decided to take them to another open classroom in another building instead.[126]

Lynn Deming in Room 104 was getting her class ready to go early to recess. She was standing at the south door of the west building waiting for a child to get a water bottle when her students heading out the south door reported that a coach was yelling at them. She heard "pow pow" and told her kids to get back into the classroom.[127]

Elsa Avila taught fourth grade in Room 109. She had lined-up her students at 11:30 a.m. to go to recess. Some of the children reported to her that students from Deming's classroom were returning screaming and crying. She opened the door and did not see anybody, but she heard a female voice saying, "get in your rooms." She returned to her classroom and slammed the door shut, because otherwise the lock would not latch. She turned off the lights and closed the door. Her students knew what to do—they positioned themselves away from the windows and the doors.[128]

Nicole Ogburn, the fourth grade teacher in Room 102 at the southwest corner of the west building, heard a sound like metal on brick from the outside. She looked out her window and saw a man in dark clothes with a gun and a bag walking up the sidewalk. She told her students to get down. She heard shots coming from the outside into the window, and she hid underneath a curtain in the room.[129]

---

[125] Committee testimony of Jaime Perez, Robb Elementary head custodian (June 16, 2022).

[126] Committee testimony of Sasha Martinez, Robb Elementary teacher (June 29, 2022). Martinez commented that she thought a lot of time passed between hearing gunshots and then later receiving the Raptor alert. *Id.*

[127] Committee testimony of Lynn Deming, Robb Elementary teacher (June 29, 2022).

[128] Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[129] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

In Room 105, fourth grade teacher Jennieka Rodriguez received a Raptor alert of a lockdown at 11:32 a.m. Her students knew what to do and where to hide. She stepped outside and checked her classroom door to ensure it was locked. As she did so, she looked across the hall and locked eyes with another fourth grade teacher, Ms. Garcia, who was locking the door to her classroom, Room 112.[130]

### The Attacker Enters the West Building

After walking north along the west side of the west building, as observed by Ms. Ogburn,[131] the attacker entered the unlocked west door of the west building.[132] The exterior doors on the east and south sides of the building also were unlocked, such that even if the west door had been locked, the attacker still would have had the ability to enter the building, but his progress likely would have been slowed.

After passing through the west door, the attacker walked east into the building, then turned to his right, south into a hallway. He proceeded down to the vestibule for Rooms 111 and 112 and turned left to face those classroom doors.

### The Attacker Enters Rooms 111 & 112

The surveillance video in the hallway shows that the attacker fired his gun toward Rooms 111 and 112 at approximately 11:33 a.m. He walked forward toward the doors and could be seen stepping back into the hallway before proceeding again into one of the classrooms.

We cannot be certain which of the doors the attacker entered. But, based on the evidence available to the Committee, it is most likely that the attacker found the door to Room 111 unlocked or unsecured and entered through that door.[133] There is no evidence that the attacker

---

[130] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022).

[131] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022).

[132] The Committee received some evidence that this door was usually kept locked, as it was supposed to be. Committee investigator interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee also heard some evidence that staff often propped open the door with a rock so that teachers could run out and come back in. *See, e.g.,* Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022). The surveillance camera inside the west building recorded that someone had propped open the west door with a rock earlier on May 24. *See* Robb Elementary surveillance video. Apparently in response to the lockdown alert, a teacher came into the hallway and removed the rock. *Id.* When the attacker arrived, the door was not propped open by a rock—but because the door was unlocked, he was still able to open the door and enter the building. *Id.*

[133] As discussed later in this report, responding officers assumed, but did not verify, that the doors to Rooms 111 and 112 were locked because of school policies and door designs intended to ensure locked classroom doors. Acting on that assumption, officers spent a great amount of time seeking a master key that could open a door they presumed to be locked. Other information described in this report casts doubt on the suggestion the door

made a forced entry through either door. As noted previously, there is evidence that Ms. Garcia, a teacher in Room 112, locked her classroom door as witnessed by the teacher in Room 105 across the hall, Ms. Rodriguez.[134]

As for Room 111, there was substantial evidence that door did not secure properly. The teacher in Room 111, Arnulfo Reyes, knew this, and on several occasions reported the condition of the door to the school.[135] There was also evidence that teachers and students throughout the fourth grade knew the condition of Room 111's door, as they regularly would enter the door to access the printer in that room.[136] Reyes has no recollection of ever receiving a lockdown alert[137] or any memory that he undertook the special effort needed to get his classroom door to lock before the arrival of the attacker.[138]

According to an analysis provided to the Committee, after entering the attacker spent about 2½ minutes rapidly firing over 100 rounds between the two rooms,[139] ultimately killing many innocent victims.[140] Law enforcement discovered a Hellfire trigger system in the room with the attacker, but based on the evidence provided to date, the Committee is unable to determine whether it was used to increase the weapon's rate of firing. The Department of Public Safety

---

was actually locked. The Committee has been advised that none of the Border Patrol agents who used a key and ultimately opened the door were wearing body cameras which might have shed additional light on this question.

[134] Committee testimony of Jennieka Rodriguez, Robb Elementary teacher (June 29, 2022). One of the surviving students in Room 112 also reported that she saw Ms. Garcia lock the door. DPS interview of Khloie Torres (June 2, 2022).

[135] Committee testimony of Mandy Gutierrez, Robb Elementary Principal (June 16, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[136] Committee testimony of Nicole Ogburn, Robb Elementary teacher (June 29, 2022); *see also* interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022).

[137] DPS (Elizondo) interview of Arnulfo Reyes, Robb Elementary teacher (June 8, 2022).

[138] *E.g.*, DPS (Williamson/Benitez) interview of Arnulfo Reyes, Robb Elementary teacher (May 27, 2022). Reyes told the Committee's investigators that he believes the attacker entered through Room 112 and from there shot through the wall into Room 111. Interview of Arnulfo Reyes, Robb Elementary teacher (June 30, 2022). The Committee finds that suggestion to be unlikely for the reasons previously explained about why Room 112 likely was locked and Room 111 likely was unlocked. It is more likely, and otherwise consistent with his account, that Reyes heard bullets fired by the attacker from outside in the hallway, through the doors, and into Room 111.

[139] *Cf.* Texas Department of Public Safety (@TexasDPS), https://twitter.com/TxDPS/status/1539256179234332673 (June 21, 2022) (reference materials for testimony before Texas Senate Special Committee to Protect All Texans).

[140] *See also* Committee interview of DPS Director Col. Steven C. McCraw (June 9, 2022) (incident timeline). The analysis provided to the Committee strongly suggests that of approximately 142 total rounds fired by the attacker in the building, approximately 21 of those rounds can be identified as being fired after officers entered the building. The first 11 officers to enter the building did so over the course of approximately 6 seconds. It thus appears to be virtually certain that over 100 rounds were fired before the arrival of the first responders.

has advised the Committee there is no indication that the Hellfire device was used by the attacker. It is also possible that it was used. [141]

Terrified teachers and students throughout the west building heard this extended burst of gunfire, as did law enforcement officers who were arriving on the campus and closing in on the west building.[142] Responders heard the tail end of this gunfire as they entered the building through the south and west doors.[143] During those two and a half minutes of gunfire, it is likely that one of the bullets passed through the walls and struck Ms. Avila, the teacher in Room 109.[144]

Also during this time, at approximately 11:36 a.m., Uvalde Police Department dispatch received a call reporting a woman "shot in the head on Diaz Street."[145]

### First Law Enforcement Approaches & Enters

After the attacker already had fired over 100 shots in Robb Elementary's west building, two separate groups of officers converged on the building at the same time from different directions. From the time of their initial entry and over the course of the next five minutes, the attacker fired approximately 16 additional rounds.

On the south side of the building, Chief Arredondo and Officer Adrian Gonzalez of the Uvalde CISD Police and Uvalde Police Officer Page and Sgt. Coronado approached. Officers Page and Gonzalez were the first to enter,[146] followed by Chief Arredondo, then by Sgt.

---

[141] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Report of Investigation #13 (June 2, 2022).

[142] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[143] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

[144] *See* Committee testimony of Elsa Avila, Robb Elementary teacher (June 30, 2022).

[145] Uvalde County Sheriff Ruben Nolasco testified to the Committee that while he was on his way to respond to the report of shots fired in the vicinity of Robb Elementary, he learned about the shooting of a woman on Diaz Street (who turned out to be the attacker's grandmother) from a man in a vehicle who flagged him down in the street. *See* Uvalde Police Department Call Sheet Report (May 24, 2022); Committee testimony of Uvalde County Sheriff Ruben Nolasco (July 11, 2022). Other information provided to the Committee has suggested that Sheriff Nolasco learned about the shooting on Diaz Street by other means, and perhaps earlier than he has acknowledged. In a desire to put this issue to rest, and to foreclose the suggestion that earlier reporting of the attacker's assault on his grandmother could have led to an earlier law enforcement intervention, the Committee has requested records from Sheriff Nolasco's mobile phones to confirm that he was not contacted directly for assistance on Diaz Street. The Committee has not yet received these records. The issue is important if a more timely report of the Diaz Street shooting could have prompted an earlier call from dispatch for law enforcement response to the area or an earlier Raptor alert at the school.

[146] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

Coronado. Officers Page and Gonzales both heard rounds as they were approaching.[147] So did Sgt. Coronado, who yelled "shots fired."[148]

Meanwhile, on the north side of the building, Lt. Martinez and Ssgt. Canales of the Uvalde Police entered the building first, followed by Uvalde Police Officer Louis Landry.[149] Lt. Martinez told a DPS investigator that he heard gunfire from inside the building, then he entered.[150] He testified to the Committee that he suspected the attacker was inside shooting,



*West Building, Robb Elementary.*

---

[147] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); DPS interview of Officer Donald Page, Uvalde Police (May 25, 2022).

[148] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022); *see also* Sgt. Coronado's body-worn camera footage (11:36).

[149] DPS interview of Officer Louis Landry, Uvalde Police (May 26, 2022); *see also* Robb Elementary surveillance video.

[150] DPS interview of Lt. Javier Martinez, Uvalde Police (May 25, 2022); *see also* Robb Elementary surveillance video.

but that as he entered the building it was definitely quiet, with no screaming or crying. He said that on arrival inside the building, he heard "a few muffled shots."[151]

The evidence establishes that as they arrived at the west building, the initial responders knew there had been gunfire inside the building. They heard it as they were approaching. When they entered, they could see a cloud of debris in the hallway from drywall, as well as bullet holes in the walls and spent rifle casings on the floor. Yet the testimony received by the Committee also indicated that none of these initial responders recalled hearing screams or having any contemporaneous understanding, as they arrived in the building, that teachers and students just then had been shot inside the classrooms.



*Uvalde Police officers enter from north end of hallway.*

---

[151] *E.g.*, Committee testimony of Lt. Javier Martinez, Uvalde Police (June 29, 2022); *see also* Robb Elementary surveillance video.

After entering the west building, the two separate groups of officers converged on Rooms 111 and 112. Coming from the south, Officer Page saw smoke and fog and observed that both classrooms were dark. Officer Gonzales remembers smelling gunpowder, saying that it looked smoky or cloudy, like someone set off a fire extinguisher.[152] Chief Arredondo made similar observations of smoke, and he also saw spent casings on the ground.[153] As Sgt. Coronado followed this group and Chief Arredondo from the south, he heard no more active gunfire as recorded on his body camera. It was quiet, and he could see bullet holes through the sheetrock.[154] On Sgt. Coronado's body camera footage, another officer can be heard saying, "it's an AR."[155] Upon entering the building, the officers tried but were unable to communicate on their radios. Officer Page stopped near Rooms 111 and 112,[156] and the school surveillance video suggests that the officers coming north from the south door were the first to reach the near vicinity of Rooms 111 and 112.

Simultaneously, Lt. Martinez followed by SSgt. Canales entered the hallway and approached Rooms 111 and 112, with Lt. Martinez approaching along the east wall and SSgt. Canales following along the west wall, as recorded on SSgt. Canales's body camera and the school surveillance video. Immediately behind them, four additional officers entered the building and remained in the north hallway.

At approximately 11:37 a.m., the officers converged from both sides of the hallway on Rooms 111 and 112. Coming from the north, Lt. Martinez peered into the vestibule for Rooms 111 and 112, and he faced gunfire, getting grazed by fragments of building material on the top of his head.[157] He immediately retreated to the north end of the hallway.[158] On the opposite side

---

[152] *E.g.*, Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022).

[153] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 87 (June 21, 2022). Chief Arredondo testified that he recalled seeing "the locking mechanism" for the door to Room 111, or what he calls "a thumb, the locking mechanism that goes in the throw." He explained, "there's a small gap in between the door and the frame, and you could see, you know, a fraction of an inch. I have an image in my head of seeing that—that throw." *Id.* at 97. For the reasons explained above, the Committee finds it is most likely that the door to Room 111 was not properly or effectively locked.

[154] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022).

[155] Sgt. Coronado's body-worn camera footage (11:36).

[156] DPS interview of Uvalde Police Department Officer Donald Page (May 25, 2022).

[157] ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022) (stating that Lt. Martinez and Sgt. Canales were hit by "building material fragments caused by the suspect's rounds passing through the walls," citing "Investigating Officer Interview" and "Internal School Surveillance").

[158] *See* Robb Elementary surveillance video (11:36). The recent ALERRT report states that "[o]nce the officers retreated, they should have quickly made a plan to stop the attacker and gain access to the wounded," noting "[t]here were several possible plans that could have been implemented." "Perhaps the simplest plan," according to ALERRT, "would have been to push the team back down the hallway and attempt to control the classrooms

of the hall, fragments also hit SSgt. Canales on his ear. He likewise retreated and exited the building on the west side. No shots were fired at that time toward the attacker by the law enforcement responders.

## What Happened for the Next 73 Minutes?

Like the initial approach into the west building, the remainder of law enforcement actions at Robb Elementary School until the ultimate breach of the classroom and neutralization of the attacker was a tale of two separate responses on the north and south sides of the hallway.

## On the South …

After the attacker fired on the responders, Chief Arredondo noticed the light on in Room 110—the room immediately south of Room 111 which was used by Ms. Martinez, who had taken her class out of the building early for recess. Chief Arredondo wondered if there could be a threat in Room 110. The door was either open or unlocked. He entered to clear the room, and he saw holes in the wall. The room was vacant. He told the Committee he thought, "There's no babies in here. It's awards day."[159] He testified that he prayed that if Room 110 was empty, the children might be gone from the rooms occupied by the attacker as well.

Although the encounter had begun as an "active shooter" scenario, Chief Arredondo testified that he immediately began to think of the attacker as being "cornered" and the situation as being one of a "barricaded subject" where his priority was to protect people in the other classrooms from being victimized by the attacker.[160]

With the benefit of hindsight, we now know this was a terrible, tragic mistake.

Testifying before the Committee, Chief Arredondo explained his thinking on this subject at the time as follows:

> We have this guy cornered. We have a group of officers on … the north side, a group of officers on the south side, and we have children now that we know in these other rooms. My thought was: We're a barrier; get these kids out -- not the hallway, because the bullets

---

from the windows in the doors." The report explains the purported simplicity of the plan by noting: "Any officer wearing rifle-rated body armor (e.g., plates) would have assumed the lead as they had an additional level of protection." ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* (July 6, 2022). A problem with ALERRT's depiction of its "simplest plan" is that no officer present was wearing "rifle-rated body armor (e.g., plates)." The Committee agrees the officers should have attempted to breach the classrooms even without armor, but it is inflammatory and misleading to release to the public a report describing "plans that could have been implemented" that assume the presence of protective equipment that the officers did not have.

[159] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[160] *Id.*

are flying through the walls, but get them out the wall – out the windows, because I know, on the outside, it's brick.

\*\*\*

[T]o me … once he's … in a room, you know, to me, he's barricaded in a room. Our thought was: "If he comes out, you know, you eliminate the threat," correct? And just the thought of other children being in other classrooms, my thought was: "We can't let him come back out. If he comes back out, we take him out, or we eliminate the threat. Let's get these children out."

It goes back to the categorizing. … I couldn't tell you when -- if there was any different kind of categorizing. I just knew that he was cornered. And my thought was: " … We're a wall for these kids." That's the way I looked at it. "We're a wall for these kids. We're not going to let him get to these kids in these classrooms" where … we saw the children.[161]

Chief Arredondo's testimony about his immediate perception of the circumstances is consistent with that of the other responders to the extent they uniformly testified that they were unaware of what was taking place behind the doors of Rooms 111 and 112. They obviously were in a school building, during school hours, and the attacker had fired a large number of rounds from inside those rooms. But the responders testified that they heard no screams or cries from within the rooms, and they did not know whether anyone was trapped inside needing rescue or medical attention. Not seeing any injured students during their initial foray into the hallway, Sgt. Coronado testified that he thought that it was probably a "bailout" situation.[162]

Chief Arredondo and other officers contended they were justified in treating the attacker as a "barricaded subject" rather than an "active shooter" because of lack of visual confirmation of injuries or other information. Chief Arredondo explained his reasoning for not continuing an active shooter-style response, telling the Committee:

[W]hen there's a threat … you have to visibly be able to see the threat. You have to have a target before you engage your firearm. That was just something that's gone through my head a million times … .[G]etting fired at through the wall … coming from a blind wall, I had no idea what was on the other side of that wall. But … you eliminate the threat when you could see it. … I never saw a threat. I never got to … physically see the threat or the shooter.[163]

This "barricaded subject" approach never changed over the course of the incident despite evidence that Chief Arredondo's perspective evolved to a later understanding that fatalities

---

[161] *Id.* at 122, 125-25.

[162] *E.g.*, Committee testimony of Sgt. Daniel Coronado, Uvalde Police (June 20, 2022). Chief Arredondo also testified that the possibility of a bailout "came on my mind at some point … because they happen so often, and there's been a few that were armed." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 49 (June 21, 2022).

[163] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

and injuries within the classrooms were a very strong probability.[164] He effectively conceded his error when asked what he would have done differently had he known injured victims were in the classroom. Chief Arredondo responded to the Committee: "I guess, if I knew there was somebody in there, I would have—we probably would have rallied a little more, to say, 'Okay, someone is in there.'"[165]

Chief Arredondo went to Room 109, found it locked and dark, saw a child's head, and realized there were students in that room.[166] Officer Gonzales asked Chief Arredondo if he wanted to activate the SWAT team, which he confirmed, so Gonzales then stepped out and made the call.[167] As mentioned earlier, however, the head of the Uvalde Police SWAT team already was in the building.

Chief Arredondo then used his mobile phone to call the Uvalde Police. The Department of Public Safety supplied the following transcription of that call:

> Hey..hey it's Arredondo..it's Arredondo can you hear me? No I have to tell you where we're at..it's an emergency right now. I'm inside the building, I'm
>
> *dispatcher can be heard talking in the background asking what room number*
>
> Is the teacher with him? Is the teacher with him? Is the teacher with him? Is she in the same room as him? Can you hear me? Ma'am?
>
> *dispatcher: I'm right here*
>
> Ma'am, is the teacher with him? In his classroom?
>
> *dispatcher: She's in another classroom she's in room 102. Another person possible shot across from her.*
>
> Okay, we have him in the room. he's got an AR15, he's shot a lot. He's in the room, he hasn't come out yet. We're surrounded, but I don't have a radio
>
> *dispatcher confirms SWAT location*
>
> Yes and they need to be outside of this building prepared. Because we don't have enough fire power right now it's all pistol and he has an AR15. If you
>
> *dispatcher asked if you can stay on the phone with me as long as you can*
>
> I am but I'm gonna drop it when he comes out of that door. Alright.
>
> *dispatcher advises over the radio that 401 has the shooter in 111 or 112. He's going to be armed with a rifle. He's requesting SWAT by the funeral home.*

---

[164] For example, later in the incident, Sgt. Coronado's body-worn camera footage recorded that somebody asked, at 12:34 p.m., "we don't know if he has anyone in the room with him, do we?" Chief Arredondo responded, "I think he does. There's probably some casualties." Sgt. Coronado agreed, saying "yeah, he does … casualties." Then at 12:41 p.m.: "Just so you understand, we think there are some injuries in there."

[165] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[166] *Id.*

[167] Committee testimony of Officer Adrian Gonzalez, Uvalde CISD Police (June 20, 2022); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

So. So I need you to bring a radio for me, and give me my radio for me. I need to get one rifle. Hold on. I'm trying to set him, I'm trying to set him up.

By 11:42 a.m., Constable Johnny Field had arrived on the north end of the hallway.[168] Constable Field saw Chief Arredondo on the other end and held up his phone. Chief Arredondo called and began communicating with him by phone as his primary contact on the north end.[169] They discussed the need to evacuate children from the building,[170] and Chief Arredondo decided to accomplish that by breaking windows.[171] Officers Gonzales and Page proceeded to start breaking classroom windows and helping to evacuate students from classrooms.[172] Chief Arredondo found another unlocked classroom on the east side of the hallway with a teacher and students locked down inside, and he told them to stay down.[173]

Meanwhile, Sgt. Coronado had exited the building through the south door and made his own report by radio.[174] He requested shields and flashbangs from the police department, and he asked for helicopter support and ballistic shields from the Department of Public Safety. Agreeing with Chief Arredondo's assessment, he reported the shooter was "contained" inside the building and "barricaded in one of the offices." Dispatch asked Sgt. Coronado if the classroom door was locked. He responded he was not sure, but that they had a Halligan tool to break it. Radio traffic indicated the attacker was in Ms. Mireles's classroom (Room 112) and asked whether her students were inside. In response, Sgt. Coronado requested a mirror to look around corners. A voice on the radio stated that "the class should be in session."[175]

After the initial responders took fire from the attacker, Sgt. Coronado remained outside the building on the south and west sides for a total of approximately 30 minutes,[176] regularly

---

[168] *See* Robb Elementary surveillance video.

