# 22-2908(L)

## 22-2972(Con)

# United States Court of Appeals
# for the Second Circuit

---

IVAN ANTONYUK,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of
the New York State Police,

*Defendants-Appellants.*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the Northern District of New York

---

**BRIEF FOR APPELLANTS
STEVEN A. NIGRELLI AND MATTHEW A. DORAN**

---

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
PHILIP J. LEVITZ
ALEXANDRIA TWINEM
ERIC DEL POZO
  *Assistant Solicitors General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: January 9, 2023

(*Caption continues from front cover.*)

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ v

PRELIMINARY STATEMENT .................................................................. 1

JURISDICTIONAL STATEMENT ............................................................. 4

ISSUES PRESENTED ............................................................................... 5

STATEMENT OF THE CASE .................................................................. 6

    A.   Legal Background ........................................................... 6

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* .......................... 6

        2.   New York's Concealed Carry Improvement Act (CCIA) ..... 9

    B.   Procedural Background ......................................................... 13

        1.   The district court's jurisdictional dismissal and advisory opinion in *Antonyuk I* ................................ 13

        2.   The district court's entry of a temporary restraining order and preliminary injunction in *Antonyuk II* .......... 14

        3.   This Court's stay of the preliminary injunction.............. 19

STANDARD OF REVIEW....................................................................... 19

SUMMARY OF ARGUMENT ................................................................. 20

ARGUMENT ........................................................................................... 25

POINT I

    Plaintiffs Failed to Establish a Likelihood of Success on the Merits of Their Challenges to New York's Firearm-Licensing Provisions ........................................................ 25

i

**Page**

A. Plaintiffs Lack Standing to Challenge the Licensing Requirements. ..................................................... 26

B. The Challenged Licensing Requirements Do Not Implicate the Second Amendment's Text. ............................. 28

C. The Licensing Requirements Are Consistent with the Historical Tradition of Firearm Regulation. ......................... 33

    1. The good-moral-character requirement is consistent with the historical tradition of firearm regulation. ........ 34

    2. The requirement to identify an applicant's spouse and other adult coinhabitants is consistent with the historical tradition of firearm regulation. ................. 40

    3. The requirement to identify recent social-media accounts is consistent with the historical tradition of firearm regulation. ........................................... 43

    4. The requirement to provide other information reasonably necessary and related to the review of a licensing application is consistent with the historical tradition of firearm regulation. ....................... 46

POINT II

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S SENSITIVE-PLACE PROVISIONS .................................................... 48

A. Plaintiffs Lack Standing to Challenge Several of the Sensitive-Place Provisions. .................................... 49

B. The Sensitive-Place Provisions Are Presumptively Constitutional. ....................................................... 52

**Page**

C. The Sensitive-Place Provisions Are Consistent with the Historical Tradition of Firearm Regulation. ..........................53

    1. There is a longstanding tradition of restricting firearm possession in sensitive locations. ......................54

    2. The historical record amassed to date identifies at least three categories of sensitive locations. ...................58

    3. The sensitive-place provisions at issue in this appeal are consistent with the historical tradition of firearm regulation. ......................................61

    4. The district court's speculation about hypothetical applications of the sensitive-place restrictions is unavailing. ................................................67

POINT III

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S PRIVATE-PROPERTY PROVISION ........................................................69

A. Plaintiffs Failed to Establish a Likelihood of Success on Their Second Amendment Challenge. ...............................69

    1. Plaintiffs lack standing to challenge the private-property provision on Second Amendment grounds. ......69

    2. The Second Amendment does not bestow a right to carry firearms onto others' private property absent consent. .............................................71

    3. The private-property provision is consistent with the historical tradition of firearm regulation. ................74

B. The Private-Property Provision Does Not Compel Speech in Violation of the First Amendment. .......................76

iii

**Page**

POINT IV

The District Court Erred in Applying the Remaining Preliminary-Injunction Factors ..................................................... 80

CONCLUSION .......................................................................... 87

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Andrews v. State,*
    50 Tenn. 165 (1871) ........................................................................ 57-58

*Antonyuk v. Bruen,*
    No. 22-cv-734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ........ 13, 80

*Cayuga Nation v. Tanner,*
    824 F.3d 321 (2d Cir. 2016) ................................................................. 50

*City of New York v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) ................................................................. 48

*Department of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020) ........................................................................... 86

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................... 7, 22, 52-53, 71

*English v. State,*
    35 Tex. 473 (1871) ............................................................................... 57

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014) ................................................................. 79

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012) ................................................. 23, 72-73

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs,*
    788 F.3d 1318 (11th Cir. 2015) ........................................................... 84

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,*
    764 F.3d 210 (2d Cir. 2014) ................................................................. 20

*Hill v. State,*
    53 Ga. 472 (1874) ......................................................................... 57, 59

| Cases | Page(s) |
|---|---|

*Jobe v. City of Catlettsburg,*
    409 F.3d 261 (6th Cir. 2005) ............................................................ 78

*Kane v. De Blasio,*
    19 F.4th 152 (2d Cir. 2021) ........................................................ 82, 86

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ....................................................... 33-34

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................ 46

*Libertarian Party of Erie County v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020) ................................................... 21, 26-27

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 50

*Maryland v. King,*
    567 U.S. 1301 (2012) ...................................................................... 82

*Matter of Cohen v. Kelly,*
    30 A.D.3d 170 (1st Dep't 2006) ....................................................... 81

*Matter of Rucker v. NYC/NYPD License Div.,*
    78 A.D.3d 535 (1st Dep't 2010) ....................................................... 81

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................ 52

*New Hope Fam. Servs., Inc. v. Poole,*
    966 F.3d 145 (2d Cir. 2020) ............................................................ 77

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015) ....................................................... 20, 85

*New York State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ............................................................ 78

**Cases**                                                                **Page(s)**

*New York State Rifle & Pistol Association v. Bruen,*
   142 S. Ct. 2111 (2022) ................................................................ passim

*Owens v. State,*
   3 Tex. App. 404 (Tex. Ct. App. 1878) ................................................. 57

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007) ............................................................ 26

*Range v. Attorney Gen. U.S.,*
   53 F.4th 262 (3d Cir. 2022) ........................................................ 28, 34

*Romer v. Green Point Sav. Bank,*
   27 F.3d 12 (2d Cir. 1994) .................................................................. 84

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.,*
   547 U.S. 47 (2006) ............................................................................ 78

*Simon v. Eastern Ky. Welfare Rts. Org.,*
   426 U.S. 26 (1976) ............................................................................ 70

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .......................................................................... 26

*State v. Shelby,*
   90 Mo. 302 (1886) ............................................................................. 58

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .......................................................................... 51

*Torcivia v. Suffolk County,*
   17 F.4th 342 (2d Cir. 2021) ............................................................... 40

*Uniformed Fire Officers Ass'n v. De Blasio,*
   973 F.3d 41 (2d Cir. 2020) ................................................................ 82

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019) .......................................................... 62

**Cases**                                                        **Page(s)**

*United States v. Salerno,*
    481 U.S. 739 (1987)..............................................................32, 47

*West Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)..................................................................77

*Whole Woman's Health v. Jackson,*
    142 S. Ct. 522 (2021).................................................................70

*Wilson v. State,*
    33 Ark. 557 (1878)....................................................................57

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008)..................................................................19-20

*Wooley v. Maynard,*
    430 U.S. 705 (1977)..................................................................77

## Constitution

U.S. Const. amend. II...................................................................28

## Laws

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.).......................9, 11

Penal Law
    § 265.01-d ................................................... 12, 69, 77, 79
    § 265.01-e ........................................................... passim
    § 265.03 ...................................................................... 6
    § 265.20 ...................................................................... 6
    § 400.00 ............................................................... passim

*States (alphabetical)*

Ala. Code § 13A-11-75 ...............................................................46

Conn. Gen. Stat. § 29-28 ...........................................................29

**Laws**                                                              **Page(s)**

*States (alphabetical)*

Del. Code Ann. tit. 11, § 1441 ................................................. 29

Ga. Code Ann. § 16-11-129 .................................................... 29

Ind. Code § 35-47-2-3 ............................................................ 29

An Act to Regulate the Election of Members of the Legislative
   Council and General Assembly, Sheriffs and Coroners, in
   This State (Feb. 22, 1797), *Laws of the State of New-Jersey*
   273 (1821) ......................................................................... 55

11 R.I. Gen. Laws Ann. § 11-47-11 ........................................ 29

*English*

4 Hen. 4, c. 29 (1403) ............................................................. 55

26 Hen. 8, c. 6 (1534) ............................................................. 55

Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328) ........... 54

**Miscellaneous Authorities**

Assembly Sponsor's Mem. A41001 (2022),
   https://nyassembly.gov/leg/?default_fld=&leg_video=
   &bn=A41001&term=2021&Memo=Y .................................... 10-11, 31

Brief of *Amicus Curiae* Patrick J. Charles in Supp. of Neither
   Party, Appendix, *New York State Rifle & Pistol Association v.
   Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843),
   https://patrickjcharlesnysrpavbruenamicusbrief.wordpress.com/ ..... 36

Buffalo State Asylum for the Insane, *Rules & Regulations* (1888),
   https://collections.nlm.nih.gov/bookviewer?PID=nlm:nlmuid-
   101609279-bk ..................................................................... 64

Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA
   v. Bruen *and the Future of the Sensitive Places Doctrine*,
   63 B.C. L. Rev. I.-60 (2022) ............................................... 66

**Miscellaneous Authorities** **Page(s)**

City of New York, *Concealed Carry Firearm Laws in
New York City* (Aug. 31, 2022), https://www.nyc.gov/nyc-
resources/new-york-city-concealed-carry-law.page ........................... 83

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*,
28 Wm. & Mary Bill Rts. J. 459 (2019) .............................................. 62

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
49 Law & Comtemp. Probs. 143 (1986).............................................. 35

Francois-Xavier Martin, *A Collection of the Statutes of the Parliament
of England in Force in the State of North-Carolina* (1792)................55

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns:
Public Support for "No Carry" Defaults on Private Land*,
48 J.L., Med. & Ethics 183 (2020) ..................................................... 73

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013)................. 37

Margaret Walls, Res. for the Future, *Parks and Recreation
in the United States: Local Park Systems* (June 2009),
https://media.rff.org/documents/RFF-BCK-
ORRG_Local20Parks.pdf .................................................................. 66

Margaret Walls, Res. for the Future, *Parks and Recreation
in the United States: State Park Systems* (Jan. 2009),
https://media.rff.org/documents/RFF-BCK-
ORRG_State20Parks.pdf .................................................................. 66

National Park Serv., Firearms Regulations in the National Parks:
1897-1936 (May 2008), http://npshistory.com/publications/ranger/
np-firearms-regs-history.pdf............................................................. 66

New York Governor, Proclamation (June 24, 2022),
https://www.governor.ny.gov/sites/default/files/2022-
06/Proclamation_Extraordinary_Session_June_2022.pdf .................. 9

**Miscellaneous Authorities**                                             **Page(s)**

New York State Div. of Crim. Just. Servs., Frequently
Asked Questions Regarding Recent Changes to
New York State Firearm Laws (Aug. 27, 2022),
https://troopers.ny.gov/system/files/documents/2022/08/new-gun-law-faq-8-27-22-final-1.pdf ............................................................ 83

New York State Lunatic Asylum, Utica,
*Rules, Regulations & By-Laws* (1866),
https://collections.nlm.nih.gov/bookviewer?PID=nlm:nlmuid-101522281-bk .......................................................................... 64

Patrick J. Charles, *The Fugazi Second Amendment*
(2022) (forthcoming Clev. St. L. Rev.) ......................... 36, 38, 55-56, 84

Saul Cornell & Nathan DeDino, *A Well Regulated Right:
The Early American Origins of Gun Control*,
73 Fordham L. Rev. 487 (2004) ......................................................... 34

Saul Cornell, *History and Tradition or Fantasy and Fiction:
Which Version of the Past Will the Supreme Court Choose in*
NYSRPA v. Bruen?, 49 Hast. Const. L.Q. 145 (2022)....................... 35

Senate Sponsor's Mem. S51001 (2022),
https://www.nysenate.gov/legislation/bills/2021/s51001 ......... 10-11, 31

Thomas M. Cooley, *A Treatise on the Constitutional Limitations
Which Rest Upon the Legislative Power of the States of the
American Union* (2d ed. 1871) ........................................................ 60

United States Census, *Historical Statistics of the United States,
Colonial Times to 1970*,
https://www2.census.gov/library/publications/1975/compendia/hist_stats_colonial-1970/hist_stats_colonial-1970p1-chA.pdf ........... 39

*Visitor Demographics*, Ass'n of Zoos & Aquariums,
https://www.aza.org/partnerships-visitor-demographics?locale=en .................................................................. 62

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). Shortly after this legislation took effect, applicants—five individuals with licenses to carry firearms and a sixth individual who has never applied for such a license—sued to challenge nearly every provision of the CCIA as unconstitutional. After giving defendants[1] approximately three weeks to oppose a motion seeking a preliminary injunction as to dozens of distinct provisions, the U.S. District Court for the Northern District of New York (Suddaby, J.) preliminarily enjoined enforcement of vast swaths of the CCIA on a statewide basis.[2] This Court should reverse.

