# 22-2908-cv(L), 22-2972-cv(CON)

## United States Court of Appeals
### *for the*
## Second Circuit

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

– v. –

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police, MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## BRIEF OF *AMICUS CURIAE* GREATER NEW YORK HOSPITAL ASSOCIATION IN SUPPORT OF APPELLANTS

ADAM L. DEMING
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600

MARK D. HARRIS
MATTHEW J. MORRIS
PROSKAUER ROSE LLP
11 Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Amicus Greater New York Hospital Association is not a corporation with a parent corporation or corporations owned by a publicly held corporation. *See* Fed. R. App. P. 29(a)(4)(A).

Dated:  January 17, 2023

*/s/ Mark D. Harris*
Mark D. Harris

# **TABLE OF CONTENTS**

Table of Authorities ....................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................1

ARGUMENT .............................................................................5

I.      THE DISTRICT COURT ERRED BY REQUIRING PERFECT
        HISTORICAL ANALOGUES TO MODERN MEDICAL
        FACILITIES, WHICH DO NOT EXIST. .......................................5

        A.      *Bruen's* Historical Inquiry Is a Flexible One. .....................5

        B.      The District Court Applied *Bruen's* Analysis of Historical
                Analogues Too Narrowly. ...............................................6

        C.      Modern Hospitals Are Fundamentally Different from Hospitals
                in the Founding and Reconstruction Eras. ............................8

II.     THE MODERN HOSPITAL, WHICH SERVES A BROAD ARRAY
        OF PURPOSES, HAS MANY HISTORICAL ANALOGUES, ALL
        OF WHICH A PROPER SECOND-AMENDMENT ANALYSIS
        MUST CONSIDER. .........................................................12

        A.      Modern Hospitals Are Analogous to Educational Facilities
                Where Firearms Were Historically Regulated. ......................13

        B.      Modern Hospitals Are Analogous to Locations with Hazardous
                Conditions Where Firearms Were Historically Regulated. ...........20

        C.      Modern Hospitals Are Analogous to Behavioral-Health and
                Addiction-Treatment Institutions Where Firearms Were
                Historically Regulated. ...............................................24

III.    FIREARM PROHIBITIONS IN HOSPITALS WILL PROMOTE
        PUBLIC HEALTH AND SAFETY. .............................................28

CONCLUSION ..........................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)......................................................................16, 25

*New York State Rifle & Pistol Association v. Bruen*,
   142 S. Ct. 2111 (2022)...................................................................*passim*

STATUTES AND REGULATIONS

1 Annotated Statutes of Wisconsin, containing the General Laws in
   Force October 1, 1889 (1889)....................................................26

2 Gen. Stat. of the State of Kan. 353 (1897)....................................26

1782 Mass. Acts 119, ch. 46 § 1 ......................................................22

1784 Laws of N.Y. 627, ch. 28 .........................................................23

1870 Tex. Gen. Laws 63 ...................................................................16

1878 Miss. Laws 175 § 4 ..................................................................16

1878 N.H. Laws 612, ch. 270 § 2 .....................................................26

1878 Vt. Acts 30, ch. 14 § 3 .............................................................26

1879 R.I. Laws 110, ch. 806 § 3 .......................................................26

1880 Oh. Rev. St. 1654, ch. 8 § 6995 ..............................................26

1883 Kan. Sess. Laws 159 § 1 ..........................................................26

1883 Mo. Laws 76 ............................................................................16

1889 Ariz. Sess. Laws 16-17 ............................................................16

1897 Iowa Laws 1981, ch. 5 § 5135 .................................................26

2022 N.Y. Sess. Laws, ch. 371 § 4 ...............................................4, 6

iii

A Law for the Better Securing of the City of New York from the
Danger of Gun Powder (1763) ...............................................................23

Act of Aug. 27, 1746, 1746 Mass. Acts 208........................................................22

Act of Dec. 6, 1783, ch. CIV, 1783 Pa. Laws 161, ch. MLIX,
11 Pa. Stat. 209 .......................................................................................23

Act of Jan. 30, 1847, 1846–47 Va. Acts, ch. 79 ................................................22

Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274 ......................................23

Act of June 24, 1859, ch. LXXXII § 7, 1859 Conn. Pub. Acts 61 ..................23

Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261 ........................................22

Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78.............................22

Act of Oct. 14, 1713, 1713 Mass. Acts 291 .......................................................22

Act of Oct. 1672, 1672 Conn. Pub. Acts 3 ........................................................22

Fla. Stat. § 394.458 .............................................................................................31

Fla. Stat. § 916.1085 ...........................................................................................31

Ga. Code Ann. § 16-11-127(b)(5)........................................................................31

Mass. Gen. Laws 232, ch. 257 § 4 (1880) .........................................................26

Mass. Gen. Laws 484 (1776) ..............................................................................26

New Brunswick (N.J.) Common Council, *Gun-powder: an ordinance,
to prevent the storage, or otherwise keeping, within half a mile of
the line of buildings of this city, certain quantities of gunpowder*
(1813).......................................................................................................23

N.Y.C., N.Y. Act of Apr. 22, 1786, *reprinted in* The Daily Advertiser
(N.Y.C., N.Y. Dec. 30, 1788)..................................................................22

Rules, Regulations and By-Laws of the N.Y. State Lunatic Asylum at
Utica (1840) ............................................................................................27

Rules & Regulations of the Buffalo State Asylum for the Insane (1888)............................................................................27

Stats. of Okla., 1890 § 7...................................................................16

Tex. Penal Code Ann. § 46.03(a)(11)...............................................31

**OTHER AUTHORITIES**

Accreditation Council for Graduate Medical Education, *Data Resource Book: Academic Year 2021–2022* (2022)..........................15

Amanda Woods et al., *Chaotic video captures shooting at NYC hospital that left victim injured, ER in lockdown*, N.Y. Post, Jan. 25, 2022...............................................................................................2

Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. Nursing Sch. (2011), https://www.nursing.upenn.edu/nhhc/nurses-institutions-caring/history-of-hospitals/..............................................................9

Benjamin Franklin, A Collection of all the Laws of the Province of Pennsylvania: Now in Force (1742) ..............................................22

Boston Board of Fireworks, *An Act, Further Regulating the Storage, Safe Keeping, and Transportation of Gunpowder, in the Town of Boston, Together With the Rules and Regulations of the Firewards, Relative to the Same* (1821) ...............................................................23

Center for Health Workforce Studies, *Graduate Medical Education in New York: The Nation's Largest Supplier of Physicians* (forthcoming, Jan. 2023).................................................................15

Children's Hospital Association, Comparative Analysis of GME Funding Programs for Children's Hospitals and General Acute Care Teaching Hospitals (Mar. 24, 2022) ........................................15

Chris Clemens, *A Look Inside the Former 'New York State Lunatic Asylum at Utica,'* Exploring Upstate, June 20, 2015, https://exploringupstate.com/a-look-inside-the-former-new-york-state-lunatic-asylum-at-utica/.............................................................26

Cynthia A. Connolly, *Late-Nineteenth and Early-Twentieth Century Pediatrics*, Penn Nursing, https://www.nursing.upenn.edu/nhhc/home-care/late-nineteenth-and-early-century-pediatrics/ ............................................................................18

