# 22-2908(L)

22-2972(Con)

## 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤

For the Second Circuit

———

**IVAN ANTONYUK,**

*Plaintiffs-Appellees,*

- *against* -

**STEVEN A. NIGRELLI, in his official capacity as Acting Superintendent of the New York State Police,**

*Defendant-Appellants.*

*(Caption continues inside front cover.)*

**On Appeal from the United States District Court
for the Northern District of New York**

## BRIEF OF AMICI CURIAE
## DISTRICT ATTORNEYS FOR NEW YORK COUNTY,
## BRONX COUNTY, KINGS COUNTY, AND QUEENS COUNTY

STEVEN C. WU
*Chief, Appeals Division*
PHILIP V. TISNE
*Assistant District Attorney*

ALVIN L. BRAGG, JR.
*District Attorney*
*New York County*
One Hogan Place
New York, New York 10013
(212) 335-9000

Dated: January 17, 2023

*(Caption continues from front cover.)*

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN,
LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

v.

MATTHEW J. DORAN, in his Official Capacity of as the Licensing
Official of Onondaga County, JOSEPH CECILE, in his Official
Capacity as the Chief of Police of Syracuse,

*Defendant-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of
New York, WILLIAM FITZPATRICK, in his Official Capacity as the
Onondaga Country District Attorney, EUGENE CONWAY, in his
Official Capacity as the Sheriff of Onondaga Country, P. DAVID
SOARES, in his Official Capacity as the District Attorney of Albany
County, GREGORY OAKES, in his Official Capacity as the District
Attorney of Oswego County, DON HILTON, in his Official Capacity
as the Sherriff of Oswego County, JOSEPH STANZONE, in his
Official Capacity as the District Attorney of Greene County,

*Defendants,*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICI CURIAE ................................................................ 1

ARGUMENT

    A.  The CCIA's Licensing Reforms Enhance Officials' Ability to Identify the Law-Abiding, Responsible Individuals Who May Be Entrusted with A Firearm ................................................. 4

    B.  The Legislature Determined to Prohibit Guns in the Places That, in Modern New York, Are the Most Likely to Present a Risk of Gun-Based Danger ........................................................... 9

    C.  The CCIA Provides Protection for Private Property that is Essential in our Communities....................................................... 17

CONCLUSION ......................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ........ 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................. 2, 9

*Hudgens v. N.L.R.B.*, 424 U.S. 507 (1976) ............................................. 18

*Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) ................................... 18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................... 1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................................ *passim*

*People v. Bush*, 39 N.Y.2d 529 (1976) .................................................... 18

*People v. Licata*, 28 N.Y.2d 113 (1971) .................................................. 17

*Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) ................................................. 1

## STATUTES

Concealed Carry Improvement Act, Ch. 371, 2022 N.Y. Laws

    § 1............................................................................................................. 4
    § 4................................................................................................ 11, 14, 15
    § 5........................................................................................................... 17
    § 9......................................................................................................... 6, 7
    § 23....................................................................................................... 4, 7

Criminal Procedure Law ("CPL")

    530.12 ..................................................................................................... 8
    530.13 ..................................................................................................... 8
    530.14 ..................................................................................................... 8

Penal Law

§ 140.00(5) ................................................................... 18
§ 140.05 .......................................................................... 17
§ 140.10 .......................................................................... 17
§ 140.17(1) ..................................................................... 19

## OTHER AUTHORITIES

Anjali Hemphill, *10 Hurt, Including 4 Bystanders Shot in Park, in 3 Separate Harlem and Queens Shootings*, NBC 4 New York (Sept. 27, 2022) ................................................................. 6

Arlin J. Benjamin, Jr. *et al.*, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Soc. Psych. Rev. 347 (2018) ................................................ 5

Ashley Southall & Nate Schweber, *Midday Subway Shooting Is Latest Shock to City*, N.Y. Times (May 23, 2022) ........................ 12

Central Park Zoo, *Children and Families*, *available at* https://centralparkzoo.com/learn/families .......................... 13

Chelsia Rose Marcius, *15-Year-Old Boy Shot Dead While Riding Subway in Far Rockaway*, N.Y. Times (Oct. 17, 2022) .................... 12

