# 22-2908(L)

**22-2972(Con)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

IVAN ANTONYUK,

*Plaintiffs-Appellees*

– v. –

STEVEN A. NIGRELLI, **in his Official Capacity as Acting Superintendent of the New York State Police,**

*Defendants-Appellants*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the Northern District of New York, No. 1:22-cv-0986 (Suddaby, J.)

## BRIEF OF AMICI CURIAE GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY, AND MARCH FOR OUR LIVES IN SUPPORT OF APPELLANTS AND REVERSAL

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Amici Curiae*
*Giffords Law Center to Prevent Gun*
*Violence, Brady, and March for Our*
*Lives*

*(Caption continues from front cover.)*

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sherriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF AMICI CURIAE ......................................................................... 1

INTRODUCTION .............................................................................................. 4

ARGUMENT ..................................................................................................... 5

I.     The Circuit Courts Must Articulate a Workable Test Under Bruen. ................................. 5

II.    The District Court Erred in its Application of *Bruen*. ..................................... 10

III.    The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant Under the *Bruen* Standard................................................................................... 14

      A.    The Public-Safety Purpose of Firearm Regulation Is a Key Consideration Under Bruen................................................................................ 15

      B.    Science Shows New York's Law Effectively Accomplishes the Underlying Public Safety Purpose. ....................................................... 17

            1.    Stronger Gun Regulations Reduce Violent Crime and Enhance Public Safety. ................................................................. 17

            2.    Firearms Are Rarely Used in Self-Defense in Public Settings and More People Carrying Guns in Public Undermines Public Safety. .......... 20

            3.    Science Supports the Conclusion that New York's Law Will Promote Public Safety.......................................................... 26

CONCLUSION ................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Hochul*,
 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ................................... 2, 10, 11, 12

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
 910 F.3d 106 (3d Cir. 2018) ................................................................... 2

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) .................................................................... 2, 3, 13

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
 45 F.4th 306 (2022) ................................................................................ 3

*Hardaway v. Nigrelli*,
 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ..................................... 7

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
 417 F. Sup. 3d 747 (W.D. Va. 2019) ..................................................... 2

*Libertarian Party v. Cuomo*,
 970 F.3d 106 (2d Cir. 2020) ................................................................... 2

*McCulloch v. Maryland*,
 4 Wheat. 316 (1819) ............................................................................. 16

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ................................................................................ 2

*Md. Shall Issue v. Hogan*,
 353 F. Sup. 3d 400 (D. Md. 2018) ......................................................... 2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022) ................................................................. *passim*

*New York State Rifle & Pistol Ass'n, Inc v. City of New York*,
 140 S. Ct. 1525 (2020) ........................................................................... 3

*Peruta v. County of San Diego*,
 824 F.3d 919 (9th Cir. 2016) ................................................................. 2

*Stimmel v. Sessions*,
  879 F.3d 198 (6th Cir. 2018) ............................................................................2

*United States v. Perez-Gallan*,
  2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).................................................6

*Wade v. University of Michigan*,
  MSC No. 156150 (Mich.) ....................................................................................3

**Statutes**

1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and
  Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 ..................15

1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and
  Other Firearms within this State, on Certain Days Therein
  Mentioned, ch. 81 .............................................................................................15

A Law for the Better Securing of the City of New York from the
  Danger of Gun Powder (1763) ..........................................................................15

Ordinances of the City of Pittsburgh, An Act to Suppress the
  Disorderly Practice of Firing Guns, etc. on the times therein
  mentioned, § 1 (1774)........................................................................................15

Proceedings of the Conventions of the Province of Maryland Held at
  the City of Annapolis, in 1774, 1775, & 1776  .................................................15

**Other Authorities**

Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC
  Report: The Latest Lessons for the Empirical Evaluation of Law
  and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014) ...............25

Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive
  Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive
  Behavior: A Meta-Analytic Review of the Weapons Effect
  Literature*, PERSONALITY & SOC. PSYCH. REV. 22(4) (2018) ...........................24

Brad J.  Bushman, et al., The Weapons Effect on Wheels:  Motorists
  Drive More Aggressively When There Is a Gun in the Vehicle, 73
  J. EXPERIMENTAL SOC. PSYCH. 82-85, at 4 (2017)...............................................24

Brady, Giffords Law Center to Prevent Gun Violence, and March for Our Lives, *The Gun Industry's Advertising: Effective, Deadly, and Actionable*, Petition to the Federal Trade Commission (Apr. 7, 2022) ................................................................................20

Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* 8 (Oct. 15, 2016) .........................................19

