# 22-2908(L)

## 22-2972 (Con)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

*v.*

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendants-Appellants.*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the Northern District of New York, No. 22-cv-0986
Before the Honorable Glenn T. Suddaby

## BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

SIMON B. KRESS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109

ALAN SCHOENFELD
JUAN M. RUIZ TORO*
JOSHUA M. FEINZIG*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
alan.schoenfeld@wilmerhale.com

* Admitted only in Washington, D.C.;
practicing under the supervision of
Principals of the Firm.

January 17, 2023

*(Caption continues from front cover.)*

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF AMICI CURIAE ........................................................... 1

INTRODUCTION ............................................................................. 2

ARGUMENT .................................................................................... 4

I.    NEW YORK'S RESTRICTED LOCATIONS PROVISION DOES NOT IMPLICATE SECOND AMENDMENT RIGHTS GIVEN OWNERS' RIGHT TO EXCLUDE .......................................................................... 4

    A.    The Right To Exclude Is Foundational To American Property Law And Includes The Right To Set The Terms Of Entry ............... 5

        1.    Governmental regulation routinely shapes whether and on what terms owners exercise the right to exclude ............... 6

        2.    The right to exclude inheres in all private property— including private property open to the public ........................ 10

    B.    A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude And Therefore Must Be Rejected ................................................................ 12

    C.    Because There Is No Second Amendment Right To Carry Onto Another's Property Nor To A Presumption That A Private Owner Welcomes Firearms, The Restricted Locations Provision Does Not Implicate The Second Amendment And Plaintiffs Fail To Meet *Bruen* Step One ............................................... 18

II.    NEW YORK'S RESTRICTED LOCATIONS PROVISION IS CONSISTENT WITH HISTORY AND TRADITION ................................................. 23

    A.    The State's Analogues Establish The Law's Consistency With History and Tradition ...................................................... 23

    B.    New York's Restricted Locations Provision Is Properly Understood As Default-Shifting Legislation And Not An Outright Prohibition On Carrying Firearms ............................. 27

CONCLUSION ................................................................................ 29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Manufacturers Mutual Insurance Co. v. Sullivan*,
 526 U.S. 40 (1999) ........................................................................... 19

*Amalgamated Food Employees Union v. Logan Valley Plaza*,
 391 U.S. 308 (1968) ......................................................................... 15

*Baker v. Howard County Hunt*, 171 Md. 159 (1936) ............................... 12

*Berman v. Parker*, 348 U.S. 26 (1954) .................................................... 22

*Birt v. Ratka*, 886 N.Y.S.2d 293 (2009) ................................................. 14

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ................................................... 19

*Breard v. Alexandria*, 341 U.S. 622 (1951) .......................................... 8, 16

*Carpenter v. City of New York,* 984 F. Supp. 2d 255 (S.D.N.Y. 2013) ..................... 7

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ......................... 2, 5, 11, 12

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972) ............................. 17

*College Savings Bank. v. Florida Prepaid Postsecondary Education
 Expense Board*, 527 U.S. 666 (1999) ............................................... 5, 12

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971) .......................... 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................... 2, 17, 21, 27

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) .............. 6, 12

*Hodel v. Irving*, 481 U.S. 704 (1987) ..................................................... 28

*Hudgens v. NLRB*, 424 U.S. 507 (1976) ................................................. 15

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ....................................... 11, 15

*Madden v. Queens County Jockey Club, Inc.*, 296 N.Y. 249 (1947) ............... 13

*Marsh v. Alabama*, 326 U.S. 501 (1946) ................................................. 15

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................*passim*

*Philip v. United Force Security Corp.*, 516 F. App'x 38 (2d Cir. 2013).................9

*Ploof v. Putnam*, 71 A. 188 (Vt. 1908) ...................................................13

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ......................11, 16, 18

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)...............................16

*Shalala v. Illinois Council on Long Term Care, Inc.*,
    529 U.S. 1 (2000).......................................................................18

*Shelly v. Kraemer*, 334 U.S. 1 (1948) ...................................................14

*Shiffman v. Empire Blue Cross and Blue Shield*,
    681 N.Y.S. 2d 511 (1st Dep't 1998)..........................................................7

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*,
    794 F. Supp. 2d 304 (D. Mass. 2011)........................................................16

*United States v. Messina*, 806 F.3d 55 (2d Cir. 2015)............................................25

*United States v. Woods*, 571 U.S. 31 (2013)..........................................................25

*Watchtower Bible & Tract Society v. Village of Stratton*,
    536 U.S. 150 (2002)........................................................................19

*Yorzinski v. City of New York*, 175 F. Supp. 3d 69 (S.D.N.Y. 2016) .......................7

## STATUTES, RULES, AND REGULATIONS

430 ILCS 66/65(b) (2021) .................................................................12

N.Y. Penal Law
    § 140.05 ..............................................................................7
    § 265.01-d .........................................................................1, 2

## OTHER AUTHORITIES

Ayres, Ian & Spurthi Jonnalagadda, *Guests with Guns: Public Support
    for "No Carry" Defaults on Private Land*, 48 J.L. Med. &
    Ethics 183 (Winter 2020) .............................................................21

3 Blackstone, *Commentaries on the Laws of England* ch. 12 .................................26

Blocher, Joseph & Darrell A.H. Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295 (2016).................................................8, 9

Blocher, Joseph, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1 (2012) .......................................................................................17

Ellickson, Robert, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623 (1986) ..........................28

Friend or Foe, Home Page, https://friendorfoe.us ...................................................21

Kopel, David B. & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203 (2018)..................................................27

Kraakman, Reiner H., *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53 (1986) ....................................9

Merrill, Thomas W. & Henry E. Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357 (2001) ......................................28

Merrill, Thomas W., *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998) ..................................................................................6

Poppe, Emily S. Taylor, *Choice Building*, 63 Ariz. L. Rev. 103 (2021)................28

Strahilevitz, Lior Jacob, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835 (2006) .........................................................9

Zambito, Thomas C., *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007 .......................................................................................21

# INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.[2]  Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law. Professors Ayres and Vars have researched and written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the doctrinal and policy issues implicated by this case, particularly as they relate to the constitutionality of the restricted locations provision of New York State's Concealed Carry Improvement Act (CCIA), enacted in response to *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  N.Y. Penal Law § 265.01-d.  The historical record and longstanding principles of property law demonstrate that New York's restricted locations provision accords with the Nation's historical tradition of firearm regulation and does not unconstitutionally impose on conduct protected by the

---

[1] No counsel for a party wrote this brief in whole or in part, and no one other than amici or their counsel contributed money to fund the preparation or submission of this brief.  The parties have consented to its filing.

[2] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.

Second Amendment.  On the contrary, New York's provision is firmly rooted in "one of the most treasured" rights of property ownership: the right to exclude. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  In brief, your Second Amendment right to bear arms ends at my property line—and always has.

## INTRODUCTION

The Second Amendment does not guarantee an individual right to bear arms on another's private property.  The right of property owners to exclude others from using or interfering with their property is "universally held to be a fundamental element of the property right" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  That longstanding right to exclude necessarily encompasses property owners' right to set terms of entry, including with respect to the carrying of firearms on their property.  This is true regardless of whether the property is open to the public.  Neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), can be read to announce a right so sweeping as to displace centuries-old property rights.

Because there has never been an individual Second Amendment right to bear arms on another's private property, there is no freestanding Second Amendment right to a presumption that a private owner welcomes firearms on their property

until they say otherwise.  Thus, New York's restricted locations provision, N.Y.

Penal Law § 265.01-d, does not implicate the Second Amendment's "plain text."

*Bruen*, 142 S. Ct. at 2129-2130.  To the contrary, New York's selection of a

presumption reflects States' enduring legislative prerogative to shape property

owners' right to exclude—including the right to exclude firearms.

Even if this Court were to find that the Second Amendment is implicated

here, New York's restricted locations provision is "consistent with the Nation's

historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, and should be

upheld on those grounds.  As an initial matter, amici are unaware of any common

law or statutory law of trespass—whether at the time of the Founding or

Reconstruction—that excepted carrying of firearms from the general requirement

that lawful presence was conditioned on the informed consent of the property

owner.  Nor are amici aware of any constitutional challenge to general trespass

laws on the ground that they failed to provide a presumptive allowance for carrying

firearms.  The historical analogues cited by the State reflect this baseline

understanding of trespass law and collectively establish that state regulations

conditioning carrying of firearms on the consent of property owners are in keeping

with Second Amendment protections.  As the Supreme Court affirmed in *Bruen*,

determining whether proffered historical analogues bear a "relevant similarity" to

the law at issue requires assaying "how and why the regulations burden a law-

abiding citizen's right to armed self-defense." *Id.* at 2132-2133. Contrary to the district court's reading, SA167-172, these analogues cannot be cast aside as mere "anti-poaching" laws; rather, the analogues evince a longstanding tradition of state firearm regulation whereby entry on private property with firearms is conditioned on the informed consent of the property owner. Attempting to ensure that property owners were informed about the presence of guns on their property, these laws— like New York's provision today—empowered property owners to decide for themselves how best to protect themselves and their property.

In short, longstanding principles of property law and the historical record demonstrate that New York's restricted locations provision is not an unconstitutional imposition on conduct protected by the Second Amendment and is consistent with the history of firearms regulation.

## ARGUMENT

## I. NEW YORK'S RESTRICTED LOCATIONS PROVISION DOES NOT IMPLICATE SECOND AMENDMENT RIGHTS GIVEN OWNERS' RIGHT TO EXCLUDE

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that a two-part inquiry guides courts' consideration of Second Amendment claims. First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2111, 2129-2130 (2022). Only if the plaintiff has carried their burden with respect to that inquiry does the burden shift to the government to show that the firearm regulation is "consistent with the

- 4 -

Nation's historical tradition of firearm regulation." *Id*. at 2130. Plaintiffs here have failed to carry their burden because the restricted locations provision does not implicate the individual right "to carry a handgun for self-defense outside the home." *Id*. at 2122.

Given the foundational status of the right to exclude, there is no constitutional right to enter onto another's property without the owner's permission, much less a Second Amendment right to carry weapons onto another's property without permission. This is true regardless of whether private property is open or closed to the public. And because there is no right to carry onto private property in the first instance, the provision's enabling of private owners to more easily avail themselves of their right to exclude gun possessors raises no constitutional problem. Put another way, there is no freestanding Second Amendment right to have a private owner's silence on the permissibility of guns construed in either direction. The selection of such a default rule is left to the States, part and parcel of their time-honored prerogative to reinforce property owners' right to exclude.

## A. The Right To Exclude Is Foundational To American Property Law And Includes The Right To Set The Terms Of Entry

The right to exclude others from interfering with one's property is "one of the most treasured" rights of property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021); *see also College Sav. Bank. v. Fla. Prepaid*

- 5 -

*Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (characterizing the right as the "hallmark of a protected property interest"). Indeed, the right to exclude was likely the "first step in the evolution of property rights in land" and should be viewed as the "sine qua non" of property. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730, 745-747 (1998). And "[i]t is simply beyond rational dispute that the Founding Fathers, through the Constitution and the Bill of Rights, sought to *protect* the fundamental right of private property." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2111.

### 1. Governmental regulation routinely shapes whether and on what terms owners exercise the right to exclude

The district court's analysis of New York's restricted locations provision treats it as an aberrational exercise of state power. SA167. This misunderstands the history and context of laws relating to property owners' right to exclude. That right is not self-actualizing or exercised in isolation. It is nested within a broad range of criminal, tort, and property laws that give shape to that right, imposing liability on those who violate an owner's terms of entry, setting "default rules" around which an owner and potential entrants can negotiate claims of access, and regulating informational exchange between parties. A brief survey of these regulatory traditions makes clear that the restricted locations provision exists comfortably within them.

Most obviously, States have long exercised their police power to reinforce property owners' right to exclude by enacting relevant trespass laws. For example, New York's criminal trespass statute provides that a "person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." N.Y. Penal Law § 140.05. Such statutes take the informed consent of the property owner as the key determinant for whether an individual's presence is lawful, vindicating the owner's right to exclude by enforcing their own terms of entry through criminal sanction. This holds true for private property generally "open" to the public as much as for "closed" property. *See, e.g.*, *Carpenter v. City of New York,* 984 F. Supp. 2d 255, 265-266 (S.D.N.Y. 2013) (concluding that there was probable cause to arrest the plaintiff for criminal trespass in a bank open to the public because the bank employees asked the plaintiff to move their protest outside); *Yorzinski v. City of New York*, 175 F. Supp. 3d 69, 77 (S.D.N.Y. 2016) (noting that when premises are "open to the public," a person "remains unlawfully if he defies a lawful order not to enter or remain") (internal citations omitted). The law of civil trespass similarly reinforces an owner's right to exclude by empowering owners to demand compensation for unlawful entry. *See Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S. 2d 511, 511-512 (1st Dep't 1998).

Inevitably, both criminal and civil trespass laws assume general "default rules" or presumptions about consent that govern where an owner does not

expressly announce terms of entry. For instance, the absence of a physical fence around a private property does not communicate implicit consent to enter, though in the past States had adhered to the opposite rule. *See infra* Section II.B (discussing States' shifts from "fencing out" to "fencing in" rules). With respect to the question of whether visitors can bring guns without an owner's express permission, there will necessarily be one of two default rules accepted by courts in the course of enforcing the law of trespass: An owner's silence will be construed as either permission or prohibition. That choice of default can be made through legislation, as in the case of New York's provision and as States have done with respect to other property-related default rules. *See, e.g.*, *Breard v. Alexandria*, 341 U.S. 622, 645 (1951) (upholding an ordinance prohibiting door-to-door solicitation unless a homeowner gave prior consent). Or that choice can be made through a common-law judicial process involving individual adjudications of alleged trespasses. *See* Blocher & Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 315 n.128 (2016). Either way, there will necessarily be a default rule on this issue adopted, explicitly or implicitly, by state legal institutions.

In addition to furnishing sanctions for when an owner's terms of entry are violated and setting default rules that inform how terms of entry should be interpreted, states routinely shape how owners make exclusion decisions in the first

instance. State enactments that promote disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling property owners to execute terms of entry that more closely align with their preferences. *See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006).

Alongside legislation regulating informational exchange, the common law of torts influences owners' exclusion decisions by imposing duties toward guests or other entrants. For example, a property owner bears a duty to protect guests from foreseeable dangers present on the land or posed by other guests. *See Philip v. United Force Sec. Corp.*, 516 F. App'x 38, 38 (2d Cir. 2013). Legal rules imposing liability for wrongdoing or injury arising on an owner's premises will have some degree of influence on an owner's decision to exclude certain people or forms of behavior. *Cf.* Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53, 63 (1986) (examining a variety of legal regimes that encourage "gatekeepers" to "disrupt misconduct largely by excluding wrongdoers from a particular market"). In the context of firearms possession, such liability may impact the possession and use of guns on private premises even though these rules do not explicitly regulate guns as such. *See* Blocher & Miller, *supra*, at 298.

- 9 -

Together with these many legal rules ordering private behavior, New York's restricted locations provision contributes to the backdrop against which individual owners exercise their right to exclude. It is a default rule informing the meaning of an owner's silence as to whether guns are permitted, much like other default rules shaping the meaning of consent in the criminal and civil trespass contexts (*e.g.*, the established rule that the absence of a physical fence does not indicate implicit consent to enter). And as with these analogous default rules, decisions over whether a gun possessor may enter remains with the owner, just as it was before the CCIA and as it has always been. Perhaps New York's restricted locations provision will have the effect of increasing the proportion of owners who will exercise their right to exclude gun possessors, though this may be offset by the decisions of other owners to explicitly welcome firearms by posting signs on their property or notices on the Internet, or giving express consent by other low-cost means. Any such net effect reflects the preferences of landowners to protect their property and is not unique, considering the many ways in which court-made common law as well as state legislation influence owners' exclusion decisions.

### 2. The right to exclude inheres in all private property— including private property open to the public

The district court drew a distinction between private property that has been opened to the public and that which has remained closed. *See* SA173. In doing so, the court seemed to assume that owners of commercial property have less

- 10 -

constitutional leeway in setting terms of entry pertaining to gun possession than owners of closed property, and thereby centered its analysis on open property. SA166-172. But the constitutionality of the restricted locations provision flows directly from the right to exclude—which remains robust for open and closed private property alike.

Although there are important constitutional differences between open and closed private property, those differences do not fundamentally diminish a property owner's right to exclude. This becomes clear from the vantage of the Court's Takings jurisprudence. Though some forms of unwanted entry onto closed private property may constitute *per se* takings while those onto open private property are analyzed under the more "flexible" *Penn Central* balancing framework, *see Cedar Point*, 141 S. Ct. at 2072, 2076-2077, the Court has never suggested that the owner's right to set terms of entry is *nonexistent* for owners of open property. Indeed, the Court has consistently reaffirmed that property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'" *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980) (quoting *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972)); *see also Lloyd Corp.*, 407 U.S. at 569 ("The essentially private character of a store … does not change by virtue of being large or clustered with other stores in a modern shopping center.").

**B.  A Constitutional Right To Carry A Weapon Onto Another's Property Would Vitiate The Right To Exclude And Therefore Must Be Rejected**

Recognizing a Second Amendment right to carry a weapon onto another's private property would be an unprecedented abrogation of the owner's right to exclude—the "hallmark of a protected property interest," *Florida Prepaid*, 527 U.S. at 673.  It is unsurprising, then, that no court has recognized such a constitutional exception to the exclusion right.[3]

In codifying a pre-existing common-law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights," including an "owner's exclusive right to be king of his own castle."  *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1264 (examining the compatibility between the rights at common law).  Rather, the right to bear arms was clearly circumscribed by the common law of trespass, which reflected an unfettered right to exclude armed individuals and never exhibited special treatment for firearms.  *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 171 Md. 159, 188 (1936)

---

[3] There have been recent state *legislative* attempts to extend an array of gun-related privileges into private-property settings, including "bring your gun to work" statutes restricting employers from barring licensed carry in certain areas. *See, e.g.*, 430 ILCS 66/65(b) (2021) (restricting employers from prohibiting the carrying of a firearm within a vehicle on an employer's parking lot).  But these statutes say nothing about the scope of the individual right to bear arms (*i.e.*, the constitutional floor).  After *Cedar Point*, these statutes may constitute unconstitutional regulatory takings under the federal Takings Clause.

(surveying the history of "the relative rights of fox hunters and the owners of the land over which they hunt" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

This is not to say that the right to exclude, as instantiated through the law of trespass, was absolute. For example, the common law of trespass long accommodated defenses of necessity as well as "reasonable access" requirements meant to constrain innkeepers and common carriers from arbitrarily excluding patrons. *See, e.g.*, *Ploof v. Putnam*, 71 A. 188, 189 (Vt. 1908) (necessity defense); *Madden v. Queens Cnty. Jockey Club, Inc.*, 296 N.Y. 249, 253 (1947) (reasonable access). But unlike these longstanding black-letter limitations, a constitutional defense to the law of trespass based in the right to bear arms was *never* recognized—much less even considered—by courts.

The historical absence of any firearms-related exception to the right to exclude dovetails with the more general relationship, as elaborated by the federal courts in modern times, between the owner's right and the federal constitutional rights of non-owners. Indeed, amici are aware of only two potential instances where the right to exclude has been judicially limited by the federal constitutional rights of non-owners: the judicial enforcement of racially restrictive covenants and restrictions on street expression imposed by privately-run company towns. But neither offers a rationale relevant to the Second Amendment context, especially

- 13 -

considering that they arose long after Reconstruction—the historical moment most relevant for purposes of defining the balance between the right to exclude and the right to carry.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court found that the enforcement of a racially restrictive covenant was prohibited by the Equal Protection Clause. Its analysis turned on the fact that the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint." *Id*. at 19. In other words, *Kraemer* pit both the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant they had collectively enacted. A neighbor's right to enforce a covenant against the potential buyer of another property may seem analytically similar to the right to exclude, but such an enforcement right has never been given nearly as much legal force. *See, e.g.*, *Birt v. Ratka*, 886 N.Y.S.2d 293, 293 (2009) (extinguishing a restrictive covenant solely because it "is of no actual and substantial benefit to the persons seeking its enforcement"). Thus, *Kraemer* cannot stand for a general constitutional limit on the right to exclude because it did not even involve such a right; that property rights were involved on both sides of the

- 14 -

ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

The only other arguable occasion where constitutional rights have limited the right to exclude involves the privately run "company towns" once prevalent in the American South.  In *Marsh v. Alabama*, 326 U.S. 501 (1946), the Supreme Court held that a private company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials.  The Court stressed, however, that the company town had "all the characteristics of any other American town."  *Id*. at 502.  In *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308 (1968), the Court momentarily expanded *Marsh*'s rationale to protect a union's picketing of a store located in a shopping center.  Just four years later, though, the Court shifted course, definitively limiting *Marsh*'s reach to the company towns of yesteryear.  *See Lloyd Corp.*, 407 U.S. at 568 (overturning *Logan Valley* and recognizing that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned"); *Hudgens v. NLRB*, 424 U.S. 507, 516-517 (1976) (recognizing that *Marsh*'s rationale only applies to private property that "has taken on all the attributes of a town").  Whatever doubts remained as to the scope of this doctrine were resolved in *PruneYard*, where the Court considered whether California's state constitutional

right to petitioning inside shopping centers effectuated a taking, but was clear that "when a shopping center owner opens his private property to the public for purposes of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression." 447 U.S. at 81. There is thus no difference today between open and closed private property with respect to entrants' expression and petition rights.

Other First Amendment rights likewise end at the private-property line, as courts have routinely recognized. *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain"); *Breard*, 341 U.S. at 645 (upholding a municipality's default rule that door-to-door solicitation was presumptively disallowed absent an owner's express prior consent, because "[i]t would be … a misuse of the guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass …."); *Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise). In short, a private owner's fundamental control over their dominion

means that they can decide to prohibit potential entrants carrying firearms, just as they can decide to prohibit handbill distributors, association members, newsgathering journalists, or religious observers.[4]

The rejection of a constitutional right to carry onto another's private property is also consistent with the Court's reasoning in *Heller* and *Bruen*. As the district court recognized, neither case establishes a right to carry a handgun on other people's private property closed to the public. *See* SA173. But neither does *Bruen* support the proposition that "a right to carry in public" includes private property open to the public. SA167.

For one, Justice Thomas's majority opinion uses only the term "public" without further elaboration, even though when the Court refers to private commercial sites in other contexts it is careful to use qualified language like "quasi-public" or "property open to the public"—suggesting that the legal meaning of "public" has long been distinct from private real property. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for

---

[4] Analogies to the First Amendment reveal an additional reason why the Second Amendment does not restrict an owner's right to exclude gun possessors: Just as First Amendment rights to free speech or religious exercise include the bilateral rights not to speak or not to practice, so too should the Second Amendment right to bear arms in self-defense encompass the freedom not to keep or bear them. *See* Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1, 26-50 (arguing that being forced to have a gun brought into one's home constitutes compelled keeping).

the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are 'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'"). More crucially, construing "public" to include "private commercial property" would be the first time since *Logan Valley Plaza* in 1968 (which the Court overturned soon thereafter) that a federal constitutional right was found to override the exclusion right inhering in private commercial property. *See supra* Section II.B. Had the Court in *Bruen* wished to upset the constitutional status of the right to exclude and private property at large, it would have said so. *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

### C. Because There Is No Second Amendment Right To Carry Onto Another's Property Nor To A Presumption That A Private Owner Welcomes Firearms, The Restricted Locations Provision Does Not Implicate The Second Amendment And Plaintiffs Fail To Meet *Bruen* Step One

Because there is no constitutional right to enter onto another's property without the owner's permission, much less a Second Amendment right to carry weapons onto that property, the fact that New York's restricted locations provision enables private owners to more easily avail themselves of their right to exclude gun

possessors is of no constitutional concern.[5]  Put another way, there is no freestanding Second Amendment right to have a private owner's silence regarding the issue of guns construed in a particular direction, just as there is no constitutional right to either default rule informing the meaning of the absence of a physical fence for purposes of trespass.  New York's restricted locations provision does not, therefore, implicate the text of the Second Amendment and this Court need not reach Step Two of the *Bruen* test.

---

[5] Even if there were such a Second Amendment right to carry guns onto another's private property, plaintiffs lack standing to challenge the restricted locations provision on that basis.  *See* Appellants Br. Section I.A.  Moreover, it is not clear that the restricted locations provision encumbers that right.  Under the provision, any exclusion of a gun possessor is the decision of the individual owner—not of the state.  *Cf. American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (finding no state action, and thus no constitutional rights violation, where the "[a]ction taken by private entities [is] with the mere approval or acquiescence of the State"); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains .").  Perhaps the provision will encourage owners to exercise their right to exclude gun possessors more readily, but that alone is not enough to trigger a constitutional problem considering how practically easy (and without any risk of legal liability) it is for owners to opt out through the posting of a sign announcing the permissibility of firearms.  The fact that private owners, not the state, have the first and final word distinguishes this situation from unconstitutional legislative attempts to assign entry determinations to state actors.  *See, e.g.*, *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002) (striking down an ordinance requiring that individuals obtain an official's permission to engage in door-to-door solicitations).

- 19 -

Even accepting that there is no right to carry onto another's private property, plaintiffs may still argue that the provision implicates the *Bruen* right to carry on public property. But the right to public carry, of whatever ultimate scope, is perfectly compatible with the restricted locations provision. The provision does not restrict an individual's ability to obtain a gun and carry it in public (*i.e.*, on public property), and therefore has no resemblance to the law at issue in *Bruen*. In other words, an individual can exercise the maximum extent of the *Bruen* right all the while complying with the provision's consent requirement.

To the extent Plaintiffs claim that the provision implicates the text of the Second Amendment because it may have the effect of reducing rates of public carry (*i.e.*, gun owners seeking to enter a mix of public and private properties over the course of a day may decide to leave their guns at home), such an "effects" theory is misguided for four reasons. First, it is simply too early to know whether and to what extent the default rule will influence owners' exclusion decisions. Second, countless laws and regulations—including those that facially have nothing to do with firearms—have significant if not comparatively greater disincentivizing effects with respect to both gun possession at large as well as private owners' decisions to exclude gun possessors. *See supra* Section I.A.1. Third, aside from the Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142

- 20 -

S. Ct. at 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates. And fourth, even if effects were to somehow matter constitutionally, the relevant measurement is the reduction in carrying caused by landowners who prefer to permit visitors to carry guns but for some reason fail to contract around the no-carry default. But the size of this effect may be highly circumscribed considering the broad support for a "no carry" default. *See* Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 187-189 (Winter 2020) (finding that only 28.7% of New York respondents said that a plumber should be allowed to bring a gun onto one's premises without express permission, only 34.9% said that a visiting friend should be allowed to bring a gun without express permission, and only 38% said that a customer should be allowed to bring a gun onto commercial property without express permission).[6]

---

[6] In addition, the effect is likely circumscribed because, even before the passage of the CCIA, gun-friendly businesses had been holding themselves out as such to capture what market demand there is. *See, e.g.*, Zambito, *NY's New Gun Laws Restrict Weapons in Businesses, But Some Owners Welcome Them. Here's Why*, Lohud (July 28, 2022), https://www.lohud.com/story/news/2022/07/28/as-nys-gun-laws-restrict-guns-in-businesses-some-owners-welcome-them/65382470007 (describing the positive customer support received by New York businesses that have posted "[c]oncealed [c]arry is welcome here" signs). Online databases are also emerging to help gun owners locate gun-friendly businesses. *See, e.g.*, Friend or Foe, Home Page, https://friendorfoe.us. There is

In a separate vein, Plaintiffs have suggested that the *Heller* right to control the presence of guns on one's own private property is implicated because the provision will allegedly make it more difficult for property owners to invite guns onto their premises. But for reasons elaborated in the State's brief, the provision imposes no legal liability on owners such that there is no standing for this theory of injury. *See* Appellants Br. Section III.A.1. In any event, the provision does not in any way restrict an owner's choice to possess guns himself or to allow guns for potential entrants; it simply alters the meaning of an owner's silence on the issue. Ultimately, the legislative selection of this default rule, just like the selection of a presumption pertaining to trespass generally, is committed to a state's police power rather than controlled by federal constitutional rights. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) (noting that "the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation").

*    *    *

At bottom, Plaintiffs are arguing that the constitutional rights of potential entrants override the private choices of landowners regarding access to their property. For good reason, that is not how constitutional law works. The restricted locations provision enjoys considerable public support precisely because the public

---

presently no evidence for the view that the new law will inhibit gun carriers from engaging in commercial activity like buying gas or eating out.

sees it as the better default rule—*i.e.*, it makes it easier for private owners who do not want guns on their premises to maintain those terms of entry, though enables those who would like to permit guns to do so.  The extent to which the restricted locations provision will influence the influx of guns onto private premises is difficult to predict.  But what is not hard to predict is that whatever happens will dominantly be the result of private owners' preferences, not those of the state.

## II. NEW YORK'S RESTRICTED LOCATIONS PROVISION IS CONSISTENT WITH HISTORY AND TRADITION

For the reasons stated above, the Second Amendment is not implicated by the provision.  But even if it were, New York's restricted locations provision should still be upheld as "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

### A. The State's Analogues Establish The Law's Consistency With History and Tradition

The historical analogues on which the State relies amply support the proposition that New York's restricted locations provision is consistent with the nation's history and tradition.  In *Bruen*, the Supreme Court affirmed that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar,'" and that two metrics that might be relevant to that inquiry are "how and why the regulations burden a law-abiding citizen's right to armed

self-defense." *Bruen*, 142 S. Ct. at 2132-33.  And it instructed that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id*. at 2133.

In its analogical evaluation, the district court made three principal errors. First, it misapprehended the plain text of the statutes.  Second, it overlooked historical context key to understanding the statutes.  And third, it mischaracterized the statutes' common purpose.

Below, the State identified eight historical analogues: colonial-era laws from New York (1763), New Jersey (1722 and 1771), Pennsylvania (1721), and Maryland (1715), as well as Reconstruction-era laws from Louisiana (1865), Texas (1866), and Oregon (1893).  *See* JA697-698, 702, 706, 710, 712, 721, 727, 733. Like the restricted locations provision, each statute conditioned the carrying of firearms on the express consent of the private owner by prohibiting the carrying or possession of a gun on another's private property without permission.  *See* JA697 (bars "carry[ing] any gun"); 702 ("be[ing] seen to carry a gun"); 706 ("carry[ing], shoot[ing], or discharg[ing] any Musket, Fowling-Piece, or other Fire-Arm whatsoever"); 710 ("carry[ing] any Gun"); 712 ("carry[ing] any Gun"); 721 ("carry[ing] fire-arms"); 727 ("carry[ing] firearms"); 733 (prohibiting "being armed with a gun, pistol, or other firearm").  In other words, *how* the historical analogues would burden alleged Second Amendment rights is similar—if not

identical—to Plaintiffs' argument regarding New York's provision. *See Bruen*, 142 S. Ct. at 2132-2133. Both then and now, the only instances potentially burdening Second Amendment rights are those where property owners want to allow visitors to carry firearms but are unable to communicate consent. But given the multiplicity of means (*e.g.*, online posts or physical signs) by which owners can provide consent under New York's provision, such instances will likely be proportionately rarer than they were under the analogues.

The district court summarily dismissed these similarities, focusing instead on the statutes' attention to poaching. SA167. But the statutes resist such a narrow reading. It is true that some prohibit additional conduct—including "hunting," "poaching," or "killing"— but these additional prohibitions are each set off with the disjunctive "or." The ordinary purpose of "or" is to denote alternatives. *See United States v. Woods*, 571 U.S. 31, 45-46 (2013). And that is the most natural reading here—indeed, if the statutes were meant to prohibit only conduct relating to hunting or poaching, the term "carrying" would be rendered superfluous. Whatever the animating concerns of these laws were, their texts plainly prohibit the possession of guns on another's property without first obtaining consent. That plain and unambiguous meaning, which the district court failed to even consider, should "control[] without need for further inquiry." *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015).

- 25 -

The district court further erred by misreading the term "enclosure," which led it to underappreciate the analogous character of the historical statutes. It identified "enclosure" with the physical fencing in of property, SA168, even though "enclosure" was not so limited historically. *See, e.g.*, 3 Blackstone, *Commentaries on the Laws of England* ch. 12, p. 209-210 ("[E]very man's land is in the eye of the law inclosed and set apart from his neighbour's," whether set apart "by a visible material fence" or "by an ideal invisible boundary, existing only in the contemplation of law."). Moreover, only two of the statutes (the 1870 Texas law and the 1893 Oregon law) limit their reach to "inclosed" lands; the others that mention "enclosure" (the 1721 Pennsylvania law, the 1722 New Jersey law, and the 1763 New York law) do not limit their scope to enclosed lands but rather use the term as an explanation or as a penalty enhancer. This is not surprising, considering how property law exists to protect an owner's right to control what happens on their land, *see supra* Part I, above and beyond the physical structures an owner may use to maintain control.

Finally, the purpose of these historical analogues and the New York provision—or their *why*, to borrow the phrasing in *Bruen*—is the same: to support the ability of owners to protect themselves and their property. By ensuring that owners are informed of the presence of guns and given a chance to consent, the analogues empowered owners to decide whether permitting guns would enhance or

- 26 -

undermine their safety and security.  This shared purpose is precisely that at the core of the Second Amendment: to protect "the home, where the need for defense of self, family, and property is most acute." *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

### B.  New York's Restricted Locations Provision Is Properly Understood As Default-Shifting Legislation And Not An Outright Prohibition On Carrying Firearms

As discussed above in Parts I and II, New York's restricted locations provision is a default rule.  But the district court mischaracterized the type of regulation at issue, instead finding that it was "a thinly disguised version of the sort of impermissible 'sensitive location' regulation that the Supreme Court considered and rejected in [*Bruen*]," SA172.  Whereas "sensitive-place" laws typically prohibit the carrying of firearms in defined locations, *see Bruen*, 142 S. Ct. at 2133, default-shifting laws effect no such prohibition, *see* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 289 (2018) ("Private property in general is not part of the sensitive places doctrine.").  Indeed, New York's provision is consistent with a long history of default-shifting legislation, further indicating that it is not a type of regulation that would have triggered constitutional concern at the Founding or Reconstruction.

States have long used their legislative prerogative to clarify default rules across different areas of property law.  *See supra* Section I.A1 (providing varied

modern examples of default legislation). In the nineteenth century, for instance, States adopted new default rules over whether one's domesticated cattle were allowed to graze on the land of another property owner. *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986) (documenting the shifts to "fencing in" regimes that find trespass if cattle graze on another's property without that owner's affirmative consent). Before and after the shift in default, property owners were empowered to permit or prohibit grazing. But state legislatures decided that, as a matter of public policy, it was best to refocus responsibility on the cattle owner and away from other landowners. *See* Merrill & Smith, *What Happened to Property in Law and Economics?*, 111 Yale L.J. 357, 389-390 (2001). After the default shift, grazing cattle on another owner's land without their permission became an actionable trespass. Or consider intestacy laws, which govern how property is distributed at death. States have long created and refashioned presumptions over distribution that control until an owner opts out. *See* Poppe, *Choice Building*, 63 Ariz. L. Rev. 103, 112-117 (2021) (discussing how intestacy laws are a form of default rule); *see also Hodel v. Irving*, 481 U.S. 704, 717 (1987) ("reaffirm[ing] the … broad authority [of States] to adjust the rules governing the descent and devise of property"). As States have long done across different areas of property law,

New York has chosen to clarify the default rule with respect to the issue of firearms on private property.

## CONCLUSION

History, tradition, and enduring principles of property law establish that New York's restricted locations provision is constitutional. Not only does this context show that the Second Amendment cannot be fairly read to trammel on property owners' right to exclude, but it also establishes that the provision is concordant with a long and extensive history of firearm regulation. The Court should reverse the district court's order granting a preliminary injunction.

Respectfully submitted.

/s/ Alan Schoenfeld

| | |
|---|---|
| SIMON B. KRESS | ALAN SCHOENFELD |
| WILMER CUTLER PICKERING | JUAN M. RUIZ TORO* |
| HALE AND DORR LLP | JOSHUA M. FEINZIG* |
| 60 State Street | WILMER CUTLER PICKERING |
| Boston, MA 02109 | HALE AND DORR LLP |
| | 7 World Trade Center |
| | 250 Greenwich Street |
| | New York, NY 10007 |
| | alan.schoenfeld@wilmerhale.com |

\* Admitted only in Washington, D.C.; practicing under the supervision of Principals of the Firm.

January 17, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.　　Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 6,982 words.

2.　　The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


　　　　　　　　　　　　　　　　/s/ Alan Schoenfeld
　　　　　　　　　　　　　　　　ALAN SCHOENFELD

January 17, 2023