# 22-2908 (L)

## 22-2972 (Con)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

IVAN ANTONYUK,

*Plaintiffs-Appellees,*

*v.*

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of
the New York State Police,

*Defendants-Appellants.*

*(Caption continues inside front cover.)*

---

On Appeal from the United States District Court
for the Northern District of New York, No. 1:22-cv-00986
Before the Honorable Glenn T. Suddaby

---

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
(646) 324-8174

January 17, 2023

*(Caption continues from front cover.)*

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN,
LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

*v.*

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of
Onondaga County, JOSEPH CECILE, in his Official Capacity as
the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of
New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga
County District Attorney, EUGENE CONWAY, in his Official Capacity as the
Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the
District Attorney of Albany County, GREGORY OAKES, in his Official Capacity
as the District Attorney of Oswego County, DON HILTON, in his Official
Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official
Capacity as the District Attorney of Greene County,

*Defendants*.

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT ................................................................................................. 4

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ............. 4

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ................................................................................................... 7

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers," Insufficiently Statistically "Representative," or of "Unknown Duration" .......................... 16

    IV.    This Court Should Consider Historical Context in Evaluating Historical Laws ........................................................................................ 25

CONCLUSION .......................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ...................................................................... 2

*Christian v. Nigrelli*,
No. 1:22-cv-00695, 2022 WL 17100631
(W.D.N.Y. Nov. 22, 2022) ......................................................... 3, 6, 17, 23

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) ................................................................................ 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008)....................................................................... *passim*

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3d Cir. 2021) ........................................................................ 8

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................8, 13

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ..............................................................19, 20

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ..................................................................... 8

*Hardaway v. Nigrelli*,
No. 1:22-cv-00771, 2022 WL 16646220
(W.D.N.Y. Nov. 3, 2022)............................................................... *passim*

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022) .............................................................................. 5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)......................................................................8, 12, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ................................................................... *passim*

*Rehaif v. United States*,
   139 S. Ct. 2191 (2019) ................................................................ 2

*Shelby Cnty., Ala. v. Holder*,
   570 U.S. 529 (2013) ................................................................... 23

*Spencer v. Nigrelli*,
   No. 6:22-cv-06486, 2022 WL 17985966
   (W.D.N.Y. Dec. 29, 2022) ............................................ 4, 17, 23

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) ..................................................... 8

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..... 11, 12

Brief for Independent Institute as Amicus Curiae, *New York State Rifle &
   Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ........................... 13, 17, 18

*Bulletin of the Park and Outdoor Art Association* (1901), *available at*
   https://bit.ly/3NPLSae ............................................................. 29

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's
   Greatest Treasure* (2019) .......................................................... 27

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:
   Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205
   (2018) ...................................................................... 13, 17, 18

David Schuyler, *The New Urban Landscape: The Redefinition of City Form
   in Nineteenth-Century America* (1988) ......................................... 26

Dept. of Interior, Compendium of Eleventh Census: 1890 (1892) ................. 21

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881) .......... 27, 28

James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1,
   2003), https://www.historians.org/research-and-
   publications/perspectives-on-history/september-2003/revisionist-
   historians ................................................................................ 22

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .......... 11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ........................................................................ 10

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020) ........................................................................................ 28

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ............................................................. 14

U.S. Bureau of the Census, *A Century of Population Growth* (1969), *available at* https://bit.ly/3QJizrn ........................................................... 18

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 650,000 in New York. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 40 cities, towns, and other localities in New York are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has filed more than 60 amicus briefs in Second Amendment and other firearms cases, including in this case below. *See Antonyuk v. Hochul*, No. 1:22-cv-00986, Dkt. 63 (N.D.N.Y. Oct. 19,

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person (including any party or party's counsel) contributed money to fund its preparation or submission. All parties on appeal consent to this brief's filing.

2022). Several courts have expressly relied on Everytown's amicus briefs. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The restrictions in New York's Concealed Carry Improvement Act ("CCIA") are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons defendants-appellants Nigrelli and Doran ("the State") set out in their brief, Dkt. 95 ("State Br.").[2] Everytown submits this amicus brief to expand on four points. *First*, on the initial, textual inquiry of the *Bruen* framework, plaintiffs have the burden, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia*

---

[2] This amicus brief addresses only aspects of plaintiffs-appellees' Second Amendment claims. The Court should reverse the district court's judgment for the reasons the State and defendant-appellant Cecile (*see* Dkt. 90) have set out.

2

*v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary—and it does not require a government to prove that the laws it presents were statistically representative of the nation or continuous over time. *Fourth*, *Bruen*'s inquiry requires consideration not just of historical laws but also of the historical context within which states and localities chose to legislate (or not to legislate)—a point we illustrate with the historical context surrounding the regulation of firearms in parks.

Everytown intends to submit amicus briefs in at least three other pending appeals involving challenges to the CCIA, two of which will be heard in tandem with this case. *See Hardaway v. Nigrelli*, No. 22-2933; *Christian v. Nigrelli*, No. 22-2987; *Spencer v. Nigrelli*, No. 22-3237. To minimize any need to read overlapping but distinct briefs, Everytown plans (absent unexpected developments) to submit briefs in *Hardaway*, *Christian*, and *Spencer* that will largely track this brief in substance. Accordingly, this brief will address some of the plaintiffs' arguments and district court's reasoning in *Hardaway v. Nigrelli*, No. 1:22-cv-00771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022); *Christian v. Nigrelli*, No. 1:22-cv-00695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022),

and *Spencer v. Nigrelli*, No. 6:22-cv-06486, 2022 WL 17985966 (W.D.N.Y. Dec. 29, 2022), as well as in *Antonyuk* below.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

In the district court, plaintiffs admitted that they had the burden on the initial, textual inquiry. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Permanent Injunction, Dkt. 6-1 ("D. Ct. Dkt. 6-1") at 32 ("Under *Heller* and *Bruen*, the standard for assessing Second Amendment challenges requires Plaintiffs to show that their conduct falls under the Second Amendment's plain text."). That admission was inevitable, for at least two reasons. First, *Bruen* itself makes it clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or

4

"because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Despite conceding that they bore the burden, however, plaintiffs made virtually no effort to carry it. They asserted that they "have clearly made this showing," Dkt. 6-1 at 32, but they cited no evidence (or even allegations) in support of that assertion. Plaintiffs instead merely stated, without more, that (i) they "are part of 'the People' protected by the amendment," (ii) "the weapons (handguns) in question are in fact 'arms' protected by the amendment," and (iii) "the regulated conduct falls under the phrase 'keep and bear.'" *Id.* at 32-33.

The district court erred in concluding that plaintiffs satisfied their burden with these minimal assertions. As the State explains, the "people" the Second

Amendment protects are "law-abiding, responsible citizens," and its licensing requirements exclude only those who are not in that category—those, in other words, who are not within the Amendment's text. *See* State Br. 29-30. With respect to "sensitive places," the district court appears to have concluded that the Second Amendment's text encompasses a right to carry loaded firearms in *all specific locations* that are open to the public simply because a government may not prohibit public carry *altogether*.[3] To the contrary, as the State explains, that would make the Second Amendment presumptively applicable to locations that the Supreme Court has already said fall outside its scope, like schools and government buildings. *See* State Br. 52-53. With respect to "restricted locations" that are open to the public—carrying on accessible *private property*—the district court passed over the textual step without comment.[4] As the State explains, the court's failure to require plaintiffs to establish that the Second Amendment's text encompasses carrying concealed arms on someone

---

[3] *See, e.g.*, SA 123-25 (textual analysis with respect to prohibitions in certain specific healthcare facilities; concluding that prohibition involves conduct within the Second Amendment's text except in those areas "to which the public or a substantial group of persons have not been granted access").

[4] As the State notes, *Antonyuk* correctly recognized that carrying on private property *not* open to the public does not implicate the Second Amendment. *See* State Br. 71; SA 173. In *Christian*, the relief granted was limited to private property open to the public (because that was all the plaintiffs requested), but the court's reasoning was not so limited. *See Christian*, 2022 WL 17100631, at *2 n.5. That reasoning was *a fortiori* erroneous.

6

else's property—something they manifestly cannot establish—was a misapplication of *Bruen*. *See id.* at 52.

On each of these questions of textual coverage, the CCIA stands in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevented law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150. Accordingly, plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public for self-defense, as the *Bruen* petitioners did. At the very least, plaintiffs should be required to prove that the Second Amendment's text protects their "proposed course of conduct," *id.* at 2134, with respect to each aspect of their challenge to the CCIA. They have failed to do so, and so are not entitled to relief.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868,

when the Fourteenth Amendment was ratified and made the Second

Amendment applicable to the states.

Several circuits reached this conclusion in analyzing state and local laws

under the Second Amendment at the first, historical step of the framework that

applied prior to *Bruen*.[5] *See Gould*, 907 F.3d at 669 ("Because the challenge here

is directed at a state law, the pertinent point in time would be 1868 (when the

Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684,

702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),]

confirms that if the claim concerns a state or local law, the 'scope' question

asks how the right was publicly understood when the Fourteenth Amendment

was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th

Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217,

227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth*

Amendments' ratifiers approved [the challenged] regulations …." (emphasis

added)).

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the
issue concluded that Second Amendment analysis should proceed in two steps:
a historical step, in which courts examined whether the challenged law
restricted conduct falling within the scope of the Second Amendment, as
historically understood; and, if so, a scrutiny step, where courts examined the
fit between the government's interest and the challenged law, usually under
intermediate scrutiny. *See id.* at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668
(1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

*Bruen* does not alter that conclusion. The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it need not resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, *Bruen* concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the State's brief, this Court can uphold New York's challenged laws under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. *See, e.g.*, State Br. 34-36 (licensing standard); 54-58 (sensitive places); 74 (restricted locations).[6] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the correct focus.

---

[6] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century (and even 20th-century) history to clarify that meaning. *See infra* pp. 15-16.

9

To begin with, in a case involving a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights

and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

11

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[7] More recently, Professor Lash wrote—as quoted in *Bruen*— "When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was

---

[7] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government").

incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[8]

---

[8] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) ("Indep. Inst. *Bruen* Br.")

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843). Mr. Clement's new firm, Clement & Murphy, represents plaintiffs-appellees challenging the CCIA's place of worship provision in *Spencer*, No. 22-3237 (2d Cir.) and No. 6:22-cv-06486 (W.D.N.Y.).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to

---

(disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[9] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2136-37 & 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison); *see also infra* Part IV (explaining *Bruen*'s admonition that new technologies or new societal concerns may "require a more nuanced approach" to historical inquiry).

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the

---

[9] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the State correctly points to such history in its brief. *See* State Br. 39, 54-55, 74-75.

provisions of the CCIA at issue. *See, e.g.*, State Br. 35-36, 55-56, 74.[10] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if the Court were uncertain that the State's extensive earlier evidence conclusively establishes the constitutionality of the challenged provisions in this case, it should then consider this later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the CCIA.

## III.  This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers," Insufficiently Statistically "Representative," or of "Unknown Duration"

In preliminarily enjoining provisions of the CCIA, the district court below (as well as the district court in other challenges currently on appeal) discounted the State's robust and extensive record of historical laws in part by characterizing its laws as "outlier enactments," insufficiently statistically "representative" of the nation, or of "unknown or limited duration." *See, e.g.*, SA 162-63 (rejecting State's laws as "outliers" that are "neither established nor representative"); *Hardaway*, 2022 WL 16646220, at \*16 (requiring "continuity"

---

[10] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

16

and rejecting laws of "unknown duration"); *Christian*, 2022 WL 17100631, at

*8; *Spencer*, 2022 WL 17985966, at *11-12. Each of these was in error. *Bruen*

does not justify dismissing the historical laws the State has presented in these

cases as "outliers," and it imposes no burden on the State to demonstrate

statistical representativeness or endurance over time. To the contrary, *Bruen*'s

discussion of the historical laws justifying sensitive-places restrictions

demonstrates that a small number of laws can establish a tradition, that even

small-population jurisdictions matter, and that proof of "continuity" is not

required.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and

government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*,

554 U.S. at 626), and then recognized that three additional, more specific

locations (legislative assemblies, polling places, and courthouses) were also

"'sensitive places' where arms carrying could be prohibited consistent with the

Second Amendment," *id.* But the sources the Court cited for the historical

record justifying restrictions in those three locations identified *only two laws*

naming legislative assemblies and *two laws* naming courthouses. *See* Kopel &

Greenlee, 13 Charleston L. Rev. at 235, 246; Indep. Inst. *Bruen* Br. 11-12.[11]

---

[11] In addition, *Bruen* repeatedly used the singular when referring to the
government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S.

Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were enacted three years apart, in 1647 and 1650, in a single colony, Maryland, that made up an estimated 8.7 percent of the total population in 1650.[12] *See id.*; Kopel & Greenlee, 13 Charleston L. Rev. at 235.

Under *Bruen*'s sensitive-places analysis, therefore, a small number of laws covering a small proportion of the nation's population can suffice to establish a tradition of regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[13] Moreover, as

_____

Ct. at 2133.

[12] *See* U.S. Bureau of the Census, *A Century of Population Growth* 9, Table 1 (1969), *available at* https://bit.ly/3QJizrn.

[13] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative comment should not be given undue weight given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is no such "overwhelming" evidence of a right to carry in any of the locations the CCIA regulates. And—to be clear—even if there were evidence of a traditional *practice* of carrying in those locations, that would not be enough. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressman to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

18

demonstrated further below, *see infra* pp. 23-24, nothing in *Bruen*'s sensitive-places analysis suggests that a government must establish "continuity" of a location restriction over time before the Supreme Court will assume it "settled" that guns may be prohibited in that location. Indeed, its approval of prohibitions in legislative assemblies on the basis of two laws in a three-year span indicates the opposite.

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the

Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

Similarly, courts should not reject historical laws merely because they covered a small percentage of the nation's population, for at least three reasons. *First*, as explained above, such an approach runs counter to *Bruen*'s discussion of sensitive places, which approved restrictions in (for example) legislative assemblies without looking further than two laws in one small jurisdiction. *See supra* pp. 17-18.[14] Some district courts have concluded

---

[14] Indeed, the district court below seems to have understood this point when it discussed restrictions on firearms in preschools, noting that "the Supreme Court has already recognized the permissibility of this restriction as it applies to 'schools.'" SA 145 (quoting *Heller*, 554 U.S. at 626). The court explained that it "[could] see why this is so, based on the historical analogues"

20

otherwise based on *Bruen*'s brief reference to "miniscule territorial populations," 142 S. Ct. at 2154; *see* SA 14-15; *Hardaway*, 2022 WL 16646220, at *15, but the Supreme Court there was merely explaining why a handful of territorial carry restrictions did not counteract the "overwhelming evidence" it had already found in favor of "an otherwise enduring American tradition permitting public carry," *Bruen*, 142 S. Ct. at 2154. Accordingly, absent "overwhelming" evidence of a widespread contrary tradition, a jurisdiction's relatively small population size is no reason to deny it a role in the nation's historical tradition.[15] *Second*, as multiple historians have commented, the process of unearthing and understanding historical laws demands patience and

---

it had examined. *Id.* It then cited four laws prohibiting any person from carrying weapons in schools: an 1870 Texas law, an 1883 Missouri law, an 1889 Arizona territorial law, and an 1890 Oklahoma territorial law. *Id.* at 145 n.112; *see also id.* (citing two university rules and Mississippi law concerning college students only as "*cf.*"). Those four jurisdictions made up only about 8 percent of the American population in 1890. *See* Dept. of Interior, Compendium of Eleventh Census: 1890, at 9 (1892); *cf.* SA 131 (finding 12.9 percent insufficiently representative of the total population). But, as the court seemingly understood, those two state and two territorial laws nevertheless demonstrate a robust tradition of completely prohibiting firearms in schools.

[15] For similar reasons, there is no basis in *Bruen* for concluding that city ordinances are not "part of this Nation's historical tradition of firearm regulation" unless "accompanied by similar laws from states." SA 94. *Bruen*'s discussion of city ordinances was limited to a single paragraph about a Kansas law that would have applied to three cities in 1890 and, as with the territorial laws, cut against what it called the overwhelming weight of other evidence. *See* 142 S. Ct. at 2155-56. To glean from that passage a categorical rule that local ordinances form no part of the nation's historical tradition is nonsensical.

openness to constant reevaluation.[16] Where a state—particularly in expedited preliminary litigation—has produced historical laws covering only a small percentage of the nation's population, newly-discoverable historical sources may later yield more examples and increase that percentage.[17] To discard a state's proffered laws for failing to meet some unstated population threshold is to fundamentally misunderstand the gradual and cumulative nature of historical research. *Third*, dismissing the laws of states with smaller populations is in tension with what the Supreme Court has deemed a "historic tradition" and "fundamental principle" of our constitutional bargain: "that all the States enjoy equal sovereignty." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529,

---

[16] *See* Decl. of Prof. Zachary Schrag, *Angelo v. District of Columbia*, No. 1:22-cv-01878, Dkt. 18-13 (Sept. 16, 2022) (explaining historical research process and basis for conclusion (at ¶ 41) that 60 days would be inadequate even for a team of professional historians to "adequately research the questions presented in *Bruen*" in challenge to firearms prohibition on DC's metro); State Br. 38 (citing scholar explaining that many local ordinances have been lost to time); James McPherson, *Revisionist Historians*, Persps. on Hist. (Sept. 1, 2003), https://www.historians.org/research-and-publications/perspectives-on-history/september-2003/revisionist-historians ("History is a continuing dialogue between the present and the past. Interpretations of the past are subject to change in response to new evidence, new questions asked of the evidence, new perspectives gained by the passage of time.").

[17] *Compare, e.g.*, SA 136-42 (considering eight park ordinances in addressing CCIA's restriction on guns in parks), *with* State's Exhibits 12 to 78, *Christian*, No. 1:22-cv-00695, Dkts. 33-3, 33-4, 34, 35 (in a case focused more narrowly on CCIA's parks restriction, exhibiting over sixty 19th- and early-20th-century parks prohibitions).

540, 544 (2013) (citations omitted). If the people of a small state responded to local needs by enacting certain policies, the fact that their neighbors in a larger state chose a different path does not nullify the constitutional agency of the smaller state.

The demands that the district judge in *Hardaway* made for "continuity" of laws the State presents likewise has no foundation in *Heller* or *Bruen*.[18] The primary originalist inquiry asks how the public understood the scope of the right "*when* the people adopted" it, *Heller*, 554 U.S. at 634-35 (emphasis added)—not over some unspecified period of continuous time. Certainly, evidence from before, during, or after 1868 can all help demonstrate how the public understood the right in 1868. *See, e.g.*, *id.* at 605 ("[E]xamination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification … is a critical tool of constitutional interpretation."); *see also supra* pp. 15-16. But nothing in *Heller*, *Bruen*, or originalist principles says that the understanding at the time of

---

[18] The same district court judge decided *Hardaway*, *Christian*, and *Spencer*, and applied this "continuity" requirement in all three. *See Hardaway*, 2022 WL 16646220, at *16; *Christian*, 2022 WL 17100631, at *8; *Spencer*, 2022 WL 17985966, at *11. *Antonyuk* found "no reason to disagree" with *Hardaway*'s analysis. SA 129. We refer to the "continuity" discussion in *Hardaway* for brevity, but errors we identify apply equally to any such requirement in other decisions.

adoption must also be a "continu[ous]" one. In concluding otherwise, *Hardaway* relied on *Bruen*'s discussion of territorial enactments, which the Supreme Court described as "short lived," 142 S. Ct. at 2155. *See* 2022 WL 16646220, at \*15-16; *cf.* SA 13-14. *Bruen* explained that territorial carry restrictions, due in part to their transitory nature, could not outweigh the "overwhelming" evidence of a contrary tradition in support of public carry. 142 S. Ct. at 2155. But absent overwhelming contrary evidence, there is no reason to dismiss territorial laws out of hand. And there is even less reason to require states to prove affirmatively the continuity of every state or local law they rely on, because unlike territorial laws—which, *Bruen* said, were "transitional," "temporary," and regularly did not survive the ascension to statehood, *id.* at 2154-55—state and local laws have no such presumptive termination.[19] There is thus no basis for dismissing laws of "unknown duration."

Leaving aside the error in requiring proof of continuity, the district court in *Hardaway* and *Spencer* failed to recognize that the record *already contained* that proof—namely, that the State's historical laws persisted for decades and,

---

[19] If plaintiffs wish to argue that certain historical laws were promptly repealed, they are free to submit proof to that effect—but nothing in *Bruen* suggests that it is the state's burden to prove the duration of historical state and local laws.

as the State notes, that "state high courts repeatedly confirmed [their] constitutionality," State Br. 56-58; *see, e.g.*, Everytown Amicus Br., *Hardaway*, No. 1:22-cv-00771, Dkt. 47, at 11-12. That court simply chose to ignore those facts. *Compare, e.g.*, *id.*, *with Hardaway*, 2022 WL 16646220, at *16 & n.19.

## IV. This Court Should Consider Historical Context in Evaluating Historical Laws

In evaluating the historical laws the State has presented, this Court should recognize that context matters. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. In *Bruen*'s words, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to history. 142 S. Ct. at 2132.

The CCIA's restrictions on firearms in public parks exemplify this point.[20] Many dozens of historical laws from the mid-19th century through the early 20th century establish that prohibiting firearms in parks is "consistent

---

[20] Only *Antonyuk* enjoined the CCIA's parks prohibition; that issue remains pending in *Christian*. *See* No. 1:22-cv-00695, Dkts. 48, 60. We discuss the *Christian* plaintiffs' arguments because the *Antonyuk* plaintiffs might try to raise similar arguments on appeal.

with this Nation's historical tradition of firearm regulation," *id.* at 2126. *See* JA 671-89, 748-66; *supra* note 17 (noting that State exhibited over sixty 19th- and early 20th-century parks prohibitions in *Christian*).[21] Given that 1868 is the correct focus for this Court's analysis, these laws establish beyond doubt that prohibiting firearms in parks is constitutional. But even if the Court were to focus its analysis on an earlier period, it should still give these 19th- and 20th-century laws particular weight, because parks in the modern sense did not begin to emerge until the mid-19th century. *See generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals). Given Central Park's position as the foundational paradigm of this new movement, it is particularly significant that its original 1858 rules, brief enough to appear on a single sheet and "posted in conspicuous locations that would be easily seen by all visitors," Cynthia S.

---

[21] *See also, e.g.*, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (citing and linking 20 parks restrictions and compilation of federal restrictions); *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (same, for additional 46 parks restrictions).

Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019), forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Further evidence that parks as we understand them today first took hold in the second half of the 19th century comes from Frederick Law Olmsted himself, Central Park's principal architect and first Commissioner. In 1881, Olmsted wrote: "Twenty-five years ago we had no parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus recently occurred[.]" Frederick Law Olmsted, *The Justifying Value of a Public Park* 7-8 (1881). Olmsted explained that this notion of parks was revolutionary, not simply "an improvement on what we had before, growing out of a general

27

advance of the arts applicable to them." *Id.* at 8. Parks in the modern sense were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. Under *Bruen*, that is reason enough to conclude that the State's historical park regulations amply justify its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged. And this point holds equally for wilderness parks as for urban parks; for example, prohibitions on firearms in National Parks were enacted soon after they were established. *See* State Br. 66 n.22; *see also* State Br. 66 ("Most state park systems were not established until the twentieth century[.]").

In *Christian*, the plaintiffs attempted to rebut the fact that firearms prohibitions emerged alongside or soon after the creation of parks by arguing that Boston Common was a "park" that had existed since "well before the founding" and, given its use in the 17th and 18th centuries for "military training," the State "will be unable to point to any" founding-era tradition of restricting firearms in parks. *See Christian*, No. 1:22-cv-00695, Dkt. 19-1, at 17. But that claim—in addition to being a non-sequitur—rested on a misconception about Boston Common. During its first two centuries, the Common was shared grazing land, not a park. *See, e.g.* Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at*

28

https://bit.ly/3NPLSae (Common was used for grazing "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park"). Thus, Boston Common at the founding did not present the same "general societal problem" that New York has sought to address with its prohibition on guns in parks today. And even if the Common had been a park at the founding, the fact that there was one such location for which the historical record has not (yet) yielded a prohibition on carrying firearms proves nothing about whether Bostonians historically understood the right to keep and bear arms to foreclose such a prohibition. If public carry in Boston was rare (either because of social mores or because of carry regulations not specific to particular locations), then its inhabitants may have seen no need to enact sensitive-places prohibitions; or they may have chosen not to regulate (if that is what they chose) for policy, rather than constitutional, reasons. *See supra* pp. 19-20 (federalism requires respect for decisions to legislate, or not, according to local needs).

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction.

Dated: January 17, 2023

Respectfully submitted,

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
jcarter@everytown.org
(646) 324-8174

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 6,965 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

/s/ Janet Carter
Janet Carter
*Counsel for amicus curiae*
*Everytown for Gun Safety*