# 22-2908 (L)

## 22-2972 (Con)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

IVAN ANTONYUK,
PLAINTIFFS-APPELLEES,

v.

STEVEN A. NIGRELLI, in his Official Capacity as
Acting Superintendent of the New York State Police, *et al.*,
DEFENDANTS-APPELLANTS.

*(Caption continues inside front cover.)*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

**BRIEF FOR THE DISTRICT OF COLUMBIA, THE STATES OF ILLINOIS,
CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, OREGON, RHODE
ISLAND, VERMONT, AND WASHINGTON, AND THE NORTHERN MARAIANA
ISLANDS AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ALEXANDRA LICHTENSTEIN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9807
ashwin.phatak@dc.gov

KWAME RAOUL
Attorney General for the State of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

*(Additional counsel on signature page)*

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN,
LESLIE LEMAN, LAWRENCE SLOANE
PLAINTIFFS-APPELLEES,

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County,
JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,
DEFENDANTS-APPELLANTS,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York,
WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney,
EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID
SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY
OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in
his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official
Capacity as the District Attorney of Greene County,
DEFENDANTS.

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ...........................................................................................3

    I.    The Second Amendment Allows States to Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence..............................................................3

    II.   New York's Licensing Regulations Help Prevent Dangerous Individuals From Publicly Carrying Firearms ......................................7

    III.  New York's Designation of "Sensitive Places" Protects Uniquely Vulnerable Locations and Populations.................................................11

CONCLUSION ......................................................................................18

# TABLE OF AUTHORITIES

## *Cases*

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
704 S.E.2d 365 (Va. 2011) ............................................................................ 15

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................ 2, 4, 5, 6, 7, 8, 11, 16

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ...................................................................... 7

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ................................................................... 7, 9

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)................................................................................. 4, 5, 6

*Medtronic Inc. v. Lohr*,
518 U.S. 470 (1996)....................................................................................... 4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)................................. 2, 3, 4, 5, 6, 7, 8, 11, 12, 16

*Nordyke v. King*,
563 F.3d 439 (9th Cir. 2009) ..................................................................... 15

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019)................................................................... 16

*United States v. Jimenez*,
895 F.3d 228 (2d Cir. 2018) ....................................................................... 8

*United States v. Morrison*,
529 U.S. 598 (2000)........................................................................................4

## *Statutes and Regulations*

Ala. Code § 13A-11-72............................................................................. 10

Ala. Code § 13A-11-61.2........................................................................... 17

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.) ........................................... 2

Conn. Gen. Stat. Ann. § 29-28 ................................................................................ 10

D.C. Code § 7-2502.03 ........................................................................................... 11

D.C. Code § 7-2509.07 ........................................................................................... 18

Del. Code Ann. tit. 11, § 1441 ................................................................................ 10

Fla. Stat. § 790.06 .................................................................................................. 17

Fla. Stat. § 790.23 .................................................................................................. 10

Ga. Code Ann. § 16-11-127 .................................................................................... 18

Ga. Code Ann. § 16-11-129 ...................................................................................... 9

430 Ill. Comp. Stat. 66/65 .................................................................................. 17, 18

Ind. Code Ann. § 35-47-2-3 .................................................................................... 10

80 Ind. Admin. Code 11-2-2 .................................................................................... 16

Ky. Rev. Stat. § 237.110 ......................................................................................... 17

Minn. Stat. § 609.66, subd. 1d ................................................................................ 17

Mont. Code Ann. § 87-5-401 ................................................................................... 17

N.C. Gen. Stat. § 14-404 ......................................................................................... 11

N.C. Gen Stat. § 14-277.2 ....................................................................................... 16

N.D. Cent. Code § 20.1-11-13 ................................................................................ 17

N.J. Stat. Ann. § 2C:58-3 ........................................................................................ 11

N.Y. Penal Law § 265.01-e ..................................................................................... 18

Neb. Rev. Stat. § 28-1206 ....................................................................................... 10

Neb. Rev. Stat. § 69-2441 ........................................................... 17

R.I. Gen. Laws § 11-47-11 .......................................................... 10

Tex. Penal Code § 46.03 .............................................................. 17

Vt. Stat. Ann., tit. 13, § 4023 ...................................................... 17

Wash. Rev. Code Ann. § 9.41.300 ................................................17

### Other

Joseph Blocher & Reva B. Siegel, *When Guns Threaten The Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 NW. U. L. Rev. 139 (2021) ........................................ 14

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Facilitating Private Sales: A Federal Firearms Licensee Guide* (2016) ............................................ 8

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018) ...................................... 13

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) ............ 17

Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022) ...................................... 14

Giffords Law Center, *Universal Background Checks* (last visited Jan. 7, 2023) ................................................................ 10

Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp. I.-60 (2022).......... 12

David Hemenway et al., *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263 (2000) ............................................ 13

Mass. Bay Transportation Authority, Rider Rules and Regulations (last visited Jan. 8, 2023) ................................................................ 18

Carlie Porterfield, *10 Injured In Stampede At New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) ............................... 14

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019)...... 15

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim. & Pub. Pol'y 171 (2020) ..................................................................... 9

## INTEREST OF AMICI CURIAE

Amici the District of Columbia, the States of Illinois, California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the Northern Mariana Islands (collectively, "Amici States") submit this brief in support of defendants-appellants pursuant to Federal Rule of Appellate Procedure 29(a)(2). Amici States have a substantial interest in the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. To serve that compelling interest, Amici States have long exercised their governmental prerogative to regulate firearms by establishing requirements for gun licenses and permits and by implementing restrictions on the use and possession of firearms in "sensitive places" where such weapons pose special risks. Amici States seek to maintain their right to address the problem of gun violence through legislation that is reasonable, effective, and tailored to the specific circumstances in each of their communities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As independent sovereigns, Amici States have a responsibility to protect the health, safety, and welfare of the public from threats like gun violence. They have historically fulfilled this responsibility by exercising their police powers to implement reasonable measures to ensure that firearms are not wielded by dangerous

1

individuals or in sensitive places. Such regulation does not conflict with the Second Amendment. On the contrary, as the Supreme Court has recognized, the Second Amendment does not protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)).

The challenged provisions of New York's Concealed Carry Improvement Act ("CCIA") fit squarely within a long tradition of constitutionally acceptable regulations designed to meet states' responsibility to protect their residents. First, the CCIA limits gun licenses to those who have good moral character, defined as "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.). The law also includes several disclosure requirements relevant to determining whether an applicant is of good moral character, including the names and contact information of family members and cohabitants and a list of character references. These measures, like requirements in place throughout the country, are vital to protecting public safety, allowing states to ensure that those who are likely to misuse firearms to cause harm do not have access to such weapons.

Likewise, the law's list of sensitive places where firearms are prohibited accords with the types of locations that other states have identified—limiting firearm possession in particularly dangerous places, around vulnerable populations, and where individuals are exercising other constitutionally protected rights. The CCIA identifies as sensitive places locations providing behavioral health or chemical dependence services, places of religious worship or observation, public parks and zoos, airports, buses, any establishment where alcohol is consumed, theaters, conference centers, banquet halls, and any gathering of individuals to protest or assemble. As is the case in other states, these sensitive place designations protect the public from a heightened risk of gun violence in such locations. The district court's preliminary injunction suspending these commonsense measures therefore undermines New York's sovereign responsibility to protect the safety of its residents, and it should be reversed.

## ARGUMENT

**I. The Second Amendment Allows States to Implement Reasonable Firearm Regulations To Promote Gun Safety And Protect Against Gun Violence.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See Bruen*, 142 S. Ct. at 2145. The CCIA is one in a long line of government restrictions

3

designed to make gun possession and use safer for the public, and it is a lawful exercise of New York's police powers.

States have a fundamental responsibility to protect the public, and they have long exercised their police powers to maintain public health and safety. *See Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (explaining that states have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted)). Enacting reasonable measures to promote safety, prevent crime, and minimize gun violence within their borders falls squarely within states' responsibility. Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court thus has repeatedly affirmed the States' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, 554 U.S. 570, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*, 142 S. Ct. 2111—the Court expressly acknowledged the important role that States play in protecting their residents from the harms of gun violence, a role consistent with our Nation's historical tradition.

In *Heller*, the Supreme Court made clear that the Second Amendment right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although government entities may not ban the possession of handguns by responsible, law-abiding individuals or impose similarly severe burdens on the Second Amendment right, states still possess "a variety of tools" to combat the problem of gun violence. *Id.* at 636. They may, for example, implement measures prohibiting certain groups of people from possessing firearms, and they may "forbid[] the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626-27. The Court reiterated this point in *McDonald*, emphasizing that the Second Amendment "by no means eliminates" the States' "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785; *see also id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even the First Amendment—is absolute.").

The Supreme Court reaffirmed these principles in its recent *Bruen* decision. The Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). And, building on *Heller*, the Court "assume[d] it settled" that prohibiting firearms in certain sensitive locations (including "schools and government buildings," "legislative assemblies, polling places, and

5

courthouses"), as well as analogous "new" sensitive locations, is constitutional. *Id*. at 2133. That is, the Second Amendment should not be understood to protect the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626-27).

In their concurrence, Chief Justice Roberts and Justice Kavanaugh stressed that *Bruen* should not be read to invalidate "presumptively lawful regulatory measures," including longstanding prohibitions on the possession of firearms by felons, the carrying of firearms in sensitive places, conditions on the commercial sale of arms, or limitations on dangerous and unusual weapons. *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27). Justice Alito echoed this sentiment in his concurrence. *Id.* at 2157 (Alito, J., concurring) (explaining *Bruen* does not "disturb[ ] anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession or carrying of guns").

These Supreme Court decisions make clear, moreover, that laws enacted by states to protect their residents need not be uniform: states are empowered to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations appropriately and effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785. As the Court in *Bruen* emphasized, the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. On the contrary, states are free to enact a wide range of firearm regulations. S*ee id.* at 2162

(Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (explaining that "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity"). Nor must the laws be frozen in time. In *Bruen*, for example, the Supreme Court instructed courts to "use analogies" to recognized sensitive places—such as schools and government buildings—to "determine [whether] modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." 142 S. Ct. at 2133-34; *see Heller*, 554 U.S. at 627 n.26.

In short, although the Supreme Court has defined the outer bounds of permissible regulations, the Court did not "abrogate" the states' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022). States retain not only the freedom, but the fundamental responsibility, to regulate firearms and protect their residents from the harms of gun violence.

## II. New York's Licensing Regulations Help Prevent Dangerous Individuals From Publicly Carrying Firearms.

The Second Amendment right has always been limited to those individuals considered able to responsibly handle firearms. *See Heller*, 554 U.S. at 626-27. As

the Supreme Court has consistently recognized, the Second Amendment codifies only "'the right of *law-abiding, responsible* citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635) (emphasis added); *see United States v. Jimenez*, 895 F.3d 228, 234-35 (2d Cir. 2018) ("The Supreme Court . . . identified the core of Second Amendment protections by reference . . . to particular persons, namely, those who are 'law-abiding and responsible.'"); Appellant Br. 2 ("[L]aws aimed at disarming persons who pose a danger to public safety are well within the historical tradition of firearm regulation.").

Licensing and permitting requirements offer a straightforward and effective means of screening out individuals who lack the character, temperament, or judgment necessary to be entrusted with a potentially deadly weapon. Like many other states, New York requires that applicants have good moral character, provide sources to validate their character (including the names and contact information of family members, cohabitants, and character references), and supply any other information necessary for the licensing officer to complete his or her investigation.

Collecting information about applicants and corroborating that information by talking to close contacts and performing other background checks helps "enhance public safety, assist law enforcement, and help ensure firearms end up only in the hands of those who are legally allowed to possess them." Bureau of Alcohol, Tobacco, Firearms and Explosives, *Facilitating Private Sales: A Federal Firearms*

*Licensee Guide* 2 (2016).[1]  This information allows states' licensing and permitting systems to function as intended, preventing individuals who are likely to misuse firearms from being able to access them.  Such provisions are effective.  For instance, states with licensing laws that require an in-person application or fingerprinting have 56% fewer mass shootings incidents than states that do not collect such information. Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim. & Pub. Pol'y 171, 181 (2020).  And studies suggest "that laws requiring firearm purchasers to be licensed through a background check process" are one of the "most effective gun policies for reducing fatal mass shootings." *Id*. at 171.

Given the importance of these measures, it is little surprise that the CCIA's licensing provisions are in line with the sorts of requirements that have long been adopted by states throughout the country to ensure that individuals have the proper character, temperament, and judgment to obtain a gun permit or license.  For example, Georgia requires that a probate judge determine that an applicant is of "good moral character" before issuing a weapons carry license, Ga. Code Ann. § 16-11-129(d)(4), and Indiana similarly requires that the licensing authority ascertain whether an applicant for a license to carry a handgun "is of good character

---

[1]  *Available at* https://tinyurl.com/44natze8.

and reputation," Ind. Code Ann. § 35-47-2-3(g); *see also* Del. Code Ann. tit. 11, § 1441(a) (requiring "good moral character" for a concealed carry permit). Other states require that authorities verify that an applicant is a "suitable person" to carry a firearm. *See, e.g.*, Conn. Gen. Stat. Ann. § 29-28(b); R.I. Gen. Laws § 11-47-11. And a number of states bar individuals with certain indicators of dangerousness or bad character from receiving a license or permit. *See, e.g.*, Ala. Code § 13A-11-72(b) (prohibiting "drug addict[s]" and "habitual drunkard[s]" from owning or possessing a pistol); Neb. Rev. Stat. § 28-1206(1)(b) (criminalizing possession of a firearm for an individual who has been convicted of a misdemeanor crime of domestic violence within the past seven years); Fla. Stat. § 790.23(1) (criminalizing possession of a firearm by individuals who have been convicted of a felony).

States have also developed a panoply of regulations to collect the information they need to evaluate an individual's potential for dangerousness. Twenty-one states and the District of Columbia have implemented additional background check requirements on top of federal law. Giffords Law Center, *Universal Background Checks* (last visited Jan. 7, 2023).[2] Some states obligate applicants to submit character references who can confirm "that the applicant bears a good reputation for

---

[2]     *Available at* https://tinyurl.com/bdh658ya.

peace and good order in the community in which the applicant resides." Del. Code Ann. tit. 11, § 1441(a)(2); *see* N.J. Stat. Ann. § 2C:58-3(e) (requiring character references who can vouch for an applicant's lack of dangerousness). Similarly, North Carolina instructs that the sheriff of the county in which a gun permit is sought must "[f]ully satisf[y] himself or herself by affidavits, oral evidence, or otherwise, as to the good moral character of the applicant." N.C. Gen. Stat. § 14-404(a)(2). And certain jurisdictions give the licensing or registration authority the ability to collect any further information that it deems necessary. *See, e.g.*, N.J. Stat. Ann. § 2C:58-3I; D.C. Code § 7-2502.03(b)(13).

In short, New York's good-moral-character requirement, and the disclosure requirements relevant to that determination, are reasonable measures designed to ensure that only law-abiding and responsible citizens obtain firearms and are similar to those in many other states. The district court erred in enjoining New York's enforcement of those commonsense provisions intended to protect the public's safety.

## III. New York's Designation of "Sensitive Places" Protects Uniquely Vulnerable Locations and Populations.

The Second Amendment also allows States to regulate guns in "sensitive places." *Heller*, 554 U.S. at 626; *see Bruen* 142 S. Ct. at 2132 (noting that in sensitive places, "arms carrying [can] be prohibited consistent with the Second Amendment"); Appellant Br. 3 (noting "the presumption repeatedly recognized by

the Supreme Court that such sensitive-place regulations are constitutional").  As the Supreme Court has explained, the term "sensitive places" refers to locations that are "in effect exempt" "from the Second Amendment," such as schools, government buildings, legislative assemblies, polling places, and other "new and analogous" areas.  *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted).

At issue in this case is the CCIA's designation of various locations in New York, including theaters and banquet halls, establishments where alcohol is consumed, locations providing behavioral health services, and places of worship as sensitive places.  These restrictions are a reasonable and appropriate response to the heightened threats caused by the presence of firearms in certain locations.  Without the power to institute such restrictions, New York and other states and localities would be left unable to effectively prevent gun violence in particularly dangerous places, around vulnerable populations, or where individuals are exercising other constitutionally protected rights, putting the public at risk.

*First*, states frequently restrict the use of firearms in places where volatile conditions create special risks to health and safety.  For example, states have designated places as sensitive, and limited the carrying of firearms in them, to preserve order in crowded locations, improve the safety of travelers, and diminish the risk of panic in confined spaces.  *See* Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev.

E. Supp. I.-60, I.-68 (2022) (explaining that "[t]he number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place"). Physical jostling and emotional frustration are inevitable and routine in spaces like sports arenas, theaters, and event spaces, which can erupt into violence. The presence of firearms would only make these situations more dangerous. Indeed, given the "weapons effect," wherein the presence of a weapon primes individuals to think and act more aggressively, allowing firearms in these spaces makes violence all the more likely. *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018).[3]

Similarly, in places in which individuals are consuming alcohol, impairing both their judgment and their dexterity, the risk of either accidental or intentional use of a weapon increases. *See* David Hemenway et al., *Gun Use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263, 266 (2000) ("Regular citizens with guns, who are sometimes tired, angry, drunk or afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for inappropriate gun use.").[4] And in dense, confined spaces,

---

[3]     *Available at* https://tinyurl.com/5ypudyhd.

[4]     *Available at* https://tinyurl.com/3vnx7uc7.

use of a firearm is likely to end in tragedy—not only for the innocent bystanders who may be shot, but also for the countless other victims who may be crushed or trampled by a panicked crowd. *See, e.g.*, Carlie Porterfield, *10 Injured In Stampede At New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022)[5]; Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022) (noting that nine people were shot and five others were injured in the stampede that ensued during the gunfire).[6]

Allowing firearms to be carried in certain sensitive locations can also jeopardize the effective operation of those places. The discharge of a firearm in an airport or a shopping mall, for example, could shut down those facilities at a huge cost to individuals and businesses. And even the perceived risk of gun violence could cause social and economic repercussions, as individuals may be discouraged from visiting crowded or confined locations in which they know others may be armed. *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten The Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 NW. U. L. Rev. 139, 141 (2021) ("Gun laws protect people's freedom and confidence to participate in every domain of our shared life, from attending school to shopping,

---

[5]     *Available at* https://tinyurl.com/2xeuc7fj.

[6]     *Available at* https://tinyurl.com/5n8y2w62.

going to concerts, gathering for prayer, voting, assembling in peaceable debate, counting electoral votes, and participating in the inauguration of a President.").

*Second*, designating schools, parks, treatment centers, and similar facilities as sensitive places helps protect particularly vulnerable populations, like children and those suffering from illness. Such individuals cannot easily defend themselves or escape a violent attack, should one occur. And even if they are not physically harmed by firearms, exposure to such violence can cause marked psychological harm. *See* Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881, 888 (2019) (finding that indirect exposure to gun violence, including witnessing violence or hearing gunshots, can be traumatic to children).[7] Indeed, both federal and state courts have recognized that the frequent presence of children and other vulnerable populations in a particular location strongly indicates that the area can be deemed sensitive for Second Amendment purposes. *See, e.g., DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (holding that "GMU is a 'sensitive place'" because it "is a school" with many students "under the age of 18," including "elementary and high school students" in the summer); *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir.

---

[7]     *Available at* https://tinyurl.com/ymn9jzf6.

2010) (noting that "[t]he [Supreme] Court listed schools and government buildings as examples[ of sensitive places], presumably because possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)").

*Third*, states may designate sensitive places to protect the exercise of other constitutional rights.  As the Supreme Court has recognized, courthouses, polling places, and legislative assemblies are quintessential examples of sensitive places. *See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626-27.  Firearms are consistently prohibited in these sorts of locations because of the risk that violence could threaten key government functions.  The D.C. Circuit, for example, held that a parking lot near the Capitol could be designated a sensitive place because it enabled staffers to safely travel to and from their work operating the national legislature.  *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019).  The same reasoning applies to areas in which individuals engage in other constitutionally protected activity, such as speech, worship, and political engagement.  Not only are these locations often targets of violence, but the mere presence of firearms (and the implicit threat they communicate) could chill individuals' peaceful exercise of their rights.

Given the importance of sensitive-place designations in protecting public safety, states have long restricted firearms in sensitive locations.  For instance, many states limit the concealed carry of firearms or ban them altogether at event sites and other crowded locations.  *See* N.C. Gen Stat. § 14-277.2(a) (parade routes); 80 Ind.

16

Admin. Code 11-2-2(b) (fairgrounds); Ala. Code § 13A-11-61.2(a) (school and professional athletic events); Tex. Penal Code § 46.03(a) (racetracks and amusement parks). States also frequently prohibit firearms at the sites of protests or demonstrations, *see* Wash. Rev. Code Ann. § 9.41.300(2); and in other locations where individuals are exercising their constitutional rights, *see* Neb. Rev. Stat. § 69-2441(1)(a) (places of worship and political rallies).

States also prohibit firearms in locations specific to the characteristics and needs of their communities. *See* FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017) (noting that a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, the size of the youth population, poverty level, job availability, modes of transportation, climate, and cultural characteristics).[8] For example, Montana and North Dakota prohibit firearms in wildlife preserves. Mont. Code Ann. § 87-5-401(1) (game preserves); N.D. Cent. Code § 20.1-11-13(3) (game refuges and game management areas). Other states prohibit firearms in bars, *see* Fla. Stat. § 790.06(12)(a)(12), Ky. Rev. Stat. § 237.110(16)I; at schools and playgrounds, *see* Minn. Stat. § 609.66, subd. 1d (schools), 430 Ill. Comp. Stat. 66/65(a)(12) (public playgrounds); and in healthcare facilities, *see* 13 Vt. Stat. Ann., tit. 13, § 4023 (public and private

---

[8]     *Available at* https://tinyurl.com/2s3k6dxh.

hospitals), Ga. Code Ann. § 16-11-127(b) (state mental health facilities). It is also common for jurisdictions with public transportation to limit firearms in those facilities and vehicles—indeed, such weapons are prohibited on the four most commonly used rapid transit systems in the United States. N.Y. Penal Law § 265.01-e(2)(n) (New York subway); D.C. Code § 7-2509.07(a)(6) (D.C. Metro); 430 Ill. Comp. Stat. 66/65(a)(8) (Chicago "L"); Mass. Bay Transportation Authority, Rider Rules and Regulations (last visited Jan. 8, 2023) (Massachusetts "T").[9]

Like these myriad other state provisions restricting firearms in sensitive places, New York is similarly free under the Second Amendment to limit firearms in the sensitive places identified in the CCIA to protect the public safety. The district court erred in concluding otherwise.

## CONCLUSION

The Court should reverse the decision below.

---

[9]    *Available at* https://tinyurl.com/55f5e6xd.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General

ALEXANDRA LICHTENSTEIN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9807
ashwin.phatak@dc.gov

KWAME RAOUL
Attorney General for the State of
Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

Office of the Attorney General for the
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
sarah.hunger@ilag.gov

January 2023

19

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ELIZABETH N. DEWAR
*Acting Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes
Justice Complex
25 Market Street
Trenton, NJ 08625

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

EDWARD E. MANIBUSAN
*Attorney General*
*Commonwealth of the*
*Northern Mariana Islands*
Caller Box 10007, Capitol Hill
Saipan, MP 96950

## CERTIFICATE OF COMPLAINCE

I certify that this amicus brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,019 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 17, 2023, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK