# 22-2908(L)

## 22-2972 (Con)

### United States Court of Appeals
### For the Second Circuit

---

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN,
LESLIE LEMAN, AND LAWRENCE SLOANE,

*Plaintiffs-Appellees*

v.

STEVEN P. NIGRELLI, IN HIS OFFICIAL CAPACITY AS ACTING-SUPERINTENDENT OF THE
NEW YORK STATE POLICE, MATTHEW J. DORAN, IN HIS OFFICIAL CAPACITY AS THE
LICENSING OFFICIAL OF ONONDAGA COUNTY, JOSEPH CECILE, IN HIS OFFICIAL CAPACITY
AS THE CHIEF OF POLICE OF SYRACUSE,

*Defendants-Appellants*

KATHLEEN HOCHUL, IN HER OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF
NEW YORK, WILLIAM FITZPATRICK, IN HIS OFFICIAL CAPACITY AS THE ONONDAGA
COUNTY DISTRICT ATTORNEY, EUGENE CONWAY, IN HIS OFFICIAL CAPACITY AS THE
SHERIFF OF ONONDAGA COUNTY, P. DAVID SOARES, IN HIS OFFICIAL CAPACITY AS THE
DISTRICT ATTORNEY OF OSWEGO COUNTY, DON HILTON, IN HIS OFFICIAL CAPACITY AS
THE SHERIFF OF OSWEGO COUNTY, JOSEPH STANZIONE, IN HIS OFFICIAL CAPACITY AS
THE DISTRICT ATTORNEY OF GREENE COUNTY,

*Defendants*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF
## IN RESPONSE TO DEFENDANTS-APPELLANTS NIGRELLI AND DORAN

Robert J. Olson
William J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
Stephen@sdslaw.us

# TABLE OF CONTENTS

Table of Authorities..................................................................iv

Issue Presented......................................................................1

Statement of the Case ...........................................................1

Standard of Review................................................................1

Summary of the Argument.....................................................1

Argument................................................................................5

I. Defendants Fail to Undermine Plaintiffs' Standing.........................5
    A. Plaintiffs Have Standing to Challenge the Licensing Requirements....................................................6
    B. Plaintiffs Have Standing to Challenge the Enjoined Sensitive Locations.................................................8
    C. Plaintiffs Have Standing to Challenge the Restricted Locations Provision..........................................10
    D. Defendants Waived Any Appeal as to Buses and Vans.........................10

II. The Second Amendment Unambiguously Covers Plaintiffs' Conduct..................................................12
    A. The CCIA's Licensing Requirements Implicate the Second Amendment........................................14
    B. The CCIA's Sensitive Locations Prohibitions Implicate the Second Amendment..............................18
    C. The CCIA's Restricted Locations Prohibition Implicates the Second Amendment..............................19

III. The CCIA Is Without Any Relevant Analogue, and Thus Unsupported by a Historical Tradition.......................21
    A. The CCIA's Licensing Requirements Are Unsupported by History................................................21
        1. There Are No Relevant Historical Analogues for "Good Moral Character" ....................................23
        2. There Is No Historical Tradition Requiring a Person to Provide Family Members for Government Interrogation as a Condition of Exercising Constitutional Rights.....................30
        3. There Is No Historical Tradition of Conditioning the Exercise of an Enumerated Right on a Person Divulging His Papers, Writings, Political Statements, and Communications.................................35

ii

4.  There Is No Historical Tradition Requiring a Person to Disclose Any "Other Information" a Government Official May Demand Prior to Licensure to Exercise an Enumerated Right.................................39

5.  There Is No Historical Tradition Prohibiting Firearm Possession in the Enjoined "Sensitive Locations" ........................41

    a.  Defendants' Pre-Founding and Post-Bellum Sources Hold Little Weight....................................41

    b.  Defendants' Attempts to Concoct Three Broad Types of Sensitive Locations Lack Support.........................47

    c.  The CCIA Cannot Be Justified by Reference to Allegedly Permissible "Purposes" Instead of by Historical Analogue.....................................49

    d.  The District Court Carefully Applied *Bruen*'s Analytical Framework.............................................51

    e.  Defendants' Attempts to Make the CCIA Appear More Reasonable Cannot Overcome its Plain Text.....................................52

6.  There Is No Historical Tradition for Prohibiting Firearm Possession on All Private Property.............................54

IV.  The CCIA Violates the First Amendment...................................56

V.  The Equitable Factors Weigh in Favor of Plaintiffs.................................58

VI.  Defendants' Attempts to Besmirch Plaintiffs and the District Court Are Without Merit................................................61

Conclusion.........................................................................63

Certificate of Service.........................................................64

# TABLE OF AUTHORITIES

## U.S. Constitution

Amendment I ................................................................ 9, 10, 38, 55, 56

Amendment II .....................................................................*passim*

Amendment V ................................................................................ 38

Amendment XIV ................................................................ 13, 26, 42, 44

## Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ....... 56

*Andrews v. State*, 50 Tenn. 165 (1871) ....................................................... 46

*Antonyuk v. Bruen*, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022) ........ 61

*Antonyuk v. Nigrelli*, 2023 U.S. LEXIS 396 (Jan. 11, 2023) .................................... 60

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) .................................................... 8

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018) ............................................ 56

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) .................................................... 39

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) ........................................................................... 61

*Christian v. Nigrelli*, 2022 U.S. Dist. LEXIS 211652
(W.D.N.Y. Nov. 22, 2022) ................................................................ 20, 21, 62

*Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999) .......................................... 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................*passim*

*Doe v. Putnam Cnty.*, 344 F. Supp. 3d 518 (S.D.N.Y. 2018) ....................................... 7

*English v. State*, 35 Tex. 473 (1871) ....................................................... 45

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ........................ 20

*Hardaway v. Nigrelli*, 2022 U.S. Dist. LEXIS 200813
(W.D.N.Y. Nov. 3, 2022) ................................................................ 19, 47, 62

*Hill v. State*, 53 Ga. 472 (1874) ......................................................... 46, 48

*Image Carrier Corp. v. Beame*, 567 F.2d 1197 (2d Cir. 1977) .................................... 7

*Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) .................. 4, 7

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418
(2d Cir. 2005) ................................................................................................ 38, 41

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ................................... 21, 22, 23, 24

*Koons v. Reynolds*, 2023 U.S. Dist. LEXIS 3293 (D.N.J. Jan. 9, 2023) .. 10, 19, 20, 62

*Maryland v. King*, 567 U.S. 1301 (2012) .................................................... 59

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................. 29, 46

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ........................... 39

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ............................... 39

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32
(2d Cir. 2018) ............................................................................................... 60

*New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) ............. 56

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .............................................. 61

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ............. 59

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .....................*passim*

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973
(10th Cir. 2004) ........................................................................................... 60

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) .................... 7

*Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375 (D.Del. Sept. 23, 2022) ............ 18

*Romeu v. Cohen*, 121 F. Supp. 2d 264 (S.D.N.Y. 2000) ................................ 7

*Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47 (2006) .................... 56

*Schenck v. United States*, 249 U.S. 47 (1919) ............................................ 31

*Siegel v. Platkin*, 2023 U.S. Dist. LEXIS 15096 (D.N.J. Jan. 30, 2023) ............ 49, 62

*Speiser v. Randall*, 357 U.S. 513 (1958) .................................................. 24

*Spencer v. Nigrelli*, 2022 U.S. Dist. LEXIS 233341 (W.D.N.Y. Dec. 29, 2022) ........ 62

*State v. Shelby*, 90 Mo. 302 (1886) ........................................................... 46

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................... 10

*Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ................. 39

*Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41 (2d Cir. 2020) .................. 58

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ................................ 49

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .............................. 1, 7, 17, 41

*United States v. Jones*, 565 U.S. 400 (2012) ................................................ 39

*United States v. Quinones*, 317 F.3d 86 (2d Cir. 2003) ............................... 11

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988) ............................ 11

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................... 61

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002) ............................................................................................................ 57

*Watson v. Stone*, 4 So. 2d 700 (Fla. 1941) ................................................. 32

*Wilson v. State*, 33 Ark. 557 (1878) ........................................................... 46

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................... 58

*W.Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ....................... 24

## Statutes

N.Y. Penal Law § 265.00(17)(b) .................................................................. 58

N.Y. Penal Law § 400.00(1)(c) .................................................................... 58

N.Y. Penal Law § 400.00(1)(o)(iv ................................................................ 36

N.Y. CPL §530.12(1), 530.14(1)-(2) ............................................................ 58

18 U.S.C. §922(d)(8)-(9) and (g)(8)-(9) ...................................................... 58

## Miscellaneous

A. Scalia & B. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>, (Thomson West 2012) ................................................................................................... 45

Del. Const. of 1792 ...................................................................................... 42

D. Peterson & S. Halbrook, *Feature: A Revolution in Second Amendment Law*, 29 DEL. LAW. 12 (2011) ...................................................................................... 42

Hebrews 11:1 ................................................................................................ 51

L.Q.C. Elmer, <u>A Digest of the Laws of New Jersey</u> (1838) ......................... 55

S. Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HAST. CONST. L.Q. 145 (2022) ................................................................................................ 25

W. F. Dunaway, <u>The Scots-Irish of Colonial Pennsylvania</u>, UNC Chapel Hill Press (1944) ................................................................................................ 32

# ISSUE PRESENTED

Did the district court abuse its discretion in granting Plaintiffs a preliminary injunction on multiple portions of the New York Concealed Carry Improvement Act?

# STATEMENT OF THE CASE

Plaintiffs incorporate their Statement of the Case from their Answering Brief to Defendant-Appellant Cecile.

# STANDARD OF REVIEW

Plaintiffs incorporate their Standard of Review from their Answering Brief to Defendant-Appellant Cecile.

# SUMMARY OF THE ARGUMENT[1]

Although abandoning most of the standing challenges they made below, Defendants claim that Plaintiffs may not challenge the CCIA's licensing provisions, even though Defendants (i) have *prohibited* Sloane from applying for a license; (ii) have announced they will *refuse to process* his application once submitted, and (iii) have admitted they *will deny* his application even if processed.  Any one of these is sufficient to demonstrate "futility" under *Decastro*.  Likewise, Plaintiffs have standing to challenge the CCIA's firearm bans in "sensitive locations."  Defendants are simply wrong that multiple portions of the CCIA cannot simultaneously apply to a single location.  Nor were Plaintiffs required to testify that they already had broken the law in order to maintain standing.  Next, Plaintiffs have standing to challenge

---

[1] Plaintiffs incorporate herein the arguments made in their Answering Brief to Appellant-Defendant Cecile.

1

the CCIA's gun ban on all private property. The State may not mandate a default statewide rule (imposing criminal penalties), and then blame property owners. Lastly, Defendants appear to misunderstand the scope of both the CCIA's text and the district court's injunction as it applied to public transportation but, regardless, they have waived any challenge that portion of the injunction.

Defendants seek to escape their burden to provide historical analogues supporting the CCIA's provisions, wrongfully flipping the *Bruen* framework on its head and claiming that it is in fact *Plaintiffs* who must show historical support. Nor does the CCIA escape review simply because Defendants claim it is designed to weed out those who they decide cannot be trusted with firearms. This ignores the Supreme Court's instructions to analyze the historical record not only with respect to the "why" but also the "how." Defendants claim that banning guns at any place the state declares "sensitive" is constitutional without further analysis, yet the Supreme Court never said that even its "presumptive[] … sensitive places" were exempt from the *Bruen* framework. Rather, the Court explicitly warned New York not to turn entire cities (not to mention the entire State) into a sensitive place, as the CCIA accomplishes. Finally, the CCIA's firearm ban on private property cannot avoid scrutiny under *Bruen*, as the Supreme Court has never split hairs as to *where* the broad right to "bear arms" applies.

Next, finally attempting to shoulder their burden under *Bruen*, Defendants seek to justify all of the CCIA's licensing provisions on a single theory – that they are designed to keep "unvirtuous" persons from obtaining firearms. Yet the CCIA's

provisions apply to the law-abiding, including Plaintiffs, not simply prohibited persons who the law *already* dispossesses of firearms. Indeed, as then-Judge Barrett has explained, there is no historical record of "virtue-based restrictions on the right," and the Supreme Court in *Bruen* rejected the notion that a person must prove his "suitability" and "character" to the government. In other words, the CCIA's "good moral character" standard and, by implication, each of the provisions the state requires to make that determination, *already have been rejected by Bruen.*

Nevertheless, amassing nearly a thousand pages of exhibits, Defendants claim that a robust historical record supports the CCIA's onerous licensing provisions and its scores of gun bans. Nothing could be further from the truth. Defendants' sources are unhelpful or irrelevant for numerous reasons, including that they: (i) involve transient, wartime enactments that *Bruen* rejected; (ii) only applied to, and were enforced against, disfavored minorities; (iii) significantly predated the ratification-era or postdated the incorporation-era; (iv) were based on a repudiated, fundamental misunderstanding of the Second Amendment; (v) represent the same sources explicitly rejected in *Bruen*; (vi) were never subjected to constitutional challenge and judicial review; (vii) focus entirely on the ends, not the means, violating *Bruen*'s instruction to consider both "how" and "why"; (viii) were from at most a few cities or territories representing a tiny fraction of jurisdictions and a small percentage of overall population; or (ix) simply do not stand for what Defendants claim (applying to entirely different persons, arms, or activities than the CCIA).

Finally, Defendants' historical sources *do establish* one general principle. Across much of history, the selective deprivation of the right to keep and bear arms almost invariably has been used as a weapon by the politically powerful to disarm disfavored groups on racist, xenophobic, and theophobic bases. Aside from such morally objectionable and legally questionable outliers, a robust right to bear arms has been broadly protected and ubiquitously exercised throughout this nation's history.

Arguing that the balance of the equities supports them, Defendants misunderstand the inquiry, focusing entirely on speculative harms to themselves rather than the ongoing, serious, and irreparable harms to Plaintiffs' constitutional rights and personal safety. Even then, Defendants' allegations of harm generally revolve around the absurd notion that ordinary, law-abiding persons cannot be trusted to safely bear arms in public, and that the mere *exercise of constitutional rights* shifts the balance of the equities in favor of the State.

Lastly, this Court should reject Defendants' attempts to besmirch both Plaintiffs and the district court. The assignment of this case to the same judge who dismissed Plaintiffs' prior complaint was not some nefarious scheme, but rather by simple operation of the local rules. Likewise, the district court's opinion dismissing Plaintiffs' prior challenge appropriately recognized the emergency nature of the matter, and the real possibility that this Court might reverse on the standing issue. Nor does the district court's opinion represent some outlier, as three different district

court judges across two circuits have struck down numerous portions of the CCIA or nearly-identical provisions elsewhere.

The CCIA is a "patently unconstitutional" law, designed from the ground up to disrupt the constitutional order and "fight back" against the Supreme Court. *Bruen* warned that Second Amendment rights cannot be conditioned on "suitability" or "character," yet the CCIA demands that a person satisfy the open-ended discretion of licensing officials to decide whether he has "good moral character" – imposing barrier after barrier on the licensing process in order to "deny ordinary citizens their right to public carry." *Bruen* warned that the entire "island of Manhattan" could not be turned into a "sensitive place," yet the CCIA turns virtually the entire State into a "sensitive location." New York's blatant affront to the Supreme Court's authority should not be tolerated. This Court should affirm the district court's injunction and vacate its stay.

## ARGUMENT

## I. DEFENDANTS FAIL TO UNDERMINE PLAINTIFFS' STANDING.

Defendants continue to challenge[2] Plaintiffs' standing to challenge many of the enjoined provisions of the CCIA. *See* Appt.Br. 26-27, 49-51, 69-70. None of Defendants' arguments hold water.

---

[2] Defendants abandon most of their standing challenges below. *See* ECF#48, at 5 ("no plaintiff has suffered an injury-in-fact ... traceable to any State Defendant"); 8 (no credible threat of enforcement); 9 (no "non-speculative constitutional injury [regarding] carrying of firearms"); 13 (no specific threat by law enforcement); 64 (arguing that airports are sensitive places and government property); 80 (no "realistic threat of future harm"); 57, 92 (no imminent threat to constitutional rights); 11-12

5

**A.    Plaintiffs Have Standing to Challenge the Licensing Requirements.**

Defendants claim Plaintiffs cannot challenge the CCIA's licensing provisions, asserting that "no plaintiff has applied for a firearm license … much less been denied," and Plaintiff Sloane "failed to plausibly allege that he would be denied...." Appt.Br. 26-27.    Defendants are wrong on both counts for several reasons.    First, Defendants acknowledge that Sloane *has been prohibited from even submitting his application* to authorities, as his "application purportedly could not be processed until October 2023."    Appt.Br. 27; *see also* ECF#35 at ¶10 ("admit[ting]" as much).[3] Moreover, October 2023 is not when Sloane's application will be "*processed,*" but rather when it could be *submitted.    See* JA149.    Second, Defendants entirely fail to acknowledge the concession that Sloane's sheriff *has refused to process* an incomplete application that, like Sloane's, does not contain the information unconstitutionally *required* by the enjoined licensing provisions.    *See* SA19, 20-21; ECF#35 at ¶5 ("Incomplete applications will not be processed … Your entire application will be returned …").    Third, Defendants fail to acknowledge their implied admission below that any application by Sloane *would be denied*: "if an incomplete application were submitted to [Doran], he would act 'in accordance with the law,'" which means denying Sloane's application.    SA21 (explaining that the CCIA requires that "no license shall be issued" until *all* requirements are met).    Under this Court's

_____

(Defendants not proper parties).

[3] As the district court noted, this refusal to accept Sloane's application is itself a violation of the New York licensing scheme.    SA23 n.11.

6

precedents, any one of these impediments to Sloane's licensure provides him standing to challenge the CCIA's licensing provisions.  Indeed, *Bruen* explicitly invited future challenges "where ... lengthy wait times in processing license applications deny ordinary citizens their right to public carry."  *Id.* at 2138 n.9.

Arguing Sloane lacks standing, Defendants misunderstand the distinction between *necessary* and *sufficient*, mischaracterizing *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), which never determined that a license denial was *required*, but rather was the "distinct injury" *in that case*.  *Cf. id.* at 376 with Appt.Br. 26.  Next, Defendants rely on the statements in *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012), that "fail[ure] to apply for a gun license" is fatal to standing. Appt.Br. at 26-27.  But Defendants neglect to disclose *Decastro*'s futility exception, where this Court explained that "[f]ailure to apply for a license would not preclude Decastro's challenge if ... submitting an application 'would have been futile.'"  *Id.* at 164.  Sloane has clearly made this showing.  *See* SA23 (finding Sloane's "application futile for the purpose of standing to sue").

Finally, Defendants fail to wrestle with numerous precedents that support Sloane's standing.  *See Desiderio v. NASD*, 191 F.3d 198, 200 (2d Cir. 1999) (finding standing where, similar to here, a plaintiff would "sign the form only if the mandatory arbitration provision was stricken"); *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201-02 (2d Cir. 1977); *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977); *Doe v. Putnam Cnty.*, 344 F. Supp. 3d 518, 534 (S.D.N.Y. 2018); *Romeu v. Cohen*, 121 F. Supp. 2d 264, 274 (S.D.N.Y. 2000); *Bach v. Pataki*, 408 F.3d 75, 83

(2d Cir. 2005) (need not "complete an application for which he is statutorily ineligible"); *cf.* SA20, 23, 201 (Conway will not accept, and Doran required to deny, Sloane's incomplete application).

## B. Plaintiffs Have Standing to Challenge the Enjoined Sensitive Locations.

With respect to the CCIA's ban on firearms in dozens of purported "sensitive locations," Defendants apparently now concede standing with respect to many of them, claiming only that Plaintiffs lack standing to challenge "*several.*" Appt.Br. 49 (emphasis added). Defendants have not appealed Plaintiffs' standing with respect to (i) "any place of worship or religious observation," (ii) "public parks" and "zoos," (iii) "buses" and "airports," (iv) "any establishment ... where alcohol is consumed," and (v) "theaters." SA244, 245 (CCIA (c), (d), (n), (o), (p)). Rather, Defendants claim *only* that the district court erred in finding standing with respect to (i) "behavioral health[] or chemical dependance care or services," (ii) "banquet halls," (iii) "conference centers," and (iv) "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble." SA244, 245 (CCIA (b), (p), (s)).

First, Defendants claim that Pastor Mann's provision of drug counseling services through the "RU Recovery" program (JA181 ¶28) is not "treatment that might be covered by the statute himself [sic]." Appt.Br. 49-50. Defendants' attempt to artificially narrow the plain text of the statute is unpersuasive, as Pastor Mann's counseling of drug addicts clearly constitutes "behavior health[] or chemical

dependence care or services," and the CCIA applies to "any location" where such services are "provid[ed]."

Second, Defendants attack Pastor Mann's standing to challenge the CCIA's ban on firearms in "banquet halls," apparently believing that one location cannot simultaneously fall under multiple different prohibitions of the CCIA. Appt.Br. 50 (arguing that the Pastor's church is covered only by "the directly applicable provision governing places of worship"). But Defendants' creative theory is belied by their co-Defendant/Appellant Cecile, who claims firearms are banned at the Rosamond Zoo not only because it is a "zoo" but also because it "enjoy[s] additional protections" under the CCIA, as it "contains County building(s)" and a "teaching hospital." Cecile Br. at 23. Defendants cannot have it both ways. Plaintiffs have standing to challenge each provision of the CCIA that restricts their activities.

Third, Defendants claim that Plaintiff Terrille cannot challenge the CCIA's ban on firearms in "conference centers," "banquet halls," and places where First Amendment rights are exercised. Appt.Br. 51. Undermining their argument above, Defendants do not dispute that the "Polish Community Center" where gun shows occur falls under multiple CCIA prohibitions. *See* JA191-192 ¶16 (both a "banquet hall" and a "conference center"). Instead, Defendants muse only that "[t]he gun show had already occurred," and "there was nothing in the record to show whether Terrille attended the show or was armed while doing so." Appt.Br. 51. Defendants' argument fails for at least three reasons. First, it is evident from Terrille's affidavit that he *regularly* attends gun shows, which occur on a *routine* basis. JA191-192 ¶16. Second,

"Defendants wa[i]ved their right to cross-examine [Terrille] at the Preliminary Injunction Hearing." SA69. Third, a person is "not required [to] confess to a crime ... to establish standing," and "the limitations period has not yet expired on a criminal charge..." SA77; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014).

### C. Plaintiffs Have Standing to Challenge the Restricted Locations Provision.

Lastly, Defendants claim that Plaintiffs lack standing to bring a Second Amendment challenge against the CCIA's gun ban on all private property, but do not challenge Plaintiffs' standing to bring their First Amendment claim. SA173-180; Appt.Br. 69. In support, Defendants claim a lack of traceability – that it "is up to a property owner" to decide "when and how to convey th[e] determination ... whether to allow guns on the premises," and "an injunction against defendants cannot vindicate plaintiffs' asserted desire to carry guns onto others' property." Appt.Br. 69-70. Defendants do not provide a single legal authority for their claim that a state can establish a default rule for all landowners, and then cast itself blameless – pointing its finger at landowners as the source of the problem. *See Koons v. Reynolds*, 2023 U.S. Dist. LEXIS 3293, *52 (D.N.J. Jan. 9, 2023) (describing this same argument, offered in support of a nearly identical New Jersey statute, as "disingenuous").

### D. Defendants Waived Any Appeal as to Buses and Vans.

Defendants claim not to appeal the district court's "injunction as it applies to airports, or to *privately* chartered vans and buses."[4] Appt.Br. 48 n.14 (emphasis

---

[4] Defendants argue that "[t]he CCIA does not apply to private buses or vans."

added).  One would infer, then, that Defendants *do* challenge the injunction as to *public* buses.  Rather, Defendants assert that "the *injunction does not apply* to buses used in public transit," based on the district court's limited statement that "*Metropolitan Transportation Authority* buses are not an issue in this action." Appt.Br. 48 n.14 (emphasis added) (quoting SA150 n.114).  On the contrary, there is no reasonable way to read the district court's opinion as being so limited.  *See* Appt.Br. 17; *see also* SA151 ("Defendants are preliminarily enjoined from enforcing this regulation ... with regard to ... 'buses' and vans."); SA59, 61, 146 (emphasis added) (finding Plaintiffs have standing to challenge "this provision," and "the State treats Plaintiff Mann's church bus and van as vehicles used for *public* transportation..."); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (courts will "not rewrite a state law to conform it to constitutional requirements.").

Apparently recognizing that their interpretation of the district court's opinion may be incorrect, Defendants defend that "[i]n any event, the sensitive-place restriction on public transportation is lawful for the reasons discussed *infra* at 52- 66." Appt.Br. 49.  But this conclusory argument is not properly raised and thus forfeited.  *See United States v. Quinones*, 317 F.3d 86, 90 (2d Cir. 2003) ("[W]e do not consider an argument mentioned only in a footnote....").  Nowhere do Defendants

---

Appt.Br. 48 n.14.  But Defendants cannot simultaneously (i) not challenge the district court's decision with respect to private vans and buses and (ii) dicker about whether the CCIA even applies.  Defendants' express decision not to appeal this issue waives any arguments they make on this issue.  Nevertheless, the district court's opinion repudiates Defendants' claims here.  SA59-61.

offer a single historical analogue or claim that public "buses or vans" fall within any of the categories of permissible categories of "sensitive places" they concoct. Appt.Br. 53-66.

## II. THE SECOND AMENDMENT UNAMBIGUOUSLY COVERS PLAINTIFFS' CONDUCT.

Sensitive to their weak historical analogues, Defendants attempt to escape their burden to provide them, instead arguing that the CCIA's restrictions "do not implicate the Second Amendment's text." Appt.Br. 28-33, 52-53, 71-73. Relying on *Bruen*'s statement that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," (*id.* at 2126, 2129-30), Defendants claim that it is actually *Plaintiffs* who bear the burden to show (with evidence of a historical tradition): (i) that the Second Amendment applies to each "sensitive location" under the CCIA (Appt.Br. 52); (ii) that the bearing of arms extends expressly to "private property" (Appt.Br. 71); and (iii) that the right historically applied without each of the CCIA's "licensing requirements." Appt.Br. 30.

Defendants never dispute that Plaintiffs are within the class of persons who possess the right to keep and bear arms, nor could they. As in *Bruen*, "[i]t is undisputed that [Plaintiffs]—[six] ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* at 2134. Neither have Defendants disputed that the handguns Plaintiffs wish to carry in public are protected "arms" – New York conceded the issue in *Bruen* and has already licensed five of the six Plaintiffs to carry such weapons in public. *Id.*; Appt.Br. 1.

Nevertheless, Defendants assert the CCIA's licensing provisions and designation of places as off-limits to firearms do not even "implicate" the ability to "keep and bear arms." This argument is baseless.

As a preliminary matter, the CCIA infringes not only the right to "bear arms" in public, but also to "keep" them in one's own home for self-defense. For example, without a license issued by the State of New York, a person *may not even acquire* a handgun – even to possess within his own home. Additionally, as Pastor Mann explained below, since his home is part of his church, it counts as a "place of worship" under the CCIA, meaning his Second Amendment rights (both to keep and bear) are *entirely extinguished* by the CCIA. JA175 at ¶4; JA177.

Moreover, Defendants' attempt to shift their burden to Plaintiffs is foreclosed by *Bruen* itself, which explains precisely how the Second Amendment applies here: "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*." *Id.* at 2122 (emphasis added). As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction…." *Id.* at 2134. Likewise, the text does not split hairs with respect to *where* in public one may carry, because the right applies universally "in case of confrontation," to be ready "for offensive or defensive action in a case of conflict with another person." *Id.* Just as it "would make little sense" to distinguish between keeping arms in "the home" and bearing them in public (*id.* at 2134-35), it makes absolutely no sense to distinguish between a "confrontation [that] can surely take place" in a public park, a zoo, or "on a sidewalk in a rough neighborhood…." *Id.* at

2135.  The right to "bear arms" *applies everywhere*, without qualification, and it is Defendants who must show a broad and enduring historical tradition, justifying each of the CCIA's provisions.  *Id.* at 2126.

### A. The CCIA's Licensing Requirements Implicate the Second Amendment.

Apparently unwilling to contest Plaintiffs' status as "ordinary, law-abiding, adult citizens" with a "[]typical need for armed self-defense" (*Bruen* at 2134, 2138 n.9), Defendants redirect, arguing that the CCIA is designed to catch *other* persons "who are <u>not law-abiding</u>, responsible citizens." Appt.Br. 28 (emphasis added).  Thus, Defendants posit, as the CCIA's licensing requirements are allegedly designed to weed out such persons from firearm possession, the law's provisions "do not restrict the right of <u>law-abiding</u>, responsible citizens to carry arms…."  *Id.*; *see* Appt.Br. 29. Defendants claim that, whereas their "proper cause" requirement imposed a "burden[] [on] the right of law-abiding, responsible citizens," the CCIA's requirements "impose no such burden."  Appt.Br. 30.  In other words, according to Defendants, unless the CCIA *entirely eliminates* Second Amendment rights, it cannot be said even to *infringe* them, and *any* licensing restriction is constitutionally permissible so long as, at the end of the day, some typical, law-abiding persons obtain a license.  Indeed, that appears to be the theory on which Nassau County relied when it inferred authority from the CCIA to demand a *urine sample* from licensing applicants. ECF#69 at 10 n.25.[5]

---

[5] Insofar as such abusive requirements *already exist*, the district's court

14

Defendants' argument, taken to its logical conclusion, would permit the state, as condition of firearm licensure to: (i) conduct a DNA swab (to identify perpetrators of past crimes); (ii) obtain a blood sample (to determine recent drug or alcohol usage); (iii) demand an interview with minor children, away from their parents, to find out if Daddy has ever raised his voice or if Mommy has ever smoked a "funny cigarette"; and (iv) conduct a home, vehicle, cellular phone and digital records search (to uncover evidence of criminal or immoral behavior). According to Defendants, each of these harassments and violations would be perfectly permissible – after all, New York would argue, the Second Amendment does not apply to the criminals and deviants who would be uncovered by such invasive screening methods. Plus, once an "ordinary, law-abiding" person was poked, pulled, snipped, scanned, and prodded to the state's satisfaction, he should *eventually* receive a license to carry a firearm in public. As Defendants muse, "[i]ndividuals will be denied licenses … only if they are *not* law-abiding, responsible citizens." Appt.Br. 30. See, no harm done! On the contrary, focusing only on the purported reasons "why" the CCIA's licensing regulations were enacted, Defendants omit any analysis of "how" those purposes are accomplished. *See Bruen* at 2133.

Defendants seek to creatively characterize *Bruen*'s descriptor of "law-abiding, responsible citizens" as some *subset of* "the people," with New York free to decide who falls within that subset. On the contrary, *Bruen* merely recognized that certain

conclusion that the licensing process would be misused was hardly "unsupported speculation." Appt.Br. 30-31. *See also infra*, n.30.

persons (like illegal aliens) historically have been outside the scope of persons covered by "the people." Defendants' apparent notion, that the government may conduct a pre-crime analysis to pre-emptively disarm persons who bureaucrats are not sure can be "entrusted" with firearms, is the repudiated approach taken in England by Protestant governments banning possession by Catholics, and vice versa. No other enumerated constitutional right is withheld from subsets of "the people" in such a discretionary fashion.

Lastly, Defendants claim the district court failed to support certain of its findings of facial unconstitutionality. Appt.Br. 31-33. First, Defendants take issue with the district court's conclusion that the CCIA's definition of "good moral character" is flawed because its language, "use it only in a manner that does not endanger oneself or others," fails to contain an "exception for actions taken in self defense." Appt.Br. 28, 31; SA99. Defendants posit that "[s]uch an exception is unnecessary because legal actions taken in lawful self-defense would not cast doubt on one's good moral character." Appt.Br. 31. But Defendants' *ipse dixit* cannot override the plain text. *See* SA103 ("Unfortunately, this is not the law that the New York State Legislature passed"). Second, Defendants object to the district court's conclusion that two of the CCIA's licensing requirements would be unconstitutional in almost all circumstances, and "[u]sually" constitutional only [if] not enforced." SA101.[6] In support, however, Defendants attack *only one of three* separate rationales

_____

[6] For example, Defendants claimed below that a licensing official might find the CCIA unconstitutional and refuse to enforce it. PI Tr. 40:20-24. *See*

given by the district court for its conclusion, claiming that the "large fraction" of cases standard has never been applied "outside the abortion context." Appt.Br. 32. Of course, Defendants offer no reason why such a standard *should not apply* here. Nor do they wrestle with the district court's *additional* conclusions (i) that the CCIA's provisions "lack[] a plainly legitimate sweep" under *Decastro*, and (ii) that it would make little sense under *Bruen* "to find that such a law is inconsistent with history and tradition, just to watch it be saved by the *one* possible application that makes it constitutional." SA101-103.

In *Bruen*, although *some* New Yorkers were able to get permits under the "proper cause" standard, "*many* 'ordinary, law-abiding citizens'" were denied "the right to carry handguns for self-defense..." *Bruen* at 2161 (Kavanaugh, J., concurring). Obviously, the Supreme Court's holding that "proper cause" was facially unconstitutional was not predicated on a finding that *no one* who deserved a permit could get one. And in this case, the "'good moral character' requirement is just a dressed-up version of the State's improper 'special need for self-protection' requirement." SA101.

---

https://bit.ly/3WPtBwo (PI Transcript). Desperate to keep the CCIA on the books, Defendants raise an argument – previously unknown in American jurisprudence – that the CCIA should be deemed *constitutional* because licensing officials might find its provisions so *unconstitutional* and disregard them – a spin on the saying that "to save the village, we had to destroy it."

### B. The CCIA's Sensitive Locations Prohibitions Implicate the Second Amendment.

Defendants claim that the CCIA's blanket prohibitions on the possession of firearms in dozens of so-called "sensitive locations" are constitutional without further analysis, on the theory that "[t]he Supreme Court has repeatedly explained that 'laws forbidding the carrying of firearms in sensitive places' are 'presumptively lawful' and outside the 'scope of the Second Amendment.'" Appt.Br. 52 (citations omitted). On the contrary, just as "not every regulation on the commercial sale of arms is presumptively lawful,"[7] not every location New York arbitrarily classifies a "sensitive location" is *therefore* off-limits to the constitutional possession of firearms. Moreover, the Supreme Court never said that such provisions were *conclusively* lawful, nor did the Court exempt such statutes from analysis under the *Bruen* framework, which applies across-the-board to *all* Second Amendment challenges. In fact, even for the types of "sensitive places" that the Court *did* presumptively identify (schools, government buildings), the Court promised that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). Indeed, the Supreme Court expressly warned New York against expanding the list of possible "sensitive places" the Court had identified, so as not to "effectively declare the island of Manhattan a 'sensitive place'...." *Bruen* at 2118. In

---

[7] *Rigby v. Jennings*, 2022 U.S. Dist. LEXIS 172375, *14 (D.Del. Sept. 23, 2022).

direct defiance, the CCIA declares not only Manhattan, but virtually the entire landmass of New York State, off-limits to firearms. It is no wonder that, when asked where New Yorkers *could* still carry firearms, Governor Hochul replied, "probably some streets." JA50 at ¶105.

Finally, Defendants claim that a proper understanding of permissible "sensitive places" must include completely ordinary places that are "open to the public," theorizing that "several of the exemplar sensitive places identified by the Supreme Court in *Bruen* are quintessentially open to the public" (ironically identifying courthouses and legislative assemblies, which are definitively *not* open to the public other than at limited times and for express, controlled purposes). Appt.Br. 52-53. On the contrary, *Bruen*'s focus on "sensitive places" involved locations "*disrupt[ing] key functions of democracy*," or "*where government officials are present and vulnerable to attack.*" *Hardaway v. Nigrelli*, 2022 U.S. Dist. LEXIS 200813, at *34 (W.D.N.Y. Nov. 3, 2022). Hardly any of the CCIA's designated "sensitive locations" are such places, and all are subject to the *Bruen* framework.

## C. The CCIA's Restricted Locations Prohibition Implicates the Second Amendment.

As with the CCIA's licensing and "sensitive locations" provisions, Defendants argue that "the Second Amendment's text as historically understood" is not even implicated because it "does not provide a right to bear arms on others' private property…." Appt.Br. 71-72. But as explained, *supra*, neither the Second Amendment's text nor the Supreme Court's decisions split hairs in this way, but

rather protect a robust right to "bear arms" generally.[8]  *See Koons* at *44 (finding, with respect to a nearly identical New Jersey statute, that "the plain text of the Second Amendment covers the conduct in question," namely carrying firearms on private property); *Christian v. Nigrelli*, 2022 U.S. Dist. LEXIS 211652, at *15 n.12 (W.D.N.Y. Nov. 22, 2022) ("*Bruen*'s articulation of 'in public' is not a limitation … *Bruen* … addressed the right *outside of the home*.  The Court did not indicate that the right ceased at the property line of others.").

In support, Defendants rely exclusively on a pre-*Bruen* decision, *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012).  Appt.Br. 72.  Yet *Bruen* specifically rejected *GeorgiaCarry* as having employed the repudiated two-step test.  *Bruen* at 2127 n.4.  But more fundamentally, as Defendants acknowledge (Appt.Br. 72), *GeorgiaCarry* involved an *entirely different issue*, where a gun owner asserted a Second Amendment "right to bring a firearm on the private property of another *against the wishes of the owner*."  *Id.* at 1261 (emphasis added).  Therefore, the right affirmed in that case was merely the right of a property owner to exclude, not the right of the government to order that exclusion on behalf of all property owners.  That a landowner has been able to request a person carrying a firearm to not enter or leave is not a historical analogue for the CCIA's inversion of that common-law rule – to allow New York to arrest and prosecute gun carriers absent any statement from the property owner.

---

[8] As the district court correctly noted, *Bruen* implicitly foreclosed the CCIA's firearm ban on all private property.  *Bruen* at 2134; SA172 and n.129.

Plaintiffs have never disputed the right of property owners to exclude, but rather New York's exercising that right and "selecting a default" (Appt.Br. 73) rule on behalf of all property owners. *See Koons* at *44-45 ("Defendants are flipping the constitutional presumption" and making "an 'apples and oranges' argument."); *Christian* at *19-20 and n.20 ("that right has always been one *belonging to the private property owner* – not to the State"). And as the district court noted, there is no "pernicious problem" of property owners being unable to control their property in this way. SA169.[9]

## III. THE CCIA IS WITHOUT ANY RELEVANT ANALOGUE, AND THUS UNSUPPORTED BY A HISTORICAL TRADITION.

### A. The CCIA's Licensing Requirements Are Unsupported by History.

Defendants theorize that the CCIA's entire slew of licensing requirements can be justified on a single basis – they allegedly are designed to "disarm those who have demonstrated a proclivity for violence or … would otherwise threaten the public safety…."[10] Appt.Br. 33 (citing *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019)

---

[9] Defendants reference a journal article concluding that "a statistically significant majority of Americans reject a default right to carry weapons onto others' property." Appt.Br. 73. But aside from the misleading phrasing of its questions (SA179 n.137), demonstrating that "he who writes the resolved clause wins the debate," the study reported just shy of a 50/50 split on the issue. Either way, the scope of constitutional rights is not determined by reference to purported sociological studies by left-wing law professors. *See Bruen* at 2126 n.3; *Heller* at 635.

[10] Defendants abandon many of the historical sources on which they relied below. *Cf.* Appt.Br. 33-35 with ECF#48 at 20-24 (discussing disarming "Native American tribes," Catholics, "dissident[s]," and "subversives" "who refused to take an oath of loyalty," and including a New York militia statute not cited here). Plaintiffs rebutted the applicability of each of these sources below, and the district court found them unhelpful in determining a historical tradition. ECF#69 at 11-14; SA93-94.

(Barrett, J., dissenting)). But as the district court noted, "it seems overreactive (and a bit offensive) to literally analogize the need to regulate concealed-carry applicants to the need to regulate 'groups deemed dangerous.'" SA105. Indeed, Defendants' claim (made repeatedly in their brief) that the CCIA's *licensing provisions* are justified because they disarm the *law-breaking* is belied by Defendants' audacious claim that the CCIA's "*sensitive locations*" provisions are necessary to prevent harm caused by the *law-abiding*. *See* 22-2908, ECF#18 at 16-17.

Predictably, Defendants once again rely on then-Judge Barrett's dissent in *Kanter* for this proposition. Appt.Br. 33-34. But although Defendants have recycled these same cherry-picked statements on no fewer than six occasions throughout this litigation (*Antonyuk I*, ECF#19 at 39; *Antonyuk II*, ECF#18 at 5, 7 and ECF#48 at 1, 20; 22-2379 ECF#16 at 27; 22-2908 ECF#8 at 21-22; 22A557 Response at 25), not once have they addressed Plaintiffs' response – that Defendants omit Judge Barrett's explanatory statements.

First, Judge Barrett explained "that power [to disarm people who are dangerous] extends only to people who are *dangerous*," whereas the CCIA extends to *everyone*, including Plaintiffs who are "ordinary, law-abiding, adult citizens...." *Kanter* at 451; *Bruen* at 2134. Neither have Defendants ever explained Judge

---

Here, Defendants have not alleged error in the district court's rejection of these historical sources, nor have they proffered these sources to this Court in defense of the CCIA. As Defendants waived reliance on these sources, Plaintiffs do not address them here. *See Bruen* at 2130 n.6 ("[W]e follow the principle of party presentation....").

Barrett's point finding no "evidence that founding-era legislatures imposed *virtue-based restrictions on the right*," such as the CCIA's "good moral character" demand imposes. *Kanter* at 451 (emphasis added); *see also Bruen* at 2123 and n.1 (rejecting the idea of disarming people based on "perceived lack of … suitability" and explaining that the "'suitable person' standard precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon'" – *i.e.*, <u>rejecting the very same standard that the CCIA imposes</u>); *cf*. Appt.Br. 34 (claiming oppositely that the Second Amendment permits "laws disarming those deemed 'unvirtuous'….").   In fact, Judge Barrett explicitly disagreed that "the legislature can disarm felons because of their poor character, without regard to whether they are dangerous" – yet that is precisely what the CCIA allows with respect to *everyone*. *Kanter* at 462; *see also* 464 (concluding that the Second Amendment's "limits are not defined by … a lack of virtue or good character").   Judge Barrett's dissent (not to mention *Bruen*) is fatal to Defendants' arguments here.

1.  **There Are No Relevant Historical Analogues for "Good Moral Character."**

In support of the CCIA's demand that licensing applicants possess "good moral character," Defendants first claim that "Revolutionary-era loyalty laws" support the CCIA's demand that a person demonstrate "good moral character" to the state before being licensed.   Appt.Br. 34.   But such wartime loyalty oaths, forced upon the opposing side during or shortly after a conflict, have no bearing on the domestic carry

of arms for self-defense during peacetime. *See Bruen* at 2133 (cautioning that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted'"). Indeed, such oaths have been found to be patently unconstitutional. *W.Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Speiser v. Randall*, 357 U.S. 513 (1958). Plaintiffs address the usefulness of loyalty oaths under the *Bruen* framework in greater detail in III.A.2, *infra*.

Next, relying on what they call "militia-mustering laws," Defendants claim (in conflict with *Kanter*, on which they just relied) that the Second Amendment protects only "a right of the 'virtuous citizen,' [and] permits laws disarming those deemed 'unvirtuous,'" providing citations to (but no explanation of) two historical sources from the appendix. Appt.Br. 34. But as noted above, this claim that the Second Amendment only applies to suitable persons was explicitly rejected by *Bruen*. *Id.* at 2123 and at n.1 (discussing a Connecticut statute's "suitable person" provision, which permits denials of permits to those the state demonstrates to *lack* "essential character," in stark contrast to the CCIA's demand that law-abiding persons prove they *possess* "good moral character"). Unless Defendants can explain how "essential character" is somehow different from "good moral character," it is hard to read *Bruen* as anything but a repudiation of this requirement imposed on applicants.

Moreover, Defendants' *organized* militia-mustering statutes (military discipline for the standing military force for being drunk, fighting, or disobeying

orders)[11] bear no similarity to the CCIA. Indeed, "the Second Amendment right to bear arms [i]s an individual right *unconnected to militia service*." *Heller* at 611 (emphasis added); *see also* at 584. The *temporary* disarmament of *drunk soldiers* has no bearing on whether New York can *permanently* deny constitutional rights to purportedly "unvirtuous," but otherwise nonviolent and law-abiding, persons.

Finally, Defendants point to a series of "licensing requirements … enacted in municipalities throughout New York State, among many other places" between 1878 and 1913, which Defendants claim "advance the same purpose [as the CCIA] of keeping firearms out of the hands of individuals deemed dangerous." Appt.Br. 35-36 (listing eight New York cities,[12] referencing a law review purportedly "identifying many other[s],"[13] and citing an amicus brief allegedly "linking to copies of" the same

---

[11] Defendants do not even bother to make any specific reference to which portion(s) of their 67 pages of militia statutes support their position, requiring Plaintiffs and the Court to "sift the historical materials for evidence to sustain New York's statute." *Bruen* at 2150. However, upon review, the New Jersey statute provided only that an enlisted soldier who was "drunk … disobey[ed] orders," used bad language, or started a fight "shall be disarmed and put under guard … *until the company is dismissed*…." JA389 (emphasis added); *see also* JA419 (Pennsylvania statute providing the same).

[12] Each of these seven ordinances is highly similar, if not a near copy of, New York City's 1878 ordinance.

[13] Defendants' cited law review article opines that, during and after the Reconstruction era, "many localities adopted good cause permit laws – precisely the type of regulations that [were] at issue in *[Bruen]*." S. Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HAST. CONST. L.Q. 145, 169 (2022). But such ordinances did not save the "proper cause" requirement in *Bruen*, and Defendants do not explain how those same sources can justify the "good moral character" requirement here.

25

laws).[14] Of course, *Bruen* rejected the very same type of evidence – "a handful of late-19th-century jurisdictions…." *Id.* at 2138. This Court should reject them as well.

Defendants seriously mischaracterize these ordinances from various New York cities, which: (i) on their face do not require an "in-person interview," but merely that a person "apply to the officer in command at the station-house" (JA448);[15] (ii) imposed at most a penalty of ten dollars (*see Bruen* at 2149); (iii) did not require "good moral character" but only that the applicant be law-abiding, far more akin to an objective background check, (*see Bruen* at 2138 n.9); and (iv) misunderstood the Second Amendment (*cf.* JA448, "the better and law-abiding class … protect themselves with nothing but nature's weapons" with *Bruen* at 2134, "ordinary citizens [have a] right to public carry"). Moreover, (v) Defendants have not even attempted to meet their "burden" to provide evidence that such ordinances were "ever enforced" or, at least, more than in cases "involving black defendants" or other "selective or pretextual enforcement." *Bruen* at 2149 and n.25.[16]

---

[14] Contrary to Defendants' characterization, these sources do not "identif[y]" "dozens" of "similar laws" with a "good moral character" requirement, but rather provide a lengthy list of *more than one hundred* different general gun control statutes and ordinances spanning a period of more than *fifty years*. *See* Cornell at 175-77. Aside from referencing this lengthy list, Defendants *do not specifically identify* any other purported historical examples of "good moral character." *See Bruen* at 2150; SA95.

[15] Other city ordinances are even less indicative of any sort of "interview." *See* JA478, 485, 491 (Buffalo, 1891, written application under oath and with "sufficient reasons," a standard rejected in *Bruen*; Syracuse, 1892, "in proper cases" upon payment of $2.50; Lockport, 1913, upon payment of $1.50).

[16] *See also Antonyuk I*, ECF#40 at 16-21 (summarizing the racist, xenophobic, and often theophobic underpinnings of historical good moral character requirements

26

The district court rejected these city ordinances for three additional reasons. First, the district court correctly concluded that Defendants' sources are "too distant in time from the 1791 ratification and 1868 incorporation…." *See* Appt.Br. 39; SA94. The Second Amendment has the scope it was "understood to have *when the people adopted [it].*" *Bruen* at 2136 (quoting *Heller* at 634-35) (cautioning courts to "guard against giving postenactment history more weight than it can rightly bear"). Ordinances that were enacted between 10 and 45 years *after* the late-coming Fourteenth Amendment cannot possibly provide insight into the minds of the people "***when*** [they] adopted" the Second Amendment in 1791. As the Court explained, "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight'" and, to the extent that 1868-era sources were to be used, it was only as "confirmation of what … had already been established" by founding-era sources. *Id.* at 2137. Indeed, the Court questioned (but ultimately did not decide) whether 1868-era sources can play *any role at all* in interpreting the Constitution, as "we have generally assumed that the scope of the protection … is pegged to the public understanding … in 1791." *Id.* at 2137-38.

Second, using census data, the district court correctly discounted Defendants' "handful of late-19th-century jurisdictions" because they did not constitute a representative sample of the types of laws under which any significant portion of the

_____

in the Nation's early immigration laws, various states' slave codes, and Florida licensing officials' oppression of blacks and Italians in the early 1900s).

American population lived. *Bruen* at 2138; SA97-98. Defendants complain that "[t]he court identified this metric of representativeness for the first time in the preliminary-injunction ruling, thereby depriving defendants of an opportunity to address it." Appt.Br. 37. Not so: (i) this analysis was discussed at the court's preliminary injunction hearing, (ii) the Court *specifically asked defense counsel* about the methodology, and (iii) defense counsel argued against using such a test. PI Tr. 13:22-14:8; at 48:7-14. Nor was this a novel invention by the district court – rather, the methodology was drawn directly from *Bruen*, where census data was discussed by both majority and dissent. *Id.* at 2154; *see also* at 2168, 2173 (Breyer, J., dissenting); *see* Appt.Br. 38 n.10.

Defendants demur that "[t]he population-based analysis is flawed for other reasons as well," speculating that other historical sources might come to light in the future to paint a broader historical picture than Defendants have offered. Appt.Br. 38; *see also* at 65 ("almost certainly represent only a subset"). But again, it is not this Court's role to find such records (*Bruen* at 2150), or to conjure a historical tradition supported by *faith* that yet-unidentified sources might emerge. Next, Defendants challenge the district court's math, claiming that the district court "calculat[ed] percentages without counting" certain small cities with comparatively tiny populations that do not change the calculus more than a couple tenths of one percent. Appt.Br. 38. Finally, Defendants claim that, even though 5.8 percent of the American population may be a small number, it "was in fact a large proportion of the population then living in cities" as, "in 1870, less than 13% of the country lived in cities."

28

Appt.Br. 39 and n.11.  But Defendants hoist themselves with their own petard – if very few Americans lived in cities at the time, then the laws of a few cities (a small percentage of a small number) cannot possibly be seen as representative of a broad and enduring American tradition.

Third, Defendants criticize the district court for "refus[ing] to credit … city ordinances … insofar as they were not accompanied by similar state laws."  Appt.Br. 36.  Thus, Defendants _concede_ that there exist no relevant state-level historical analogues.  Nevertheless, Defendants argue that "States expected localities to regulate firearms" and city ordinances "could have been and were not checked by state legislatures," both of which Defendants claim "provide compelling evidence of the historical tradition."  Appt.Br. 36-37.  On the contrary, absence of disapproval does not indicate approval, and certainly a _lack of evidence_ cannot be relied on by this Court to establish a historical tradition.  Similarly, Defendants posit that "guns in crowded urban areas have always presented special public-safety considerations," and gun control has "consistently been more stringent in cities."  Appt.Br. 36-37.  But the Supreme Court has _thrice_ explicitly rejected that argument, noting that "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications" (_Bruen_ at 2126 n.3, citing _McDonald v. City of Chicago_, 561 U.S. 742 (2010)), explaining that "New York's proper-cause requirement concern[ed] the same alleged societal problem addressed in _Heller_: 'handgun violence,' primarily in 'urban area[s]'" (_Bruen_ at 2131), and that "there is no historical basis for" gun control "simply because [a place] is crowded…."  _Id._ at

29

2134.  Contrary to Defendants' claims, the Second Amendment has the same meaning and application from sea to shining sea, population density notwithstanding.

### 2. There Is No Historical Tradition Requiring a Person to Provide Family Members for Government Interrogation as a Condition of Exercising Constitutional Rights.[17]

Defendants selectively summarize the CCIA's provision requiring an applicant to identify and provide contact information for any spouse, children, cohabitants, and identify whether minors reside in the home, omitting the demand for contact information of "adult children."  *Cf.* Appt.Br. 40 with Sec. 400(1)(o)(i) (emphasis added).  Defendants claim these requirements "facilitate inquiries … for information relevant to the good-moral-character evaluation," and "assist in identifying red flags…."[18]  Appt.Br. 40.  In support, Defendants point obliquely to "[t]he historical record amassed to date," again expecting Plaintiffs and this Court to "sift" through and flesh out Defendants' argument for them.  Appt.Br. 40; *see also Bruen* at 2150.

Specifically, Defendants point to a 1756 Virginia statute "for disarming Papists" who refused to take a loyalty oath to the Crown.  Appt.Br. 41; JA279-283;

---

[17] As Defendants agree that the CCIA's additional licensing provisions are useful only to determine "good moral character," if that standard is struck as an infringement of the Second Amendment, then each of the additional requirements would also fall.

[18] Defendants opine that this requirement "is particularly important" because "domestic violence is among the most common misuses of firearms."  *Id.* at n.12.  By that logic, New York could require a victim of domestic violence seeking a firearm to protect herself to list her abusive husband on her application so that the state could seek his input about his wife's "suitability" to have a gun, thereby giving the abuser notice that his victim might soon have the means to repel his next attack.  Likewise, Defendants could demand a therapist's notes on the grounds that suicide is "among the most common misuses of firearms."

*see also* SA93 (referencing similar 17th century laws, on which Defendants no longer rely, and which are too far removed from the founding to be instructive[19]).  Of course, unlike the CCIA, this statute was limited to a disfavored minority of the population and, even then, exempted "necessary weapons … for the defense of his house or person…."  JA281; *see Bruen* at 2142 n.12 (making the same point).  Similarly, *temporary* pre-America wartime loyalty oaths (JA297-98) enacted by a minority of colonies to disarm (and otherwise punish and harass) British loyalists during the Revolutionary War cannot possibly be found to be  evidence of an enduring American tradition.[20]  *See Bruen* at 2152 n.26 ("There is … little indication that these military dictates were designed to align with the Constitution's usual application during times of peace."); at 2140 (rejecting the tradition of disarming "political opponents," which only made those who would later become Americans more "jealous of their arms"); at 2154 (rejecting territorial "improvisations" of a "transitional and temporary [nature] … which might not have been tolerated in a permanent setup"); *see also Schenck v. United States*, 249 U.S. 47, 51-52 (1919) (finding that certain otherwise-unconstitutional requirements might be justified by wartime exigencies).

---

[19] The 1637 Massachusetts Bay source cited by Defendants below (JA287) is entirely unhelpful, as it is merely a court order that a few named persons be disarmed (hardly a historical tradition).

[20] *See* JA298-302 (Massachusetts, 1776) (search of home and seizure of arms); JA303-308 (Pennsylvania, 1777) (loss of *all rights*, imprisonment "without bail"); JA309-313 (Maryland, 1777) (treble taxation); JA314-317 (North Carolina, 1777) (sent "either to Europe or the West-Indies"); JA318-320 (Virginia, 1777) (loss of all civil rights); JA321 (New York, 1776) (disarmament).

Nor is it likely that such Revolutionary War-era laws were ever "subject to judicial scrutiny" explaining "the basis of their perceived legality," and thus there is no "evidence explaining why these unprecedented prohibitions ... were understood to comport with the Second Amendment." *Bruen* at 2155 (noting that certain laws "did not survive … admission to the Union as a State," categorizing them as "passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood," rather than "part of an enduring American tradition of state regulation").

As with laws disarming American Indians (1600s) (*see* SA93), freed blacks (1800s), and even Japanese Americans (1940s)[21] based on perceived loyalties, the laws on which Defendants rely were never applied to the population broadly. *See Bruen* at 2151 (recounting the "systematic[] … abuses" by many states "violating blacks' right to keep and bear arms"). If such laws had applied beyond politically disfavored groups, they would have been challenged and almost certainly struck down by courts, or simply ignored by the people. *Antonyuk I*, ECF#40 at 14; *see also Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941) (explaining that Florida's "good moral character" requirement "was passed for the purpose of disarming the negro [and] was never intended to be applied to the white population … it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested"); *see also Bruen* at 2152 n.27 ("Southern prohibitions on concealed carry were not always applied equally"); at 2149 (rejecting as "surely too slender a reed" surety laws with "little

_____

[21] https://static01.nyt.com/images/blogs/learning/pdf/2017/NYT2.12.42LN.pdf.

evidence" of enforcement aside from a "handful of … examples … all involving black defendants who may have been targeted for selective or pretextual enforcement"). Indeed, by the end of the Revolutionary War, "there were only 24,000 Catholics in the entire United States"[22] (and far fewer in 1756, the date of Defendants' proffered historical source) compared to a population of about 2.5 million (less than 1 percent).[23] Likewise, during the Revolutionary War, only between 15 and 20 percent of colonists were loyalists. *See Bruen* at 2136, 2155-56 (discounting restrictions that applied to a small percentage of the population or that were "consistent with the transitory nature of territorial [here, revolutionary] government—short lived" and had "become 'obsolete … at the time of the adoption of the Constitution'"); 2144 ("[I]t does not appear that the statute survived for very long").

Moreover, these types of laws *prohibited all possession* of firearms by certain categories of persons, eliminating not only the ability to *bear* arms but also to *keep* them in one's own home. Yet as *Bruen* explains, reliance on such historical sources is inappropriate as "this kind of [broad] limitation is inconsistent with *Heller*'s historical analysis [and] was not incorporated into the Second Amendment's scope." *Id.* at 2141 n.10.

Defendants also reference "[l]ater incorporation-era laws" unearthed by the district court which "sometimes specifically required references who knew the

---

[22] W. F. Dunaway, The Scots-Irish of Colonial Pennsylvania, UNC Chapel Hill Press (1944), at 41.

[23] https://www.census.gov/library/stories/2019/07/july-fourth-celebrating-243-years-of-independence.html.

applicant." Appt.Br. 41 (citing SA105 n.81). But like above, the 1832 Delaware statute applied only to "any such free negro or free mulatto," a tiny minority of the total population (2.5 percent).[24] Likewise, the 1871 Jersey City ordinance applied to only six tenths of one percent of the population.[25] *But see Bruen* at 2154. Standing alone, then, the 1881 New York City ordinance (which also applied to a small percentage of the overall population) cannot establish a broad and enduring historical tradition. *See Bruen* at 2137-38 (rejecting "a handful of late-19th-century jurisdictions" as "belated innovations [that] come too late"); at 2153, 2156 (rejecting "outliers," explaining that "we will not 'stake our interpretation of the Second Amendment upon a single law'").

After proffering their historical sources, Defendants accuse the district court of error for failing to allow sufficient flexibility in its historical analysis – refusing to allow laws restricting access to firearms "based on a reputation-based perception of an individual" to justify the CCIA's demand for names and contact information for family and cohabitants. Appt.Br. 41, SA103-107. Defendants set a low bar, asserting that the CCIA need only tangentially involve "the same kind of associate and reputational information" in order to be constitutional. Appt.Br. 41. Again, focusing solely on the "why" underlying the CCIA and its purported analogues entirely ignores

---

[24] In 1830, "the total number of free blacks had risen to 319,000," https://www.pbs.org/wgbh/aia/part3/map3.html, or 2.5 percent of the U.S. population of 12.9 million, https://www2.census.gov/library/publications/decennial/1830/1830b.pdf (at 47).

[25] https://en.wikipedia.org/wiki/Jersey_City,_New_Jersey, 82,546/12,900,000.

the "how" metric for relevant similarity that the Supreme Court identified as a "'*central*' consideration[]." *Bruen* at 2133. Indeed, "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers'" – such as requiring an applicant to turn over one's children to the government for interrogation – "that our ancestors would never have accepted." *Id.*

It requires a massive leap of reasoning – which Defendants do not even attempt to bridge – to liken the requirement to take an oath (sometimes required only *after being suspected or accused* of being disloyal[26]) with the CCIA's demand that friends and family demonstrate an applicant's bona fides *absent any suspicion or accusation* of wrongdoing or other ineligibility. *See Bruen* at 2148-49 (contrasting "New York's regime" requiring "proper cause" in every case with older laws where "a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace"). In sum, nothing Defendants have proffered evinces anything close to a widespread acceptance of a demand for family and household residents' identities and contact information, so that they can be questioned by authorities. *See id.* at 2138, 2153.

### 3. There Is No Historical Tradition of Conditioning the Exercise of an Enumerated Right on a Person Divulging His Papers, Writings, Political Statements, and Communications.

Once again, Defendants place all their analogical eggs in the "why" basket, neglecting to address *Bruen*'s "how … metric[]." *Id.* at 2133. Defendants claim the

---

[26] *See* Appt.Br. 41; *see also* ECF#48 at 32 (disarming those "know[n] to be Catholics," upon "just cause of suspicion," or those "thought" to be dangerous).

CCIA's demand for unprecedented access to social media is "well supported by the historical tradition of officials assessing past conduct, associates, and reputation," apparently incorporating by reference the historical sources previously discussed. Appt.Br. 43; *see also* Defs.' Opp'n to Prelim. Inj., ECF#48 at 38 ("[a]s discussed above"). But neither Plaintiffs nor this Court are "obliged to sift the historical materials…." *Bruen* at 2150. However, as discussed *supra*, examining the purported good-character analogues already rebutted – namely, wartime loyalty oaths and militia-mustering statutes – reveals markedly different motivations ("whys") in addition to mechanisms ("hows") compared to the CCIA's social media requirement. *Compare* JA332-429 (temporary disarmament to maintain military discipline *during* military maneuvers) *and supra* note 20 (disarmament *after* failure to sign wartime loyalty oaths), *with* N.Y. Penal Law § 400.00(1)(o)(iv) (wholesale disarmament *unless* one provides social media accounts for open-ended scrutiny).

Again, Defendants' logic would permit a whole host of similar constitutional abuses, such as a licensing official demanding to search an applicant's cellular phone during a licensing interview, purportedly to "assess[] past conduct, associates, and reputation." Appt.Br. 43. After all, as Defendants' referenced sources reveal, one mass murderer had "notes in his phone reflect[ing] that he unsuccessfully sought to fit in," and a review of his "internet usage suggests he may have wondered if he was a sociopath…." JA554-555.

Defendants are keen to reference sociological studies and public policy arguments that have no bearing on Second Amendment analysis. *Cf.* Appt.Br. 43

with *Heller* at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them"); *Bruen* at 2135 (regulations must be "consistent with this Nation's historical tradition of firearm regulation"); at 2126 n.3 (rejecting the dissent's use of "statistics" of "evidence of crimes committed by individuals with firearms"). Nevertheless, Defendants proffer that some criminals might provide advance warning signs on social media. Appt.Br. 43-44. But even if true, Defendants do not explain how most such social media postings could be used to justify prohibiting constitutional access to firearms. *See* ECF#68 at 43-44 (explaining that most of the examples Defendants provided represent entirely protected – and legitimate – speech and expression). Nor do Defendants make any effort to demonstrate how denial of a New York handgun carry license would have thwarted crimes such as the 2022 Buffalo shooting, the 2017 Bronx-Lebanon Hospital attack, and the 2012 ambush of firefighters, each of which involved long guns, for which a New York carry license is not required to merely possess.[27] Likewise, the 2022 NYC Subway shooter used a handgun lawfully purchased in Ohio.[28] Nor do Defendants identify how many persons obtain licenses to carry firearms lawfully, before using them to commit heinous murders. *See Bruen* at 2157 (Alito, J., concurring) ("Why … is [it] relevant to recount the mass shootings that have occurred in recent years? … Does the dissent think that laws like New York's prevent or deter

---

[27] https://cnn.it/3JvDsEQ, https://bit.ly/3Y9zkOO, https://nyti.ms/3HLZ7Ht.
[28] https://bit.ly/3YebDFa.

such atrocities?  Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home?").

Finally, Defendants dispute the district court's finding that Defendants' historical analogues were "not sufficiently analogous."  Appt.Br. 44.  According to Defendants, "social media is a quintessential dramatic technological change" such as *Bruen* anticipates, and thus efforts to review social media must be lawful without further analysis.  *Id.* at 2132.  But not so fast.  While social media is certainly a new form of digital communication, the founding-era had printed equivalents (e.g., pamphlets, handbills, and letters).  ECF#6-1 at 25.  Moreover, the *societal problem* to be addressed "has persisted since the 18th century."  SA112 (citing *Bruen* at 2131).  Thus, colonial-era statutes would have required a person to provide access to his private papers and letters for government review, and identify anonymous pamphlets he had published.  *Bruen* at 2133.  Yet no such historical analogues are known to exist and Defendants have proffered none.  Such a law would have required Madison, Hamilton, and Jay to reveal their authorship of The Federalist Papers as "Publius."  Defendants gloss over this problem, insisting that "good moral character" analogues "cited above" are sufficient to justify the CCIA's social media requirement.  Appt.Br. 46.  But as the district court correctly noted, "none of them required persons … to disclose private information about themselves."  SA110 (and, "[n]ot surprisingly, the Court has found none").

Finally, Defendants challenge the district court's conclusion that the CCIA likely violates the First and Fifth Amendments.[29] Appt.Br. 45-46, SA114. Defendants argue that the First Amendment is not even implicated because the CCIA "requires only that applicants identify the existence" of accounts, "which is not speech." Appt.Br. 45. On the contrary, Defendants wrongly assume that there is no knowledge gained or inferences drawn (including those used to judge good moral character) from merely learning about the *existence of* certain accounts. *See* ECF#6-1 at 20-22 (providing numerous examples); *see also NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) (rejecting "compelled disclosure of affiliation…. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring); *Carpenter v. United States*, 138 S. Ct. 2206 (2018); *Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1053 (Colo. 2002). Defendants do not (nor did they below) wrestle with any of these issues.

### 4. There Is No Historical Tradition Requiring a Person to Disclose Any "Other Information" a Government Official May Demand Prior to Licensure to Exercise an Enumerated Right.

Defendants again incorporate by reference their previous arguments, claiming that the CCIA's demand for such "other information required by the licensing officer"

---

[29] Although referencing the district court's Fifth Amendment conclusions, Defendants do not appear to contest them. Appt.Br. 45-46; *see JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

is "justified by the longstanding tradition of regulations to ensure that those carrying firearms are law-abiding and responsible." Appt.Br. 46. But again, focusing only on the "why," Defendants gloss over the "how" (*Bruen* at 2133), assuming that any amount of intrusion into constitutionally protected rights is lawful if it could lead to relevant information.

Defendants assert that modern laws from "other States with licensing regimes" were "***approved*** in *Bruen*...." Appt.Br. 46 (emphasis added). When Defendants offered that argument below, the district court called it "just disingenuous." PI Tr. 60:10-15. Indeed, *Bruen*'s caution that it was not ruling that statutes from other states, which were not before the Court, were ***unconstitutional***, does not mean the Court decided the ***constitutionality*** of those other statutory schemes.

Finally, Defendants accuse the district court of "fanciful speculation" for recognizing that licensing officers will exercise "open-ended ... unbridled discretion" and make unconstitutional demands such as for "a urine sample." Appt.Br. 47, SA116. As Defendants are well aware, this is far from "speculation" – rather, Nassau County now demands that all applicants submit *a urine sample*.[30] *See* ECF#69 at 10. Defendants claim that, at most, this could give rise to an as-applied (but not a facial) challenge (Appt.Br. 47), apparently forgetting that *Bruen* itself involved the Court's facial rejection of a "grant[] [of] open-ended discretion to licensing officials" –

---

[30] Below, Defendants claimed the CCIA's social media provision required only divulgement of the existence of such accounts. PI Tr. 71:6-12. Not so. Recently, Nassau County has begun demanding "access" to private or hidden social media accounts. *See* https://bit.ly/3YjeT29 at 2.

irrespective of whether that discretion had been abused in practice. *Bruen* at 2161; Appt.Br. 47; *see also Decastro*, 682 F.3d at 168.

## 5. There Is No Historical Tradition Prohibiting Firearm Possession in the Enjoined "Sensitive Locations."

Defending the CCIA's litany of so-called "sensitive locations," Defendants do not offer specific purported historical analogues for any, instead (i) giving a broad overview of pre-founding and post-bellum laws (Appt.Br. 54-58); (ii) purporting to identify "three categories" of places where firearms can be banned (Appt.Br. 58-61); (iii) claiming the enjoined "sensitive locations" fall into one or more of these categories (Appt.Br. 61-63); (iv) raising various methodological critiques of the district court's opinion (Appt.Br. 63-66); and (v) objecting that one location cannot fall within more than one of the CCIA's broad and overlapping categories (Appt.Br. 67-68). Plaintiffs address each in turn.[31]

### a. Defendants' Pre-Founding and Post-Bellum Sources Hold Little Weight.

Defendants offer various sources from antiquity that they allege establish a broad historical record of banning firearms "in a wide array of sensitive places." Appt.Br. 54. First, Defendants rely on the 1328 Statute of Northampton, which

---

[31] Defendants for the first time reference numerous purported historical sources never mentioned below, not included in the Joint Appendix, and not provided as attachments to or links in Defendants' brief. Defendants apparently expect Plaintiffs and the Court to attempt to track down these centuries-old statutes, and have this Court reverse the district court based on historical evidence never offered below. But the district court cannot have abused its discretion by failing to consider historical evidence that Defendants failed to present. *See also JP Morgan Chase Bank*, 412 F.3d at 428.

*Bruen* explicitly rejected as unhelpful. *Id.* at 2139-40 (noting this statute "has little bearing on the Second Amendment adopted in 1791," as it was centuries removed from the relevant periods; likely dealt only with "the wearing of armor" or perhaps "lances … worn or carried only when one intended … to breach the peace," and "[t]he Statute's prohibition on going or riding 'armed' obviously did not contemplate handguns"); at 2143-45 (explaining that later laws modeled on the Statute applied only to "affray" and "riots" and "going armed 'to the terror of the people'"). Defendants' other newly-cited statutes (1403, 1534) similarly appear to have dealt only with "affray" and "dangerous weapons." Appt.Br. 54-55.

Defendants next claim that "[s]uch laws made their way to America," expressly contradicting the Supreme Court's statement that these early English laws had "'faded without explanation' … by the time Englishmen began to arrive in America in the early 1600s." *Bruen* at 2140; Appt.Br. 55. Worse still, Defendants paint a highly deceptive picture of these early sources, claiming they generally "prohibited bearing arms in sensitive places such as 'fairs or markets' and election grounds." Appt.Br. 55. On the contrary, the 1786 Virginia law, like those discussed above, prohibited merely one to "ride armed by night [or] by day … in terror of the county" or to "come before" public officials "with force and arms." JA670, ECF#69 at 31. This is far from a general prohibition on carrying firearms, but merely restricted doing so in a manner that would incite public panic or interfere with government functions.[32]

---

[32] Defendants' 1792 record from North Carolina, although not provided here and never referenced below, appears to contain identical language. *See*

Other than polling places not challenged here, Defendants failed to reference a *single* founding-era source for the proposition that governments can ban all firearms in *any* location.

Next, Defendants jump past *both* relevant historical eras, referencing a series of nine state laws from 1867 to 1890, claiming that these "prohibited firearms in a broad range of sensitive places." Appt.Br. 55. Defendants' amalgamation of *many different* provisions does not establish a historical tradition for *any particular* type of location before the Court and, upon scrutiny, only a few of these sources (at most) overlap as to any specific type of place (*e.g.*, only Arizona and Oklahoma prohibited firearms in places where liquor was sold). Moreover, with one exception, these laws (and ordinances) postdate the ratification of the Fourteenth Amendment, some significantly. Notably, several of Defendants' statutes operated on a now-rejected view of the Second Amendment as allowing broad prohibitions on concealed carry, something *Bruen* explicitly rejected. *See* JA694, 620, 630. Further, most laws imposed small punishments, such as a fine, or at most a misdemeanor – nothing like the CCIA's serious felony crimes.

---

https://bit.ly/3wG0Ojx. To be sure, Defendants' 1776 Delaware constitutional provision prohibited anyone to "come armed" to a polling place. JA622. However, the prohibition was soon *removed*. *See* Del. Const. of 1792; D. Peterson & S. Halbrook, *Feature: A Revolution in Second Amendment Law*, 29 DEL. LAW. 12, 15 (2011). With respect to Defendants' "Fugazi" law review article, those laws appeared to be tailored only to "dangerous and unusual weapons, in such a manner as will naturally cause terror to the people…." *See* https://bit.ly/3jgdqL5.

Three of the types of "places" in Defendants' sources have not been challenged and are not at issue here (courts, schools, elections). One type of restriction is not a restriction of a *location*, but an *activity* (carry while intoxicated). Indeed, two of Defendants' sources (Kansas, Wisconsin) *only* reference intoxicated carry, and thus are entirely irrelevant here. Moreover, two are from territories (Oklahoma and Arizona), which *Bruen* explicitly discounted as transient and experimental, and therefore irrelevant. *Id.* at 2154-55. Even so, the Arizona ordinance did not apply (i) to one's own property (yet the CCIA flatly bans firearms in "sensitive locations" including a doctor in his own office, or Pastor Mann within his own home and church), (ii) to "persons traveling," or (iii) to those with "reasonable ground for fearing an unlawful attack upon his person." JA616-17. Finally, Defendants' remaining five sources are not broadly representative (and certainly not with respect to any particular type of location), as these states contained a small minority of the total U.S. population. SA131 (finding even if a tradition was "*established*," it was not "*representative*" of the nation generally).

To their list of unhelpful state statutes, Defendants add "several cities across the country [with purportedly] similar restrictions." Appt.Br. 56. The first is an 1861 restriction on firearms in Central Park (JA672), ordained less than a decade after the City had created the park by confiscating the land from freed blacks who had established a "thriving … community" there – likely an attempt to disarm those same

persons who had been displaced.[33]  Other City regulations on certain parks (Philadelphia, St. Paul, Detroit, Chicago, St. Louis, Pittsburgh) all used similar language, prohibiting one to "carry firearms … or throw stones or other missiles" or "shoot birds in the Park."  JA675, 680, 687, 750, 758, 762.[34]  Notably, Defendants offer no explanation why the language from these city ordinances differs from the language used in state statutes enacted during the same time period and purportedly for the same purpose.  *See* JA602, 605, 608, 616, 620, 691 (using variations of "carry concealed on or about his person" and "upon or about his person").  With different texts from the same time period referencing similar subjects in contrasting ways, "a material variation in terms suggests a variation in meaning."  A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts, 170-71 (Thomson West 2012).  A clear-eyed look at these city ordinances betrays a specific intent to prevent vandalism and small-game hunting rather than to infringe the right to carry in self-defense.

Defendants' attempt to incorporate other historical sources by obscurant reference to a "*Fugazi*" law review article as "citing several example laws" fairs no better.  Appt.Br. 56.  First, this source was never discussed below, and Defendants have not provided the alleged historical sources it references.  Even so, the city ordinances it lists all postdate the Fourteenth Amendment (some significantly) (*see Bruen* at 2137); many of the "sensitive places" are not at issue here (schools, courts,

---

[33] https://www.centralparknyc.org/articles/seneca-village.
[34] Only Salt Lake City's 1888 ordinance used different language, prohibiting the "carry or discharge" of firearms without the Mayor's authorization – which very well could have contemplated a licensing scheme.  JA756.

polling places, and "desperadoes"); and many contain prohibitions *Bruen* expressly repudiated (*e.g.*, within city limits, *cf. Bruen* at 2134).

Next, Defendants move on to state supreme court decisions, first referencing the *English* case. Appt.Br. 56-58. But *English*, by both name and reasoning, was expressly rejected by the Supreme Court. To the extent that *English* would have defined "pistols" as "wicked devices of modern craft," *Heller* described them as "the quintessential self-defense weapon." *English* at 474; *Heller* at 629. Whereas *English* claimed the Second Amendment protects only "arms ... of war," *Heller* explains that "the Second Amendment extends ... to all … bearable arms...." *English* at 475; *Heller* at 582; *see also* at 624 (rejecting the idea that "only those weapons useful in warfare are protected").

Defendants' other state court cases generally misconstrued the Second Amendment in a similar way. *See Hill v. State*, 53 Ga. 472, 474 (1874) (rejecting the idea that the Second Amendment covers "the right to carry pistols," a "perversion of the meaning of the word arms…."); *Andrews v. State*, 50 Tenn. 165, 188-189 (1871); *Wilson v. State*, 33 Ark. 557, 559 (1878); *State v. Shelby*, 90 Mo. 302, 306 (1886) (looking *only* at a state constitutional provision which expressly exempted "the practice of wearing concealed weapons") (*see* Appt.Br. 58 n.18, admitting as much); *McDonald* at 936 (Breyer, J., dissenting) (listing many of these decisions as upholding "bann[ing] the possession of all nonmilitary handguns"); *Bruen* at 2155 (explaining that states which banned "concealed carry of handguns … generally operated under a fundamental misunderstanding of the right to bear arms"). It is no wonder that,

having entirely misunderstood the arms protected under the Second Amendment, various outlier state courts concluded firearms could be prohibited – in certain places or entirely. Moreover, Defendants fail to acknowledge that *Bruen* expressly rejected *English*, its reasoning, and the Texas statute which it interpreted. *Bruen* at 2153 (calling them "outliers," at best).

### b. Defendants' Attempts to Concoct Three Broad Types of Sensitive Locations Lack Support.

Between them, *Heller* and *Bruen* identified a total of five presumptively "sensitive places" – "schools," "government buildings," "legislative assemblies," "polling places," and "courthouses." *Heller* at 626, *Bruen* at 2133. Each of these locations is owned or tightly controlled by the government, and used for express, limited, governmental purposes. Striking down the CCIA's ban on firearms in churches, Judge Sinatra explained *Bruen*'s "sensitive places" as locations "where a bad-intentioned armed person could disrupt key functions of democracy," or "where uniform lack of firearms is generally a condition of entry, and where government officials are present and vulnerable to attack." *Hardaway* at *34.

In stark contrast, *none* of the CCIA's purported "sensitive locations" enjoined below are such places. Nevertheless, attempting to provide air-cover for the CCIA's dozens of unrelated gun bans, Defendants claim that the "historical record" justifies broad, categorical firearm bans (i) in "places intended for the exercise of … other fundamental rights," (ii) when "protect[ing] vulnerable populations" and "impaired people," and (iii) in "crowded locations." Appt.Br. at 59-60. But none of these

47

categories is in any way related to the presumptive "sensitive places" the Court identified; none has anything to do with the "functions of democracy" or represents the seat of government.

For starters, Defendants claim that guns can be banned in "voting places, courthouses, and legislative assemblies" because "other fundamental rights" are exercised there. But none of these locations is at issue here. Moreover, such limitations are based not on the *exercise of constitutional rights* but rather the *performance of government's constitutional duties* (legislative and judicial). Thus, these places are not related in the way Defendants claim, but rather in the way Judge Sinatra described (key functions of democracy). Moreover, Defendants' attempt to shoehorn privately owned and controlled "places of worship" into this category is inapt, as churches do not involve exercise of constitutional rights *vis-à-vis* the government, unlike a polling place. Defendants' continued reliance on *Hill* is unhelpful, for the reasons above. Finally, Defendants' claim that people should not "meet and worship God … armed as though for battle" is belied by the overwhelmingly broad historical tradition – from *the Founding era* – of colonists and early Americans doing exactly that. *See* Answering Brief to Defendant-Appellant Cecile at 30.

Second, Defendants' attempt to use laws prohibiting firearm possession *by certain people* to justify prohibiting possession *in certain places* falls flat. Appt.Br. 59-60. Indeed, New York and/or federal statutes already disarm those under 18, those adjudicated mentally defective, and those who are committed to mental institutions. These historical sources, even to the extent they could represent

sufficient historical traditions,[35] do not establish that *everyone* may be disarmed simply because *some* disqualified persons are present.

Third, Defendants' audacious claim that firearms can be banned "in crowded locations" does not even clear the starting gate, as *Bruen* <u>expressly rejected</u> this <u>very same</u> argument when raised by the <u>very same</u> state, explaining that a place could not be declared off-limits to firearms "simply because it is crowded…." *Id.* at 2118-19, 2133-34. Nor is population density the basis for disarmament in any of the locations the Court identified as presumptively "sensitive places." This Court should reject Defendants' invitation to disregard the Supreme Court's clear holdings.

### c. The CCIA Cannot Be Justified by Reference to Allegedly Permissible "Purposes" Instead of by Historical Analogue.

Believing themselves freed from having to provide *actual* historical analogues for the CCIA, Defendants next claim that "[e]ach of the sensitive-place restrictions at issue in this appeal serves at least one of the traditional purposes described above…." Appt.Br. 61. But this unsupported, freewheeling methodology is not the framework *Bruen* established, and this Court should reject Defendants' invitation to replace "sensitive places" with "sensitive purposes."

First, Defendants claim that (i) churches, (ii) places where the "rights to protest or assemble" are exercised, and (iii) public parks[36] fit into their newly-created

---

[35] Defendants' string cite to the Joint Appendix (Appt.Br. 60) merely repeats historical sources already dealt with, *supra*.

[36] Defendants claim that the CCIA's parks ban is "independently lawful because the government may restrict firearms on its own property," referencing a

category of places where "other fundamental rights" are exercised. Appt.Br. 61. But aside from continued reliance on *Hill*, Defendants provide no authority for the notion that different constitutional rights cannot be exercised simultaneously. Moreover, the CCIA disarms the very people Defendants presumably would claim it is designed to protect – for example, (i) rendering defenseless Pastor Mann's own congregation; (ii) making it impossible to hold historic reenactments at public parks;[37] and (iii) making it illegal for groups of gun owners themselves to gather to discuss the state's anti-gun politics at gun shows. *See* SA75. Indeed, the CCIA broadly makes it unlawful for Plaintiff Johnson to carry a firearm while he goes fishing, and for Plaintiff Leman to provide emergency services (while armed) in rural, sparsely populated, backcountry parks.

Second, Defendants claim that bans on firearm possession by *certain* groups of people justify the CCIA's ban on firearm possession by *anyone* in (i) public parks, (ii) zoos, (iii) drug and mental health services locations, and (iv) bars and restaurants. Appt.Br. 62. But many such categories of persons are *already* prohibited from firearm possession, and so the CCIA restricts only the law-abiding. Moreover, vulnerable

D.C. Circuit case that was implicitly overruled by *Bruen*. Appt.Br. 62 n.19. But even then, Defendants grossly misrepresent that decision, which held only that firearms may be restricted on certain "property surrounding" a "government building" that is "sufficiently integrated" with that location because the government's role there is that of "a proprietor rather than as a sovereign." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). *See also* ECF#69 at 24. By Defendants' logic, New York could ban firearms on all public streets because the government owns them – ironically, the *only* place that Governor Hochul admits guns may still be carried. *See id.* at 6; *see also Siegel v. Platkin*, 2023 U.S. Dist. LEXIS 15096, *41 (D.N.J. Jan. 30, 2023).

[37] https://bit.ly/3HqWcT6.

persons generally are in the greatest need of having others present to protect them, and yet the CCIA even prohibits parents from carrying their firearms to protect their own children.

Third, Defendants claim that all but one of the enjoined sensitive locations are crowded locations. Appt.Br. 62-63. Yet the Supreme Court has determined that Manhattan, one of the most densely inhabited places, is definitively not a "sensitive place." *Bruen* at 2134.

### d. The District Court Carefully Applied *Bruen*'s Analytical Framework.

Next, Defendants bring four challenges to the district court's historical methodology. Appt.Br. 63-66. First, Defendants claim that the district court erred by failing to adopt their concocted set of three broad categories of locations where firearms can be banned. Appt.Br. 64. Defendants object to finding historical analogues for banning guns in zoos (or analogous locations), claiming that "few zoos existed" (indeed, it would appear that none existed at the time of the founding). Yet crowds, including vulnerable or impaired persons, have *always* existed, and Defendants have never claimed that zoos somehow present "novel modern conditions" or "unprecedented societal concerns" that were not present and entirely unanticipated during the founding.[38] *Bruen* at 2132, 2134.

---

[38] Defendants rely on information not presented below – internal rules for two New York asylums (one city, one state) in the mid and late 1800s (*i.e.*, a largely unhelpful time period). Appt.Br. at 64 n.21. These rules governed "*patient*" access to certain items to ensure they did not "procure weapons," and did not appear to apply to anyone else. The rights of New Yorkers are not defined by rules governing asylum

Second, Defendants again object to the district court's use of census data, discussed at III.A.1, *supra*. Again, Defendants audaciously claim that "this criterion is inherently misleading" because their historical analogues "almost certainly represent only a subset of the relevant historical regulations" – or at least it is a "possibility." Appt.Br. 65. Rather than meet their burden to actually *produce* such sources, they ask this Court to employ the Biblical concept of "faith … the substance of things hoped for, the evidence of things not seen." Hebrews 11:1.

Third, Defendants critique the district court's discounting of territorial restrictions (Appt.Br. 66), even though *Bruen* said that such ordinances were "transient," "transitory," and "not … instructive." *Id.* at 2144, 2154-55. Likewise, Defendants object to the district court's rejection of the ordinances of certain cities (Appt.Br. 66-67) – a "few late-19th-century outlier jurisdictions" that were not part of a "long, unbroken line" of such restrictions (even within a state), even though this follows their treatment in *Bruen*. *Id.* at 2136, 2156.

Finally, Defendants erroneously claim that "public parks developed in the nineteenth century," and "state park systems [in] the twentieth century." Appt.Br. 66. But that claim ignores that dozens (if not hundreds) of city and town squares, commons, and greens existed in colonial times, providing central locations for meeting places, parades, community events, militia mustering, and eventually protests against the Crown and even mustering places for the colonial militia.

inmates.

Defendants provide no historical sources showing that firearms were ever banned in such places. On the contrary, the historical record is replete with references of firearms universally present in such locations. *See* Answering Brief to Defendant-Appellant Cecile at 26-31.

### e. Defendants' Attempts to Make the CCIA Appear More Reasonable Cannot Overcome Its Plain Text.

Lastly, Defendants seek to minimize the CCIA's obvious effects, claiming them to be "unlikely applications ... based on unsupported speculation...." Appt.Br. 67. For example, the CCIA entirely bans firearms in "any place of worship or religious observation." As Pastor Mann explained, this means his right to keep and bear arms is *entirely extinguished*, as his home is a parsonage on church property and *physically part of* the church building. JA177. Defendants demur, claiming that "nothing in the CCIA prohibits carrying a firearm in one's own home merely because the home is connected to a church...." Appt.Br. 67. But this disavowal *directly contradicts* Defendants' own statements below, where they opined that the application of the CCIA to Pastor Mann's home is an "interesting question," an answer to which would result from a "course of enforcement actions by law enforcement..." TRO Tr. at 31:8-10.[39] Actually, the problem runs deeper than whether Pastor Mann's home meets Defendants' contrived category of "church," because the CCIA bans firearms not only in churches, but in "any place of worship or religious observation" – incredibly broad

---

[39] *See* https://bit.ly/3kQtWBP (TRO Transcript).

language which, on its face, could include private religious worship *within the home itself*. JA176-7.

Defendants' attack on the district court's finding that the CCIA "could be stretched to prosecute someone" who finds himself "in the middle of a protest" fares no better, as that was not the basis for the district court's conclusion that this provision is unconstitutional. *Cf.* Appt.Br. 68 with SA163 (finding the provision "could also apply to Plaintiff Terrille's gun shows and Plaintiff Mann's expressive religious assemblies.").

Lastly, the district court did not "question[]" whether the CCIA's ban in bars and restaurants applies to "patrons who are not drinking" (Appt.Br. 68), but rather struck down the provision because it is not "even limited to persons who are intoxicated... Rather, it broadly prohibits concealed carry by … Plaintiffs Johnson and Terrille, who will be merely eating at the establishments with their families." SA153. Both provisions lack a "plainly legitimate sweep," are without historical analogue, and the district court's injunction was correct.

### 6. There Is No Historical Tradition for Prohibiting Firearm Possession on All Private Property.

Claiming the CCIA's firearms ban on all private property is consistent with "a long and well-established tradition," Defendants rely on the same eight statutes as above.[40] Appt.Br. 74. But there is a world of difference between walking up the

---

[40] As Plaintiffs have explained, three were enacted more than three-quarters of a century *after* the Second Amendment was ratified (1865, 1866, 1893), *see Bruen* at 2137 and *Heller* at 614, and three were imposed by the British Crown nearly three-

54

driveway and knocking on someone's front door, versus sneaking across their backyard hunting deer. Indeed, as Plaintiffs explained and the district court found, these were merely anti-poaching statutes that prohibited only *trespassers* (discovered where they were not supposed to be) from carrying firearms to *hunt illegally* and/or only applied to "enclosed lands," thus providing no authority for the CCIA's ban on all visitors (even if invited or welcome).[41] ECF#69 at 37-39; SA167-68. *See* JA696-99, 708-711, 712-718, 700-03, 704-707, 723, 731.[42] As Plaintiffs explained, New York has long had laws dealing with each of these issues (ECF#69 at 38-39), and thus the CCIA was designed to regulate *other* conduct to which Defendants' historical sources do not apply.

Finally, Defendants criticize the district court's rejection of the two remaining state statutes based on their small populations and thus unrepresentative nature.

---

quarters of a century *before* (1715, 1721, 1722) – certainly not representative of what the colonists thought when they ratified the Second Amendment after throwing off colonial rule.

[41] These sources generally imposed fines (tobacco, shillings) or at most short jail sentences ("not exceeding one month," JA723), unlike the CCIA's felonies.

[42] Defendants claim that "some of the statutes did not mention hunting at all," or at least "barred carrying guns more generally…." Appt.Br. 75. In support, Defendants provide carefully selected quotations which omit important text. For example, Defendants' reference to JA697 for "carry[ing] any gun" actually reads "carry any gun or hunt." Likewise for Defendants' other references. See JA702, 706, 710. Defendants do not include the first page of the New Jersey act (JA712), but that was "an Act for the preservation of deer, and other game…." L.Q.C. Elmer, A Digest of the Laws of New Jersey (1838), at 219. *See also* JA696, 705, 709. Similarly leaving out context, Defendants claim these statutes had "broad purposes," citing JA705's statement regarding "the great Danger of the Lives of his Majesty's Subjects," omitting the context of that statement – "tread down … Corn, and other Grain …." This statute focused on preventing the destruction of crops, not gun violence.

Appt.Br. 76, JA171-72. Defendants claim that this methodology, drawn directly from *Bruen*, "excluded other States with relevant historical laws" (*id.*), again expecting this Court either to "sift" the historical record or to have faith that such laws existed. This Court should do neither.

## IV.  THE CCIA VIOLATES THE FIRST AMENDMENT.

Defendants argue that the CCIA's ban on firearms carried on private property does not violate the First Amendment because it "does not compel property owners to speak *any* statement," but then concede that the only way to allow guns onto one's property is through speech – "signage, a call, a text message, or prior word at the front door." Appt.Br. 78-79. Indeed, the CCIA puts gun-friendly property owners to a Hobson's choice – unless they make a government-specified statement, firearms are illegal on their property. For that reason, Plaintiffs' compelled speech claim also implicates the freedoms of assembly and association.

No longer do Defendants rely on this Court's decision in *Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018), likely because, as Plaintiffs noted below, it says that "compelled speech will vitiate the individual's decision either to express a perspective by means of silence, or to remain humbly absent from the arena.... The decision to withhold speech depends on views and calculations known only to the individual." *Id.* at 84-85. Indeed, Plaintiff Leman has explained his "calcul[us]" that to remain silent on contentious issue of firearms is best for business. JA158-9.

Instead, Defendants now rely on *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020), claiming that compelled speech only applies to "views they

find objectionable," and that the government-mandated message in this case "is one with which [Plaintiffs] agree." Appt.Br. 77-78. But *Poole* never said this was the only form of compelled speech; rather that "government … cannot tell people that there are things 'they must say,'" because "'[a]t the heart of the First Amendment' is the principle 'that each person should decide for himself or herself the ideas and beliefs deserving of expression….'" *Id.* at 170. Indeed, the Supreme Court has struck down compelled speech requiring a "policy explicitly opposing prostitution" where "recipients … wish to remain neutral on prostitution," *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), much like Plaintiff Leman wishes to remain publicly neutral on guns at his business. JA158; *Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47, 62 (2006) ("[C]ompelled statements of fact … like compelled statements of opinion, are subject to First Amendment scrutiny.").

The CCIA infringes protected speech by mandating that no other speech or activity can occur *unless and until* the government's specified communication occurs. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002). Plaintiffs here seek to avoid the stigma associated with the CCIA's compelled speech – sending the very obvious message that guns are a taboo and "icky" subject that needs to be confronted and addressed before any other speech or activities can take place.

Finally, claiming that the CCIA regulates "conduct" and not "speech," Defendants assert that either "intermediate" or "strict scrutiny" is satisfied because it "furthers substantial government interests" of "protecting public safety and owners'

right to" control their private property. Appt.Br. 78-79. But Defendants do not explain or provide evidence as to how public safety is advanced, nor do they counter Antonyuk's detailed allegations explaining how his and his family's safety is *diminished* by the restriction. JA171-2. And with respect to the purported need to protect property owners, the district court noted that "the State of New York does not appear to be plagued by this sort of silent epidemic." SA179 n.137.

## V. THE EQUITABLE FACTORS WEIGH IN FAVOR OF PLAINTIFFS.

Claiming the district court erred in finding that the balance of equities favored Plaintiffs, Defendants *entirely misunderstand* what is at issue, discussing only purported harms *to themselves*, while omitting any discussion of (and certainly not contesting) the serious, real, and irreparable harms to Plaintiffs (*e.g.,* violation of constitutional rights, freedom from unlawful arrest and prosecution, diminished personal safety from inability to engage in self-defense). Appt.Br. 80-85. *Cf.* ECF#48 at 91-92 (where Defendants *did* make the argument). Defendants apparently confuse the harm *they* had to show to obtain a *stay* with the harm to *plaintiffs* to obtain an *injunction. Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (plaintiffs "likely to suffer irreparable harm") with *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) ("irreparable injury to the applicant").

Defendants' claims of harm to themselves and the public are fanciful. First, Defendants claim that the CCIA's "good moral character" requirement is necessary to prevent "domestic abusers" and those "subject to orders of protection" from

acquiring firearms.[43] Appt.Br. 80-81. But both federal and state law *already* prohibit such persons from acquiring and/or possessing firearms. *See* 18 U.S.C. §922(d)(8)-(9) and (g)(8)-(9) and N.Y. Penal Law §400.00(1)(c); 265.00(17)(b); CPL §530.12(1), 530.14(1)-(2). Defendants similarly claim that, without the enjoined licensing provisions, licenses must be "granted to people who cannot be trusted...." Appt.Br. 81. Yet the CCIA replaced the prior existing statutory language denying a license to a person for whom "good cause exists for the denial of the license." SA103. Finally, Defendants recycle their claim that the CCIA cannot be enjoined because they educated the public about compliance with its unconstitutional mandates. Appt.Br. 83. But Defendants' desire to maintain their public image and not "reverse themselves" results from their own actions, not the district court's order for them to stop enforcing a "patently unconstitutional law." *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 489 (2d Cir. 2013) (discounting "confusion" from a preliminary injunction because it does not "outweigh the irreparable harm that stems from restrictions on political speech").

Next, Defendants complain that allowing firearms into places *where firearms have always been allowed* suddenly now will wreak havoc, as law-abiding gun owners – licensed by the state *to carry firearms in public* – cannot be trusted *to carry firearms in public*. Appt.Br. 81. But Defendants (i) provide no evidence to support the notion

---

[43] Defendants repeat their claim that the district court "recognized" a link between guns and "violent crime." Appt.Br. 80. On the contrary, the district court merely noted that supporting amicus briefs claimed such a link, and instead concluded just the opposite. *See* 22-2908, Doc.38 at 12 n.9.

that "ordinary, law-abiding citizens" pose a clear and present danger; (ii) fail to wrestle with significant evidence showing the opposite is true[44] (22-2908 No. 38 at 13-14); and (iii) fail to explain how the basic *exercise of constitutional rights* itself can justify curtailing their exercise. *See id.* at 14.

Next, Defendants reference *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) for the proposition that a state suffers irreparable injury any time its statute is enjoined. Appt.Br. 82. But this case hardly stands for Defendants' broad *ipse dixit* that the injunction must be reversed – otherwise no federal court could *ever* enjoin an unconstitutional law.

Next, Defendants repeat their tired mantra that the district court's injunction altered the status quo, and thus that it was error to have "cross-referenced" findings in an earlier decision "that would have" maintained the status quo. Appt.Br. 82-83. But the "status quo" "in preliminary-injunction parlance is really a 'status quo ante.'" *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018). This means "the last peaceable uncontested status existing between the parties before the dispute developed." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 981 (10th Cir. 2004). Defendants have yet to address this point.

---

[44] In fact, on January 15, 2023, an Applebee's patron with a New York license to carry drew his firearm (carried *in violation of the CCIA*) and – without firing a shot – stopped a vicious knife attack, likely saving lives in the process. *See* https://bit.ly/3x3xOT3.

Next, Defendants object again to the allegedly "truncated timeframe" in this litigation, claiming they have not had enough time to present their defense (Appt.Br. 84), even though Justices Alito and Thomas recently suggested that "expedite[d] consideration" of this matter is appropriate. *Antonyuk v. Nigrelli*, 2023 U.S. LEXIS 396, at *2 (Jan. 11, 2023). The appropriate time for New York to have considered whether the CCIA is constitutional was ***before its enactment***. This "weeping and gnashing of teeth" by the State is no justification to reverse the injunction in order to give the State the opportunity to engage in the "'long and time consuming' process" of defending its actions. Meanwhile, New Yorkers continue to suffer real and irreparable harm to their constitutional rights and personal safety.

## VI. DEFENDANTS' ATTEMPTS TO BESMIRCH PLAINTIFFS AND THE DISTRICT COURT ARE WITHOUT MERIT.

Throughout this litigation, Defendants have sought to malign both Plaintiffs and the district court. Both claims are worth discussing. First, Defendants repeatedly refer to the district court's opinion in *Antonyuk I* as "improper and wholly advisory." Appt.Br. 83. Notwithstanding Defendants' framing the dismissal of *Antonyuk I* on standing grounds, the district court provided what "would constitute the [its] holding" on the merits were it to be overruled on the standing issues. Recognizing the time-sensitive nature of the matter (the CCIA's impending implementation), the district court appropriately acknowledged there was "a conceivable chance ... Plaintiffs [would] take an immediate appeal … to the Second Circuit and be found to, in fact, possess standing." *Antonyuk v. Bruen*, 2022 U.S.

Dist. LEXIS 157874, at *68 (N.D.N.Y. Aug. 31, 2022). Indeed, the standing issues leading to dismissal were grounded in this Circuit's rejection of representational standing in Section 1983 challenges. *See Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). To Plaintiffs' knowledge, no other circuit has reached this conclusion, which conflicts with Supreme Court precedents. *See Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 122 (2d Cir. 2017) (Jacobs, J., dissenting) (explaining that "we (and apparently we alone) prevent representational standing," acknowledging that *Warth v. Seldin*, 422 U.S. 490 (1975), was a Section 1983 case based on representational standing). It was not improper for the district court to provide an analysis of the CCIA, in case this Court reversed on an emergency appeal.

Second, Defendants accuse Plaintiffs of "forum shopping," claiming they intentionally "steered their case to a judge" with the design and intent to obtain a favorable ruling. Appt.Br. 86. But Defendants are apparently unfamiliar with the Northern District of New York's Civil Cover Sheet[45] and its General Order 12(G)(2),[46] which *require* the listing of "related cases" by parties and provide for assignment of related cases to the same judge. Defendants' accusations of impropriety are nothing more than the natural progression of litigation according to long-established rules. Nor is the district court's injunction an outlier, as another federal judge, in another district, reached the same result, striking some of the same portions of the CCIA. *See*

---

[45] https://www.uscourts.gov/sites/default/files/js_044.pdf.
[46] https://www.nynd.uscourts.gov/sites/nynd/files/general-ordes/GO12.pdf.

*Hardaway*, *Christian*, and *Spencer v. Nigrelli*, 2022 U.S. Dist. LEXIS 233341 (W.D.N.Y. Dec. 29, 2022). So too, a district court in New Jersey recently enjoined a nearly-identical ban on firearms in public libraries, museums, places where alcohol is served, entertainment facilities, and all private property. *Koons* at *70. Two days ago, the same court extended its injunction to New Jersey's ban on firearms in parks, beaches, recreational facilities, and casinos. *Siegel* at *60.

## CONCLUSION

For the reasons stated, this Court should (i) affirm the district court's preliminary injunction and opinion, and (ii) vacate its stay of that order pending appeal.

Respectfully submitted,

Dated: February 1, 2023

Robert J. Olson                          */s/ Stephen D. Stamboulieh*
William J. Olson                          Stephen D. Stamboulieh
William J. Olson, PC                      Stamboulieh Law, PLLC
370 Maple Ave. West, Suite 4             P.O. Box 428
Vienna, VA 22180-5615                     Olive Branch, MS 38654
703-356-5070 (T)                          (601) 852-3440 (T)
703-356-5085 (F)                          Stephen@sdslaw.us
wjo@mindspring.com
*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I, Stephen D. Stamboulieh, one of the attorneys for Plaintiffs-Appellees, hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 16,390 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1 and this Court's Order (Doc. 237).

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh