# 22-2908-cv(L), 22-2972-cv(CON)

## United States Court of Appeals
### for the
## Second Circuit

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE,
JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

— v. —

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the
New York State Police, MATTHEW J. DORAN, in his Official Capacity as the
Licensing Official of Onondaga County, JOSEPH CECILE, in his Official
Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of
New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga
County District Attorney, EUGENE CONWAY, in his Official Capacity as the
Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the
District Attorney of Albany County, GREGORY OAKES, in his Official
Capacity as the District Attorney of Oswego County, DON HILTON, in his
Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE,
in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR *AMICUS CURIAE* NEW YORK STATE FIREARMS
## ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES

STEPHEN KLEIN
BARR & KLEIN PLLC
*Attorney for Amicus Curiae*
  *New York State Firearms Association*
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 804-6676

**Corporate Disclosure Statement**

The New York State Firearms Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# Table of Contents

Corporate Disclosure Statement .................................................. i

Table of Contents ................................................................... ii

Table of Authorities ............................................................... iii

Interest of *Amicus Curiae* and Consent to File ........................................1

Summary of the Argument............................................................2

Argument...............................................................................4

   I.     The Court Below Correctly Applied the Second Amendment When It Enjoined Myriad Parts of the Concealed Carry Improvement Act..............6

     A.    The Court Below Correctly Enjoined the "Good Moral Character" Definition and the Disclosure of Social Media Accounts Provision (N.Y. Penal Law § 400.00(1)(b), (1)(o)(iv)) ............................................8

     B.    The Court Below Correctly Enjoined Most of the Sensitive Locations Provisions (N.Y. Penal Law § 265.01-e)................................................17

     C.    The Court Below Correctly Enjoined the Restricted Locations Law (N.Y. Penal Law § 265.01-d)...................................................22

Conclusion ...........................................................................23

Certificate of Compliance .........................................................24

Certificate of Service .............................................................25

# Table of Authorities

## Cases

*Betancourt v. Bloomberg*,
448 F.3d 547 (2d Cir. 2006) ...................................................................16

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................... 6, 7, 9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...................................................................6

*Ezell v. City of Chicago*,
846 F.3d 888 (7th Cir. 2017) ...................................................................6

*Harlen Assocs. v. Inc. Vill. of Mineola*,
273 F.3d 494 (2d Cir. 2001) ...................................................................19

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36 (1961) ...................................................................7

*LaTrieste Rest. & Cabaret v. Village of Port Chester*,
40 F.3d 587 (2d Cir.1994) ...................................................................19

*Marbury v. Madison*,
5 U.S. 137 (1803) ...................................................................5

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ...................................................................6

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ...................................................................16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ................................................. 2, 4, 6, 7, 8, 17, 18, 20, 21

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
140 S. Ct. 1525 (2020) ...................................................................6

*N.Y. State Rifle & Pistol Ass'n v. City of New York*,
883 F.3d 45 (2d Cir. 2018) ...................................................................6

*Shuttlesworth v. Birmingham*,
   394 U.S. 147 (1969) ........................................................................17

*Skilling v. U.S.*,
   561 U.S. 358 (2010) ........................................................................16

*U.S. v. Ceasar*,
   142 S. Ct. 2841 (2022) ....................................................................14

*U.S. v. Ceasar*,
   No. 19-2881, 2021 WL 3640387 (2d Cir. Aug. 18, 2021)..................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ........................................................................16

**Statutes**

2022 N.Y. SESS. LAWS Ch. 731 ..................................................................4

N.Y. PENAL LAW § 210.10 ........................................................................3

N.Y. PENAL LAW § 265.01-d................................................... 3, 4, 6, 22

N.Y. PENAL LAW § 265.01-e........................................ 3, 17, 18, 19, 21

N.Y. PENAL LAW § 400.00.......................... 2, 3, 5, 8, 10, 12, 17, 18, 19

N.Y. PENAL LAW § 70.00 ..........................................................................3

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ....................................... 9, 14

BLACK'S LAW DICTIONARY (4th ed. 1968)................................................20

David B. Kopel, *Restoring the Right to Bear Arms:* New York State Rifle & Pistol
   Association v. Bruen, 2022 CATO S. CT. REV. 305 ...............................7

*Help with username registration*, TWITTER, https://help.twitter.com/en/managing-
   your-account/twitter-username-rules..................................................13

MERRIAM-WEBSTER DICTIONARY (2023) ...............................................14

State of New York Pistol/Revolve License Application Semi-Automatic Rifle License Application (PPB-3 (Rev 08/22)) .............................................................12

*Telegram FAQ*, Telegram, https://telegram.org/faq#q-what-39s-the-difference-between-groups-and-channels ..............................................................................15

**Constitutional Provisions**

U.S. Const. amend. I .......................................................................... 2, 16, 22

U.S. Const. amend. II.................................. 2, 4, 5, 6, 7, 9, 10, 13, 16, 17, 20, 22, 23

U.S. Const. amend. XIV ........................................................... 2, 3, 18, 21, 22, 23

**Interest of *Amicus Curiae* and Consent to File[1]**

The New York State Firearms Association ("NYSFA") is a nonprofit that is organized under section 501(c)(4) of the Internal Revenue Code. NYSFA advocates for the protections of the right to keep and bear arms—codified in the Second Amendment to the United States Constitution and New York Civil Rights Law article II, section 4—through grassroots advocacy and engagement with New York policymakers.

NYSFA offers this brief on behalf of more than 10,000 members and to bolster future efforts to protect and advance the right to keep and bear arms in New York.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), NYSFA certifies that all parties have consented to the filing of this *amicus* brief.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), NYSFA certifies that (1) no party's counsel authored the brief in whole or in part, (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (3) no person other than NYSFA contributed money that was intended to fund preparing or submitting this brief.

## Summary of the Argument

The district court correctly ruled that myriad parts of the "Concealed Carry Improvement Act" are unconstitutional under the Second and First Amendments to the United States Constitution and preliminarily enjoined these provisions. U.S. CONST. amend. I, II. This Court should affirm that ruling and lift its stay of the injunction. In this brief, NYSFA endeavors to bolster the opinion below and the arguments of the Appellees by raising additional concerns under the Second Amendment, First Amendment and Equal Protection Clause of the Fourteenth Amendment.

While removing the "good cause" standard for the state's firearm licensing regime per the Supreme Court's opinion in *New York State Rifle & Pistol Association v. Bruen*, the New York State Legislature added as many other arbitrary standards as it could muster barely a week after the opinion. 142 S. Ct. 2111 (2022). The law opens with outright defiance of the Second Amendment by limiting licenses to New Yorkers who can demonstrate "good moral character," or, without qualification, that they will "use [a weapon] only in a manner that does not *endanger oneself or others*[.]" N.Y. PENAL LAW § 400.00(1)(b) (emphasis added). Self-defense is inherently dangerous to oneself or others but is nevertheless the core right embodied in the Second Amendment. This makes the law's licensing structure entirely unconstitutional.

The requirement that one demonstrate good moral character by disclosing all of one's social media accounts for the prior three years is unconstitutionally vague. One can only guess whether this requirement is limited to a name one uses on a typical social media application like Twitter or whether it also includes the name one uses on a messaging application such as Telegram. Similarly, the law offers no guidance as to what constitutes a "former" or "current" account. N.Y. PENAL LAW § 400.00(1)(o)(iv). Incorrect disclosure not only puts a citizen at risk of denial or revocation of a concealed carry license but exposes him to felony charges for perjury. N.Y. PENAL LAW §§ 210.10; 70.00(2)(e). This is subject to the strictest vagueness standard owing to its regulation of constitutional rights (here, the right to bear arms and the right to free speech), and the social media accounts provision does not meet this standard.

Finally, the court below correctly ruled that most parts of the new sensitive locations law and the entire restricted locations law are unconstitutional. *See* N.Y. PENAL LAW §§ 265.01-e, 265.01-d. Both laws are also facially unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1. The law still provides special concealed carry permits to certain private actors: messengers working for a banking institution or express company. N.Y. PENAL LAW § 400.00(2)(c). These permit holders are exempt from both the sensitive and restricted locations laws. N.Y. PENAL LAW §§ 265.01-e(3)(g), 265.01-

d(2)(f). For purposes of the Second Amendment, messengers are similarly situated to any citizen, who always have some property on them in public and will inevitably deliver items from time-to-time. In any event, the right to self-defense is universal, and elevating it for a private special interest in this manner is invidious discrimination.

## Argument

Eight days after the United States Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, the New York State Legislature passed the "Concealed Carry Improvement Act" ("CCIA"). 142 S. Ct. 2111 (2022); 2022 N.Y. SESS. LAWS Ch. 731. The law's title is ironic because it does not improve concealed carry in New York much less recognize *Bruen*'s holding that the Second Amendment protects the right to carry a weapon in public for self-defense. 142 S. Ct. at 2122; *see* U.S. CONST. amend. II. Rather, while under the CCIA the Appellants (collectively, "the State") may no longer subject the right to concealed carry to an arbitrary display of "good cause" by a citizen, now New York law provides the State with as many *other* arbitrary burdens and restrictions as state legislators, their staffers, interns and gun control lobbyists could muster in roughly one week. *But see* Brief for Appellants Nigrelli and Doran (hereinafter "Nigrelli Br."), ECF No. 95 at 97 (arguing that the "process of locating and analyzing historical materials from scattered archives and other sources" to justify restrictions in light of *Bruen* "cannot

be completed in a matter of *weeks*" (emphasis added)). This Court should affirm that several the CCIA's restrictions are unconstitutional under the Second Amendment, uphold the preliminary injunction below, and lift the stay of that injunction. *See* Special Appendix ("SA"), ECF No. 94 at 234-36.

The district court took the CCIA in stride, carefully juxtaposing the Legislature's recalcitrance against the Second Amendment with respect for the Second Amendment. *See generally Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the Legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."). This brief endeavors to bolster some of the most pressing parts of that opinion: first, the brief supports enjoining the CCIA provision that defines "good moral character" and requires providing "a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicants [sic] character and conduct" in order to receive a license to carry. N.Y. PENAL LAW § 400.00(1)(b), (1)(o)(iv); SA92-103, 109-114. Second, the brief argues in favor of the decision to enjoin many "sensitive location" provisions where the CCIA criminalizes possession of a firearm. N.Y. PENAL LAW § 265.01-e; SA 123-166. Finally, the brief supports upholding the injunction against the "restricted location" provisions of the CCIA, which criminalizes the bearing of arms on most private property and makes a prohibition

on concealed carry a default rather than an exception. N.Y. PENAL LAW § 265.01-d; SA166-180.

## I. The Court Below Correctly Applied the Second Amendment When It Enjoined Myriad Parts of the Concealed Carry Improvement Act

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in [*District of Columbia v.*] *Heller* more explicit[.]" 142 S. Ct. at 2134; *Heller*, 554 U.S. 570 (2008). This was urgently needed because, particularly after the Court recognized in *McDonald v. City of Chicago* that the Second Amendment applies to state and local governments through the Fourteenth Amendment, certain state and local governments set out to infringe upon the right to keep and bear arms to the greatest extent possible. 561 U.S. 742 (2010); *see, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 689–90 (7th Cir. 2011) (rejecting a Chicago ordinance that "mandate[d] one hour of range training as a prerequisite to lawful gun ownership . . . yet at the same time prohibit[ed] all firing ranges in the city[.]"); *Ezell v. City of Chicago*, 846 F.3d 888, 890 (7th Cir. 2017) (striking portions of an ordinance that left "only 2.2% of the city's total acreage is even theoretically available" for firing ranges). Unfortunately, some courts—including this Court—upheld a number of these shenanigans. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 57 (2d Cir. 2018), *vacated and remanded sub nom. N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525 (2020) ("The Rule restricts *only* his ability to remove the handgun licensed by New York City authorities from the City

premises for which it is specifically licensed." (emphasis added)); *see also* David B. Kopel, *Restoring the Right to Bear Arms:* New York State Rifle & Pistol Association v. Bruen, 2022 CATO S. CT. REV. 305, 308–12, *available at* https://www.cato.org/sites/cato.org/files/2022-09/Supreme-Court-Review-2022-Chapter-11.pdf. The Second Amendment's explicit standard should end these legislative burlesques once and for all; it certainly leaves much of the CCIA unconstitutional and unenforceable.

*Bruen* clarified that Second Amendment scrutiny is an analysis that tracks the amendment's text, history and tradition:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). "[T]he right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Plainly, "the Second Amendment guarantees a general right to public carry", or the right for "'law-abiding, responsible citizens'" to do so. *Bruen*, 142 S. Ct. at 2135, 2138 n.9 (quoting *Heller*, 554 U.S. at 635). For laws regulating public carry, then, the government must not merely assert, but

"*affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127 (emphasis added). The court below aptly structured and applied this analysis for purposes of issuing a preliminary injunction. SA88-89. But there are still more constitutional problems with the new law. The new regulations that make up the CCIA are mostly unconstitutional.

### A. The Court Below Correctly Enjoined the "Good Moral Character" Definition and the Disclosure of Social Media Accounts (N.Y. Penal Law § 400.00(1)(b), (1)(o)(iv))

The first part of the CCIA amended New York's licensing requirements for firearms. *See* N.Y. PENAL LAW § 400.00. At the outset, the revised statute demonstrates ignorance of—or resistance to—the right to bear arms, given what now constitutes "good moral character" for purposes of licensing:

> [No license shall be issued or renewed except for an applicant] . . . of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not *endanger oneself or others*[.]

N.Y. PENAL LAW § 400.00(1)(b) (emphasis added). The court below accurately concluded this inflicts "unconstitutional[] impact" of significant breadth, due in part to the arbitrariness of the terms "character, temperament and judgment." SA102. But it is the final qualification of this provision that is the most blatantly unconstitutional: that the State will assess merely whether one might endanger oneself or others.

Self-defense is inherently dangerous to oneself and others, for it is the "use of force to protect oneself, one's family, or one's property from a real or threatened attack." *Self Defense*, BLACK'S LAW DICTIONARY (11th ed. 2019). One cannot exercise self-defense—that is, one's Second Amendment right—and *not* endanger oneself or others. It is nevertheless the core of the right. *See Heller*, 554 U.S. at 584 ("bear arms" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."). The Legislature could have easily qualified this provision with a word such as "*unjustifiably* endanger oneself or others", but instead from the outset shunned the constitutional standard. The court below concluded that "[t]he 'good moral character' requirement is just a dressed-up version of the State's improper 'special need for self-protection' requirement." SA101. Indeed, by enabling the State to use the *purpose* of the Second Amendment as the very *basis* for denying the right, it is worse.

This is not mere scrivener's error from the Legislature's eight-day foray against *Bruen*, because the State makes its defiance clear to this Court. *See* Nigrelli Br. at 41-46. The permitting law, they argue, is *entirely outside* the purview of the Second Amendment because it "appropriately prohibit[s] licensing only of applicants who are neither law-abiding nor responsible." *Id.* at 42. They claim "legal actions taken in lawful self-defense would not cast doubt upon one's good moral

character." *Id.* at 44. But the law reads that to have good moral character one must demonstrate he would "only" use a weapon "in a manner that does not endanger oneself or others." N.Y. PENAL LAW § 400.00(1)(b). These are irreconcilable positions: the law's unequivocal prohibition against issuing licenses to those who might *endanger* someone leaves the "good moral character" standard constitutionally stillborn.

After enjoining the overall standard of "good moral character," in a generous concession to the State and the CCIA, the court below adopted something akin to a narrowing construction for the permitting provisions that determine good moral character. The court instead compared each of these provisions to an appropriate Second Amendment standard, "reduc[ing] *non-self-defensive* handgun violence (whether intentional or accidental, and whether in the home or outside the home) that is caused in some way by the possession or use of a handgun by someone who also possesses a concealed-carry license." SA109 (emphasis added); *see also* SA90, 103, 106, 115. Considering this narrower standard, the court appropriately enjoined the requirements that an applicant disclose the identities and contact information of everyone residing in his or her home, SA106-109, provide "a list of former and current social media accounts from the past three years[,]" SA109-114, and disclose "such other information required by the licensing officer that is reasonably necessary

and related to the review of the licensing application[.]" SA115-17.[2] The court below thoroughly analyzed and enjoined the provisions as to disclosing family members and the law's all-too-nebulous permission to licensing officers to require "such other information," but there are additional problems with the social media accounts provision and it is especially urgent that this Court affirm the injunction of it.

"[T]he apparent reason for [social media accounts disclosure] is to enable licensing officers to determine if the applicant has recently posted any statements online showing them to be a danger to themselves or others." SA109 (citations omitted). Considering the historic statutes provided by the State, the district court concluded that they were akin to the character references provision and are not analogous to the disclosure of writings (or, as is more commonly used in the context of the internet, *posts*). SA110. This is all but affirmed by the State in its current briefing, for they argue that the provision is meant to "assess[] past conduct, associates, and reputation of persons seeking to carry firearms to confirm suitability." Nigrelli Br. at 56. The court searched specifically for firearm laws conditioned on the disclosure of "nicknames and/or aliases used among friends" or "pseudonyms used in any published writings[.]" SA110. Finding none, the court

---

[2] The court below declined to enjoin the provisions of the law requiring four character references, SA103-106, eighteen hours of firearm training, SA117-120, and an in-person meeting to acquire a permit. SA120-123. These are not subject to this appeal.

correctly enjoined this provision after discovering only a rich history of firearm ownership in the Founding Era that featured anonymous writings "under pseudonyms such as Brutus, Cato, Centinel, Cincinnatus, The Federal Farmer, A Landowner, and Publius[.]" SA110-112. Indeed, plenty of citizens who bore *noms de plume* also bore firearms. *Id.*

The CCIA does not define what constitutes "social media." The court below addressed the term generally, though in their complaint the Appellees raised concerns as to "some vague class of 'social media accounts[.]'" JA40. The law's meaning is plain *enough* to enjoin the provision, but its vagueness raises serious constitutional concerns. The law requires an applicant to provide "a list of [1] former and [2] current [3] social media accounts of the applicant [4] from the past three years [5] to confirm the information regarding the applicants [sic] character and conduct as required in subparagraph (ii) of this paragraph[.]" N.Y. PENAL LAW § 400.00(1)(o)(iv). The current version of the State's application demands this almost verbatim, providing three blank lines for the applicant to make the disclosure. *See* State of New York Pistol/Revolve License Application Semi-Automatic Rifle License Application (PPB-3 (Rev 08/22)) (hereinafter "PPB-3") at 2, *available at* https://troopers.ny.gov/system/files/documents/2022/10/ppb-3-08-22.pdf [https://perma.cc/PMZ6-FG77] (last visited Jan. 26, 2023). This requirement is a

hopelessly vague trap that threatens an applicant with criminal penalties merely for applying to exercise his Second Amendment rights.

Today, when one is asked for a "social media account" he will probably reply with, for example, a Twitter, Instagram or Snapchat handle. The court below provided some humorous examples: "'@iluvgunz!' or '@bulletz&kittenz[.]'" SA114.[3] Indeed, one is likely to assume that this is limited to accounts within the online communities provided by social media websites and applications such as Facebook. *See* JA145 (Appellee Sloane attests that "my understanding of 'social media' would include various forums where people congregate to speak, many times anonymously. I also believe this to include Facebook, Twitter, Instagram and more well-known 'social media' platforms."). The State suggests as much in its briefing, because only in these applications might a licensing official see another's "associates" (Nigrelli Br. at 44) such as one's "friends" on Facebook or "followers" of one's account on Twitter and who one is "following." But technically "social media" is not so limited. Social media includes "forms of electronic communication (*such as* websites for social networking and microblogging) through which users

---

[3] The court below wisely included special characters in these examples that typically cannot be used in social media accounts, including Twitter. *See Help with username registration*, TWITTER, https://help.twitter.com/en/managing-your-account/twitter-username-rules [https://perma.cc/P532-KFM7] ("A username can only contain alphanumeric characters (letters A-Z, numbers 0-9) with the exception of underscores[.]") (last visited Jan. 28, 2023).

create online communities to share information, ideas, personal messages, and other content (such as videos)." *Social media*, MERRIAM-WEBSTER DICTIONARY (2023), https://www.merriam-webster.com/dictionary/social%20media [https://perma.cc/WN34-EPAF] (last visited Jan. 28, 2023) (emphasis added). Black's provides an even broader definition: "social media [is] Collectively, *all the technological means*, esp. websites and apps, that enable people to participate in Internet content creation and online social networking." *Media*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). Thus, "social media accounts" could mean any handle one uses online.

This Court suggested a distinction when it summarized the facts of a recent appeal: "Using social media and the encrypted *messaging application* Telegram, Ceasar expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas." *U.S. v. Ceasar*, No. 19-2881, 2021 WL 3640387 (2d Cir. Aug. 18, 2021), *cert. denied,* 142 S. Ct. 2841 (2022) (emphasis added). Indeed, this distinction seems a practical one if on a "social media application" one interacts with no one in particular while Telegram is a "messaging application" that one uses to directly communicate with individuals. But what if one participates in or merely subscribes to a large *group* or *channel* on Telegram?

> Telegram groups are ideal for sharing stuff with friends and family or collaboration in small teams. But groups can also grow very large

and support communities of up to 200,000 members. You can make any group public, toggle persistent history to control whether or not new members have access to earlier messages and appoint administrators with granular privileges. You can also pin important messages to the top of the screen so that all members can see them, including those who have just joined.

Channels are a tool for broadcasting messages to large audiences. In fact, a channel can have an unlimited number of subscribers. When you post in a channel, the message is signed with the channel's name and photo and not your own. Each message in a channel has a view counter that gets updated when the message is viewed, including its forwarded copies.

*Telegram FAQ*, TELEGRAM, https://telegram.org/faq#q-what-39s-the-difference-between-groups-and-channels [https://perma.cc/ME4P-F8PD] (last visited Jan. 28, 2023). The distinction dissipates and one's Telegram account, depending on the eyes of the bureaucratic beholder, could be a "social media account" that an applicant is required to disclose. *See generally N.Y. State Firearms Ass'n*, TELEGRAM, https://t.me/NYSFirearmsAssociation (NYSFA's Telegram Channel).

The concerns with what constitute a "social media account" are multiplied by the rest of the provision. What is a "former" social media account? Is it an account that one has deleted or merely one that an applicant has stopped using? If the latter, and the applicant can still technically access the account, is it still a "current" account even if the applicant has not used it in the last three years? If the applicant shares a Facebook profile with his or her spouse, is that a social media account "of the applicant" or not? Vagueness permeates the provision and provides the State with

an arbitrary tool to deny Second Amendment rights and even punish those who dare apply to exercise them. *See generally Skilling v. U.S.*, 561 U.S. 358, 412 (2010) ("[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.").[4]

This is not a petty exercise in semantics, because before the required oath on the PPB-3 form it contains the warning that "[k]nowingly providing false information will be sufficient cause to deny this application and constitutes a crime punishable by fine, imprisonment, or both." PPB-3 at 4. This warning subjects the applicant to perjury, a class E felony in New York that is punishable by up to four years of imprisonment. N.Y. PENAL LAW §§ 210.10; 70.00(2)(e). Though the *mens rea* requirement of punishing a "knowing[]" failure to disclose might provide some defense against an actual prosecution, the State need only find an outstanding "social media account"—whatever that may be—and issue an arrest warrant for this felony,

---

[4] The social media accounts provision implicates the First Amendment as plainly as the entire CCIA implicates the Second Amendment. *Cf.* Nigrelli Br. at 58 ("The law requires only that applicants identify the existence of recent social-media accounts, *which is not speech* . . . ." (emphasis added)) *with McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995) ("[A]n author generally is free to decide whether or not to disclose his or her true identity."). Owing to the provision's impact on either right (here, both of them), "'a more stringent vagueness test should apply.'" *Betancourt v. Bloomberg*, 448 F.3d 547, 553 (2d Cir. 2006) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982)) ("'[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.'").

which at the very least is grounds to revoke the license. *See* N.Y. PENAL LAW §§ 400.00(1)(c) (a license may be denied to anyone who is "subject of an outstanding warrant of arrest issued upon the alleged commission of a felony"), 400.00(11) (if "a licensee at any time becom[es] ineligible to obtain a license . . . shall operate as or be grounds for[] a revocation of the license."). The State need not even go this far to deny or revoke a license for an errant application. N.Y. PENAL LAW § 400.00(11).

The good moral character and social media accounts provisions are far from "'narrow, objective, and definite standards' guiding licensing officials[.]" *Bruen*, 142 S.Ct. at 2138 n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). The social media accounts provision is an unconstitutionally vague trap, and if the Legislature aimed to deliberately forge a tool to disarm and punish gun owners in New York it could not have done a better job. The Court should affirm that both provisions must be enjoined under the Second Amendment.

## B. The Court Below Correctly Enjoined Most of the Sensitive Locations Provisions (N.Y. Penal Law § 265.01-e)

Despite the breadth of the CCIA's licensing requirements before *and after* the injunction by the court below, the law further defies the Second Amendment with far-reaching prohibitions against possession of "a firearm, rifle or shotgun in or upon a sensitive location [when] such person knows or reasonably should know such location is a sensitive location." N.Y. PENAL LAW § 265.01-e(1). Even after a background check and training for licensing, the CCIA prohibits concealed carry by

citizens in locations listed out in *twenty* sub-parts. The law defies logic and, again, the ruling in *Bruen*:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. . . . Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen*, 142 S. Ct. at 2134; *see* N.Y. Penal Law § 265.01-e(2). The court below patiently and methodically analyzed and enjoined most of these provisions. SA123-166. This Court should uphold these rulings under *Bruen* but should independently consider that the entire provision violates the Equal Protection Clause of the Fourteenth Amendment owing to its exception for licensed "messenger[s] employed by a banking institution or express company." N.Y. Penal Law §§ 400.00(2)(c), 265.01-e(3)(g).

The Equal Protection Clause commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.

> The Equal Protection Clause requires that the government treat all similarly situated people alike. . . . Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials.

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citations omitted). Establishing invidious discrimination under a law requires a showing that "(1) [plaintiffs] were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on '"impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights[.]"'" *Id.* at 499 (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.1994)). The statute violates both prongs, and thus invidiously discriminates against most holders of New York concealed carry permits.

The CCIA maintains all of the "types of licenses" that were available prior to *Bruen* except for the "proper cause" license. N.Y. PENAL LAW § 400.00(2)(a)-(e). The law still includes a license to "have and carry concealed while so employed by a messenger [who is] employed by a banking institution or express company[.]" N.Y. PENAL LAW § 400.00(2)(c); *see* PPB-3 at 1 (providing for "possess/carry during employment" license). Messengers with carry licenses may carry in *any* sensitive location under the CCIA: "This section shall not apply to . . . persons licensed under paragraph (c) . . . of subdivision two of section 400.00 of this chapter while in the course of his or her official duties[.]" N.Y. PENAL LAW § 265.01-e(3)(g). Thus, messengers with licenses who are on duty with a bank or express company may carry concealed firearms in sensitive locations such as libraries, on public playgrounds, and in nursery schools, while most other license holders may not.

Messengers are different from ordinary citizens in that they deliver property from one point to another for a living. But that is not a meaningful distinction: every clothed citizen has property on his or her person in public and, from time to time, delivers property from one place to another. The State cannot claim there is a distinction in the value of property being transported: to be sure, the "messenger" license is available to drivers of armored trucks carrying cash, but by the law's terms it is also available to anyone employed by "[a] firm or corporation engaged in the business of transporting parcels or other movable property, in the capacity of common carriers[.]" *Express company*, BLACK'S LAW DICTIONARY (4th ed. 1968). Although express companies "*especially* undertak[e] the safe carriage and speedy delivery of small but valuable packages of goods and money[,]" they do not do so *exclusively*. *Id.* (emphasis added). A New Yorker delivering a parcel on his own— be it NYSFA's Executive Director Aaron Dorr or any of the organization's members—is similarly situated to one doing it professionally.

The differential treatment here is meant to inhibit the constitutional right to carry. The Second Amendment "protect[s] an individual's right to carry a handgun for *self-defense* outside the home." *Bruen*, 142 S. Ct. at 2122 (emphasis added). Punishing this exercise for most concealed carry holders in "sensitive locations" while permitting messengers with licenses to carry in those locations stands for, at best, nothing more than a skewed principle that New York's licensing regime places

*property protection* above self-defense. At its worst, this is a holdover handout that the Legislature granted to a special interest decades ago that quite literally placed the value of the lives of professional messengers above everyone else. In either instance, or somewhere in between, the exemption of messengers from "sensitive locations" restriction is unconstitutional discrimination that violates the Equal Protection Clause.[5]

The Supreme Court ruled in *Bruen* that "we have no occasion to comprehensively define 'sensitive places' in this case[.]" 142 S. Ct. at 2133. This Court may do so here, given the CCIA's attempt to make just about everywhere in New York fit the bill. But the Court should rule that the sensitive locations statute invidiously discriminates against citizens based on an irrational scale of need—one that chillingly echoes "proper cause"—by permitting messengers with concealed carry licenses to carry in any sensitive place. To be sure, "courts can use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133. But the Court should not

---

[5] The messenger exemption should also inform the Court under the *Bruen* analysis: a carve-out for members of a certain private profession has no historic basis as to "sensitive locations." Indeed, it entirely undermines the claim that any of these areas are sensitive for purposes of concealed carry when private messengers with licenses may freely enter even "any place owned or under the control of . . . state or local government, for the purpose of government administration, including courts[.]" N.Y. PENAL LAW § 265.01-e(2)(a), (3)(g).

permit the law to discriminate between the Second Amendment rights of citizens and special interests even in *legitimate* sensitive locations.

### C. The Court Below Correctly Enjoined the Restricted Locations Law (N.Y. Penal Law § 265.01-d)

The district court correctly enjoined the new law in the CCIA that makes it a felony for most concealed carry permit holders to carry in "a restricted location", which is "private property where the [carrier] knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage . . . or has otherwise given express consent." N.Y. PENAL LAW § 265.01-d; SA166-180. The court analyzed this under both the First and Second Amendments, considering free speech a better basis to enjoin compelled speech on "privately owned property that is not open to the public (including other persons' homes)[.]" SA173. This Court should also uphold the injunction of this law, again noting additional concerns under the Equal Protection Clause.

Like the sensitive locations law, the restricted locations law also exempts messengers who are licensed to carry. N.Y. PENAL LAW § 265.01-d(2)(f). While other license holders must have express permission or find it on "clear and conspicuous signage" to carry in a restricted location, messengers need not. Under the Equal Protection Clause, the law is unconstitutional for the same reasons as the sensitive locations law. *See supra* part I(B). Neither does an industry carve-out provide a historic analogue for such a law pursuant to *Bruen*. *See supra* note 5.

**Conclusion**

To hastily defy *Bruen*, the New York State Legislature passed a law that is mostly unconstitutional. The court below correctly identified and enjoined many of the CCIA's deficiencies. As this brief argues, there are alternative grounds to rule that these provisions are unconstitutional, including vagueness concerns and the Equal Protection Clause. The Court should uphold the preliminary injunction of the court below and lift the stay of that injunction.

Dated: February 8, 2023

Respectfully submitted,

*/s/ Stephen Klein*
Stephen R. Klein
BARR & KLEIN PLLC
1629 K St NW Ste. 300
Washington, DC 20006
Tel/Fax: 202-804-6676
steve@barrklein.com

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c) because it contains 5,539 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

*/s/ Stephen Klein*
Stephen R. Klein

**Certificate of Service**

I hereby certify that on February 8, 2023, this brief was filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Stephen Klein*
Stephen R. Klein