# 22-2908(L)

**22-2972 (Con)**

## United States Court of Appeals
## for the Second Circuit

IVAN ANTONYUK,

*Plaintiffs-Appellees*,

v.

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendants-Appellants*.

(*Caption continues inside front cover.*)

On Appeal from a Judgement of the United States District Court
for the Northern District New York

**BRIEF FOR THE CENTER FOR HUMAN LIBERTY
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

———————————————

BENBROOK LAW GROUP, PC
Bradley A. Benbrook
Stephen M. Duvernay
701 University Avenue, Suite 106
Sacramento, CA 95825
(916) 447-4900                                        February 8, 2023

(*Caption continues from front cover.*)

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, counsel for *amicus curiae* hereby state that the Center for Human Liberty has no parent corporation and has issued no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF AMICUS CURIAE .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ......................................................................................3

I.   This Court Should Focus Its Historical Analysis On The Founding Era ........3

II.  New York's Expansive List Of New "Sensitive Places" Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation ..............................8

    A.   The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense ...................................................................................9

        1.   Legislatures....................................................................10

        2.   Courthouses ..................................................................12

        3.   Polling Places ................................................................15

    B.   The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding-Era Sensitive Places Identified In *Heller* And *Bruen* ....................................................................................17

    C.   The Historical Record Supports Restrictions On Students' Firearm Rights, But Not A Complete Ban On Firearms At Schools, Colleges, And Universities .................................................................20

    D.   Founding-Era Historical Regulations *Required* The Carry Of Firearms At Public Assemblies And Church Services......................................22

    E.   Historical Restrictions On Hunting And The Discharge Of Firearms Confirm That There Is No Basis To Ban Carrying Firearms On Private Property Altogether ................................................................25

CONCLUSION .................................................................................29

CERTIFICATE OF COMPLIANCE .......................................................30

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul,*
  2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) .......................................... passim

*Castle Rock v. Gonzales,*
  545 U.S. 748 (2005) ........................................................................18

*Crawford v. Washington,*
  541 U.S. 36 (2004) .......................................................................4, 5

*DeShaney v. Winnebago Cnty. Dep't of Social Servs.,*
  489 U.S. 189 (1989) .......................................................................18

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................................... passim

*Espinoza v. Montana Dep't of Revenue,*
  140 S.Ct. 2246 (2020) ......................................................................6

*Gamble v. United States,*
  139 S.Ct. 1960 (2019) ......................................................................5

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ...........................................................5

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ........................................................................6

*McIntyre v. Ohio Elections Comm'n,*
  514 U.S. 334 (1995) ........................................................................4

*Nevada Comm'n on Ethics v. Carrigan,*
  564 U.S. 117 (2011) ........................................................................4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S.Ct. 2111 (2022) ................................................................. passim

*Ramos v. Louisiana,*
  140 S.Ct. 1390 (2020) ......................................................................6

*Timbs v. Indiana,*
  139 S.Ct. 682 (2019) .......................................................................7

*Virginia v. Moore,*
  553 U.S. 164 (2008) ........................................................................4

**Historical Regulations**

1 Laws of the State of New York (1807) ...................................................................13

1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England (Bartlett 1856)..............................................................................................24

1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature (Hening 1808)........................................24

5 Laws Of The Colony Of New York (1894)........................................................26

1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 .................................................26

1812 Del. Laws 329...............................................................................................26

1818 Vermont Acts & Resolves 64, § 42 ...............................................................27

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4 ...............................................26

A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire (1808) ................................................................................................12

A Collection Of All Such Acts Of the General Assembly Of Virginia (1803)........13

A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive (1812)......................11

A Digest of the Laws of the State of Georgia (1800)......................................14, 16

A Manual of The Laws of North-Carolina(3d ed. 1814).......................................15

Abridgement Of The Public Permanent Laws Of Virginia (1796) .........................16

Acts and Laws of the State of Connecticut, In America (1784)..............................14

Acts and Resolves of Massachusetts, 1786–87 (1893). ...........................................14

An Act for the Support of Government, in 1 Laws of the State of New York (2nd ed. 1807). ...........................................11

Digest Of The Laws Of Georgia (1800).................................................................28

Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony (Brown & Parsons 1850)............................23

Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-seven, vol. 2 (1797)....................................10, 13, 16

Laws of the State of New Jersey (Bloomfield, ed. 1811).......................................16

iv

Maryland, 3 Archives of Maryland (Browne 1885)................................................24

Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England (White 1853)...................23

Md. Const. art 1, § I (1776) .....................................................................................19

Md. Const. art. 1, §§ 3 & 14 (1776) .......................................................................16

New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature (Joseph Bloomfield, 1811). ....................................13

North Carolina, A Manual Of The Laws Of North Carolina (1814).......................27

Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October (1835)........11

The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799)...........................................................................14

The Laws of the State of New-Hampshire (1797)....................................................15

The Laws of the State of Vermont, vol. II (1808). ..................................................15

The Public Laws of the State of Rhode-Island (1798) ......................................10, 15

The Public Laws Of The State Of Rhode-Island And Providence Plantations (1798). ..........................................................................25

The Public Laws of the State of South-Carolina (1790) ............................11, 12, 17

The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X (1779–1781). ..............................................................11, 14

Vermont, The Laws of the State of Vermont, vol. II  (1808)..................................12

Virginia, Abridgment of the Permanent Laws of Virginia, (1796) ........................28

Virginia, Journal of the House of Delegates of the Commonwealth of Virginia (Printed by Thomas W. White, 1828). .................................................................12

Votes and Proceedings of the House of Delegates of the State of Maryland, October Session (1781)..........................................................................................12

Votes and Proceedings of the Senate of the State of Maryland, November Session (1792)......................................................................................12

**Other Authorities**

Amar, The Bill of Rights: Creation and Reconstruction xiv, 223 (1998) ................3

Boyd, Take Your Guns to Church: The Second Amendment and Church
Autonomy, 8 Liberty Univ. L. Rev. 653 (2014) ...................................23

Cramer, Guns On Campus: A History,
27 Acad. Questions 411 (Dec. 2014) ....................................................20

Kopel & Greenlee, *The "Sensitive Places" Doctrine*,
13 Charleston L. Rev. 203 (2018)....................................................9, 20

Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation
(manuscript Jan. 15, 2021).....................................................................3

Laws of the Columbian College in the District of Columbia (1824). ....................22

Laws of the University of North-Carolina; Established by the Board of Trustees, at
Their Session in December 1799 (Gales 1800). ...................................21

Mark Smith, *"Not all History is Created Equal": In the Post-Bruen World, the
Critical Period for Historical Analogues is when the Second Amendment was
Ratified in 1791, and not 1868*, (manuscript posted Nov. 4, 2022)...............4, 5, 7

The Lawes Of The Colledge
Published Publiquely Before The Students Of Harvard Colledge (1655). ..........21

The Laws of Rhode-Island College,
Enacted by the Fellows and Trustees (Carter 1803). ...........................21

The Laws of Yale College, in New-Haven, In Connecticut,
Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795
(Thomas Green and Son 1800). .........................................................21

Univ. of Georgia,
The Minutes of the Senatus Academicus, 1799-1842 (Univ. Ga. Lib. 1976)......22

Walker & Katz, The Police in America  (2013) ....................................................18

## INTEREST OF AMICUS CURIAE

The Center for Human Liberty is a nonprofit organization dedicated to defending and advancing individual liberty and freedom, including the rights and liberties protected by the Constitution. Consistent with this purpose, The Center for Human Liberty engages in legal efforts, including the submission of amicus briefs, to promote the protection of liberty. Amicus is interested in this case to ensure that New York's regulation of firearms is consistent with the original meaning of the Second Amendment as the Framers understood it.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus offers this brief to assist the Court's consideration of the historical evidence of "sensitive place" restrictions on the right to carry firearms. *Bruen*, like *Heller* before it, stressed that the scope of the Second Amendment's protection must be determined by historical analysis: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court

---

[1] No party's counsel authored this brief in whole or part and, apart from the Constitutional Defense Fund, Inc., no person (including any party or party's counsel) contributed money to fund its preparation or submission. All parties on appeal have consented to the filing of this brief.

1

conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022) (citation omitted).

We begin by emphasizing that the founding-era understanding of the "sensitive location" doctrine controls. The "scholarly debate" referenced in *Bruen*— when conducting the historical analysis, should a court look to the understanding of the Second Amendment's scope in 1791 or 1868?—provides no basis for straying from the Court's consistent practice. The "scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S.Ct. at 2137-38.

The many locations New York now hopes to treat as "sensitive" cannot possibly be analogized to the core founding-era sensitive locations recognized in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The historical record shows that, at the founding, carry restrictions were strictly limited to locations where the government exercised a heightened level of control to secure the proper operation of government, which stands in stark contrast to New York's sweeping restrictions.

Indeed, early Americans were *required* by law to carry firearms in many of the locations—such as places of worship and at public assemblies—where the State now seeks to disarm citizens altogether. New York's current impulse to protect

potential victims by disarming everyone at public gatherings thus runs directly contrary to the Founders' solution: Where contained spaces could not be comprehensively secured by government-provided protection, the people were instructed to be ready to defend themselves in the event of violence.

New York's bans fail *Bruen*'s test. The injunction should not be disturbed.

## ARGUMENT

## I. This Court Should Focus Its Historical Analysis On The Founding Era.

*Bruen* cautioned lower courts to remember that, when they analyze history to evaluate whether the government has met its burden, "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in *Bruen*). While the Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," 142 S.Ct. at 2138,[2] multiple signs show that this "debate" must be settled in favor of 1791.

---

[2] Citing Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998), and Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917.

The notion that, "[w]hen the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings," Lash, *supra* at 2,[3] makes little sense. *See* Mark Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, (manuscript posted Nov. 4, 2022, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297). *Bruen* stressed that "we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." 142 S.Ct. at 2137 (emphasis added and citations omitted). And it cautioned that the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 142 S.Ct. at 2137-38.[4] In other words, the Fourteenth Amendment's passage did not change the scope of incorporated rights.

---

[3] *See also* ECF No. 193, Am. Br. of Everytown for Gun Safety at 7-16.

[4] *Bruen* cited *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (scope of Sixth Amendment right to confrontation governed by "founding generation's" understanding); *Virginia v. Moore*, 553 U.S. 164, 168-69, 172 (2008) (scope of Fourth Amendment determined in "founding era") (citation omitted); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-23 (2011) (founding-era treatment "dispositive" on scope of First Amendment). *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J. concurring) (First

*Bruen* further affirmed that post-founding-era regulations are relevant only to the extent they *confirm* traditions from the founding, so courts must "guard against giving postenactment history more weight than it can rightly bear." 142 S.Ct. at 2136. Thus, while it is *permissible* for courts to consider post-founding-era historical regulations, that review is limited to determining whether such regulations *confirm* a founding-era tradition. *Bruen*, 142 S.Ct. at 2136.[5] Nineteenth-century laws that regulated firearms in a manner that broke with founding-era traditions do not establish a "tradition" that could narrow the scope of the Second Amendment's protection. *Bruen*, 142 S.Ct. at 2137 ("'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *id.* at 2154 n.28 ("late-19th-century [and] 20th-century evidence . . . *does not provide*

---

Amendment must be interpreted based on its "original meaning" by "seek[ing] the original understanding" of Framers).

[5] *See also Gamble v. United States*, 139 S.Ct. 1960, 1975-76 (2019) (observing that, in *Heller*, "19th-century treatises were treated as mere *confirmation* of what the Court thought had already been established") (emphasis added); *see also* Smith, *supra*, manuscript at 4-5 ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the founding, remained consistent with the public understanding in 1791."); *Crawford*, 541 U.S. at 47, 50 (citing 19th-century treatises that "confirm[ed]" founding-era rule).

*insight* into the meaning of the Second Amendment when it contradicts earlier evidence") (emphasis added).[6]

These principles doom the eccentric theory that the Second Amendment's original meaning could be "transformed" by Civil War era regulations that were inconsistent with founding-era practices. "Incorporation" simply asks whether a particular limitation on the *federal* government in the Bill of Rights should also apply to state and local governments because it is a "fundamental" right. *McDonald v. City of Chicago*, 561 U.S. 742, 764 (2010). And because incorporation assumes and accepts that the right has restricted the federal government *since the founding*, "incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government." *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020). Their meanings did not *change* in the 19th century with the adoption of the Fourteenth Amendment. *McDonald*, 561 U.S. at 788 ("relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle"); *Timbs v. Indiana*, 139 S.Ct. 682, 687

---

[6] *Bruen* also cited *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2258-59 (2020) (rejecting argument that 30 states' late-19th-century adoption of "no aid" laws inconsistent with founding-era understanding of Free Exercise Clause could overcome original understanding). Justice Barrett cited this analysis from *Espinoza* in stressing that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'" 142 S.Ct. 2163 (Barrett, J., concurring).

6

(2019) ("if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires"); Smith, *supra* at 4-5.

\* \* \*

Limiting the use of 19th-century evidence to only confirm the founding-era understanding plays a dispositive role here. New York relied on late 19th-century laws for the vast majority of its historical evidence in the district court.[7] The State sought to justify a ban on carrying firearms in "any place of worship or religious observation" by pointing to six state and territorial regulations enacted between 1870 and 1890.[8] It cited a series of state, territorial, and municipal regulations passed between 1870 and 1897 to support its ban on carrying in "public playgrounds, public parks, and zoos."[9] It then relied on four state and territorial laws from 1869 to 1890 when defending its prohibition on carrying firearms in "aviation transportation," "airports," and "buses";[10] identified a series of regulations primarily from the 1880s

---

[7] By contrast, New York identified *only one* founding-era law—a lone 1786 Virginia law that prohibited carrying arms "in terror of the Country" that the Supreme Court did not find persuasive in *Bruen*—to support any of its sensitive place restrictions. New York offered this law to justify the ban on carrying on planes, in airports, and on buses, as well as the carry prohibition in theaters, conferences centers, and banquet halls. *Antonyuk v. Hochul*, 2022 WL 16744700 at \*69, \*73 (N.D.N.Y. Nov. 7, 2022).

[8] *Id.* at \*61.

[9] *Id.* at \*64.

[10] *Id.* at \*69.

to support its prohibition on carrying firearms in bars;[11] referenced four post-Civil War regulations in defense of its firearms ban in "theaters," "conference centers," and "banquet halls";[12] and found six state and territorial laws passed between 1869 and 1890 to support its ban on carrying firearms at gatherings to "express . . . constitutional rights to protest or assemble."[13]

As shown below, however, these 19th-century laws were not consistent with the tradition of sensitive-place regulation in the founding era.[14]

## II. New York's Expansive List Of New "Sensitive Places" Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.

Founding-era history confirms not only that government authority to ban firearms was sharply limited (primarily to contained places under the government's control with government-provided security), it demonstrates that citizens were generally allowed to carry firearms (schools) or even required to do so (places of worship) in several of the very same locations where New York seeks to ban firearms altogether. New York's law cannot survive *Bruen*'s test.

---

[11] *Id.* at *71.

[12] *Id.* at *73.

[13] *Id.* at *75.

[14] Although the district court ultimately reached the correct conclusion when enjoining each of the sensitive-place restrictions that are at issue in this appeal, the court could have reached that conclusion more swiftly by dismissing the mid- and late-19th century regulations that were inconsistent with regulations (or lack of regulations) at the founding.

A.    **The Core "Sensitive Places" Identified In *Heller* And *Bruen* Were All Secured By Guards, Thus Reducing The Imperative Of Carrying For Self Defense.**

In *Bruen*, the Court identified three types of "sensitives places" where historical regulations traditionally prohibited the possession of weapons: "legislative assemblies, polling places, and courthouses." 142 S.Ct. at 2133 (citing Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 203, 229–236, 244–247 (2018), and Br. of Independent Institute as Amicus Curiae in Supp. of Pet'rs at 11–17). Review of these regulations illuminates the limits of the so-called sensitive places doctrine and provides the historical context for the analogical inquiry *Bruen* prescribes for analyzing New York's restrictions in this case.

Two defining characteristics run through each of the sensitive places acknowledged by *Bruen*. First, each location involved deliberative processes central to the republican democracy that should be free from potential armed intimidation. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 205 ("Protecting government deliberation from violent interference is the core of the sensitive places tradition."). Second, and correspondingly, history demonstrates substantial evidence that each of these places was, in contrast to virtually all other locations, well secured by the presence of armed guards, so the *need* for armed self-defense by the public was significantly reduced. This latter characteristic will, as shown below, prevent New York from analogizing its widespread bans to the founding era tradition.

9

1.  **Legislatures.** The historical record reflects a uniform tradition of providing publicly-funded or publicly-administered physical security in legislative assemblies throughout the nation. Legislative records from throughout the United States in the founding era reflect the presence of sergeants-at-arms and door-keepers at legislative proceedings, which is evidenced through public funding and legislative journals detailing the appointment of these officers:

- In Rhode Island, sheriffs, town sergeants, and constables were paid for attending the General Assembly. The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798) ("The Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly").

- Delaware provided for public payment of fees to the legislature's sergeant-at-arms and door-keepers. Laws of the State of Delaware, From the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-seven, vol. 2, pp. 1100, 1118 (1797) ("the fees belonging to the Sergeant at Arms shall be as follow . . . Taking any person into custody, Thirty-31 three Cents," "Fees to the Door-keepers of the respective Houses—For every day's attendance, One Dollar").

- Pennsylvania appropriated funds for the assembly's sergeant-at-arms and door-keepers in 1781: "The sergeant-at-arms, for every day's attendance, the sum of ten shillings. The door-keeper of the council and the door-keeper of the house

10

of assembly, each the sum of ten shillings for every day's attendance." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, pp. 376, 378 (1779–1781).

- South Carolina provided for the payment of door-keepers in 1787. The Public Laws of the State of South-Carolina, pp. 426, 427 (1790) ("Two Door-keepers £50 each per annum").

- New York legislated that "there shall also be allowed and paid to the serjeant at arms and the door keepers of the senate and assembly, each the sum of two dollars for every day they shall attend the legislature" An Act for the Support of Government, in 1 Laws of the State of New York, p. 532 (2nd ed. 1807).

- Georgia appropriated funds for the legislature's door-keepers in 1808: "to the messenger and door-keeper of the Senate, and messenger and door-keeper of the House of Representatives, three dollars each per day." A Compilation of the Laws of the State of Georgia, Passed by the Legislature Since the Political Year 1800, to the Year 1810, Inclusive, pp. 372–73 (1812).

- New Jersey provided for payment "[t]o the door keeper, the sum of five shillings per diem, for each day that he hath or shall attend this Congress." Provincial Congress, Journal of the Votes and Proceedings of the Provincial Congress of New-Jersey: Held at Trenton in the Month of October 1775, pp. 239, 240 (1835).

- Virginia provided for "allowances" for the sergeant-at-arms and door-keepers' "services" to the General Assembly in 1783. Virginia, Journal of the House

of Delegates of the Commonwealth of Virginia, p.77 (Printed by Thomas W. White, 1828).

- Vermont compensated sheriffs and constables "[f]or attendance on the general assembly" in 1798. Vermont, The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808).[15]

      2.    **Courthouses.** The historical record likewise confirms that states provided for the securing of courthouses at the founding by requiring law enforcement officials (sheriffs or constables) to attend court.

- South Carolina directed that "sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts." The Public Laws of the State of South-Carolina, pp. 268, 271 (1790).

- Virginia enacted a 1792 law providing that "[t]he keeper of the public jail, shall constantly attend the General Court, and execute the commands of the

---

[15] *See also* Votes and Proceedings of the House of Delegates of the State of Maryland, October Session, 1780, p. 2 (1781) ("The house appointed . . . Mr. Robert Reynolds sergeant at arms, and Mr. Cornelius Mills door-keeper."); Votes and Proceedings of the Senate of the State of Maryland, November Session, 1791, p. 1 (1792) ("Edward Roberts [was appointed] door-keeper"); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session."); A Journal of the Proceedings of the Honorable Senate of the State of New-Hampshire, p. 6. (1808) ("Voted that Mr. James Buswell be door-keeper for the Senate the present Session.").

Court," and further providing that "the Sheriff, or so many of the Under-Sheriffs as shall be thought necessary, of the County where such Court may be held, shall attend the said Court during their Sessions." A Collection Of All Such Acts Of the General Assembly Of Virginia, pp. 69–71 (1803).

- Delaware, in a 1793 law, directed that "the Sheriff of Kent county . . . shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, and be the officer for the purpose of executing the orders and process of the said court." Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, vol. 2, pp. 1088, 1091 (1797).

- New Jersey, in 1798, mandated that "the constables of the several townships in such county shall be the ministerial officers of the said court" and provided that the constable "shall be appointed to attend the jury." New Jersey, Laws of the State of New Jersey, Compiled and Published, Under the Authority of the Legislature, pp. 49, 50, 58 (Joseph Bloomfield, 1811).

- New York, in 1801, required "sheriffs and their officers" to attend court proceedings "to do those things which to their officers shall appertain." 1 Laws of the State of New York, p. 172 (1807).

- Pennsylvania, in 1780, provided courts with "the power to . . . compel the attendance of sheriffs, coroners, constables, and other ministerial officers require

13

sheriffs, constables, and other officers." The Statutes at Large of Pennsylvania From 1682 to 1801, vol. X, p. 57 (Wm. Stanley Ray 1904).

Beyond these requirements, the legislative record in other early American jurisdictions shows that law enforcement officials were compensated for attending judicial proceedings, which provides further evidence that courthouses were secured by the government:

• Connecticut's legislative record includes a fee schedule for sheriffs and constables attending court proceedings. Acts and Laws of the State of Connecticut, In America, pp. 63–65 (1784).

• Georgia provided in a 1792 law for fees to sheriffs and constables for court proceedings. A Digest of the Laws of the State of Georgia, pp. 471, 473, 474, 478 (1800).

• Maryland law provided for compensation "to the Sheriff," including for "Empanelling" and "Swearing" juries and for "Attendances, per day." The Laws of Maryland to which are prefixed The Original Charter, with an English translation, v. 1, ch. XXV (1799) (1779 law).

• Massachusetts provided for payment to "[e]very Constable who shall attend the Supreme Judicial Court, or Court of General Sessions of the Peace, or Common Pleas." Acts and Resolves of Massachusetts, 1786–87, p. 235 (1893) (1786 law).

14

- New Hampshire law provided for "Sheriff's fees" "[f]or every trial," "[f]or attending the grand jury," and "[f]or attending the petit jury." The Laws of the State of New-Hampshire, pp. 112–16 (1797).

- North Carolina allocated payment to sheriffs "[f]or summoning, impannelling and attending on every jury in every cause in court" and "[f]or attendance of a constable every court when summoned by the sheriff." A Manual of The Laws of North-Carolina, pp. 190, 191, 196 (3d ed. 1814).

- Rhode Island directed that "[t]he Sheriffs," "Town Sergeants, and Constables" "shall be allowed" fees "[f]or attending the General Assembly, the Supreme Judicial Court, and the Courts of Common Pleas, by the day." The Public Laws of the State of Rhode-Island, pp. 220, 222 (1798).

- Vermont provided for payment of fees to sheriffs and constables "[f]or attending before a justice's court, when required," "[f]or attending freeholders' courts," and "[f]or attendance on the general assembly, or supreme or county court." The Laws of the State of Vermont, vol. II, pp. 382, 387 (1808) (1798 law).

　　　　**3.**　　**Polling Places.** The founding-era record reveals a similarly robust tradition of stationing government-funded officers at polling places to oversee elections, maintain order, and provide security:

- Georgia law required sheriffs to attend elections "for the purpose of enforcing the orders of the presiding magistrates in preserving good order." A Digest of the Laws of the State of Georgia, p. 611 (1800).

- Virginia provided in 1778 that "[t]he sheriff shall attend and take the poll at such election, entering the names of the persons voted for." Abridgement Of The Public Permanent Laws Of Virginia, p. 325 (1796).

- An 1807 New Jersey statute provided constables and other elections officers with authority to detain "riotous" or "disorderly" people for up to 24 hours to preserve "good order" and "for the security of the election officers from insult and personal abuse." Laws of the State of New Jersey, p. 36 (Bloomfield, ed. 1811).

- Maryland's constitution mandated that "the Sheriff of each county, or . . . his Deputy . . . shall be the judges of the election" for the house of delegates, and "the Sheriff of each county, or . . . his Deputy . . . shall hold and be judge of the said election" for senate." Md. Const. art. 1, §§ 3 & 14 (1776).

- Delaware law authorized "the Sheriffs" and other officials "to attend, conduct, and regulate the election." Laws of the State of Delaware, From The Fourteenth Day Of October, One Thousand Seven Hundred, To The Eighteenth Day Of August, One Thousand Seven Hundred And Ninety-Seven, vol. 2, p. 984 (1797).

- South Carolina's laws contain a "Table of Fees" that includes payment to the sheriff for "publishing writs for electing members of the General Assembly,

16

taking the ballots and returning the writ." The Public Laws of the State of South-Carolina, pp. 386–88 (1790).

**B.    The Supposed Sensitive Places At Issue Here Cannot Be Analogized To The Founding-Era Sensitive Places Identified In *Heller* And *Bruen*.**

For a historic law to serve as a "proper analogue" to a modern firearm regulation under *Bruen*, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132-33. On that score, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted).

The context of the founding era's narrow categories of "sensitive places" was highly unique. The government exercised a heightened level of control to secure the proper operation of government (*i.e.*, safeguarding the legislature's business, promoting free election, or securing legal proceedings). Each of the areas was self-contained such that government officers actually could provide for the safety of the individuals in the area. With that guarantee of personal protection, the burden on a citizens' right to armed self-defense was significantly reduced: If violence broke out, government security was present and ready to quell it, so there was a vastly reduced *need* to carry arms for self-defense.

17

This stands in stark contrast to the supposed "sensitive" locations where New York has sought to disarm citizens. They encompass a broad swath of locations that ordinary citizens visit on a routine basis that have no connection to core government functions and, most important, lack ubiquitous state-provided security in any way comparable to armed security in contained locations like courthouses or legislative assemblies. Modern policing does not remotely compare to the level of security provided at founding-era sensitive places. *Cf. Bruen*, 142 S.Ct. at 2133-34 ("there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department").[16] As such, all of the locations enjoined below flunk *both* the "how" and "why" tests.

New York points to no founding-era historical precedent that supports general authority to ban firearms in "crowded locations," which underlies its attempt to prohibit firearms in places like public parks, zoos, conference centers, theaters,

---

[16] Since the founding, Americans have been their own first responders outside of the few sensitive locations described above. Advancements in professional policing have not remotely changed this condition: Citizens remain primarily responsible for their own defense. *See* Walker & Katz, The Police in America 4 (2013) (noting the an "enduring myth[] that police are primarily crime fighters," even though "[o]nly about one-third of a patrol officer's activities are devoted to criminal law enforcement"). This reality surely underlies the Supreme Court's consistent refusal to recognize a right to protection from law enforcement. *See, e.g.*, *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189 (1989); *Castle Rock v. Gonzales*, 545 U.S. 748 (2005).

public assemblies, public transportation, and the like. *See* ECF No. 95, Nigrelli Opening Br. at 62–63. It claims that these modern restrictions are analogous to founding-era prohibitions on "bearing arms in . . . 'fairs or markets,'" *id.* at 55, but the only precedent cited for this assertion is a 1786 Virginia law that prohibited carrying arms "in terror of the Country." *See Antonyuk*, 2022 WL 16744700 at *73-74. *Bruen* already established that this very law—and others like it that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"—provides no historical foundation for a "broad prohibition[]" against carrying arms generally. 142 S.Ct. at 2144-45. Even setting that aside, a single regulation from one state is insufficient to establish an adequate historical tradition to withstand constitutional scrutiny. *Heller*, 554 U.S. at 632; *Bruen*, 142 S.Ct. at 2153.

Beyond that, New York relies on a handful of mid- to late-19th century laws prohibiting firearms in public gatherings and assemblies. ECF No. 95, Nigrelli Opening Br. at 55–58; *see also supra*, § I, pp. 7-8 (reviewing historical precedent New York submitted to the district court). Because this 19th-century evidence does not confirm a similar practice at the founding, it is entitled to no weight. *Bruen*, 142 S.Ct. at 2136-37. In short, New York's historical material cannot demonstrate the "well-established and representative" tradition of analogous regulation that *Bruen* requires. 142 S.Ct. at 2133.

19

### C. The Historical Record Supports Restrictions On Students' Firearm Rights, But Not A Complete Ban On Firearms At Schools, Colleges, And Universities.

New York's attempt to prohibit firearms at all schools, colleges, and universities is inconsistent with the historical tradition of firearms regulation at the founding. There is no evidence that guns were generally banned from schools in Colonial America before 1791, and the post-ratification evidence shows an acceptance for restricting *students'* possession and use of firearms. *See*, *e.g.*, Clayton Cramer, Guns On Campus: A History, 27 Acad. Questions 411 (Dec. 2014), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2998355, manuscript at 12–13 (noting that in many instances, students needed to be armed for militia duty and observing that while "[c]olleges in the Colonial period often prohibited students from hunting, . . . this does not appear to have been a prohibition on firearms possession"). Such restrictions on students were prominent at colleges and universities at the time of the founding, and the record demonstrates that those restrictions did not apply to faculty, staff, or visitors:

- Kopel and Greenlee describe the University of Virginia's prominent 1825 ban on student possession in response to the students' "spoiled and violent behavior;" they had previously "fired guns in the air, and shot at each other." 13 Charleston L. Rev. at 247–48.

- Harvard's rules stated that "[n]o Student nor students shall be suffered to have a Gunn in his or their Chambers, or Studyes, or keeping for their use any elsewhere in the Towne." The Lawes Of The Colledge Published Publiquely Before The Students Of Harvard Colledge (1655).

- Yale similarly provided that "[n]o Scholar is allowed to keep any kind of fire-arms, or gun-powder, upon penalty of seventeen cents; and if any Scholar shall fire any gun-powder in or near the College-yard, he shall be fined fifty cents: and if it be done near the dwelling-house or the person of the President, a Professor or a Tutor, he shall also be punished as for contempt." The Laws of Yale College, in New-Haven, In Connecticut, Enacted by the President and Fellows, The Sixth Day of October, A.D. 1795, p. 26 (Thomas Green and Son 1800).

- The University of North Carolina followed suit: "No student shall keep a dog or fire-arms; nor shall he use fire-arms without permission from some one of the Faculty." Laws of the University of North-Carolina; Established by the Board of Trustees, at Their Session in December 1799, p. 12 (Gales 1800).

- Rhode Island College (now Brown University) provided that "No student shall keep any kind of fire-arms or gunpowder in his room, nor fire gunpowder in or near the College, in any manner whatever." The Laws of Rhode-Island College, Enacted by the Fellows and Trustees, p. 12 (Carter 1803).

- At the University of Georgia, an 1810 restriction providing that "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." The Minutes of the Senatus Academicus, 1799-1842, p. 86 (Univ. Ga. Lib. 1976).

- Columbian College (now George Washington University) provided that "No student shall keep a servant, nor shall he keep fire arms, or any deadly weapon whatever. He shall bring no gunpowder upon the College premises . . . ." Laws of the Columbian College in the District of Columbia, p. 10 (1824).

In short, the historical evidence demonstrates that restrictions on firearms at schools were limited to minors or students, therefore these cannot serve as analogues for broad-based gun restrictions on law-abiding adults.

## D. Founding-Era Historical Regulations *Required* The Carry Of Firearms At Public Assemblies And Church Services.

New York has included in its "sensitive place" restrictions places of worship and religious congregations, as well as public assemblies, which it justifies by pointing to late-19th century regulations. *Antonyuk*, 2022 WL 16744700, at *61–62 & *75. In a remarkable contrast to current bans, evidence from the founding shows that, instead of general bans on firearms in these locations, there was a tradition of ensuring that citizens were in fact armed when they came to church or assembled

together. Indeed, *Heller* cited to a 1770 Georgia law that required men to carry firearms "to places of public worship." 554 U.S. at 601.

Georgia was not alone: There is a robust tradition in Colonial and early-America requiring the carrying of arms not only to religious services, but to public assemblies more broadly. *See* Boyd, Take Your Guns to Church: The Second Amendment and Church Autonomy, 8 Liberty Univ. L. Rev. 653, 697–99 (2014) (reviewing Colonial and founding-era historical precedent for requiring firearms at church services). Laws dating back across the colonial period required the carry of firearms in assemblies or at church services precisely because of the risk of violence in those locations.

- Connecticut ordered "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting." Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, p. 95 (Brown & Parsons 1850) (1643 order).

- Colonial Massachusetts ordered that "all such persons . . . shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets . . . ." Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order).

- Colonial Maryland ordered that every man "able to bear arms" must carry a firearm when at church. Maryland, 3 Archives of Maryland, p. 103 (Browne 1885) (1642 order).

- Rhode Island prescribed in 1639 that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 Records Of The Colony Of Rhode Island And Providence Plantations, In New England, p. 94 (Bartlett 1856).

- Virginia enacted multiple similar requirements. 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, p. 174 (Hening 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church"); *id.* at 263 (1642 act requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"); *id.*, vol. VI, p. 534 (1755 law "providing that "it shall and may be lawful, for the chief officer of the militia, in every county, to order all persons listed therein, to go armed to their respective parish churches").

This widespread precedent confirms that New York's effort to ban firearms at places of worship and public assembly runs directly *counter* to the Nation's history and tradition. New York's solution to the risk of violence breaking out is that *no one* may lawfully carry arms in these locations. The founders took precisely the

opposite approach: Where public spaces could not be comprehensively secured by government-provided protection, the people were instructed to carry arms so they could defend themselves in the event of violence. The founding era's solution must control under *Bruen*.

### E. Historical Restrictions On Hunting And The Discharge Of Firearms Confirm That There Is No Basis To Ban Carrying Firearms On Private Property Altogether.

Beyond the so-called "sensitive places" discussed above, New York has also attempted to ban firearms in what it terms "restricted locations," which effectively cover all privately-owned property. *See Antonyuk*, 2022 WL 16744700 at *78. Two facets of historical regulation show how this broad effort to disarm New Yorkers is unconstitutional.

First, founding-era regulations consistently focused on restricting *discharge* (not possession of arms) if indiscriminate firing posed a problem at a particular location. Such restrictions were often imposed in city limits or particular public spaces, but they did not prohibit carry more broadly. Several states restricted discharge in this manner:

- Rhode Island prohibited the discharge of a firearm "in or across any road, street, square or lane," punishable by fine. The Public Laws Of The State Of Rhode-Island And Providence Plantations, p. 568 (1798).

25

- Delaware prohibited the "fir[ing] or discharg[ing]" of a firearm "within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State." 1812 Del. Laws 329.

- New Hampshire generally restricted firearm discharge within a "quarter mile from the nearest building of any such city, town, village or station." 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

- Colonial New York enacted a similar restriction. 5 Laws Of The Colony Of New York, p. 12 (1894) (1769 law).

- New York City in 1763 prohibited the "Fire and discharge of any gun" by "any Children, Youth, apprentices, Servants, or other persons . . . at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk." *See* Supp. App'x of New York City, *NYSRPA v. New York*, No. 18-280 at SA6 (U.S. 2019) (reprinting Ordinances of the City of New York, § 6 (1763)).

- Massachusetts enacted similar restrictions. 1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot or Ball in the Town of Boston, chap. 11, §§ 1 to 3 ("no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharf or

vessel," and "no person shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston, or in any part of the Harbor . . . .").

- Vermont law provided that "[n]o non-commissioned officer, private or citizen shall unnecessarily fire a gun, single musket or pistol in any public road or near any house, or place of parade . . . ." 1818 Vermont Acts & Resolves 64, § 42.

These discharge restrictions are not a proper analogue to modern regulations banning firearms in a particular location. After all, a restriction on discharging firearms presupposes individuals possess firearms. And in a related context, *Heller* recognized that it would be "implausible" for such discharge restrictions to "have been enforced against a citizen acting in self-defense." 554 U.S. at 633.

Second, founding-era regulations restricted hunting and poaching on private land, rather than prohibiting carry altogether. In addition to the laws identified by New York in the district court, laws from other states confirm that firearm restrictions on private land generally prohibited trespassing, *i.e.*, hunting on someone else's land without permission. A 1784 North Carolina law, for example, prohibited "hunt[ing] with a gun or dogs on the lands of any other person, without leave obtained from the owner of the said land," so long as "the owner of the land shall, by advertisement posted up in two or more public places, have forbid the persons so hunting by name, or all persons generally to hunt on his land, previous to the offence." North Carolina, A Manual Of The Laws Of North Carolina, p. 236 (1814).

And Virginia similarly established a fine "[i]f any person or persons, shall at any time shoot, hunt, or range upon the lands or tenements . . . included within the bounds of any other person or persons, without license first obtained of the owner of such lands." Virginia, Abridgment of the Permanent Laws of Virginia, pp. 157–58 (1796); *accord* Georgia, Digest Of The Laws Of Georgia, p. 428 (1800) (1790 law making it punishable by fine to "hunt with a gun by fire light or kill any deer so hunting by fire light in the night time without his or their own enclosures").

For its part, New York relied on several anti-poaching regulations to justify its "restricted locations" law—and the district court rightly rejected this gambit. *Antonyuk*, 2022 WL 16744700 at \*79–81. These regulations show that when the founding generation considered banning firearms in particular types of property, they only did so in a very narrow circumstance (hunting), and they did not ban carry in these locations for self-defense. These restrictions provide no support for New York's private-property restriction. As the district court observed, "the need to restrict fowling-piece-wielding poachers on fenced-in farms in 18th and 19th century America appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." 2022 WL 16744700 at \*80.

In short, founding-era historical precedent regulating hunting and firearm discharge provides no support for New York's broad carry bans on private property.

28

## CONCLUSION

This Court should affirm the district court's order granting a preliminary injunction.

Dated:  February 8, 2023                    Respectfully submitted,

Benbrook Law Group, PC
Bradley A. Benbrook

<u>s/ Bradley A. Benbrook</u>
Attorneys for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

I certify that this amicus brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because it contains 6,762 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Fed. R. of App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  February 8, 2023                    Respectfully submitted,

                                            Benbrook Law Group, PC
                                            Bradley A. Benbrook


                                            s/ Bradley A. Benberook
                                            Attorneys for *Amicus Curiae*