# No. 22-2908(L)

22-2972(Con)

## United States Court of Appeals
## For the Second Circuit

―――――――――――

IVAN ANTONYUK ET AL.,
*Plaintiffs-Appellees*,

v.

STEVEN A. NEGRELLI, IN HIS OFFICIAL CAPACITY AS
ACTING SUPERINTENDENT OF THE NEW YORK STATE POLICE, ET AL.
*Defendants-Appellants*, (*caption continues inside front cover*)

―――――――――――

On Appeal from the United States District Court
for the Northern District of New York, No. 22-cv-986

―――――――――――

**BRIEF OF *AMICI CURIAE* LAW ENFORCEMENT GROUPS AND
FIREARMS RIGHTS GROUPS NEW YORK STATE SHERIFFS'
ASSOCIATION *ET AL.* IN SUPPORT OF APPELLEES AND
AFFIRMANCE (ALL AMICI LISTED INSIDE FRONT COVER)**

C.D. MICHEL
  OF COUNSEL
MICHEL & ASSOCIATES, P.C.
180 EAST OCEAN BOULEVARD, SUITE 200
LONG BEACH, CALIFORNIA 90802
(562) 216-4444
CMICHEL@MICHELLAWYERS.COM

DAN M. PETERSON
  COUNSEL OF RECORD
DAN M. PETERSON PLLC
3925 CHAIN BRIDGE ROAD, SUITE 403
FAIRFAX, VA 22030
(703) 352-7276
DAN@DANPETERSONLAW.COM

(*caption continues from front cover*)

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees.*

*v.*

MATTHEW J. DORAN, IN HIS OFFICIAL CAPACITY AS THE LICENSING OFFICIAL OF ONONDAGA COUNTY, JOSEPH CECILE, IN HIS OFFICIAL CAPACITY AS THE CHIEF OF POLICE OF SYRACUSE,

*Defendant-Appellants.*

KATHLEEN HOCHUL, IN HER OFFICIAL CAPACITY AS THE GOVERNOR OF NEW YORK, WILLIAM FITZPATRICK, IN HIS OFFICIAL CAPACITY AS THE ONONDAGA COUNTY DISTRICT ATTORNEY, EUGENE CONWAY, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF ONONDAGA COUNTY, P. DAVID SOARES, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF ALBANY COUNTY, GREGORY OAKES, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF OSWEGO COUNTY, DON HILTON, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF OSWEGO COUNTY, JOSEPH STANZONE, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF GREENE COUNTY,

*Defendants.*

————————————

(continued from front cover) The following law enforcement groups and firearms rights groups are *amici curiae* in this case:

**New York State Sheriffs' Association, National Association of Chiefs of Police, Western States Sheriffs' Association, California State Sheriffs' Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Connecticut Citizens Defense League, CRPA Foundation, Gun Owners' Action League Massachusetts, Gun Owners of California, Second Amendment Law Center, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, and Virginia Shooting Sports Association**

## CORPORATE DISCLOSURE STATEMENTS

New York State Sheriffs' Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

National Association of Chiefs of Police is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

California Sheriffs' Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

International Law Enforcement Educators and Trainers Association is a corporation which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company

owns 10% or more of its stock.

Connecticut Citizens' Defense League is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

CRPA Foundation is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Gun Owners' Action League Massachusetts is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Gun Owners of California is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Second Amendment Law Center is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Vermont Federation of Sportsmen's Clubs is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held

company owns 10% or more of its stock.

Vermont State Rifle & Pistol Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Virginia Shooting Sports Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

iii

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENTS ......................................................i

TABLE OF CONTENTS.......................................................................................iv

TABLE OF AUTHORITIES .................................................................................vi

INTEREST OF AMICI CURIAE............................................................................1

STATEMENT PURSUANT TO RULE 29(c) .........................................................1

INTRODUCTION ...................................................................................................4

SUMMARY OF ARGUMENT ...............................................................................5

ARGUMENT ...........................................................................................................8

I. THE APPROPRIATE TIME PERIOD TO DETERMINE ORIGINAL
   PUBLIC UNDERSTANDING OF THE SECOND AMENDMENT
   IS 1791,WHEN THE BILL OF RIGHTS WAS ADOPTED..............................8

   A. Briefing in this case that suggests or advocates that the time
      to determine the original meaning of the Bill of Rights is when
      the 14th Amendment was ratified is seriously in error....................................8

   B. The case law and quotations relied on to establish 1868
      as the pertinent year are illusory..................................................................12

   C. The Constitution's meaning is fixed according to the
      understandings of the Founders....................................................................18

   D. Each provision of the Bill of Rights means the same thing
      when applied against the states through the Fourteenth Amendment
      as it does when applied against the federal government ...............................18

iv

E. *Bruen* and *Heller* both held that history from around the
   time of the Civil War or later cannot be used to contradict the
   original understanding from 1791, but can only be used to
   confirm that understanding ........................................................................20

F. The position that 1868 is the proper year is contrary to the
   Supreme Court's prior holdings and will not be adopted by it .....................22

   1. The Supreme Court's universal practice has been to look
      at the Founding era, not 1868, to determine the original
      understanding of the Bill of Rights .............................................................22

   2. The Supreme Court will not overturn its fundamental
      incorporation jurisprudence to focus on 1868
      rather than the Founding........................................................................24

II. WHEN HISTORICAL ANALOGUES ARE LIMITED TO
    THE TIME OF THE FOUNDING, NEW YORK HAS PRESENTED
    ALMOST NOTHING TO JUSTIFY ITS EXTENSIVE RESTRICTIONS
    ON CARRYING IN "SENSITIVE PLACES."...................................................27

CONCLUSION ........................................................................................................29

CERTIFICATE OF COMPLIANCE.......................................................................31

CERTIFICATE OF SERVICE ................................................................................32

# TABLE OF AUTHORITIES

## CASES                                                                    Page

*Benton v. Maryland*, 395 U.S. 784 (1969)..............................................23

*Bolling v. Sharpe*, 347 U.S. 497 (1954)...............................................26

*Crawford v. Washington*, 541 U.S. 36 (2004) .......................................24

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................5, 8, 18, 20, 23

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) .....................14

*Duncan v. Louisiana*, 391 U.S. 145 (1968) ...........................................24

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................6, 13, 14

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)..........................22

*Gamble v. United States*, 139 S.Ct. 1960 (2019)...............................20, 23

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018).....................6, 12, 13, 15

*Hosanna-Tabor Evangelical Lutheran Church
and School v. E.E.O.C.*, 565 U.S. 171 (2012).........................................23

*In re Oliver*, 333 U.S. 257 (1948)..........................................................24

*Klopfer v. North Carolina*, 386 U.S. 213 (1967).....................................24

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ................................................23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................13, 14, 19

*Malloy v. Hogan*, 378 U.S. 1 (1964).......................................................19

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................14

*Near v. Minnesota*, 283 U.S. 697 (1931) ................................................23

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)................23

*New York State Rifle Association v. Bruen*, 142 S. Ct. 2111 (2022) ..............*passim*

*Powell v. Alabama*, 287 U.S. 45 (1932) ..................................................24

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..........................................23

*Reynolds v. United States*, 98 U.S. 145 (1878).......................................23

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ................................................................ 24

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ...............................12, 14, 15

*United States v. Jones*, 565 U.S. 400 (2012) .........................................................18

*Virginia v. Moore*, 553 U.S. 164 (2008) ................................................................23

*Washington v. Texas*, 388 U.S. 14 (1967) .............................................................24

*Wilson v. Arkansas*, 514 U.S. 927 (1995) .............................................................23

*Wyoming v. Houghton*, 526 U.S. 295 (1999) .........................................................23

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. CONST. AMEND. II ...............................................................................*passim*

U.S. CONST. AMEND. XIV .............................................................................*passim*

Statute of Northampton, 2 Edw. 3, c. 3 (1328) .......................................28

4 Hen. 4 c. 29 (1403) ...............................................................................28

26 Hen. 8, c. 6, § 3 (1534) .......................................................................28

An Act to Regulate the Election of Members of the
Legislative Council and General Assembly, Sheriffs
and Coroners, in This State § 12 (Feb. 22, 1797) Laws
of the State of New-Jersey 273, 276 (1821) .....................................28, 29

## OTHER AUTHORITIES

AKHIL REED AMAR, THE BILL OF RIGHTS:
CREATION AND RECONSTRUCTION (1998) ...................................... 16, 25, 26

K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine
of Incorporation*, 97 Ind. L.J. 1439 (2022)................................16, 25, 26

Mark W. Smith, *"Not all History is Created Equal":
In the Post-Bruen World, the Critical Period for
Historical Analogues is when the Second Amendment
was Ratified in 1791, and not 1868*, SSRN .........................................15

Mark Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harvard Journal of Law & Public Policy Per Curiam (Fall 2022) ........................15

## <u>INTEREST OF *AMICI CURIAE*[1]</u>

### New York State Sheriffs' Association

The New York State Sheriffs' Association is a not-for-profit corporation formed for the purpose of assisting sheriffs in the efficient and effective delivery of services to the public. It comprises all fifty-eight elected and appointed sheriffs of the State of New York. Since 1934, the Sheriffs' Association has helped New York's sheriffs to serve and protect the citizenry through member-supported training programs, accreditation, legislative advocacy, and public safety programs.

### National Association of Chiefs of Police

The mission of the National Association of Chiefs of Police, a non-profit organization founded in 1967, is to promote and support the law enforcement profession. Membership is limited to command staff officers, and it currently has over 7,000 members.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than amici, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

1

## Western States Sheriffs' Association

The Western States Sheriffs' Association was established in 1993, and consists of more than three hundred members from seventeen member states. Most of these states have "shall-issue" concealed carry permit systems and permitless carry, which WSSA members have observed in action.

## California State Sheriffs' Association

The California State Sheriffs' Association is a nonprofit professional organization that represents each of the fifty-eight California sheriffs. It was formed to allow the sharing of information and resources in order to improve law enforcement throughout the state.

## International Law Enforcement Educators and Trainers Association

The International Law Enforcement Educators and Trainers Association is an association of 4,000 professional law enforcement instructors committed to the reduction of law enforcement risk, and to saving lives of police officers and citizens through the provision of training enhancements for criminal justice practitioners.

## Law Enforcement Legal Defense Fund

Law Enforcement Legal Defense Fund is non-profit organization that

provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty.

The following are groups that promote the shooting sports, provide firearms safety training, educate the public about firearms, and defend Second Amendment rights, including the right of ordinary citizens to lawfully carry firearms for legitimate purposes such as self-defense: Connecticut Citizens Defense League, CRPA Foundation, Gun Owners' Action League Massachusetts, Gun Owners of California, Second Amendment Law Center, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, and Virginia Shooting Sports Association. These organizations have numerous members who are current or former law enforcement officers.

Thus, *amici* are all organizations with members who are law enforcement officers or that support law enforcement officers and agencies.

## INTRODUCTION

An unusual phenomenon is now occurring in Second Amendment litigation. It is widely accepted that in constitutional interpretation the object is to ascertain the original meaning or original public understanding of the constitutional text that is at issue. After *New York State Rifle & Pistol Association v. Bruen* was decided in 2022, it is understood that a key way of determining whether a present-day restriction on Second Amendment rights is constitutional is by looking at "historical analogues" from the Founding era. There can be some dispute as to exactly how close in time a particular purported analogue must be to the Founding period for it to be of value in interpreting the scope of the Second Amendment. And certainly, there are other ways to evaluate the usefulness of the proposed analogue, such as how widespread the law in question was, how long it endured, whether it was employed only against individuals or groups that were not considered part of the "people" or political community, and so forth.

But what has not been in question, until now, is the relevant time period for determining the original public understanding of a constitutional provision; namely, the Founding era, when the Constitution and Bill of Rights were adopted. Now that is being questioned, and the time period of the ratification of the Fourteenth Amendment in 1868 as part of the Reconstruction amendments is being proposed as

4

the relevant time period.  This brief demonstrates that the substitution of 1868 for 1791 is deeply mistaken.

After showing that the Supreme Court has universally looked to the Founding era for determining original meaning, and that there is no good reason to substitute 1868, this brief then shows that the process for determining whether purported historical analogues for "sensitive places" are valid is greatly eased by simply looking at the date of the proposed analogue.  Most of the proposed "sensitive places" analogues in the brief of the appellants fall by the wayside just by examining when the analogues were in effect.  That is shown in more detail in the second part of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court in *District of Columbia v. Heller* and *New York State Rifle & Pistol Association v. Bruen* have made it clear that the scope of the Second Amendment is determined in accordance with the scope it was understood to have when the people adopted it.  It was adopted in 1791. A number of briefs in this case, including Appellants' Opening Brief, suggest that 1868, the time of adoption of the Fourteenth Amendment, which applies the Second Amendment to the states, is the relevant period.  Several amicus briefs in support of appellants apparently take that position, and one amicus brief (filed by Everytown for Gun Safety) expressly

argues that 1868, not 1791, is the appropriate time for determining the Second Amendment's scope.

The case law from Courts of Appeals cited in the Everytown brief does not support that position.  The *Gould* decision from the First Circuit was abrogated by *Bruen*. The rest merely cite a plainly erroneous statement made by the Seventh Circuit in the *Ezell* decision. That error was promptly corrected by the Seventh Circuit in another case the following year.  The Everytown brief cites not a single Supreme Court case that has held that 1868 rather than 1791 is the proper time for determining original meaning, and thus for evaluating the relevance of purported historical analogues. Instead, that brief discusses an "ongoing scholarly debate" briefly mentioned in *Bruen* on that subject.

The Supreme Court has clearly held that the Constitution's meaning is fixed according to the understandings of those who ratified it, although that fixed meaning can be applied to circumstance the Founders did not foresee. Furthermore, the individual rights enumerated in the Bill of Rights have the same scope against the states as they do against the federal government.  Because that meaning was fixed in 1791, the scope did not change in 1868.  Accordingly, the Court has held that post-enactment history cannot contradict the original meaning, but can only be used to confirm it. Here, Appellants and their amici seek to contradict the original

6

meaning by offering analogues a century after the Founding by claiming that 1868, not 1791, is the relevant period.

The Supreme Court's universal practice when examining history to determine the meaning of incorporated provisions of the Bill of Rights has been to look to the understanding at the time of the Founding. Numerous Supreme Court cases cited in the present brief demonstrate this, and none have looked to post-Civil War history as the relevant period.

The "ongoing scholarly debate," which is not much of a debate, does not change this fact. To adopt the position advocated by the Everytown brief would overturn all of the Supreme Court's jurisprudence on incorporation. The Court is unlikely to do so. In any event, it has not done so and lower courts are bound by the decisions of the Supreme Court.

The purported analogues cited by the Appellants' Opening Brief in support of ostensible "sensitive places" are largely eliminated simply by looking at whether they are from the proper time period. The rest are of little or no importance because they have already been dealt with by *Bruen*, or are militia statutes that have no relevance to the constitutional right of citizens to carry arms outside of militia service.

**ARGUMENT**

**I. THE APPROPRIATE TIME PERIOD TO DETERMINE ORIGINAL PUBLIC UNDERSTANDING OF THE SECOND AMENDMENT IS 1791, WHEN THE BILL OF RIGHTS WAS ADOPTED.**

**A. Briefing in this case that suggests or advocates that the time to determine the original meaning of the Bill of Rights is when the 14th Amendment was ratified is seriously in error.**

The Supreme Court's decision in *New York State Rifle Association v. Bruen*, 142 S. Ct. 2111 (2022) made it clear that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Bruen*, 142 S.Ct. 2136 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008). The Second Amendment was adopted by the people in 1791, when they ratified the Bill of Rights. So it seems plain enough, since the Supreme Court has twice so held, that the scope of the Second Amendment is determined by the meaning it had in 1791. In determining its scope, laws from that time that are "historical analogues" to present day restrictions can be consulted to determine whether those present day laws are constitutional; that is, if the analogues showed that the conduct restricted by challenged laws was considered outside the scope of the Second Amendment during the Founding era. If, on the contrary, there were no analogues at the time of the Founding that is good evidence that the Founding generation considered the conduct protected, and modern laws infringing on such conduct may be

8

unconstitutional.

The test is purely historical. The *Bruen* Court firmly, categorically, and unequivocally rejected any form of "balancing test,"—such as strict scrutiny, intermediate scrutiny, or general interest balancing as proposed by Justice Breyer in his dissent in *Heller*. *Heller*, 554 U.S. at 681. The test is textual and historical only, and the relevant time period for determining the scope of the Second Amendment— like any other provision of the Bill of Rights—is 1791.

Yet throughout Appellants' Opening Brief (App. Open. Br.) there are multiple references to "1868," the "Reconstruction era," "the time the Fourteenth Amendment incorporated the Second Amendment against the States in 1868," and similar words and phrases. *See, e.g.*, App. Open. Br. 9, 21, 23, 35, 39, 41, 60, 65, 74, 76. Often these references are used in connection with a statement or implication that such a law passed or in existence after the Civil War can be used as a "historical analogue" to limit the original public understanding that very little conduct fell outside the scope of the Second Amendment's protection.

As shown in this amicus brief, it means no such thing. The time of determining original meaning or original public understanding of the Second Amendment is 1791, when that amendment was ratified by the people. The time of ratification of the Fourteenth Amendment—1868, during the Reconstruction

9

period—quite literally has nothing to do with the original public understanding of the Second Amendment and tells us nothing important about the tradition of firearms regulation in this country. That is true for several reasons, explored in Parts I.C. through I.F., below.

The amicus brief filed by Everytown for Gun Safety on this appeal explicitly argues that 1868, and not 1791, is the "most relevant" time period for the historical inquiry because "that is when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states." Brief of Everytown for Gun Safety, Doc. No. 193, at 7-8. Positing 1868 as the appropriate time period is advantageous to those who wish to limit Second Amendment rights[2] because it greatly expands

---

[2] Other amicus briefs in support of appellants also refer to the Reconstruction era as especially relevant in determining analogues. *See, e.g.*, Brief of Amici Curiae Giffords Law Center to Prevent Gun Violence, Brady, and March for Our Lives, Doc. No. 190, at 4, 17, 20 (claiming that Supreme Court in *Bruen* endorsed a test that was "in keeping with the 'balance struck by the founding generation *and later generations, including around the time of Reconstruction*'"; that public safety was a motivating reason for gun laws "before and at the founding, *during Reconstruction*, and into the modern era"; and that "governments at the founding and *during Reconstruction* sought to protect their citizens" by enacting restrictive gun laws); Brief for Amicus Curiae City of New York, Doc. No. 233, at 15-16 (arguing that certain "*Reconstruction-era* local laws serve as compelling proof that sensitive-place restrictions are consistent with the *contemporaneous understanding* of the Second Amendment"); Brief of Amicus Curiae Greater New York Hospital Association, Doc. No. 149, at 8 (arguing that modern hospitals are fundamentally different from hospitals "in the Founding and *Reconstruction Eras*"); Brief of Amici Curiae District Attorneys for New York County, Kings County, and Queens

the time window for historical analogues, to include not only the period immediately surrounding 1791, but also periods up to 1868 and (they argue) at least some decades past 1868.[3] It also gives weight to later 19th century analogues that they would otherwise not have, by claiming that 1868 rather than 1791 is the central time to determine original meaning.

The problem is that the Supreme Court did not hold in *Bruen* that 1868 is the proper year for determining original public understanding; it merely noted the existence of an "ongoing scholarly debate" on this subject. As shown below in this brief, the Court has never once used 1868 as the central period to determine original meaning of the Second Amendment or any of the first eight amendments in the Bill of Rights. *See* Part I.F., below.

An examination of the case law that the Everytown brief relies on to posit that 1868 is the proper year reveals that claim to be baseless. *See* Part I.B., below. Such a claim is completely illogical and barred by other principles that are firmly established in the Supreme Court's Bill of Rights jurisprudence. Parts I.C., I.D., and

---

County, Doc. No. 184, at 10 (stating that places where people congregate today may be different from "where they tended to congregate in 1328, or 1791, *or 1868*.") (emphasis added in all quotes).

[3] The historical inquiry "should focus on the period around 1868, not 1791. Moreover, 1868 is not a cutoff…." Everytown Br. at 14.

I.E., below. Most conclusively, it is contrary to the Court's universal practice of looking at the time of the Founding, not the Reconstruction period, to determine the meaning of the substantive provisions of the Bill of Rights, including the Second Amendment. Part I.F., below.

**B. The case law and quotations relied on to establish 1868 as the pertinent year are illusory.**

The Everytown brief contends that if this court conducts a historical inquiry "it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states." Everytown Br. 7-8. It argues that several courts of appeals have reached this conclusion, quoting the First Circuit to the effect that "[b]ecause the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)." That quotation is supported by the following citation in the Everytown brief: "*Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases),[4] criticized by *Bruen*, 142 S. Ct. at 2124, 2126-27." Everytown Br. at 8. But *Gould* was a pre-*Bruen* case from Massachusetts, and involved a *discretionary* carry licensing system of the kind struck down in *Bruen*. It was one of the six states whose licensing schemes were

---

[4] *See* below for the single case cited by *Gould* (the *Greeno* case) for this proposition.

12

expressly condemned in *Bruen. Bruen*, 142 U.S. at 2124. It also explicitly adopted the two-step interest balancing scheme rejected by *Bruen. Gould*, 907 F.3d at 668-69. Furthermore, *Gould* held that "the core Second Amendment right is limited to self-defense in the home," *id*. at 671, another holding contrary to *Bruen. Gould* was not "criticized by" *Bruen*. It was abrogated by *Bruen* and is no longer good law, if it ever was.

The next case relied on by the Everytown brief is *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). The brief quotes *Ezell* to the effect that "*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified." *Ezell* does contain that quote, but the Everytown brief omits the Seventh Circuit's citation to *McDonald*, which was "*McDonald*, 130 S.Ct. at 3038–47." There is a fatal problem with that citation. In that nine-page range, there is no statement that the time of ratification of the Fourteenth Amendment is the relevant time period for determining the scope of the Second Amendment. Neither *Ezell* nor the Everytown brief offers a quote from *McDonald* allegedly establishing that proposition, nor a cite to a specific page within that page range on which such a statement appears. Instead, Justice Alito's *McDonald* opinion in the page range 3038-47 merely

13

examines history during that time period to determine whether the Second Amendment should be held to be incorporated. It does not say that 1868 is the principal time period for determining the meaning or scope of the Second Amendment.

The Seventh Circuit simply made a mistake in *Ezell.* It corrected that mistake the next year in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). There, the Seventh Circuit held that "1791, the year the Second Amendment was ratified" was "the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago, supra*, 130 S.Ct. at 3035 and n. 14."

The Everytown brief next cites *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)[5] as "following *Ezell,*" and *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021), quoting language that "[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." But as one scholar has noted:

> *Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating its accuracy.… The *Drummond* case did not hold that 1868 is the proper date. It merely stated, without any elaboration or citation of authority, that "[f]or the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where

---

[5] As noted above, the description of *Gould* by Everytown as "citing cases" for the proposition that 1868 is the key year really only cites one case: *Greeno*.

firearms practice was otherwise permitted." It then cited authorities from 1825, 1885, and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the Fourteenth Amendment may have understood the right's scope to be in 1868 (citations omitted). [6]

Thus, the Everytown brief chiefly relies on *Gould*, which relied only on *Greeno*, which relied only on the mistake (promptly corrected by the Seventh Circuit) in *Ezell*. This line of cases in the Courts of Appeals proves nothing.

What does the Everytown brief *not* cite for the proposition that the 1868 time of ratification is or ought to be controlling? It does not cite a single Supreme Court case, throughout our nation's history, that has ever held that 1868 is the principal relevant time period for determining the original public understanding of the Second Amendment or of any of the first eight provisions of the Bill of Rights. That is because when history is consulted by the Supreme Court to determine the original meaning of a provision of the Bill of Rights it has always looked to the Founding era as the principal focus for that inquiry. *See* Part I.F., below. It has never considered 1868 to be the uniquely relevant time period.

---

[6] Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, at 32, SSRN, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297. *See also* Mark Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harvard Journal of Law & Public Policy Per Curiam (Fall 2022) https://www.harvard-jlpp.com/wp-content/uploads/sites/21/2022/12/Smith-1791-vF1.pdf.

That brief does mention *Bruen,* but tries to transmute a passing remark made by Justice Thomas, the author of the *Bruen* opinion, into a holding that 1868 is the key year for determining meaning, which neither *Bruen* nor any other Supreme Court opinion has ever held.

*Bruen* merely noted the unexceptionable principle that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second….[citation omitted] Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [multiple citations omitted] And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. [citing three Court cases from the past twenty years holding that 1791 is the proper period for determining public understanding of the First, Fourth, and Sixth Amendments].

Justice Thomas's opinion then continued:

> We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation [now published at 97 Ind. L.J. 1439 (2022)] ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). We need not address this issue today because, as we explain below, the public understanding of the right to

16

keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

*Bruen*, 142 S.Ct. at 2138.

Several things are worth noting in this passage. First, though characterized as an "assumption," the test actually applied by the *Bruen* court, and in numerous cases cited by *Bruen*, was 1791, not 1868. Second, the acknowledgement of an "ongoing scholarly debate" does not imply that the Court has changed or will change the historical period it will look at for determining original public understanding, through "historical analogues" or other means.[7] Third, adoption of 1868 as the historical period to determine original meaning would contravene the entire course of Supreme Court incorporation jurisprudence, and would require that that all Bill of Rights cases, whether based on incorporation against the states or directly against the federal government, be revisited. Fourth, *Bruen* states that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Bruen*, 142 S.Ct. at 2138. If that is the case, there is no reason to settle on 1868 as the dispositive year (and every reason not to) other than to greatly extend the time period for allegedly relevant historical analogues.

_____

[7] It is also not much of a debate, as shown below.

### C. The Constitution's meaning is fixed according to the understandings of the Founders.

*Bruen* expressly held that the Constitution's "meaning is fixed according to the understandings of those who ratified it," although "the Constitution can, and must, apply to circumstances beyond those *the Founders* specifically anticipated." *Bruen*, 142 S.Ct. 2132 (citing *United States v. Jones*, 565 U.S. 400, 404–405 (2012), a Fourth Amendment case that held that installation of a tracking device "would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added) *Heller* also specifically determined that the Founding was the relevant time for ascertaining original public understanding, noting that the "Constitution was written to be understood by the voters," and that "Normal meaning … excludes secret or technical meanings that would not have been known to ordinary citizens *in the founding generation*." *Heller*, 554 U.S. at 576-77 (emphasis added). So, the Constitution, including the Bill of Rights and Second Amendment, had an ascertainable, fixed meaning at the time it was adopted, which is the time of the Founding.

### D. Each provision of the Bill of Rights means the same thing when applied against the states through the Fourteenth Amendment as it does when applied against the federal government.

*Bruen* itself made it clear that "individual rights enumerated in the Bill of

18

Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S.Ct. at 2137. The Second Amendment therefore cannot have one meaning when applied against the federal government and a different meaning when incorporated against the states. That principle was conclusively established in the 1960s in *Malloy v. Hogan*, 378 U.S. 1 (1964) after extended debate among the members of the Court over a period of years. It has been adhered to by the Court ever since. *McDonald* reviewed the debate on this issue, and concluded that *Malloy* "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *McDonald*, 561 U.S. at 765-66 (citing cases).

If the Second Amendment meant something in 1791 regarding the restraints placed on the federal government, as it surely did, then the principle just described means that it meant the identical thing when applied to restrain the states in 1868 and thereafter. And that meaning was fixed in 1791, as seen above. Thus, no amount of "historical analogues" in later times can change the 1791 meaning, and whatever the ratifiers of the Fourteenth Amendment may have understood about the meaning of the Second Amendment in 1868 cannot change the 1791 meaning,

19

either.

**E. *Bruen* and *Heller* both held that history from around the time of the Civil War or later cannot be used to contradict the original understanding from 1791, but can only be used to confirm that understanding.**

Although both *Heller* and *Bruen* examined a small amount of evidence from the mid- to late-nineteenth century, they clearly did so only to confirm the original understanding from the time of the ratification of the Second Amendment in 1791. *Bruen* relied on *Gamble v. United States*, 139 S.Ct. 1960 (2019) to make that point concisely. The *Bruen* opinion noted that "we made clear in *Gamble* that *Heller's* interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence 'only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions.'" *Bruen,* 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975–76). Any evidence from the mid- to late-nineteenth century was treated as "mere confirmation of what the Court thought had already been established." *Id.*

Furthermore, both *Heller* and *Bruen* noted that little weight should be given such evidence under any circumstances. *Bruen* expressly cautioned "against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S.Ct. at 2136. *Bruen* also quoted *Heller* regarding post-Civil War discussions of the right to

20

keep and bear arms, observing that because they "took place 75 years after the *ratification of the Second Amendment*, they do not provide as much insight into its original meaning as earlier sources." *Bruen*, 142 S.Ct. at 2137 (emphasis added). If 1868 were the proper period, then such evidence would be the most relevant of all; but both *Heller* and *Bruen* viewed the "ratification of the Second Amendment" as the proper period for determining original meaning. In fact, the Court in *Bruen* refused even to consider "any of the 20th-century historical evidence brought to bear by respondents or their amici." *Bruen*, 142 S.Ct. at 2154 n.28. The Court's reason was straightforward: "As with their late-19th-century evidence, the 20th century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.*

Of course, the reason that New York and its amici offer evidence or historical analogues from the late nineteenth century and twentieth century is precisely because it contradicts earlier evidence. Prohibitions on carrying weapons at the time of the Founding were nearly non-existent, except potentially a few laws prohibiting carry in "legislative assemblies, polling places, and courthouses." *Bruen*, 142 S.Ct. at 2133. That was the historical tradition: virtually no restrictions on the places where a citizen could carry. As time went on, restrictions on carry, though still few,

accumulated. New York would like this court to consider those later regulations, often from roughly a century or more after the Founding, as determinative of the original public understanding of the Second Amendment when, in fact, they contradict that original understanding. The court should decline that invitation.

**F. The position that 1868 is the proper year is contrary to the Supreme Court's prior holdings and will not be adopted by it.**

**1. The Supreme Court's universal practice has been to look at the Founding era, not 1868, to determine the original understanding of the Bill of Rights.**

As noted, New York and its amici have not cited a single Supreme Court case in which the Court looked to 1868 or the Reconstruction period as the principal time period to ascertain the original meaning of the provisions of the Bill of Rights. Of course, the Court does not always need to consult history to determine the outcome of a case involving an incorporated provision of the Bill of Rights. But when it has employed history, the Court has always considered the Founding period, or very shortly before or thereafter, to be the principal or exclusive period to examine. Following is a partial list of such cases using history from the Founding:[8]

**First Amendment**

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1894–912 (2021) (Free

---

[8] This list is based in part on the list contained in Smith, *Attention Originalists*, *supra* n.6, at 7 n.35.

Exercise Clause) (concurrence by Justices Alito, Thomas, and Gorsuch); *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 182–84 (2012) (Establishment Clause and Free Exercise Clause); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (freedom of speech); *Lynch v. Donnelly*, 465 U.S. 668, 673–74 (1984) (Establishment Clause); *Near v. Minnesota*, 283 U.S. 697, 713–17 (1931) (freedom of the press); *Reynolds v. United States*, 98 U.S. 145, 163 (1878) (Free Exercise Clause).

**Second Amendment**

*New York State Rifle Association v. Bruen*, 142 S. Ct. 2111, 2136 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008).

**Fourth Amendment**

*Virginia v. Moore*, 553 U.S. 164, 168–169 (2008); *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999); *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

**Fifth Amendment**

*Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019) (Double Jeopardy Clause); *Benton v. Maryland*, 395 U.S. 784, 795–96 (1969) (Double Jeopardy Clause).

**Sixth Amendment**

*Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–96 (2020) (Jury Trial Clause);

23

*Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Duncan v. Louisiana*, 391 U.S. 145, 151–54 (1968) (right to jury trial in state cases); *Klopfer v. North Carolina*, 386 U.S. 213, 223–25 (1967) (right to speedy trial); *Washington v. Texas*, 388 U.S. 14, 20, 23 (1967) (Compulsory Process Clause); *In re Oliver*, 333 U.S. 257, 266–268 (1948) (right to public trial); *Powell v. Alabama*, 287 U.S. 45, 60–67 (1932) (Right to Counsel Clause).

**Eighth Amendment**

*Timbs v. Indiana*, 139 S. Ct. 682, 687–99 (2019) (Excessive Fines Clause).

Justice Thomas's statement in *Bruen* that the Court has "generally *assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," is thus too modest. *Bruen*, 142 S.Ct. at 2137. The cases listed above demonstrate that, when the Court looks at history, the period around 1791 has been the central, often only, time period that it has examined to determine original public understanding of the Bill of Rights.

## 2. The Supreme Court will not overturn its fundamental incorporation jurisprudence to focus on 1868 rather than the Founding.

The "ongoing scholarly debate" referenced by the *Bruen* opinion has not turned out to be much of a debate. The Court cites only two books or articles on the

subject, Prof. Akhil Reed Amar's 1998 book on the Bill of Rights,[9] and a recent law review article by Prof. Kurt Lash.[10] The most relevant of these is the article by Lash. According to Westlaw at the time this is written, there have been ten citations to Lash's article. Nine were in briefs filed by Everytown, and one was in a law journal article.

Amar's book does not argue that 1868 is the central or exclusive time focus for determining the original meaning or public understanding of the Bill of Rights. His approach is more subtle, arguing that "a particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment." Amar at xiv. With regard to the Second Amendment, Amar argues that the words of that Amendment "take on a different coloration and nuance when they are relabeled 'privileges or immunities of citizens' rather than 'the right of the people,'" and that "the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789." Amar at 223. Thus, "when we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the

---

[9] AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998).

[10] K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022). Justice Thomas cited to the version of the article as it existed then on SSRN.

Bill of 1789." *Id.* He stopped short of contending that in determining original public understanding of the Bill of Rights, the time of the Fourteenth Amendment should prevail over and replace the time of the Founding.

Lash takes the forthright position that the relevant time period for determining meaning is 1868, not 1791. He claims that when the Fourteenth Amendment was ratified, the people "respoke" the provisions of the Bill of Rights and "invested those original 1791 texts with new 1868 meanings." Lash at 1441. He calls this "reverse incorporation,"[11] and contends that his version of "reverse incorporation" would turn that "proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights." Lash at 1442. This is essentially the position advocated by the Everytown brief.

Recall that the provisions of the Constitution have one meaning, fixed at the time of the Founding. For the Bill of Rights, that meaning cannot apply differently to the federal government and the states. A special rule regarding which time period to use cannot be employed for the Second Amendment, because as the Supreme Court has said, that amendment is not a "second class right." *McDonald*,

---

[11] That is the term sometimes used for the approach taken in *Bolling v. Sharpe*, 347 U.S. 497 (1954), in which the equal protection clause of the Fourteenth Amendment was "read back" into the Fifth Amendment's due process clause.

561 U.S. at 780. That means that the Supreme Court's entire incorporation jurisprudence would have to be overturned for *all* provisions of the Bill of Rights, and *all* decisions regarding the original meaning of those provisions would have to be revisited, with an allegedly different understanding from 1868 substituted for the original understanding of 1791.

Needless to say, that is unlikely to happen. In any event, it has not happened, and lower courts are bound by the decisions of the Supreme Court. Accordingly, talk about substituting an 1868 understanding for the original understanding of 1791 should be dismissed.

## II. WHEN HISTORICAL ANALOGUES ARE LIMITED TO THE TIME OF THE FOUNDING, NEW YORK HAS PRESENTED ALMOST NOTHING TO JUSTIFY ITS EXTENSIVE RESTRICTIONS ON CARRYING IN "SENSITIVE PLACES."

Because the time of the Founding, or perhaps shortly before or thereafter, is the legally relevant time period for examining historical analogues, the analysis of the purported analogues offered by New York for locations that it now dubs "sensitive places" is greatly simplified.

New York in its brief identifies dozens of alleged analogues in the portion of its brief that discusses "sensitive places." App. Open. Br. at 53-68. However, it turns out that very few of these are from the relevant time period. A few are too

27

early. Most are too late, since they are from the Civil War period or later.

The first three purported analogues offered by appellants are far too early, and have little or nothing to do with the actual tradition of firearms regulation in the colonies or early republic. App. Open. Br. at 54-55. The first is the Statute of Northampton, 2 Edw. 3, c. 3 (1328). Any reliance on that statute as an analogue was refuted at length by the Supreme Court in *Bruen* on several grounds, including the fact that it is too far distant in time and place. *Bruen,* 142 S.Ct. at 2139-42. The other two early purported analogues are 4 Hen. 4 c. 29 (1403) and 26 Hen. 8, c. 6, § 3 (1534), which are also too early to have any relevance to firearms regulation in the colonies or early republic.

Of the remaining statutes cited to support the declaration that most of New York is a "sensitive place," only seven fall within the relevant time frame. A 1786 Virginia version of the Statute of Northampton is cited in appellants' brief at 7. But the Statute of Northampton has been dealt with already, and Virginia's statute expressly required as an element of the offense that a person go armed "in terror of the county," which is not the same thing as peaceably possessing a concealed handgun. *See* App. Open. Br. at 55 (citing JA 670). Three more within the relevant time frame were a 1776 Delaware constitutional provision (JA 622), a statute from New York in 1787 (JA 623-24), and a New Jersey law from 1797, entitled An Act

28

to Regulate the Election of Members of the Legislative Council and General Assembly, Sheriffs and Coroners, in This State § 12 (Feb. 22, 1797), Laws of the State of New-Jersey 273, 276 (1821) App. Open. Br. at 55. All of them related to violence, intimidation, or weapons at election polling places. This breaks no new ground, as the Supreme Court in *Bruen* has already stated that it is "aware of no disputes regarding the lawfulness of such prohibitions" at polling places. *Bruen*, 142 S.Ct. at 2133.

There are three remaining statutes cited by appellants as historical analogues for its bans in a multitude of "sensitive places" that, for purposes of argument, we will assume fall within the relevant time frame. These are militia statutes from Massachusetts in 1837, Maine in 1837, and Rhode Island in 1843. App. Open. Br. at 60 (citing JA 636, 641, and 644). All of them prevent certain individuals from serving in the state militia. For example, Rhode Island excepted "idiots, lunatics, common drunkards, paupers, vagabonds and persons convicted of any infamous crime" from serving. JA 644. These laws did not prohibit the public generally from carrying concealed weapons in locations open to the public, and form no basis for a purported analogue to New York's CCIA.

## **CONCLUSION**

The decision of the District Court should be affirmed.

29

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
    Counsel of Record
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
(703) 352-7276
dan@danpetersonlaw.com
*Counsel for Amici Curiae*

C.D. Michel
    Of Counsel
Michel & Associates, P.C.
180 East Ocean Boulevard, Suite 200
Long Beach, California 90802
(562) 216-4444
cmichel@michellawyers.com

Dated: February 8, 2023

30

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Local Rule 32.1(a)(4). According to the word count feature of the word-processing system used to prepare the brief, it contains 6,704 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

Date: February 8, 2023

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2023, an electronic PDF of the foregoing Brief of *Amici Curiae* Law Enforcement Groups and Firearms Rights Groups. was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Dan M. Peterson
Dan M. Peterson