# 22-2908(L)

## 22-2972(Con)

## United States Court of Appeals
## for the Second Circuit

---

IVAN ANTONYUK,

*Plaintiffs-Appellees*,

v.

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of
the New York State Police,

*Defendants-Appellants.*

---

(*Caption continues inside front cover.*)

---

On Appeal from the United States District Court
for the Northern District of New York

---

## REPLY BRIEF FOR APPELLANTS
## STEVEN A. NIGRELLI AND MATTHEW A. DORAN

---

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
PHILIP J. LEVITZ
ALEXANDRIA TWINEM
 *Assistant Solicitors General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: February 21, 2023

*(Caption continues from front cover.)*

COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN,
LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

v.

MATTHEW J. DORAN, in his Official Capacity as the Licensing Official of Onondaga
County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants,*

KATHLEEN HOCHUL, in her Official Capacity as the Governor of the State of New York,
WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District
Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga
County, P. DAVID SOARES, in his Official Capacity as the District Attorney of Albany
County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego
County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County,
JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT ....................................................................................... 4

POINT I

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
CHALLENGES TO NEW YORK'S FIREARM-LICENSING PROVISIONS ............ 4

    A.   Plaintiffs Lack Standing to Challenge the Licensing
        Requirements. ........................................................... 4

    B.   The Licensing Requirements Do Not Implicate the
        Second Amendment's Text. ...................................... 6

    C.   The Licensing Requirements Are Consistent with the
        Historical Tradition of Firearm Regulation. .......... 10

POINT II

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
CHALLENGES TO NEW YORK'S SENSITIVE-PLACE PROVISIONS .............. 20

    A.   Plaintiffs Lack Standing to Challenge Several of the
        Sensitive-Place Provisions. ..................................... 20

    B.   The Sensitive-Place Provisions Are Presumptively
        Constitutional. ........................................................ 22

    C.   The Sensitive-Place Provisions Are Consistent with the
        Historical Tradition of Firearm Regulation. .......... 24

**Page**

POINT III

PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
CHALLENGES TO NEW YORK'S PRIVATE-PROPERTY PROVISION ............. 33

    A.    Plaintiffs Are Unlikely to Succeed on Their Second
    Amendment Challenge to the Private-Property Provision. ... 33

        1.    Plaintiffs lack standing to challenge the private-
        property provision on Second Amendment grounds. ...... 33

        2.    The Second Amendment does not bestow a right
        to carry firearms onto others' private property
        absent consent. .............................................................. 34

        3.    The private-property provision is consistent with
        the historical tradition of firearm regulation ................. 36

    B.    The Private-Property Provision Does Not Compel
    Speech in Violation of the First Amendment. ........................ 38

POINT IV

THE DISTRICT COURT ERRED IN APPLYING THE REMAINING
PRELIMINARY-INJUNCTION FACTORS .................................................... 40

CONCLUSION ..................................................................................... 45

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs.*,
17 F.4th 793 (8th Cir. 2021) ............................................................... 43

*Bach v. Pataki*,
408 F.3d 75 (2d Cir. 2005) ...................................................................... 6

*Calcano v. Swarovski N. Am. Ltd.*,
36 F.4th 68 (2d Cir. 2022)..................................................................... 22

*Cayuga Nation v. Tanner*,
824 F.3d 321 (2d Cir. 2016) ................................................................. 21

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021)........................................................................... 35

*Christian v. Nigrelli*,
No. 22-cv-695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ........... 35

*Community Hous. Improvement Program v. City of New York*,
No. 20-3366, 2023 WL 1769666 (2d Cir. Feb. 6, 2023) ................. 9, 32

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................ 22, 24, 27

*Eastman Kodak Co. v. STWB, Inc.*,
452 F.3d 215 (2d Cir. 2006) ................................................................. 12

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012).......................................................... 35

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021).................................................................. 44

*Kanter v. Barr*,
919 F.3d 447 (7th Cir. 2019).............................................................. 11

*Koons v. Reynolds*,
No. 22-cv-7464, 2023 WL 128882 (D.N.J. Jan. 9, 2023) ................... 34

iii

**Cases**                                                                          **Page(s)**

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................ 19

*Libertarian Party of Erie County v. Cuomo*,
    970 F.3d 106 (2d Cir. 2020) ............................................. 5-6

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    141 S. Ct. 2038 (2021) ...................................................... 16

*Matter of Kamenshchik v. Ryder*,
    Index No. 612719/2022 (Sup. Ct. Nassau County Jan. 31, 2023) ........ 8

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .................................................... 17, 22

*New Hope Fam. Servs., Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020) .......................................... 38-39

*New York ex rel. Schneiderman v. Actavis plc*,
    787 F.3d 638 (2d Cir. 2015) ............................................. 41

*New York State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .................................... 20, 40, 42

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................. passim

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020) ...................................................... 16

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
    547 U.S. 47 (2006) ............................................................. 39

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ............................................................... 24

*Simon v. Eastern Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ............................................................. 34

| Cases | Page(s) |
|---|---|

*Timbs v. Indiana,*
139 S. Ct. 682 (2019) ............................................................ 16

*United States v. Class,*
930 F.3d 460 (D.C. Cir. 2019) ............................................. 28

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) ................................................ 19

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) ................................................................ 9

**Laws**

*Federal*

18 U.S.C. § 922 ......................................................................... 42

*New York*

Criminal Procedure Law § 530.14 ......................................... 42

Penal Law
§ 265.01-e ......................................................................... 21, 23, 33
§ 400.00 ................................................................. 7, 11, 17, 19, 42

*Other States*

Act No. 702, 7 *Statutes at Large of South Carolina* 417-19
(D.J. McCord ed., 1840) ...................................................... 30

**Miscellaneous Authorities**

A3005/S4005, 246th Sess. (2023) ........................................... 33

Akhil Reed Amar, *The Bill of Rights: Creation
and Reconstruction* (1998) ................................................. 15

## Miscellaneous Authorities    Page(s)

Assembly Sponsor's Mem. A41001 (2022),
https://nyassembly.gov/leg/?default_fld=&leg_video=
&bn=A41001&term=2021&Memo=Y .............................................. 7, 42

Brief of *Amicus Curiae* Patrick J. Charles in Supp. of Neither
Party, Appendix, *New York State Rifle & Pistol Association v.
Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843),
https://patrickjcharlesnysrpavbruenamicusbrief.wordpress.com/ ...... 14

Dan M. Peterson & Stephen P. Halbrook, *A Revolution in
Second Amendment Law*, 29 Del. Law. 12 (2011) ............................. 25

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of
Incorporation*, 97 Ind. L.J. 1439 (2022) ............................................ 16

Onondaga County Sheriff's Off., *Pistol License Appointment*,
https://sheriff.ongov.net/pistol-license-unit/appointment/ .................. 6

Patrick J. Charles, *The Fugazi Second Amendment* (2022)
(forthcoming Clev. St. L. Rev.),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490 ......... 15

Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia
and the Carolinas* (2001) ................................................................... 30

Senate Sponsor's Mem. S51001 (2022),
https://www.nysenate.gov/legislation/bills/2021/s51001 ............... 7, 42

United States Census Off., Dep't of the Interior, *Statistics
of the Population of the United States at the Tenth Census
(June 1, 1880)* (1881), https://www2.census.gov/library/
publications/decennial/1880/vol-01-population/1880_v1-07.pdf ........ 26

Violence Pol'y Ctr., *Concealed Carry Killers*,
https://concealedcarrykillers.org/ ...................................................... 43

## PRELIMINARY STATEMENT

Contrary to plaintiffs' view, the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), did not abrogate the ability of States to regulate firearms to protect public safety. Instead, *Bruen* recognized that a wide range of measures pertaining to firearms licensing and possession are consistent with the Second Amendment. Nor did *Bruen* hold, as plaintiffs urge, that modern gun regulations are lawful only if supported by historical twins that were the law of every State at the time of the founding and were also somehow devoid of the legally codified prejudices of the time. Plaintiffs urge this Court to interpret *Bruen* as creating a constitutional standard that nearly no gun regulation could ever survive. It is plaintiffs, and not the State, that fundamentally misconstrue *Bruen*, the history of gun regulation, and the relationship between the Second Amendment and a State's police powers.

Plaintiffs' circular efforts to defend the district court's preliminary injunction are meritless. First, plaintiffs repeatedly mischaracterize New York's longstanding good-moral-character requirement for a firearm license as an invention of the Concealed Carry Improvement Act (CCIA). To the

contrary, the good-moral-character requirement has been a feature of New York's licensing laws for over 100 years. The CCIA merely codified a definition of the term and added several related disclosure requirements. While plaintiffs disagree with the policy judgments embodied in New York's licensing scheme, they lack standing to challenge the licensing requirements as five of the six plaintiffs already have a firearms license and the sixth has never applied for a license. Plaintiffs cannot overcome Article III through a rote invocation of futility based on an individual's unilateral decision not to submit the required application materials. In any event, plaintiffs' challenge to the licensing requirements is premised on a basic misconception that they must show "virtue" beyond being law-abiding and responsible in order to receive a license. The statute includes no such requirement.

Second, plaintiffs defend their standing to challenge various sensitive-place restrictions based on the same speculative reasoning erroneously used by the district court. Once again, plaintiffs' challenge amounts to a policy disagreement with the Legislature's designation of certain places as sensitive and not to a justiciable case or controversy. In addition, plaintiffs do not even attempt to overcome the presumption of legality

2

attendant to sensitive-place restrictions. And plaintiffs' insistence that the State failed to support the enjoined sensitive-place restrictions with historical evidence is premised on their own unreasonable, cramped, and dangerous reading of *Bruen* and the historical record.

Third, plaintiffs' complaint about the CCIA's default rule for the presence of firearms on private property again represents their distaste for the policy judgment made by the Legislature, and not a justiciable constitutional claim. Plaintiffs do not have standing to bring a Second Amendment challenge to the private-property provision, because—as plaintiffs do not dispute—an injunction against the state defendants cannot vindicate plaintiffs' asserted desire to carry firearms onto others' private property when property owners, not defendants, decide whether to allow firearms on their property. Moreover, plaintiffs fail to meaning-fully contend with the long history of laws analogous to the private-property provision. Nor do plaintiffs explain how a provision that merely *permits* property owners to say they are allowing firearms unconstitu-tionally *compels* speech in violation of the First Amendment.

Finally, plaintiffs wholly fail to show how any inconvenience from their refraining from carrying firearms in select locations while the litiga-

3

tion is pending outweighs the confusion and harm to public safety of the district court's *statewide* injunction of enforcement of already-effective public-safety legislation that the Legislature deemed critical. Indeed, plaintiffs do not dispute that, at minimum, any preliminary injunction should have been limited to plaintiffs.

## ARGUMENT

## POINT I

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S FIREARM-LICENSING PROVISIONS

#### A.  Plaintiffs Lack Standing to Challenge the Licensing Requirements.

The State showed in its opening brief (at 26-27) that plaintiffs lack standing to challenge the CCIA's licensing requirements at issue in this appeal—namely, the good-moral-character requirement for obtaining a license, as well as the related requirements to identify spouses, adult cohabitants, and recent social-media accounts, and to provide other reasonably related information upon request of a licensing official.

Plaintiffs fail to rebut either of the independent grounds for lack of standing. First, plaintiff Lawrence Sloane—the only plaintiff who does not already have a license to carry—has not even applied for such a license,

4

and it is settled law that a person who has "'failed to apply for a gun license in New York . . . lacks standing to challenge the licensing laws.'" *See Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 121-22 (2d Cir. 2020), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Second, plaintiff Sloane attests that he is a law-abiding and responsible citizen, and he thus would be granted a license if he simply completed the application process. See Br. for Appellants Steven A. Nigrelli & Matthew A. Doran ("State Br.") 27.

Although plaintiffs argue that Sloane cannot apply for a license because of a purported delay in processing firearm applications by a local licensing officer, plaintiffs acknowledge that licensing appointments are available for later this year. Pls.-Appellees' Answering Br. in Resp. to Defs.-Appellants Nigrelli & Doran (Br.) 6. And plaintiffs do not dispute that any alleged injury based on a local officer's processing delay is not traceable to the challenged provisions of the CCIA, or to any state defendant. It is defendant Eugene Conway, an Onondaga County official, who

said that he did not have a licensing appointment available until October 2023.[1] Conway Answer ¶ 10 (Oct. 11, 2022), Dist. Ct. ECF 35.

While plaintiffs further contend (Br. 6-7) that Sloane's application is futile because he refuses to provide some of the required application information, plaintiffs have no response to the State's explanation that a plaintiff cannot manufacture standing by refusing to "submit to the challenged policy." *Libertarian Party*, 970 F.3d at 121 (quotation marks omitted). The cases on which plaintiffs rely (Br. 7-8) are inapposite, because plaintiffs do not contend that Sloane is "statutorily ineligible" for a license, *e.g.*, *Bach v. Pataki*, 408 F.3d 75, 83 (2d Cir. 2005).

## B.     The Licensing Requirements Do Not Implicate the Second Amendment's Text.

The State also showed in its opening brief (at 28-33) that the challenged licensing provisions do not implicate the Second Amendment's text, because they do not limit firearm access for the law-abiding, respon-

---

[1] In any event, it appears that Onondaga County has since opened additional licensing appointments. As of February 21, 2023, there were appointments available later in February, in March, and in May. *See* Onondaga County Sheriff's Off., *Pistol License Appointment*. (For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on February 21, 2023.)

sible citizens who are the "people" referenced in the text of the Second Amendment. Accordingly, the CCIA's licensing regime requires no historical defense to pass constitutional muster.

Plaintiffs' contention that the CCIA's licensing provisions implicate the Second Amendment rests on a fundamental misunderstanding of New York's law. Plaintiffs assume (Br. 14) that the CCIA permits licensing officers to deny licenses to "typical, law-abiding persons." But, on the contrary, the statutory definition of good moral character permits officers to deny licenses only if applicants are unable "to be entrusted with a weapon and use it only in a manner that does not endanger oneself or others," Penal Law § 400.00(1)(b), i.e., only if applicants are *not* "typical, law-abiding persons." The undisputed legislative history is likewise clear that anyone satisfying the CCIA's requirements, i.e., anyone who is law-abiding and responsible, "will receive their license," *see* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022).

Plaintiffs misread (Br. 23-24) *Bruen* in suggesting that the Supreme Court already rejected a statutory standard that denies licenses to those "'lacking the essential character o[r] temperament necessary to be entrusted with a weapon.'" On the contrary, the Supreme Court *endorsed*

7

that standard as a valid "shall issue"-like regime "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *See Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9. The CCIA's licensing regime serves the same lawful purpose.

Plaintiffs are also mistaken in maintaining (Br. 15, 39-41) that the State's defense of the CCIA's licensing requirements would justify licensing requirements such as DNA swabs and blood samples. The possibility of constitutional challenges to plaintiffs' list of imagined requirements provides no justification for enjoining the far less burdensome requirements at issue in this case.[2]

Finally, plaintiffs come nowhere close to satisfying the demanding standard for facial constitutional challenges to state statutes. As this Court recently reiterated, the governing standard for facial challenges requires a plaintiff to "'establish[] that no set of circumstances exists under which

---

[2] Plaintiffs' assertions (Br. 14, 40 & n.30) that Nassau County has requested that license applicants provide a urine sample and access to private social-media accounts are no help to them, because the very source plaintiffs cite underscores that any such requests were pursuant to "local requirements" established by the county police commissioner—not the CCIA. *See* Decision & Order at 2, *Matter of Kamenshchik v. Ryder*, Index No. 612719/2022 (Sup. Ct. Nassau County Jan. 31, 2023), NYSCEF No. 23.

the [challenged] Act would be valid.'"[3] *Community Hous. Improvement Program v. City of New York*, No. 20-3366, 2023 WL 1769666, at *5 (2d Cir. Feb. 6, 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This rigorous standard makes good sense because facial challenges like plaintiffs' "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008).

A facial challenge to the CCIA's actual licensing requirements cannot succeed. As the district court acknowledged (S.A. 103, 115-116)—and plaintiffs do not dispute—there are innumerable constitutional applications of the CCIA's licensing requirements, which are designed to keep firearms out of the hands of demonstrably dangerous individuals.[4]

---

[3] Plaintiffs insist that the governing standard for facial challenges is whether the statute has a "plainly legitimate sweep" (Br. 17, 54), but this Court confirmed that such a formulation is limited to First Amendment claims, *Community Hous. Improvement Program*, 2023 WL 1769666, at *6. In any event, the State would prevail under either standard.

[4] By contrast, the Supreme Court struck down New York's "proper cause" requirement, which required an applicant to prove a "special need"

(*continued on the next page*)

9

**C.    The Licensing Requirements Are Consistent with the Historical Tradition of Firearm Regulation.**

The State further showed in its opening brief (at 33-37) that, even if the licensing requirements at issue required a historical defense, the requirements are fully consistent with a long historical tradition of firearm regulations to disarm dangerous individuals, spanning from before the founding through the nineteenth-century incorporation era. In arguing to the contrary, plaintiffs find one quibble after another with the State's historical evidence—an approach that, if adopted, would eliminate virtually the entire body of historical sources that a government could cite in support of its laws and render virtually any firearm regulation unconstitutional. This is not the result intended by *Bruen*.

As an initial matter, plaintiffs' contention (Br. 21-30) that the CCIA's licensing requirements lack historical support rests on the same basic misunderstanding discussed above (at 7) that the CCIA denies licenses to law-abiding and responsible individuals. Plaintiffs suggest (Br. 23-24) that the CCIA's requirements, unlike historical laws, deny firearm licenses to

---

for a license beyond proof that the applicant is not dangerous, because the Court found that this requirement was unconstitutional in all circumstances. *See Bruen*, 142 S. Ct. at 2122.

individuals who are *not* dangerous, if the individuals cannot prove some heightened level of "virtue." But, contrary to plaintiffs' unsupported suggestion, the CCIA does not require any applicant to show "virtue" beyond the mere ability to use a firearm "only in a manner that does not endanger oneself or others," i.e., to use it in a non-dangerous manner. *See* Penal Law § 400.00(1)(b).

For similar reasons, plaintiffs fail to distinguish (Br. 22-23) now-Justice Barrett's opinion in *Kanter v. Barr*, 919 F.3d 447 (7th Cir. 2019). Although Justice Barrett concluded that proof of virtue beyond not being dangerous has not been a typical historical qualification for use of a firearm, she correctly concluded—and plaintiffs do not dispute—that proof of non-dangerousness *has* been a typical historical qualification. *See id.* at 451 (Barrett, J., dissenting). The CCIA requires only the same showing of non-dangerousness that history supports.

Plaintiffs' efforts to draw minor distinctions (*e.g.*, Br. 23-25) between the CCIA's licensing requirements and historical analogs the State proffered—for instance, because some (but by no means all) of the historical laws were enacted in wartime or targeted particular disfavored groups—

11

do not withstand scrutiny.[5] Plaintiffs do not contest *Bruen*'s clear statement that where the "how and why" of historical firearm regulations are similar to modern ones, the modern regulations are sufficiently analogous to pass constitutional muster. *See* 142 S. Ct. at 2132-33. And, here, the historical laws the State proffered have the same "how and why" as the CCIA's licensing requirements: keeping firearms out of the hands of those deemed dangerous based on information about the individuals' past conduct, reputation, and associates. See State Br. 34-36.

Although plaintiffs assert that the State has not proffered historical laws that have precisely the same "how" as each of the CCIA's licensing

---

[5] Plaintiffs' assertions (*e.g.*, Br. 21 n.10, 31) that the State is no longer relying on certain historical sources are incorrect. The sources the State discussed in its opening brief were expressly described as "example[s]," and the State included other examples in the joint appendix. See State Br. 34, 41. (*See* J.A. 261-518.) Plaintiffs' brief more generally frequently asserts waiver or abandonment of sources or argument variations when the State was merely constrained in the detail it could offer in a word-limited brief addressing so many issues. For the avoidance of doubt: the State is not abandoning any sources or arguments and reserves its right to elaborate on any arguments at any stage of the litigation.

Conversely, plaintiffs complain (*see, e.g.*, Br. 41 n.31, 45, 51 n.38) that the State cited certain sources on appeal that it did not cite below; but it is settled law that "appeals courts may entertain additional support that a party provides for a proposition presented below," *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006).

requirements, plaintiffs do not contest *Bruen*'s holding that the State need identify only a "historical *analogue*, not a historical *twin*"—particularly when the modern requirement responds to unprecedented "dramatic technological changes," as, for example, in the case of the CCIA's social-media account listing requirement. *See* 142 S. Ct. at 2132-33. In any event, the "how" of each of the CCIA's requirements closely resembles that of the historical laws the State proffered. All these laws involve officials using information provided to them about individuals' conduct, reputation, and/or associates to determine if individuals may safely carry firearms.

Moreover, in contending that the "how" of some of the historical laws the State proffered differs from the CCIA's, plaintiffs misrepresent those laws. For instance, plaintiffs say (Br. 31) that a founding-era Virginia law that required disarmament if a justice of the peace was informed that an individual was a member of a group deemed dangerous exempted "'necessary weapons . . . for the defense of his house or person.'" But plaintiffs omit additional language demonstrating that the exemption was only for "necessary weapons *as shall be allowed to him, by order of the justices of the peace at their court*, for the defense of his house or person" (J.A. 281).

13

In other words, just as with the CCIA, it was state officials who determined what, if any, firearms the individual could safely carry.

There is also no merit to plaintiffs' attempts (Br. 25-26) to undermine the relevance of the nineteenth-century licensing analogs on which the State relies. Plaintiffs' suggestion (*id.* at 25-26 & nn.13-14) that nineteenth-century firearm licensing laws were limited to New York State is simply wrong: the sources the State cited in its opening brief identify and link to more than 40 similar nineteenth-century laws from other States across the country.[6] Plaintiffs' attempt to cast doubt (*id.* at 26) on such laws because the State did not provide evidence of their enforcement likewise fails. As a leading historian of firearm regulations has explained, the vast majority of records of local-law enforcement before the twentieth century "have either been lost to time or are woefully incomplete," and those records that have "miraculously" survived ordinarily require demanding archival

_____

[6] Br. of *Amicus Curiae* Patrick J. Charles in Supp. of Neither Party, Appendix, *Bruen*, 142 S. Ct. 2111 (No. 20-843) (Mid-to-Late Nineteenth Century Laws Requiring a Permit or License to Carry Concealed and Dangerous Weapons). Many other similar laws were enacted in the first few years of the twentieth century. *See id.* (Early Twentieth Century Laws Requiring a Permit or License to Carry Concealed and Dangerous Weapons).

research to locate. *See* Patrick J. Charles, *The Fugazi Second Amendment* 35 (2022) (forthcoming Clev. St. L. Rev.). The State did not have a reasonable opportunity to complete such archival research on the accelerated preliminary-injunction timeline below—much less in dozens of localities nationwide.[7] More fundamentally, plaintiffs' insistence that the State identify not only a historical analog but detail a history of enforcement that meets some unknown metric of robustness is unsupported by *Bruen* or any other constitutional standard.

Plaintiffs and some of their amici also are incorrect to discount (*e.g.*, Br. 27, 54 n.40) nineteenth-century laws the State proffered as irrelevant to the constitutional inquiry. Both *Bruen*, *see* 142 S. Ct. 2145-56, and the district court properly relied heavily on nineteenth-century laws. Ignoring the nineteenth-century incorporation-era understanding of Second Amendment rights would ignore the understanding of the right at the time the People opted to give it effect against the States. *See, e.g.*, Akhil Reed

---

[7] Plaintiffs also offer no support for their speculation (Br. 26) that the facially neutral historical licensing laws were enforced in a racist manner. But even if they were so enforced, historical enforcement focused on groups (wrongly) deemed dangerous at the time would only underscore that the Second Amendment has long been understood to permit disarming those deemed dangerous.

Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223 (1998); Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorpora-tion*, 97 Ind. L.J. 1439 (2022). Ignoring the incorporation-era understand-ing of the Second Amendment also would be inconsistent with the Supreme Court's use of incorporation-era historical materials to inform its under-standing of other constitutional rights that the Fourteenth Amendment incorporated against States. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020); *Timbs v. Indiana*, 139 S. Ct. 682, 688-89 (2019); *see also Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2059 (2021) (Thomas, J., dissenting) ("I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (quotation and alteration marks omitted)). *See also* Br. of Amicus Everytown for Gun Safety 7-16.

Plaintiffs likewise are incorrect to suggest that city laws cannot reflect a representative historical tradition. Br. 28. City laws may well reflect a historical tradition of firearm regulation in urban areas—which, as unusually crowded areas with more gun-related crime than rural areas, have always had their own distinct needs and desires for firearm regula-

16

tion. *See, e.g.*, Br. of Amici Dist. Att'ys 5 & n.4, 16; Br. of Amicus City of New York 2, 11-13, 17. Contrary to plaintiffs' assertion (Br. 29-30), the Supreme Court has never rejected the significance of such a location-specific historical tradition. In fact, the Supreme Court has expressly emphasized—consistent with bedrock federalism principles—that the Second Amendment protects States' and cities' "ability to devise solutions to social problems that suit local needs and values." *See McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010).

Plaintiffs' contentions (Br. 35-39) that the CCIA's social-media provision lacks historical support likewise rest on a fundamental misunderstanding of that provision. The provision requires only "a list" of recent social-media accounts to facilitate the licensing officer's review of any public information that the applicant has chosen to share with the world on social media. *See* Penal Law § 400.00(1)(o)(iv). As the State explained in its opening brief (at 46), the social-media provision does *not* require disclosure of any non-public material from social-media accounts. *See* Penal Law § 400.00(1)(o)(iv). Accordingly, plaintiffs are wrong to seek (Br. 38) historical licensing analogs that required applicants to give

officials "access to [their] private papers and letters." The CCIA does not require disclosure of any such private information.

For similar reasons, plaintiffs are wrong to suggest that the social-media provision compels any speech, much less incriminating speech, in violation of the First and Fifth Amendments. The provision requires only a list of accounts that would allow a licensing official to review information that applicants have already chosen to disclose publicly. The use of such a list to facilitate review of public social-media information on a single occasion, for the limited purpose of confirming that it includes no "leakage" of intent to cause harm with firearms, satisfies any level of constitutional scrutiny: it is narrowly tailored to the compelling state interest of protecting public safety. Indeed, plaintiffs do not dispute the social science making clear that the CCIA's requested information, both from social media and from spouses and other coinhabitants, is precisely the sort of information that may "leak" dangerous intentions for use of firearms. *See* Amicus Br. of Dr. Jaclyn Schildkraut. See State Br. 43-44 & n.13.

The remaining arguments regarding the social-media provision are made not by plaintiffs but by amici. For example, one group of amici argues

that the social-media provision chills speech. *See* Br. of Amici Asian Pac. Am. Gun Owners Ass'n et al. ("Gun Groups Br."). Another group contends that the CCIA's reference to "social media" is unconstitutionally vague. Br. of Amicus N.Y. State Firearms Ass'n ("NYSFA Br.") 12-17. But an amicus brief is "not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001).

In any event, amici's arguments provide no basis to support the district court's ruling. Amici's speculation (*see, e.g.*, Gun Groups Br. 8-15) that plaintiffs would need to "register" their anonymous accounts or be subject to continued monitoring has no basis in the CCIA and could not support a "chilling" claim. *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("speculative apprehensiveness" about misuse of information does not support First Amendment claim). The CCIA permits a licensing official to review social-media accounts only "to confirm the information regarding the applicant[']s character and conduct as required" to grant or deny a license, and does not sanction use of the information for any other purpose. *See* Penal Law § 400.00(1)(o)(iv). Likewise, amici's vagueness argument (NYSFA Br. 12-17) fails because (among other reasons) "social

19

media" has a commonly understood core meaning covering social networks such as Facebook and Twitter and is not fatally vague in all applications. *Cf. New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015).

## POINT II

**PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S SENSITIVE-PLACE PROVISIONS**

### A. Plaintiffs Lack Standing to Challenge Several of the Sensitive-Place Provisions.

The State showed in its opening brief (at 49-51) that plaintiffs lack standing to bring pre-enforcement challenges to several of the CCIA's sensitive-place provisions, including those prohibiting carrying firearms in addiction or behavioral-health facilities, banquet halls, conference centers, and gatherings to express constitutional rights to protest or assemble.[8]

---

[8] Contrary to plaintiffs' assertion (Br. 8), the State does not concede that plaintiffs have standing to challenge any other sensitive-place provisions and reserves the right to challenge standing as to any of those provisions at a post-preliminary-injunction stage.

Plaintiffs fail to demonstrate standing based on their assertions that the statutory language of such sensitive-place provisions could be stretched to apply to them, because plaintiffs have not shown a "credible threat of prosecution" in the unlikely manner they propose, as they must to establish standing for a pre-enforcement challenge. *See Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). For instance, even if the language of the sensitive-place provisions covering "location[s] providing health, behavioral health, or chemical dependance care or services" and "place[s] used for . . . performance, art[,] entertainment, gaming, or sporting events[,] such as . . . banquet halls," could be stretched to cover plaintiff Joseph Mann's church, Mann has shown no credible threat of prosecution under those provisions, rather than the much more clearly applicable provision covering "place[s] of worship or religious observation." *See* Penal Law § 265.01-e(2)(b), (c), (p).

Moreover, plaintiffs do not dispute that the gun show plaintiff Alfred Terrille wished to attend—which plaintiffs claimed gave him standing to challenge the sensitive-place provisions governing "conference centers," "banquet halls," and gatherings to express constitutional rights to protest or assemble, *see id.* § 265.01-e(p), (s)—had already occurred before the

preliminary injunction was ordered. Contrary to plaintiffs' assertion (Br. 9), nothing in Terrille's declaration (*see* J.A. 191-192) states that he regularly attends gun shows, much less that he has "certainly impending" plans to attend another in the imminent future, *cf. Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quotation marks and emphasis omitted). And plaintiffs' suggestion that the State failed to cross-examine Terrille to prove that he *does not* intend to attend gun shows in the future attempts to improperly shift plaintiffs' own burden to demonstrate standing. *See id.*

## B. The Sensitive-Place Provisions Are Presumptively Constitutional.

Plaintiffs in any event do not dispute the State's showing in its opening brief (at 52) that the Supreme Court has repeatedly described laws prohibiting firearms in sensitive places as "presumptively lawful" and outside the "scope of the Second Amendment." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald*, 561 U.S. at 786. Because plaintiffs have not rebutted the

presumptive lawfulness of the CCIA's sensitive-place provisions, those provisions are constitutional.

Although plaintiffs note that the sensitive-place designation should not be stretched so far as to "effectively declare the island of Manhattan a 'sensitive place'" (Br. 18-19), the CCIA does nothing of the sort. The CCIA designates a set of specifically defined locations, such as government buildings, schools, and places of worship, as sensitive—not whole cities. *See* Penal Law § 265.01-e. The set of sensitive places designated by the CCIA overlaps with the sensitive places already recognized by the Supreme Court. *See Bruen*, 142 S. Ct. at 2133. And insofar as the CCIA adds additional sensitive places, it merely follows the Supreme Court's guidance that the Court's identification of example sensitive places was not intended to "comprehensively define" such places; rather, States were expressly invited to regulate firearms in additional "*new* and analogous sensitive places." *See id*.

There is no support for plaintiffs' assertions (Br. 19, 47) that sensitive places should be limited to places for "key functions of democracy" or "where government officials are present and vulnerable to attack" (although a number of the CCIA's sensitive places fall into one or both of

those categories). In fact, the Supreme Court's remarks about sensitive places to date indicate that its conception of sensitive locations is far broader. For example, both *Bruen* and *Heller* identified schools among sensitive places. *See Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Yet schools do not typically have vulnerable government officials present, and it is unlikely that the Supreme Court's justification for including schools as sensitive places was to protect a "key function of democracy," given that the U.S. Constitution does not recognize a right to education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-36 (1973).

## C.  The Sensitive-Place Provisions Are Consistent with the Historical Tradition of Firearm Regulation.

Even if the CCIA's sensitive-place regulations were not presumptively lawful and therefore required a historical defense, plaintiffs do not cast doubt on the State's showing (e.g., State Br. 53-58) that the CCIA's regulations are fully consistent with longstanding historical tradition.

Plaintiffs again miss the mark in seeking minor distinctions (Br. 41-47) between the CCIA's sensitive-place regulations and the analogous historical regulations on which the State relies. Plaintiffs' demands for

historical "dead ringer[s]" reflect precisely the "regulatory straightjacket" approach that *Bruen* rejected. *See* 142 S. Ct. at 2133.

Plaintiffs' quibbles are also meritless. Plaintiffs' assertions (Br. 41-42) that some of the earliest historical regulations the State proffered may have been focused principally on dangerous weapons other than firearms (which were not yet common), and using such weapons in "affray" of the peace, in no way undermine that the regulations restricted dangerous weapons in the same sorts of sensitive places as the CCIA, including unusually crowded public gathering places like fairs, markets, and churches. See State Br. 54-55.

Plaintiffs likewise are incorrect to suggest that the Supreme Court indicated that sensitive-place laws "'faded without explanation' . . . by the time Englishmen began to arrive in America." Br. 42 (quoting *Bruen* 142 S. Ct. at 2140). The Court was there referring to specific regulations of small handguns called "dags"—not regulations of firearms in sensitive places, which lasted far longer. *See Bruen*, 142 S. Ct. at 2140. Plaintiffs' assertion that Delaware's constitutional prohibition on arms in polling places was later removed is also misleading: Delaware's new 1792 constitution rejected *any right to bear arms at all*. *See* Dan M. Peterson &

25

Stephen P. Halbrook, *A Revolution in Second Amendment Law*, 29 Del. Law. 12, 15 (2011).

Moreover, there is no merit to plaintiffs' attempt to dismiss (Br. 44) the incorporation-era sensitive-place laws the State proffered as "not broadly representative." Those laws applied to at least five of the fourteen largest States in the country at the time—Missouri, Texas, Tennessee, Georgia, and Virginia[9]—in addition to a number of smaller States and territories. And, contrary to plaintiffs' unfounded suggestion (*id.* at 43-44), several of the incorporation-era laws covered long lists of sensitive places identical to, or clearly historical precursors to, the sensitive places covered by the CCIA, like places of worship, schools, polling places, courts, and places of public assembly and social gathering. See State Br. 55-56. (*See also* J.A. 601-621.)

Plaintiffs also err in their attempt to discount the numerous judicial opinions from the incorporation period that found constitutional challenges to sensitive-place regulations "'little short of ridiculous.'" See State

---

[9] *See* U.S. Census Off., Dep't of the Interior, *Statistics of the Population of the United States at the Tenth Census (June 1, 1880)* tbl. 1(a) (1881).

Br. 56-58 (quoting *English v. State*, 35 Tex. 473, 478-79 (1871)). Contrary to plaintiffs' suggestion, the U.S. Supreme Court has never undermined those opinions' relevant holdings that sensitive-place restrictions are constitutional. Quite the contrary, the Court has confirmed those holdings by repeatedly underscoring that sensitive-place regulations are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133.

Plaintiffs likewise fail to rebut the State's showing that historical sensitive-place laws protected at least three broad categories of places: (1) places intended for the exercise of other fundamental rights; (2) places where vulnerable and/or impaired people are typically present; and (3) unusually crowded places.[10] See State Br. 58-61.

---

[10] Plaintiffs erroneously maintain (Br. 11) that the district court's injunction applies to public buses, even though the court made clear that "Metropolitan Transportation Authority buses are not an issue in this action" and referenced no other public bus system that could possibly be implicated by the complaint (S.A. 150 n.114). In any event, public buses are sensitive for multiple reasons. Public buses are quintessentially crowded, and, as the district court acknowledged (S.A. 150 n.114), they often transport vulnerable children to school. Public buses also often transport senior, disabled, and impaired persons. Moreover, public buses are often government-owned property, and thus subject to the government's right to control that property by prohibiting firearms. *See, e.g.*,

(continued on the next page)

As to the first category—places intended for the exercise of other fundamental rights—plaintiffs' observation (Br. 48) that such places also may be places associated with "key functions of democracy" in no way suggests that *only* places associated with "key functions of democracy" are sensitive places. On the contrary, the State also identified places where people exercise rights largely unrelated to democracy—such as religious congregation—where there is a long history of prohibiting firearms. Plaintiffs also misunderstand (Br. 50) the State's argument in noting that multiple rights can be exercised in the same location. Though that may be so in some cases, there is a long tradition of laws recognizing that the presence of firearms in certain locations is sufficiently likely to chill the exercise of other rights, e.g., voting, that firearms can and should be prohibited in locations dedicated to the exercise of those other rights.

As to the second category—places where vulnerable and/or impaired people are typically present—plaintiffs are wrong (Br. 48-49) that the

---

*United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019). Contrary to plaintiffs' assertion (Br. 10-12), the State did not waive any appeal as to public buses, because the State explained in its opening brief (at 48 n.14) that, insofar as the district court's injunction applied to public buses, the injunction was improper.

State is relying only on historical "laws prohibiting firearm possession *by certain people* to justify prohibiting possession *in certain places*." On the contrary, plaintiffs cited numerous historical laws prohibiting firearms in *places* where vulnerable or impaired people are typically present, like schools and establishments serving alcohol. (*See, e.g.*, J.A. 602, 611, 616-618, 620-621.) The fact that other historical laws prohibited firearm carrying by the same sorts of vulnerable or impaired people altogether only underscores the historical concern regarding firearms around such people.

Finally, as to the third category—unusually crowded places—contrary to plaintiffs' suggestion (Br. 49), the State has not argued that a large area like Manhattan should be declared a sensitive place "simply because it is crowded," *Bruen*, 142 S. Ct. at 2134. On the contrary, the State has observed that many historical laws prohibited firearms in specific locations that are so unusually crowded that it becomes difficult if not impossible to defend oneself with a firearm safely there, like fairs, markets, shows, and public assemblies. See State Br. 60-61. The CCIA takes the same approach. *Bruen* in no way suggested that the specific

dangerously crowded places that the CCIA recognizes as sensitive are not sensitive places.

Plaintiffs also err in their attempts to undermine the long historical traditions of prohibiting firearms in places of worship and parks. As to places of worship, plaintiffs' observation (Br. 48) that certain laws from the seventeenth to eighteenth centuries required bringing firearms to church is no help with them. Those laws were in large part intended to maintain the institution of slavery—not to protect an underlying right to bear arms. *See, e.g.*, Act No. 702, 7 *Statutes at Large of South Carolina* 417-19 (D.J. McCord ed., 1840) (reprinting 1743 law requiring white persons to bring arms to church for "better ordering and governing negroes and other slaves"); *see also* Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* 140-41 (2001). Moreover, laws mandating firearms in particular places cannot logically signify a right to be free from government interference in the bearing of arms, which is what the Second Amendment codifies. If anything, these colonial laws support the opposite inference, because government regulation is no less interference when it is a mandate than when it is a prohibition.

As to parks, plaintiffs do not dispute that firearms were prohibited in parks from the time they first existed in the nineteenth century. (*See* J.A. 671-689, 748-766.) Plaintiffs' attempts to distinguish those prohibitions fail. Plaintiffs offer no support for their implausible speculation that a facially neutral early prohibition of firearms in New York's Central Park (J.A. 672) was "likely an attempt to disarm [African American] persons who had been displaced" in the construction of the park (Br. 44-45). Plaintiffs likewise offer no support for their assertion (*id.* at 45) that other historical prohibitions of firearms in parks were intended merely "to prevent vandalism and small-game hunting," when they broadly banned "carry[ing] firearms" (*e.g.*, J.A. 675, 680, 750, 758, 762). Regardless, *Bruen* recognized that historical firearm regulations may justify analogous modern regulations, even if the purpose of those regulations has changed to address evolving societal concerns—like more gun violence and less small-game hunting in parks. *See* 142 S. Ct. at 2132.

Plaintiffs misplace their complaint (Br. 52-53) that the State pointed to no founding-era laws prohibiting firearms in purported precursors to parks like town commons and greens. Plaintiffs' historical anecdotes suggesting that firearms were at times present in places like commons

and greens concern only early militia mustering, not individual self-defense. *See* Pls.-Appellees' Answering Br. in Resp. to Def.-Appellant Cecile 26-28. And even if firearms were more broadly permitted in commons and greens, such permission would not mandate similar permission in modern parks, particularly because commons and greens were intended principally for livestock—making them far more appropriate places for carrying firearms than modern parks where people gather.

Finally, plaintiffs fail to defend (Br. 53-54) the district court's facial injunction of sensitive-place provisions based on speculation about implausible applications of those provisions, for instance, to prosecute a pastor for carrying a firearm in his parsonage home. Plaintiffs cannot prevail on their facial challenges to the sensitive-places provisions unless they prove there is no set of circumstances under which the provisions could be applied constitutionally—and plaintiffs cannot satisfy that burden, for all the reasons discussed above.[11] *See, e.g.*, *Community Hous. Improvement Program*, 2023 WL 1769666, at *5.

---

[11] The Governor also has proposed technical amendments to the CCIA to confirm that the sensitive-place provisions do not apply to some of the activity cited by plaintiffs, including carrying in places of private

(*continued on the next page*)

# POINT III

**PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CHALLENGES TO NEW YORK'S PRIVATE-PROPERTY PROVISION**

## A. Plaintiffs Are Unlikely to Succeed on Their Second Amendment Challenge to the Private-Property Provision.

### 1. Plaintiffs lack standing to challenge the private-property provision on Second Amendment grounds.

Plaintiffs have no substantive response to the State's showing in its opening brief (at 69-70) that plaintiffs lack standing to challenge the CCIA's private-property provision because an injunction against the state defendants cannot vindicate plaintiffs' asserted desire to carry firearms onto others' private property. Any injury to plaintiffs is not traceable to the state defendants, because individual property owners, not the defendants, decide whether to allow plaintiffs to carry firearms on their property pursuant to the provision. And the State cited ample Supreme Court authority explaining that a federal court has standing only to "redress injury that fairly can be traced to the challenged action of the defendant,

---

"religious observation" (Penal Law § 265.01-e(2)(c)); carrying in places of worship by "those persons responsible for security at such place of worship" (*id.*); carrying by "persons while engaged in historical reenactments" (*id.* § 265.01-e(3)(l)); and carrying through Adirondack and Catskill Parks (*id.* § 265.01-e(4)). A3005/S4005, 246th Sess., pt. F, subpt. A, § 1 (2023).

and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). Plaintiffs' challenge to the private-property provision fails for this reason alone. *See also* Br. for Appellant at 17-23, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Jan. 23, 2023).

### 2. The Second Amendment does not bestow a right to carry firearms onto others' private property absent consent.

Even if plaintiffs had standing, they would have no Second Amendment claim as to the private-property provision, because, as the State explained in its opening brief (at 71-73), the Second Amendment provides no right to carry firearms onto others' private property without the owner's consent. *See also* Br. of Amici Professors of Prop. Law 4-23.

In response, plaintiffs acknowledge "the right of property owners to exclude." Br. 21. Although plaintiffs suggest (at 19-20) that the Second Amendment can trump the right to exclude, they cite no authority for that proposition aside from two district-court decisions that followed the erroneous decision of the district court on appeal here. *See Koons v. Reynolds*, No. 22-cv-7464, 2023 WL 128882, at *19 n.25 (D.N.J. Jan. 9,

2023); *Christian v. Nigrelli*, No. 22-cv-695, 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022).

There is no evidence that the Second Amendment was intended to supersede the right to exclude. On the contrary, the right to exclude "is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) (citation and quotation marks omitted). And when the framers codified the common-law right to bear arms in the Second Amendment, they preserved the "well established property law, tort law, and criminal law" limiting that right to protect "a private property owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Plaintiffs' attempt (Br. 20) to distinguish *GeorgiaCarry* fails. As plaintiffs acknowledge, *GeorgiaCarry* involved a purported Second Amendment "right to bring a firearm on the private property of another against the wishes of the owner," 687 F.3d at 1261. That is precisely the purported right at issue here—and precisely the right *GeorgiaCarry* rejected as inconsistent with a property owner's right to exclude. *See id.* at 1266. Plaintiffs' suggestion that the right to bring firearms on others' property

35

against the owners' wishes is not at issue here ignores that the rule plaintiffs seek—permitting concealed carrying on others' property unless expressly forbidden—would necessarily permit guests to bring firearms on others' property against the owners' wishes, because owners ordinarily would not know who is carrying a concealed weapon or have an opportunity to object.

### 3. The private-property provision is consistent with the historical tradition of firearm regulation.

Even if the Second Amendment did apply to the private-property provision, the State explained in its opening brief (at 74-76) that the provision would be constitutional because the State has shown a longstanding tradition of laws, spanning the colonial era through the founding and incorporation eras, prohibiting carrying firearms onto others' property without the owner's permission. *See also* Br. of Amici Professors of Prop. Law 23-27.

Although plaintiffs note that some of the historical laws the State proffered mention concerns about hunting, there is no dispute that all the laws ultimately prohibited *any* carrying of firearms onto others' land without consent—just like the CCIA's private-property provision. See

36

State Br. 75.[12] And plaintiffs fail to rebut the State's explanation (at 75) that half the cited laws made no mention of hunting at all. (*See* J.A. 712 (New Jersey 1771 law), 721 (Louisiana 1865 law), 727 (Texas 1866 law), 733 (Oregon 1893 law).)

Regardless, plaintiffs have no response to the State's explanation that refusing to consider close historical analogs because they served in part a now-largely-anachronistic anti-poaching purpose defies *Bruen*'s lesson that "[t]he regulatory challenges posed by firearms today" need not be "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" in order to justify analogous modern regulation. *See* 142 S. Ct. at 2132. New York was entitled to decide that a random customer's brandishing or firing a gun at an actual or perceived criminal inside a business today hazards "great Danger [to] the Lives" of others no less than traipsing armed onto someone's property to hunt in 1763. (J.A. 705.) Regulating either serves the same longstanding tradi-

---

[12] For that reason, all the States with such laws should have been counted in the district court's calculation of States with such historical laws, not just New Jersey and Louisiana. (*Contra* S.A. 171-172.)

tion of conditioning access to private property on the informed consent of the property owner.

## B. The Private-Property Provision Does Not Compel Speech in Violation of the First Amendment.

The State also explained in its opening brief (at 76-79) that the CCIA's prohibition on carrying firearms onto private property (including private property that is not otherwise open to the public, i.e., people's residences) without express consent does not compel speech. Rather, property owners may choose to say or do—or *not* say or do—whatever they wish to give or withhold consent.[13] *Cf. New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 170 (2d Cir. 2020) (defining compelled speech as the government "tell[ing] people that there are things 'they must say'" (quoting *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013))).

Although plaintiffs contend that property owners must speak in order to allow firearms on their property, any such "speech" is not

---

[13] Accordingly, plaintiffs may permit firearms on their property via private communications without incurring any purported "stigma" associated with public statements supporting firearms. *Contra* Br. 57.

38

unconstitutional compelled speech, for two reasons. First, if a property owner decides to say that firearms are allowed on the owner's property, the owner is "speaking" a statement with which the owner agrees—and for that reason alone the owner's statement is not unconstitutional. *Cf. id*. Second, any such speech is not actually compelled; property owners can choose to allow firearms and say so, or they can choose not to. Under plaintiffs' contrary view, every default rule the government sets from which one may depart by express statement unconstitutionally compels speech. Indeed, by plaintiffs' logic, overturning the private-property provision would also compel speech by forcing property owners who do not want firearms on their property into the same choice: allow unwanted firearms on their property, or speak a message that such guns are not wanted.

In any event, plaintiffs do not dispute that the private-property provision ultimately regulates the *conduct* of guests in carrying firearms, rather than speech. The provision is thus subject to intermediate scrutiny. *See Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 67 (2006). The law satisfies that standard, and would also satisfy strict scrutiny, because it is narrowly tailored to compelling government interests in

(1) protecting private owners' rights to control access to their own property, and (2) public safety. See State Br. 78-79. Plaintiffs do not dispute the first interest, which supports the constitutionality of the provision on its own. And insofar as plaintiffs dispute the public-safety benefits of the private-property provision, the Court must "remain mindful that, in the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Cuomo*, 804 F.3d at 261 (quotation and alteration marks omitted). See *infra* at 42-43 (citing evidence of relevant public-safety benefits).

## POINT IV

### THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS

Plaintiffs also have not rebutted the State's showing in its opening brief (at 80-86) that the remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—weigh overwhelmingly in favor of continued enforcement of the CCIA while plaintiffs' challenge is litigated.

Plaintiffs are incorrect to suggest (Br. 58) that the State did not consider potential harms to them in its analysis of the equities. As the State explained (State Br. 85), it was plaintiffs' burden to make a "strong showing" of imminent irreparable harm to themselves, outweighing all the harms to the public resulting from the preliminary injunction. *See New York ex rel. Schneiderman v. Actavis plc*, 787 F.3d 638, 650 (2d Cir. 2015) (quotation marks omitted). Plaintiffs simply did not meet their burden.

Plaintiffs' individual harms from either a minor inconvenience if they decide to forego visits to the disputed locations where the CCIA prohibits firearms while the litigation is pending, or a minor burden on their purported right to carry if they do visit any such locations, cannot outweigh the dramatic harms to the State at large from enjoining enforcement of the CCIA on a statewide basis. Enjoining enforcement of much of the CCIA while it is already in effect, only to potentially reinstate provisions of the law later, would both create widespread confusion (as plaintiffs do not dispute) and, most troublingly, expose twenty million New Yorkers to the heightened gunfire risk that the Legislature sought to avoid.

41

There is no merit to plaintiffs' contention (Br. 59) that there can be no harm from enjoining enforcement of firearm restrictions that are new. As an initial matter, the good-moral-character licensing requirement subject to the district court's injunction is not new, but rather has been critical to keeping firearms out of the hands of dangerous individuals for many years.[14] Moreover, the Legislature determined that the other CCIA provisions that are new are necessary to protect public safety in light of the Supreme Court's recent striking down of the State's prior proper-cause requirement for a license. *See* Assembly Sponsor's Mem. A41001; Senate Sponsor's Mem. S51001. Although plaintiffs may disagree with the Legislature's conclusion, their view cannot negate the informed determination of the State's elected officials. *Cf. Cuomo*, 804 F.3d at 261.

In addition, there is ample social-science evidence supporting the Legislature's public-safety determination. *See, e.g.*, Br. of Amici Giffords

---

[14] Plaintiffs' assertion (Br. 58-59) that this requirement is superfluous to public safety because other statutes prohibit domestic abusers from having firearms ignores that such provisions apply only to those *convicted* of domestic abuse or subject to active protective orders, *see, e.g.*, 18 U.S.C. § 922(d)(8)-(9), (g)(8)-(9); Penal Law § 400.00(1)(c); Criminal Procedure Law § 530.14(1)-(2)—leaving ample room for dangerous individuals who have not yet been convicted or subjected to a protective order to gain access to firearms, if not for the good-moral-character requirement.

L. Ctr., Brady, & March for Our Lives 17-26. That includes specific evidence of the public-safety risk posed by firearms carried by licensed individuals. *See, e.g.*, Violence Pol'y Ctr., *Concealed Carry Killers* (identifying 2,240 people killed by those licensed to carry concealed since 2007, including in 37 mass shootings). Plaintiffs' remark (Br. 37) that the CCIA's requirements still could not stop all deadly shootings likewise misses the mark: no one firearm regulation could stop *all* deadly shootings—but that fact does not weigh in favor of eliminating every form of firearm regulation.

Plaintiffs also are wrong to claim (Br. 60) that the injunction does not alter the status quo. It is undisputed that the CCIA was already in effect when plaintiffs filed this lawsuit and sought a preliminary injunction. Enjoining enforcement of such a law that "has been in effect" would necessarily "disrupt, not preserve, the status quo," even if the law is new, because the government would need to revert to the prior legal regime if the injunction were granted. *See, e.g.*, *Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health & Hum. Servs.*, 17 F.4th 793, 806 (8th Cir. 2021).

43

Finally, plaintiffs do not dispute that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Kane v. De Blasio*, 19 F.4th 152, 173 (2d Cir. 2021) (quotation marks omitted). Accordingly, insofar as the statewide preliminary injunction is not reversed, it should be narrowed to apply only to plaintiffs.

## CONCLUSION

The Court should reverse the order granting a preliminary injunction.

Dated:  New York, New York
        February 21, 2023

                                Respectfully submitted,

                                LETITIA JAMES
                                  *Attorney General*
                                  *State of New York*
                                Attorney for State Appellants


                        By:  */s/ Philip J. Levitz*
                                PHILIP J. LEVITZ
                                Assistant Solicitor General

BARBARA D. UNDERWOOD            28 Liberty Street
  *Solicitor General*          New York, NY 10005
ESTER MURDUKHAYEVA              (212) 416-6325
  *Deputy Solicitor General*
PHILIP J. LEVITZ
ALEXANDRIA TWINEM
  *Assistant Solicitors General*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,644 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1, and as authorized by this Court (ECF 328).


 /s/ *Kelly Cheung*