[169] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022); Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[170] Testimony of Constable Johnny Field, Uvalde County Pct. 1 (June 30, 2022).

[171] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[172] Testimony of Officer Adrian Gonzalez, UCISD Police (June 20, 2022) (stating that after calling for SWAT, he began to help evacuating children on his own initiative and received no further orders from Chief Arredondo).

[173] Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[174] Sgt. Coronado's body-worn camera footage (11:38).

[175] Sgt. Coronado's body-worn camera footage (11:43).

[176] Sgt. Coronado's body-worn camera documented his activity. At 11:44 a.m., a responder asked by radio where he was needed, and received direction to head to the south side of the school. The responder then stated that a lot of people were pulling up by the funeral home. Sgt. Coronado responded to have some officers available to keep everybody back. At 11:48 am he suggested locking down the high school and all the other schools. At 11:49 a.m., a little more than 10 minutes after their initial encounter with the attacker, Sgt. Coronado warned arriving officers about a doorway and a "fatal funnel." He asked them to prop open the south door.

advising other officers to be careful about potential crossfire or a "fatal funnel" in the hallway and assisting the evacuation of students and teachers through windows on the west side of the building. When some newly arrived responders appeared to suggest that the officers should clear out of the south side of the hallway because United States Border Patrol Tactical Unit (BORTAC) responders were operating on the opposite end, Sgt. Coronado responded, "Chief is in there, Chief is in charge right now,"[177] suggesting both that Chief Arredondo was in control and in communication with the other side of the building.

While Sgt. Coronado was outside, his body camera recorded several people commenting on the need to find a master key to the classrooms. Once Sgt. Coronado returned inside the south side of the hallway, he found Chief Arredondo on his phone also asking for a key, which was a primary focus of his attention for the next 40 minutes. Chief Arredondo personally tried all of one large set of keys brought to him,[178] and when Sgt. Coronado cautioned him to stay clear of the hallway and the "fatal funnel," Chief Arredondo responded, "just tell them to f***ing wait."[179]

Much of this time was spent by Chief Arredondo on the phone with Constable Field. He issued a series of additional requests for equipment and support, including snipers,[180] a master key,[181] and breaching tools,[182] repeatedly referencing the need for a key and breaching tools before they could attempt to enter the classrooms with the attacker. While waiting, he also periodically attempted to communicate with the attacker in English and Spanish, including immediately after four shots were fired inside the classroom at 12:21 p.m.

Despite all of the discussion of breaching tools, Chief Arredondo testified no one made him aware when one arrived at the building.[183]

Chief Arredondo prioritized making certain all other classrooms in the building were cleared of teachers and students, including the evacuation of Room 109, where the attacker had shot Ms. Avila through the walls.[184] In the context of this evacuation, Chief Arredondo commented

---

[177] Sgt. Coronado's body-worn camera footage.

[178] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[179] *Id.* (12:17 p.m.).

[180] *Id.* (12:14 p.m.).

[181] *Id.* (12:16 p.m.).

[182] *Id.* (12:21 p.m.); *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[183] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[184] *See* Sgt. Coronado's body-worn camera footage (12:26 p.m.).

that "people are going to ask why we're taking so long," and, in an apparent reference to the ongoing evacuations, that they were trying to care of "the rest of the lives first."[185]

In addition to seeking keys and a breaching tool, the other predominant theme on the south side of the building was waiting for BORTAC to breach the classrooms. Chief Arredondo discussed with Constable Field various means of assisting the breach, such as by using a sniper or flashbangs to kill or distract the attacker.[186]

Beginning around 12:30 p.m., various officers entered through the south door and walked by Chief Arredondo and Sgt. Coronado, stacking up south of Rooms 111 and 112 and on the west side of the hallway, anticipating a move to breach the classrooms.[187]



*Responders stack in hallway south of Rooms 111 & 112.*

At 12:45 p.m., somebody commented that a Ranger had a set of keys that was being tested. And finally, at 12:50 p.m., a team of officers made entry into the classrooms and killed the attacker, with officers stationed in the south part of the hallway quickly falling in behind them and entering Rooms 111 and 112.

---

[185] Other public reports about this particular quote appear to be inaccurate.

[186] Sgt. Coronado's body-worn camera footage (12:17 p.m.).

[187] Sgt. Coronado's body-worn camera footage; *see also* Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022); Committee testimony of Trooper Joshua Bordovsky, Tex. Dep't of Public Safety (June 20, 2022).

Chief Arredondo testified that the only direction he gave to the north side of the building, through Constable Field, was for them to evacuate the kids and to test the keys before trying to go into the room with the attacker. He said he did not make any decision for BORTAC to breach the classrooms.[188]

O n   t h e   N o r t h   …

Rewinding the clock to the point at which the attacker shot at the initial responders in the building, there were three Uvalde Police officers who led the way down the hallway from the north side of the building: Lt. Martinez, followed by SSgt. Canales, followed by Officer Landry. Building fragments hit Lt. Martinez and SSgt. Canales as the attacker shot into the hallway, and all three officers retreated to the north end.

As Ssgt. Canales ran out, his body camera documented the presence of multiple officers in the north hallway and a Department of Public Safety trooper stationed at the door as he exited to the west. Ssgt. Canales stated "we got to get in there," and he made a phone call requesting more help.[189] Uvalde Police Officer Landry, who had been third in line on the north side behind Lt. Martinez and Ssgt. Canales, also exited the building on the west side, then moved to the south side of the building where he began helping to clear classrooms and waiting for specialized teams to arrive.[190] After the initial shock of taking gunfire, Lt. Martinez returned south back down the hallway. Following active shooter training, he began to advance again toward Rooms 111 and 112 in an evident desire to maintain momentum and to "stop the killing," but this time no other officers followed him. Several law enforcement officers suggested to the Committee that if others had followed him as backup, Lt. Martinez might have made it back to the classroom doors and engaged. Later, he helped to evacuate children from classrooms and moved to the south side of the building, and ultimately he was part of the stack of officers on that side of the hallway when BORTAC finally breached the classrooms.

The school surveillance camera installed where the north-south hallway intersects the east-west hallway at the north end of the building captured the movement and activity of law enforcement officers on the north side of the building. From that perspective, the period from 11:37 a.m., when Lt. Martinez, Ssgt. Canales, and Officer Landry made their retreat from the attacker's gunfire, to 12:50 p.m., when a BORTAC-led stack finally made entry into the

---

[188] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[189] *See* Ssgt. Canales's body-worn camera footage.

[190] DPS interview of Uvalde Police Department Officer Louis Landry (May 26, 2022).

classrooms, saw the movement of dozens of officers from a variety of law enforcement agencies in and out of the north hallway, positioning and preparing themselves for the eventual breaching effort.

At first, responders from the Uvalde Police Department, including the acting chief of police on that day, Lt. Mariano Pargas, dominated the north end of the building. Lt. Pargas, who was one of the earliest responders, testified that he was never in communication with Chief Arredondo, and that he was unaware of any communication with law enforcement officers on the south side of the building. He told the Committee he figured that Chief Arredondo had jurisdiction over the incident and that he must have been coordinating the law enforcement response—and that the Uvalde Police were there to assist. He did not coordinate with any of the other agencies that responded, such as the Uvalde Sheriff's Office and the Department of Public Safety. Lt. Pargas did receive a phone call from the chief of the Uvalde Police, who was out of town on vacation, who called to tell him to set up a command post right away. Lt. Pargas testified that he went to the back of the funeral home to start a command post, that the funeral home provided an office, and that then he went back outside to try to keep up with what was going on.[191] This did not result in the establishment of an effective command post.

Lt. Pargas was present when a Uvalde CISD officer, Ruben Ruiz, entered through the west door and stated, "she says she is shot." Officer Ruiz was referring to his wife, Ms. Mireles, who was one of the teachers in Room 112. Officer Ruiz was escorted away from the building. Lt. Pargas also testified he heard on the radio about 911 calls that had come from inside the classrooms, and he told the Committee that it was his understanding that officers on the north side of the building understood there were victims trapped inside the classroom with the attacker. According to Lt. Pargas, while nobody said it, the officers on the north side of the building were waiting for other personnel to arrive from Department of Public Safety or BORTAC, with better equipment like rifle-rated shields.[192]

As responders continued to arrive on the scene, officers stationed outside the building directed them to assist on the perimeter. Special Agent Luke Williams of the Department of Public Safety testified that upon his arrival he disregarded a request that he assist at the perimeter, and instead he proceeded into the east door on the north side of the building. He began to clear rooms along the north hallway, and he found a student hiding in the boys' restroom. The student had his legs up so as not to be seen, and as he had been trained to do, he demanded

---

[191] Committee testimony of Lt. Mariano Pargas, Jr., Uvalde Police (June 29, 2022).

[192] *Id.*

that Special Agent Williams confirm he was with law enforcement, which he did by showing his badge under the stall.

As Special Agent Williams then approached the intersection of the hallways from the east where a group of officers was positioned at the west side of the intersection with weapons pointed south, he heard somebody ask, "y'all don't know if there's kids in there?" Special Agent Williams interjected, "if there's kids in there we need to go in there."



An officer who had been positioned in the hallway responded to Special Agent Williams that whoever was in charge would figure that out. Another officer pointed out to him that his position on the east side of the intersection was creating a crossfire situation relative to the group of officers pointing their weapons toward Rooms 111 and 112 from the south. Special Agent Williams departed to continue clearing other classrooms.[193]

*Responders positioned in north end of hallway (Special Agent Williams's body camera).*

Between 11:52 a.m. and 12:21 p.m., the surveillance video shows four different ballistic shields arriving in the building. Importantly, however, only the last shield, furnished by the U.S. Marshals, was rifle-rated. The Committee heard evidence that the rifle-rated shield was the only one that would have provided meaningful protection to officers against the attacker's AR-15 rifle. The Committee received no evidence that anyone told Chief Arredondo or anyone else on the south side of the building about the arrival of the rifle-rated shield.

Just before 12:30 p.m., there was a burst of activity on the north side. A group of officers moved past the position previously established at the north hallway intersection, and they began to establish a stack close to the north side of Rooms 111 and 112. Viewed from the south, Sgt. Coronado announced the arrival of BORTAC.[194] Another group of officers began to stage medical triage equipment in the east side of the north hallway. This indicates that BORTAC likely assumed tactical command of the incident at this time.

---

[193] *See* Special Agent Williams's body-worn camera footage.

[194] Sgt. Coronado's body-worn camera footage (12:29 p.m.).

BORTAC Acting Commander Paul Guerrero came to the north side of the building upon his arrival at Robb Elementary. In a post-incident statement, he said he was advised "that the subject had possibly shot multiple children and was still in the classroom." He requested surveillance through the back windows of Rooms 111 and 112 to possibly deploy gas as they made entry. He then went to retrieve a Halligan tool from his car.[195] The school's surveillance camera shows the arrival of a Halligan breaching tool at 12:35 p.m..[196] The Committee received no evidence that the arrival of the breaching tool ever was communicated to Chief Arredondo or anyone else on the south side of the building.

According to his statement, Cdr. Guerrero attempted to pry open a door in the hallway to see if the Halligan tool would work. He determined it would take too long and dangerously expose an officer to gunfire coming from inside the classroom. He observed that the classroom doorway had multiple holes consistent with bullet holes, and he did not want to expose or jeopardize the safety and lives of any officers by trying to pry the door open.[197]

Cdr. Guerrero then obtained a master key from an officer at the scene. As he made his way to the classroom door, an officer advised him to try it on another door first. He attempted to open another door along the hallway, and it did not work. He saw a few Border Patrol agents and advised them to start setting up for a triage situation of mass casualties. He then received a second master key, which he successfully used to open another door.[198]

Working with the BORTAC team, Cdr. Guerrero had another agent use the rifle-rated ballistic shield to give him cover as he opened the classroom door. Cdr. Guerrero placed the key in the door to Room 111 and opened the door.  (Cdr. Guerrero's contemporaneous report stated that he unlocked the door,[199] but as explained above, there is reason to question whether the door was actually locked.)

---

[195] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).

[196] *See* Special Agent Williams's body-worn camera footage.

[197] *Id.*

[198] *Id.*

[199] In his statement, Commander Guerrero said "I placed the key into the keyhole. The key worked and I was able to unlock and open the door." *Id.*; *see also* Statement of Agent Warren John Becker (undated, taken by Ranger Tyler Williamson) ("The door was locked, and I utilized the shield to provide cover for Acting BORTAC Commander Guerrero as he opened the door with the master key.").

The attacker was standing in front of a closet in the corner of Room 111, and he fired his rifle at the stack of officers coming through the classroom door. The officers fired on the attacker, killing him.[200]

The Committee has been advised that none of the Border Patrol agents involved in opening the door were wearing activated body cameras.

### On the Outside …

As mentioned in the narratives above, there were important events happening outside the north and south ends of the west building. In part due to the difficulty of maintaining radio communications within the building, not everybody inside the building received all of this information.

A police radio communication of unknown origin stated at 11:56 a.m.: "[I]t is critical for everybody to let PD take point on this."[201] None of the witnesses interviewed by the Committee indicated any knowledge of this communication or what it meant by "PD" taking "point on this." The general consensus of witnesses interviewed by the Committee was that officers on the scene either assumed that Chief Arredondo was in charge, or that they could not tell that anybody was in charge of a scene described by several witnesses as "chaos" or a "cluster."

There was a series of phone calls with a student inside Room 112, initiated by the student calling 911 at 12:03 p.m.. Radio traffic communicated to those officers who could hear it the fact that a student had called from within the classroom. Several witnesses indicated that they were aware of this, but not Chief Arredondo. The Committee has received no evidence that any officer who did learn about phone calls coming from inside Rooms 111 and 112 acted on it to advocate shifting to an active shooter-style response or otherwise acting more urgently to breach the classrooms.

### What Didn't Happen in Those 73 Minutes?

A major error in the law enforcement response at Robb Elementary School was the failure of any officers to assume and exercise effective incident command. Uvalde Police officers responding to a vehicle wreck and shots fired appear to have arrived first on the scene, which would make one of them the initial incident commander. Uvalde CISD Police Chief Arredondo quickly arrived as the incident moved to school property and the law enforcement

---

[200] Statement of Agent Paul Guerrero (undated, taken by Ranger Ricardo Guajardo).
[201] Source: DPS timeline.

response evolved. This made him a natural person to assume command over an incident as it developed. But Chief Arredondo does not consider himself to have assumed incident command. He explained to the Committee:

> [W]hile you're in there, you don't title yourself … .I know our policy states you're the incident commander. My approach and thought was responding as a police officer. And so I didn't title myself. But once I got in there and we took that fire, back then, I realized, we need some things. We've got to get in that door. We need an extraction tool. We need those keys. As far as … I'm talking about the command part … the people that went in, there was a big group of them outside that door. I have no idea who they were and how they walked in or anything. I kind of – I wasn't given that direction.
>
> ***
>
> you can always hope and pray that there's an incident command post outside. I just didn't have access to that. I didn't know anything about that.[202]

Other people could have assumed command, including the next people in Uvalde CISD's preassigned line of command for active shooter response or others on the scene with more experience or training. ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that an incident commander can transfer responsibility as an incident develops. That did not happen at Robb Elementary, and the lack of effective incident command is a major factor that caused other vital measures to be left undone. Also, the misinformation reported to officers on the outside likely prevented some of them from taking a more assertive role. For example, many officers were told to stay out of the building because Chief Arredondo was inside a room with the attacker actively negotiating.

Responders did not remain focused on the task of "stopping the killing" as instructed by active shooter training.[203] They never attempted to breach the classroom before BORTAC accomplished entry. Chief Arredondo explained:

> I knew those doors … .Those doors opened outward. … They're thick, heavy doors with a metal frame. Most people are used -- as police officers, used to going to a residence and you kick in doors. That's just such a common thing in our business. You didn't have that option here. I knew a ramrod, which I call a buddy, which is … a heavy pipe with two handles, that wasn't going to work … and that's why I called for that extraction tool and keys.[204]

---

[202] Committee testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[203] *E.g., id.*

[204] *Id.*

But nobody ever checked the doors of Rooms 111 or 112 to confirm they were actually locked or secured.[205] Room 111 probably was not. Chief Arredondo's search for a key consumed his attention and wasted precious time, delaying the breach of the classrooms.[206]

Nobody called Principal Gutierrez to ask about the location of a master key.[207] She had a key, and the head custodian had a key. Yet despite all the effort to find a key, nobody called her.

Although discussed on both the south and north sides of the building, nobody ever created a diversion on the east side of the building, where Rooms 111 and 112 had windows.[208]

And although it should not have proved necessary had responders remained focused on "stopping the killing" as soon as possible, as the incident dragged on, nobody tasked any law enforcement responder to establish reliable communications between the south and north sides of the building and with resources outside the building. Radio communication was ineffective, so something else was needed for decisionmakers to receive critical information, such as the fact that victims had called from inside the rooms with the attacker.[209] To the extent there was confusion among officers about whether the scenario was an "active shooter" or "barricaded subject," information that there were wounded victims in the rooms would have clarified the existence of an active shooter scenario.

Law Enforcement Responder Headcount

In total, 376 law enforcement officers responded to the tragedy at Robb Elementary School.

---

[205] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[206] ALERRT has noted the failure to check the lock in its criticisms. *See* ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 18-19 (July 6, 2022). A representative of ALERRT testified before the Committee that the "first rule of breaching" is to check the lock. *See* Testimony of John Curnutt, ALERRT (July 11, 2022). Unfortunately, ALERRT apparently has neglected to include that "first rule of breaching" in its active-shooter training materials, which includes modules entitled "Closed and Locked Interior Doors" and "Entering Locked Buildings Quickly, Discreetly, and Safely." *See* Federal Bureau of Investigation & ALERRT, *Active Shooter Response – Level 1*, at STU 3-8 – 3-10, 4-20 – 4-25.

[207] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (no recollection of communicating with Principal Gutierrez).

[208] *E.g.*, Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022).

[209] *See* Testimony of Chief Pete Arredondo, Uvalde CISD Police (June 21, 2022) (did not recall tasking anyone, commented "it would be fantastic" to have the most up-to-date information and that his "priority was to get into that classroom," and "I didn't have communication with … what was going on outside. My big thing was getting through that door.").

The breakdown of responders, by agency, is as follows:[210]

| | |
|---|---|
| 149 | United States Border Patrol |
| 91 | Texas Department of Public Safety |
| 25 | Uvalde Police Department |
| 16 | San Antonio Police Department (SWAT) |
| 16 | Uvalde County Sheriff's Office |
| 14 | Department of Homeland Security – HIS |
| 13 | United States Marshals |
| 8 | Drug Enforcement Agency |
| 7 | Frio County Sheriff's Office |
| 5 | Kinney County Sheriff's Office |
| 5 | Uvalde Consolidated Independent School District |
| 4 | Dilley Police Department |
| 4 | Zavala County Sheriff's Office |
| 3 | Medina County Sheriff's Office |
| 3 | Sabinal Police Department |
| 2 | City of Uvalde Fire Marshals |
| 2 | Pearsall Police Department |
| 2 | Texas Parks and Wildlife |
| 2 | Uvalde County Constables |
| 2 | Val Verde County Sheriff's Office |
| 1 | Frio County Constables |
| 1 | Southwest Texas Junior College |
| 1 | Zavala County Constables |

---

[210] Source: Texas Department of Public Safety.

**JA587**

# 6 | Information Flow

This Committee's chief goal from the very beginning has been to provide accurate information from dependable sources. The public's need for accurate information only has intensified as we have investigated the facts surrounding the tragedy. Problems with the flow of information have plagued government, media, and public discussion about what happened at Robb Elementary from the outset—damaging public trust, inflicting a very real toll on the people of Uvalde, and creating an imperative to provide a reliable set of facts.

## The First Reports

Shortly after the shooting, authorities first reported to the public that the shooter killed fourteen students and one teacher, and the attacker was reported dead at that time.[211]

The next day, state leaders looked to law enforcement for more information in preparation for a broader press conference. The briefing was planned to be led by a Uvalde police lieutenant who had been at the scene, but that officer literally passed out while waiting in the hallway beforehand. In his place, the DPS Regional Director for South Texas, Victor Escalon, agreed to conduct the briefing.[212] Director Escalon, who is not based in Uvalde, had arrived on the scene shortly before the attacker was killed. He did not personally witness the bulk of the day's events, leaving him to depend on secondhand knowledge acquired from other law enforcement officers who had been part of the response.[213]

That briefing was the basis for the press conference the day after the shooting, in which Governor Abbott and other leaders relied on the information law enforcement gave them. After correcting the death toll to nineteen students and two teachers, they made statements based upon Director Escalon's briefing (which itself was based entirely on secondhand knowledge). These statements repeated a false narrative that the entire incident lasted as little as forty minutes thanks to officers who rapidly devised a plan, stacked up, and neutralized the attacker. The general sentiments shared that day were that law enforcement responders were courageous in keeping the attacker pinned down while children were evacuated.

---

[211] All press conferences referenced in this report were recorded.

[212] Committee testimony of DPS Director Col. Steven C. McCraw (July 11, 2022).

[213] Uvalde CISD Police Chief Pete Arredondo said he approached Regional Director Escalon after the briefing because he was surprised and frustrated after hearing his comments that a school district officer had engaged the attacker. "Y'all haven't even gotten our statements yet," he told Escalon. "We were all the first ones there." Chief Arredondo testified: "he corrected that. But during the press conference, it still came out that way." Committee testimony of Chief Pete Arredondo, Uvalde CISD Police, at 180-81 (June 21, 2022).

Another press conference was held the next day outside of Robb Elementary School, and new details emerged. One was: "The back door was propped open. It wasn't supposed to be … a teacher … propped it open [and] that was an access point that the subject used." The idea that the door was propped open led to public outcry, and even a teacher who was not implicated was devastated as she wondered whether she had accidentally left a door open.[214] The truth—confirmed by video—is that while a teacher had propped open the west exterior door, she actually saw the attacker approaching and slammed that door shut as she called 911 for help. The door was closed; it simply was either already unlocked or the lock failed to engage, which she could not have known because the doors lock from the outside.[215] On May 31, it was confirmed that her account was correct.[216]

The media repeated the communication failures of relevant authorities, supplemented by leaks released uncritically. The Committee certainly does not question the role or value of reporting by the press, but it is unfortunate that caution and context have been so uncommon. Various people commenting publicly perpetually have taken information at face value, presenting it as definitive when provided as tentative, and they rarely have characterized it as one small part of a vastly larger body of evidence. (To their credit, some outlets did produce original investigative pieces questioning many of the inconsistencies documented earlier.)

The Committee recognizes the natural tension between providing the public with immediate information and the need for accuracy. A complete and thorough investigation can take months or even years to confirm every detail, especially when this many law enforcement officers are involved. However, one would expect law enforcement during a briefing would be very careful to state what facts are verifiable, and which ones are not.

While this is by no means an exhaustive list, the Committee draws attention to two instances to make its broader points.

A L E R R T   R e p o r t

The first instance is based upon the report, and subsequent media coverage, of the report released by the Advanced Law Enforcement Rapid Response Training (ALERRT) Center. The report was "based on an incident briefing held for select ALERRT staff . . . for approximately

---

[214] One teacher emotionally testified to the Committee that she had spent several distraught days thinking it was her fault the attacker had entered the building, and she had gone as far as apologizing to people.

[215] Like virtually all schools, Robb Elementary made use of "Columbine" doors that can only be locked from the outside; from the inside, exterior doors are opened with a push bar.

[216] Travis Considine, chief communications officer for DPS, confirmed this for the Associated Press as one of their reporters explored the story.

1 hour" along with some unspecified "additional information" staff later received from DPS.[217] ALERRT conducted no investigation of its own and spoke to no witnesses, relying instead on a snapshot of an evolving investigation. One of its conclusions was a bombshell: a "UPD officer was armed with a rifle and sighted in to shoot the attacker; however, he asked his supervisor for permission to shoot."[218] He failed to get a response, and the attacker quickly slipped into the school.

During testimony before the Committee, an ALERRT representative admitted he had learned that DPS had received an additional statement from the officer, stating he no longer believed he had seen the attacker when he sought permission to shoot. In fact, and as the Committee has concluded, that officer saw a coach ushering kids inside—something the Texas Rangers, under the purview of DPS, had discussed with the officer during a later interview. Uvalde Mayor McLaughlin issued a statement explaining as much, and ALERRT quickly caveated its findings, saying it did not know "the officer gave a third statement to investigators that was different from the first two statements."

Video Evidence

The Committee fought hard to make sure the public could see the hallway video (although, as previously stated, the Committee would not have shown the images of the attacker and would have let the families of the victims see it first). Our justification was that we could tell people all day long what we saw, but everyone needed to see it for themselves.

After the leak of part of a composite video prepared by the FBI, images began circulating condemning some shown on it. "Cellphone cop" was said to be standing around checking his phone, indifferent. What those sharing it did not know was that it was an image of Eva Mireles's husband. She had been in contact with him already, and when he moved off camera later, she told him she was dying. After receiving this call, he was naturally devastated and was not permitted to return by other law enforcement officers. While this report has cited numerous failures by law enforcement, the actions of this man were not among them.

The problem, of course, is the power, speed, and unaccountable nature of social media. While it allows the truth to spread, it has done far more to amplify incorrect or incomplete information. This is an example of how a picture without context can lead to an incomplete or false impression that is repeated even by respected news organizations. Mark Twain said it best: "A lie can travel halfway around the world before the truth puts on its shoes."

---

[217] *See* ALERRT, *Robb Elementary School Attack Response Assessment and Recommendations* at 3 (July 6, 2022).

[218] *Id.* at 15.

## Compromised Trust

This report has addressed many of the discrepancies and loose threads related to the Robb Elementary shooting, and the Committee focused on research and documentation to support its findings, in part because we expected to be met with rightful skepticism after everything that has happened. The results of the information issues surrounding the shooting are wide ranging and will be felt for a long time to come.

An uncertain narrative also opens the door much wider for conspiracy theories, many of which have been harmful. The fear of a coverup is palpable here, and while most see it as simply part of an intragovernmental "blame game," others have made wild accusations that authorities are sweeping some major scandal under the rug.[219] Comments on social media have repeated and shared specific false allegations about the attacker's identity and associations. And predictably, some have promoted the disgusting Sandy Hook-style claim that Robb Elementary was home to a hoax or "false flag" operation.[220] While this and similar claims might seem obviously beneath our dignifying with a response, it does become harder to proclaim the truth when it is so opaque.

Most fundamentally, there has been a loss of trust in government. As peace officers' union CLEAT said in a recent release, the "great deal of false and misleading information" means that sources "Texans once saw as iron-clad and completely reliable have now been proven false."[221] The Committee certainly has felt the distrust and doubt about its work from those who have cynically but justifiably worried about the way we conducted our investigation.

We tried at every turn to elevate and respect the needs of Uvalde, because nowhere has unreliable information more impacted a community. We saw wounds continuously ripped open and agonizing disillusionment grow there among the people who most deserve swift, sure answers about the tragedy that shook their community. Uvalde itself has paid a terrible price as it has waited for the truth and waded through the shaky narrative given instead.

---

[219] In fact, #uvaldecoverup is a popular hashtag for tweets related to the Robb Elementary School shooting, and those are the kinds of claims regularly associated with it.

[220] Some coverage can be found at the *Houston Chronicle* (https://www.houstonchronicle.com/politics/texas/politifact/article/fact-check-uvalde-false-flag-17214816.php), among other outlets.

[221] CLEAT's release is at https://www.cleat.org/cleat-response-to-uvalde-mass-shooting/.

# 7 | FACTUAL CONCLUSIONS

Based on the foregoing information developed through its investigation, the Committee has drawn the following preliminary conclusions:

1. **Uvalde CISD and Robb Elementary**

   a. *Communications and lockdown alerts*:

      i. Poor wi-fi connectivity in Robb Elementary likely delayed the lockdown alert through the Raptor application.

      ii. Once the alert was sent, not all teachers received it immediately for a variety of reasons including wi-fi coverage, whether the teacher used the Raptor phone application (as opposed to logging in through a web browser), and whether the teacher was carrying a phone at the time.

      iii. No one used the school intercom as another means to communicate the lockdown.

      iv. As a result, not all teachers received timely notice of the lockdown, including the teacher in Room 111.

   b. *Effect of bailouts*:

      i. The frequency of less-serious bailout-related alerts in Uvalde diluted the significance of alerts and dampened everyone's readiness to act on alerts.

      ii. In response to the May 24, 2022, lockdown alert at Robb Elementary, the initial reaction of many administrators, teachers, and law enforcement responders was that it likely was a less-dangerous bailout.

   c. *Doors and locks*:

      i. Robb Elementary had recurring problems with maintaining its doors and locks.

      ii. In particular, the locking mechanism to Room 111 was widely known to be faulty, yet it was not repaired.

         1. The Robb Elementary principal, her assistant responsible for entering maintenance work orders, the teacher in Room 111, other teachers in the fourth grade building, and even many fourth grade students widely knew of the problem with the lock to Room 111.

2. Nevertheless, no one placed a work order to repair the lock—not the principal, her secretary, the teacher to Room 111, or anyone else.

iii. Robb Elementary had a culture of noncompliance with safety policies requiring doors to be kept locked, which turned out to be fatal.

1. Exterior doors.

   a. Teachers at Robb Elementary often used rocks to prop open exterior doors.

   b. The west door to the west building was supposed to be continuously locked. When the attacker approached on May 24, 2022, it was unlocked, and he was able to enter the building there.

   c. If the door had been locked as policy required, the attacker likely would have been slowed for some period of time as he either circumvented the lock or moved to another point of entry into the building.

2. Interior classroom doors.

   a. Teachers at Robb Elementary commonly left interior doors unlocked for convenience, and they also used magnets and other methods to circumvent door locks.

   b. The doors to Rooms 111 and 112 were required to be locked at all times, and in a lockdown, the teachers were supposed to check that they were locked.

      i. A teacher in Room 112 was seen locking her classroom door after the lockdown alert.

      ii. The door to Room 111 probably was not locked. The teacher in Room 111 does not recall hearing the lockdown alert. The door required special effort to lock it, and the teacher has no memory of having done so. The attacker apparently did not have to take any actions to overcome a locked door before entering the classrooms.

   c. If the door to Room 111 had been locked, the attacker likely would have been slowed for some time as he either circumvented the lock or took some other alternative course of action.

2. **Information that was known or knowable about the attacker**

    a. *Home and family*:

        i. The attacker had an unstable home life with no father figure and a mother struggling with *a* substance abuse disorder.

        ii. The attacker's family moved often and lived in relative poverty.

        iii. The attacker developed sociopathic and violent tendencies, but he received no mental health assistance

        iv. Various members of the attacker's family were aware during the time leading up to the attacker's 18th birthday that he was estranged from his mother and that he had asked for help in buying guns through straw purchases that would have been illegal. Family members uniformly refused to buy guns for him.

        v. During the week between his 18th birthday and the events of May 24, 2022, the attacker expressed suicidal ideation to a cousin, who talked to him and did not believe he was an imminent suicide risk.

        vi. During the week between his 18th birthday and the events of May 24, 2022, the attacker's grandparents and other family members became aware that the attacker had bought guns. The grandparents demanded that the guns be removed from their home.

    b. *School*:

        i. The attacker struggled academically throughout his time in school.

        ii. The school made no meaningful intervention with the attacker before he was involuntarily withdrawn for poor academic performance and excessive absences.

        iii. The attacker had few disciplinary issues at school, but he was suspended once for a fight.

        iv. Due to his excessive absences, there apparently was no information actually known to the school district that should have identified this attacker as a threat to any school campus.

    c. *Law enforcement*: There apparently was no information actually known to local Uvalde law enforcement that should have identified this attacker as a threat to any school campus before May 24, 2022.

    d. *Friends and acquaintances*: Some of attacker's social media contacts received messages from the attacker related to guns, suggesting that he was going to do

something they would hear about in the news, and even referring to attacking a school.

  e. *Social media*:

      i.  Reports suggest that some social-media users may have reported the attacker's threatening behavior to the relevant social media platforms. The social media platforms appear to have not done anything in response to restrict the attacker's social media access or report his behavior to law enforcement authorities.

      ii. The services used by Uvalde CISD to monitor social media for threats did not provide any alert of threatening behavior by the attacker.

  f. *Firearms and ammunition sellers*: There was no legal impediment to the attacker buying two AR-15-style rifles, 60 magazines, and over 2,000 rounds of ammunition when he turned 18. The ATF was not required to notify the local sheriff of the multiple purchases.

3. **Law enforcement response on May 24, 2022**

  a. There was no law enforcement officer on the Robb Elementary campus when the attacker came over the fence and toward the school.

  b. Citizens at the scene quickly alerted local law enforcement about a vehicle accident, a man with a gun, and shots fired near the Robb Elementary campus.

  c. As initially reported by Uvalde Police dispatch and as understood by most initial responders, the incident began off-campus and as one that would have been in the jurisdiction of the Uvalde Police Department. Uvalde Police officers were among the first, if not the first, law enforcement responders on the scene as a man firing a gun moved toward Robb Elementary School.

  d. As the situation developed and responders received more information, it became apparent that the threat moved on to the school campus and within the jurisdiction of the Uvalde CISD Police Department.

  e. Multiple law enforcement officers arrived at Robb Elementary within a few minutes of the attacker coming over the fence.

  f. A Uvalde Police Department officer saw a person dressed in black and thought it might have been the attacker. From a distance of over 100 yards, that officer requested permission to shoot. Subsequent analysis suggests that the person in black was a school coach, and the officer did not have an opportunity to stop the attacker by shooting him before he entered the west building.

  g. Robb Elementary School Coach Yvette Silva acted heroically and almost certainly saved lives by alerting the school to the attacker's advance. Most fourth grade classes successfully locked down as a result of her quick response.

h. After entering through the unlocked west door, the attacker had about three minutes in the west building before first responders arrived at the building, including approximately two and a half minutes during which the attacker is estimated to have fired over 100 rounds.

i. The initial responders to the west building heard gunfire and encountered a hallway with a fog of drywall debris, bullet holes, and empty rifle casings. They converged on Rooms 111 and 112, which they identified as the location of the attacker. They acted appropriately by attempting to breach the classrooms and stop the attacker. The attacker immediately repelled them with a burst of rifle fire from inside the classrooms.

j. The responders immediately began to assess options to breach the classroom, but they lost critical momentum by treating the scenario as a "barricaded subject" instead of with the greater urgency attached to an "active shooter" scenario.

k. It actually was an "active shooter" scenario because the attacker was preventing critically injured victims from getting medical attention.

   i. An active shooter scenario differs from a barricaded-subject scenario in that law enforcement officers responding to an active shooter are trained to prioritize the safety of innocent victims over the safety of law enforcement responders.

   ii. At first, the first responders did not have "reliable evidence" about whether there were injured victims inside Rooms 111 and 112, although circumstantial evidence strongly suggested that possibility, including the fact that the attacker had fired many rounds inside classrooms at a time when students were in attendance.

   iii. The ALERRT training "reliable evidence" standard does not align with the "reasonable officer" standard applied by ALERRT in its preliminary and partial report.

l. Uvalde CISD's active shooter policy called for Uvalde CISD Police Chief Arredondo to be the incident commander in any active shooter response.

   i. Chief Arredondo was one of the first responders to arrive at the west building.

   ii. In the initial response to the incident, Chief Arredondo was actively engaged in the effort to "stop the killing" up to the point when the attacker was located in Rooms 111 and 112, and the attacker fired on responding officers.

   iii. By this time, there were dozens of officers on the scene, but Chief Arredondo did not assume his preassigned responsibility of incident command, which would have entailed informing other officers that he

        was in command and also leaving the building to exercise command, beginning with establishing an incident command post.

    iv. Instead, he remained in the hallway where he lacked reliable communication with other elements of law enforcement, and he was unable to effectively implement staging or command and control of the situation.

m. Over the course of the next hour, hundreds of law enforcement officers arrived at the scene.

    i. The scene was chaotic, without any person obviously in charge or directing the law enforcement response.

    ii. To the extent any officers considered Chief Arredondo to be the overall incident commander, they also should have recognized that was inconsistent with him remaining inside the building.

    iii. There was an overall lackadaisical approach by law enforcement at the scene. For many, that was because they were given and relied upon inaccurate information. For others, they had enough information to know better.

n. Despite obvious deficiencies in command and control at the scene which should have been recognized by other law enforcement responders, none approached Chief Arredondo or any of the officers around him or subordinate to him to affirmatively offer assistance with incident command.

o. Chief Arredondo and the officers around him at the south end of the building were focused on gaining access to the classrooms (through use of a breaching tool, a key, or other means) and protective equipment for officers (through rifle-rated ballistic shields, flashbangs, etc.).

p. Meanwhile, dozens of law enforcement officers were assembling in the hallway on the north side of the building, stacking up for an assault on the classrooms, and mostly waiting for further instructions pending the arrival of protective gear and breaching equipment.

q. While 911 received communications from victims inside Rooms 111 and 112, Chief Arredondo did not learn about it because of his failure to establish a reliable method of receiving critical information from outside the building.

r. Eventually, Chief Arredondo came to understand there probably were casualties inside Rooms 111 and 112. Even if he had received information of surviving injured victims in the classrooms, it is unclear that he would have done anything differently to act "more urgently."

s. U.S. Marshals provided a rifle-rated shield and it arrived around 12:20 p.m., approximately 30 minutes before the classroom was finally breached.

t.   While officers acted on the assumption that the doors to Rooms 111 and 112 were locked, as they were designed to be, nobody tested that assumption.

u.   Room 111's door probably was not effectively locked shut.

v.   Chief Arredondo did not actually exercise tactical incident command over the BORTAC team, nor did the BORTAC team seek instruction from Chief Arredondo.

w.   By the time the BORTAC team breached the classrooms, the tactical command inside the building had been de facto assumed by BORTAC.

x.   Acting on effectively the same information available to Chief Arredondo, including an assumption of injured victims in the room, the BORTAC commander on scene waited until arranging a rifle-rated shield and obtaining a working master key before attempting to breach the classrooms.

y.   The Committee has not received medical evidence that would inform a judgment about whether breaching the classroom sooner than the approximately 73 minutes that passed between the first responders' initial arrival at the west building and their eventual breach of the classrooms could have been saved lives or mitigated injuries.

   i.   As described above, it is likely that most of the deceased victims perished immediately during the attacker's initial barrage of gunfire.

   ii.   However, given the information known about victims who survived through the time of the breach and who later died on the way to the hospital, it is plausible that some victims could have survived if they had not had to wait 73 additional minutes for rescue.

I N   M E M O R Y   O F

Nevaeh Bravo

Jacklyn Cazares

Makenna Elrod

Jose Flores, Jr.

Eliahna Garcia

Irma Garcia

Uziyah Garcia

Amerie Jo Garza

Xavier Lopez

Jayce Luevanos

Tess Mata

Maranda Mathis

Eva Mireles

Alithia Ramirez

Annabell Rodriguez

Maite Rodriguez

Alexandria Rubio

Layla Salazar

Jailah Silguero

Eliahna Torres

Rojelio Torres

**JA599**

# GENERAL LAWS

#### OF THE

## TWELFTH LEGISLATURE,

#### OF THE

# STATE OF TEXAS.

———————

### CALLED SESSION.

———————

#### BY AUTHORITY.



AUSTIN:
PRINTED BY TRACY, SIEMERING & CO.
1870.

## GENERAL LAWS. 63

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

——————

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

**64**                      **GENERAL LAWS.**

county of Hill ; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2.  That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3.  That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4.  That this act be in force from and after passage.

Approved August 12, 1870.

———————

## CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 18, 1870.

SEC. 2.  That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3.  That this act shall take effect from and after its passage.

Approved August 12, 1870.

———————

# ACTS

## OF THE

# STATE OF TENNESSEE,

### PASSED BY THE FIRST SESSION OF

## THE THIRTY-SIXTH GENERAL ASSEMBLY

### FOR THE YEARS 1869-70.

PUBLISHED BY AUTHORITY.

NASHVILLE, TENN.:
JONES, PURVIS & CO., PRINTERS TO THE STATE.
1870.

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868, entitled "An Act to amend the revenue laws of the State."

SECTION 1.  *Be it enacted by the General Assembly of the State of Tennessee,* That An Act to amend the revenue laws of the State, passed on the 13th day of March, 1868, be so amended as to impose a tax of fifty cents on each room except two in a hotel or tavern,  and a tax of fifty cents  on  each stall in a livery stable, or stable kept by hotel or tavern keepers, instead of one dollar, as now imposed by law. *[Hotels and Livery Stable]*

SEC. 2.  *Be it further enacted,* That this Act take effect from and after its passage.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed November 27, 1869.

## CHAPTER XXII.

AN ACT to Amend the Criminal Laws of the State.

SECTION 1.  *Be it enacted by  the General  Assembly of the State of Tennessee,* That all voters in this State shall  be required to vote in the civil district or ward in which they may reside.   Any person violating this Act shall be guilty of a misdemeanor, and upon conviction thereof shall not be fined less than twenty nor more than fifty dollars ; *Provided,* that sheriffs and other officers holding  elections shall be permitted  to  vote at any ward  or precinct in which they may hold an election. *[To vote in Civil District or Ward.]*

SEC. 2.  *Be it further enacted,* That it shall not be lawful for any qualified voter or other person  attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed  or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape *[Deadly Weapons.]*

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

Penalty.

SEC. 3. *Be it further enacted*, That all persons convicted under the second section of this Act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

Liquor Shops.

SEC. 4. *Be it further enacted*, That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

Grand Juries.

SEC. 5. *Be it further enacted*, That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

Judges.

SEC. 6. *Be it further enacted*, That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

Proviso.

SEC. 7. *Be it further enacted*, That there shall be no property exempt from execution for fines and costs for this offense; *Provided*, That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

SEC. 8. *Be it further enacted*, That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.

# ACTS AND RESOLUTIONS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

# SESSION OF 1870.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.          421

*To preserve the peace and harmony of the people of this State, etc.*

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed— *nolle prosequi.*
6. All indictments, etc., submitted to a jury.

### (No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *Carrying deadly weapons to certain places prohibited.* *Exception.*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *Violation a misdemeanor— penalty.*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

### (No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *Chain-gang punishment prohibited.*

422        PUBLIC LAWS.—Penal Code—Amendments to.

To repeal Section 415 of the Revised Code.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

Sec. 2. *Be it further enacted,* That said section be further amend-

Punishment in lieu of chain-gang.

ed, by substituting for the words herein stricken out, the words "to work on the city or town streets, or county roads, not longer than six months; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

Sec. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

———

(No. 287.)

*An Act to repeal section four hundred and fifteen (415) of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

Section 1. *Be it enacted, etc.,* That section four hundred and

Section 415 of Code, as to nolle prosequi, repealed.

fifteen (415) of Irwin's Revised Code of Georgia, which said section authorizes Solicitors-General in this State to enter a *nolle prosequi* on indictments, be, and the same is hereby repealed, and no *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court,

Judge shall order second bill.

in which case the presiding Judge shall order another bill of indictment to be forthwith submitted to the grand jury.

Sec. 2. *And be it further enacted by the authority aforesaid,* That

All indictments submitted to jury.

all cases of indictments, or special presentments, shall be submitted to and passed upon by the jury, under the direction of the presiding Judge, unless there is a settlement thereof between the

Settlement—when good.

prosecutor and defendant, which settlement shall be good and valid only by the approval and order of the court on examination into the merits of the case.

Sec. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page102 of 167

# LAWS OF MISSOURI,

PASSED AT THE SESSION OF THE

## THIRTY-SECOND GENERAL ASSEMBLY,

BEGUN AND HELD AT THE CITY OF JEFFERSON,

## WEDNESDAY, JANUARY 3, 1883.

(REGULAR SESSION.)

*BY AUTHORITY.*



JEFFERSON CITY:
STATE JOURNAL COMPANY, STATE PRINTERS.
1883.

JA610

76                   CRIMES AND CRIMINAL PROCEDURE.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.
    Approved April 2, 1883.

———————

CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled '' Of Crimes and Criminal Procedure.''

SECTION 1.  Carrying concealed weapon, etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1.   That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word '' twenty '' before the word '' five '' in the sixteenth line of said section, and by striking out the word '' one '' in the same line and inserting in lieu thereof the word ''two,'' and by striking out the word '' three '' in the seventeenth line of said section and inserting in lieu thereof the word ''six,'' so that said section, as amended, shall read as follows:   Section 1274.   If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.
    Approved March 5, 1883.

**JA611**

# PENAL CODE

## OF

# STATE OF IDAHO,

## 1901.

Press of
**Capital** News Printing Co.,
Boise, Idaho.

84      CRIMES AGAINST THE REVENUE, ETC.      *Ch. CCXVIII*

person of F. a bodily injury, as while being prosecuted in the magistrate's court for displaying a deadly weapon in a rude, angry and threatening manner in the presence of others, the defendant was never in any danger of being convicted of an assault with a deadly weapon with intent to inflict bodily harm.—Territory v. Stocker, 9 Mont. 6. 22 Pac. 496.

**Section 4781.  Persons Other than Officers Carrying Certain Weapons:**  It is unlawful for any person, except United States officials, officials of the State of Idaho, county officials, peace officers, guards of any jail, and officers or employees of any express company on duty, to carry, exhibit or flourish any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapons, within the limits or confines of any city, town or village or in any public assembly of the State of Idaho.  Every person so doing is guilty of a misdemeanor and is punishable by fine not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for a period of not less than twenty days nor more than fifty days, or by both such fine and imprisonment.

1889, 15th Ses. p. 23, Sec. 1.

**Section 4782.  Fines Provided in Preceding Section-To Whom Paid:**  One half of all fines collected under the preceding Section shall be paid to the officer making the arrest, which amount shall be payment in full for his services.  The other one half shall be paid into the common School Fund of the county, after deducting the necessary costs of the prosecution of the case.

1889, 15th Ses. p. 23, Sec. 2.

**Section 4783.  Forcible Entry:**  Every person using or procuring, encouraging or assisting another to use, any force or violence in entering upon or detaining any lands or other possessions of another, except in the cases and in the manner allowed by law, is guilty of a misdemeanor.

1887 R. S. Sec. 6962; 1874-5 p. 209, Sec. 570.      Forcible entry:  See Sec. 3974 C. Civ. Proc.

**Section 4784.  Taking Repossession of Land:**  Every person who has been removed from any lands by process of law, or who has removed from any lands pursuant to the lawful adjudication or direction of any court, tribunal, or officer, and who afterwards unlawfully returns to settle, reside upon, or take possession of such lands, is guilty of a misdemeanor.

1887 R. S. Sec. 6963.

# CHAPTER CCXVIII.

## CRIMES AGAINST THE REVENUE AND PROPERTY OF THE STATE.

Section.
4785. Embezzlement and falsification of accounts by public officers.
4786. Officers neglecting to pay over public moneys.
4787. Public moneys defined.

Section.
4788. Certain officers refusing to pay over fine or forfeiture according to law.
4789. Refusing to give assessor list of property.

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

---

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page108 of 167

16                     LAWS OF ARIZONA.

SEC. 3.   This Act shall take effect from and after its passage.

Approved March 18, 1889.

No. 12.                   AN  ACT

Concerning the Transaction of Judicial Business on Legal Holidays.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.   No Court of Justice shall be open, nor shall any Judicial business be transacted on any Legal Holiday, except for the following purposes:

1.   To give, upon their request, instructions to a Jury when deliberating on their verdict.

2.   To receive a verdict or discharge a Jury.

3.   For the exercise of the powers of a magistrate in a criminal action, or in a proceeding of a criminal nature; provided, that the Supreme Court shall always be open for the transaction of business; and provided further, that injunctions, attachments, claim and delivery and writs of prohibition may be issued and served on any day.

SEC. 2.   All Acts and parts of Acts in conflict with this Act are hereby repealed.

SEC. 3.   This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

No. 13.                   AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.   If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.

SEC. 2.   The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page109 of 167

LAWS OF ARIZONA.                      17

or policeman, or person summoned to his aid, nor to a rev-
enue or other civil officer engaged in the discharge of offi-
cial duty, nor to the carrying of arms on one's own prem-
ises or place of business, nor to persons traveling, nor to
one who has reasonable ground for fearing an unlawful at-
tack upon his person, and the danger is so imminent and
threatening as not to admit of the arrest of the party
about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or relig-
ious assembly, any school room, or other place where per-
sons are assembled for amusement or for educational or
scientific purposes, or into any circus, show or public ex-
hibition of any kind, or into a ball room, social party or
social gathering, or to any election precinct on the day or
days of any election, where any portion of the people of
this Territory are collected to vote at any election, or to
any other place where people may be assembled to minister
or to perform any other public duty, or to any other public
assembly, and shall have or carry about his person a pistol
or other firearm, dirk, dagger, slung shot, sword cane,
spear, brass knuckles, bowie knife, or any other kind of a
knife manufactured and sold for the purposes of offense or
defense, he shall be punished by a fine not less than fifty
nor more than five hundred dollars, and shall forfeit to the
County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace
officers, or other persons authorized or permitted by law to
carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of
Articles 1 and 3, may be arrested without warrant by any
peace officer and carried before the nearest Justice of the
Peace for trial; and any peace officer who shall fail or refuse to
arrest such person on his own knowledge, or upon information
from some credible person, shall be punished by a fine not ex-
ceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms
within settlements or towns of the Territory for one-half  hour
after arriving in such settlements or town, and while going
out of such towns or settlements; and Sheriffs and Constables
of the various Counties of this Territory and their lawfully ap-
pointed deputies may carry weapons in the legal discharge of
the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and
every hotel, boarding house and drinking saloon, to keep
posted up in a conspicuous place in his bar room, or reception
room if there be no bar in the house, a plain notice to travel-
ers to divest themselves of their weapons in accordance with
Section 9 of this Act, and the Sheriffs of the various Counties

18          LAWS OF ARIZONA.

shall notify the keepers of hotels, boarding houses and drink-
ing saloons in their respective Counties of their duties under
this law, and if after such notification any keeper of a hotel,
boarding house or drinking saloon, shall fail to keep notices
posted as required by this Act, he shall, on conviction thereof
before a Justice of the Peace, be fined in the sum of five dol-
lars to go to the County Treasury.

SEC. 8.   All Acts or parts of Acts in conflict with this Act
are hereby repealed.

SEC. 9.   This Act shall take effect upon the first day of
Apr 1, 1889.

Approved March 18, 1889.

No. 14.                   AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   That Paragraph 492, Chapter 5, Title 13, of
the Revised Statutes, be amended so as to read as follows: "If
he fail to attend in person or by deputy any term of the Dis-
trict Court, the Court may designate some other person to
perform the duties of District Attorney during his absence from
Court, who shall receive a reasonable compensation to be certi-
fied by the Court, and paid out of the County Treasury, which
the Court shall by order direct to be deducted from the salary
of the District Attorney, if the absence of such Attorney is
not excused by such Court."

SEC. 2.   That all Acts and parts of Acts in conflict with
this Act be, and the same are, hereby repealed.

SEC. 3.   That this Act shall take effect and be in force
from and after its passage.

Approved March 19, 1889.

No. 15.                   AN ACT

To Provide for the Payment of Boards of Supervisors of the
Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   Each member of the Board of Supervisors
within this Territory shall be allowed as compensation for their
services Five Dollars per day for each day's actual attendance
at the sitting of said Board, at which sitting any County busi-
ness is transacted; and twenty cents per mile actually traveled

**JA618**

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

~~~~~~~~~~~~~~

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page112 of 167

(2430) § **6.**  Every person who, with intent to extort any <u>Chap. 25.</u>
money or other property from another, sends to any person any <span style="font-size:small">Sending</span>
letter or other writing, whether subscribed or not, expressing or <span style="font-size:small">threatening letter.</span>
implying, or adapted to imply, any threat, such as is specified in
the second section of this article, is punishable in the same man-
ner as if such money or property were actually obtained by means
of such threat.

(2431) § **7.**  Every person who unsuccessfully attempts by means <span style="font-size:small">Attempting to export money.</span>
of any verbal threat such as is specified in the second section of
this article, to extort money or other property from another is
guilty of a misdemeanor.

## ARTICLE 47.—CONCEALED WEAPONS.

SECTION.
1.  Prohibited weapons enumerated.
2.  Same.
3.  Minors.
4.  Public officials, when privileged.
5.  Arms, when lawful to carry.

SECTION.
6.  Degree of punishment.
7.  Public buildings and gatherings.
8.  Intent of persons carrying weapons.
9.  Pointing weapon at another.
10. Violation of certain sections.

(2432) § **1.**  It shall be unlawful for any person in the Terri- <span style="font-size:small">Prohibited weapons enumerated.</span>
tory of Oklahoma to carry concealed on or about his person, sad-
dle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger,
slung-shot, sword cane, spear, metal knuckles, or any other kind
of knife or instrument manufactured or sold for the purpose of de-
fense except as in this article provided.

(2433) § **2.**  It shall be unlawful for any person in the Terri- <span style="font-size:small">Same.</span>
tory of Oklahoma, to carry upon or about his person any pistol,
revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles,
or any other offensive or defensive weapon, except as in this arti-
cle provided.

(2434) § **3.**  It shall be unlawful for any person within this <span style="font-size:small">Minors.</span>
Territory, to sell or give to any minor any of the arms or weapons
designated in sections one and two of this article.

(2435) § **4.**  Public officers while in the discharge of their <span style="font-size:small">Public officials, when privileged.</span>
duties or while going from their homes to their place of duty, or
returning therefrom, shall be permitted to carry arms, but at no
other time and under no other circumstances: *Provided, however,*
That if any public officer be found carrying such arms while under
the influence of intoxicating drinks, he shall be deemed guilty of
a violation of this article as though he were a private person.

(2436) § **5.**  Persons shall be permitted to carry shot-guns or <span style="font-size:small">Arms, when lawful to carry.</span>
rifles for the purpose of hunting, having them repaired, or for kill-
ing animals, or for the purpose of using the same in public muster
or military drills, or while travelling or removing from one place
to another, and not otherwise.

(2437) § **6.**  Any person violating the provisions of any one of <span style="font-size:small">Degree of punishment.</span>
the foregoing sections, shall on the first conviction be adjudged
guilty of a misdemeanor and be punished by a fine of not less than
twenty-five dollars nor more than fifty dollars, or by imprison-
ment in the county jail not to exceed thirty days or both at the
discretion of the court.  On the second and every subsequent con-

496                    CRIMES AND PUNISHMENT.

Chap. 25.  viction, the party offending shall on conviction be fined not less
than fifty dollars nor more than two hundred and fifty dollars or
be imprisoned in the county jail not less than thirty days nor
more than three months or both, at the discretion of the court.

Public build-
ings and gather-
ings.
(2438) § 7.  It shall be unlawful for any person, except a peace
officer, to carry into any church or religious assembly, any school
room or other place where persons are assembled for public wor-
ship, for amusement, or for educational or scientific purposes, or
into any circus, show or public exhibition of any kind, or into any
ball room, or to any social party or social gathering, or to any elec-
tion, or to any place where intoxicating liquors are sold, or to any
political convention, or to any other public assembly, any of the
weapons designated in sections one and two of this article.

Intent of per-
sons carrying
weapons.
(2439) § 8.  It shall be unlawful for any person in this Terri-
tory to carry or wear any deadly weapons or dangerous in-
strument whatsoever, openly or secretly, with the intent or for the
avowed purpose of injuring his fellow man.

Pointing
weapons at an-
other.
(2440) § 9.  It shall be unlawful for any person to point any
pistol or any other deadly weapon whether loaded or not, at
any other person or persons either in anger or otherwise.

Violation of
section seven.
(2441) § 10.  Any person violating the provisions of section
seven, eight or nine of this article; shall on conviction, be punish-
ed by a fine of not less than fifty dollars, nor more than five hun-
dred and shall be imprisoned in the county jail for not less than
three not more than twelve months.

ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

Punishment
for false imper-
sonation.
(2442) § 1.  Every person who falsely personates another, and
in such assumed character, either:

First.  Marries or pretends to marry, or to sustain the mar-
riage relation toward another, with or without the connivance of
such other person; or,

Second.  Becomes bail or surety for any party, in any proceed-
ing whatever, before any court or officer authorized to take such
bail or surety; or,

Third.  Subscribes, verifies, publishes, acknowledges or proves,
in the name of another person, any written instrument, with in-
tent that the same may be delivered or used as true; or,

Fourth.  Does any other act whereby, if it were done by the
person falsely personated, he might in any event become liable to
any suit or prosecution, or to pay any sum of money, or to incur
any charge, forfeiture or penalty, or whereby any benefit might
accrue to the party personating, or to any other person.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page114 of 167

A. D.
1776.

chosen to that office until the first day of October in the year of our Lord One Thousand Seven Hundred and Seventy-eight, provided the freemen think proper to re-elect them at every general election ; and the present Sheriffs and Coroners respectively sh..'! continue to exercise their offices as heretofore until the Sheriffs and Coroners to be elected on the said twenty-first day of October shall be commissioned and sworn into office.   The Members of the Legislative Council and Assembly shall meet for transacting the business of the state on the twenty-eighth day of October next, and continue in office until the first day of October which will be in the year One Thousand Seven Hundred and Seventy-seven ; on which day, and on the first day of October in each year forever after, the Legislative Council, Assembly, Sheriffs and Coroners, shall be chosen by ballot in manner directed by the several laws of this state for regulating elections of Members of Assembly and Sheriffs and Coroners ; and the General Assembly shall meet on the twentieth day of the same month for the transacting the business of the state ; and if any of the said first and twentieth days of October should be Sunday, then and in such case the elections shall be held and the General Assembly meet the next day following.

*and meeting of the Legislature under this constitution.*

*Of the freedom of election*

ART. 28. To prevent any violence or force being used at the said elections, no persons shall come armed to any of them ; and no muster of the militia shall be made on that day, nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter who offers to vote objects thereto ; nor shall any battalion or company in the pay of the Continent, or of this or any other state, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carrying on the said election : *Provided always,* That every elector may in a peaceable and orderly manner give in his vote on the said day of election.

ART. 29. There shall be no establishment of any one

Digitized from Best Copy Available

# LAWS

### OF THE

# STATE OF NEW-YORK,

#### PASSED BY THE

#### LEGISLATURE AT THEIR TENTH SESSION.

---

## CHAP. 1.

AN ACT concerning the rights of the citizens of this State.

PASSED the 26th of January, 1787.

*Be it enacted by the People of the State of New York represented in Senate and Assembly and it is hereby enacted and declared by the authority of the same.*

**All authority derived from State**

*First,* That no authority shall, on any pretence whatsoever be exercised over the citizens of this State but such as is or shall be derived from and granted by the people of this State.

**Right of property and personal liberty.**

*Second,* That no citizen of this State shall be taken or imprisoned or be disseised of his or her freehold or liberties of free customs or outlawed or exiled or condemned or otherwise destroyed, but by lawful judgment of his or her peers or by due process of law.

*Third* That no citizen of this State shall be taken or imprisoned for any offence upon petition or suggestion unless it be by indictment or presentment of good and lawful men of the same neighbourhood where such deeds be done, in due manner or by due process of law.

**Id.**

*Fourth* That no person shall be put to answer without presentment before justices, or matter of record, or due process of law according to the law of the land and if any thing be done to the contrary it shall be void in law and holden for error.

**Id.**

*Fifth* That no person, of what estate or condition soever shall be taken or imprisoned, or disinherited or put to death without being brought to answer by due process of law, and that no person shall be put out of his or her franchise or freehold or lose his or her life or limb, or goods and chattels, unless he or she be duly brought to answer and be forejudged of the same by due course of law and if any thing be done contrary to the same it shall be void in law and holden for none.

CHAP. I.]                    TENTH SESSION.                    **345**

*Sixth* That neither justice, nor right shall be sold to any person, nor Justice to
denied nor deferred; and that writs and process shall be granted freely be free.
and without delay to all persons requiring the same and nothing from
henceforth shall be paid or taken for any writ or process but the accus-
tomed fee for writing and for the seal of the same writ or process and
all fines duties and impositions whatsoever heretofore taken or demanded
under what name or description soever, for or upon granting any writs,
inquests, commissions or process to suitors in their causes shall be and
hereby are abolished.

*Seventh* That no citizens of this State shall be fined or amerced with- Fines to be
out reasonable cause and such fine or amerciament shall always be propor-
according to the quantity of his or her trespass or offence and saving to offense;
him or her, his or her contenement; That is to say every freeholder ments.
saving his freehold, a merchant saving his merchandize and a mechanick
saving the implements of his trade.

*Eighth* That excessive bail ought not to be required, nor excessive Excessive
fines imposed, nor cruel and unusual punishments inflicted. ball pro-
                                                               hibited.

*Ninth* That all elections shall be free and that no person by force of Elections
arms nor by malice or menacing or otherwise presume to disturb or to be free.
hinder any citizen of this State to make free election upon pain of fine
and imprisonment and treble damages to the party grieved.

*Tenth* That it is the right of the citizens of this State to petition the Right of
person administering the government of this State for the time being, petition.
or either house of the legislature and all commitments and prosecutions
for such petitioning are illegal.

*Eleventh* That the freedom of speech and debates and proceedings in Freedom
the senate and assembly shall not be impeached or questioned in any of speech
court or place out of the senate or assembly. ture.

*Twelfth* That no tax duty aid or imposition whatsoever shall be taken Taxes to
or levied within this State without the grant and assent of the people of be laid
this State by their representatives in senate and assembly and that no authority
citizen of this State shall be by any means compelled to contribute to lature.
any gift loan tax or other like charge not set laid or imposed by the
legislature of this State: *And further,* that no citizen of this State shall
be constrained to arm himself or to go out of this State or to find soldiers
or men of arms either horsemen or footmen, if it be not by assent and
grant of the people of this State by their representatives in senate and
assembly.

*Thirteenth* That by the laws and customs of this State the citizens Billeting
and inhabitants thereof cannot be compelled against their wills to prohibited.
receive soldiers into their houses and to sojourn them there and there-
fore no officer military or civil nor any other person whatsoever shall
from henceforth presume to place, quarter or billet any soldier or
soldiers upon any citizen or inhabitant of this State of any degree or
profession whatever without his or her consent and that it shall and
may be lawful for every such citizen and inhabitant to refuse to sojourn
or quarter any soldier or soldiers notwithstanding any command order
warrant or billetting whatever.

VOL. 2. — 44

# LAWS

OF THE

## GENERAL ASSEMBLY

OF THE

## STATE OF PENNSYLVANIA,

PASSED AT THE

## SESSION OF 1873,

In the Ninety-seventh year of Independence.

## WITH AN APPENDIX.

BY AUTHORITY.

HARRISBURG:
BENJAMIN SINGERLY, STATE PRINTER.
1873.

JA625

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page118 of 167

## No. 808.

### An Act

Authorizing the electors of the borough of Lykens, in the county of
Dauphin, to elect one supervisor for said borough, et cetera.

SECTION 1. *Be it enacted, &c.,* That the qualified electors of
the borough of Lykens, in the county of Dauphin, on the
third Friday of March, one thousand eight hundred and
seventy-three, and every succeeding March election thereafter,
elect but one supervisor for said borough instead of two su-
pervisors; and that all laws heretofore enacted in relation
thereto be and the same are hereby repealed.

APPROVED—The 10th day of April, A. D. 1873.

J. F. HARTRANFT.

———

## No. 809.

### An Act

To repeal an act for the appointment of an auctioneer for the county of
Westmoreland, approved twentieth March, one thousand eight hun-
dred and sixty-nine.

SECTION 1. *Be it enacted, &c.,* That the act providing for
the appointment of an auctioneer for the county of West-
moreland, approved the twentieth day of March, Anno Domini
one thousand eight hundred and sixty-nine, be and the same
is hereby repealed.

APPROVED—The 10th day of April, A. D. 1873.

J. F. HARTRANFT.

———

## No. 810.

### An Act

To prevent the carrying of deadly weapons within the city of Harris-
burg.

SECTION 1. *Be it enacted, &c.,* That any person who shall
carry any pistol, dirk-knife, slung-shot or deadly weapon

736                    LAWS OF PENNSYLVANIA,

within the city limits of Harrisburg, except police officers,
shall be deemed guilty of misdemeanor, and being convicted
thereof, shall be sentenced to undergo an imprisonment or
be fined in any sum of not less than fifty dollars, or both, at
the discretion of the court, and in case of non payment of
the fine so imposed, shall be imprisoned for a period of not
less than three months, and be required to give security for
future good behavior.   The fines collected shall be paid into
the city treasury for the use of said city.

APPROVED—The 12th day of April, A. D. 1873.

                              J. F. HARTRANFT.

———

No. 811.

# An Act

To incorporate the Mountain Grove Camp-Meeting Association of the
Methodist Episcopal Church.

**Corporators**   SECTION 1. *Be it enacted, &c.*, That Reverends Samuel
Barnes and Samuel Creighton, Messrs. J. M. Shoop, N. P.
John, M. W. Jackson, B. G. Welch, Stephen Turnbaugh, E.
M. Wardin, A. J. Amerman, J. R. Cleaver and Joseph Smith,
with such other person or persons, citizens of this state and
of any other state, as may associate with them, and their
successors, be and they hereby are created a body politic and
**Title.**   corporate in law by the name, style and title of the Mountain
Grove Camp-Meeting Association of the Methodist Episcopal
**Purpose.**   Church, for the purpose of providing and maintaining for
the members and friends of the Methodist Episcopal church
a proper, convenient, desirable and permanent camp-meeting
ground and christian family resort ; and by the name of the
Mountain Grove Camp-Meeting Association of the Methodist
**Powers and privi-**   Episcopal Church, shall have perpetual succession, and be
**leges.**   able to sue and be sued in any court of law or equity, and
may have and use a common seal, and the same at their plea-
sure alter and renew ; and shall have power to purchase and
hold such real and personal estate, and erect such buildings
and improvements thereon as they may deem necessary,
proper or desirable for the purposes and objects of the cor-
poration, and the same, or any part thereof, to dispose of in
parcels or otherwise, by lease, or in fee simple, or otherwise,
on such terms, conditions and restrictions, not repugnant to
the laws of this state or the United States, as they may see
fit ; and the said corporation shall have authority to receive
gifts or bequests, by will or otherwise, for the purpose of
ornamenting, improving and maintaining the camp-ground
**Managers may**   of said association.   The managers of the said corporation
**borrow money.**   shall have power to borrow money to any amount, not ex-

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page120 of 167

# ACTS

AND

## JOINT RESOLUTIONS

PASSED BY

# THE GENERAL ASSEMBLY

OF THE

## STATE OF VIRGINIA

DURING THE

### SESSION OF 1877-78.

------

RICHMOND:
R. F. WALKER, SUPERINTENDENT PUBLIC PRINTING.
1878.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page121 of 167

**304** ACTS OF ASSEMBLY.

Penalty — ished by a fine not exceeding one hundred dollars, or by imprisonment in jail not exceeding six months.

### Cruelty to animals; profanity and drunkenness.

Cruelty to animals — 15. If a person cruelly beat or torture any horse, animal or other beast, whether his own or that of another, he shall

Penalty — be fined not exceeding fifty dollars.

Profanity and drunkenness — 16. If any person, arrived at the age of discretion, profanely curse or swear, or get drunk, he shall be fined by a

Penalty — justice one dollar for each offence.

### Violation of the Sabbath.

Violation of Sabbath — 17. If a person, on a Sabbath day, be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work

Penalty — of necessity or charity, he shall forfeit two dollars for each offence; every day any servant or apprentice is so employed constituting a distinct offence.

### Exceptions as to the mail, and as to certain persons.

Transportation of mail excepted — 18. No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail, or of

Exception as to certain religionists — passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business

Proviso — and labor on that day: provided he does not compel an apprentice or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person.

Sale of intoxicating liquors prohibited between certain hours — 19. No bar-room, saloon, or other place for the sale of intoxicating liquors, shall be opened, and no intoxicating bitters or other drink shall be sold in any bar-room, restaurant, saloon, store, or other place, from twelve o'clock on each and every Saturday night of the week, until sunrise of the succeeding Monday morning; and any person violating the provisions of this section, shall be deemed guilty of a misdemeanor, and, if convicted, shall be punished by fine

Penalty — not less than ten nor more than five hundred dollars; and shall, moreover, at the discretion of the court, forfeit his

Proviso — license: provided that this law shall not apply to any city having police regulations on this subject, and an ordinance inflicting a penalty equal to the penalty inflicted by this section.

Disturbance of religious worship — 20. If a person willfully interrupt or disturb any assembly met for the worship of God, or being intoxicated, if he disturb the same, whether willfully or not, he shall be confined

Penalty — in jail not more than six months, and fined not exceeding one hundred dollars, and a justice may put him under restraint during religious worship, and bind him for not more than one year to be of good behavior.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page122 of 167

21. If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars. If any offence under this section be committed at a place of religious worship, the offender may be arrested on the order of a conservator of the peace, without warrant, and held until warrant can be obtained, but not exceeding three hours. It shall be the duty of justices of the peace, upon their own knowledge, or upon the affidavit of any person, that an offence under this section has been committed, to issue a warrant for the arrest of the offender. *[Carrying dangerous weapons at a place of worship or on Sunday. Penalty. Offenders subject to arrest without warrant. Duty of justice where he knows of offence under this section.]*

*Protection of religious assemblies; prohibition against sale of liquors or other things near such meetings; proviso.*

22. If any person shall erect, place, or have any booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance whatever, for the purpose or use of selling, giving, or otherwise disposing of any kind of spirituous and fermented liquors, or any other articles of traffic; or shall sell, give, barter, or otherwise dispose of any spirituous or fermented liquors, or any other articles of traffic within three miles of any camp-meeting, or other place of religious worship, during the time of holding any meeting for religious worship at such place, such person, on conviction before a justice of the peace, for the first offence, shall be fined not less than ten dollars, nor more than twenty dollars, and stand committed to jail until the fine and costs are paid; and for the second offence, shall be fined as aforesaid, and be imprisoned not less than ten nor more than thirty days. *[Sale of liquors, &c., prohibited. Penalty. Penalty for second offence.]*

23. If any person shall commit any offence against the provisions of the preceding section, he shall, in addition to the penalties therein mentioned, forfeit all such spirituous or fermented liquors, and other articles of traffic, and all the chests and other things containing the same, belonging to and in the possession of the person so offending, together with such booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance or thing prepared and used in violation of said section; and it shall be the duty of any sheriff, deputy sheriff, or constable, if he sees any person violating the preceding section, to arrest the offender and carry him before a justice of the peace. The sheriff, deputy sheriff, or constable, when he arrests the offender, shall seize the property hereby declared to be forfeited, or shall seize the same on a warrant against the offender, if such offender cannot be found; and the justice of the peace before whom such offender is convicted, or before whom the warrant is returned that the offender cannot be found, shall enter judgment of condemnation against such property, and issue a fieri facias for the *[Additional penalty. Duty of sheriffs, &c., to arrest offender and seize the property. Judgment of condemnation.]*

39

JA630

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page123 of 167

**306**                        ACTS OF ASSEMBLY.

Fi. fa. to issue
Proviso

sale thereof: provided the person who has been returned not found, and whose property has been condemned in his absence, may appear at any time before the sale of the property and have the case tried as if he had appeared at the return of the warrant.

To whom provisions not to apply

24. The provisions of the two preceding sections shall not apply to any licensed tavern-keeper, merchant, shop-keeper, farmer, or other person in the usual and lawful transaction of his ordinary business, in the usual place of transacting such business, or to any person having permission, in writing from the superintendent of such meeting, to sell such articles

Proviso

as may be named in such permission: provided this permission shall not extend to the sale of any spirituous or fermented liquors.

*Right of appeal.*

Right of appeal preserved

25. Nothing in this chapter shall prevent the courts of record from exercising their common law or statutory jurisdiction in all cases for disturbing public worship: provided

Proviso

that the party convicted under the twenty-second or twenty-third sections of this chapter shall have the right to appeal to the next county court for the county where the conviction is had, upon giving bail for his appearance at court, and upon such appeal shall be entitled to a trial by jury: and

Persons proceeded against not subject to answer before grand jury

provided further, that when any person or persons are proceeded against under the twenty-second or twenty-third sections of this chapter, he or they shall not be held to answer for the same offence before any grand jury or court of record, except as herein provided.

*Temporary police force for religious meetings.*

Temporary police authorized

26. The supervisor, or any justice of the magisterial district where the meeting is held, shall have power to appoint a temporary police to enforce the provisions of this chapter.

--------

CHAPTER VIII.

OF OFFENCES AGAINST PUBLIC HEALTH.

*Selling unsound provisions.*

Sale of unsound provisions

1. If a person knowingly sell any diseased, corrupted, or unwholesome provisions, whether meat or drink, without making the same known to the buyer, he shall be confined

Penalty

in jail not more than six months, and fined not exceeding one hundred dollars.

JA631

# LAWS

## OF THE

# STATE OF MISSISSIPPI,

### PASSED AT A REGULAR SESSION

#### OF THE

# MISSISSIPPI LEGISLATURE,

##### HELD IN THE

# CITY OF JACKSON,

Commencing Jan. 8th, 1878, and Ending March 5th, 1878.

## PRINTED BY AUTHORITY.

JACKSON, MISS.:
POWER & BARKSDALE, STATE PRINTERS.
1878.

JA632

STATE OF MISSISSIPPI.                    175

## CHAPTER XLVI.

AN ACT to prevent the carrying of concealed weapons, and for other purposes.

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That any person, not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be, punished for the first offence by a fine of not less than five dollars nor more than one hundred dollars, and in the event the fine and cost are not paid shall be required to work at hard labor under the direction of the board of supervisors or of the court, not exceeding two months, and for the second or any subsequent offence, shall, on conviction, be fined not less than fifty nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor not exceeding six months under the direction of the board of supervisors, or of the court. That in any proceeding under this section, it shall not be necessary for the State to allege or prove any of the exceptions herein contained, but the burden of proving such exception shall be on the accused.

*When concealed weapons may be carried.*

*Penalty for carrying weapons.*

*Burden of proof on accused.*

SEC. 2. *Be it further enacted,* That it shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described, or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months.

*Minors, or persons intoxicated.*

**JA633**

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page126 of 167

176                         LAWS OF THE

SEC. 3. *Be it further enacted*, That any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

*Minor under 16 years.*

SEC. 4. *Be it further enacted*, That any student of any university, college or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars, and if the fine and costs are not paid, condemned to hard labor under the direction of the board of supervisors or of the court.

*Students.*

SEC. 5. *Be it further enacted*, That each justice of the peace before whom a conviction is had, shall, in addition to the costs now allowed by law, be entitled to a tax fee of two dollars and a half.

*Tax fee of justice.*

SEC. 6. *Be it further enacted*, That immediately after the passage of this Act, the Secretary of State shall transmit a copy to each circuit judge in the State, who shall cause the same to be read in open court on the day for the calling of the State docket of the court.

*Act to be read in courts*

SEC. 7. *Be it further enacted*, That this Act take effect from and after its passage.

APPROVED, February 28, 1878.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page127 of 167

THE

# GENERAL LAWS

OF THE

## Commonwealth of Massachusetts

PASSED AT THE

## JANUARY SESSION, 1837.

---

NOTE. [The omitted chapters are those which contain the Special Statutes.]

---

### CHAPTER 1.

AN ACT CONCERNING THE SURPLUS REVENUE OF THE UNITED
STATES.

Treasurer authorized to receive, &c., Commonwealth's proportion of public money.

THE treasurer and receiver general of this Commonwealth is
hereby authorized to receive, on the terms prescribed in the
thirteenth section of the act of Congress, entitled, "an act to
regulate the deposits of the public money," approved the
twenty-third day of June, eighteen hundred and thirty-six, the
proportion of the moneys thereby directed to be deposited with
the several states, which may according to the provisions of
that section be deposited with this state; and to sign, and de-
liver to the secretary of the treasury of the United States, such
certificates of deposit therefor as may be required under the
provisions of that section ; and to pledge the faith of this state
for the safe keeping and repayment thereof, in such manner as
may be necessary to entitle the treasurer and receiver general
to receive, for and in behalf of this state, said proportion of the
moneys before mentioned.   [January 19, 1837.]

*Treasurer authorized to receive, &c., Commonwealth's proportion of public money.*

*And to sign certificates of deposit, &c.*

---

### CHAPTER 13.

AN ACT RELATING TO THE SALARY OF THE SERGEANT AT ARMS.

Salary of Sergeant at Arms increased.

FROM and after the first day of January, one thousand eight
hundred and thirty-seven, the sergeant at arms shall receive an
annual salary of one thousand dollars, instead of eight hundred
and fifty dollars, as provided in the sixty-fifth section of the
thirteenth chapter of the Revised Statutes.   [February 14, 1837.]

*Salary $1,000.*

3

JA635

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page128 of 167

## CHAPTER 240.

### AN ACT CONCERNING THE MILITIA.

Section
1. Who shall be enrolled in the militia, and included in military returns.
2. Who shall appoint division inspectors, &c.
3. When commissions of staff officers expire.
4. Adjutant general to present his account to governor and council in February.
5. How military returns shall be made; penalties for neglect; by whom penalties sued for.
6. Certain yearly returns dispensed with; majority of voters present may elect

Section
company officers.
7. On what terms members of voluntary companies exempted from duty in standing company.
8. Division inspector to keep roster, &c.; his compensation.
9. How fines, &c. of members of volunteer companies may be collected and disposed of.
10. When towns required to provide powder, &c.: forfeiture for not providing.
11. Sections of former statute repealed.

Who shall be enrolled in the militia, and included in military returns.

SECT. 1.    Every able-bodied white male citizen resident within this Commonwealth, who is, or shall be, of the age of eighteen, and under the age of forty five years, excepting idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia, and included in the military returns : *provided*, that nothing herein contained shall be so construed as to render any of the exempts mentioned in the first, second and third sections of the twelfth chapter of the Revised Statutes, liable to do military duty otherwise than is therein provided.

Who shall appoint division inspectors, &c.

SECT. 2.    Division inspectors and division quarter masters shall hereafter be appointed by the respective major generals, and approved by the commander in chief.

When commissions of staff officers expire.

SECT. 3.    The commissions of all staff officers, appointed by any commanding officer, shall expire after the commanding officer shall be discharged or vacate his commission, as soon as his successor is commissioned.

Adjutant general to present his account to governor and council in February.

SECT. 4.    The adjutant general shall annually, in the month of February, lay before the governor and council, for adjustment, an account of all expenditures of money made by him as adjutant general and acting quarter master general, with vouchers to support the same ; and such accounts shall be settled by the governor and council.

How military returns shall be made ; penalties for neglect; by whom penalties sued for.

SECT. 5.    The military returns shall continue to be made, as provided in the thirty first and thirty second sections of the twelfth chapter of the Revised Statutes, excepting, that every commanding officer of a brigade shall make and transmit returns of the state of his brigade, to the commanding officer of the division to which he belongs, in the month of July annually ; and every commanding officer of such division shall make and transmit returns of the state of his division to the adjutant general in the month of August annually.    And the penalty for neglecting to make the returns as provided for in the thirty first and thirty second sections of the twelfth chapter of the Revised Statutes, and in this section, shall be as follows :

Every captain or commanding officer of a company, who shall

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page129 of 167

neglect to make returns, for each instance of such neglect, ten dollars.

Every commanding officer of a regiment or separate battalion, who shall neglect to make returns, for each instance of such neglect, twenty-five dollars.

Every commanding officer of a brigade, who shall neglect to make returns, for each instance of such neglect, fifty dollars.

Every commanding officer of a division, who shall neglect to make returns, for each instance of such neglect, seventy-five dollars.

Every brigade major and inspector who shall neglect to make returns, for each instance of such neglect, fifty dollars.

The above fines and forfeitures to be prosecuted for by the officer to whom the respective returns should be made, in any court of competent jurisdiction, and paid into the treasury of the Commonwealth.

Sect. 6.   So much of the one hundred and fourteenth section of the twelfth chapter of the Revised Statutes as requires clerks of companies to make annual returns to the brigade majors, and the brigade majors to the commander-in-chief; and so much of the fifty-eighth section of the twelfth chapter of the Revised Statutes as requires a majority of the qualified voters of the company to be present at an election of officers, is hereby repealed; and a majority of the legal voters present at any company election, duly notified, may elect company officers. *Certain yearly returns dispensed with; majority of voters present may elect company officers.*

Sect. 7.   No non-commissioned officer or private of any company raised at large, shall be required to perform military duty in the standing company within whose limits he resides: *provided*, that when notified of his enrolment in such standing company, or otherwise requested, he shall produce within ten days, to the commanding officer of such standing company, a certificate from the commanding officer of his own company, that he is a member thereof; and if any such non-commissioned officer or private remove out of the limits within which his company is raised, he shall continue to be a member thereof. *On what terms members of volunteer companies exempted from duty in standing company.*

Sect. 8.   The division inspector of each division shall constantly keep a correct roster of the division to which he belongs, and an orderly book, in which he shall record all orders received and issued; and he shall receive annually the same compensation which is now by law allowed to the oldest aid-de-camp of each major general; and so much of the twenty-seventh section of the twelfth chapter of the Revised Statutes as provides that the oldest aid-de-camp of each major general shall keep such roster and orderly book, is hereby repealed. *Division inspector to keep roster, &c.; his compensation.*

Sect. 9.   All fines and forfeitures, incurred by the members of volunteer companies, may be collected by such persons and disposed of in such manner, for the benefit of said companies, as a majority of the members thereof may determine. *How fines, &c. of members of volunteer companies may be collected and disposed of.*

Sect. 10.   Whenever in the opinion of the commander-in-chief it shall be necessary, he shall issue his proclamation, requiring all towns to provide, and deposit in some suitable and convenient place therein, sixty-four pounds of good powder; one hundred pounds of musket balls, each of the eighteenth *When towns required to provide powder, &c.; forfeiture for not providing.*

**JA637**

**56**          1837.—Chap. 241.   Sect. 1—2.

part of a pound; one hundred and twenty-eight flints suitable for muskets; three copper, iron, or tin camp kettles, for every sixty-four soldiers enrolled in said town; and the same proportion of the aforesaid articles for a greater or less number, and so to keep the same, until he shall by proclamation declare the same no longer necessary.

Any town which shall neglect to provide and keep deposited all or any of the aforesaid articles, as above required, shall forfeit the sum provided in the one hundred and sixth section of the twelfth chapter of the Revised Statutes.

*Sections of former statute repealed.*

Sect. 11.   The forty-sixth and forty-seventh sections of the twelfth chapter, and all other provisions of the Revised Statutes which are inconsistent with this act, are hereby repealed. [April 20, 1837.]

## CHAPTER 241.

### AN ACT RELATING TO COMMON SCHOOLS.

| Section | Section |
|---|---|
| 1. Board of education, how constituted; term of office, &c. | 3. Board to make yearly report of its doings, with suggestions, &c. |
| 2. Board to make yearly abstract of school returns: May appoint a secretary; his duty, &c. | 4. Governor may draw for secretary's salary. |

*Board of education, how constituted; term of office, &c.*

Sect. 1.   His excellency the governor, with the advice and consent of the council, is hereby authorized to appoint eight persons, who, together with the governor and lieutenant governor ex officiis, shall constitute and be denominated the board of education; and the persons so appointed shall hold their offices for the term of eight years: *provided*, the first person named in said board shall go out of office at the end of one year, the person next named shall go out of office at the end of two years, and so of the remaining members, one retiring each year, and in the order in which they are named, till the whole board be changed; and the governor, with the advice and consent of the council as aforesaid, shall fill all vacancies in said board, which may occur from death, resignation or otherwise.

*Board to make yearly abstract of school returns.*

*May appoint a secretary; his duty, &c.*

Sect. 2.   The board of education shall prepare and lay before the Legislature, in a printed form, on or before the second Wednesday of January, annually, an abstract of the school returns received by the secretary of the Commonwealth, and the said board of education may appoint their own secretary, who shall receive a reasonable compensation for his services, not exceeding one thousand dollars per annum, and who shall, under the direction of the board, collect information of the actual condition and efficiency of the common schools, and other means of popular education, and diffuse as widely as possible throughout every part of the Commonwealth, information of the most approved and successful methods of arranging the studies and conducting the education of the young, to the end that all children in this Commonwealth, who depend upon common schools for instruction, may have the best education which those schools can be made to impart.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page131 of 167

# PUBLIC LAWS

OF THE

# STATE OF MAINE.

———

## Chapter 252.

..N ACT providing for the acceptance of the public money, apportioned to
the State of Maine, on deposite, by the Government of the United States.

*Be it enacted by the Senate and House of
Representatives in Legislature assembled,* That
the Treasurer of this State is hereby authorized to
receive on the terms prescribed in the thirteenth
section of the Act of Congress, entitled "An Act
to regulate the deposites of the public money,"
approved the twenty-third day of June, eighteen
hundred and thirty-six, the proportion of the moneys
thereby directed to be deposited with the several
States which may, according to the provisions of
that section, be deposited with this State, and to sign
and deliver to the Secretary of the Treasury of the
United States such certificates of deposites therefor
as may be required under the provisions of that
section, and to pledge the faith of this State for the
safe keeping and repayment thereof in such manner
as may be necessary to entitle the Treasurer to
receive, for and in behalf of this State, said propor-
tion of the monies before mentioned.

*Treasurer of
State to receive
the proportion of
surplus funds be-
longing to Maine.*

[*Approved by the Governor January* 26, 1837.]

2

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page132 of 167

missioned Officer or private so appointed, shall
refuse or neglect to perform all or any of the duties
of said office during said term, (except keeping the
records,) he shall forfeit and pay not less than ten *Penalty for their refusing to perform said duty.*
nor more than twenty dollars.   And in case of the
absence, sickness, or other inability of the Clerk of
any Company, the commanding Officer thereof
may appoint a Clerk pro tempore; or upon satis-
factory evidence that no member of the Company
will accept the office pro tempore, he may order any —*Clerk pro tem. may be appointed in case of absence or sickness of Clerk.*
non-commissioned Officer or private in like man-
ner to perform all the duties of the office of Clerk
(except keeping the records,) until the Clerk shall
be able to perform the same, or some other person
be appointed, not exceeding the term of three
months; and any person so ordered, refusing or *Penalty for refusing to perform said duty.*
neglecting to perform all the duties of said office
(except keeping the records,) shall forfeit and pay
not less than ten nor more than twenty dollars.   In
all such cases the records of the Company shall be *Records to be kept by commanding Officer, and to be competent evidence.*
kept by the commanding Officer as long as such
vacancy, absence, sickness or other inability shall
continue: and the records so kept shall be compe-
tent evidence of such orders and temporary appoint-
ments, as well as of all other matters of which such
records would be evidence if kept by the Clerk.

SECT. 4.  *Be it further enacted,* That all fines
and forfeitures incurred in neglecting military duty, *How fines are to be collected and how to be disposed of.*
by members of any Company without Officers,
(except forfeitures for refusing to give notice when
ordered by the Officer detailed to command such
Company, as provided in the second section of this
Act or by the commanding Officer of the Regiment;
and except forfeitures incurred by Clerks in neglect-
ing to return the roll as required by the first section
of this Act,) shall be prosecuted and collected by
the Officer detailed to command said Company as
provided in the second section of this Act, substan-
tially in the manner that Clerks of Companies are

424                              MILITIA.

authorized and required to do by "An Act to organize, govern and discipline the Militia of this State," passed March 8, A. D. 1834, to which this is additional; one half of the amount recovered to be to the use of the Regiment, and the other half to the use of the Officer; and the Officer so prosecuting shall be a competent witness in the case. All fines and forfeitures incurred under the first, second and third sections of this Act, shall be recovered by indictment, or by action on the case, by any person whatever, one half of the sum recovered to be to the use of the State, and the other half to the use of the prosecutor.

SECT. 5. *Be it further enacted,* That no
*No idiot, lunatic, common drunkard, vagabond, pauper, or person convicted of any infamous crime to be eligible for office,—nor unless able bodied, &c., &c.*
idiot, lunatic, common drunkard, vagabond, pauper, nor any person convicted of any infamous crime, nor any other than white, able-bodied, male citizens, shall be eligible to any office in the Militia; and whenever it shall appear to the Commander-in-Chief, that any person thus ineligible has received
*Persons ineligible not be commissioned.*
a majority of votes cast at any election of Officers, he shall not commission him, but, with the advice and consent of the Council, shall declare said elec-
*—vacancy to be filled.*
tion null and void, and appoint some person to fill the vacancy.

SECT. 6. *Be it further enacted,* That all stu-
*Students in Colleges made liable to do military duty.*
dents attending any of the several colleges, academies or seminaries of this State, shall be holden and compelled to do military duty as other persons, in the town where said colleges, academies or seminaries are established.

SECT. 7. *Be it further enacted,* That when-
*Verbal notice to appear on a future day may be given on parade.*
ever any Company shall be paraded, the command-ing Officer thereof is hereby authorized verbally to notify the men so paraded, to appear on some future day not exceeding thirty days from the time of such notification, for any military duty required by law, and such notification shall be legal as it respects the men present.

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page134 of 167

MILITIA.                                                      425

SECT. 8.   *Be it further enacted,* That all com- <span style="font-size:smaller">Officers and Clerks of Companies made witnesses.</span>
manding officers, subaltern Officers, and all Clerks
of Companies be and they hereby are made com-
petent witnesses in law, to testify to all or any facts
within their knowledge, in any suit commenced by
said Clerk or commanding Officer, for the collec-
tion of any fine or forfeiture named in this Act, or
in the several Acts to which this is additional.

SECT. 9.   *Be it further enacted,* That when- <span style="font-size:smaller">In case of death of Clerk, commanding Officer, to continue prosecution for fines to final judgment —and to commence them where there is no Clerk.</span>
ever any action shall have been commenced, for any
fine or forfeiture, by any Clerk of any Company,
and said Clerk shall die, resign or refuse, or in any
other way be disqualified to prosecute said suit so
commenced, it shall be lawful and is hereby made
the duty of the commanding Officer of the Com-
pany, to assume and prosecute said suit to final
judgment and execution; and whenever any fine or
forfeiture shall have been incurred by any private or
non-commissioned Officer of any Company, and
there shall be no Clerk, or the Clerk shall resign or
die, or be disqualified, it shall be lawful for any
Clerk appointed after said fine or forfeiture has been
incurred, to sue for and recover the same; *Pro-*
*vided* said action shall be commenced within the
time prescribed by law.

SECT. 10.   *Be it further enacted,* That a <span style="font-size:smaller">Copy of records of Courts Martial made evidence in cases.</span>
copy of the record of any Court Martial, certified by
the President of such Court, together with a duly
authenticated copy of the order convening said Court,
shall be conclusive and sufficient evidence to sustain
in any Court, any action commenced for the recov-
ery of any fine and costs, or part costs, or either,
agreeably to the provisions of an Act to which this
is additional.

SECT. 11.   *Be it further enacted,* That if any <span style="font-size:smaller">Fine imposed on commanding Officers who neglect to make returns of the May Inspection.</span>
Captain or commanding Officer shall neglect or
refuse to make, or cause to be made, a return of
the state of his Company as it existed on the day
of the annual inspection in May, to the command-

# JUNE, 1843.

At the General Assembly of the STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, begun and holden by adjournment, at Newport, within and for said State, on the third Monday of June, in the year of our Lord one thousand eight hundred and forty-three, and of Independence the sixty-seventh.

## PRESENT:

His Excellency JAMES FENNER, Governor:

His Honor BYRON DIMAN, Lieutenant Governor.

SENATORS FROM THE SEVERAL TOWNS:

| Town | Senator |
|---|---|
| Newport, | EDWARD W. LAWTON. |
| Providence, | ALBERT C. GREENE, |
| Portsmouth, | JOHN MANCHESTER. |
| Warwick, | JOHN BROWN FRANCIS. |
| Westerly, | |
| New-Shoreham, | SIMON R. SANDS. |
| North-Kingstown, | JEFFREY DAVIS. |
| South-Kingstown, | ELISHA R. POTTER. |
| East-Greenwich, | WILLIAM GREENE. |
| Jamestown, | GEORGE C. CARR. |
| Smithfield, | ISAAC WILKINSON. |
| Scituate, | JOB RANDALL. |
| Glocester, | SAMUEL STEERE. |
| Charlestown, | ASA CHURCH, Jun. |
| West-Greenwich, | GEORGE DAWLEY. |
| Coventry, | ELISHA HARRIS. |
| Exeter, | SAMUEL PHILLIPS. |
| Middletown, | JOSEPH I. BAILEY. |
| Bristol, | NATHANIEL BULLOCK. |
| Tiverton, | DAVID DURFEE. |
| Little-Compton, | NATHANIEL CHURCH. |
| Warren, | JOSEPH SMITH. |
| Cumberland, | OLNEY BALLOU. |
| Richmond, | ISRAEL ANTHONY. |
| Cranston, | ANSON POTTER. |
| Hopkinton, | JOSIAH W. LANGWORTHY. |
| Johnston, | CYRUS BROWN. |
| North-Providence, | LEVI C. EATON. |
| Barrington, | JAMES BOWEN. |
| Foster, | SAMUEL TILLINGHAST. |
| Burrillville, | OTIS WOOD. |

*THE SECRETARY.*

GEORGE RIVERS, Esq. Clerk.

# MILITIA LAW.

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS.

*In General Assembly, June Session, A. D. 1843.*

AN ACT TO REGULATE THE MILITIA.

*It is enacted by the General Assembly as follows :*

*Of the Enrolled Militia.*

Section 1. Every able bodied white male citizen, in this State, who is or shall be of the age of eighteen years, and not exceeding the age of forty-five years, excepting persons absolutely exempted by the provisions of this act, and idiots, lunatics, common drunkards, paupers, vagabonds, and persons convicted of any infamous crime, shall be enrolled in the militia, as hereinafter provided.

Sec. 2. In addition to the persons exempted from military duty by the act of Congress, there shall also be exempted from the performance of such duty, the following persons to wit: all persons who have holden the office of Governor, or Lieutenant Governor ; all persons who, after the last day of February, A. D. 1796, shall have holden any military commission or commissions, or staff office, with the rank of an officer of the line, for the space of five years successively, and who shall have been engaged thereon according to law, and been honorably discharged ; and also all persons who shall have holden any such military commission or commissions, or staff office aforesaid, for a less term than five years, and who have been superseded without their consent.

Sec. 3. Persons of the following descriptions, as long as they shall remain of said descriptions, shall be exempted from the performance of military duty, to wit : the justices and clerks of the supreme judicial court, the justices and clerks of

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page137 of 167

2

the courts of common pleas, the Secretary of State, the Attorney General, the General Treasurer, the sheriff of each county, one ferryman at each stated ferry, who usually navigates the boat, the keepers of light houses within this State, all settled or ordained ministers of the gospel, the president, professors, tutors, students, and steward of Brown University, the town councils of the several towns, the Mayor and Aldermen of the city of Providence, town and city treasurers, town and city clerks, practising physicians, practising surgeons—not including the pupils of either—preceptors and ushers of academies and schools, and engine men ; and provided that no engine shall have more than twenty men, unless otherwise provided by special enactment ; the members of fire hook and ladder companies, and chartered fire hose companies ; all persons belonging to the Society of Friends, commonly called Quakers, and the inhabitants of the towns of New-Shoreham and Jamestown, and of the island of Prudence, and such others as shall make oath or affirmation that they are conscientiously scrupulous against bearing arms, which fact shall appear to the commanding officer, by certificate of the magistrate before whom said oath or affirmation was given.

Sec. 4. It shall be the duty of the assessors of taxes in each town in this State, and in the city of Providence, annually to prepare a list or roll of all persons liable to be enrolled in the militia, as provided in the first section, together with all persons liable to do duty in case of invasion, insurrection, riot, and tumult, living within their respective limits, whether such persons be or be not attached to any chartered or regimental companies ; and to place the same in the hands of the town clerk of such town, and of the said city of Providence, and it shall be the duty of every such clerk to record such list or roll of names in a proper book of record, to be kept for that purpose, in every town in this State, and in the city of Providence. Annual returns of the militia, thus enrolled, shall be transmitted to the Adjutant General in the month of October, in each and every year, by the clerks aforesaid, and by him to the President of the United States. It shall also be the duty of said assessors to assess upon the persons liable to be enrolled in the militia as aforesaid, except in the towns of New Shoreham and Jamestown, and that portion of the town of Portsmouth forming the island of Prudence, a tax of fifty

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page138 of 167

3

cents each annually, distinguishing said tax in their assessment, as a tax in commutation of military duty, which tax shall be collected with the State taxes, on property of said person, if any; and if none, then with the town taxes, if any, in the same manner as by law is provided for the collection of State and town taxes; and if no property tax be assessed against him, then this tax shall be collected in manner aforesaid, by itself. The several collectors of taxes shall be entitled to retain five per cent. of the amount of this tax, so by them collected, in full compensation for their services for collection, and they are hereby required to keep by itself this tax assessed and collected for militia duty, and to pay over the same to the General Treasurer on or before the first day of January in each year. No such tax shall be collected of any person who holds a military commission, or who shall produce a certificate from the commanding officer of a regimental company, that he has been enrolled and done duty therein according to law for at least one day within a year preceding the assessment of said tax, or who, whether as a commissioned officer, non-commissioned officer or private, has, within the terms of this act, been superseded or honorably discharged.

Sec. 5. Every keeper of a tavern or boarding-house, and every master or mistress of a family or dwelling house, shall, upon application of the assessors of taxes of the town or city within which such tavern or house is situated, or on application of any person acting under the direction and authority of such assessors, give information of the names of all persons residing in such tavern or house, liable to enrollment, or to do military duty.

Sec. 6. If any non-commissioned officer or private shall become a pauper, vagabond or common drunkard, or be convicted of any infamous crime, he shall be forthwith disenrolled from the militia.

### Of the Active Militia.

Sec. 7. The active militia of this State shall consist and be composed of the several chartered corps now existing, who shall within sixty days after the passage of this act, voluntarily accept by vote the provisions of this act, and communicate the same to the Adjutant General, which acceptance shall be irrevocable, and of all military companies which may be hereafter

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page139 of 167

4

chartered.  Said companies shall be drilled and disciplined as
battalions as well as companies, and as the peace establishment
of the State, and as nurseries of officers, shall be called regi-
mental companies, or reduced regiments.  The active militia
shall in all cases be first ordered into service in case of war or
invasion, or to prevent invasion, or to suppress insurrection, riot
or tumult, or to aid civil officers in the execution of the laws
of the State.

Sec. 8.  Whenever forty men shall have enrolled themselves
as a corps of artillery or infantry, or thirty-two men as a corps
of cavalry, and have been uniformed as hereinafter required,
and it shall be made to appear to the General Assembly that
they are desirous to serve the State, as a portion of the milita-
ry force thereof, they shall be entitled to a charter in confor-
mity with the system by this act established ; *Provided, how-
ever*, that the number of such companies shall not exceed thir-
ty, and that hereafter they shall be formed in the proportion of
one regimental company to five hundred enrolled militia in the
several towns or districts where such companies may be loca-
ted, including in such proportion, the existing companies : and
*provided further*, that every such regimental company may
admit members to the number of five hundred, any thing in
the charters of said companies to the contrary notwithstanding.

Sec. 9.  Whenever any corps of the active militia hereafter
chartered, shall at any time be destitute of commissioned offi-
cers, and having been twice ordered to fill vacancies, shall neg-
lect or refuse to fill them, or shall be reduced to a less number
than twenty privates in a corps of cavalry, or thirty in a corps
of infantry or artillery, and remain so reduced for three months,
such corps may be disbanded by the General Assembly.

*Organization.*

Sec. 10.  The whole militia of this State shall be arranged
in one division ; the militia of the county of Newport shall
form the first brigade : the militia of the county of Providence
the second : the militia of the county of Washington the
third.: the militia of the county of Kent the fourth : and the
militia of the county of Bristol the fifth brigade.

Sec. 11.  The brigades shall consist of the several regimen-
tal companies or reduced regiments, in their respective limits,
now existing, or hereafter to be raised.  The said regimental
companies or regiments shall be numbered through the divis-

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page140 of 167

5

ion according to the dates of their respective charters. In compensation for their services, every member of the active militia who shall be returned to the General Treasurer, as hereinafter provided, as having done military duty four times in the year next preceding the return, in any regimental company in this State, shall be entitled to an equal proportional part of the tax for militia duty collected and paid into the General Treasury as aforesaid, not exceeding the sum of five dollars a year to each man. In the month of January of each year the General Treasurer shall apportion the sum received as a tax for militia duty, as aforesaid, amongst the active militia, and issue certificates to the members of the several regimental companies returned as hereinafter provided, payable to their individual order, for their proportional part of the whole amount of said tax by him received, not exceeding five dollars per man as aforesaid, *Provided however*, the members of no existing chartered company of this State, who shall not accept the provisions of this act, and conform thereto, shall be entitled to receive the compensation aforesaid.

Sec. 12. Every non-commissioned officer and soldier, of any regimental company who shall have done duty therein, according to law for the term of seven years, from the time of his enlistment, and shall have received an honorable discharge, shall not be compelled to do duty in the militia, except in time of war or invasion, or to prevent an invasion, or of insurrection, riot or tumult. Such discharge upon the completion of the term of service aforesaid, shall be given by the commanding officer of the brigade, upon the application of the commanding officer of the regimental company to which such private or non-commissioned officer may belong.

### How Officered.

Sec. 13. The officers and non-commissioned officers of the militia shall be as follows, to wit: the Governor, for the time being, shall be Captain-General and Commander-in-Chief; and he shall command, except when the militia shall be called into the service of the United States; and he shall be entitled to appoint his own aids, with the rank of Colonel. There shall be one Major General, two aids of the Major General, with the rank of Major, and a Military Secretary, with the rank of Captain; one Division Inspector with the rank of Lieutenant

**6**

Colonel; one Adjutant General, with the rank of Brigadier General; one Quarter-master General, with the rank of Brigadier General: The Adjutant General and the Quarter-master General, with the assent of the Commander-in-Chief, to appoint a sufficient number of assistants with the rank of Captain; one Commissary General, with the rank of Colonel; one Pay-master General, with the rank of Colonel; one Surgeon General, to appoint, with the assent of the Commander-in-Chief, a sufficient number of assistants; one Purveyor General of Hospitals. To each Brigade there shall be one Brigadier General; one Aid, with the rank of Captain; one Brigade Inspector, who is also to serve as Brigade Major, with the rank of Major; one Brigade-Quarter Master, with the rank of Captain. To each regimental company or regiment, there shall be one Colonel, one Lieutenant Colonel, one Major, one Adjutant, with the rank of Captain, one Quarter-master, one Pay-master, each with the rank of Lieutenant; one Surgeon, one Chaplain, one Sergeant Major and one Sergeant-Quarter-Master, one Drum Major, and one Fife Major, and the necessary number of non-commissioned officers. In time of war or insurrection, when new levies are drafted into said regimental companies or regiments, as hereinafter provided, to each company of infantry, light infantry, and riflemen, there shall be one Captain, one first Lieutenant, one second Lieutenant, and one third Lieutenant, five Sergeants and four Corporals; to each company of artillery there shall be one Captain, one first Lieutenant, one second Lieutenant, and one third Lieutenant, five Sergeants, four Corporals, and three Drivers; to each company of cavalry there shall be one Captain, one first Lieutenant, one second Lieutenant, one third Lieutenant, five Sergeants, four Corporals, one Saddler, one Farrier, and one or more Trumpeters.

Sec. 14. Whenever the office of Major General, Brigadier General, Colonel, Lieutenant Colonel, Major-commandant, or Captain, shall be vacant, or such officer be sick or absent, the officer next in rank shall command the division, brigade, regiment, battalion or company, as the case may be, until the vacancy be supplied; and whenever the office of Adjutant General and Quarter-master General shall be vacant, the duties thereof shall be performed by the senior Assistant Adjutant,

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page142 of 167

7

and senior Assistant Quarter-master General, until the same be filled.

Sec. 15. Whenever a company belonging to a regiment or regimental company, filled up by drafts or levies shall have neither commissioned nor non-commissioned officers, the commanding officer of the regiment to which such company belongs, shall appoint suitable persons of said company to be non-commissioned officers of the same; and the senior non-commissioned officer of a company without officers shall command the same, except upon parade, and except as provided in the following section.

Sec. 16. Whenever any such company shall, from any cause, be without officers, the commanding officer of the regiment to which such company belongs, may detail some officer of the staff, or of the line of the regiment, to train and discipline said company, until some officer shall be elected or appointed by the Commander-in-Chief, as provided in the nineteenth section, and such officer, so detailed, shall have the same power and authority, and be subject to the same liabilities, as if he were Captain in said company; and he shall keep the records of the Company.

## Of Elections and Appointments of Commissioned and Non-commissioned Officers.

Sec. 17. The officers of the line and general staff of the militia shall be elected as follows, to wit: Division Inspector, Adjutant General, Quarter-master General, Commissary General, Pay-master General, Surgeon General, Purveyor General of Hospitals, by the General Assembly: the officers of regimental companies, as by their charters is or may be provided; Brigadier Generals upon the nominations of the Colonels, Lieutenants Colonels and Majors of their respective brigades, by the General Assembly; the Major General, upon the nomination of the several Brigadier Generals, by the General Assembly; Brigade Inspectors and Brigade Quarter-masters by the General Assembly, upon the nomination of their respective Brigade Generals; or, if there be no such nominations, or improper nominations, the above offices shall be filled by the General Assembly; aids to the Commander-in-Chief shall be appointed by the Commander-in-Chief; aids and military secretary of the Major General, by the Major General; aids to

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page143 of 167

8

the Brigadier Generals, by the respective Brigadier Generals ;
Adjutants, Pay-masters, Quarter-masters, and Chaplains of
regiments, by the respective Colonels ; Surgeons and Assistant-
surgeons of regiments, by the respective Colonels, with the
approval of the Surgeon General.  *Provided, however*, that the
General Assembly shall, for the year 1843, elect the Major
General and the Brigadier Generals, who shall hold their com-
missions until the first Tuesday of May, 1844, and until their
successors are qualified to act.  And *provided further*, that
the Commander-in-Chief shall issue commissions agreeably to
the provisions of this act, to all the officers of such chartered
companies now existing, who may accept the provisions of this
act as aforesaid.

Sec. 18.  Any person elected Major General, shall be forth-
with notified of his election by the Secretary of State ; and
shall, within twenty days after such notice, signify to the
Secretary his acceptance of said office, or shall be considered
as having declined.

Sec. 19.  Whenever any regimental company is filled up by
drafts or otherwise to a regiment, it shall consist of eight
companies of sixty men each, and the Commander-in-Chief
shall have power to appoint a sufficient number of commission-
ed officers therefor, from such regimental companies ; and in
case of such filling up of regimental companies, the Captains
of the respective companies therein shall have power to ap-
point a sufficient number of non-commissioned officers for
their respective companies.

Sec. 20.  No officer, non-commissioned officer, or private
shall be arrested on any civil process, while going to, or re-
turning from, or remaining at any place which he shall have
been ordered to attend, for the election of any military officer,
or the performance of any military duty.

## Of Commissions.

Sec. 21.  All commissions for officers shall be signed by the
Commander-in-Chief, and countersigned by the Secretary of
State, and shall be for the term of five years, except in case
of regimental companies already chartered, who shall be gov-
erned as to the returns of their officers elected, and terms of
the commissions of their officers by their charters ; warrants
for regimental, staff, and non-commissioned officers, shall be

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page144 of 167

9

signed and issued by the Colonels of the regimental compa-
nies or the regiments respectively; and of non-commissioned
officers of companies, by the commander thereof.

Sec. 22. All commissioned officers of the same grade shall
take rank according to the respective dates of their commis-
sions; and when two or more of the same grade bear an equal
date, their rank shall be determined by lot, to be drawn by
them before the commanding officer of the division, brigade,
regimental company or regiment, company or detachment, or
the President of a court martial, as the case may be. The
day of election or appointment of any officer shall be the date
of his commission; and whenever he shall be transferred to
another corps or station of the same grade, the date of his orig-
inal commission or appointment shall be the date of his com-
mission : *Provided, however*, that the first commissions issued
under this act to officers of companies who shall within sixty
days from and after the rising of this General Assembly volun-
tarily accept the provisions of the same, shall, for the purpose
of rank and command, bear date on the same day.

Sec. 23. Whenever any officer shall lose his commission, he
shall be entitled to a duplicate commission of the same grade
and date, on his affidavit made before a justice of any court in
this State, on application to the Commander-in-Chief.

Sec. 24. All commissions shall be delivered to the Adjutant
General, and by him to the persons for whom they are intend-
ed.

Sec. 25. All brigade or field officers to whom commissions
shall be sent or delivered, by the Adjutant General, shall sig-
nify to him their acceptance or refusal of such office, within
thirty days after the receipt of the commissions. In case the
person elected shall refuse his commission, or neglect to return
any answer, that office shall be deemed vacant, and a new elec-
tion may take place.

### *Officers, how qualified.*

Sec. 26. Each commissioned officer, before he shall enter on
the discharge of the duties of his office, shall take and subscribe
the following oath and declarations, before some Justice of the
Peace, or other magistrate, or town clerk : on the back of each
commission the following form of the oath shall be printed, to

2

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page145 of 167

**10**

wit: "I,     do solemnly swear, (or affirm,) that I will bear
true faith and allegiance to the State of Rhode-Island and
Providence Plantations; that I will support the Constitution
and laws thereof, and the Constitution and laws of the United
States; and that I will faithfully and impartially discharge all
the duties incumbent upon me as     to the best of my
abilities and understanding, according to the laws of this State,
and of the United States; so help me God." (Or, "this I
promise on the pains and penalties of perjury:) On the back
of each commission, the following form of certificate shall be
printed, and signed by the person before whom such officer
shall be qualified, to wit: "This may certify, that     com-
missioned within named, appeared before me this     day of
     A. D.     , and took and subscribed the oath and de-
clarations prescribed by the laws of this State, before me."
(Signed, &c.)

*Officers, how discharged.*

Sec. 27. Any officer who shall have holden any commission
or commissions in the militia of this State during the term of
five years in succession, and faithfully performed the duties of
the same, shall be honorably discharged, on his application, to
the Commander-in-Chief, and shall forever after be exempt
from the performance of military duty, except in time of war,
invasion of, or insurrection, riot or tumult within this State:
and no officer shall be discharged, unless on his own applica-
tion, or unless in cases hereinafter provided.

Sec. 28. All resignations shall be in writing, and shall be
approved and certified as follows: the resignation of the Major
General shall be made to, and approved by the Commander-
in-Chief; the resignation of a Brigadier General, shall be ap-
proved by the Major General; the resignation of a field officer
shall be approved by the Brigadier General of the brigade to
which such field officer belongs; and the resignation of a Cap-
tain or subaltern officer, shall be approved by the commanding
officer of the regimental company or regiment to which such
Captain or subaltern shall belong. And the Major General,
Brigadier General, or commanding officer of a regimental com-
pany or regiment who shall approve of any resignation afore-
said, shall certify the same to the Commander-in-Chief, who
shall have the power to allow or disallow thereof, at his discre-
tion. And no officer shall be considered as having resigned

11

his commission, unless the same shall have been approved and certified as aforesaid, and allowed by the Commander-in-Chief.

### *How Armed and Equipped.*

Sec. 29. Each chartered regimental company of light infantry, grenadiers, and riflemen, raised at large, shall be furnished with muskets or rifles, and every such company of cavalry, with sabres, belts, and pistols, and every such company of artillery with muskets, if applied for, and with swords and belts, on application to the Quarter-master General, and on delivering to him a sufficient bond, signed by the officers of such company, for the safe keeping and return of the same when required by the Commander-in-Chief, and producing to him satisfactory evidence that a suitable armory or place of deposite for such muskets or rifles has been provided in the town or city within which said company is situated; which arms so furnished shall be carefully kept for the use of such company for military purposes only. The Commander-in-Chief may, from time to time, require any officer to examine the armory or place of deposite provided as aforesaid, and report to him the condition thereof, and of the arms therein deposited. Whenever any arms are furnished as aforesaid, to any regimental company formed from different towns, the same shall be deposited in the town within which the greatest number of said company may vote to establish their armory, or place of deposite.

Sec. 30. Each regimental company of artillery shall be provided by the Quarter-master General or officer acting as such, with two good brass field pieces, of such calibre as the Commander-in-Chief shall direct, with carriages and apparatus complete; with an ammunition cart, forty round shot, forty rounds of cannister shot, tumbrils, harness, implements, laboratory and ordnance stores, which may, from time to time, be necessary for their complete equipment for the field; and a quantity of powder, annually, not exceeding one hundred pounds, to be expended on days of inspection and review, and in experimental gunnery: and the commanding officer of each regimental company shall be accountable for the preservation of the pieces, apparatus and ammunition aforesaid, and for the proper expenditure of the ammunition.

Sec. 31. In case of new levies in time of war or insurrec-

12

tion, the Commander-in-Chief shall arm, equip and furnish them out of the States Arsenal.

### Discipline, Inspection, Training and Review.

Sec. 32. The system of discipline and field exercise, from time to time ordered for the army of the United States, shall be the system of discipline and field exercise for the militia of this State.

Sec. 33. Each commanding officer of a regimental company shall order out his company on the third Monday of May, annually, at nine o'clock in the forenoon, for inspection and drill, and shall keep his company under orders at least until four o'clock, P. M., and longer if he deems it necessary; and he shall inspect, examine, and take an exact account of the equipments of his men, note all delinquencies of appearance and deficiencies of equipments, and correct his roll, in order that a thorough inspection may be made of all the militia in this State: and every commanding officer of a regimental company shall faithfully train and discipline his company on said day, as well as inspect them.

Sec. 34. The active militia of this State shall in the month of September or October of each year, meet by brigade, for the purpose of training, disciplining and improving them in martial exercises; the places of brigade rendezvous shall be appointed by the brigadier general, and the days of the brigade rendezvous by the Major General.   The trainings above mentioned are to be included in the number of trainings prescribed by the charters of the regimental companies: *Provided, however*, that the Major General shall have power to divide any brigade, for the purpose of the brigade training, in such manner as from their position the convenience of the regimental companies therein may from time to time require.

Sec. 35. Each brigade, when in the field, shall take rank according to its number, beginning at the lowest number as highest in rank; and each regimental company shall form according to the rank of the officers present commanding them, having due regard to the arm of the service to which said corps belong, and when such regiment is filled up by drafts or levies, according to the number of each regiment; and when distinct corps shall parade, join, or do duty together, the senior officer present shall command, without regard to corps.

JA655

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page148 of 167

13

Sec. 36. Every commanding officer when on duty is here-
by authorised to ascertain and fix necessary bounds and limits
to his parade, not including any road on which people travel,
so as to obstruct the same or prevent their passing, within
which no spectator shall have a right to pass or enter, without
leave from such commanding officer, and the commanding offi-
cer of any battalion or regimental company may put under
guard every person who shall encroach upon the parade ground ;
and also any spectator or bystander who shall abuse, molest,
or strike any one when on parade or under arms.

Sec. 37. The brigadier generals, brigade inspectors, and
brigade quartermasters, shall attend the inspections and re-
views of their respective brigades ; shall inspect their arms,
ammunition, and equipments ; superintend their exercises and
evolutions, and introduce and enforce the system of discipline
required by law and by the orders of the commander-in-chief.

Sec. 38. No non-commissioned officer or private, shall un-
necessarily, or without orders from his superior officer, come
on to any place of parade, with his musket, rifle, or pistol
loaded with balls, slugs, shot, or other dangerous substance,
or shall so load the same while on parade.

Sec. 39. No officer, non-commissioned officer, or private,
shall be compelled to do military duty on any day appointed
for town, city or ward meetings, or for the election of any civil
officer, in the town or city in which he shall reside, except on
the third Monday in May, unless it be in case of invasion, in-
surrection, riot or tumult threatened ; and no doings of any
town, city, or ward meeting, and no election of civil officers,
holden on the third Monday in May, shall be valid, or of any
legal force.

Sec. 40. Nothing herein contained shall prevent any com-
pany from meeting at any time for drill, funeral, or any other
voluntary duty, nor to impair the corporate privileges of any
chartered company, nor any lawful articles of agreement adopt-
ed by any company so far as relates to those who have volun-
tarily signed the same, not inconsistent herewith.

Sec. 41. All general orders shall be distributed by the Ad-
jutant General ; all division orders by one of the aids of the
Major General ; all brigade orders, by the Brigade Major ; all
regimental orders, by the Adjutant ; and company orders, by
any non-commissioned officer, or private, when required by the

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page149 of 167

14

commanding officer. *Provided however,* that if the Adjutant General or Brigade Major shall be sick, absent or unable to distribute such orders, or either of such offices shall be vacant, the orders may be distributed by any other officer detailed ed for that purpose by the officer issuing the orders.

Sec. 42. The commander-in-chief shall have power to order out the whole or any part of the militia, as may seem to him expedient, for review, the performance of escort, and other duties.

*Rolls and Returns.*

Sec. 43. A fair and correct roll of each regimental company shall be kept by the adjutant, with the state of the arms and equipments belonging to each man ; and said officer shall keep an orderly book of all orders received or issued, and all accounts of all fines, from whom received, and when and for what cause.

Sec. 44. Each commanding officer of a regimental company, shall, on or before the fifteenth day of November, in each and every year, make out a fair and correct roll of his company, containing the christian and surname of all the men belonging thereto, alphabetically arranged, and place opposite the name of each, the equipments and the quality of equipments of each, whether good or bad, and which of said men had done military duty within the year, for one or more days, and on what days, and at what trainings ; and shall on or before said first day of November, deliver the same to the Brigade Inspector. The brigade majors and inspectors shall make a like return of the state of their respective brigades to the Adjutant General, annually, on and before the 20th day of December. And the Adjutant General shall make duplicate abstracts of the active militia, one to be delivered to the commander-in-chief, who shall present the same to the General Assembly, and the other to be delivered in the month of January, to the Major General. Each commanding officer of a regimental company shall make a like return under oath to the General Treasurer, on or before the first day of January in each year, of all the members of his company, who have been duly equipped and have done military duty according to law for at least four days in the year preceding the time of such return.

Sec. 45. The Adjutant General shall furnish blank forms of rolls and of the various returns that may be required, at the expense of the State ; and explain the principles on which

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page150 of 167

15

they are to be made out; and the roll shall be kept up as pre-scribed.

Sec. 46. Every regimental company shall have an appropri-ate uniform.  Every officer of the line, and every staff officer, shall provide himself with a uniform complete, which shall be such as the commander-in-chief shall prescribe, and subject to such limitations, restrictions, and limits, and alterations as he may order.

Sec. 47. Every officer, non-commissioned officer and pri-vate, shall hold his uniform, arms, ammunition, and equipments free from all suits, distresses, executions, or sales for debt or taxes.

*Of Drafts, and calling the Militia into service.*

Sec. 48. Whenever in case of war, invasion, threatened in-vasion, or insurrection, the commander-in-chief shall deem it necessary to increase the active militia of this State, he shall have power to order a draft or levy to be made from the en-rolled militia in any town or city, into any or all of the regi-mental companies thereof, of such number of men as he may judge the exigency of the case requires, or if there be no reg-imental company in such town or city, may order them into any of the regimental companies of the brigade in the limits of which such town or city may be situated, directing his order therefor to the town council of the town, or to the mayor and aldermen of the city, in which such draft is to be made.— Whenever such order is made and directed as aforesaid, it shall be the duty of the town council, or mayor and aldermen, to ap-point a time and place of parade for the enrolled militia in each town or city, and to order them to appear at the time and place, either leaving a written notice or orally, and then and there proceed to draft as many thereof, or to accept as many volun-teers, as is required by the commander-in-chief; and the may-or and aldermen or town council shall notify the commander-in-chief forthwith that they have performed the aforesaid duty. Whenever the said regimental companies shall be filled up by drafts or levy as aforesaid, the commander-in-chief may ar-arrange the regiment so filled up into companies as he may think fit, and commission the officers of the same as provided in the 19th section.

Sec. 49. Whenever any invasion of the State, or any in-

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page151 of 167

16

surrection, riot, or tumult shall be made in any part of the State, the commander-in-chief shall call out the militia or any part thereof, as he may deem expedient or necessary, to suppress or repel the same ; and he may order out the division or any brigade, brigades, regimental companies, regiments, companies or company, or any portions of the same, or cause any number of men to be detached or drafted from them, and cause officers to be detailed, which with those attached to the troops, shall be sufficient to organize the forces ; and if such invasion or insurrection, or any imminent danger thereof, be so sudden in any part of the State, that the commander-in-chief cannot be informed, and his orders received and executed in season to suppress or repel the same, the Major General may order out the division or any part thereof, as the commander-in-chief might do ; and when any troops are in the field for such pur- poses, the senior officer of said troops, present, shall command until the commander-in-chief, or some officer detailed by him, shall appear to take the command.

Sec. 50. Whenever any draft from the militia into the ser- vice of the United States, shall be ordered, the non-commis- sioned officers and privates, except so many as shall volunta- rily offer to serve, shall be drafted by lot, from the company, and the officers detailed from the roll.

Sec. 51. If any company without officers be ordered to march, or any draft or detachment therefrom ordered, the commanding officer of the regiment to which said company belongs, shall detail some officer to command them, who shall have the same authority to command them to appear, and to command them in the field, and to make any draft or detach- ment therefrom, as though he were captain of said company, and shall have the same responsibility.

Sec. 52. Every officer who, when ordered to march to the place of rendezvous, shall unnecessarily neglect to do so, or who shall otherwise disobey any lawful order, shall be punish- ed as is hereinafter provided ; and every soldier ordered out, drafted or detached, who shall not appear at the time and place appointed, armed and equipped as commanded, shall be punished as hereinafter provided ; and each non-commissioned officer and private shall take with him provisions for at least three days, when so ordered.

Sec. 53. When in any county in this State, there shall be

JA659

any tumult, riot, mob, or any body of men acting together, with intent to commit felony, to offer violence to persons or property, or in any other way to resist the laws of the State by force of arms, or by violence, or when any of said acts shall be threatened, and the fact made to appear to the commander-in-chief, or to the sheriff of said county, or to either of the justices of the court of common pleas in such county, or, if in the city of Providence, to the mayor of said city in the first instance, or in his absence, to the board of aldermen, the commander-in-chief shall issue his order, or such justice, sheriff, mayor, or board of aldermen, shall issue his or their precept, properly signed, directing the commanding officer of the division, brigade, regimental company or company, as the cause may be, to order out his command, or any part of the same, to suppress such riot, tumult or mob, and to prevent the perpetration of any such felony, or act of unlawful violence.

Sec. 54. The officer to whom any such order or precept shall be directed, as named in the foregoing section, shall forthwith order out the troops therein required, to parade at the time and place appointed ; and if he shall refuse to obey such order or precept, or if any officer under his command shall refuse to obey an order issued under such order or precept, he shall be punishable as hereinafter provided ; and any non-commissioned officer or private, who shall neglect or refuse to appear at the time and place of parade, or to obey any lawful order issued in such case, shall suffer the penalty hereinafter provided.

#### Surgeons and Assistant Surgeons.

Sec. 55. No surgeon, or assistant surgeon, nor any physician shall take any gratuity whatsoever from any person, for a certificate for inability to perform military duty on account of bodily infirmity ; and it shall be the duty of such, to examine critically, the cases of all applicants for such certificates, and not to grant any certificate for bodily infirmity or inability unless such infirmity or inability be, beyond all doubt, such as to render the applicant unable to perform military duty ; and any surgeon, assistant surgeon, or physician who shall violate the provisions of this section, shall be liable to be punished as hereinafter provided.

Sec. 56. Whenever any regiment may be without a surgeon,

3

or assistant surgeon, or when any person may claim to be exempt from military duty by reason of bodily infirmity or disability, and shall not reside within ten miles of the surgeon or assistant surgeon of the regiment, any respectable physician within said distance, may grant him a certificate, subject to the restrictions contained in the preceding section ; and the commanding officer of any regimental company is authorised to exempt any person of his company from military duty, on the presentation of such certificate from the surgeon or assistant surgeon, or a physician as aforesaid, either for a longer or shorter period, not exceeding one year, as in the judgment of the commanding officer, the case may demand.

### Of Fines and Penalties of Officers, and of the Manner of Enforcing the same.

Sec. 57. All offences committed by general, field, commission, and staff officers, and surgeons, whether consisting in disobedience of orders, or unofficer-like conduct while on duty or during any day appropriated to military exercise, inspection or review, or in neglect or violation of any duty imposed upon them by law as officers of the militia, and whether committed in times of quiet, or of invasion, insurrection, riot or tumult, shall be punished by courts martial, according to the usage and practice of war, by a fine not exceeding five hundred, nor less than twenty dollars ; by imprisonment not exceeding six months ; cashiering, with or without disability of ever after holding any military office in the State ; or reprimand ; either or all with costs at the discretion of the court ; said fines and costs to be collected for the use of the State by warrant of distress, under the hand and seal of the president of the court martial imposing the same, directed to the sheriff of the county in which the convicted officer shall reside, who shall pay over the fine so collected to the general treasurer. The president of the court martial which shall impose upon any officer the penalty of imprisonment, shall by a mitimus in common form, under his hand and seal, have power to commit the convicted officer to the jail of the county in which he shall reside, for the term of his sentence ; and all sheriffs, deputy sheriffs and jailors, are directed to govern themselves accordingly.

### Other Fines and Penalties.

Sec. 58. The ordinary fines and penalties of non-commis-

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page154 of 167

19

sioned officers and privates in every regimental company, will
be regulated by the charter of such company. And the fines
for non-attendance at any brigade training, shall be six dollars,
to be recovered in the manner prescribed in the charter of the
regimental company to which such non-commissioned officer
or private belongs, for non-attendance at a company training.

Sec. 59. In case of war, invasion, threatened invasion, in-
surrection, mobs, riot or tumult, any militia soldier below the
rank of a commissioned officer ordered out, volunteered, de-
tached or drafted, who shall neglect to appear at the time and
place designated by his commanding officer, or in case of the
enrolled militia, at the time and place designated by the town
council or mayor and aldermen, or to place himself under the
command of the officers of the regimental company into which
he may have been drafted or have volunteered, shall forfeit the
sum of one hundred dollars, or be imprisoned three months,
either or both, at the discretion of the court who shall try
such offender ; said punishment to be enforced by indictment
in the supreme court, or court of common pleas of the county
in which the offender may reside ; or in time of actual war
may be otherwise dealt with as the articles of war then es-
tablished may direct.

Sec. 60. Any assessor of taxes who shall neglect or refuse
to perform the duty of preparing a list or roll of all persons
liable to be enrolled in the militia within the limits of the
town or city of which he is an assessor, or of placing the same
in due time in the hands of the town or city clerk of such
town or city for record and return, shall be individually liable
for every such refusal or neglect to the penalty of fifty dollars,
to be recovered by indictment in the supreme court, or court of
common pleas, in the county in which the offence may be
committed. Any town or city clerk who shall refuse or neg-
lect to record said list or roll of names, or to make due return
of the same to the Adjutant General, shall for every such re-
fusal or neglect, be liable to the penalty of fifty dollars, to be
recovered by indictment as aforesaid.

Sec. 61. When information is required by persons lawfully
ordered or authorised to make enrollment of those liable to do
military duty, or by those acting under them, any person refu-
sing to give information of his name or age, or giving false in-
formation concerning the same ; and also any keeper of a tav-

20

ern or boarding house, any parent, master or mistress of a family refusing to give the required information, or giving false information, shall forfeit and pay the sum of twenty-five dollars, to be recovered by indictment for the use of the State, before the supreme court, or the court of common pleas of the county in which such offence may be committed.

Sec. 62. Any spectator or bystander who shall abuse, molest, or strike any commissioned or non-commissioned officer, or private, when on parade or under arms, shall in addition to all other remedies or penalties by law provided, forfeit and pay the sum of twenty dollars; to be recovered, if a field or staff officer, upon the complaint, and to the use of such field or staff officer; and if a company officer, whether commissioned or non-commissioned, or a private, upon the complaint of the commanding officer of the company and to the use of the company to which such officer or private belongs, by ordinary complaint and warrant before a justice of the peace. Every spectator or bystander who shall intrude upon the bounds and limits of parades, shall pay the sum of ten dollars, to be recovered upon complaint of the officer in command at the time of such intrusion, in like manner as last aforesaid, to and for the use of the State.

Sec. 63. Any physician or assistant surgeon who shall take any. gratuity whatsoever, from any person for a certificate for inability to perform military duty on account of bodily infirmities, or shall grant any such certificate unless after critical examination, and unless such infirmity or inability be beyond all doubt such as to render the applicant unable to perform military duty, shall be liable to the penalty of fifty dollars, to be recovered by indictment in the supreme court, or court of common pleas for the county in which such offence may be committed.

*Courts Martial.*

Sec. 64. General, field, commission and staff officers, shall be subject to trial by court martial, according to the usage and practice of war, for disobedience of orders, unofficer-like conduct while on duty, or during any day appropriated to military exercise, inspection or review and for neglect or violation of any duty imposed upon them by law, as officers of the militia; which court martial shall consist of not less than five, nor more than seven members; and the senior officer, who

**21**

shall always be of a rank superior to that of the officer on trial, shall preside. The court martial for the trial of an officer under the grade of a field officer, shall be appointed by the commanding officer of the brigade to which he belongs; for the trial of an officer of the grade of field officer, by the commanding officer of the division; and for the trial of a general officer, by the commander-in-chief. In every court martial there shall be a judge-advocate, who shall discharge the duties of that office according to the usage and practice of courts martial; and no other person shall be admitted to prosecute or defend an arrested officer. Whenever a court martial shall be ordered, the order shall designate the time and place of holding the same, the name of the officer to preside, and the names and ranks of the other officers, of which the court is to be composed. *Provided*, that no court martial shall be called without the approval of the commander-in-chief, and no expense of any court martial shall be paid unless allowed by the general assembly. If the court shall be ordered by the commander-in-chief, the orders shall be as follows to wit :

*State of Rhode-Island, sc.*

### GENERAL ORDERS.

" A general court martial is ordered to assemble at      on the      day of      A. D.      for the trial of such persons as may be brought before them, to consist of      members to be taken from the division to wit; the Major General,      Brigadier General or Generals,      Colonel or Colonels      Lieutenant Colonel or Colonels.   Major General will preside.  The Adjutant of the      regimental company or regiment will furnish an Orderly Sergeant, to attend and execute the orders of the court."   (To be signed by the commander-in-chief, or by the Adjutant General by his order.)   If a court martial be ordered by the Major General the orders shall be as follows to wit :

*State of Rhode-Island, sc.*

### DIVISION ORDERS.

A general court martial of the division will assemble at      on the      day of      A. D.      for the trial of such persons as may be brought before them, to consist of members, to wit:      Brigadier-General or Generals, Colonel or Colonels      Lieutenant-Colonel or Colonels

22

Major or Majors. Brigadier-General will preside. The Adjutant of the regimental company or regiment will furnish an orderly sergeant to attend and execute the orders of the court. (To be signed by the Major-General, or by the division-inspector by his orders.) If the court be ordered by a Brigadier-General, the orders shall be as follows, to wit:

*State of Rhode-Island sc.*

## BRIGADE ORDERS FOR THE BRIGADE OF RHODE-ISLAND MILITIA.

A general court martial for the brigade will assemble at on the day of A. D. for the trial of such persons as shall be brought before them, to consist of members, so wit: Colonels, Lieutenant-Colonels Majors, (and if any) Captains, Subalterns. Colonel will preside. The Adjutant of regimental company or regiment will furnish an orderly sergeant to attend and execute the orders of the court. (To be signed by the Brigadier-General, or the Brigade-Major, by his order.) For a general court martial, the Adjutant General shall notify all general officers, and give notice of the other officers detailed, to the division-inspector or brigade-majors, who shall notify said officers, and make return thereof to the Adjutant-General. In a division court martial, the division-inspector or an aid-de-camp under the direction of the Major-General, shall notify the general officers, and give notice of the other officers detailed, to the respective Brigade-Majors, who shall notify the field officers required of their brigades, and make return thereof to the Major-General. For a brigade court martial, the Brigade-Major shall notify the field officers required to serve on said court martial, and notify the respective adjutants of the other officers detailed; and the adjutant of each regimental company or regiment shall notify them, and make return thereof to the Brigade-Major; and if the officer to be tried be a general officer, he shall be furnished with a copy of the order for said court, and a copy of the charges against him by the Adjutant-General, or by the division-inspector, or by a brigade-inspector, as the Commander-in-Chief shall direct, thirty days before the sitting of said court, who shall make return thereof, with the names of the officers composing said court; and the officer to be tried, if under the

23

rank of a field officer, shall be furnished with like copies, twenty days before the sitting of the said court, by a Brigade-Major, or inspector, or by the adjutant of the regimental company or regiment to which he belongs, as the officer ordering the court martial shall direct; who shall return the same, and the names of the officers composing the court, to the judge-advocate of the court; and it shall be the duty of the said judge-advocate to summon, or cause to be summoned, such witnesses on the part of the State, as may be necessary, by subpœna signed by the officer ordering the court, or by the president thereof, or by said judge-advocate; and the accused shall be entitled to like process, to procure the attendance of his witnesses; which process shall be served by the judge-advocate, or by any disinterested person deputed by him. All charges shall be made out in due form, by way of complaint, and signed by the party complaining, and addressed to the officer whose duty it is to order the court, specifying the act or neglect of which the accused is supposed to be guilty, and praying due process, before said officer shall order a court martial for the trial of the officer accused. The members of the court shall appear in full uniform, and before they enter upon the trial of any person accused, shall take the following oath, to wit: "You swear [or affirm] that you will truly try and determine according to the evidence given in court, the matter depending between this State, and the officer [or officers] now to be tried; and that you will not divulge the sentence of the court, until the same has been approved or disapproved pursuant to law; and that you will not, at any time, disclose the vote or opinion of any member of this court, unless required to do so in due course of law. So help you God." Or this affirmation you make and give upon the peril of the penalty of perjury. And the foregoing oath shall be administered by the judge-advocate; but all other oaths which it may be necessary to administer, during the continuance of the court, may be administered either by him, or any general or field officer.

Sec. 65. There shall be appointed by the officer ordering the court-martial, a judge-advocate for each court-martial, who shall perform all the duties of that office, and who shall take the following oath, to wit: "You swear [or affirm] that you will not, at any time whatever, disclose the vote or opinion of any member of this court-martial, unless required by due

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page159 of 167

course of law, nor divulge the sentence of the court, till the
same has been approved or disapproved according to law ; and
that you will faithfully and impartially discharge the duty of
Judge-Advocate, according to the best of your abilities, so
help you God." Or, this affirmation you make and give upon
the peril of the penalty of perjury. And said oath may be
administered by a judge of any court, or any justice of the
peace in the State ; and a certificate thereof shall be made on
the warrant of the Judge-Advocate, by the person administer-
ing the oath.

Sec. 66. If, on trial, the accused shall object to any one, or
more members of the court, he shall state the ground of his
objection, and if it appear to the court sufficient, the member
or members objected to, shall leave their seats ; and if the
numbers remaining be less than five, the court shall be ad-
journed for a reasonable time, that the officer ordering the
court may detail others to supply the place or places vacated
by such member or members. No sentence of a court-martial
shall be carried into effect, unless passed by the concurrent
vote of two thirds of the court, and approved by the Com-
mander-in-Chief. In case an officer under arrest, shall refuse
or neglect to attend a court-martial, according to orders and
notice given him, he shall, by said court, be sentenced to pay
a fine not exceeding two hundred dollars, and be cashiered,
with disability of ever after holding any military office in the
State ; unless he be prevented from attending such court-mar-
tial by reason of sickness, or some other reasonable cause ; in
which case the court shall have power to adjourn ; and notice
thereof shall be given to the arrested officer, by the Judge-
Advocate, at least ten days before the day to which the court
shall have been adjourned. In all cases in which a fine and
costs or imprisonment shall be awarded by a court-martial, and
the sentence of such court shall be approved by the Command-
er-in-Chief, and the President of such court shall die, be dis-
charged or promoted, without having issued a warrant of dis-
tress or mittimus for such fine and costs or imprisonment, it
shall be the duty of the member of said court next in rank to
said President, to issue said warrant or mittimus.

Sec. 67. If any witness duly summoned shall refuse to
obey such summons, he shall be committed to the jail in the
county in which he resides, by a warrant from the president

25

of the court, directed to the sheriff, or a deputy-sheriff of said county, there to be held at his own expense, until he will conform, and give evidence in the case, or until discharged by due course of law. All witnesses summoned on the part of the State, and the Judge-Advocate or other person for summoning them shall, for travel and attendance, have the same fees that are allowed in civil causes, to be taxed by the President of the court; expenses shall be paid to the Judge-Advocate by the State, and when received by him, be paid over to the persons to whom they are due. If the sentence of the court be against the accused, and the same shall be approved by the Commander-in-Chief, the said expenses shall, by warrant under the hand and seal of the President of the court, directed in manner aforesaid, be collected of the delinquent, and paid into the general treasury. The members and officers of said court shall be allowed nine cents per mile travel to and from the place of holding said court, and one dollar for each day during its sitting; and there shall be allowed to the person in whose house said court shall be held, not exceeding two dollars per day, in full of all expenses for room-rent, fuel and lights; and which shall be paid from the State treasury, after the same shall have been allowed by the General Assembly. The Judge-Advocate shall be allowed twenty-five cents for each legal page of the copy of the proceedings and records of the court martial, to be taxed and paid in the same manner. The Commander-in-Chief shall have power to approve or disapprove all sentences passed by courts martial, and mitigate or remit any punishment or punishments awarded by them or any part thereof; and the record of all proceedings and sentences of courts martial, and of the approval, mitigation or remission by the commander-in-chief, shall be deposited by the respective judge-advocates, in the office of the Adjutant General.

### Board of Officers and Courts of Enquiry.

Sec. 68. The commander-in-chief, whenever in his opinion it shall be necessary, may call boards of officers, for settling military questions, or for other purposes relative to good order and discipline.

Sec. 69. General, division, and brigade courts of enquiry, shall consist of three officers, and a judge-advocate, to be appointed by the commander-in-chief; and they may be ordered and organized in the like manner, as courts martial, and under

4

26

the same regulations, may examine into the nature of any transaction, or any imputation, or accusation against any officer, made by an inferior.

All vacancies shall be filled as in courts martial.

The judge-advocate shall administer to each of the officers composing a court of enquiry the following oaths or affirmations;

You, A. B., do swear, or affirm, that you will well and truly examine, and enquire into the matter now before you, without fear, favor, partiality, prejudice, or hope of reward. So help you God. Or, this affirmation you make and give upon the penalty of perjury.

After which, the president shall administer to the judge-advocate the following oath :

You, A. B., do swear that you will impartially record the proceedings of the court, and the evidence to be given in the case now in hearing. So help you God. Or, this affirmation you make and give upon the penalty of perjury.

Witnesses shall be summoned in the same manner, take the same oath, and be examined, and cross examined, by the parties in the same way, as on trials before courts martial; but the court shall not give their opinions on the merits of the case unless specially required so to do. All the proceedings therein shall be recorded, and with the papers and documents used therein, authenticated and transmitted, by the judge-advocate, to the officer who ordered the court.

Sec. 70. The pay and fees of boards of officers and courts of enquiry shall be the same as in courts martial.

Sec. 71. All acts heretofore passed in relation to the militia of this State, which are inconsistent with the provisions of this act, shall be and the same are hereby repealed. *Provided however*, that the charters and corporate rights of the existing chartered companies of this State, who shall not accept the provisions of this act, shall be wholly unimpaired thereby; and *provided further* that the rights of property of the existing chartered companies, who do accept the provisions of this act, shall in no court be impaired or affected thereby, and the corporate name of such company shall be retained in business transactions therewith, and that upon the repeal of this act, they shall be remitted to all the corporate rights and privileges heretofore by them enjoyed.

[ 35 ]

fame offenders come not as afore is faid, and the proclamation made and returned, they fhall be convict and attainted of the riot, affembly, or rout aforefaid : And moreover the Juftices of Peace in every county or corporation, where fuch riot, affembly, or rout of people fhall be made, in cafe the fame be made in their prefence, or if none be prefent, then the juftices having notice thereof, together with the fheriff, under fheriff, or ferjeant, of the fame county or corporation, fhall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth, as often as they fhall be found in default of the execution of the faid act ; and on fuch default of the juftices and fheriff, under fheriff, or ferjeant, a commiffion fhall go from the General Court at the inftance of the party grieved, to enquire as well of the truth of the cafe, and of the original matter for the party complainant, as of the default or defaults of the faid juftices, fheriff, under fheriff, or ferjeant, in this behalf fuppofed, to be directed to fufficient and indifferent perfons at the nomination of the Judges ; and the faid commiffioners prefently fhall return into the General Court the inquefts and matters before them in this behalf taken and found : But no perfons convicted of a riot, rout, and unlawful affembly, fhall be imprifoned for fuch offence by a longer fpace of time than one year. Perfons legally convicted of a riot, rout, or unlawful affembly, otherwife than in the manner directed by this act, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury, under the like limitation.

## C H A P.  XLIX.

### An ACT forbidding and punifhing AFFRAYS.

BE it enacted by the General Affembly, That no man, great nor fmall, of what condition foever he be, except the Minifters of Juftice in executing the precepts of the courts of juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the juftices of any court, or either of their Minifters of Juftice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrefted and committed to prifon by any Juftice on his own view, or proof by others, there to abide for fo long a time as a jury, to be fworn for that purpofe by the faid Juftice, fhall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon fhall be imprifoned for fuch offence by a longer fpace of time than one month:

## C H A P.  L.

### An ACT againft C O N S P I R A T O R S.

BE it declared and enacted by the General Affembly, That confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them fhall aid and bear the other falfely and malicioufly, to move or caufe to be moved any enticement or information againft another on the part of the Commonwealth, and thofe who are convicted thereof at the fuit of the Commonwealth, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury.

## C H A P.  LI.

### An ACT againft conveying or taking PRETENSED TITLES.

BE it enacted by the General Affembly, That no perfon fhall convey or take, or bargain to convey or take, any pretenfed title to any lands or tenements, unlefs the perfon conveying or bargaining to convey, or thofe under whom he claims fhall have been in poffeffion of the fame, or of the reverfion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, fhall forfeit the whole value of the lands or tenements; the one moiety to the Commonwealth, and the other to him who will fue as well for himfelf as for the Commonwealth : But any perfon lawfully poffeffed of lands or tenements, or of the reverfion or remainder thereof, may neverthelefs take or bargain to take the pretenfed title of any other perfon, fo far and fo far only as it may confirm his former eftate.

## C H A P.  LII.

### An ACT to punifh BRIBERY and EXTORTION.

BE it enacted by the General Affembly, That no Treafurer, Keeper of any Public Seal, Councillor of State, Counfel for the Commonwealth, Judge, or Attornies at law, practifing either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Efcheator, nor any officer of the Commonwealth, fhall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or fhall be allowed by fome act of General Affembly, paffed after the inftitution of the Commonwealth, that is to fay, after the fifteenth day of May, in the year of our Lord, one thoufand feven hundred and feventy fix ; and he that doth, fhall pay unto the party grieved, the treble value of that he hath received, fhall be amerced and imprifoned at the difcretion of a jury, and fhall be difcharged from his office forever; and he who will fue in the faid matter, fhall have fuit as well for the Commonwealth as for himfelf, and the third part of the amercement.

CHAP.

**JA670**

# FOURTH ANNUAL REPORT

OF THE

# BOARD OF COMMISSIONERS

OF THE

# CENTRAL PARK.

**JANUARY, 1861.**

NEW YORK:
WM. C. BRYANT & CO., PRINTERS, 41 NASSAU STREET, CORNER LIBERTY.

1861.

106

# APPENDIX.

———

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park ;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park.   All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal

Digitized by Google

Original from
HARVARD UNIVERSITY

# FIRST

# ANNUAL REPORT

OF THE

# Commissioners of Fairmount Park.

Philadelphia

———————•◦•◦•———————

PHILADELPHIA:

KING & BAIRD, PRINTERS, No. 607 SANSOM STREET.

1 8 6 9 .

Generated on 2022-10-07 00:13 GMT / https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

**JA673**

Generated on 2022-10-07 00:15 GMT / https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

## A SUPPLEMENT

To an Act, entitled "An Act appropriating ground for public purposes, in the City of Philadelphia," approved the twenty-sixth day of March, Anno Domini one thousand eight hundred and sixty-seven.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the boundaries of the Fairmount Park in the City of Philadelphia shall be the following, to wit: Beginning at a point in the northeasterly line of property owned and occupied by the Reading Railroad Company, near the City bridge over the river Schuylkill at the Falls, where said northeasterly line * [is intersected by the line dividing property of H. Duhring from that of F. Stoever and T. Johnson; extending] from thence in a southwesterly direction upon said dividing line and its prolongation to the middle of the Ford road; from thence by a line passing through the southeast corner of Forty-ninth and Lebanon streets to George's run; thence along the several courses of said run to a point fourteen hundred and eighty-seven and a half feet from the middle of the Pennsylvania Railroad, measured at right angles thereto; thence by a straight line through the northeast corner of Forty-third and Hancock

---

* Amended by Act of April 21, 1869, Sec. 8, page 27.

Digitized by  Google

Original from
UNIVERSITY OF MICHIGAN

**JA674**

Case 22-2908, Document 93-1, 01/09/2023, 3448890, Page167 of 167

18

SECT. 19. The said Park Commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount Park, and to maintain the same in good order and repair; and to construct all proper bridges, buildings, railways, and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

SECT. 20. That the said Park Commissioners shall have authority to license the laying down, and the use for a term of years, from time to time, of such passenger railways as they may think will comport with the use and enjoyment of the said Park by the public, upon such terms as said Commissioners may agree; all emoluments from which shall be paid into the City Treasury.

SECT. 21. The said Park shall be under the following rules and regulations, and such others as the Park Commissioners may from time to time ordain:

I. No persons shall turn cattle, goats, swine or horses or other animals loose into the Park.

II. No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the Park.



Digitized by Google

Original from
UNIVERSITY OF MICHIGAN