First, the district court erroneously enjoined enforcement of New York's longstanding good-moral-character requirement to obtain a firearm

---

[1] This brief is filed on behalf of state defendants Steven A. Nigrelli, in his official capacity as Acting Superintendent of the New York State Police, and Judge Matthew J. Doran, in his official capacity as licensing officer for Onondaga County.

[2] This Court subsequently stayed the injunction pending appeal.

license, as well as several disclosure requirements relevant to an applicant's compliance with the good-moral-character requirement. No plaintiff has applied for—much less been denied—a license under the CCIA, and thus no plaintiff has standing to challenge the statute's licensing requirements. In addition, the licensing requirements restrict firearm carrying only by those who are *not* the law-abiding, responsible citizens protected by the Second Amendment. Finally, to the extent defendants were required to proffer historical evidence to support the challenged licensing provisions, defendants easily demonstrated that laws aimed at disarming persons who pose a danger to public safety are well within the historical tradition of firearm regulation.

Second, the district court erroneously enjoined enforcement of various sensitive-place provisions that would prohibit firearms in places like houses of worship, theaters, political protests, and bars and restaurants serving alcohol. The court mistakenly found that plaintiffs had standing to challenge these provisions based on speculative allegations and implausible interpretations of the statute's scope and compounded the error by facially enjoining the enforcement of the challenged provisions on a statewide basis. The court also mistakenly relieved plaintiffs

of their burden to rebut the presumption repeatedly recognized by the Supreme Court that such sensitive-place regulations are constitutional. And the trial court's rigid analysis of the substantial historical evidence proffered by defendants notwithstanding the court's expedited schedule was inconsistent with *Bruen*'s command that lower courts apply careful analogical reasoning rather than create a regulatory straitjacket.

Third, the district court erroneously enjoined enforcement of the CCIA provision that bars carrying firearms onto others' private property absent express consent from the owner. Plaintiffs lack standing to challenge this provision on Second Amendment grounds because an injunction against defendants cannot vindicate their asserted desire to carry guns onto others' private property. Any injury to plaintiffs stems from the actions of property owners who decide whether to consent to such carriage, and not from defendants. The court also mistakenly presumed that the private-property provision infringes the Second Amendment right; that right has never been interpreted to allow carrying onto others' private property without consent. In any event, the provision has ample historical analogs. And, contrary to the district court's reasoning, the

3

provision does not compel anyone to speak, and thus raises no First Amendment issue.

Finally, the district court misapplied the equitable injunction factors by disregarding an acknowledged risk of serious injury and death from preliminarily enjoining enforcement of New York's duly enacted licensing requirements and prohibitions on firearms in sensitive locations. Moreover, the court failed to account for the disruption to the status quo, regulatory havoc, and public confusion attendant to enjoining enforcement of the CCIA during the pendency of this litigation. At a minimum, any preliminary injunction should have been limited to plaintiffs, as the statewide relief ordered by the district court is grossly disproportionate to the individual harms alleged in the complaint.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction for the federal claims at issue under 28 U.S.C. § 1331. Because the district court's order granting a preliminary injunction is an appealable interlocutory order, this Court has jurisdiction under 28 U.S.C. § 1292(a). The state defendants' notice of appeal of the district court's November 7, 2022 order is

timely because the notice was filed on November 8, 2022. Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1.      Did the district court erroneously find that plaintiffs would likely succeed on the merits of their challenges to New York's good-moral-character and related firearm-licensing requirements?

2.      Did the district court erroneously find that plaintiffs would likely succeed on the merits of their challenges to several of New York's sensitive-place laws, which prohibit possession of firearms in locations such as places of worship, theaters, and political protests?

3.      Did the district court erroneously find that plaintiffs would likely succeed on the merits of their challenges to New York's law prohibiting possession of firearms on others' private property absent express consent?

4.      Did the district court err in its application of the remaining preliminary-injunction factors by, among other things, discounting the likelihood of serious public-safety harms associated with the injunction, and disregarding the injunction's disruption to the status quo?

## STATEMENT OF THE CASE

**A.    Legal Background**

**1.    The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen***

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). New York has long set forth basic eligibility criteria for a license, including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *Id.* § 400.00(1)(a)-(c).

Until recently, New York also required demonstrating "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" demanded showing "a special need for self-defense," this requirement implicated the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense and was invalid because it was unsupported by historical tradition. 142 S. Ct. at 2122, 2130-31. In so holding, *Bruen* rejected the framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges in favor of a restated standard: if "the Second Amendment's plain

text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* recognized the necessity and constitutionality of modern firearm regulation, explicitly endorsing at least two types of restrictions. First, the Court announced that "nothing in [its] analysis" was meant to undermine the constitutionality of "shall-issue" licensing regimes. *Id.* at 2138 n.9. These laws "often require applicants to undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see also id.* at 2161-62 (Kavanaugh, J., concurring). Second, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. The opinion endorsed such "longstanding" bans in schools, legislative assemblies, polling places, and courthouses, while recognizing that this list was non-exhaustive and "that

7

modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

*Bruen* acknowledged that the application of the restated Second Amendment standard would require further development in the lower courts. For example, the court declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." *Id.* at 2134 (quotation and alteration marks omitted). And while *Bruen* instructed that the historical inquiry required in Second Amendment cases "will often involve reasoning by analogy," it similarly declined to "provide an exhaustive survey of the features that render regulations relevantly similar," except to identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. As the Court recognized, in some cases, historical analogies will be "relatively simple to draw," while "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support

8

modern regulations. *Id.* at 2133. The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

### 2. New York's Concealed Carry Improvement Act (CCIA)

The day after *Bruen* was decided, New York Governor Kathy Hochul announced that she would convene an extraordinary legislative session to bring New York's law into compliance with the ruling. *See* N.Y. Gov., Proclamation (June 24, 2022).[3] On July 1, 2022, the Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y.

---

[3] For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on January 9, 2023.

9

Legis. Retrieval Serv.); *see also* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022).

First, the CCIA made more precise the longstanding requirement of "good moral character" for a firearm license; this is the provision under which the State has denied licenses to people with criminal records and other evidence of a propensity for violence. The CCIA defined the term "good moral character" to mean "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b).

In addition, the CCIA provided that applicants for licenses to carry concealed firearms in public "shall meet in person with the licensing officer for an interview," *id.* § 400.00(1)(o), complete training and two hours of live-fire instruction, *id.* §§ 400.00(1)(o)(iii), 400.00(19), and submit statutorily specified information, *id.* § 400.00(1)(o)(i)-(v). The specified information includes names and contact information for references who can attest to the applicant's good moral character; names and contact information for the applicant's spouse or domestic partner and any other adults residing with the applicant; whether any minors reside with the

applicant; a list of social-media accounts of the applicant from the past three years "to confirm the information regarding the applicant[']s character and conduct" provided by the applicant's references; and "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application." *Id.*

Anyone satisfying the license requirements "will receive their license." Assembly Sponsor's Mem. A41001; Senate Sponsor's Mem. S51001. If an application is denied, the licensing officer must explain in writing the reasons for the denial, and an applicant has the right to appeal the decision and to introduce additional evidence in support of their application at the appeal hearing.[4] *See* Penal Law § 400.00(4-a).

The CCIA also codified several "sensitive locations" in which carrying a firearm would not be allowed. The sensitive places recognized by the CCIA include government buildings such as courthouses; polling places; places of worship; schools, colleges, and universities; nursery schools and preschools; public parks, zoos, and playgrounds; shelters for the homeless and domestic-violence victims; sites providing addiction or

---

[4] The provision governing appeals takes effect on April 1, 2023. *See* Ch. 371, § 26(g), 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.).

11

behavioral-health care; bars and restaurants serving alcohol; public transit and airports; entertainment venues including theaters, conference centers, and banquet halls; "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble"; and Times Square, if clearly "identified with signage." *Id.* § 265.01-e(1)-(2).

The CCIA separately bars possessing a firearm in a so-called "restricted place," that is, another person's private property, when the person carrying the firearm "knows or reasonably should know that the owner or lessee of such property" has not "given express consent" to carry firearms on the premises, whether by posted signage or other means. *Id.* § 265.01-d(1).

The sensitive-place and private-property provisions have several exemptions, including for law-enforcement officers, military personnel, security guards, and persons lawfully hunting. *Id.* §§ 265.01-d(2), 265.01-e(3).

12

## B. Procedural Background

### 1. The district court's jurisdictional dismissal and advisory opinion in *Antonyuk I*

Ten days after the CCIA's enactment, Ivan Antonyuk and two gun-advocacy organizations filed suit under 42 U.S.C. § 1983 in the Northern District of New York against the then-superintendent of the New York State Police in his official capacity, challenging the CCIA provisions described above under the First, Second, and Fourteenth Amendments. *See* Compl., *Antonyuk v. Bruen* (*Antonyuk I*), No. 22-cv-734 (N.D.N.Y. July 11, 2022), ECF 1. The plaintiffs sought a preliminary injunction to block these provisions from taking effect. The superintendent opposed that request and moved to dismiss for lack of Article III standing.

The district court (Suddaby, J.) granted the motion to dismiss. Despite acknowledging the absence of a live controversy, the court proceeded to render an advisory opinion describing what "would constitute the Court's holding" on the merits if the plaintiffs had been found to possess standing. *See Antonyuk I*, 2022 WL 3999791, at *1, *25 (N.D.N.Y. Aug. 31, 2022). The court stated that the CCIA was "an unconstitutional statute," and indicated that it would have enjoined enforcement of nearly every challenged provision of the law. *Id.* at *26.

13

Following the dismissal, the CCIA took effect as planned on September 1, 2022.

## 2. The district court's entry of a temporary restraining order and preliminary injunction in *Antonyuk II*

Several weeks later, Antonyuk filed a new § 1983 lawsuit attacking mostly the same CCIA provisions under the First, Second, Fifth, and Fourteenth Amendments. Antonyuk dropped the organizational plaintiffs who lacked standing, added five individual plaintiffs, and named additional official-capacity state and local defendants alongside the Superintendent of the State Police.[5] (Special Appendix (S.A.) 17-89.) Plaintiffs marked this complaint as related to *Antonyuk I* (*see* Joint Appendix (J.A.) 195), and Judge Suddaby accepted the case as related (*see* Text Order (Sept. 26, 2022), ECF 12).

The complaint attempted to shore up standing deficiencies by adding a plaintiff who did not yet have a carry license, and by alleging that plaintiffs intend to bring weapons into various prohibited locations "in

---

[5] Acting Superintendent Nigrelli was automatically substituted as a defendant after the prior Superintendent left government service.

14

the near future." Mem. in Supp. of Pls.' Mot. for TRO, Prelim. Inj., &/or Permanent Inj. ("PI Mem.") at 3 (Sept. 22, 2022), ECF 6-1.

Plaintiffs moved for a temporary restraining order (TRO), preliminary injunction, and permanent injunction. *See id.* at 1. After giving defendants less than a week to respond, the district court granted a TRO as to multiple CCIA provisions. (S.A. 185-237.) The court held that all plaintiffs had standing, all defendants were proper, each of the challenged provisions was a proper subject for adjudication, and most of the challenged provisions were likely unlawful based on criteria and evidence the court announced for the first time in its decision. (S.A. 198-230.) The state defendants noticed an appeal and moved for a stay pending appeal, *see Antonyuk v. Hochul*, No. 22-2379 (2d Cir.) (appeal docketed Oct. 7, 2022), while simultaneously preparing a lengthy preliminary-injunction response due just a week after the TRO was issued (Prelim. Inj. Opp'n (Oct. 13, 2022), ECF 48).

This Court granted an interim stay of the TRO pending final determination of the stay motion. *See Antonyuk*, CA2 ECF 39, 67, 68. Several weeks later, the district court entered a preliminary injunction order. The court preliminarily enjoined enforcement of many (but not all) of the

provisions subject to the TRO and of several provisions that were not subject to the TRO. (S.A. 1-84.)

First, the district court reversed its prior ruling subjecting only some applications of the good-moral-character requirement to the TRO. (S.A. 92-103.) The court acknowledged that the requirement had historical support and would be constitutional if it allowed licensing officers to determine, based on prior conduct, that applicants were "likely to use [a] weapon in a manner that would injure themselves or others (other than in self-defense)." (S.A. 103.) But the court nevertheless found that plaintiffs were likely to succeed on the merits of their facial challenge to the good-moral-character requirement in its entirety. (S.A. 103.)

As in the TRO, the district court found that plaintiffs were likely to succeed on the merits of their challenges to the requirements to identify coinhabitants, disclose whether children live in the home, and list social-media accounts, all for a perceived lack of sufficient historical analogs. (S.A. 106-114.) The court departed from the TRO by also finding a likelihood of success on the merits on plaintiffs' challenge to the requirement to provide other information necessary to complete the licensing officer's review, based on speculation that a licensing officer might use that

16

provision to demand inspection of an applicant's cell phone or production of a urine sample.[6] (S.A. 115-117.)

Second, the district court acknowledged for the first time that plaintiffs lacked standing to challenge most of the sensitive-place provisions. (S.A. 24-81.) The court also found that plaintiffs were unlikely to succeed on the merits of several challenges on the ground that the provisions at issue were consistent with a historical tradition of sensitive-place restrictions aimed at protecting children. (S.A. 138-139 (public playgrounds); 144-145 (nursery schools and preschools).)

As to the remaining provisions, the court concluded that many lacked sufficient historical analogs. The court therefore found that plaintiffs were likely to succeed on the merits of their challenges to sensitive-place restrictions covering places of worship, public parks and zoos, publicly accessible sites providing addiction or behavioral-health care, bars and restaurants serving alcohol, theaters, conference centers, banquet halls, gatherings to express constitutional rights to protest or assemble, buses,

---

[6] The court found that plaintiffs were unlikely to succeed on their challenges to the in-person interview requirement (which was subject to the TRO), or the character-reference and training requirements. (S.A. 103-106, 117-123.)

and airports to the extent the license holder is complying with federal regulations. (S.A. 183-184; *see* S.A. 25-45, 57-74, 75-80.)

Third, the district court found that plaintiffs were likely to succeed on the merits of their facial challenge to the entirety of the prohibition on carrying firearms onto private property without express consent, eliminating the TRO's carveout for fenced-in farmland or hunting grounds. (S.A. 166-180.)

Finally, the district court stated that the equitable preliminary-injunction factors—irreparable harm, balance of the equities, and the public interest—favored plaintiffs. The court included no supporting analysis, but instead referred back to its similar conclusion in its advisory opinion in *Antonyuk I*. The court did not consider whether the equities had shifted since the CCIA went into effect and became the status quo. (S.A. 180.)

### 3. This Court's stay of the preliminary injunction

State defendants Nigrelli and Doran promptly noticed an appeal and sought a stay pending appeal.[7] This Court (Sack, Wesley, and Bianco, JJ.) granted a stay pending appeal (CA2 ECF 76).[8]

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Movants must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief;

---

[7] The district court dismissed the complaint against Governor Hochul for lack of standing. (S.A. 85-87.)

[8] This Court also granted stays pending appeal of preliminary injunctions against enforcement of certain CCIA provisions entered by Judge John L. Sinatra in the Western District of New York. *See Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022), ECF 53 (place-of-worship provision); *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022), ECF 40 (private-property provision). Judge Sinatra subsequently stayed a third preliminary injunction pending appeal. *See* Decision & Order at 35-36, *Spencer v. Nigrelli*, No. 22-cv-06486 (W.D.N.Y. Dec. 29, 2022), ECF 56 (place-of-worship provision). This Court denied plaintiffs' motion for an injunction pending appeal in *Gazzola v. Hochul*, No. 22-3068 (2d Cir. Dec. 21, 2022), ECF 29, a case challenging mostly different provisions of the CCIA. Accordingly, the legislation remains in full effect today, subject to certain limitations on the stays requested by appellants and granted by this Court.

(3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. Where, as here, an injunction would alter the status quo rather than maintaining it, movants are held to a "heightened" standard, requiring a "clear" or "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

On appeal from an order granting injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014). An error of law is an abuse of discretion, as is "a clearly erroneous assessment of the evidence." *Actavis*, 787 F.3d at 650.

## SUMMARY OF ARGUMENT

The district court erred in preliminarily enjoining enforcement of numerous provisions of the CCIA, for several independent reasons.

I.A.   Plaintiffs lack standing to challenge the CCIA's good-moral-character requirement for a carry license and related disclosure requirements. No plaintiff has even applied for, much less been denied, such a license under the CCIA; thus, plaintiffs lack standing to challenge the

20

licensing requirements. *See, e.g.*, *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. The district court was incorrect to invoke a futility exception to standing based on an allegation that it would take a long time to get a licensing appointment. Alleged injuries based on processing delays are not traceable to the challenged provisions of the CCIA.

I.B.   Plaintiffs' challenge to the licensing requirements is independently barred because the provisions do not implicate the Second Amendment's plain text. "The people" referenced in the Second Amendment are "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635), and the CCIA's licensing requirements limit access to firearms only for those who are not law-abiding and responsible.

I.C.   In any event, the licensing requirements are constitutional because they are consistent with a long history, stretching from the founding period through the period when the Second Amendment was incorporated against the States, of analogous regulations to disarm those who lack the good moral character to use firearms safety. The district court erred in conjuring one excuse after another to discount the historical analogs—too small a population governed by the laws, not quite simi-

lar enough, and so on. Nothing in *Bruen* suggests that some minimum number of identical historical statutes is necessary to justify a firearm regulation. *Bruen* requires only an established "historical *analogue*, not a historical *twin*"—much less a slew of them. 142 S. Ct. at 2133. And that makes good sense because regulatory variation to address local conditions and preferences is a longstanding feature of firearm regulation in our federal system.

II.A.  Plaintiffs also lack standing for their challenges to several of the CCIA provisions prohibiting firearms in sensitive places. The district court had no basis to find standing for pre-enforcement facial challenges based on wholly implausible theories, for instance that a plaintiff pastor is likely to be prosecuted for carrying a firearm in an addiction or behavioral-health care facility because he wishes to carry while counseling drug-addicted parishioners *in his church.*

II.B.  The district court separately erred in enjoining enforcement of sensitive-place provisions without holding plaintiffs to their burden to overcome the Supreme Court's presumption that sensitive-place restrictions are constitutional. *See, e.g.*, *Heller*, 554 U.S. at 626-27 & n.26.

II.C.  Regardless, the sensitive-place provisions are consistent with a long history of firearm regulations dating back to the medieval Statute of Northampton, and continuing through the founding era and the incorporation era. These historical regulations served several purposes, including protecting places intended for the exercise of other constitutional rights, such as religious exercise and public assembly; protecting places where vulnerable people such as children or impaired people are frequently present; and protecting unusually crowded places where there is a risk of mass shootings or chaos from firearm-related fears or threats. The CCIA regulations at issue here serve the same purposes.

III.A. The district court also erred in enjoining enforcement of the CCIA provision prohibiting firearms on others' private property without their express consent. Plaintiffs lack standing to assert a Second Amendment challenge to that provision because any asserted injury is traceable to the individual property owners who may deny consent to armed carry on their property, and not to defendants. In any event, the Second Amendment does not give plaintiffs the right to carry firearms on others' private property absent consent. *See GeorgiaCarry.Org, Inc. v. Georgia,*

687 F.3d 1244 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Even if the Second Amendment applied, the private-property provision is consistent with a long history of firearm regulations. The district court was wrong to dismiss historical statutes prohibiting carrying firearms on others' private property as mere anti-poaching laws, where the plain language of these provisions is substantially broader, and in some cases does not address hunting at all. Moreover, the court failed to analyze these statutes as appropriate analogs for modern restrictions.

III.B. There is likewise no merit to the district court's conclusion that the private-property provision compels property owners to speak in violation of the First Amendment. The provision does not compel property owners to do anything; it requires *guests* to get consent before carrying a concealed firearm onto others' property. And even if the provision implicated the First Amendment, it would be constitutional under any level of scrutiny because it is narrowly tailored to compelling government interests in protecting public safety and property owners' fundamental right to limit access to their property as they see fit.

24

IV.   The district court also erred in applying the equitable injunction factors. The court erroneously disregarded the risk of serious physical harm from an injunction that would block public-safety provisions the Legislature deemed necessary. And the court further erred in failing to account for the injunction's reversal of the status quo operation of the CCIA, which would engender substantial regulatory and public confusion.

## ARGUMENT

## POINT I

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S FIREARM-LICENSING PROVISIONS

The district court erroneously found that plaintiffs demonstrated a likelihood of success on the merits of their challenges to: (i) the good-moral-character requirement in its entirety; (ii) the requirement to identify and provide contact information for an applicant's current spouse or domestic partner and any adult coinhabitants, and to disclose whether minors reside in the applicant's home; (iii) the requirement to identify an applicant's social-media accounts from the last three years; and (iv) the requirement to provide, upon request, other information "that is reasonably necessary and related to the review of the licensing application."

(S.A. 90-103, 106-117, 182-183 (discussing Penal Law § 400.00(1)(b), (o)(i), (iv), (v)).)

Plaintiffs have not met their heightened burden to show a likelihood of success for several reasons.

## A. Plaintiffs Lack Standing to Challenge the Licensing Requirements.

The "irreducible constitutional minimum" of standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation marks omitted). In a challenge to a firearm-licensing statute, the license application "denial . . . is [the] distinct injury." *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007). It is therefore well settled that a person who has "'failed to apply for a gun license in New York . . . lacks standing to challenge the licensing laws.'" *Libertarian Party*, 970 F.3d at 121-22 (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)).

Here, no plaintiff has applied for a firearm license under the CCIA, much less been denied such a license. Accordingly, no plaintiff has stand-

ing to challenge the licensing requirements. In addition, Lawrence Sloane, the sole plaintiff without a license, failed to plausibly allege that he would be denied a license on the basis of the good-moral-character requirement; to the contrary, he attested that he is a law-abiding and responsible person (J.A. 144 ¶ 3, 146 ¶ 14), which is all the good-moral-character provision requires. *See Libertarian Party*, 970 F.3d at 127; Penal Law § 400.00(1)(b).

The district court ignored these deficiencies and this Court's binding precedent in *Libertarian Party*, and instead erroneously concluded that Sloane need not file an application as a predicate to bringing a constitutional challenge because the application purportedly could not be processed until October 2023. (S.A. 23.) Even if that were true, Sloane's injury would be traceable to the delay and not to the relevant CCIA provisions. And insofar as the district court concluded that an application would be futile because of Sloane's refusal to provide required disclosures (S.A. 19-22), this Court has already held that a plaintiff cannot manufacture standing by refusing to "submit to the challenged policy." *Libertarian Party*, 970 F.3d at 121 (quotation marks omitted).

27

**B. The Challenged Licensing Requirements Do Not Implicate the Second Amendment's Text.**

Even if plaintiffs had standing to challenge the CCIA's licensing requirements, that challenge would fail because the provisions do not infringe the right protected by the Second Amendment. The Supreme Court has been clear that "the people" whose right to carry arms in self-defense is guaranteed by the Second Amendment are "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); U.S. Const. amend. II. Conversely, those who are not law-abiding, responsible citizens "fall outside 'the people' entitled to keep and bear arms." *Range v. Attorney Gen. U.S.*, 53 F.4th 262, 284 (3d Cir. 2022), *reh'g en banc granted*, No. 21-2835, 2023 WL 118469 (3d Cir. Jan. 6, 2023).

The licensing requirements at issue in this case do not restrict the right of law-abiding, responsible citizens to carry arms and are therefore constitutional. The good-moral-character requirement precludes possession of firearms only by persons who lack "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b). Comparable requirements are a feature of several other "shall-issue" licensing regimes favorably referenced in *Bruen*. *See*

28

142 S. Ct. at 2124 n.1; *see also, e.g.*, Ind. Code § 35-47-2-3(g)(2) (applicant must be "of good character and reputation"); Ga. Code Ann. § 16-11-129(d)(4) ("of good moral character"); Del. Code Ann. tit. 11, § 1441(a) (same); Conn. Gen. Stat. § 29-28(b)(2) ("suitable person to receive such permit"); 11 R.I. Gen. Laws Ann. § 11-47-11 ("suitable person to be so licensed"). And as described above (at 25-26), the remaining licensing requirements at issue here are all intended to inform a licensing officer's assessment of good moral character and therefore appropriately prohibit licensing only of applicants who are neither law-abiding nor responsible.

The district court's analysis on this predicate issue was erroneous in several respects. First, the court incorrectly excused plaintiffs from showing that the Second Amendment's text covered the challenged restrictions. *Bruen* made clear that the government's burden to support a regulation with historical evidence is triggered only upon a predicate showing that the regulation covers conduct protected by the Second Amendment. *See* 142 S. Ct. at 2126, 2129-30. Plaintiffs made no showing that the Second Amendment covers the challenged licensing requirements, and it does not.

29

Second, the district court put the cart before the horse in assuming that any requirement for a carry license implicates the Second Amendment right to bear arms for self-defense. (S.A. 91.) To the contrary, as the Supreme Court has indicated, an individual does not have the right to bear arms if the individual is not a law-abiding, responsible citizen as shown by appropriate licensing requirements such as "a background check." *See Bruen*, 142 S. Ct. at 2138 n.9; *see also id.* at 2161-62 (Kavanaugh, J., concurring). While *Bruen* found that New York's prior "proper cause" requirement was within the scope of the Second Amendment because it burdened the right of law-abiding, responsible citizens to bear arms by denying them licenses if they did not show a particularized need for self-defense, *id.* at 2134, the licensing requirements at issue here impose no such burden. Individuals will be denied licenses pursuant to the CCIA licensing requirements only if they are *not* law-abiding, responsible citizens.

The district court's insistence that the good-moral-character requirement would give licensing officers "open-ended" or "unchanneled" discretion to deny licenses to law-abiding and responsible citizens (S.A. 98, 100) was based on unsupported speculation about how licensing officers might

30

interpret the CCIA's definition of "good moral character" in individual cases and has no bearing on the facial constitutionality of the underlying provision. Contrary to the district court's suggestion, under the CCIA, anyone satisfying the statutorily defined license requirements "will receive their license." *See* Assembly Sponsor's Mem. A41001; Senate Sponsor's Mem. S51001. And the applicant may present additional evidence in an appeal hearing if the applicant believes a license was improperly denied. *See* Penal Law § 400.00(4-a).

Likewise, the court's concern that the statutory definition does not "expressly recognize an exception for actions taken in self-defense" (S.A. 99) is no basis to find a likelihood of success on a facial constitutional challenge. Such an exception is unnecessary because legal actions taken in lawful self-defense would not cast doubt on one's good moral character. More fundamentally, there is no basis to conclude that a facial constitutional challenge would be successful based on a speculative case of an applicant deemed not to have good moral character because he lawfully used a firearm in self-defense.

Finally, the district court erroneously found a likelihood of success on the merits despite acknowledging that the good-moral-character crite-

rion and the requirement to disclose other reasonably necessary and related information could be constitutionally applied in many circumstances. (S.A. 103, 115-16.) Such a finding is fatal to plaintiffs' facial constitutional challenges. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge "must establish that no set of circumstances exists under which the Act would be valid"); *cf. Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.").

The district court's assumption that "a large fraction" of unconstitutional applications is sufficient to strike down a statute on its face is based on a misapplication of the "undue burden" standard used in since overruled abortion cases. (S.A. 101-102 & n.80, 116 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 895 (1992), and *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016), *overruled in relevant part by Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2273 (2022)).) The Supreme Court has never applied the "large fraction" standard outside the abortion context, and the district court offered no explanation of why it would apply in Second Amendment cases.

32

In any event, the district court failed to explain how the good-moral-character criterion and the "reasonably necessary and relevant" disclosure requirement would be unconstitutional in even "a large fraction" of cases. The statutory context for these provisions makes clear that they are intended to identify dangerous conduct that a licensing officer may constitutionally consider in the licensing process. *See generally* Penal Law § 400.00(1). The court's conjecture that individual licensing officers would apply these provisions arbitrarily or improperly in a "large fraction" of cases is not a basis to order statewide injunctive relief.

## C. The Licensing Requirements Are Consistent with the Historical Tradition of Firearm Regulation.

Because the good-moral-character licensing requirement does not implicate the text of the Second Amendment, defendants were not required to proffer historical evidence to support the challenged licensing provisions. But even if such a showing were required, the historical record confirms that a "legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting), because the person "belongs to a danger-

ous category or bears individual markers of risk," *id.* at 451; *see also Range*, 53 F.4th at 274-282. The good-moral-character criterion and related licensing requirements serve the same purpose.

### 1. The good-moral-character requirement is consistent with the historical tradition of firearm regulation.

For centuries, jurisdictions across America have enacted laws that disarm individuals deemed threats to public safety or lacking the moral character to be entrusted with firearms. For example, Revolutionary-era loyalty laws required those who might be "disaffected to the cause of America" to appear in person and take an oath of allegiance, or else be disarmed. (J.A. 31; *see also, e.g.*, J.A. 297-320 (1776-1777 Massachusetts, Pennsylvania, Maryland, North Carolina, and Virginia laws).) Likewise, early militia-mustering laws provided for the disarmament of anyone who appeared unfit to bear arms. (*See, e.g.*, J.A. 361-393, 394-429.) These laws reflect the long tradition of understanding the right to bear arms as a right of the "virtuous citizen," which permits laws disarming those deemed "unvirtuous" (e.g., dangerous), based on their conduct, associates, or reputation. *See, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev.

487, 492 (2004); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Comtemp. Probs. 143, 146 (1986).

At around the time the Fourteenth Amendment incorporated the Second Amendment against the States in 1868, jurisdictions nationwide enforced licensing requirements to advance the same purpose of keeping firearms out of the hands of individuals deemed dangerous. In New York City, for instance, an individual who wanted to carry a pistol for his protection was obligated to appear for an in-person interview with a local officer. (J.A. 437-451 (1878 ordinance).) If, based on this interview, the officer was "satisfied that the applicant is a proper and law-abiding person," the officer would recommend that the individual receive a permit. (J.A. 439.) Similar requirements were enacted in municipalities through-out New York State, among many other places. (*See*, *e.g.*, J.A. 475 (1880 Brooklyn ordinance); 478-479 (1891 Buffalo ordinance); 485 (1892 Syracuse ordinance); 482 (1892 Elmira ordinance); 493-494 (1905 Albany ordinance); 487 (1905 Troy ordinance); 491 (1913 Lockport ordinance).) *See also* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in* NYSRPA v. Bruen*?*,

49 Hast. Const. L.Q. 145, 168-170 & fig. 1 (2022) (identifying many other jurisdictions across the country with similar laws).[9]

The district court correctly acknowledged that requirements similar to the good-moral-character requirement are historically supported. (S.A. 103.) The court nevertheless erred in disregarding key historical evidence supporting the full scope of the good-moral-character requirement. For instance, the district court refused to credit the nineteenth-century city ordinances on which defendants relied insofar as they were not accompanied by similar state laws. (S.A. 94-95.) But that refusal overlooks that there are at least two important reasons that city ordinances are more common than state laws in the historical record. First, during the relevant time period, many States expected localities to regulate firearms. *See* Patrick J. Charles, *The Fugazi Second Amendment* 39 & n.179, 43 n.198 (2022) (forthcoming Clev. St. L. Rev.). Second, guns in crowded urban areas have always presented special public-safety considerations that are not present in sparsely populated rural areas, just as guns in

---

[9] *See also* <u>Br. of *Amicus Curiae* Patrick J. Charles in Supp. of Neither Party, Appendix, *Bruen*, 142 S. Ct. 2111 (No. 20-843)</u> (linking to copies of dozens of these laws).

rural areas could be commonplace for reasons not applicable in cities, such as hunting. That is why firearm regulation has always varied across the country, and consistently been more stringent in cities. And it is why city ordinances, which could have been and were not checked by state legislatures, provide compelling evidence of the historical tradition of firearm regulation. *See* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013).

The district court also erred in discounting historical city ordinances on the ground that they purportedly governed only about 6% of the country and are therefore not "representative" of a tradition of firearm regulation. (S.A. 97-98.) The court identified this metric of representativeness for the first time in the preliminary-injunction ruling, thereby depriving defendants of an opportunity to address it. Indeed, the court used an entirely different metric in the TRO, requiring "three or more" historical analogs to justify a modern regulation. (S.A. 203-204.) Neither metric is required by *Bruen*; to the contrary, both run afoul of the Court's direction to apply

careful analogical reasoning rather than turn the revised Second Amendment framework into a regulatory straitjacket.[10] 142 S. Ct. at 2133.

The population-based analysis is flawed for other reasons as well. As "any professional historian or archivist will attest," the records of local ordinances that have survived, much less those that were accessible to defendants on the accelerated preliminary-injunction briefing schedule set by the district court, "are only a tiny fragment of the whole." *See* Charles, *Fugazi Second Amendment*, *supra*, at 42. Second, the district court did not consider some of the cities whose relevant ordinances defendants *did* proffer to the court. (*See, e.g.*, S.A. 95, 97 (calculating percentages without counting cities whose relevant ordinances were filed at J.A. 480-482, 486-494).) Third, only a small proportion of the country lived in cities when the cited ordinances were enacted—so 6% of the total

---

[10] The only support the district court offered (S.A. 98) for its population-based metric was a passing reference in *Bruen* regarding territorial laws governing less than 1% of the country, *see* 142 S. Ct. at 2154-55. Not only is this a much smaller proportion of the population than at issue here, but nothing in *Bruen* suggested that this reference was intended to create a categorical rule based on population data.

national population was in fact a large proportion of the population then living in cities.[11]

The district court also discounted historical laws from the seventeenth and early twentieth centuries, purportedly because they were too distant in time from the 1791 ratification and 1868 incorporation of the Second Amendment. (S.A. 94.) But these laws were precursors to, or additional consistent examples of, similar laws enacted shortly before or after the Second Amendment was ratified or incorporated. The Supreme Court recognized that evidence of a "long, unbroken line" of historical tradition that "prevailed up to the period immediately before and after the framing," is highly relevant, even if some of the evidence is older than the seventeenth century. *See Bruen*, 142 S. Ct. at 2136 (quotation marks omitted); *see also id.* at 2127 (Second Amendment "codified a right inherited from our English ancestors" (quotation marks omitted)).

---

[11] For instance, in 1870, less than 13% of the country lived in cities of at least 50,000 people, and in 1890 less than 19% lived in cities of at least 50,000. *See* U.S. Census, *Historical Statistics of the United States, Colonial Times to 1970*, Series A 57-72, at 12.

### 2. The requirement to identify an applicant's spouse and other adult coinhabitants is consistent with the historical tradition of firearm regulation.

The district court erred in finding that the CCIA's requirements that an applicant (i) identify and provide contact information for his or her current spouse or domestic partner and any adult coinhabitants, and (ii) disclose whether minors reside in the applicant's home are unsupported by the historical tradition of firearm regulation. (S.A. 106-108 (citing Penal Law § 400.00(1)(o)(i)).) These requirements allow a licensing officer to assess whether an applicant is law-abiding and responsible. Among other things, the requirements facilitate inquiries to the applicant's close associates for information relevant to the good-moral-character evaluation and assist in identifying red flags that may cast doubt on the applicant's ability to use firearms safely.[12]

The historical record amassed to date contains several examples of analogous provisions which allowed disarmament based on information

---

[12] It is particularly important to ensure that those in the applicant's home do not cast doubt on the applicant's ability to use firearms safely, because domestic violence is among the most common misuses of firearms. *See*, *e.g.*, *Torcivia v. Suffolk County*, 17 F.4th 342, 359 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 438 (2022).

obtained from or about an individual's close associates. For example, the founding-era Virginia law cited above required disarmament if a justice of the peace was "informed" that an individual was a member of a group deemed dangerous (and the individual refused a loyalty oath). (J.A. 279-284.) Later incorporation-era laws sometimes specifically required references who knew the applicant, for instance from neighbors, for the licensing officer to issue the license. (*See* S.A. 105 n.81 (citing example laws).)

The district court's conclusion (S.A. 107) that these laws are insufficiently similar because they do not require identification of spouses or coinhabitants and do not refer to minor children misses the point of *Bruen*'s analogical framework. *Bruen* "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. Even if the exact information requested by this provision is not "a dead ringer" for historical precursors, the laws are "relevantly similar" under *Bruen. See id.* at 2132-33. Specifically, the challenged CCIA provision authorizes the collection of the same kind of associate and reputational information used to inform disarmament and licensing determinations for centuries and uses that information for the

same purpose: to determine whether the applicant is law-abiding and responsible.

The district court was also incorrect to find (S.A. 107-108) these disclosure requirements unduly burdensome because, in its view, some of the requested information may be publicly available to the licensing officer from other sources. But *Bruen*'s suggestion that courts evaluate "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is a description of an analytical method used to evaluate similarities between historical and modern regulations. 142 S. Ct. at 2133. Nothing in *Bruen* authorizes a free-wheeling judicial inquiry into the burdens of a particular application requirement.

In any event, requiring an applicant to provide the licensing officer with publicly available information imposes no incremental burden on the applicant's Second Amendment rights; it merely saves the official the burden of searching for the information and avoids mistakes from inaccurate or outdated public information. Thus, contrary to the district court's unsupported assertion (S.A. 108), this requirement bears no resemblance to "abusive" or "exorbitant" wait-time or fee requirements which could,

in extreme circumstances, be viewed to "deny ordinary citizens their right to public carry," *Bruen*, 142 S. Ct. at 2138 n.9.

### 3. The requirement to identify recent social-media accounts is consistent with the historical tradition of firearm regulation.

The CCIA's requirement that applicants provide the licensing officer with a list of recent social-media accounts is likewise well supported by the historical tradition of officials assessing past conduct, associates, and reputation of persons seeking to carry firearms to confirm suitability. *See* Penal Law § 400.00(1)(o)(iv). In modern times, social media is critical to the accuracy of this assessment.

Research demonstrates that social media is a frequent forum for "leakage" previewing intent to use firearms to cause harm. *See, e.g.*, Amicus Br. of Dr. Jaclyn Schildkraut (Schildkraut Br.), *Antonyuk I*, No. 22-cv-734 (Aug. 17, 2022), ECF 27. For example, an investigative report found that shortly before the Uvalde, Texas, elementary school shooter acquired a firearm and killed 21 children and educators, he posted threats, gruesome videos and images, and other material reflecting a fascination

43

with school shootings on social media. (*See* J.A. 527, 554-556.)[13] Similar social-media leakage has become routine before tragic shooting events, *see* Schildkraut Br., *supra*, at 9-22.

The district court erred in finding a likelihood of success on the merits of plaintiffs' challenge to the social-media requirement on the theory that the historical laws identified by defendants were not sufficiently analogous. (S.A. 109-113.) *Bruen* emphasized that a nuanced analogical approach was necessary for firearm regulations "implicating unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. The development of social media is a quintessential dramatic technological change. And yet the "how and why," *id.* at 2132-33, of the social-media requirement remains the same as the historical regulations cited above: looking to past conduct, associates, and reputation to assess whether an applicant is law-abiding and responsible. The court's assumption (S.A. 110) that only a historical regulation requiring identification of nicknames, aliases, or pseudonyms would be sufficiently

---

[13] The same report also demonstrated coinhabitants' knowledge of the shooter's violent tendencies, supporting the CCIA's provision requiring identification of coinhabitants. (*See* J.A. 554-558.)

analogous is both too demanding under the Supreme Court's test, *see Bruen*, 142 S. Ct. at 2132-33, and off-base, in that social-media accounts are likely to provide more immediately accessible and valuable information about whether applicants are law-abiding and responsible than, for instance, an author's pseudonym would.

The district court's suggestion that the social-media requirement may present First or Fifth Amendment "concerns" because it "compel[s] speech" (S.A. 114) is equally mistaken. The law requires only that applicants identify the existence of recent social-media accounts, which is not speech, and which, as the district court recognized, may be publicly available information already. In addition, the court assumed that licensing officers would have "extraordinary discretion" to deny licenses based on "any hobby, activity, political ideology, sexual preference, or social behavior" reflected on social media. (S.A. 114.) However, the statute limits a licensing officer's review of social-media accounts "to confirm the information regarding the applicant[']s character and conduct" for purposes of the good-moral-character inquiry. *See* Penal Law § 400.00(1)(o)(iv). The court's concern that an individual licensing officer may misapply this requirement in a particular application is no basis to find a likelihood of

success on the merits of a facial challenge. Moreover, the only plaintiff who does not already have a license attested that his Facebook account (the only specific social-media account he identified) is on "'friends' only" mode. (J.A. 145.) The CCIA does not permit a licensing officer to see such restricted social-media accounts. *See* Penal Law § 400.00(1)(o)(iv); *cf. Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("speculative apprehensiveness" that government may access private information improperly cannot support constitutional claim).

### 4. The requirement to provide other information reasonably necessary and related to the review of a licensing application is consistent with the historical tradition of firearm regulation.

The CCIA's requirement that an applicant provide any "other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application," Penal Law § 400.00(1)(o)(v), is likewise justified by the longstanding tradition of regulations to ensure that those carrying firearms are law-abiding and responsible. See *supra* at 34-36. Accordingly, other States with licensing regimes approved in *Bruen* include similar provisions. *See*, *e.g.*, Ala. Code § 13A-11-75(d)(2) ("If the sheriff cannot determine whether [an enumer-

46

ated factor] applies to the applicant, the sheriff may request additional information from the applicant.").

The district court erred in finding that plaintiffs were likely to succeed on the merits of this challenge based on speculation that a licensing officer could require an applicant to "hand over the applicant's cell phone," or "provide a urine sample based on something as subjective as an opinion about the applicant's appearance." (S.A. 116.) The statute expressly limits the licensing officer to requesting information "reasonably necessary" to the license application. And the district court offers no explanation of why demanding cell phones and urine samples would be "reasonably necessary" to a license application.

The court's fanciful speculation provided no basis for finding the provision facially unconstitutional where, as here, there are many other undisputably valid applications of the provision. *See Salerno*, 481 U.S. at 745. Indeed, in the earlier TRO decision, the court itself recognized that there are valid applications of this provision—for instance, requests for "minor follow-up information from an applicant (such as identifying information)." (S.A. 211.) The court's prior analysis was correct.

## POINT II

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S SENSITIVE-PLACE PROVISIONS

The district court erroneously found that plaintiffs demonstrated a likelihood of success on the merits of their challenges to provisions barring firearms in certain statutorily identified sensitive locations, namely: (i) places providing behavioral-health or chemical-dependence care or services; (ii) places of worship or religious observation; (iii) public parks and zoos; (iv) airports, to the extent an individual is compliant with federal regulations, and buses;[14] (v) establishments serving alcohol;

---

[14] State defendants do not appeal the injunction as it applies to airports, or to privately chartered vans and buses, which are the only forms of ground transportation mentioned in the complaint (J.A. 48, 75) and in the district court's standing analysis (S.A. 57-63). The CCIA does not apply to private buses or vans. *See* Penal Law § 265.01-e(2)(n) (restricting firearms on "vehicle[s] used for *public* transportation or *public* transit" (emphasis added)). The scope of the provision is confirmed by the canons of *noscitur a sociis* and *ejusdem generis*, because the examples of transportation referenced in the relevant statutory provision are forms of public transportation; none are exclusively private transportation. *Cf. City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401-02 (2d Cir. 2008).

And the injunction does not apply to buses used in public transit. The district court correctly stated that "Metropolitan Transportation Authority buses are not an issue in this action." (S.A. 150 n.114.) Nothing

(*continued on the next page*)

(vi) theaters, conference centers, and banquet halls, and (vii) gatherings of individuals to collectively express their constitutional rights to protest or assemble. (*See* S.A. 123-166, 182-184 (discussing Penal Law § 265.01-e(2)(b),(c), (d), (n), (o), (p), (s)).)

These rulings were incorrect for several reasons.

## A. Plaintiffs Lack Standing to Challenge Several of the Sensitive-Place Provisions.

At the outset, plaintiffs lack standing to bring pre-enforcement facial challenges to several of the sensitive places at issue in this litigation. For example, the district court erroneously found that plaintiff Joseph Mann has standing to challenge the restriction governing "behavioral health[] or chemical dependance care or services," Penal Law § 265.01-e(2)(b), because Mann allegedly provides counseling to drug-addicted individuals in his church. (S.A. 26-27, 183.) Mann attested that his counseling is intended to encourage those he counsels "to seek help and voluntarily enter treatment"—not to provide the treatment that might be covered by

---

in the opinion suggests that plaintiffs had standing to challenge the restriction as to any public-transit system. In any event, the sensitive-place restriction on public transportation is lawful for the reasons discussed *infra* at 52-66.

the statute himself. (J.A. 181.) The district court nevertheless unjusti-fiably assumed that the statutory provision would reach his church counseling and improperly relieved Mann of the burden to show "actual or imminent, not conjectural or hypothetical" injury from the provision, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted).

Similarly, the district court erroneously found that Mann had standing to challenge the sensitive-place restriction on "banquet halls." Contrary to the district court's suggestion, Mann did not attest that "his church has a 'banquet hall'" (S.A. 70), but only that parishioners "often break bread together" and participate in "the Lord's Supper (the Sacra-ment)" in his church (J.A. 183). The court offered no explanation for how Mann could face a "credible threat of prosecution," *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016), under the CCIA provision governing "place[s] used for . . . performance, art[,] entertainment, gam-ing, or sporting events[,] such as . . . banquet halls," rather than the directly applicable provision governing places of worship, Penal Law § 265.01-e(2)(c), (p).

50

Likewise, the district court erroneously found (S.A. 76) that plaintiff Alfred Terrille's desire to attend a gun show in Albany gave him standing to challenge the sensitive-place restrictions on "conference centers," "banquet halls," and "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble," Penal Law § 265.01-e(2)(p), (s). The gun show had already occurred by the time of the preliminary-injunction decision (S.A. 69-70), and there was nothing in the record to show whether Terrille attended the show or was armed while doing so (S.A. 76-77). The district court failed to analyze whether the passage of the gun show mooted Terrille's claim or to explain how the prospective injunctive relief available in this action could redress Terrille's asserted injuries, beyond observing that if he had attended the gun show while armed he might still be subject to criminal prosecution (S.A. 77). Standing "is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (alteration and quotation marks omitted).

51

**B.    The Sensitive-Place Provisions Are Presumptively Constitutional.**

Even if plaintiffs have standing to challenge the sensitive-place restrictions, they have not shown that the provisions are likely unlawful, as required to support a preliminary injunction. The Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). New York's law forbidding carrying of firearms in designated sensitive places is thus presumptively lawful too. And, as with any legal presumption, it is plaintiffs' burden to rebut the presumption. But the district court never held plaintiffs to their burden—or even acknowledged the presumption established by the Supreme Court.

Instead, the district court erroneously assumed without meaningful analysis that the Second Amendment's text reaches every sensitive place covered by the CCIA that is open to the public. (*See, e.g.*, S.A. 124, 129, 135.) But that metric cannot possibly be correct because several of the exemplar sensitive places identified by the Supreme Court in *Bruen* are

quintessentially open to the public. *See* 142 S. Ct. at 2133 (identifying, e.g., courthouses and legislative assemblies). Moreover, the court compounded its error by relying on state statutory definitions of "public place" and "public facility" from unrelated contexts such as anti-discrimination law. (S.A. 124, 129, 135.) These definitions, which are context-specific, say nothing about the original meaning of the right to bear arms under the Second Amendment.[15]

## C.   The Sensitive-Place Provisions Are Consistent with the Historical Tradition of Firearm Regulation.

Whether sensitive places fall outside the scope of the Second Amendment altogether, *see Heller*, 554 U.S. at 626, or because the CCIA's sensitive-place regulations are "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2135, the provisions whose enforcement has been enjoined by the district court are constitutional. Although *Bruen* declined to "comprehensively define" sensitive

---

[15] The district court likewise misplaced its reliance on what it claimed to be a licensing officer's understanding of the word "public," referenced in *Bruen*. The cited reference from *Bruen* does not purport to define "public," much less to opine on the original meaning of the Second Amendment. (*See* S.A. 124 & n.93 (quoting *Bruen*, 142 S. Ct. at 2125).)

places for purposes of the Second Amendment analysis, it identified examples of places that have been considered sensitive for centuries—including courthouses, legislative assemblies, polling places, and schools—and invited States to regulate firearms in "*new* and analogous sensitive places." *See id.* at 2133. The sensitive places at issue in this case are all supported by the longstanding historical tradition of regulations in analogous locations.

### 1. There is a longstanding tradition of restricting firearm possession in sensitive locations.

Dating back to at least the fourteenth century in England, arms bearing has been prohibited in a wide array of sensitive places. The Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328), provided that Englishmen were generally not permitted to bring "force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers . . . upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." Likewise, a 1403 English law established that "no Man be armed nor bear defensible armor to Merchant Towns, Churches, nor Congregations in the same, nor in the Highways, in affray of the Peace."

4 Hen. 4, c. 29 (1403). A century later, the prohibition was extended to Wales, making it unlawful to bring dangerous weapons before any "church, fair, market, or other congregation." 26 Hen. 8, c. 6, § 3 (1534). Such laws made their way to America, where the colonies and then founding-era States regularly prohibited bearing arms in sensitive places such as "fairs or markets"[16] and election grounds.[17]

By the mid-to-late nineteenth century, many jurisdictions prohibited firearms in a broad range of sensitive places. An 1870 Georgia law prohibited firearms in places of public worship, courts, election precincts, "or any other public gathering in this State." (J.A. 608.) A Texas law the same year prohibited firearms in any "church or religious assembly," election precinct, school, ballroom, social gathering, place of public assembly, or "other place where persons are assembled for educational, literary or

_____

[16] (*E.g.*, J.A. 670 (1786 Virginia law).) *See* Francois-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (1792).

[17] (*See, e.g.*, J.A. 622 (1776 Delaware constitution); 623-624 (1787 New York law).) *See also* An Act to Regulate the Election of Members of the Legislative Council and General Assembly, Sheriffs and Coroners, in This State § 12 (Feb. 22, 1797), *Laws of the State of New-Jersey* 273, 276 (1821); Charles, *Fugazi Second Amendment*, *supra*, at 81 & n.387 (citing founding-era laws from several States prohibiting armed assemblies).

55

scientific purposes." (J.A. 602.) An 1883 Missouri law prohibited firearms in any courtroom, election precinct, school, or "place where people have assembled for religious worship" or "for educational, literary, or social purposes," or "other public assemblage of persons." (J.A. 611.) The Missouri law also prohibited firearm carrying while intoxicated (J.A. 611), as did an 1867 Kansas law and an 1872 Wisconsin law (J.A. 691, 694). An 1869 Tennessee law, an 1877 Virginia law, an 1889 Arizona law, and an 1890 Oklahoma law prohibited firearms in many of the same places. (*See* J.A. 605, 616-618, 620-621, 630.) The Arizona and Oklahoma laws also prohibited firearms in any "place where persons are assembled for amusement," "circus, show or public exhibition of any kind," and any place where liquor was sold. (J.A. 616-618; *see* J.A. 620-621.) Several cities across the country enacted similar restrictions, either prohibiting firearm carrying altogether within city limits, or in particular sensitive places. *See, e.g.*, Charles, *Fugazi Second Amendment*, *supra*, at 88-90 & n.419 (citing several example laws). (*See also* J.A. 671-689, 748-766 (mid-to-late nineteenth century city regulations banning firearms in public parks).)

During these time periods, state high courts repeatedly confirmed the constitutionality of sensitive-place restrictions and rejected Second

Amendment challenges to various provisions. For example, the Texas Supreme Court found it "little short of ridiculous" to claim a right to carry "into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1871); *see also Owens v. State*, 3 Tex. App. 404, 407 (Tex. Ct. App. 1878) ("no excuse" for "wearing deadly weapons to church, or in a ball-room, or other places mentioned" in Texas's statute, because "lives of innocent people there assembled [may be] placed in jeopardy").

The Georgia Supreme Court elaborated: "carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). The Tennessee Supreme Court similarly held that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them." *Andrews v. State*, 50 Tenn. 165, 182 (1871); *see also Wilson v. State*, 33 Ark. 557, 560 (1878) ("No doubt in time of peace,

persons might be prohibited from wearing war arms to places of public worship, or elections, etc."). And the Missouri Supreme Court found that regulation of "an intoxicated person" with firearms and a public "assemblage of persons with one of the prohibited instruments" is "in perfect harmony with the constitution," given the associated threat to "personal security" and risk of "lawlessness." *State v. Shelby*, 90 Mo. 302, 305-06 (1886).[18]

### 2. The historical record amassed to date identifies at least three categories of sensitive locations.

An analysis of the historical record amassed to date shows that sensitive-place restrictions have traditionally served several purposes. While the categories of historical justifications for sensitive-place restric-

---

[18] Although some of the state courts referenced here did not recognize the Second Amendment to apply against the States in the nineteenth century, their States typically had state constitutional provisions analogous to the Second Amendment, and the courts decided these cases pursuant to those state constitutional provisions. Because the courts typically held "that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the Federal and State Constitutions," *e.g.*, *Andrews*, 50 Tenn. at 177, the courts' understanding of the analogous state constitutional provisions sheds important light on contemporary understandings of the Second Amendment, as well as its state analogs.

tions discussed below are by no means exclusive or exhaustive, they are sufficient to resolve the legal questions presented in this case.

First, the Second Amendment has long been understood to yield to other fundamental rights in sensitive places intended for the exercise of such rights. As the Georgia Supreme Court explained, any one constitutional "guarantee is not to swallow up all others," but rather "to be construed reasonably" by reference to the "other rights guaranteed to the people." *Hill*, 53 Ga. at 477. Restrictions on the right to bear arms in locations such as places of worship, voting places, courthouses, and legislative assemblies have long been deemed appropriate because "[t]he right peaceably to meet and worship God, or to vote for public officers, or to do any other public duty, are rights just as sacred, just as solemnly guaranteed, and just as necessary for the existence of a free state as the right to bear arms, and either of them is seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle." *Id.* at 478.

Second, there is an extensive tradition of regulating firearms to protect vulnerable populations and to prevent potential harms caused by firearms in the hands of impaired people. In early America, for example,

children and vulnerable and impaired adults were excluded from the
"people" permitted to serve in militias, and to carry firearms. (*See, e.g.*,
J.A. 636 (1837 Massachusetts law excluding those under 18, those who
are not "able-bodied," and "idiots, lunatics, [and] common drunkards"
from the militia); 641 (similar 1837 Maine law); 644 (similar 1843 Rhode
Island law).) A leading nineteenth century treatise called the exclusion
of "infant[s]," "idiot[s]," and "lunatic[s]" from "the people" permitted to
carry firearms as "almost universal[]." Thomas M. Cooley, *A Treatise on
the Constitutional Limitations Which Rest Upon the Legislative Power of
the States of the American Union* 30 (2d ed. 1871). And, as described
above (at 55-56), many incorporation-era laws prohibited firearms in
places with concentrations of children, such as schools, and among
intoxicated people. (*See, e.g.*, J.A. 602, 611, 616-618, 620-621, 633-634,
691, 694.)

Third, the tradition of prohibiting firearms in crowded locations
dates to medieval English laws prohibiting arms in fairs and markets to
prevent "affrays of the peace" and remained consistent throughout the
colonial, founding, and Reconstruction eras. See *supra* at 54-58. The
reason for these longstanding regulations is self-evident: crowds create

risks of mass injury and death from shootings, and, even if there is no shooting, from chaos that may follow firearm-related fears and threats. In addition, self-defense is often not feasible or safe in crowds, just as it may not be for vulnerable or impaired people.

3.    **The sensitive-place provisions at issue in this appeal are consistent with the historical tradition of firearm regulation.**

Each of the sensitive-place regulations at issue in this appeal serves at least one of the traditional purposes described above, and several provisions serve more than one purpose. In other words, New York's laws are relevantly similar to the historical tradition of firearm regulation in the ways recognized by *Bruen*. *See* 142 S. Ct. at 2132-33.

First, several of the sensitive-place restrictions at issue protect the exercise of other fundamental rights by restricting firearm possession on the premises. These include restrictions on firearms in places of worship, "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble," and public parks where such gatherings

often happen.[19] Penal Law § 265.01-e(2)(c)-(d), (s); *see also* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466-70, 475-78 (2019) (identifying all three of these places as sensitive places appropriate for firearm restrictions).

Second, several of the sensitive-place restrictions at issue pertain to locations with concentrations of vulnerable or impaired people who either cannot defend themselves or cannot be trusted to have firearms around them safely. These include restrictions on firearms in places where children are frequently present, such as public parks and zoos;[20] locations providing drug-addiction or behavioral-health services; and bars and restaurants where alcohol is consumed, and thus intoxicated people are typically present. Penal Law § 265.01-e(2)(b), (d), (o).

Third, several of the sensitive-place restrictions at issue pertain to quintessentially crowded places, such as banquet halls, conference centers,

---

[19] The restriction on firearms in government-owned public parks is independently lawful because the government may restrict firearms on its own property just as other private property owners may. *See, e.g.*, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019).

[20] Contrary to the district court's unsupported suggestion that children are not predominant zoo visitors (S.A. 144), nearly 70% of zoo visitors are parties with children. *See Visitor Demographics*, Ass'n of Zoos & Aquariums.

and theaters. *See id.* § 265.01-e(2)(p). Other sensitive places addressed above, such as gatherings for public protest, places of worship, bars and restaurants serving alcohol, public parks, and zoos also are often crowded. *See id.* § 265.01-e(2)(c)-(d), (o), (s). Not only are these regulations consistent with the historical tradition of restricting firearms in crowded locations such as fairs or markets, but the risks presented by the presence of firearms in crowded locations have only increased in modern times given developments in firearm technology.

The district court erroneously concluded that plaintiffs were likely to succeed on the merits of their challenges to these sensitive-place restrictions by applying a rigid and inflexible historical methodology. In so doing, the court flouted *Bruen*'s clear direction to take a "nuanced approach" to "cases implicating unprecedented societal concerns or dramatic technological changes," to apply the Constitution "to circumstances beyond those the Founders specifically anticipated," and to engage in careful analogical reasoning based on "well-established and representative historical analogue[s]," rather than demanding "historical twin[s]." 142 S. Ct. at 2132-33 (emphasis omitted).

63

For example, the district court ignored the obvious parallels between historical sensitive-place restrictions aimed at protecting children and the CCIA's restriction on firearms in zoos. Instead, the court searched in vain for historical regulations specific to zoos at a time when few zoos existed, and those that did were often located within parks where firearms were already prohibited (*see, e.g.*, J.A. 671-689, 748-766). (S.A. 142-144.) Likewise, rather than recognize the relevant similarities between historical restrictions on firearms in places with concentrations of vulnerable and impaired people and the CCIA's restriction on firearms in behavioral-health and addiction facilities, the court demanded examples of historical regulations specific to similar healthcare facilities. (S.A. 128.) That is precisely the search for historical "dead ringer[s]" that *Bruen* counseled against. 142 S. Ct. at 2133.[21]

The district court also employed arbitrary criteria to discount most of the historical evidence offered by defendants. For example, the court

---

[21] In any event, historical regulations governing behavioral-health-type facilities did exist. *See, e.g.*, <u>Buffalo State Asylum for the Insane, *Rules & Regulations* 13, 15 (1888)</u> (prohibiting patient access to weapons); <u>New York State Lunatic Asylum, Utica, *Rules, Regulations & By-Laws* 25-26 (1866)</u> (similar).

again relied heavily on a misguided calculation of the percentage of the national population governed by particular historical regulations. (*See, e.g.*, S.A. 126, 131, 139, 142, 157, 161.) As explained (*supra* at 38), this criterion is inherently misleading because the exemplars identified to date almost certainly represent only a subset of the relevant historical regulations. In any event, it is in the nature of federalism that firearm regulation might vary by jurisdiction to address local conditions and preferences. The court failed to account for the possibility that a significant percentage of the population for whom firearm regulation was a salient concern was subject to the type of provisions described above.

The district court likewise irrationally cast aside every territorial law cited by defendants, as well as all post-1889 firearm regulations. (S.A. 131, 137, 147-148, 153, 156, 160.) As explained (*supra* at 39), such laws shed ample light on the meaning of the Second Amendment where, as here, they are part of an ongoing historical tradition and are consistent with state and municipal laws dating from the founding and Reconstruction eras.

The district court further missed the mark in discounting city regulations prohibiting firearms in parks where defendants failed to

identify comparable statewide laws. (S.A. 137.) Statewide regulation of specific sensitive locations was often unnecessary in States that either barred public carry outright or were home to cities with municipal restrictions that would have rendered statewide site-specific regulation superfluous. *See* Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. I.-60, I.-66-67 & n.40 (2022). See also *supra* at 36-37.

Moreover, public parks developed in the nineteenth century as largely municipal institutions. Most state park systems were not established until the twentieth century, so it is no surprise that many early regulations of firearms in parks were from cities.[22] In any event, the court also unreasonably disregarded statewide laws prohibiting firearms in places where people gathered for amusement, social, educational, or other purposes (see *supra* at 55-56)—that is, places such as parks.

––––––––––––––––––

[22] *See* Margaret Walls, Res. for the Future, *Parks and Recreation in the United States: Local Park Systems* 1-2 (June 2009); Margaret Walls, Res. for the Future, *Parks and Recreation in the United States: State Park Systems* 1-2 (Jan. 2009). The federal government prohibited firearms in national parks shortly after they were established at the end of the nineteenth century. *See* Nat'l Park Serv., Firearms Regulations in the National Parks: 1897-1936 (May 2008).

### 4. The district court's speculation about hypothetical applications of the sensitive-place restrictions is unavailing.

As with the CCIA's licensing restrictions (see *supra* at 30-32, 45-47), the district court erroneously found a likelihood of success on the merits of plaintiffs' facial constitutional challenges to various sensitive-place restrictions based on unsupported speculation about unlikely applications of those provisions.

For example, the court posited that the CCIA could prohibit a pastor like plaintiff Mann from carrying a firearm in his parsonage home connected to his church or bar security officers from carrying firearms in a place of worship. (S.A. 133-134.) To the contrary, nothing in the CCIA prohibits carrying a firearm in one's home merely because the home is connected to a church, and the law has an express exception permitting security guards to carry firearms in all sensitive locations including places of worship. *See* Penal Law § 265.01-e(2)(c), (3)(e). The court likewise mistakenly surmised that the places-of-worship provision might implicate the right to religious exercise, a claim that no plaintiff asserted. (S.A. 134.) The CCIA does not preclude or hinder anyone from participating in religious services.

67

The district court similarly speculated that the prohibition on firearms in public assemblies could be stretched to prosecute someone carrying a firearm who unintentionally "find[s] himself . . . in the middle of a protest." (S.A. 163-165.) But the statute prohibits carrying in a sensitive place only if the person "knows or reasonably should know such location is a sensitive location." Penal Law § 265.01-e(1). And if someone were nevertheless prosecuted in this unlikely scenario, facial relief still would not be warranted. As the court acknowledged (S.A. 165), the statute has a plainly legitimate sweep at least as applied to persons carrying firearms into protests for purposes of intimidation.

Finally, the district court questioned whether the restriction on firearms in places that serve alcohol could lawfully preclude firearm carriage by patrons who are not drinking. (S.A. 153-155.) The answer to the court's query is yes, because bars and restaurants are dangerous places for anyone to have firearms when there are intoxicated people present. But, regardless, plaintiffs cannot possibly prevail on a facial constitutional challenge when, as the court acknowledged (S.A. 154), the statute could lawfully apply to patrons who are drinking.

## POINT III

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S PRIVATE-PROPERTY PROVISION

The district court erroneously found that plaintiffs demonstrated a likelihood of success on the merits of their challenges to the CCIA provision that prohibits carrying firearms onto others' private property without the proprietor's express consent. *See* Penal Law § 265.01-d(1).

These rulings were flawed for several reasons.

### A. Plaintiffs Failed to Establish a Likelihood of Success on Their Second Amendment Challenge.

#### 1. Plaintiffs lack standing to challenge the private-property provision on Second Amendment grounds.

In finding that two plaintiffs had standing to challenge the private-property provision on Second Amendment grounds, the district court credited allegations that those plaintiffs intended to "carr[y] concealed in privately owned, open-to-the-public locations," which the court predicted would likely "result in a complaint from a concerned citizen." (S.A. 84.) But, as plaintiffs concede, whether to allow guns on private property "is up to a property owner." PI Mem. at 30. Moreover, it is undisputed that

a person wishing to enter private property bearing a firearm can seek and obtain consent, subject to the independent sensitive-place restrictions.

Article III authorizes a federal court "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). And "under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (citation and quotation marks omitted). In this case, an injunction against defendants cannot vindicate plaintiffs' asserted desire to carry guns onto others' property. Any inability to do so would flow not from defendants' enforcement of the CCIA, but rather from decisions by property owners or lessees about whether to allow guns on the premises and when and how to convey that determination.

**2. The Second Amendment does not bestow a right to carry firearms onto others' private property absent consent.**

Even if plaintiffs had standing to challenge the private-property provision, their challenge would fail. The Second Amendment protects a right to keep and bear firearms for self-defense in one's own home, *see Heller*, 554 U.S. at 628-29, and often in public, *Bruen*, 142 S. Ct. at 2134. But the Supreme Court has never held that the Second Amendment provides a right to bear arms on *others' private property*—the only locations governed by the private-property provision. Accordingly, the district court correctly recognized that restricting firearm carrying on others' private property that is not open to the public does not implicate the Second Amendment. (S.A. 173.) However, the court reached the opposite conclusion for carrying on private property that is open to the public. The court purported to identify "little historical precedent" for restricting carrying on private property open to the public. (S.A. 167.) But that conclusion skipped a step: the district court did not analyze whether the Second Amendment's text as historically understood enshrines a right to carry a gun in businesses on others' private property in the first instance. (*See* S.A. 123-125.) That failure alone precludes entry of a

preliminary injunction on the private-property provision. See *supra* at 29 (citing *Bruen*, 142 S. Ct. at 2126).

Moreover, if the court had conducted the requisite analysis, it would have found that the Second Amendment does not provide a right to bear arms on others' private property, even if that property is open to the public. The Eleventh Circuit's opinion in *GeorgiaCarry*, 687 F.3d 1244, is squarely on point. At issue in *GeorgiaCarry* was a state statute that restricted carrying handguns into places of worship that were open to the public, without notifying security or management on arrival and following any instructions for securing the weapon. The Eleventh Circuit rejected a facial challenge to that measure, holding that the Second Amendment, properly understood, did not encompass "a right to bring a firearm on the private property of another against the wishes of the owner." *Id.* at 1261. On the contrary, a private property owner has the categorical right to decide "whether to allow firearms on its premises and, if so, under what circumstances." *Id.* at 1266. The court based this determination on an exhaustive survey of the "historical background" and "scope of any pre-existing right to bear arms on the private property of another." *Id.* at 1261, 1264-66. And that analysis hewed to *Bruen*'s first

step: the Eleventh Circuit decided that the restricted activity is not "protected by the Second Amendment in the first place.'" *Id.* at 1261 n.34.

There is no reason to depart from *GeorgiaCarry*'s conclusion here. This provision of the CCIA merely protects private property owners' right to decide when to allow firearms on their property, by selecting a default rule that enables property owners to know when someone intends to carry a concealed weapon—namely, by requiring someone carrying concealed to seek express consent—and to make an informed determination about whether to allow it. By contrast, a default rule permitting concealed carrying unless expressly forbidden deprives private property owners of the opportunity to know who is carrying concealed, and to decide whether to consent. In addition, the CCIA's no-carry default honors public expectations; a statistically significant majority of Americans reject a default right to carry weapons onto others' property, including retail establishments and businesses. Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L., Med. & Ethics 183, 189-90 (2020).

### 3. The private-property provision is consistent with the historical tradition of firearm regulation.

The district court separately erred in concluding that the private-property restriction has an insufficient historical pedigree. (*See* S.A. 166-172.) During the period from the colonial era to the incorporation era, there was a long and well-established tradition of state laws that forbade carrying guns onto others' property without their permission. Relevant precursors include colonial and founding-era laws from New York (1763), New Jersey (1722 and 1771), Pennsylvania (1721), and Maryland (1715), and incorporation-era laws from Louisiana (1865), Texas (1866), and Oregon (1893). (J.A. 697-698, 702, 706, 710, 712, 721, 727, 733.) None of these statutes distinguished between private property open to the public, and private property that was closed to the public. Instead, the statutes broadly prohibited, for example, a person's carrying a gun without express consent on "any Lands not his own, and for which the Owner pays Taxes" (J.A. 712), or to "the premises or plantations of any citizen" (J.A. 721).

These laws spanned more than a century and a half and were enacted in many parts of the nation. Yet they are all "relevantly similar" to the CCIA's private-property provision, *Bruen*, 142 S. Ct. at 2132, in

74

effectively making carrying firearms onto others' property a trespass unless consent is obtained. The district court's conclusion that these statutes failed to evince a "representative" tradition of analogous firearm regulation (S.A. 171) rested on at least two errors.

First, the district court erroneously construed all but two of the cited historical statutes to be mere "anti-poaching laws" and thus dissimilar to the CCIA. (S.A. 167-171.) However, some of the statutes did not mention hunting at all, and those that did also barred carrying guns more generally on others' property without consent. (*See* J.A. 697 (prohibits "carry[ing] any gun"); 702 ("be[ing] seen to carry a gun"); 706 ("carry[ing], shoot[ing], or discharg[ing] any Musket, Fowling-Piece, or other Fire-Arm whatsoever"); 710 ("carry[ing] any Gun"); 712 ("carry[ing] any Gun"); 721 ("carry[ing] fire-arms"); 727 ("carry[ing] firearms"); 733 ("being armed with a gun, pistol, or other firearm").) These broad prohibitions were accompanied by broad purposes, beyond preventing poaching. For instance, New York's law expressed an intent to remedy "the great Danger [to the Lives of his Majesty's Subjects" imposed by guns on others' property—the same danger the CCIA's private-property provision intends to remedy. (J.A. 705.) In any event, refusing to consider close historical analogs

75

because they served in part a now-largely-anachronistic anti-poaching purpose defies *Bruen*'s admonition that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868"—and need not be to justify analogous modern regulation. *See* 142 S. Ct. at 2132.

Second, while acknowledging that prior New Jersey and Louisiana statutes could not "fairly be characterized" as "mere anti-poaching laws," the court improperly dismissed these laws because these States comprised only 4-5% of the national population when the laws were in effect. (S.A. 171-172.) That dismissal was inappropriate both because the court's percentage calculation excluded other States with relevant historical laws, and for many of the same reasons that the district court's population-based dismissal of historical analogs relevant to the licensing requirements and sensitive-place provisions was inappropriate. See *supra* at 37-38, 64-65.

## B.  The Private-Property Provision Does Not Compel Speech in Violation of the First Amendment.

The district court also mistakenly concluded that the private-property provision compels private property owners' speech in violation of the

76

First Amendment. (S.A. 173-180.) Although the First Amendment prohibits the government from compelling individuals "to mouth support for views they find objectionable," or "mandating that persons explicitly agree with government policy," *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020) (quotation marks omitted), the private-property provision does not compel property owners to speak *any* statement, much less one the speaker finds objectionable.

The provision places no obligation on property owners whatsoever. Rather, it requires *guests* not to carry firearms on others' private property if the property owner has not given some form of "express consent." Penal Law § 265.01-d(1). Property owners retain the right to give permission to bring firearms on their property (in written, verbal, or any other form), deny permission, or choose not to speak at all. The law therefore bears no relation to laws that have been held to compel speech, which obligate a person to make an affirmative statement or face punishment. *See, e.g., West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627 (1943) (resolution required students to repeat the pledge of allegiance or face expulsion); *Wooley v. Maynard*, 430 U.S. 705, 707 (1977) (law made it a criminal misdemeanor not to display license plate including state motto).

77

And, if property owners choose to express a message, it is one with which they agree—authorizing individuals to carry firearms on their property.

In any event, the private-property provision would be constitutional even if it somehow implicated the First Amendment. Because the provision regulates conduct (that is, carrying firearms onto others' private property absent express consent) rather than speech, it is subject only to intermediate scrutiny. *See Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 67 (2006). This standard is easily satisfied because the provision furthers substantial government interests unrelated to the suppression of speech and these interests would be achieved less effectively absent the regulation. *Id.* Specifically, the provision is aimed at protecting public safety and owners' right to have "their private property left alone by those who do not have permission to use it," *Jobe v. City of Catlettsburg*, 409 F.3d 261, 268 (6th Cir. 2005), and those interests would be insufficiently served if persons could enter private property (including a person's home) with a firearm without obtaining consent or even notifying the proprietor of the presence of a deadly weapon. *See also New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("substantial, indeed

compelling, governmental interest[] in public safety and crime prevention" is "beyond cavil" (quotation marks omitted)).

Even if the private-property provision were subject to strict scrutiny (as the district court erroneously held), it would survive that more stringent standard. Under strict scrutiny, a law must be narrowly drawn to serve a compelling governmental interest. *See, e.g.*, *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014). Here, the provision serves the compelling interests of promoting public safety and protecting citizens' constitutional right to limit access to their private property as they see fit. And the law is narrowly tailored to serve that goal: it goes no further than ensuring that firearm owners receive express consent before bringing a weapon onto private property. The district court was simply incorrect to conclude that New York's law did not "leave open the channel of required communication" through which consent could be obtained, such as inconspicuous signage, a call, a text message, or prior word at the front door. (S.A. 178-179.) Any of those methods would be available to New York property holders as a form of "express consent" authorized by the law. *See* Penal Law § 265.01-d(1).

## POINT IV

### THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS

The remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—also weigh overwhelmingly in favor of defendants. Plaintiffs have not met their heightened burden to prove irreparable harm outweighing the strong public interest in continued enforcement of the CCIA while the challenge is litigated. See *supra* at 20. The district court committed multiple legal errors in nevertheless granting a preliminary injunction.

First, the district court erred in dismissing an acknowledged risk of serious physical harm from the injunction. The district court previously recognized an "associational relationship between some lenient right-to-carry laws and violent crime." *Antonyuk I*, 2022 WL 3999791, at *36. And studies indicate that the relationship between such laws and increased injury and death is more than associational; it is causal. *See, e.g.*, Br. of Giffords L. Ctr. to Prevent Gun Violence as *Amicus Curiae* (Giffords Amicus Br.) at 6-11, *Antonyuk I*, No. 22-cv-734 (Aug. 17, 2022), ECF 30.

Among other things, the injunction here forbids defendants from enforcing the good-moral-character requirement, which has been in effect

for over a century and has supported the disqualification of domestic abusers and individuals subject to orders of protection.[23] And the injunction allows a license applicant to withhold multiple categories of information relevant to assessing an applicant's fitness to carry a firearm. As a result, concealed-carry licenses may be granted to people who cannot be trusted to use firearms safely. *See* Penal Law § 400.00(1)(b).

The injunction also bars the State from enforcing prohibitions on carrying firearms in numerous sensitive locations, increasing the chance that someone will carry a loaded gun into, for instance, a place of worship, nightclub, or concert—all locations of recent deadly shooting events. The presence of guns (including legally owned guns) can escalate commonplace disputes into dangerous confrontations. *See* Giffords Amicus Br., *supra*, at 12. Moreover, even with mandatory training, many people carrying guns will lack the tactical skills or judgment needed to use guns in self-defense, leading to accidental shootings of innocent bystanders and other lethal accidents. *Id.* at 11-12. Shooting deaths (intentional or inadvertent)

---

[23] *See, e.g.*, *Matter of Rucker v. NYC/NYPD License Div.*, 78 A.D.3d 535, 535 (1st Dep't 2010); *Matter of Cohen v. Kelly*, 30 A.D.3d 170, 170 (1st Dep't 2006).

in any place covered by the statute "could not be undone, thus rendering the consequences irreparable." *See Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 48 (2d Cir. 2020).

Second, the district court erred in failing to account for the rule that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people" like the CCIA, "it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). That rule applies even if the Legislature's statute does not implicate public-safety concerns, but is all the more important where, as here, the statute does. *See id.*

Third, the district court erred in failing to account for the fact that the purpose of a preliminary injunction "is only to preserve the status quo" during a lawsuit. *See Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (quotation marks omitted). Here, the injunction bars the enforcement of a statute that has already taken effect after a failed preemptive attack in *Antonyuk I*. See *supra* at 13-14. And given this Court's stay of the district court's subsequent preliminary injunction, the CCIA remains the status quo. There is no basis to reverse the status quo while the lawsuit is pending.

82

The district court's two-sentence discussion of the equities here (S.A. 180) was fundamentally flawed because it merely cross-referenced the court's (improper and wholly advisory) discussion of the equities in *Antonyuk I*—before the CCIA had taken effect. The district court may not rest its conclusion that the equities support a preliminary injunction blocking a statute that has already taken effect exclusively on an earlier conclusion that the equities supported a preliminary injunction that would have prevented the statute from taking effect in the first place.

Moreover, public agencies have devoted significant effort to implementing the CCIA and informing the public about it.[24] If the injunction is affirmed, these agencies will now need to communicate to the public that guns are allowed in many places where the public was already told guns are *not* allowed, only to potentially reverse themselves again once defendants have a full opportunity to defend the challenged provisions on the merits. The confusion and expense of relaying such shifting

---

[24] *See, e.g.*, N.Y. State Div. of Crim. Just. Servs., Frequently Asked Questions Regarding Recent Changes to New York State Firearm Laws (Aug. 27, 2022); City of New York, *Concealed Carry Firearm Laws in New York City* (Aug. 31, 2022).

information constitutes irreparable harm. *See, e.g.*, *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994).

Fourth, the district court improperly restrained and then enjoined enforcement of numerous CCIA provisions after giving defendants less than three weeks to oppose both a TRO and a preliminary injunction. (J.A. 6.) But, under *Bruen*'s revised standard for Second Amendment challenges, defending firearm regulations requires assembling materially analogous laws and policies from a wide range of sources, and often obtaining expert testimony from legal historians and other scholars. This historiography requires a "long and time consuming" process of locating and analyzing historical materials from scattered archives and other sources that cannot be completed in a matter of weeks. *See* Charles, *Fugazi Second Amendment*, *supra*, at 69; *see also GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1327 (11th Cir. 2015) (noting the difficulty of "undertak[ing] this historical inquiry on an accelerated preliminary injunction timeline"). Granting the preliminary injunction here was thus particularly inequitable on such a truncated timeframe, not befitting this weighty litigation.

Fifth, plaintiffs did not meet their burden to make a "strong showing" of imminent irreparable harm outweighing all the harms to the public resulting from the preliminary injunction. *See Actavis*, 787 F.3d at 650 (quotation marks omitted). The harms of exposing twenty million New Yorkers to heightened risk of gunfire in their daily routines, against the judgment of the state Legislature, and subjecting the State to confusing and costly efforts to implement and un-implement various CCIA provisions, severely outweigh any prejudice to plaintiffs from continued reasonable limitations on the locations where they may bring their guns while this litigation is pending. Five plaintiffs allegedly wish to carry guns into specific sensitive locations, such as a zoo in Syracuse and a community center in Albany. (*See* S.A. 41-42, 68-69.) These allegations do not warrant an injunction preventing defendants from enforcing the challenged CCIA provisions as applied to anyone, and anywhere in the State—an inequitable and dangerous remedy far beyond what could be necessary to address the individual harms alleged.

Accordingly, if the preliminary injunction is not reversed, it should at least be narrowed to apply only to plaintiffs. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs." *Kane*, 19 F.4th at 173 (quotation marks omitted). And a broader statewide injunction rewards forum shopping, which is a particular concern here, where plaintiffs steered their case to a judge who had broadcast opposition to the CCIA in *Antonyuk I* without any jurisdiction to do so. *See Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., joined by Thomas, J., concurring in grant of stay).

## CONCLUSION

The Court should reverse the district court's order granting a preliminary injunction.

Dated:  New York, New York
        January 9, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellants


By:  <u> */s/ Philip J. Levitz*   </u>
    PHILIP J. LEVITZ
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
PHILIP J. LEVITZ
ALEXANDRIA TWINEM
ERIC DEL POZO
  *Assistant Solicitors General*

28 Liberty Street
New York, NY 10005
(212) 416-6325

87

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 16,428 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1, and as authorized by this Court (ECF 89).

*/s/ Kelly Cheung*