David B. Kopel *et al.*, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018).....................................................................................................17

David Oshinsky, *Bellevue: Three Centuries of Medicine and Mayhem at America's Most Storied Hospital* (2016).......................................8, 9

Dep't of Health & Human Servs., Center for Clinical Standards and Quality, *Memo: Workplace Violence-Hospitals*, QSO-23-04-Hospitals (Nov. 28, 2022)...................................................................29

E. Kanal & A. Shaibani, *Firearm Safety in the MR Imaging Environment*, 193(3) J. Radiology 875 (1994)...................................20

Ellen Barry, *Parents Often Bring Children to Psychiatric E.R.s to Subdue Them, Study Finds*, N.Y. Times, Dec. 27, 2022, https://www.nytimes.com/2022/12/27/health/children-emergency-room-mental-health.html ....................................................18, 25

*Evacuating & Sheltering Issues* (toolkit) (2022), GNYHA, https://www.gnyha.org/topic/evacuation-sheltering-issues/..............................21

Frontline, *Deinstitutionalization: A Psychiatric "Titanic"* (2005), https://www.pbs.org/wgbh/pages/frontline/shows/asylums/special/excerpt.html ............................................................................12

Gabor D. Kelen, M.D. et al., *Hospital-Based Shootings in the United States: 2000 to 2011*, 60(6) Annals of Emergency Med. 790 (Dec. 2012) ...................................................................................30

Helen Hughes Evans, *Hospital Waifs: The Hospital Care of Children in Boston, 1860–1920* (1995) ...............................................18

*Hundreds of patients killed in hospital fires due to accidents with oxygen during the pandemic*, Int'l Ass'n of Fire & Rescue Servs., Oct. 4, 2021, https://www.ctif.org/news/hundreds-patients-killed-hospital-fires-due-accidents-oxygen-during-pandemic ...................................21

I. Wouters & M. Mollaert, *Assessing 19th century 'fireproof' buildings*, 55 Transactions on the Built Envt. 221 (2001) .................................. 22

Jason Hanna & Amanda Watts, *Gunman who killed 4 at Oklahoma medical building had been a patient of a victim, police chief says*, CNN, June 2, 2022, https://www.cnn.com/2022/06/02/us/tulsa-hospital-shooting-thursday/index.html ................................................. 3

Jim Baumohl & William L. White, *Treatment Institutions* (2003), https://www.chestnut.org/resources/263e8c5e-6fed-4579-a129-349e2f6872b7/2003-History-of-Treatment-Institutions.pdf ............................ 11

Joseph R. Wax et al., *U.S. acute care hospital shootings, 2012-2016: a content analysis study*, 64(1) Work 77 (2019) ................................................ 30

Lauren Hoopes, *On the Periphery: A Survey of Nineteenth-Century Asylums in the United States*, Clemson Univ. TigerPrints (2015) .................... 27

Lenox Hill Hospital, Northwell Health, *Our History*, https://lenoxhill.northwell.edu/about ................................................................... 9

Kenneth M. Ludmerer, *Time to Heal: American Medical Education from the Turn of the Century to the Era of Managed Care* (1999) ............. 10, 14

Mara Laderman et al., *Tackling the Mental Health Crisis in Emergency Departments: Look Upstream for Solutions*, Health Affairs Blog (Jan. 26, 2018), https://www.healthaffairs.org/do/10.1377/forefront.20180123.22248/full/ .................................................................................................... 24

*Minutes of the Senatus Academicus 1799–1842* (Ga. Aug. 9, 1810) ...................... 16

N.Y. Academy of Medicine, *Records of City Hospital (Welfare Island, N.Y.), 1877–1961*, https://www.nyam.org/library/collections-and-resources/archives/finding-aids/ARC-0002.html/ ................................................ 8

NYC Health + Hospitals, Lincoln History: A Bronx Legacy, https://www.nychealthandhospitals.org/lincoln/history/ ...................................... 9

Paul Starr, *The Social Transformation of American Medicine: The Rise of a Sovereign Profession & the Making of a Vast Industry* (2d ed. 2017) ...................................................................... 9, 10, 12, 18

Press Release, Am. Psych. Ass'n, *Increased Need for Mental Health Care Strains Capacity* (Nov. 15, 2022), https://www.apa.org/news/press/releases/2022/11/mental-health-care-strains ...........................................................................25

Robert J. Spitzer, et al., *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) .................23

Robert E. Suter, *Emergency Medicine in the United States: A Systemic Review*, 3(1) World J. Emerg. Med. 5 (2012).....................................................10

Robin Hattersley-Gray, *Hospital Violent Crime Increased 47% Last Year*, Campus Safety (May 19, 2022), https://www.campussafetymagazine.com/news/hospital-violent-crime-increased-47-last-year ...............................................................29

Sonya Hamasaki et al., *Man who allegedly shot and killed two Dallas hospital employees was in the building to watch his son's birth, authorities say*, CNN, Oct. 24, 2022, https://www.cnn.com/2022/10/24/us/dallas-hospital-shooting-suspect-monday/index.html ...................................................................3

Talal Ansari, *New York City to Hospitalize Some Mentally Ill Homeless, Involuntarily If Necessary*, Wall St. J., Nov. 29, 2022, https://www.wsj.com/articles/new-york-city-mayor-announces-new-effort-to-tackle-homeless-mental-health-crisis-11669754489 .................25

Thomas S. Kirkbride, M.D., *On the Construction, Organization and General Arrangements of Hospitals for the Insane* (1854) ...............................27

U.S. Dep't of Labor – OSHA, Guidelines for Preventing Workplace Violence for Healthcare and Social Service Workers (2016) ...............19, 29, 30

U.S. Gov't Accountability Office, *Fireman Injuries: Health Care Service Needs and Costs*, GAO-21-515 (July 14, 2021), https://www.gao.gov/products/gao-21-515 .........................................................3

Univ. of Va. Bd. of Visitors Mins. (Oct. 4-5, 1824).......................................... 16-17

Weill Cornell Medicine, Samuel J. Wood Library, *Historical Timeline*, https://library.weill.cornell.edu/archives/historical-timeline .............................................................................................8

William Osler, M.D., *Aequanimitas: With Other Addresses to Medical Students, Nurses and Practitioners of Medicine* (1906)......................................14

## INTEREST OF *AMICUS CURIAE*

This brief of *amicus* Greater New York Hospital Association ("GNYHA") in support of Appellants is submitted with the consent of all parties.[*] GNYHA is a trade association comprising approximately 170 member hospitals and health systems in New York State, along with another 52 members in New Jersey, Connecticut, and Rhode Island. Most of GNYHA's acute-care hospitals are part of larger health systems, which may include children's hospitals and units, inpatient psychiatric facilities and units, nursing and rehabilitation centers, and outpatient facilities rendering primary and specialty care, including psychiatric and addiction treatment. Since its founding in 1904, GNYHA has sought to promote its member organizations' shared mission of rendering high-quality patient care, including by advocating for policies that foster a safe and effective environment for medical professionals to treat patients. Almost all of GNYHA's members participate in medical education by hosting undergraduate medical, nursing, and allied health students engaged in clinical observation and internships, as well as sponsoring graduate medical education (residency and fellowship) programs in a variety of

---

[*] This brief was principally authored by *amicus* along with Proskauer Rose LLP, counsel for *amicus*. No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money related to the preparation or submission of this brief. No person other than *amicus*, its members, and its counsel contributed money related to the preparation or submission of this brief.

specialties.  GNYHA regularly contributes *amicus* briefs on issues of importance to the hospital sector.

GNYHA submits this brief to help advance GNYHA's members' obligation to protect their patients, staff, and facilities from the threat of gun violence.  The Concealed Carry Improvement Act ("CCIA") includes a provision, which was partially enjoined by the district court below, that prohibits the possession of firearms in "location[s] providing health, behavioral health, or chemical dependence care or services."  GNYHA strongly urges the Court to vacate the district court's order partially enjoining this CCIA provision, as GNYHA members provide each of the statute's categories of care and services, often across different facilities.  It is vitally important to GNYHA's member institutions and their health care and educational missions that firearms remain prohibited in all such facilities.

## PRELIMINARY STATEMENT

On January 25, 2022, a man entered the emergency-department waiting room of the Jacobi Hospital in New York, removed a handgun from his coat, and shot a patient waiting there with whom he had previously been in an argument.[1] On June 2, 2022, a former patient who blamed his doctor for ongoing pain following surgery entered the physician's medical building on the Saint Francis

---

[1] Amanda Woods et al., *Chaotic video captures shooting at NYC hospital that left victim injured, ER in lockdown*, N.Y. Post, Jan. 25, 2022.

Hospital campus in Tulsa, Oklahoma, and murdered his doctor and three other people before turning his AR-15-style rifle on himself.[2]  On October 24, 2022, a man accompanied his girlfriend to a Dallas hospital for the birth of their child. After accusing his girlfriend of infidelity, he gunned down two maternity-ward employees as they entered the room to attend to his girlfriend and newborn son.[3]

These are not isolated incidents, but rather representative of the firearm violence experienced in hospitals nationwide in recent years.  Sadly, the modern American hospital is intimately familiar with the public-health risks firearms pose. In addition to treating tens of thousands of gunshot wounds each year in their busy emergency rooms,[4] hospitals have increasingly become target environments themselves.  The recent rise in gun violence comes as no surprise to healthcare workers, who are much more likely to suffer workplace violence than members of

---

[2] Jason Hanna & Amanda Watts, *Gunman who killed 4 at Oklahoma medical building had been a patient of a victim, police chief says*, CNN, June 2, 2022, https://www.cnn.com/2022/06/02/us/tulsa-hospital-shooting-thursday/index.html.

[3] Sonya Hamasaki et al., *Man who allegedly shot and killed two Dallas hospital employees was in the building to watch his son's birth, authorities say*, CNN, Oct. 24, 2022, https://www.cnn.com/2022/10/24/us/dallas-hospital-shooting-suspect-monday/index.html.

[4] *See* U.S. Gov't Accountability Office, *Firearm Injuries: Health Care Service Needs and Costs*, GAO-21-515 (July 14, 2021), https://www.gao.gov/products/gao-21-515.

any other profession.  Indeed, more than 70% of all reported workplace assaults occur in healthcare and social-service settings.[5]

Recognizing that guns greatly exacerbate the potential for and impact of this violence, the New York legislature passed the CCIA, which prohibits firearms in (among other places) "location[s] providing health, behavioral health, or chemical dependence care or services."  2022 N.Y. Sess. Laws, ch. 371 § 4.  But the district court below enjoined that provision in substantial part, reasoning that because it could not identify any analogous "laws from [the Founding or Reconstruction eras] prohibiting firearms in places such as 'almshouses,' hospitals, or physician's offices," that part of the CCIA did not pass muster under *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

*Bruen* compels a different result.  Acknowledging the need for flexibility in identifying historical analogues for *new* places and circumstances, the Supreme Court warned that historical analysis should not be "a regulatory straitjacket."  *Id.* at 2133.  Given the many functions modern hospitals serve, their historical analogues are not limited to almshouses and physician's offices, but also include educational settings like schools, mental and "inebriate" asylums, and facilities that housed dangerous substances and conditions—all places with robust, longstanding traditions of restricting firearms.  By failing to consider these analogues, the lower

---

[5] *See generally* Point III, *infra*.

court erred, stripping New York of the most direct and efficient means of protecting vulnerable patients and healthcare workers from gun violence: banning firearms in hospitals. With respect to the CCIA's prohibition on guns in healthcare settings, the court's injunction should be vacated, and the CCIA's provision given full effect.

## ARGUMENT

### I. THE DISTRICT COURT ERRED BY REQUIRING PERFECT HISTORICAL ANALOGUES TO MODERN MEDICAL FACILITIES, WHICH DO NOT EXIST.

#### A. *Bruen's* Historical Inquiry Is a Flexible One.

In *Bruen*, the Supreme Court outlined a flexible historical approach to analyzing firearm restrictions under the Second Amendment. *Bruen* held that New York's firearm-licensing regime's "proper cause" requirement infringed the right to bear arms. 142 S. Ct. at 2156. The Court pinpointed the key to analyzing such challenges as the identification of historical analogues for the challenged regulation from the relevant Founding and Reconstruction periods when the Bill of Rights was signed (1791) and the Fourteenth Amendment was ratified (1868), respectively. *Id.* at 2133. If the regulation has historical counterparts that are comparable in terms of the magnitude of and reasons for the burden they impose on Second Amendment rights, the regulation is permissible. *Id.*

The decision also made clear that "analogical reasoning under the Second Amendment is n[ot] a regulatory straitjacket." *Id.* Such reasoning requires only

5

that the government identify a well-established and representative "historical *analogue*, not a historical *twin*." *Id.* Thus, a law does not need to be a "dead ringer for historical precursors" to satisfy the Second Amendment. *Id.*

*Bruen* created a flexible analysis because the Court understood that not every modern location (or situation) has a perfect historical comparator. The Court therefore directed courts to use historical analogies "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

## B. The District Court Applied *Bruen's* Analysis of Historical Analogues Too Narrowly.

Among other provisions, the CCIA prohibits firearms in "any location providing health, behavioral health, or chemical dependence care or services." *See* 2022 N.Y. Sess. Laws, ch. 371 § 4 (hereinafter "CCIA Healthcare Provision"); Appellants' Special Appendix (S.A.) 25–33; 123–28. The court preliminarily enjoined the provision's firearm bans in the "public" areas of behavioral-health and chemical-dependence care locations as likely unconstitutional.[6] S.A. 128. The court applied *Bruen's* reasoning far too narrowly, however.

---

[6] With respect to locations providing "health" care or services, the court held that the plaintiffs lacked standing to challenge this portion of the law. *See* S.A. 25–33. This brief nevertheless addresses general health-care facilities as well as behavioral-health and chemical-dependency treatment centers.

The court first acknowledged the existence of a set of laws passed from 1837 to 1843 restricting those with "intellectual disabilities, mental health issues and/or alcoholism" from serving in state militias, but concluded that such laws burdened the right to bear arms less and were better justified than the CCIA Healthcare Provision. S.A. 127–28. Then, observing that both the "medical profession" and "gun violence" existed in eighteenth- and nineteenth-century America, the court stated that it had not located "any laws from those time periods prohibiting firearms in places such as 'almshouses,' hospitals, or physician's offices," and concluded that no historical regulations existed that could demonstrate that the CCIA Healthcare Provision was consistent with the Second Amendment. *Id.*

The court's assumption that eighteenth- and nineteenth-century almshouses, hospitals, and physician's offices exhaust potential historical analogues for the modern healthcare settings described in the CCIA gives short shrift to the evolution that hospital and other healthcare settings have undergone over the last 150 years. By adopting so narrow a concept of historical equivalence, the district court imposed precisely the kind of regulatory straitjacket that *Bruen* cautioned against. To declare a state's efforts to protect public health and safety unconstitutional requires more. A fuller examination of the various historical

---

As to "non-public" areas such as residential and treatment rooms, the Court held that they are not covered by the Second Amendment's plain text. S.A. 123–25.

comparators for the settings the CCIA regulated would have revealed a robust variety of analogues, each supporting the burden imposed by and justifications for the CCIA Healthcare Provision.

### C. Modern Hospitals Are Fundamentally Different from Hospitals in the Founding and Reconstruction Eras.

New York is home to some of the nation's oldest medical institutions. Bellevue Hospital claims its origins in "a small infirmary built in the 1660s for soldiers overcome by 'bad smells and filth,'" which was later replaced by a permanent almshouse constructed in 1736.[7]  New York Hospital followed in 1771, beginning as a refuge for wounded British troops during the Revolutionary War.[8] Still others closely followed—among them, City Hospital in 1832, which began as the penitentiary hospital for the prison occupying Roosevelt Island;[9] Lincoln

---

[7] David Oshinsky, *Bellevue: Three Centuries of Medicine and Mayhem at America's Most Storied Hospital* 13 (2016) (hereinafter "Oshinksy, *Bellevue*").

[8] *Id.*; Weill Cornell Medicine, Samuel J. Wood Library, *Historical Timeline*, https://library.weill.cornell.edu/archives/historical-timeline.

[9] N.Y. Academy of Medicine, *Records of City Hospital (Welfare Island, N.Y.), 1877–1961*, https://www.nyam.org/library/collections-and-resources/archives/finding-aids/ARC-0002.html/.

Hospital in 1839, founded as "The Home for the Colored Aged;"[10] and Lenox Hill

Hospital in 1857, founded as the "German Dispensary."[11]

     As their disparate origins indicate, these institutions' historical forebears

bore little resemblance to modern medical facilities.  Well into the nineteenth

century, most medical care was rendered in people's homes, and "hospitals"—like

some of their precursors, almshouses and dispensaries—were the last refuge for the

dying poor and other "undesirables."[12]  As one commentator remarked, "[l]acking

anesthesia, antisepsis, and X-rays, among other modern essentials, the hospital

resembled a poorhouse with a vaguely medical bent."[13]

     It was not until the late 1800s and early 1900s that the hospital as we know it

today began to take shape.  Due in part to the professionalization of nursing,

beginning with the establishment of nursing schools in New York, New Haven,

and Boston in 1873, and to the advent of antiseptic surgery in 1867, hospitals

---

[10] NYC Health + Hospitals, Lincoln History: A Bronx Legacy, https://www.nychealthandhospitals.org/lincoln/history/; *see also* Paul Starr, *The Social Transformation of American Medicine: The Rise of a Sovereign Profession & the Making of a Vast Industry* 158 (2d ed. 2017) (hereinafter "Starr, Social Transformation").

[11] Lenox Hill Hospital, Northwell Health, *Our History*, https://lenoxhill.northwell.edu/about.

[12] *See* Starr, *Social Transformation* at 150–52; Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. Nursing Sch. (2011), https://www.nursing.upenn.edu/nhhc/nurses-institutions-caring/history-of-hospitals/.

[13] Oshinsky, *Bellevue* at 46.

began to transition from the grim places they used to be into the more modern, medically-oriented facilities they are now.[14]  Mortality rates declined and surgery changed from a fast and violent last resort to a highly specialized, life-saving medical intervention with key advancements like the use of anesthesia beginning in 1846, the widespread adoption of antiseptic methods around 1880, and the development of X-rays in 1895.[15]  These developments gave rise to greater medical specialization and a new emphasis on acute care, laying the groundwork for some of the most notable features of today's hospitals, such as the modern emergency department staffed with specialists, which emerged in the 1960s.[16]

The modern hospitals that began to take shape at the turn of the twentieth century pursued a broader mission than their predecessors.  "[A]s the American hospital underwent its transformation from a sleepy domicile for the deserving poor into a large, bustling institution where scientific medical care was actively delivered, the hospital's involvement in medical education grew."[17]  Seeking to emulate the model of clinical instruction created with the opening of Johns

---

[14] Starr, *Social Transformation* at 154–55.

[15] *Id.* at 156–57.

[16] Robert E. Suter, *Emergency Medicine in the United States: A Systemic Review*, 3(1) World J. Emerg. Med. 5, 5–6 (2012).

[17] Kenneth M. Ludmerer, *Time to Heal:  American Medical Education from the Turn of the Century to the Era of Managed Care* 18 (1999) (hereinafter "Ludmerer, *Time to Heal*").

Hopkins Medical School in 1893, many medical schools developed partnerships with local hospitals over the ensuing decades.[18]  As the idea of "teaching hospitals" took hold, hospitals across the country grew more involved in medical education, providing internship and residency programs that became widespread following World War II.[19]  "As the modern hospital matured, teaching of all types occurred at virtually every institution."[20]

Modern hospitals have also broadened the types of patients they treat.  At the turn of the twentieth century, patients with addiction issues were lodged in "inebriate homes," and later "inebriate asylums."[21]  But the Prohibition movement of the early 1900s shut down most of these institutions, leading general hospitals to admit many such patients instead.[22]  The treatment of those with behavioral-health challenges followed a similar trajectory.  At the turn of the century, behavioral-health "asylums" reflected the single largest expenditure of American state governments, and these institutions' administrators wielded great political power.[23]

---

[18] *Id.* at 18–20.

[19] *Id.* at 80–88.

[20] *Id.* at 102.

[21] Jim Baumohl & William L. White, *Treatment Institutions*, 2–3 (2003), https://www.chestnut.org/resources/263e8c5e-6fed-4579-a129-349e2f6872b7/2003-History-of-Treatment-Institutions.pdf.

[22] *Id.* at 4–5.

[23] *Id.* at 2.

11

Yet, the deinstitutionalization movement of the mid-1900s and the introduction of major tranquilizers such as Thorazine, which made outpatient treatment of this population more practicable, led to an enormous decline in such institutions, and a resulting rise in numbers of behavioral-health patients in general acute-care hospitals and outpatient facilities.[24]

In sum, modern hospitals fulfill different purposes, provide a wider array of services, and serve more diverse populations than any single type of historical predecessor. As set forth below, those predecessors include not only almshouses (which the district court considered) but also schools, government facilities, storage locations for hazardous materials, and "asylums" for behavioral health and addiction treatment. The Second-Amendment analytical framework set forth in *Bruen* is sufficiently flexible to allow for—and in fact, require—the consideration of all of these historical analogues.

## II. THE MODERN HOSPITAL, WHICH SERVES A BROAD ARRAY OF PURPOSES, HAS MANY HISTORICAL ANALOGUES, ALL OF WHICH A PROPER SECOND-AMENDMENT ANALYSIS MUST CONSIDER.

The many functions of the modern hospital raise a number of historical analogues that the district court failed to consider. The hospital's role as the

---

[24] *See* Starr, *Social Transformation* at 365; Frontline, *Deinstitutionalization: A Psychiatric "Titanic"* (2005), https://www.pbs.org/wgbh/pages/frontline/shows/asylums/special/excerpt.html.

contemporary cornerstone of medical education affords apt analogies to primary and secondary schools. The presence of sensitive equipment and potentially hazardous materials evokes comparisons to sensitive storage facilities. And modern hospitals' increased treatment of patients with behavioral-health and addiction issues invites analogies to specialized institutions that used to house such populations. In each of those older locations, restrictions on possessing firearms were common and well established. Thus, those historical analogues are sufficient to sustain the CCIA Healthcare Provision.

### A. Modern Hospitals Are Analogous to Educational Facilities Where Firearms Were Historically Regulated.

Unlike the almshouses that the district court focused on, modern hospitals are key providers of medical education. The enterprise of medical education essentially developed alongside the modern concept of the American hospital.[25] From the turn of the twentieth century, hospitals became inextricably intertwined with medical education.

As Dr. William Osler remarked in his seminal 1903 essay, *The Hospital as a College*, which pushed for the widespread adoption of medical school–hospital partnerships like the one launched by Johns Hopkins Medical School, "[t]he radical reform needed is in the introduction into this country of the system of

---

[25] *See* Point I.C, *supra*.

13

clinical clerks and surgical dressers [medical students], who should be just as much a part of the machinery of the wards as the nurses or the house physicians."[26] Dr. Osler saw his reform implemented as internship and residency programs took root throughout the American healthcare system around the time of World War I, becoming widespread by World War II.[27]

Today, medical-education programs are a ubiquitous aspect of life throughout the United States' healthcare system. Hospitals serve as the principal clinical-education settings for medical students enrolled in medical schools. Medical students learn about basic science and clinical issues by participating as part of care teams in hospitals under the supervision and instruction of physicians. Nursing and allied health students similarly learn clinical skills and techniques as core parts of their education in hospital settings prior to graduation and eligibility for licensure or certification. Clinical rotations and residency training in core specialties that take place principally in hospitals are now required for residents (medical-school graduates), serving as prerequisites to medical licensure. Through this training, residents develop critical diagnostic expertise and procedural skills. Residents who aim to specialize further also pursue fellowships following

---

[26] William Osler, M.D., *Aequanimitas: With Other Addresses to Medical Students, Nurses and Practitioners of Medicine* 336 (1906).

[27] Ludmerer, *Time to Heal* at 80–88.

graduation from these core specialty programs, again under the supervision of experienced physicians. This past fiscal year, more than $15 billion in Medicare medical-education payments[28]—*i.e.*, payments designed to facilitate fellowship and residency programs—were made to hospitals to support more than 12,000 residency and fellowship programs across the United States.[29] And these numbers do not even account for hospitals with separate clinical-rotation programs.[30] New York hospitals train approximately 13% of all the residents and fellows in the country, and their programs serve as the training ground for more than 10% of the physicians in 20 different states.[31]

In comparing today's hospitals to the almshouses and hospitals of the eighteenth and nineteenth centuries, the district court ignored this critical role of the modern hospital. Because the mission of hospitals has fundamentally changed to emphasize medical education as much as medical treatment, the court should

---

[28] *See* Children's Hospital Association, Comparative Analysis of GME Funding Programs for Children's Hospitals and General Acute Care Teaching Hospitals 9 (Mar. 24, 2022), https://www.childrenshospitals.org/-/media/files/public-policy/ chgme_workforce/reports/chgme_dobson_davanzo_report_032422.pdf.

[29] Accreditation Council for Graduate Medical Education, *Data Resource Book: Academic Year 2021–2022*, 11 (2022), https://www.acgme.org/about-us/ publications-and-resources/graduate-medical-education-data-resource-book/.

[30] Clinical rotation programs are not limited to hospitals, and are frequently hosted in all of the settings identified by the CCIA Healthcare Provision.

[31] Center for Health Workforce Studies, *Graduate Medical Education in New York: The Nation's Largest Supplier of Physicians* (forthcoming, Jan. 2023).

have looked to another well-established historical "sensitive place" analogue—that of educational institutions.

Indeed, the court examined several such statutes from the relevant Reconstruction period in evaluating the constitutionality of the CCIA's "sensitive place" restriction prohibiting firearms in nursery schools and preschools. *See* S.A. 145–46 & n.112. Consistent with *District of Columbia v. Heller*'s acknowledgement of the "longstanding prohibition[]" on carrying firearms in sensitive places "such as … schools," 554 U.S. 570, 626 (2008), the court upheld that aspect of the CCIA, S.A. 146. Yet the plain language of the "sensitive place" statutes the court drew on concerned not just the education of young children or the especially vulnerable; they restricted the carrying of firearms *anywhere* that people assembled for "educational" or "scientific" purposes.[32] Several statutes also restricted *students* from carrying firearms, a restriction that would make little sense if the only concern were protecting those too young to protect themselves,[33] as the

---

[32] *See, e.g.*, 1870 Tex. Gen. Laws 63 (restricting carrying of firearms anywhere people "assemble[] for educational, literary or scientific purposes"); 1883 Mo. Laws 76 (same for "educational, literary or social purposes"); 1889 Ariz. Sess. Laws 16-17 (same for "amusement or for educational or scientific purposes"); Stats. of Okla., 1890 § 7 (same for "educational" purposes).

[33] *See* 1878 Miss. Laws 175 § 4 (restricting "any student of any university, college or school" from carrying concealed weapons); *Minutes of the Senatus Academicus 1799–1842*, at 86 (Ga. Aug. 9, 1810) (restricting students from keeping guns and other offensive weapons in or out of college); Univ. of Va. Bd. of Visitors Mins.

district court implied when it rejected the State's attempt to analogize to these laws to justify the CCIA Healthcare Provision. *See* S.A. 128 n.95.

Instead, laws prohibiting weapons in educational settings maintain the educational atmosphere free of the possible distractions, intimidation, and hazards associated with firearms and other weapons. The educational environment in a hospital is exactly the kind of atmosphere these laws were intended to protect. In hospitals and associated medical-educational settings, the open and unencumbered dissemination of accurate scientific information and instructions—sometimes touching on controversial topics like vaccine efficacy, family planning, triage decisions, and medical ethics—is critical to long-term educational aims.[34] Indeed, the justification for these restrictions is even stronger in the medical setting, where the ability for students and medical professionals to effectively communicate is a matter of patient health and safety.

Moreover, to the extent the historical educational-setting restrictions were justified because they protected a vulnerable group—children—the same is true in

---

(Oct. 4–5, 1824) (prohibiting students from keeping or using firearms or weapons "within the precincts of the university").

[34] Many similar historical firearm restrictions also exist for governmental facilities such as polling places, where there are parallel concerns regarding intimidation and free speech. *See* David B. Kopel *et al.*, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235–36, 244–47 (2018) (collecting Founding and Reconstruction-era statutes).

the modern hospital.  First, contrary to the district court's reasoning, *see* S.A. 128 n.95, there are ample reasons to believe that modern hospitals serve more children than their historical predecessors.  Hospitals of the Founding and Reconstruction eras "had been formed mainly to take care of people who did not fit into the system of family care."[35]  Children fit firmly within that system, and those who did not were generally attended to by orphanages and charities rather than hospitals. Whereas "few children received medical care in hospitals" in 1860, "[b]y 1920, the hospital was a common setting for child health care" due in large part to medical advancements and the accompanying change in perception surrounding hospitals they brought.[36]  The rise of pediatric care as a sub-specialty in the early 1900s furthered this trend,[37] as did the displacement of behavioral-health patients into outpatient and emergency-department settings.[38]  Thus, modern hospitals serve a

---

[35] Starr, *Social Transformation* at 151.

[36] Helen Hughes Evans, *Hospital Waifs: The Hospital Care of Children in Boston, 1860–1920*, iii (1995); *see also id.* at 8 (describing children as "rare" "on hospital wards").

[37] Cynthia A. Connolly, *Late-Nineteenth and Early-Twentieth Century Pediatrics*, Penn Nursing, https://www.nursing.upenn.edu/nhhc/home-care/late-nineteenth-and-early-century-pediatrics/.

[38] *See* Point II.C, *infra*; Ellen Barry, *Parents Often Bring Children to Psychiatric E.R.s to Subdue Them, Study Finds*, N.Y. Times, Dec. 27, 2022, https://www. nytimes.com/2022/12/27/health/children-emergency-room-mental-health.html (hereinafter "Barry, *Psychiatric E.R.s*").

larger proportion of the particular vulnerable population that these historic regulations protected.

Second, besides children, many hospital patients are also highly vulnerable and unable to protect themselves. Many suffer from illness or acute injuries, and they are often incapacitated as a result of their conditions or treatment. Further, they are in an environment where emotions run high, and where even those who are not patients experience immense stress. "Pain, devastating prognosis, unfamiliar surroundings, mind and mood altering medications and drugs, and disease progression can also cause agitation and violent behaviors."[39] Indeed, this high-pressure environment is part of the reason that healthcare workers are more likely to suffer from workplace violence than any other profession by a wide margin.[40]

In sum, the various historical laws restricting firearms in educational settings pose a comparable burden and a similar or weaker justification—protecting a single class of vulnerable individuals and safeguarding the spread of ideas in non-life-threatening situations—compared to the CCIA Healthcare Provision's coverage of healthcare settings where medical education has become one with

---

[39] U.S. Dep't of Labor – OSHA, Guidelines for Preventing Workplace Violence for Healthcare and Social Service Workers 4 (2016) (hereinafter "OSHA Guidelines"); *see also* Point III, *infra*.

[40] *Id.* at 3.

medical practice. The district court's unprecedented attempt to bifurcate "public" areas within hospitals where people must be permitted to carry firearms and private areas where they may not also fails under this analogue, as students, residents, and fellows travel through and occupy hospital and outpatient buildings together and with their instructors continuing the educational process, without regard to public-access distinctions. Accordingly, the CCIA Healthcare Provision can be upheld on this basis alone.

### B. Modern Hospitals Are Analogous to Locations with Hazardous Conditions Where Firearms Were Historically Regulated.

Another aspect of the modern hospital that sets it apart from historical health-care facilities is the presence of hazardous conditions and materials, which are necessary for advanced treatments that were not available during the Founding or Reconstruction eras.

For instance, sensitive equipment such as magnetic resonance imaging ("MRI") machines is used frequently in hospital and outpatient facilities.[41] Likewise, medical facilities often contain hazardous substances such as nuclear material, flammable gases, and volatile chemicals used for patient treatment, sanitization, and sterilization of medical environments. Such hazards can change

---

[41] *See, e.g.*, E. Kanal & A. Shaibani, *Firearm Safety in the MR Imaging Environment*, 193(3) J. Radiology 875 (1994) (finding that two out of six common handguns introduced into MRI environment for testing purposes discharged reproducibly due solely to magnetic field).

in unpredictable ways—for example, during the COVID-19 pandemic, a rash of fires broke out in hospitals across the globe as they stored large amounts of flammable oxygen to treat patients experiencing virus-related respiratory difficulties.[42] The introduction of a firearm into any of these locations would increase the danger exponentially.

Further complicating matters are the problems associated with evacuating hospitals and outpatient facilities in the event of an emergency. Evacuations are complex affairs potentially involving the cessation of surgeries in progress and the transportation of various life-support and drug-administration systems with patients, among other issues.[43] Introducing firearms into the mix further exacerbates all of the foregoing hazards and makes such evacuations more likely.

Though these specific hazards did not exist in the primitive eighteenth- and nineteenth-century predecessors of hospitals, similar dangers existed elsewhere and gave rise to strict safety restrictions. For instance, fire was an ever-present concern during the Founding and Reconstruction eras, when fire-resistant building

---

[42] *See Hundreds of patients killed in hospital fires due to accidents with oxygen during the pandemic*, Int'l Ass'n of Fire & Rescue Servs., Oct. 4, 2021, https://www.ctif.org/news/hundreds-patients-killed-hospital-fires-due-accidents-oxygen-during-pandemic.

[43] *See, e.g.*, *Evacuating & Sheltering Issues* (toolkit) (2022), GNYHA, https://www.gnyha.org/topic/evacuation-sheltering-issues/.

materials were less available.[44]  Many historical laws sought to address this hazard—for instance, placing restrictions on gunpowder and firearm storage and discharge—thus providing another compelling analogue for the CCIA Healthcare Provision.

Laws frequently targeted guns and gun powder as potential causes of these hazards.  A 1782 Massachusetts law forbade the keeping of loaded firearms in "any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building" and provided for their seizure by town "firewards."[45]  A 1786 New York City law similarly prohibited the discharge of guns anywhere in the city to prevent "fires and danger to houses, property, and persons," and many state laws adopted similar safety-based discharge restrictions.[46]

Gunpowder and firearm storage have also long been tightly regulated.  In 1763, New York City passed a local law forbidding the storage of certain

---

[44] *See* I. Wouters & M. Mollaert, *Assessing 19th century 'fireproof' buildings*, 55 Transactions on the Built Envt. 221, 225 (2001).

[45] 1782 Mass. Acts 119, ch. 46 § 1.

[46] N.Y.C., N.Y. Act of Apr. 22, 1786 *reprinted in* The Daily Advertiser (N.Y.C., N.Y. Dec. 30, 1788); *see, e.g.*, Act of Oct. 1672, 1672 Conn. Pub. Acts 3; Act of Aug. 27, 1746, 1746 Mass. Acts 208; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261; Act of Jan. 30, 1847, 1846–47 Va. Acts, ch. 79, at 67; Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78; *see also* Benjamin Franklin, A Collection of all the Laws of the Province of Pennsylvania: Now in Force 197–200 (1742) (concerning discharge restrictions in Philadelphia).

quantities of gunpowder within two miles of city hall, and state law imposed even broader restrictions within the city soon thereafter.[47]  An 1859 Connecticut law likewise subjected armories to regular inspection.[48]  Many other regulations put restrictions on gunpowder storage.[49]

These restrictions provide strong analogues to modern hospitals in terms of both burden and purpose.  Both these historical laws and the CCIA Healthcare Provision limit firearm possession in environments where risks to public health are already present.  The chief hazards that concerned Founding- and Reconstruction-era lawmakers were fire and other conditions presenting a heightened risk of collateral damage from firearm discharge, hazards that are also present in modern hospitals and outpatient settings, where medical equipment and potentially

---

[47] A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763); 1784 Laws of N.Y. 627, ch. 28.

[48] Act of June 24, 1859, ch. LXXXII § 7, 1859 Conn. Pub. Acts 61, 62; *see also* Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274–76 (appointing state gunpowder inspectors examine every storage and manufacturing site).

[49] *See, e.g.*, New Brunswick (N.J.) Common Council, Gun-powder: an ordinance, to prevent the storage, or otherwise keeping, within half a mile of the line of buildings of this city, certain quantities of gunpowder (1813); Boston Board of Fireworks, An Act, Further Regulating the Storage, Safe Keeping, and Transportation of Gunpowder, in the Town of Boston, Together With the Rules and Regulations of the Firewards, Relative to the Same (1821); Act of Dec. 6, 1783, ch. CIV, 1783 Pa. Laws 161, ch. MLIX, 11 Pa. Stat. 209 (concerning securing of Philadelphia from the danger of gunpowder); *see also* Robert J. Spitzer, et al., *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 80 (2017) ("Many early laws imposed storage restrictions on gunpowder ....").

hazardous substances are stored, many people congregate, and evacuation presents particular difficulties.  Nor do these conditions recognize the "public versus non-public" distinction the district court attempted to draw.  The various historical laws on gunpowder and firearm storage and discharge provide an independently sufficient basis to uphold the CCIA Healthcare Provision.

### C.    Modern Hospitals Are Analogous to Behavioral-Health and Addiction-Treatment Institutions Where Firearms Were Historically Regulated.

Last, two additional components of modern hospitals—the provision of specialized behavioral-health and addiction-treatment services—provide further historical analogues under *Bruen*.  The closure of "inebriate" and "insane" asylums arising from the Prohibition and deinstitutionalization movements, respectively, of the early-to-mid twentieth century pushed large patient populations toward general acute-care hospitals for treatment.[50]  This trend, in tandem with increasing demand for behavioral health services, has had an outsized impact on hospital emergency departments ("EDs") in particular.[51]  Because "EDs are one of the last remaining safety nets in the community," they are a refuge for those with behavioral-health

---

[50] *See* Point I.C, *supra*.

[51] *See* Mara Laderman et al., *Tackling the Mental Health Crisis in Emergency Departments: Look Upstream for Solutions*, Health Affairs Blog (Jan. 26, 2018), https://www.healthaffairs.org/do/10.1377/forefront.20180123.22248/full/.

and addiction challenges who are in crisis.[52]  As of 2018, "[o]ne in eight visits to

the ED [was] related to a mental health or substance abuse issue, a number that has

been increasing each year for the past decade."[53]  COVID has only exacerbated the

demand for behavioral-health services, leading to significant increases in those

seeking anxiety, depression, and substance-use treatment.[54]  While hospitals are

taking steps to address this crisis, one thing remains certain: the weight of

behavioral health and addiction services—especially for patients in crisis—will

continue to fall on the shoulders of hospitals for the foreseeable future.[55]

Hospitals' provision of these services evokes easy historical parallels with

another "longstanding prohibition," expressly acknowledged in *Heller*, on

possession of firearms among those with behavioral-health conditions.  554 U.S. at

626.  There are several historical examples of state laws prohibiting those with

---

[52] *Id.*; *see also* Barry, *Psychiatric E.R.s*.

[53] *Id.*  This trend will no doubt only accelerate as the behavioral-health impacts of COVID-19 continue to unfold.

[54] *See* Press Release, Am. Psych. Ass'n, *Increased Need for Mental Health Care Strains Capacity* (Nov. 15, 2022), https://www.apa.org/news/press/releases/2022/11/mental-health-care-strains.

[55] Government initiatives to address the behavioral health crisis also push many such patients toward acute-care hospital and outpatient settings.  *See, e.g.*, Talal Ansari, *New York City to Hospitalize Some Mentally Ill Homeless, Involuntarily If Necessary*, Wall St. J., Nov. 29, 2022, https://www.wsj.com/articles/new-york-city-mayor-announces-new-effort-to-tackle-homeless-mental-health-crisis-11669754489.

such conditions from serving in militias. *See* S.A. 126 (collecting laws). In addition, there are other analogous public-safety-based restrictions for these populations that the court failed to consider.[56] The CCIA Healthcare Provision likewise helps to restrict firearm possession among individuals with behavioral-health conditions.

Another category of regulations the court failed to consider was those at "asylums" before their widespread closure. For instance, from the time of its opening in the 1840s as one of the first government-run behavioral-health institutions in the United States,[57] the "New York Lunatic Asylum at Utica" had regulations that prohibited any dangerous weapon from being present and accessible to patients, and requiring attendants to monitor patients outside of the

---

[56] *See, e.g.*, 2 Gen. Stats. of the State of Kan. 353 (1897) (law passed in 1868 prohibiting, among others, "any person under the influence of intoxicating drink" from publicly carrying firearms and other weapons); 1883 Kan. Sess. Laws 159 § 1 (prohibiting transfer of "any pistol, revolver or toy pistol … or other dangerous weapons … to any person of notoriously unsound mind"); *see also* Mass. Gen. Laws 484 (1776) (providing that "committees of correspondence, inspection or safety" had power to disarm citizens based on their findings). Several Reconstruction-era laws also focused on prohibiting the possession of firearms where such possession was deemed to be a public safety concern. *See, e.g.*, 1878 N.H. Laws 612, ch. 270 § 2; 1878 Vt. Acts 30, ch. 14 § 3; 1879 R.I. Laws 110, ch. 806 § 3; 1880 Oh. Rev. St. 1654, ch. 8 § 6995; Mass. Gen. Laws 232, ch. 257 § 4 (1880); 1 Annotated Statutes of Wisconsin, containing the General Laws in Force October 1, 1889 at 940 (1889); 1897 Iowa Laws 1981, ch. 5 § 5135.

[57] *See* Chris Clemens, *A Look Inside the Former 'New York State Lunatic Asylum at Utica,'* Exploring Upstate, June 20, 2015, https://exploringupstate.com/a-look-inside-the-former-new-york-state-lunatic-asylum-at-utica/.

facility to ensure they do not "procure weapons."[58]  The "Buffalo State Asylum for the Insane" adopted the same rules upon its opening in the later 1800s.[59]  There is no reason to believe these regulations were unusual; indeed, the forefather of asylum design, Dr. Thomas Kirkbride, advised administrators to choose layouts "to avoid projections and sharp corners as much as possible, and any arrangement that would offer facilities for self-injury," and directed that "there should be little movable furniture … that could be used as weapons."[60]  If administrators worried over the risk of sharp corners and improvised weapons, one can only imagine how they would have viewed the presence of lethal firearms.

Today, patients with behavioral-health and addiction challenges seek medical attention across the continuum of care, whether they are suffering from acute or chronic conditions.  Often, they are in a state of crisis.  Upon seeking care, they confront the overwhelming conditions frequently present in busy EDs.  They may be admitted to an inpatient behavioral-health unit if their condition warrants it,

---

[58] *See* Rules, Regulations and By-Laws of the N.Y. State Lunatic Asylum at Utica §§ 8, 11 (1840) (forbidding attendants from leaving any "razor, pen-knife, rope, cord, medicine, matches or any dangerous weapon or article" within reach of a patient, and requiring patient monitoring outside the facility).

[59] *See* Rules & Regulations of the Buffalo State Asylum for the Insane § 7 (1888).

[60] Thomas S. Kirkbride, M.D., *On the Construction, Organization and General Arrangements of Hospitals for the Insane* 1–5 (1854).  Dr. Kirkbride's works set forth "the model [that] a majority of the asylums built over the next several decades followed." Lauren Hoopes, *On the Periphery: A Survey of Nineteenth-Century Asylums in the United States*, Clemson Univ. TigerPrints, at 32 (2015).

but they are more likely to receive outpatient care. And, of course, they may have comorbid conditions requiring other acute-care services, increasing the likelihood they will be cared for in general medical-surgical units and facilities.

The justifications for banning firearms from the modern hospital setting thus parallel those of the weapons bans in the earliest behavioral-health facilities in the country: they protect the patients from themselves, each other, and well-meaning third parties who may be unfamiliar with de-escalation strategies and how certain mental conditions present in patients. Those historical regulations equally burdened the right to carry arms, forbidding the introduction of arms into even "public" parts of the hospitals. Accordingly, especially set against the backdrop of far-reaching historical laws—only some of which the court below considered—restricting certain populations from possessing firearms at all, these laws provide yet another analogue that satisfies *Bruen*.

## III.  FIREARM PROHIBITIONS IN HOSPITALS WILL PROMOTE PUBLIC HEALTH AND SAFETY.

Not only is the CCIA Healthcare Provision constitutional; it indisputably reflects a policy choice the legislature was competent, and had an ample basis, to make. Recent statistics leave no doubt of the compelling need to regulate firearms in healthcare settings. Bureau of Labor Statistics data indicate that, from 2011 to 2013, between 70 and 74% of reported workplace assaults occurred in healthcare

28

and social-service settings.[61] "For healthcare workers, assaults comprise 10–11% of workplace injuries involving days away from work, compared to 3% of injuries of all private sector employees."[62] Results from the National Crime Victimization Survey corroborate these findings, showing "that between 1993 and 2009 healthcare workers had a 20% … overall higher rate of workplace violence than all other workers," and "workplace violence in the medical occupations represented 10.2% of all workplace violence incidents."[63] Hospital workers are not alone in being victims of violence; the overall hospital violent-crime rate is on the rise, with 2021 rates increasing from 1.7 incidents per 100 beds to 2.5 in 2021, a 47% increase.[64]

The causes of this high rate of violence in healthcare settings are no secret. Many patients and their families are highly stressed, sometimes in pain and on behavior-altering drugs, in bustling and unfamiliar surroundings, and among many

---

[61] OSHA Guidelines at 2; *see also* Dep't of Health & Human Servs., Center for Clinical Standards and Quality, *Memo: Workplace Violence-Hospitals*, QSO-23-04-Hospitals 1 (Nov. 28, 2022) (tracking data consistent with these findings through 2018).

[62] OSHA Guidelines at 2.

[63] *Id.* at 3.

[64] Robin Hattersley-Gray, *Hospital Violent Crime Increased 47% Last Year*, Campus Safety (May 19, 2022), https://www.campussafetymagazine.com/news/hospital-violent-crime-increased-47-last-year/.

others going through similar experiences.[65]  As OSHA recognizes in elucidating

workplace-violence risk factors particular to healthcare settings, allowing firearms

into this setting exacerbates the risk of violence, and makes the ramifications of

such violence more severe.

Indeed, between 2012 and 2016, some 88 shootings occurred across 86

hospitals.[66]  The highest number of those—30.3%—occurred in EDs, which are

and must be accessible to the general public.[67]  An earlier, longer-term study

identified 154 shootings in or immediately outside hospitals between 2000 and

2011, with a similarly high proportion of ED shootings (29%).[68]  This study found

that hospital employees comprised 20% of victims.[69]  As if that were not tragic

enough, these statistics do not account for the impact on the patients those hospital

employees cared for at the time of their shooting.

In light of these statistics, it is no surprise that statutes like the CCIA

Healthcare Provision are necessary.  Even in states with long traditions of

rigorously upholding Second Amendment rights, firearms are often prohibited in

---

[65] OSHA Guidelines at 4; *see also* Point II.B, *supra*.

[66] *See* Joseph R. Wax et al., U.S. acute care hospital shootings, 2012-2016: a content analysis study, 64(1) Work 77 (2019).

[67] *Id.*

[68] Gabor D. Kelen, M.D. et al., *Hospital-Based Shootings in the United States: 2000 to 2011*, 60 (6) Annals of Emergency Med. 790 (Dec. 2012).

[69] *Id.*

healthcare settings.[70]  If laws that attempt to prohibit firearms in hospital settings like the CCIA are declared unconstitutional, state legislatures will lose what is perhaps their most potent tool for protecting the vulnerable populations in these settings from the scourge of gun violence.  Without the support of the law, it will fall on hospitals to shoulder costly and less effective security measures—measures made even more difficult to implement by arbitrary distinctions between "private" areas where guns cannot be carried and "public" areas where guns must be permitted.[71]  Ultimately, health care workers and patients will bear the costs.

## CONCLUSION

For all the foregoing reasons, this Court should vacate the lower court's preliminary injunction.

Respectfully submitted,

PROSKAUER ROSE LLP

By:  */s/ Mark D. Harris*

Mark D. Harris
Matthew J. Morris
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000

---

[70] *See, e.g.*, Tex. Penal Code Ann. § 46.03(a)(11) (hospitals); Fla. Stat. §§ 394.458, 916.1085 (any location administering behavioral health care); Ga. Code Ann. § 16-11-127(b)(5) (inpatient behavioral health centers).

[71] Hospitals already have security personnel, the presence of which diminishes any self-defense justification for the public to bear arms in hospitals.

Adam L. Deming
One International Place
Boston, MA 02110-2600
Tel: (617) 526-9600

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the following:

1.  This brief complies with the type-volume limitation of Second Circuit Local Rule 29.1(c) because it contains 6,929 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen-point Times New Roman font.


Dated: January 17, 2022                    */s/ Mark D. Harris*
                                           Mark D. Harris

33