Eli Rosenberg & Liam Stack, *Times Square Chaos as Driver Kills a Woman and Injures 22*, N.Y. Times (May 18, 2017) ........................ 16

Georgett Roberts *et al.*, *8 Innocent Bystanders—In One Month—Caught in the Crossfire of NYC's Out-of-Control Shooting Surge*, N.Y. Post (Oct. 26, 2022) ...................................................... 6

Gun Violence Archive, Mass Shootings (All Years), *available at* https://www.gunviolencearchive.org/mass-shooting .......................... 11

John T. McQuiston, *Jury Finds Ferguson Guilty Of Slayings on the L.I.R.R.*, N.Y. Times (Feb. 18, 1995) .................................. 12

Jonah E. Bromwich & Mihir Zaveri, *Times Square Suspect Wanted to 'Carry Out Jihad,' Prosecutors Say,* N.Y. Times (Jan. 5, 2023) ......... 16

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013) ................... 5

Lisa Rozner & Kevin Rincon, *Police: Bystander John Edwards Shot and Killed Amid Night of Gun Violence in NYC*, CBS New York (July 5, 2022) .............................................................................. 6

Metro. Trans. Auth., Subway and Bus Ridership for 2021, *available at* https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021 ............................................................... 12

Michael Wilson, *Judgment Day in Two High-Profile Cases: Times Square's Would-Be Bomber Is Defiant as He Gets a Life Term*, N.Y. Times (Oct. 6, 2010) .......................................................... 16

N.Y.C. Comm. on Human Rights, *Xenophobia, Islamophobia, and Anti-Semitism In NYC Leading Up To and Following the 2016 Presidential Election* (2018) ............................................... 15

N.Y.C. Dep't of Planning, *2020 Census Results for New York City: Key Population & Housing Characteristics* (Aug. 2021) ........................... 3

Sarah Maslin Nir & William K. Rashbaum, *Man Detonates Bomb He Carried Under Times Sq.*, N.Y. Times (Dec. 12, 2017) .................... 16

Susan B. Sorenson & Daniel W. Webster, *What Works: Policies to Reduce Gun Violence*, *in Gun Violence: Prediction, Prevention, and Policy* (Am. Psych. Ass'n 2013), *available at* https://www.apa.org/pubs/reports/gun-violence-report.pdf ................. 6

Troy Closson, *The suspect in the subway shooting has been arrested, officials say*, N.Y. Times (Apr. 13, 2022) ........................................ 12

U.S. Census Bureau, *Return of the Whole Number of Person Within the Several Districts of the United States* (1793) ....................................... 9

Wildlife Conservation Society, *2022 Impact Report* (2022) ................... 13

VOA Special Report, *House of Worship Shootings, available at* https://projects.voanews.com/mass-shootings/english/locations/worship.html ............................................................. 14

## INTEREST OF AMICI CURIAE

Amici curiae Alvin L. Bragg, Jr., District Attorney of New York County, Darcel D. Clark, District Attorney of Bronx County, Eric Gonzalez, District Attorney of Kings County, and Melinda Katz, District Attorney of Queens County, submit this brief in support of defendants-appellants. The parties have consented to the filing of this amicus brief.[1]

A State's ability to protect its citizens from violent crime is a central aspect of its sovereignty. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1730-31 (2022). The Second Amendment does not disable a State from enacting such protections against the violence caused by unlawful firearms. Nor does the Second Amendment demand that this country's diverse communities adopt a one-size-fits-all approach to gun regulation. Rather, it allows States and localities "to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), narrows but does not

---

[1] This brief has been authored independently of any party's counsel. Amici received no money from a party, a party's counsel, or any other outside source to fund the preparation or submission of this brief.

1

eliminate that discretion to implement gun safety regulations that are responsive to local circumstances.

The New York Legislature's recent enactment of the Concealed Carry Improvement Act ("CCIA"), Ch. 371, 2022 N.Y. Laws (LRB) 1, fits squarely within the States' continuing authority to ensure that "those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2138 n.9 (quotation marks omitted), and to "forbid[] the carrying of firearms in sensitive places such as schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Amici—the district attorneys for four largest counties in New York City, itself the nation's largest and most densely populated metropolis—submit this brief to explain how the CCIA's measures reasonably address the special public-safety needs that arise in communities like ours, and to highlight the importance of preserving state discretion to craft effective public-safety regulations that reflect local circumstances.

New York City is by far the most populous city in the country. With roughly 8.8 million residents, it is as large as the next three largest cities combined. In fact, four of New York City's boroughs—Manhattan,

Brooklyn, Queens, and the Bronx—would each rank among the ten largest cities in the country by themselves. All of those people fit within just 300 square miles, making New York City not just the most populated but also the most densely populated city in the country. And those figures do not even include the tens of millions of tourists who visit New York City every year or the commuters who travel to the City each workday.[2]

Addressing gun crime in New York requires an approach that accounts for the unique circumstances of New York City. The Legislature appropriately took these concerns into account in enacting the CCIA. By contrast, the district court's sweeping injunction against several of the CCIA's key provisions entirely disregards those concerns—a result that is particularly unfair when none of the plaintiffs resides in New York City and no law enforcement representative from New York City was a party to this litigation. This Court should accordingly reverse the district court's order granting a preliminary injunction or, at minimum, narrow the injunction to apply only to the individual plaintiffs here.

---

[2] *See, e.g.*, N.Y.C. Dep't of Planning, *2020 Census Results for New York City: Key Population & Housing Characteristics* 5-6 (Aug. 2021).

## ARGUMENT

**A.  The CCIA's Licensing Reforms Enhance Officials' Ability to Identify the Law-Abiding, Responsible Individuals Who May Be Entrusted with A Firearm.**

The CCIA defines the "good moral character" required to obtain a license to mean the "essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Ch. 371, § 1, 2022 N.Y. Laws (LRB) at 1 (amending Penal Law § 400.00(1)(b)). The law also creates additional procedural requirements to obtain a license: applicants must appear for an in-person interview, submit a list of cohabitants and character references, and identify their social media accounts. *See id.* § 1, 2022 N.Y. Laws (LRB) at 2-3 (adding Penal Law § 400.00(1)(o)). And it requires that all firearm license applicants complete a gun-safety course before obtaining a license. *See id.* § 23, 2022 N.Y. Laws (LRB) at 19-20 (adding Penal Law § 400.00(19)).

As a general matter, these measures are properly directed at helping licensing officials identify the "law-abiding, responsible" individuals who may be entrusted with a gun—a function that *Bruen* recognized serves a legitimate state interest consistent with the Second

Amendment.[3] *See Bruen*, 142 S. Ct. at 2138 n.9. Although the CCIA's new licensing provisions may be more robust than other States', the statute's added protections appropriately reflect the enhanced risk of harm that firearms pose in densely populated areas like New York City. Dense urban communities like ours already experience violent gun crime at higher rates than other, less densely populated areas.[4] Studies confirm that the mere presence of a gun increases aggression, and increases the likelihood that the encounter will escalate into a violent conflict.[5] Firearms also make the crimes that do occur significantly more deadly: about 17.1% of interpersonal assaults involving a gunshot wound resulted in a homicide, while death is a result of only 0.009% of assaults that do not

---

[3] Numerous States' laws incorporate close analogs to the CCIA's definition of good moral character (*see* Brief for Appellants Steven A. Nigrelli and Matthew A. Doran ("State Br.") at 28-29), including some of the shall-issue States that the Supreme Court suggested would be constitutional in *Bruen*, 142 S. Ct. at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring).

[4] *See* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 100 (2013) (collecting analyses demonstrating that "gun crime is clearly an urban problem").

[5] *See, e.g.*, Arlin J. Benjamin, Jr. *et al.*, *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, 22 Personality & Soc. Psych. Rev. 347, 359 (2018).

involve a weapon.[6] And when a violent conflict with a gun occurs in a densely populated area, it means that bystanders too often become victims of violence—a grim reality with which New Yorkers are all too familiar.[7]

There is also a legitimate government interest in ensuring that gun owners responsibly secure their firearms. Studies establish that a significant number of guns carried outside the home—roughly 100,000 by one estimate—are lost and stolen.[8] Those guns are then able to circulate in the community, including by making their way into the hands of violent criminals, without any of the safeguards that would apply to sales by licensed dealers. The CCIA enhanced New York's requirements for the safe storage of firearms. *See* Ch. 371, § 9, 2022 N.Y. Laws (LRB) at 12-13. A screening process that ensures that license holders can

---

[6] Susan B. Sorenson & Daniel W. Webster, *What Works: Policies to Reduce Gun Violence*, *in Gun Violence: Prediction, Prevention, and Policy*, 27 (Am. Psych. Ass'n 2013).

[7] *See, e.g.*, Georgett Roberts *et al.*, *8 Innocent Bystanders—In One Month—Caught in the Crossfire of NYC's Out-of-Control Shooting Surge*, N.Y. Post (Oct. 26, 2022); Anjali Hemphill, *10 Hurt, Including 4 Bystanders Shot in Park, in 3 Separate Harlem and Queens Shootings*, NBC 4 New York (Sept. 27, 2022); Lisa Rozner & Kevin Rincon, *Police: Bystander John Edwards Shot and Killed Amid Night of Gun Violence in NYC*, CBS New York (July 5, 2022).

[8] *See* John J. Donohue et al., *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 207 (2019).

responsibly comply with these requirements appropriately limits the loss or theft of firearms and thus directly enhances public safety.

The CCIA's reforms are sensibly directed to achieving that end. The statute's more precise definition of "good moral character" turns not on some vague sense of an applicant's upstanding nature, but more specifically on traits that establish that the applicant can be "entrusted with a weapon" (including by securing it properly) and can be counted on to use it in a manner that will not endanger others. *See id.* The Legislature also enacted training requirements that are sensibly tailored to the distinct public safety concerns raised in densely populated areas: requiring, for instance, training about conflict de-escalation (a critical capability in an urban area where residents regularly and unavoidably interact with each other, often in close quarters), and about "best practices when encountering law enforcement" (an important topic in heavily policed areas where firearms can pose a threat to both gun owners and police officers). *See id.* § 23, 2022 N.Y. Laws (LRB) at 19-20. Justice Kavanaugh's concurring opinion in *Bruen* made plain that localities could constitutionally "require a license applicant to undergo . . . training in firearms handling and in laws regarding the use of force."

7

*Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). The CCIA's training requirements fit squarely within this language.

Finally, the CCIA's requirement that applicants appear for an in-person interview and submit lists of references, cohabitants, and social media accounts will equip licensing officials to more effectively determine whether an applicant can be a responsible gun owner. Courts regularly consult similar information when they evaluate whether to issue or obtain an order of protection, which can include a "surrender condition" suspending a defendant's firearm license and directing him to surrender any firearms he possesses. *See* CPL 530.14(1)-(2); *see* CPL 530.12, 530.13. For example, courts can and do rely on their own in-person observations of a defendant; statements from witnesses, including cohabitants and others familiar with the defendant's character; and statements made by the defendant, whether on social media or elsewhere. The CCIA's incorporation of similar information for firearm license applicants thus appropriately imports a well-established process for determining whether an individual may be entrusted to safely possess and use a firearm.

**B.** **THE LEGISLATURE DETERMINED TO PROHIBIT GUNS IN THE PLACES THAT, IN MODERN NEW YORK, ARE THE MOST LIKELY TO PRESENT A RISK OF GUN-BASED DANGER.**

The Supreme Court has repeatedly confirmed that the Second Amendment permits States to enact location-based restrictions on gun possession. The Court has said that the Second Amendment casts no doubt on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—a list, the Court explained, that did "not purport to be exhaustive." *Heller*, 554 U.S. at 626-27 & n. 26. And the Court has charted a path for courts to determine whether "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133.

To be sure, a municipality as large and densely populated as New York City poses problems that the Founders would not have encountered. (The population of New York City alone is more than twice as large as the entire population of the United States in 1790.[9]) But *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or

---

[9] *See* U.S. Census Bureau, *Return of the Whole Number of Person Within the Several Districts of the United States* 4 (1793) (reporting total 1790 U.S. population of 3,893,635).

9

the Reconstruction generation in 1868," and that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132.

The CCIA's identification of sensitive locations where firearms are not permitted accords with *Bruen* because the problems posed by the free circulation of firearms within those locations parallels the concerns that animated such enactments as the Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328), which forbade the carrying of firearms into "Fairs" and "Markets." The justification for these regulations was simple: guns do more harm in large crowds of people, and a person's opportunity for armed self-defense is limited when they are hemmed in by a crowd. Governments have thus long prohibited gun possession in locations where they deemed these concerns most salient: markets and fairs; ballrooms and social parties; circuses and racetracks (*see* State Br. at 54-61).

The places where people congregate today may be different from where they tended to congregate in 1328, or 1791, or 1868. Indeed, even today, the places where people congregate vary by community. But what is important for protecting public safety is not so much the nature of the location, but rather the fact that large gatherings of the public tend to

amplify the inherent risks posed by firearm possession. If anything, developments that have made guns capable of firing more powerful munitions more rapidly have only augmented the need to protect large groups of people congregated together: the Pulse nightclub in Orlando, Florida (June 12, 2016; 50 killed); the Mandalay Bay Casino in Las Vegas, Nevada (Oct. 1, 2017; 59 killed); the Borderline Bar and Grill in Thousand Oaks, California (Nov. 7, 2018; 13 killed); the Century 16 movie theater in Aurora, Colorado (July 20, 2012; 12 killed); the Tops Supermarket in Buffalo, New York (May 14, 2022; 10 killed).[10] If, as the Supreme Court has held, the Second Amendment should be read to include new and more deadly forms of firearms that could not have been imagined by the Founders, *see Bruen*, 142 S. Ct. at 2132, it would make sense to apply the same flexibility in considering which locations would be newly threatened by modern firearms and thus should be classified as sensitive locations.

Consider New York's decision to ban guns in the vehicles and facilities of public transportation. *See* Ch. 371, § 4, 2022 N.Y. Laws (LRB) at 9 (adding Penal Law § 265.01-e(2)(n)). The subway system in New

---

[10] *See, e.g.*, Gun Violence Archive, Mass Shootings (All Years), *available at* https://www.gunviolencearchive.org/mass-shooting.

York City is the largest, most crowded mass transportation system in the country. Indeed, on an average pre-pandemic weekday, more than 205,000 riders passed through the Times Square station alone—more than the entire population of Little Rock, Arkansas. The subway is also the city's lifeblood, shuttling nearly 1.7 billion (pre-pandemic) riders around the city annually in subway cars packed tight with commuters and tourists. New York's buses transport an additional 121 million (pre-pandemic) riders.[11] Gun violence in such crowded and cramped spaces would be uniquely hazardous, as New Yorkers learned first-hand when Frank James discharged two smoke bombs in a crowded subway car and began firing a semi-automatic pistol at commuters.[12] Although modern

---

[11] *See* Metro. Trans. Auth., Subway and Bus Ridership for 2021, *available at* https://new.mta.info/agency/new-york-city-transit/subway-bus-ridership-2021.

[12] *See* Troy Closson, *The suspect in the subway shooting has been arrested, officials say*, N.Y. Times (Apr. 13, 2022). James was not the first person to perpetrate a mass shooting on a New York train: for instance, in 1993, Colin Ferguson opened fire with a semiautomatic pistol on a Long Island Rail Road commuter train, killing six and wounding 16 passengers. *See, e.g.*, John T. McQuiston, *Jury Finds Ferguson Guilty Of Slayings on the L.I.R.R.*, N.Y. Times A1 (Feb. 18, 1995). New Yorkers have long been aware of the dangers posed by gun violence on the train. *See* Ashley Southall & Nate Schweber, *Midday Subway Shooting Is Latest Shock to City*, N.Y. Times A1 (May 23, 2022); Chelsia Rose Marcius, *15-Year-Old Boy Shot Dead While Riding Subway in Far Rockaway*, N.Y. Times (Oct. 17, 2022) (online).

subways and buses were wholly unknown to the Founders, the concerns that they raise are analogous to those that led fourteenth-century England and the Founding-era States to keep firearms out of well-trafficked areas.

The same could be said of zoos—a location that the district court here assumed would not have a sufficiently high concentration of children to warrant special protection from guns. *See Antonyuk v. Hochul*, 2022 WL 16744700, at \*67 (N.D.N.Y. Nov. 7, 2022). That assumption simply does not reflect the reality in New York City. The city contains several small local zoos—like the Queens Zoo, or the Central Park and Prospect Park zoos—that serve as common destinations for class trips, birthday parties, afterschool programs, and child caregivers. These institutions are tailored to children, with programs and exhibits specially designed to attract and engage young visitors. And they are regularly packed with children, visiting the zoo in large crowds and small groups.[13] In other municipalities, where zoos have the luxury to occupy more physical space,

---

[13] *See, e.g.*, Wildlife Conservation Society, *2022 Impact Report* 21 (2022) (noting that the New York City zoos "serve as a much-needed conservation science resource for educating millions of visitors each year, including thousands of school-age children and educators"); *see also* Central Park Zoo, Children and Families (describing children's programs), *available at* https://centralparkzoo.com/learn/families.

there may not be similar concerns about the effects of unlawful or unintentional firearm use. In New York City, however, such use would be catastrophic.

Houses of worship raise similar concerns. *See* Ch. 371, § 4, 2022 N.Y. Laws (LRB) at 9 (adding Penal Law § 265.01-e(2)(c)). In addition to being places where large groups of people congregate, houses of worship are also often targets for hate-motivated violence. Examples are numerous: the Sikh Temple in Oak Creek, Wisconsin (Aug. 5, 2012; 6 killed); the Emanuel African Methodist Episcopal Church in Charleston, South Carolina (June 17, 2015; 9 killed); the Tree of Life synagogue in Pittsburgh, Pennsylvania (Oct. 27, 2018; 11 killed); the Tennessee Valley Unitarian Universalist Church in Knoxville, Tennessee (July 27, 2008; 2 killed). By some accounts, nearly twenty percent of all mass shootings in the United States are motivated by religious animus.[14] That statistic raises a particular concern for diverse, densely populated communities like ours, which have unfortunately experienced a rise in religiously directed violence: for example, one report found that nearly forty percent

---

[14] *See* VOA Special Report, *House of Worship Shootings*, *available at* https://projects.voanews.com/mass-shootings/english/locations/worship.html.

of Muslim, Arab, South Asian, Jewish, and Sikh New Yorkers had experienced "verbal harassment, threats or taunting," and that roughly ten percent had experienced a physical assault based on their race, ethnicity, or religion.[15] In municipalities like New York City that otherwise benefit greatly from diverse religious communities living in close proximity, the Legislature could sensibly seek to ward off the risk of gun violence by keeping firearms out of the places where people worship.

Finally, the CCIA's designation of Times Square as a sensitive location also recognizes the unique experience of New York City. *See* Ch. 371, § 4, 2022 N.Y. Laws (LRB) at 9 (adding Penal Law § 265.01-e(2)(t)). Times Square is simply not the same as an intersection of two busy streets in some other municipality. Rather, it is an international symbol that draws millions of tourists every year and is filled with restaurants and theatres that regularly discharge large crowds of people into the street. It also hosts one of the world's largest gatherings to celebrate the New Year. Because of its significance and international prominence, Times Square and its environs are a regular target for criminal activity, from petty

---

[15] *See* N.Y.C. Comm. on Human Rights, *Xenophobia, Islamophobia, and Anti-Semitism In NYC Leading Up To and Following the 2016 Presidential Election* 9 (2018).

crime to international terrorism.[16] Allowing guns into Times Square would be as perilous as permitting firearms into historic markets or fairs.

Amici highlight these specific sensitive locations from the CCIA because they all raise distinct concerns in a dense metropolis like New York City that should be taken into account in determining whether the concerns they raise are analogous to those that led to restrictions on the carrying of firearms in medieval England and the Founding. Any analysis that disregards the realities of this country's largest city would improperly treat historical designations of sensitive locations as formalistic labels, rather than as practical responses to the dangers that those communities deemed at the time to be the most pressing. The New York Legislature properly translated these historical concerns to modern circumstances in the CCIA's lists of sensitive locations.

---

[16] *See, e.g.*, Jonah E. Bromwich & Mihir Zaveri, *Times Square Suspect Wanted to 'Carry Out Jihad,' Prosecutors Say,* N.Y. Times A16 (Jan. 5, 2023); Eli Rosenberg & Liam Stack, *Times Square Chaos as Driver Kills a Woman and Injures 22*, N.Y. Times A1 (May 18, 2017); Sarah Maslin Nir & William K. Rashbaum, *Man Detonates Bomb He Carried Under Times Sq.*, N.Y. Times A1 (Dec. 12, 2017); Michael Wilson, *Judgment Day in Two High-Profile Cases: Times Square's Would-Be Bomber Is Defiant as He Gets a Life Term*, N.Y. Times A25 (Oct. 6, 2010).

**C.    THE CCIA PROVIDES PROTECTION FOR PRIVATE PROPERTY THAT IS ESSENTIAL IN OUR COMMUNITIES.**

The CCIA's restricted-locations provision makes it a crime to possess a gun on private property without the owner's express consent. *See* Ch. 371, § 5, 2022 N.Y. Laws (LRB) at 10 (adding Penal Law § 265.01-d). This provision does not implicate any Second Amendment rights, since a person has no freestanding constitutional right to enter or remain on private property—let alone a right to do so armed with a deadly weapon. Rather, a property owner has wide authority to exclude others from its property. The CCIA's restricted-locations provision merely enforces that longstanding exclusionary right by creating a default rule that a person carrying a gun cannot enter private property unless the person first obtains the owner's express permission.

This kind of default rule is hardly novel. The New York Penal Law's prohibitions on trespassing have long made it illegal for any person to enter or remain on private property without permission. *See* Penal Law §§ 140.05, 140.10. An owner of property that is generally closed to the public does not need to supply a reason for excluding persons from their property; trespass liability arises if an owner withholds its consent for any reason or for no reason at all. *Cf. People v. Licata*, 28 N.Y.2d 113, 115

17

(1971) (sustaining trespass conviction for person ejected from a racetrack pursuant to policy forbidding entry to anyone for conduct that is "improper, obnoxious, unbecoming or detrimental to the best interests of racing"). And while members of the public have presumptive permission to enter property that is open to the public, *see* Penal Law § 140.00(5), even there, property owners have wide latitude to exclude individuals from their property for any lawful reason—including, by example, for exercising First Amendment rights without the owner's consent or permission. *See People v. Bush*, 39 N.Y.2d 529, 534 (1976) (sustaining trespass convictions for picketing on private property without permission); *see also Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 567-68 (1972); *Hudgens v. N.L.R.B.*, 424 U.S. 507, 521 (1976).

The CCIA's restricted-locations provision falls comfortably within these traditional protections for private property. It merely provides, in essence, that a person must obtain a property owner's express consent before bringing a gun onto their property. This default presumption appropriately reflects the particular priority our communities place on providing property owners an opportunity to control their spaces. And it makes sense, given data and common sense establishing that the

presence of a gun dramatically increases the likelihood of deadly conflict (see *supra* 4-6 & nn.3-5). Indeed, the Penal Law already provides enhanced liability for any person who enters a building unlawfully with a gun. *See* Penal Law § 140.17(1). The CCIA's restricted-locations provision merely extends that same form of protection to other types of private property.

# CONCLUSION

The order of the district court should be reversed.

Dated:  New York, New York
        January 17, 2023

                              Respectfully submitted,

                              ALVIN L. BRAGG, JR.
                                *District Attorney*
                                *New York County*


                         By:   */s/ Philip V. Tisne*
                               PHILIP V. TISNE
                               Assistant District Attorney

                               1 Hogan Place
STEVEN C. WU                   New York, NY 10013
  *Chief, Appeals Division*    (212) 335-3824
PHILIP V. TISNE
  *Assistant District Attorney*
      *of Counsel*


DARCEL D. CLARK          ERIC GONZALEZ           MELINDA KATZ
  *District Attorney*      *District Attorney*     *District Attorney*
  *Bronx County*           *Kings County*          *Queens County*
198 East 161st Street    350 Jay Street          125-01 Queens Blvd.
Bronx, NY 10451          Brooklyn, NY 11201      Kew Gardens, NY 11415

20

## PRINTING SPECIFICATIONS STATEMENT

The word count for this brief is 4033, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word 2016. The brief is printed in Century Schoolbook, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 13 points in the footnotes.