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22, 23 (Oct. 2015) .........................21

Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014) ................................................................................25

*Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004) ................................................................................25

Ian Ayres & John J. Donohue III, *Shooting Down The More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193, 1284 (2003) .........................25

John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities* (Nat'l Bureau of Econ. Res. Working Paper No. 30190, June 2022) ................................................................................17, 18

John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010) ...............................25

Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022) ...................................23

Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (Nov. 2009) ................................................................................22, 23

*Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022) .........................23

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, AM. J. PUB. HEALTH 1 (Dec. 2017) ................................................................................20

Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. URBAN HEALTH (2022) .......................................19

*Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, FOX 4 NEWS (May 16, 2017)................................................................23

Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. TRAUMA ACUTE CARE SURG. 569 (2014) ..........................................................................19

Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* 7 (June 2015)................................................................21

William Saletan, *Friendly Firearms*, SLATE (Jan. 11, 2011) ..................................23

## INTEREST OF AMICI CURIAE[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a). No counsel for a party authored this brief in whole or in part; no counsel or party made a monetary contribution to fund its preparation or submission; and no person other than Amicus, its members, or its counsel made a monetary contribution to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E); Local R. 29.1(b).

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020); *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y.). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Sup. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Sup. 3d 400, 403-05 (D. Md. 2018).

*Amicus curiae* Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady has filed amicus

briefs in many cases involving the regulation of firearms, including *Bruen*, 142 S.

Ct. 2111 (2022); *Heller*, 554 U.S. 570 (2008), and *Guedes v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 45 F.4th 306 (2022).

*Amicus Curiae* March For Our Lives Foundation ("MFOL") is a youth-led

non-profit organization dedicated to promoting civic engagement, education, and

direct action by youth to achieve sensible gun violence prevention policies that will

save lives.  Formed after the mass shooting at Marjory Stoneman Douglas High

School in Parkland, Florida, MFOL immediately began organizing the largest

single day of protest against gun violence in the nation's history.  From its Road to

Change initiative that registered 50,000 new voters in 2018 to its successful

advocacy for dozens of state, local, and federal laws, MFOL uses the power of

youth voices to create safe and healthy communities and livelihoods for all.  These

young people—all too familiar with mass shootings and other forms of gun

violence—have a vital interest in ensuring that the Constitution is correctly

interpreted to allow for the enactment of reasonable gun violence prevention

measures, including public carry licensing regimes, to protect all Americans.

MFOL has participated as amicus curiae in other cases that affect its core

interest in preventing gun violence.  It has filed amicus briefs in *Bruen*, 142 S. Ct.

2111 (2022); *New York State Rifle & Pistol Ass'n, Inc v. City of New York*, 140 S.

Ct. 1525 (2020), and *Wade v. University of Michigan*, MSC No. 156150 (Mich.).

## INTRODUCTION

As the Supreme Court has held, law-abiding, responsible citizens have a right to carry firearms, but that right is not unlimited. In its recent decision, *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court explained that courts should undertake a historical analysis when considering constitutional attacks against regulations that allegedly impinge upon the Second and Fourteenth Amendments. Recognizing that modern regulations often will not have a corresponding "historical twin," the Court endorsed an approach that allows for analogical reasoning, examining the "hows" and "whys" of modern and historical gun regulations to determine if they are in keeping with the "balance struck by the founding generation" and later generations, including around the time of Reconstruction. The standard under *Bruen* does not require a surface-level historical match for a modern regulation. Instead, the test is whether the *motivation underlying* modern regulations (the why) and *methods used* by modern regulations (the how) are in line with the balance struck by earlier generations. The motivations underlying *historical* regulations and the methods used by such regulations in the past will inform this inquiry. The district court here, and district courts throughout this Circuit, have failed to properly apply *Bruen*, and this Court is well-poised to articulate the correct standard.

Further, in light of this proper understanding of *Bruen*'s standard, and as explained below, scientific research provides critical evidence that courts should consider when analyzing the hows and whys of gun regulations. And, the results of the research are clear: More guns in public spaces make us less safe. This conclusion confirms that laws limiting public carry, like the New York Concealed Carry Improvement Act ("CCIA"), are driven by a well-founded motivation to keep the public safe, a motivation that has deep roots in the historical tradition of gun regulations in this country. Because the CCIA is clearly constitutional under the standard articulated in *Bruen*, this Court should reverse the decision below.

## ARGUMENT

## I. The Circuit Courts Must Articulate a Workable Test Under Bruen.

In *Bruen*, the Supreme Court set out a historical test for evaluating the constitutionality of firearm regulations. 142 S. Ct. at 2126. It begins with a threshold inquiry, identifying the relevant course of conduct and asking whether the "plain text" of the Second Amendment protects that conduct (an inquiry for which the plaintiff challenging the regulation bears the burden), and then proceeds to an analogical inquiry comparing modern and historical laws. Thus far, and as exemplified by the district court's decision here, district courts are flailing in their attempts to correctly understand and apply *Bruen*'s historical test. In their confusion, some district courts have misunderstood this test to involve nothing

5

more than a superficial comparison between modern regulations and historical ones.  This approach has led to rigid analyses that are not consistent with the considerably more nuanced approach that the *Bruen* Court mandated.

As an example, consider *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022), currently on appeal, concerning the constitutionality of a statute that, in order to primarily protect vulnerable women and children exposed to special dangers, restricts certain domestic abusers' access to firearms.  In trying to apply *Bruen*, the court there reached a conclusion that cannot reasonably be viewed as consistent with what the framing generation intended to accomplish through adoption of the Second Amendment.  To the contrary, historical evidence indisputably reveals that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at *11.  The district court nonetheless incorrectly struck down the federal statute at issue because the historical record lacked specific evidence of the "federal government's disarmament of *domestic abusers*." *Id.* at *12 (emphasis added).  In reaching this result, the district court failed to set reasoned parameters for the analogical inquiry. Societal judgments about what constituted domestic abuse in 1791 bear little or no resemblance to the current judgments about that serious problem.  Rather, the "nuanced approach" to the *Bruen* analogical inquiry should have focused on using societal judgments regarding violence and dangerousness as a measure for who

6

may be armed, then and now. *See Bruen,* 142 S. Ct. at 2132 (acknowledging that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach").

Or consider *Hardaway v. Nigrelli,* 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022), also on appeal, in which the district court remarkably concluded that a well-established tradition of firearm bans in public spaces such as legislative assemblies, polling places, and courthouses supports such restrictions only in places "where a bad-intentioned armed person could disrupt key functions of *democracy*," *id.* at *14 (all but final emphasis removed), but not similar protections against "bad-intentioned armed person[s]" who would kill numerous congregants in a single attack in a *religious* assembly. *Id.*

The muddled reasoning behind these lower-court decisions puts Second Amendment jurisprudence in precisely the kind of "regulatory straightjacket" that *Bruen* disclaimed. *Bruen*, 142 S. Ct. at 2133. Properly understood, *Bruen*'s test does not call for the kind of surface-level historical matching game that these district courts have played. Instead, a proper application of *Bruen*'s standard requires courts to consider the *motivation underlying* regulations and the *methods used* by the regulations to determine whether modern regulations are in line with the balance struck by earlier generations. The steps required for this deeper inquiry are set out in *Bruen*.

7

At the outset, the *Bruen* Court instructed that modern regulations implicating conduct covered by the "plain text" of the Second Amendment must be "*consistent with* this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added). A modern regulation is "consistent" with this historical tradition if it is "analogous" to—although not necessarily a "twin" of or "dead ringer" for—historical regulations. *Id.* at 2133. When explaining the analogical method to use, the Court identified two relevant metrics: the "how" and the "why" of the regulation's effect on Second Amendment rights. *Id.* Assessing and weighing a challenged regulation's "how" and "why" is necessary to determine whether the regulation imposes a "comparable burden" that is "comparably justified" when compared with founding-era restrictions. *Id.* If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional. *Id.* at 2133 n.7.

Naturally, determining whether the regulation's "how" and "why" are in keeping with this "balance" requires courts to identify and apply the relevant considerations that the legislature took into account. On one side are the undeniably strong governmental interests in protecting public safety, or what *Bruen* calls the regulation's "why." *Id.* at 2133. On the other side is the way in which the regulation limits Second-Amendment rights to achieve that interest— what *Bruen* calls the regulation's "how." *Id.* Courts applying *Bruen* must look

8

closely into these considerations and determine whether the historical and modern laws are relevantly analogous. *Id.* at 2132–33.

Thus, the underlying motivation for the regulation—its "why"—is critical to *Bruen*'s test. One of the key errors in district court opinions such as the cases cited above—as well as the ruling below here—is that they have failed to properly assess and, importantly, *analogize* the reason for the regulations they have considered.

This case presents an ideal opportunity for this Court to correct these errors by setting out a workable template for how courts in the Second Circuit are to apply *Bruen*. This case is an excellent example of these issues because it concerns the same regulatory context that the Supreme Court considered in *Bruen*, as well as a licensing scheme written to meet the *Bruen* Court's specific guidance about what would make such a regulation constitutional. Thus, this case allows this Court to elaborate on its application of *Bruen* consistent with the *Bruen* Court's instructions. In addition, and as explained in more detail below, the district court's erroneous application of *Bruen* here is a prime example of what the *Bruen* test is *not.* By reversing the lower court and setting out the proper standard, this Court will clarify the standard for other courts to follow in considering challenges to legislatively enacted restrictions implicating the Second Amendment.

The emphasis on an *analogical* inquiry, as opposed to a one-to-one match or other more rigid method of comparison, is of critical importance. Inherent in the *Bruen* methodology is a recognition of the massive differences between the circumstances faced by 18th-, 19th-, and even early-20th-century legislatures and those faced by legislatures today. Technological and societal changes have drastically altered the harms that legislators must address with firearms regulations. Modern gun violence would have been as foreign to legislators of centuries past as the notion of space travel. The greater the "unprecedented societal concerns or dramatic technological changes" addressed by the modern legislature, the more critical it is to use the "more nuanced approach" to the analogical inquiry that *Bruen* expressly dictates. *Id.* at 2132. And we know that the *Bruen* Court acknowledged the validity of one major, historical concern: protecting public safety. *Id.* at 2144–45.

## II.  The District Court Erred in its Application of *Bruen*.

Taking into account the proper analogical framework prescribed by *Bruen*, it is clear the district court here erred in its analysis.

*First*, the district court framed its analysis as consisting of three steps: (1) why and how the modern regulation burdens the right to armed self-defense; (2) why and how the historical analogues burdened the right to armed self-defense at the time; and (3) whether the modern regulation imposes a comparable reason or

justification for the burden. *Antonyuk v. Hochul*, 2022 WL 16744700, at \*41 (N.D.N.Y. Nov. 7, 2022). But the district court failed to fully consider the governmental interests that justify the historical and modern regulations—the "why," in the parlance of *Bruen*—and thus could not properly analyze the regulations' "how" to determine whether the balance was analogously consistent with that struck when the Second and Fourteenth Amendments were ratified.

For example, the district court struck down the "good moral character" requirement in the New York law because, unlike the examined historical analogues, which only imposed a burden for defined and "readily apparent" groups of people, the CCIA's good moral character requirement applies to all persons equally. In the district court's view, this demonstrated that the good moral character requirement was "unreasonably disproportionate to the burdensomeness" of historical regulations. *Id.* However, the court failed to analyze the motivations behind both the modern and historical regulations, causing its analysis to fall short of that required by *Bruen*.

Despite noting that the "readily apparent" categories of people burdened by the historical regulations were "racially, religiously or politically" motivated, *id.*, the court's surface-level analysis of the historical "why" did not take into account that these discriminatory laws were undoubtedly based in the incorrect belief at that time that barring firearm access for these groups of people would benefit

11

public safety, the same goal as the CCIA's good moral character requirement applicable to all people. When viewed in this light, the good moral character requirement achieves an analogically similar "why," without utilizing the now obviously unconstitutional discriminatory means that earlier generations employed. Only by fully considering this "why" could the court have properly examined the New York law, but it failed to do so.

*Second*, the district court created rules for its historical review that were not sanctioned by the Supreme Court in *Bruen*. One erroneous presumption that pervades the district court's opinion is the pronouncement that "[m]ore weight is . . . generally given to historical laws governing a larger percentage of the Nation's population at the time." *Id.* at *7. While *Bruen* noted in its historical review that the territories had lower populations, it made no such declaration that the reason it did not regard territorial laws as equally persuasive to state laws was because of their respective populations. *Bruen*, 142 S. Ct. at 2154–55. Nonetheless, the district court leaned heavily on its novel interpretation of *Bruen*'s instructions for conducting the historical analysis. For example, in dismissing instances of regulations from more than two dozen cities, the district court stated, "[e]ven if the Court were to assume that such laws were sufficiently established (based on their number and geographical origins across the Nation), the Court

12

could not find them *representative* of the Nation." *Antonyuk*, 2022 WL 16744700, at *45.

*Third*, the standard articulated by the district court is more stringent than what the *Bruen* Court directed. *Bruen* makes clear that many modern regulations implicating Second Amendment rights will survive scrutiny under *Bruen*'s analytical framework. The majority opinion emphasized that the "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and that many common regulations, such as restrictions of guns in sensitive places, can continue under *Bruen*. 142 S. Ct. at 2133–34. Likewise, the *Bruen* concurrences emphasized the Court's narrow focus. Justice Alito noted that the opinion "decides nothing" about who may purchase a gun, what requirements must be met to purchase a gun, or the kinds of guns that can be available for purchase. *Id.* at 2757 (Alito, J. concurring). As Justice Kavanaugh, joined by Chief Justice Roberts, summarized, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J. concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008)). It is clear that the majority in *Bruen* anticipated that many gun laws will survive its analytical test—including most public carry laws on the books around the country. *See id.* at 2138 n.9. The district court here—and district courts throughout this Circuit—have failed to recognize that.

The errors apparent in the district court's opinion, and confusion from district courts throughout the Second Circuit, necessitate an explanation of the proper application of *Bruen* by this Court.

## III. The Efficacy of Gun Laws in Accomplishing Their Purpose Is Relevant Under the *Bruen* Standard.

One of the most significant flaws in the district court's reasoning here was its failure to fully consider and compare the reason—the "why"—underlying either historical regulations or the New York law. As explained in Part I, *Bruen* makes clear that understanding a regulation's "why" is key to determining whether the "regulatory burden" of the challenged statute is "comparably justified" when compared to historical regulations, and therefore in keeping with the historical balance.

Modern legislatures look to scientific research to understand the scope of a public harm as well as the effective means for addressing it through legislation. Here, a key purpose of the New York law is to keep the public safe and to prevent those possessing firearms from terrorizing the populace through their actions in bearing arms. Thus, this purpose—as well as scientific research bearing on whether the statute is effective in promoting that purpose—are key considerations under *Bruen*.

14

### A. The Public-Safety Purpose of Firearm Regulation Is a Key Consideration Under Bruen.

Public safety is, and always has been, a significant part of the "why" underlying relevant firearm regulations. This was true at the time of the Nation's founding, as reflected by numerous contemporary gun regulations. *See, e.g.*, A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763) https://bit.ly/3oZ9Vrw (setting storage requirements due to the danger of gunpowder); 1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 https://bit.ly/3A3lg00 ("Whereas a *most dangerous* Method of setting Guns has too much prevailed in this Province . . . .") (emphasis added)); Ordinances of the City of Pittsburgh, An Act to Suppress the Disorderly Practice of Firing Guns, etc. on the times therein mentioned, § 1 (1774), https://bit.ly/3p2y7cE (preventing firing guns in urban setting because of the danger it posed to the public); Proceedings of the Conventions of the Province of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776, https://bit.ly/3BKRH4N (requiring permission from the "*council of safety*" to transport guns out of the province) (emphasis added)); 1784–1785 N.Y. Laws 152, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81., https://bit.ly/3QpYRzw (noting that "*great dangers have arisen*" due to the "pernicious practice of firing guns") (emphasis added)).

15

Public safety continues to be the crux of modern firearms regulations. And because the Second Amendment sets a "balance"—not a frozen-in-time rule—new public safety issues may justify novel regulations that serve the same broad purposes as historic ones. As *Bruen* recognized, present-day public-safety issues may raise "unprecedented societal concerns." *Bruen*, 142 S. Ct. at 2132. These new problems may require new regulations, including regulations that would have been "unimaginable at the founding." *Id.* It is precisely this responsiveness to new societal issues that enables the Second Amendment "to be adapted to the various crises of human affairs," and thus "endure for ages to come." *Id.* at 2132 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819)).

Indeed, the Second Amendment would be of little use if it did not allow for legislatures to respond to new circumstances—whether immediately after its ratification, or today. Given the passage of time, today's public-safety issues may require new regulations. So long as the balance between the reasons motivating the regulation and the degree of its restriction remains in keeping with the "balance struck" at the founding, these new measures are constitutional.

Thus, understanding the public-safety reasons for the challenged regulation is crucial to applying the *Bruen* test.

**B.      Science Shows New York's Law Effectively Accomplishes the Underlying Public Safety Purpose.**

For decades, academic researchers have studied the effects of gun possession on public safety.  Though the details of the studies and their specific focuses vary, one consistent conclusion has emerged from the reliable scientific data available: more guns in public places make us less safe, not more.  This scientific consensus illustrates that New York's law at issue here, which specifically limits the ability to carry guns in public, is driven by public safety, the same motivation—the why— that inspired regulations on guns before and at the founding, during Reconstruction, and into the modern era.

**1.      Stronger Gun Regulations Reduce Violent Crime and Enhance Public Safety.**

Reliable studies consistently demonstrate that lenient right-to-carry ("RTC") laws are associated with increased violent crime and homicide rates.  Indeed, "the predominant conclusion from studies in the last five years has been that RTC laws increase violent crime."[2]  Stanford professor John Donohue's work in this area shows persistent increases in violent crime rates in states with more permissive licensing regimes.  In a recent June 2022 study analyzing a sample drawn from 47 major U.S. cities, Donohue and his colleagues concluded that right-to-carry gun

---

[2] *See* John Donohue et al., *More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in U.S. Cities*, at 1 (Nat'l Bureau of Econ. Res. Working Paper No. 30190, June 2022).

17

laws "increase overall firearm violent crime as well as the component crimes of firearm robbery and firearm aggravated assault by remarkably large amounts with an attendant finding of no sign of any benefit from RTC laws."[3]

In particular, Donohue's study found that these lenient RTC laws led to 29 and 32 percent increases in firearm violent crime and firearm robbery, respectively.[4] The study found a "massive 35 percent increase in gun theft, with further crime stimulus flowing from diminished police effectiveness."[5] The study observed that right-to-carry laws "cause a roughly 13 percent decline in the rates that police clear violent crime, suggesting that [right-to-carry] laws strike at the very heart of law enforcement's abilities to address criminal conduct."[6]

Sadly, lenient gun laws make it more likely that interactions between members of the public and the police will become more violent. A recent study published by researchers at Johns Hopkins University found that states moving to more lenient, permitless concealed carry regimes experience an almost 13 percent

---

[3] *Id.* at 25.

[4] *See id.* at 3, 25.

[5] *Id.* at 27.

[6] *Id.* at 3.

increase in officer-involved shootings.[7]  Further compounding the danger posed by more guns in public, scientific research confirms that guns are rarely used in self-defense in public settings, and often cause harm to innocent bystanders when they are.[8]  Ultimately, Donohue and his colleagues conclude that "any such [deterrent] benefits are substantially offset by the crime-enhancing impacts of increased gun carrying."[9]

The recent research by Donohue is supported by additional scientific research that confirms lenient gun laws increase violent crime.[10]  For example, in December 2017, researchers at Boston University and Duke University released the first-ever analysis of the impact of concealed carry laws on handgun and long-

---

[7] *See* Mitchell L. Doucette et al., *Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020*, J. URBAN HEALTH (2022)

[8] *See infra* Section III.B.2.

[9] Donohue et al., *supra* note 2 at 2.

[10] *See, e.g.*, Rashna Ginwalla et al., *Repeal of the Concealed Weapons Law and Its Impact on Gun-Related Injuries and Deaths*, 76 J. TRAUMA ACUTE CARE SURG. 569, 569, 573 (2014), https://www.academia.edu/10480999 (lax concealed carry permitting laws are associated with increased gun fatalities); Daniel W. Webster et al., *Firearms on College Campuses: Research Evidence and Policy Implications* 8 (Oct. 15, 2016) (discussing data on 111 high-fatality mass shootings from 1966–2015, finding that in the 41 states with RTC laws or no concealed carry regulations, the average death toll in high-fatality mass shootings increased following the implementation of an RTC law).

gun homicide rates.[11]  Their study concluded that permissive right-to-carry

concealed carry laws were significantly associated with higher crime rates—in

particular, 6.5 percent higher total homicide rates, 8.6 percent higher firearm-

related homicide rates, and 10.6 percent higher handgun-specific homicide rates,

compared to states with stronger regulations.[12]  This robust, well-supported body

of evidence confirms that, just as governments at the founding and during

Reconstruction sought to protect their citizens by restricting the public use and

display of guns, New York's licensing law promotes public safety by protecting

New York citizens from statistically proven increases in violent crime and firearm

homicide.

> ### 2. Firearms Are Rarely Used in Self-Defense in Public Settings and More People Carrying Guns in Public Undermines Public Safety.

Regulating public carry is motivated by public safety.  Contrary to some

popular beliefs,[13] carrying firearms in public for self-defense produces no safety

---

[11] Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, AM. J. PUB. HEALTH 1 (Dec.  2017).

[12] *Id.*

[13] For decades, the gun industry has been deceptively marketing firearms as a safe means of protection.  *See generally*, Brady, Giffords Law Center to Prevent Gun Violence, and March for Our Lives, *The Gun Industry's Advertising: Effective, Deadly, and Actionable*, Petition to the Federal Trade Commission (Apr. 7, 2022), https://firearmsaccountability.org/FTCPetition.pdf.

benefits for society and likely exposes even gun carriers themselves to greater

harm.  Recent research confirms that crime victims rarely use guns in self-defense

in public settings and that persons carrying firearms are, objectively, no safer than

other crime victims.  A 2015 study found that victims of violent crimes use

firearms in self-defense in less than one percent of all criminal incidents.[14]  And,

compared to other self-protective actions that do not involve a firearm, data from

the National Crime Victimization Surveys provide little evidence that defensive

gun use is beneficial in reducing the likelihood of injury or property loss.[15]  A 2019

analysis of data from the FBI's Uniform Crime Reporting program confirmed that

while guns can be, and sometimes are, successfully used for self-defense, these

cases are the exception, rather than the rule.[16]  The analysis instead emphasized

that "[t]he reality of self-defense gun use bears no resemblance to the exaggerated

claims of the gun lobby and gun industry": "When analyzing the most reliable data

available, what is more striking is that in a nation of more than 300 million guns,

how *rarely* firearms are used in self-defense."[17]

---

[14] *See* David Hemenway & Sara J. Solnick, *The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011*, 79 PREVENTIVE MED. 22, 23 (Oct. 2015).

[15] *See id.*, at 23–24.

[16] *See* Violence Policy Center, *Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use* 7 (June 2015), https://www.vpc.org/studies/justifiable17.pdf.

[17] *Id.*

In fact, one study concluded that carrying a firearm may *increase* a victim's risk of firearm injury during the commission of a crime. In an analysis of 677 shootings over a two-and-a-half-year period in Philadelphia, researchers found, after adjusting for confounding factors, that individuals carrying a gun were 4.46 times more likely to be shot in an assault than those not carrying a gun, and they were more than 4.23 times as likely to be fatally shot.[18] Even in assaults where the victim had at least some opportunity to resist, individuals carrying a gun were 5.45 times more likely to be shot than those not carrying a gun.[19]

It is essential to understand that to the extent members of the public may attempt to use a firearm in self-defense, it is unlikely they possess the skills to do so safely. Put bluntly, real life is not like a Hollywood movie in which a hero with a gun appears to expertly and accurately shoot the villain and save the day. As a 2016 report from public health experts at Johns Hopkins University reported, "[s]hooting accurately and making appropriate judgments about when and how to shoot in chaotic, high-stress situations requires a high level of familiarity with tactics and the ability to manage stress under intense pressure."[20] Accuracy "is

---

[18] *See* Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (Nov. 2009), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2008.143099.

[19] *See id.*

[20] *See* Webster et al.*, supra* note 10, at 10.

22

influenced by distance, the opponent shooter's actions, lighting, use of cover, type

of gun, and more."[21]  This report confirmed that most people simply do not have

the tactical ability to successfully use a gun for self-defense, particularly in urban

or densely populated areas, and may end up "wounding or killing innocent

victims" if they attempt to do so.[22]  Such incidents occur with tragic regularity.[23]

Moreover, regardless of their degree of tactical training, recent examples

demonstrate that when individuals carry guns in public, there is an increased risk

that they will wield their firearms in situations that actually place themselves and

others in greater danger.  Gun carriers—even those with training—have injured

and killed innocent people after mistakenly perceiving a threat.[24]  And the mere

---

[21] *Id.*

[22] *Id.*

[23] *See Teen Crash Victim Shot, Killed Bystander Trying to Help at Lowell Intersection, Police Say*, WSOC TV (Aug. 10, 2022), https://www.wsoctv.com/news/local/lowell-police-investigate-wreck-deadly-shooting-busy-intersection-suspect-custody/AG2C7SJNGNDU7PR2U4XDI2PUTQ/ (reporting that a bystander was fatally shot by a car crash victim when he opened a car door to render aid); Joshua Rhett Miller, *9-Year-Old Houston Girl Dies after Being Shot by Robbery Victim*, N.Y. POST (Feb. 16, 2022), https://nypost.com/2022/02/16/9-year-old-dies-after-being-shot-by-houston-robbery-victim/(reporting that a 9-year-old girl was fatally shot by a robbery victim who opened fire on a vehicle that he thought contained the robber, but actually contained an innocent family of five).

[24] *See, e.g.*, *Police: Man Arrested for Shooting Uber Driver Thought He Was Helping*, FOX 4 NEWS (May 16, 2017), https://www.foxla.com/news/police-man-arrested-for-shooting-uber-driver-thought-he-was-helping.amp; William Saletan, *Friendly Firearms*, SLATE (Jan. 11, 2011),

presence of a gun can exacerbate everyday disputes into lethal confrontations. In the case of "road rage," for example, a 2017 study from researchers at The Ohio State University found that people drove more aggressively when a gun was present in their car.[25] This is consistent with a broader body of behavioral research demonstrating that merely seeing a weapon can increase aggressive thoughts and hostile appraisals, and possibly even aggressive behavior.[26]

Thus, the body of reliable scientific evidence demonstrates both that (1) guns are unlikely to be used in self-defense, and (2) if guns are used in self-defense, they are likely to be used in a dangerous way. Despite this scientific consensus, gun rights activists often point to discredited arguments made by John Lott, an economist, who claims loose concealed carry regulations reduce violent

---

http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html.

[25] *See* Brad J. Bushman, et al., *The Weapons Effect on Wheels: Motorists Drive More Aggressively When There Is a Gun in the Vehicle*, 73 J. EXPERIMENTAL SOC. PSYCH. 82-85, at 4 (2017), https://crimeresearch.org/wp-content/uploads/2017/09/The-weapons-effect-on-wheels.pdf (concluding "the mere presence of a gun in a vehicle can cause motorists [to] drive more aggressively").

[26] *See* Arlin J. Benjamin, Jr. et al., *Effects of Weapons on Aggressive Thoughts, Angry Feelings, Hostile Appraisals, and Aggressive Behavior: A Meta-Analytic Review of the Weapons Effect Literature*, PERSONALITY & SOC. PSYCH. REV. 22(4) (2018), https://www.researchgate.net/publication/319878868_Effects_of_Weapons_on_Aggressive_Thoughts_Angry_Feelings_Hostile_Appraisals_and_Aggressive_Behavior_A_Meta-Analytic_Review_of_the_Weapons_Effect_Literature.

crime.[27]  But in fact, Lott's conclusion that RTC laws are associated with lower

crime rates has been widely rejected.[28]  Lott's research is infamous because its core

conclusion has been debunked by researchers who were either unable to replicate

his findings[29] or reached opposite conclusions,[30] or who believe that Lott's

analytical model is unreliable and may be used to achieve almost any desired

outcome.[31]  Gun policy experts now consider Lott's research to be "completely

discredited,"[32] and, as discussed above, recent research shows that the very

opposite of Lott's hypothesis is true:  stronger restrictions on public carry reduce

---

[27] *See* John R. Lott, Jr., *More Guns Less Crime* (3d ed. 2010).

[28] *See, e.g.*, Ian Ayres & John J. Donohue III, *Shooting Down The More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193, 1284 (2003), http://digitalcommons.law.yale.edu/fss_papers/1241("We take these results to be generally devastating to Lott's 'More Guns, Less Crime' hypothesis"); Emily Badger, *More Guns, Less Crime? Not Exactly*, WASH. POST (July 29, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/07/29/more-guns-less-crime-not-exactly/.

[29] The National Research Council disagreed with Lott's central claim and noted that in fact, "it is at least possible that errors" in the crime data Lott used may account for his results.  *Firearms and Violence—A Critical Review* 137 (Charles F. Wellford et al. eds., 2004), https://www.nap.edu/read/10881/chapter/8#137.

[30] Abhay Aneja et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Stan. L. and Econ. Olin Working Paper No. 461, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681.

[31] *See* Ayres & Donohue, *supra* note 28 at 1230.

[32]  *See* Badger, *supra* note 28.

25

crime and enhance public safety. Outlier activists and questionable research methodologies do not change the conclusion reached by reliable study after reliable study: more guns in public make us less safe.

### 3. Science Supports the Conclusion that New York's Law Will Promote Public Safety.

As explained above, science demonstrates that more guns do not make the public safer; in fact, they tend to have the opposite effect. New York's law takes steps to promote public safety by defining sensitive locations where guns are not permitted, requiring an interview with a licensing agency before a concealed carry permit will be issued, mandating firearm safety training, and setting storage requirements, among other measures. These steps both limit the ability to carry guns in certain areas, in line with the scientific data that show guns in public pose dangers, and ensure that those who do carry guns in public are doing so safely, in line with concerns raised in the data that not all who carry publicly do so with the proper training. In passing this law, New York has acted in the interest of public safety, and the balance between the reasons motivating New York's law and the degree of its restrictions—its why and how—remains in keeping with the "balance struck" by earlier generations.

## CONCLUSION

This Court should reverse the district court's order granting the preliminary injunction.

/s/ P. Benjamin Duke
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Giffords Law Center to Prevent Gun Violence, Brady, and March for Our Lives*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief contains 5,951 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and has been prepared in proportionally spaced typeface using 14-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

Dated: January 17, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2023, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.

Dated:  January 17, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke