22-2908 (L); 22-2933; 22-2987; 22-3237
*Antonyuk; Hardaway; Christian; Spencer v. Chiumento*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

August Term, 2022

Argued: March 20, 2023     Decided: December 8, 2023

Docket Nos. 22-2908 (L), 22-2972 (Con); 22-2933; 22-2987; 22-3237
_____

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, LAWRENCE SLOANE,

*Plaintiffs-Appellees*,

v.

DOMINICK L. CHIUMENTO, in his official capacity as the Acting Superintendent of the New York State Police, MATTHEW J. DORAN, in his official capacity as the Licensing Official of Onondaga County, JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants-Appellants*,

KATHLEEN HOCHUL, in her official capacity as the Governor of the State of New York, WILLIAM FITZPATRICK, in his official capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his official capacity as the Sheriff of Onondaga County, P. DAVID SOARES, in his official capacity as the District Attorney of Albany County, GREGORY OAKES, in his official capacity as the District Attorney of Oswego County, DON HILTON, in his official capacity as the Sheriff of Oswego County, JOSEPH STANZIONE, in his official capacity as the District Attorney of Greene County,

*Defendants*.

CERTIFIED COPY ISSUED ON 12/08/2023

———————————

JIMMIE HARDAWAY, JR., LARRY A. BOYD, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees,*

v.

DOMINICK L. CHIUMENTO, in his official capacity as the Acting Superintendent of
the New York State Police,

*Defendant-Appellant,*

BRIAN D. SEAMAN, in his official capacity as the District Attorney for the County
of Niagara, New York, JOHN J. FLYNN, in his official capacity as the District
Attorney for the County of Erie, New York,

*Defendants-Appellees.*

———————————

BRETT CHRISTIAN, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT
FOUNDATION, INC.,

*Plaintiffs-Appellees,*

JOHN BROWN,

*Plaintiff,*

v.

DOMINICK L. CHIUMENTO, in his official capacity as the Acting Superintendent of
the New York State Police,

*Defendants-Appellants,*

2

JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie, New York,

*Defendant-Appellee.*

––––––––––––––––––––

MICHEAL SPENCER, HIS TABERNACLE FAMILY CHURCH, INC.,

*Plaintiffs-Appellees*,

v.

DOMINICK L. CHIUMENTO, Acting Superintendent of the New York State Police, in his official capacity, and STEVEN A. NIGRELLI in his individual capacity,

*Defendants-Appellants*,

WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities, MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities,

*Defendants.*[*]

––––––––––––––––––––

Before: JACOBS, LYNCH, and LEE, *Circuit Judges*.

––––––––––––––––––––

In these four cases, heard and now decided in tandem, Plaintiffs raise First and Second Amendment challenges to many provisions of New York's laws

---

[*] The Clerk of Court is respectfully directed to amend the caption to conform to the above. Steven A. Nigrelli, formerly Superintendent of the New York State Police, was sued in his official capacity. By operation of Federal Rule of Appellate Procedure 43(c)(2), Dominic L. Chiumento was automatically substituted upon assuming the office of Acting Superintendent of the New York State Police on October 5, 2023, following Nigrelli's retirement.

regulating the public carriage of firearms.  In *Antonyuk*, the U.S. District Court for the Northern District of New York (Suddaby, *J.*) enjoined enforcement of more than a dozen such provisions.  In *Hardaway*, *Christian*, and *Spencer*, the U.S. District Court for the Western District of New York (Sinatra, *J.*) separately enjoined a subset of the laws previously enjoined in *Antonyuk*, though based on slightly different reasoning.  We stayed the various injunctions pending appeal, expedited the appeals, and in light of the substantial overlap among the cases, heard argument in tandem on March 20, 2023.

We now **AFFIRM** the injunctions in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion.  In summary, we uphold the district court's injunctions with respect to N.Y. Penal L. § 400.00(1)(o)(iv) (social media disclosure); N.Y. Penal L. § 265.01-d (restricted locations) as applied to private property held open to the general public; and N.Y. Penal L. § 265.01-e(2)(c) as applied to Pastor Spencer, the Tabernacle Family Church, its members, or their agents and licensees.   We vacate the injunctions in all other respects, having concluded either that the district court lacked jurisdiction or that the challenged laws do not violate the Constitution on their face.

―――――――――――――――――

ESTER MURDUKHAYEVA, Deputy Solicitor General, New York State Office of the Attorney General, New York, NY (Barbara D. Underwood, Philip J. Levitz, Alexandria Twinem, Eric Del Pozo, Sara Coco; Letitia James, Jonathan D. Hitsous, New York State Office of the Attorney General, Albany, NY, *on the briefs*), *for Defendants-Appellants Dominick L. Chiumento and Matthew A. Doran*.

TODD M. LONG, (Danielle R. Smith, *on the briefs*), City of Syracuse Office of the Corporation Counsel, Syracuse, NY, *for Defendant-Appellant Joseph Cecile*.

STEPHEN D. STAMBOULIEH, Stamboulieh Law, PLLC, Olive Branch, MS (Robert J. Olson, William J. Olson, William J. Olson, PC, Vienna, VA, *on the briefs*), *for Plaintiffs-Appellees Ivan Antonyuk, Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, And Lawrence Sloane*.

JOHN D. OHLENDORF, Cooper & Kirk, PLLC, Washington, DC (David H. Thompson, Peter A. Patterson, John W. Tienken; Nicolas J. Rotsko, Phillips Lytle LLP, Buffalo, NY, *on the briefs*), *for Plaintiffs-Appellees Jimmie Hardaway, Jr., Larry A. Boyd, Firearms Policy Coalition, Inc., and Second Amendment Foundation, Inc.*

BRIAN P. CROSBY, (Melissa M. Morton, Claude A. Joerg, *on the briefs*), Gibson, McAskill & Crosby, LLP, Buffalo, NY, *for Defendant-Appellee Brian D. Seaman.*

PETER A. PATTERSON, Cooper & Kirk, PLLC, Washington, DC (David H. Thompson, John W. Tienken; Nicolas J. Rotsko, Phillips Lytle LLP, Buffalo, NY, *on the briefs*), *for Plaintiffs-Appellees Brett Christian, Firearms Policy Coalition, Inc., and Second Amendment Foundation, Inc.*

ERIN E. MURPHY, Clement & Murphy, PLLC, Alexandria, VA (Andrew C. Lawrence, Nicholas M. Gallagher; David J. Hacker, Jeremy Dys, Keisha Russell, Ryan Gardner, First Liberty Institute, Plano, TX; Jordan E. Pratt, First Liberty Institute, Washington DC; Anjan K. Ganguly, Ganguly Brothers, PLLC, Rochester, NY, *on the briefs*), *for Plaintiffs-Appellees Micheal Spencer and His Tabernacle Family Church, Inc.*

Jeffrey S. Trachtman, Susan Jacquemot, Jason M. Moff, Kramer Levin Naftalis & Frankel LLP, New York, NY *for Amici Curiae* Bishops of the Episcopal Church in New York and New England; Synods of the Evangelical Lutheran Church in America in New York and New England; New York Conference of the United Church of Christ; Central Conference of American Rabbis; Union for Reform Judaism; Men of Reform Judaism; Women of Reform Judaism; Reconstructionist Rabbinical Association; Reconstructing Judaism; and other individual religious leaders, *in support of Defendants-Appellants in Antonyuk v. Chiumento and Hardaway v. Chiumento.*

Alvin L. Bragg, Jr., District Attorney New York County, Steven C. Wu, Chief, Appeals Division, Philip V. Tisne, Assistant District Attorney, New York County District Attorney's Office, New York, NY; Darcel D. Clark, District Attorney, Bronx County District Attorney's Office, Bronx, NY; Eric Gonzalez, District Attorney, Kings County District Attorney's Office, Brooklyn, NY; Melinda Katz, District Attorney, Queens County District Attorney's Office, Kew Gardens, NY, *for Amici Curiae* District Attorneys for New York County, Bronx County, Kings County, and Queens County, *in support of Defendants-Appellants in Antonyuk v. Chiumento*.

Janet Carter, William J. Taylor, Jr., Everytown Law, New York, NY *for Amicus Curiae* Everytown for Gun Safety, *in support of Defendants-Appellants in Antonyuk v. Chiumento and Hardaway v. Chiumento*.

Max Rodriguez, Pollock Cohen LLP, New York, NY; Raphael Janove, Pollock Cohen LLP, Philadelphia, PA, *for Amicus Curiae* Dr. Jaclyn Schildkraut, Ph.D, *in support of Defendants-Appellants in Antonyuk v. Chiumento*.

P. Benjamin Duke, Covington & Burling LLP, New York, NY, *for Amici Curiae* Giffords Law Center to Prevent Gun Violence, Brady, and March for Our Lives, *in support of Defendants-Appellants in Hardaway v. Chiumento and Christian v. Chiumento*.

Mark D. Harris, Matthew J. Morris, Proskauer Rose LLP, New York, NY; Adam L. Deming, Proskauer Rose LLP, Boston, MA, *for Amicus Curiae* Greater New York Hospital Association, *in support of Defendants-Appellants in Antonyuk v. Chiumento*.

Alan Shoenfeld, Juan M. Ruiz Toro, Joshua M. Feinzig, William Cutler Pickering Hale and Dorr LLP, New York, NY; Simon B. Kress, William Cutler Pickering Hale and Dorr LLP, Boston, MA, *for*

*Amici Curiae* Professors of Property Law, *in support of Defendants-Appellants in Antonyuk v. Chiumento.*

Hon. Sylvia O. Hinds Radix, Corporation Counsel of the City of New York, Richard Dearing, Claude S. Platton, Elina Druker, of Counsels, New York City Law Department, New York, NY, *for Amicus Curiae* The City of New York, *in support of Defendants-Appellants in Antonyuk v. Chiumento.*

Brian L. Schwab, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Alexandra Lichtenstein, Assistant Attorney General, District of Columbia, Washington, D.C.; Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, State of Illinois, Chicago, IL; Rob Bonta, Attorney General, State of California, Sacramento, CA; William Tong, Attorney General, State of Connecticut, Hartford, CT; Kathleen Jennings, Attorney General, State of Delaware, Wilmington, DE; Anne E. Lopez, Attorney General, State of Hawaii, Honolulu, HI; Anthony G. Brown, Attorney General, State of Maryland, Baltimore, MD; Elizabeth N. Dewar, Acting Attorney General, Commonwealth of Massachusetts, Boston, MA; Dana Nessel, Attorney General, State of Michigan, Lansing, MI; Keith Ellison, Attorney General, State of Minnesota, St. Paul, MN; Matthew J. Platkin, Attorney General, State of New Jersey, Trenton, NJ; Ellen F. Rosenblum, Attorney General, State of Oregon, Salem, OR; Peter F. Neronha, Attorney General, State of Rhode Island, Providence, RI; Charity R. Clark, Attorney General, State of Vermont, Montpelier, VT; Robert W. Ferguson, Attorney General, State of Washington, Olympia, WA; Edward E. Manibusan, Attorney General, Commonwealth of the Northern Mariana Islands, Saipan, MP, *for Amici Curiae* the District of Columbia, the States of Illinois, California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the

Northern Mariana Islands, *in support of Defendants-Appellants in Antonyuk v. Chiumento.*

Brian L. Schwab, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Alexandra Lichtenstein, Assistant Attorney General, District of Columbia, Washington, D.C.; Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, State of Illinois, Chicago, IL; Rob Bonta, Attorney General, State of California, Sacramento, CA; William Tong, Attorney General, State of Connecticut, Hartford, CT; Kathleen Jennings, Attorney General, State of Delaware, Wilmington, DE; Anne E. Lopez, Attorney General, State of Hawaii, Honolulu, HI; Anthony G. Brown, Attorney General, State of Maryland, Baltimore, MD; Andrea Joy Campbell, Attorney General, Commonwealth of Massachusetts, Boston, MA; Dana Nessel, Attorney General, State of Michigan, Lansing, MI; Keith Ellison, Attorney General, State of Minnesota, St. Paul, MN; Matthew J. Platkin, Attorney General, State of New Jersey, Trenton, NJ; Ellen F. Rosenblum, Attorney General, State of Oregon, Salem, OR; Michelle A. Henry, Acting Attorney General, Commonwealth of Pennsylvania, Harrisburg, PA; Peter F. Neronha, Attorney General, State of Rhode Island, Providence, RI; Charity R. Clark, Attorney General, State of Vermont, Montpelier, VT; Robert W. Ferguson, Attorney General, State of Washington, Olympia, WA, *for Amici Curiae* the District of Columbia and the States of Illinois, California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, *in support of Defendants-Appellants in Christian v. Chiumento.*

Brian L. Schwab, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Alexandra Lichtenstein, Assistant Attorney General, District of Columbia, Washington, D.C.; Kwame Raoul, Attorney General,

8

Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, State of Illinois, Chicago, IL; Rob Bonta, Attorney General, State of California, Sacramento, CA; Philip J. Weiser, Attorney General, State of Colorado, Denver, CO; William Tong, Attorney General, State of Connecticut, Hartford, CT; Kathleen Jennings, Attorney General, State of Delaware, Wilmington, DE; Anne E. Lopez, Attorney General, State of Hawaii, Honolulu, HI; Anthony G. Brown, Attorney General, State of Maryland, Baltimore, MD; Andrea Joy Campell, Attorney General, Commonwealth of Massachusetts, Boston, MA; Dana Nessel, Attorney General, State of Michigan, Lansing, MI; Keith Ellison, Attorney General, State of Minnesota, St. Paul, MN; Matthew J. Platkin, Attorney General, State of New Jersey, Trenton, NJ; Ellen F. Rosenblum, Attorney General, State of Oregon, Salem, OR; Michelle A. Henry, Acting Attorney General, Commonwealth of Pennsylvania, Harrisburg, PA; Peter F. Neronha, Attorney General, State of Rhode Island, Providence, RI; Charity R. Clark, Attorney General, State of Vermont, Montpelier, VT; Robert W. Ferguson, Attorney General, State of Washington, Olympia, WA; Joshua L. Kaul, Attorney General, State of Wisconsin, Madison, WI; *for Amici Curiae* the District of Columbia and the States of Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, *in support of Defendants-Appellants in Hardaway v. Chiumento*.

Anna Diakun, Katherine Fallow, Alex Abdo, Knight First Amendment Institute at Columbia University, New York, NY, *for Amici Curiae* the Asian Pacific American Gun Owners Association, the DC Project Foundation, the Liberal Gun Club, the National African American Gun Association, Operation Blazing Sword–Pink Pistols, and the Knight First Amendment Institute at Columbia University, *in support of Plaintiffs-Appellees in Antonyuk v. Chiumento*.

Noel J. Francisco, Robert N. Stander, Jones Day, Washington, DC; Sarah E. Welch, Jones Day, Cleveland, OH; Eric C. Rassbach, The Hugh and Hazel Darling Foundation Religious Liberty Clinic at Pepperdine Caruso School of Law, Malibu, CA; Wade J. Callendar, Callender & Co., LLC, Plano, TX, *for Amicus Curiae* Congregation Beth Aron D'Karlin, *in support of Plaintiffs-Appellees in Spencer v. Chiumento*.

Austin Kundsen, Attorney General, Chistian B. Corrigan, Solicitor General, Peter M. Torstensen, Jr. Assistant Solicitor General, State of Montana, Helena, MT; Steve Marshall, Attorney General, State of Alabama, Montgomery, AL; Tim Griffin, Attorney General, State of Arkansas, Little Rock, AR; Christopher M. Carr, Attorney General, State of Georgia, Atlanta, GA; Raúl R. Labrador, Attorney General, State of Idaho, Boise, ID; Theodore E. Rokita, Attorney General, State of Indiana, Indianapolis, IN; Brenna Bird, Attorney General, State of Iowa, Des Moines, IA; Kris Kobach, Attorney General, State of Kansas, Topeka, KS; Daniel Cameron, Attorney General, State of Kentucky, Frankfort, KY; Jeff Landry, Attorney General, State of Louisiana, Baton Rouge, LA; Lynn Fitch, Attorney General, State of Mississippi, Jackson, MS; Andrew Bailey, Attorney General, State of Missouri, Jefferson City, MO; John M. Formella, Attorney General, State of New Hampshire, Concord, NH; Gentner F. Drummond Attorney General, State of Oklahoma, Oklahoma City, OK; Alan Wilson, Attorney General, State of South Carolina, Columbia, SC; Marty J. Jackley, Attorney General, State of South Dakota, Pierre, SD; Ken Paxton, Attorney General, State of Texas, Austin, TX; Patrick Morrisey, Attorney General, State of West Virginia, Charleston, WV; Bridget Hill, Attorney General, State of Wyoming, Cheyenne, WY, *for Amici Curiae* the States of Montana, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Hampshire, Oklahoma, South Carolina, South Dakota, Texas,

West Virginia, and Wyoming, *in support of Plaintiffs-Appellees in Hardaway v. Chiumento and Spencer v. Chiumento*.

Stephen R. Klein, Barr & Klein PLLC, Washington, DC, *for Amicus Curiae* New York State Firearms Association, *in support of Plaintiffs-Appellees in Antonyuk v. Chiumento*.

Dan M. Peterson, Dan M. Peterson PLLC, Fairfax, VA; C.D. Michel, Michel & Associates, P.C., Long Beach, CA, *for Amici Curiae* New York State Sheriffs' Association, National Association of Chiefs of Police, Western States Sheriffs' Association, California State Sheriffs' Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, Connecticut Citizens Defense League, CRPA Foundation, Gun Owners' Action League Massachusetts, Gun Owners of California, Second Amendment Law Center, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, and Virginia Shooting Sports Association, *in support of Plaintiffs-Appellees in Antonyuk v. Chiumento*.

David C. Tyron, Robert Alt, Jay R. Carson, Alex M. Certo, The Buckeye Institute, Columbus, OH, *for Amicus Curiae* Project 21, *in support of Plaintiffs-Appellees in Christian v. Chiumento*.

Bradley A. Benbrook, Stephen M. Duvernay, Benbrook Law Group, PC, Sacramento, CA, *for Amicus Curiae* The Center for Human Liberty, *in support of Plaintiffs-Appellees in Antonyuk v. Chiumento*.

Jay Alan Sekulow, The American Center for Law & Justice, Washington, DC, *for Amici Curiae* The Synagogue Security Council of North America and The American Center for Law & Justice, *in support of Plaintiffs-Appellees in Spencer v. Chiumento*.

**Contents**

BACKGROUND.................................................................................16

  I.   Regulatory Background ............................................................16

     A.   Licensing ................................................................................19

     B.   Sensitive Locations ..............................................................21

     C.   Restricted Locations ............................................................22

  II.   Procedural History ................................................................23

     A.   *Antonyuk* .............................................................................23

     B.   *Hardaway* ...........................................................................27

     C.   *Christian* ............................................................................28

     D.   *Spencer* ...............................................................................29

     E.   Summary ...............................................................................30

  III.  Legal Standards Governing the Right to Keep and Bear Arms...................31

     A.   *Heller* .................................................................................32

     B.   *McDonald* ..........................................................................35

     C.   Post-*Heller* and -*McDonald* Circuit Precedent ...............36

     D.   *Bruen* ..................................................................................39

     E.   History and Tradition ..........................................................45

LICENSING REGIME ......................................................................57

  I.   Standing ..................................................................................62

  II.   Merits .....................................................................................72

     A.   The Character Requirement ................................................72

        1.   Facial Second Amendment Challenge....................................74

        2.   Historical Challenge to Licensing Officer Discretion............85

        3.   *Bruen*-Based Challenge to Licensing-Officer Discretion....................102

     B.   The Catch-All ....................................................................110

     C.   The Cohabitant Requirement .............................................113

     D.   The Social Media Requirement .........................................118

SENSITIVE LOCATIONS ........................................................................... 124

I. Treatment Centers ......................................................................... 132

  A. Standing........................................................................................ 132

  B. Merits ........................................................................................... 135

    1. District Court Decision ........................................................ 135

    2. The State's Historical Analogues ....................................... 137

      a. Well-Established and Representative............................ 137

      b. Consistency with Tradition ........................................... 140

    3. Proper Analysis of Proffered Analogues ........................... 144

II. Places of Worship .......................................................................... 146

  A. *Antonyuk* and *Hardaway* ......................................................... 148

    1. Standing and Mootness ....................................................... 148

    2. Vacatur of Preliminary Injunctions .................................. 153

  B. *Spencer* ......................................................................................... 154

    1. Burden on Religious Practice ............................................. 157

    2. Neutrality & General Applicability ................................... 163

    3. Strict Scrutiny ..................................................................... 167

    4. Irreparable Harm & Balance of Equities .......................... 170

III. Parks and Zoos .............................................................................. 172

  A. Standing........................................................................................ 172

  B. Merits ........................................................................................... 175

    1. District Court Decision ........................................................ 175

      a. Public Parks.................................................................... 178

      b. Zoos ................................................................................ 179

    2. Analysis of the Historical Analogues — Public Parks ...... 181

      a. Well-Established and Representative............................ 183

      b. Consistency with Tradition ........................................... 193

    3. Analysis of the Historical Analogues — Zoos ................... 199

a. Well-Established and Representative.................................199

b. Consistent with Tradition ........................................200

IV. Premises Licensed for Alcohol Consumption ..............................203

A. District Court Decision...............................................203

B. The State's Historical Analogues ...................................206

1. Well-Established and Representative ...................208

2. Consistency with Tradition..................................211

V. Theaters, Conference Centers, and Banquet Halls ......................214

A. Justiciability .........................................................215

B. Merits ................................................................225

1. District Court Decision .....................................225

2. The State's Historical Analogues ........................228

VI. First Amendment Gatherings ....................................................233

A. Mann ................................................................233

B. Terrille ..............................................................237

RESTRICTED LOCATIONS.............................................................239

I. Standing ..................................................................241

II. Merits.......................................................................243

A. The District Court Decisions ......................................243

1. *Antonyuk* ......................................................243

2. *Christian*......................................................246

B. Merits Analysis of *Christian* and *Antonyuk* ..............249

1. *Christian*......................................................249

a. Scope of Second Amendment .....................249

b. The State's Analogues on Appeal .................253

2. *Antonyuk* ......................................................258

CONCLUSION...........................................................................261

DENNIS JACOBS, GERARD E. LYNCH, AND EUNICE C. LEE, *Circuit Judges*:

In these four cases, heard and now decided in tandem, Plaintiffs raise First and Second Amendment challenges to many provisions of New York's laws regulating the public carriage of firearms. In *Antonyuk*, the U.S. District Court for the Northern District of New York (Suddaby, *J.*) enjoined enforcement of more than a dozen such provisions. In *Hardaway*, *Christian*, and *Spencer*, the U.S. District Court for the Western District of New York (Sinatra, *J.*) separately enjoined a subset of the laws previously enjoined in *Antonyuk*, though based on slightly different reasoning. We stayed the various injunctions pending appeal, expedited the appeals, and in light of the substantial overlap among the cases, heard argument in tandem on March 20, 2023.

We now **AFFIRM** the injunctions in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion. In summary, we uphold the district court's injunctions with respect to N.Y. Penal L. § 400.00(1)(o)(iv) (social media disclosure); N.Y. Penal L. § 265.01-d (restricted locations) as applied to private property held open to the general public; and N.Y. Penal L. § 265.01-e(2)(c) as applied to Pastor Spencer, the Tabernacle Family Church, its members, or their agents and licensees. We vacate the injunctions in all other respects, having

15

concluded either that the district court lacked jurisdiction or that the challenged laws do not violate the Constitution on their face.

## BACKGROUND

Plaintiffs are several individuals, one church, and two advocacy groups. They raise numerous challenges to provisions of New York's Concealed Carry Improvement Act ("CCIA"), primarily on Second Amendment grounds. We begin with a description of that statute and then outline the Plaintiffs' challenges in the district court and the issues on appeal. Because the Second Amendment dominates this appeal, we conclude this background section with a discussion of the Supreme Court's three 21st-century precedents addressing that Amendment: *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022).[1]

## I.    Regulatory Background

New York adopted the CCIA in the wake of the Supreme Court's decision in *Bruen*, which struck down New York's former "proper cause" requirement for carrying a concealed firearm. 142 S. Ct. at 2122. Beginning with passage of the

---

[1] Some Plaintiffs raise claims based on other constitutional provisions. The law governing those claims will be described in connection with those particular claims.

Sullivan Law in 1911 and its subsequent amendments, *see* 1911 N.Y. Laws ch. 195, § 1, p. 443; 1913 N.Y. Laws ch. 608, § 1, p. 1629, New York conditioned the right to carry a concealed firearm in public on a license that could be obtained only if the applicant demonstrated "good moral character" and a "proper cause" to carry the firearm "without regard to employment or place of possession," N.Y. Penal L. § 400.00(1)(b), (2)(f) (effective Apr. 3, 2021, to July 5, 2022). Proper cause was defined as "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *In re Klenosky*, 75 A.D.2d 793, 793 (1980), *aff'd*, 53 N.Y.2d 685 (1981). No such proper cause was required to possess a firearm at one's home. N.Y. Penal L. § 400.00(2)(a) (effective Apr. 3, 2021, to July 5, 2022).[2] An applicant for an in-home license needed only to show good moral character and to satisfy certain other statutory requirements, such as being at least 21 years old and having no felony convictions. *Id.* § 400.00(1)(a)–(c), (2)(a).

---

[2] Nor was proper cause a requirement for certain classes of people to possess a concealed firearm under certain conditions. *See, e.g.*, N.Y. Penal L. § 400.00(2)(b)-(e) (effective Apr. 3, 2021, to July 5, 2022) ("a merchant or storekeeper" "in his place of business"; "a messenger employed by a banking institution or express company" "while so employed"; "a justice of the supreme court in the first or second judicial departments," or "a judge of the New York city civil court or the New York city criminal court"; certain employees of correctional or detention institutions, as approved by an appropriate supervisor).

Addressing only New York's proper-cause requirement, the Supreme Court in *Bruen* held that that requirement violated the Second Amendment because there was no 18th- or 19th-century tradition of conditioning the right to carry a firearm in public on a state official's assessment of special need or justification. 142 S. Ct. at 2135–36, 2156. "We know of no other constitutional right," the Supreme Court explained, whose exercise depends on an individual "demonstrating to government officers some special need." *Id.* at 2156.

Following the decision in *Bruen*, New York Governor Kathy Hochul convened an Extraordinary Legislative Session, *see* N.Y. CONST. art. IV, § 3 (authorizing the governor "to convene the legislature, or the senate only, on extraordinary occasions"), during which the New York legislature passed the CCIA. Signed into law on July 1, 2022, the CCIA amended various firearms-related provisions of New York's Penal Law, General Business Law, Executive Law, and State Finance Law, as those laws relate to firearms. These appeals concern the CCIA's Penal Law amendments related to "licensing," "sensitive locations," and "restricted locations."

### A.    Licensing

Under the CCIA, applicants for both in-home and concealed-carry licenses must have "good moral character" to obtain a license.  N.Y. Penal L. § 400.00(1)(b) (2023).  The CCIA defines "good moral character" as "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."  *Id.*  As noted above, the good-moral-character requirement for both in-home and concealed-carry licenses pre-dates *Bruen* and the CCIA, but that standard had not previously been defined by statute.  *See* § 400.00(1)(b) (effective Apr. 3, 2021, to July 5, 2022).

The CCIA added other relevant requirements that are particular to the issuance of concealed-carry licenses.  An applicant for a concealed-carry license must attend an in-person meeting with a licensing officer and disclose to the officer: (1) the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home"; (2) the "names and contact information of . . . four character references who can attest to the applicant's

19

good moral character"; (3) a list of all former and current social media accounts from the preceding three years; and (4) such other information as the licensing officer may require "that is reasonably necessary and related to the review of the licensing application." *Id.* § 400.00(1)(o)(i)–(ii), (iv)–(v).

The applicant must also provide the licensing officer with a certificate verifying that he has completed certain required training. *Id.* § 400.00(1)(o)(iii). To obtain a concealed-carry license, the applicant must "complete an in-person live firearms safety course conducted by a duly authorized instructor with curriculum approved by the division of criminal justice services and the superintendent of state police." *Id.* § 400.00(19). Among other things, the course must provide "a minimum of sixteen hours of in-person live curriculum" addressing various specified topics, like general firearm safety, safe-storage requirements, situational awareness, conflict de-escalation and management, the use of deadly force, and suicide prevention. *Id.* § 400.00(19)(a)(i)–(ii), (iv)–(v), (viii)–(x). The course must also provide "a minimum of two hours of a live-fire range training." *Id.* § 400.00(19)(b). To obtain a certificate of completion, the applicant must pass a written test and show proficiency in live-fire range training. *Id.* § 400.00(19).

**B.      Sensitive Locations**

The CCIA makes it a crime to carry a firearm in a number of "sensitive

locations," even for individuals with concealed-carry licenses.  N.Y. Penal L.

§ 265.01-e(1); *cf. Bruen*, 142 S. Ct. at 2133 (recognizing a "longstanding" tradition

of "laws forbidding the carrying of firearms in sensitive places such as schools

and government buildings" (quoting *Heller*, 554 U.S. at 626)).  The CCIA

designates twenty categories of places as sensitive locations.  N.Y. Penal L.

§ 265.01-e(2)(a)–(t).  For example, firearms are prohibited in "any place owned or

under the control of federal, state or local government, for the purpose of

government administration, including courts," *id.* § 265.01-e(2)(a); in nursery

schools, preschools, public schools, and certain licensed private schools, § 265.01-

e(2)(f), (m); and "any location being used as a polling place," *id.* § 265.01-e(2)(q).

More relevant to these appeals, an individual may not carry a firearm in "any

location providing health, behavioral health, or chemical depend[e]nce care or

services," *id.* § 265.01-e(2)(b); any place of worship, *id.* § 265.01-e(2)(c); zoos and

public parks, *id.* § 265.01-e(2)(d); any place holding a license for on-premise

alcohol consumption, *id.* § 265.01-e(2)(o); "any place used for . . . performance,

art[,] entertainment, gaming, or sporting events such as theaters, . . . conference

21

centers, [and] banquet halls," *id.* § 265.01-e(2)(p); and "any gathering of

individuals to collectively express their constitutional rights to protest or

assemble," *id.* § 265.01-e(2)(s).[3]

### C.    Restricted Locations

In addition to prohibiting the carriage of firearms in any designated

sensitive location, the CCIA makes it a crime to possess firearms in a "restricted

location":

> A person is guilty of criminal possession of a weapon in
> a restricted location when such person possesses a
> firearm, rifle, or shotgun and enters into or remains on or
> in private property where such person knows or
> reasonably should know that the owner or lessee of such
> property has not permitted such possession by clear and
> conspicuous signage indicating that the carrying of
> firearms, rifles, or shotguns on their property is
> permitted or has otherwise given express consent.

N.Y. Penal L. § 265.01-d(1) (2023).  It is undisputed that the restricted-locations

provision effectively prohibits entrance with a firearm onto another person's

private property – whether that property is generally open to the public, like a

---

[3] The CCIA was amended on May 3, 2023, during the pendency of these appeals, to
narrow its provisions applicable to places of worship and public parks.  *See* Ch. 55, pt. F, § 1,
2023 N.Y. Laws.  In particular, persons "responsible for security" at places of worship are now
exempt from the place-of-worship prohibition, and the term "public parks" has been defined to
exclude specially-defined forest preserves and privately-owned land within public parks.  *Id.*
Those amendments took immediate effect.  *Id.* § 4.  We discuss the impact of those amendments
on these appeals below.

gas station or grocery store, or is generally closed to the public, like a personal residence – unless the owner or lessee of the property provides affirmative, express consent to armed entry.  *Id.*

## II.    Procedural History

As noted, we are concerned with four appeals: *Antonyuk v. Chiumento*, 22-2908-cv, 22-2972-cv; *Hardaway v. Chiumento*, 22-2933-cv; *Christian v. Chiumento*, 22-2987-cv; and *Spencer v. Chiumento*, 22-3237-cv.  While we discuss the district courts' analyses in more detail during our discussion of the challenged provisions of the CCIA, here we simply outline the events in the district courts and those courts' decisions, to provide context to that discussion.

### A.    *Antonyuk*

In *Antonyuk*, six individual Plaintiffs sued several defendants in their official capacity on September 20, 2022 in the United States District Court for the Northern District of New York, challenging aspects of the CCIA's licensing, sensitive-locations, and restricted-locations provisions.  The Plaintiffs are Ivan Antonyuk, Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, and Lawrence Sloane.  Sloane, the only Plaintiff who does not already have a concealed-carry license, brought a Second Amendment challenge to the

23

character, in-person interview, disclosure, and firearm-training requirements of the CCIA licensing regime. The other five Plaintiffs challenged certain of the CCIA's sensitive-locations provisions on Second Amendment grounds. All six Plaintiffs challenged the CCIA's restricted-locations provision on First Amendment compelled-speech and Second Amendment grounds. Altogether, the Plaintiffs sued Governor Hochul, Steven A. Nigrelli, at that time the Superintendent of the New York State Police,[4] the Superintendent of the New York State Police, and various local officials responsible for enforcing the CCIA in their respective jurisdictions: Matthew J. Doran, the licensing official of Onondaga County; William Fitzpatrick, the District Attorney of Onondaga County; Eugene Conway, the Sheriff of Onondaga County; Joseph Cecile, the Chief of Police of Syracuse; P. David Soares, the District Attorney of Albany County; Gregory Oakes, the District Attorney of Oswego County; Don Hilton, the Sheriff of Oswego County; and Joseph Stanzione, the District Attorney of Greene County.

---

[4] By operation of Federal Rule of Appellate Procedure 43(c)(2), Defendant-Appellant Dominick L. Chiumento was automatically substituted as a Defendant-Appellant after assuming the office of Acting Superintendent of the New York State Police on October 5, 2023. He replaced previous Defendant-Appellant Steven A. Nigrelli. Because former-Superintendent Nigrelli was a Defendant-Appellant when briefs were filed, the opinion cites to briefs filed on Nigrelli's behalf.

On September 22, 2022, the Plaintiffs moved for preliminary injunctive relief. On November 7, 2022, the district court (Suddaby, *J.*) granted their motion in part and denied it in part. *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 349 (N.D.N.Y. 2022).

First, the court held that Sloane had standing to challenge the CCIA's licensing requirements, *id.* at 261; that each Plaintiff had standing to challenge the restricted-locations provision, *id.* at 293–94; and that at least one Plaintiff had standing to challenge the following sensitive-location provisions: (1) any location providing behavioral health or chemical dependence care or services; (2) any place of worship; (3) public playgrounds, public parks, and zoos; (4) nursery schools and preschools; (5) buses and airports; (6) any place that is licensed for on-premise alcohol consumption; (7) theaters, conference centers, and banquet halls; and (8) any gathering of individuals to collectively express their constitutional rights to protest or assemble, *id.* at 266–67, 269–72, 275, 282–83, 285, 288, 291–92.[5]

---

[5] The *Antonyuk* Plaintiffs do not challenge the district court's ruling that they lacked standing to challenge the sensitive-locations provision as applied to: (1) any place under the control of federal, state, or local government for purposes of government administration; (2) libraries; (3) the location of any program that provides services to children and youth, or any legally exempt childcare provider; (4) summer camps; (5) the location of any program regulated, operated, or funded by the Office for People with Developmental Disabilities; (6) the

Second, the court held that the CCIA violated the Second Amendment by conditioning the issuance of a license on an applicant's good moral character and disclosure of a list of the applicant's current spouse and all adult cohabitants, a list of all former and current social media accounts from the preceding three years, and such other information as the licensing officer may require. *Id.* at 305, 308, 311–12. The court declined, however, to enjoin the requirements that an applicant attend an in-person meeting, provide four character references, and undergo firearms training. *Id.* at 306–07, 314, 316. Sloane does not challenge the latter aspects of the district court's decision.

Third, the court enjoined the sensitive-locations provisions as applied to each place a Plaintiff had standing to challenge *except* for polling places, public areas restricted from general public access for a limited time by a governmental entity, public playgrounds, nursery schools, and preschools. *Id.* at 288, 327–28,

---

location of any program regulated, operated, or funded by the Office of Addiction Services and Supports; (7) the location of any program regulated, operated, or funded by the Office of Mental Health; (8) the location of any program regulated, operated, or funded by the Office of Temporary and Disability Assistance; (9) homeless shelters, family shelters, domestic violence shelters, and emergency shelters; (10) residential settings licensed, certified, regulated, funded, or operated by the Department of Health; (11) any building or grounds of any educational institutions, colleges, school districts, and private schools; and (12) the area commonly known as Times Square. *Antonyuk*, 639 F. Supp. 3d at 261, 267, 273–74, 275, 276–79, 292. Also unchallenged is the district court's ruling that Governor Hochul was not a proper defendant because she does not have or exercise sufficient enforcement authority over the CCIA. *Id.* at 295–96.

349.  The Plaintiffs do not challenge the court's refusal to enjoin the CCIA's enforcement as to these five places.

Fourth, and finally, the court enjoined the restricted-locations provision in its entirety on First Amendment compelled-speech and Second Amendment grounds.  *Id.* at 340–47, 78–85.

**B.** *Hardaway*

In *Hardaway*, the Plaintiffs are Reverend Dr. Jimmie Hardaway, Jr., Bishop Larry A. Boyd, and two advocacy organizations: the Firearms Policy Coalition, Inc. ("FPC") and the Second Amendment Foundation ("SAF").  Reverend Hardaway is the Pastor at Trinity Baptist Church in Niagara Falls, New York, and Bishop Boyd is the Pastor at Open Praise Full Gospel Baptist Church in Buffalo, New York.  Both possess concealed-carry licenses.  On October 13, 2022, those Plaintiffs filed suit in the Western District of New York against Superintendent Nigrelli, Brian D. Seaman, the District Attorney of Niagara County, and John J. Flynn, the District Attorney of Erie County.  The Plaintiffs claimed that the CCIA's sensitive-locations provision violates the Second Amendment by prohibiting firearms in Reverend Hardaway's and Bishop Boyd's respective churches—two places of worship.

The next day, they moved for preliminary injunctive relief.  On November

3, 2022, the district court (Sinatra, *J.*) granted their motion in part and denied it in

part.  *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 426 (W.D.N.Y. 2022).  While the

court held that the two organizational plaintiffs lacked standing to bring a 42

U.S.C. § 1983 claim under this Circuit's precedents, *id.* at 427 n.3, that conclusion

did not alter the scope of relief because the court enjoined the place-of-worship

provision facially, in all of its applications, *id.* at 444–46.

### C.   *Christian*

In *Christian*, the Plaintiffs are Brett Christian, an individual licensed to

carry a concealed firearm, and FPC and SAF, the same two organizational

Plaintiffs as in *Hardaway*.  On September 13, 2022, those Plaintiffs sued

Superintendent Nigrelli and District Attorney Flynn in the Western District of

New York, challenging the restricted-locations provision on Second Amendment

grounds.  A little more than two weeks later, the Plaintiffs moved for preliminary

injunctive relief.

On November 22, 2022, the district court (Sinatra, *J.*) granted the motion in

part and denied it in part.  *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 398 (W.D.N.Y.

2022).  As it did in *Hardaway*, the court held that the two organizational Plaintiffs

lacked standing under this Circuit's precedents, *id.* at 399 n.4, but that the restricted-locations provision violated the Second Amendment, enjoining enforcement of that provision only "with respect to private property open to the public," *id.* at 410–11.

### D. *Spencer*

Finally, in *Spencer*, the Plaintiffs are Pastor Micheal Spencer, an individual licensed to carry a concealed firearm, and His Tabernacle Family Church, the church at which Spencer is the Senior Pastor. On November 3, 2023, those Plaintiffs sued Superintendent Nigrelli, Weeden A. Wetmore, the District Attorney of Chemung County, and Matthew Van Houten, the District Attorney of Tompkins County, in the Western District of New York, challenging the CCIA's places-of-worship provision. In addition to a Second Amendment challenge, they raise First Amendment challenges under the Establishment and Free Exercise Clauses, on the theory that the CCIA substantially burdens Pastor Spencer's belief that he has a religious obligation to protect his congregation.

On November 8, 2022, the Plaintiffs moved for preliminary injunctive relief. On December 22, 2022, the district court (Sinatra, *J.*) held a hearing on the motion, during which Pastor Spencer testified about, among other things, his

religious beliefs concerning self-defense and the defense of his congregation.

One week later, the district court granted the Plaintiffs' motion and enjoined the

places-of-worship provision on grounds that it violated the Free Exercise Clause,

the Establishment Clause, and the Second Amendment. *Spencer v. Nigrelli*, 648 F.

Supp. 3d 451 (W.D.N.Y. 2022). As it did in *Hardaway*, the district court enjoined

that provision facially. *Id.* at 470–71.

### E. Summary

Altogether, the district courts enjoined the CCIA's:

(1) licensing requirements that

> (a) an applicant have good moral character and

> (b) disclose to a licensing officer

>> (i) a list of the applicant's current spouse and all adult
>> cohabitants,

>> (ii) a list of all former and current social media accounts from
>> the preceding three years, and

>> (iii) such other information as the officer may require;

(2) sensitive-locations provisions concerning

> (a) locations providing behavioral health or chemical dependence
> care or services;

> (b) places of worship;

(c) public parks and zoos;

(d) buses and airports;

(e) places that are licensed for on-premise alcohol consumption;

(f) theaters, conference centers, and banquet halls; and

(g) gatherings of individuals to collectively express their constitutional rights to protest or assemble; and

(3) restricted-locations provision.

The State timely appealed and moved this Court for stays pending appeal in *Antonyuk*, *Hardaway*, and *Christian*, which were granted. The State challenges each aspect of the injunctions except for the *Antonyuk* court's injunction against the CCIA's application to buses and airports. No Plaintiff cross-appeals or otherwise challenges any aspect of the district courts' decisions adverse to them.

## III. Legal Standards Governing the Right to Keep and Bear Arms

With that background, we now outline the Supreme Court's trilogy of 21st-century cases interpreting the right to keep and bear arms: *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022). We also outline our former circuit precedent and the historical framework that

we understand Supreme Court precedent requires be applied to Second and

Fourteenth Amendment challenges asserting the right to keep and bear arms.

### A.  *Heller*

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed."  U.S. CONST. amend. II.  In *Heller*, the Supreme

Court held for the first time that the Second Amendment codifies a pre-existing

individual right to keep and bear arms for self-defense in case of confrontation—

a right that is not limited to service in an organized militia.  554 U.S. at 592, 595.[6]

---

[6] Before *Heller*, Second Amendment issues were rarely litigated in federal court.  Not until passage of the Fourteenth Amendment was it understood that any provision of the Bill of Rights applied to the States, *see Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833), and even after passage of the Fourteenth Amendment, the Supreme Court reaffirmed that the Second Amendment "means no more than that it shall not be infringed by Congress," *United States v. Cruikshank*, 92 U.S. 542, 553 (1875).  Shortly after Congress began passing firearms regulations in the first half of the 20th century, most notably in the National Firearms Act of 1934 and then the Federal Firearms Act of 1938, the Supreme Court instructed courts and litigants that the Second Amendment "must be interpreted and applied" in light of its "obvious purpose to assure the continuation and render possible the effectiveness" of the well-regulated militia.  *United States v. Miller*, 307 U.S. 174, 178 (1939).  To that end, the Supreme Court in *Miller* rejected a Second Amendment challenge to a federal prohibition on possessing sawed-off shotguns because there was no evidence that such weapons had "some reasonable relationship to the preservation or efficiency of a well regulated militia."  *Id.*  Dissenting in *Heller*, Justice Stevens pointed out that "hundreds of judges ha[d] relied on [*Miller*'s] view of the Amendment," and that the Court had in fact reaffirmed that view in 1980.  *Heller*, 554 U.S. at 638 & n.2 (Stevens, J., dissenting) (citing *Lewis v. United States*, 445 U.S. 55, 65–66 n.8 (1980)).

But that right, the Court twice cautioned, is "not unlimited," just as no other right in the Bill of Rights is unlimited. *Id.* at 595, 626. Historically, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Nor has the right ever been understood to "protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Stated differently, the Second Amendment protects the right to keep and bear "the sorts of weapons" that are "'in common use'"—a "limitation [that] is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (first quoting *United States v. Miller*, 307 U.S. 174, 179 (1939); then quoting 4 Commentaries on the Laws of England 148–49 (1769)). And, the Court made clear, "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Court identified those "regulatory measures" as "presumptively lawful," noting too that those "examples" were not

an "exhaustive" list of constitutional regulations governing firearms. *Id.* at 627 n.26.

Ultimately, however, the Court had no occasion to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626. At issue in *Heller* was a District of Columbia law that "totally ban[ned] handgun possession in the home" and "require[d] . . . any lawful firearm in the home [to] be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. The Court held that requirement was a major intrusion on "the inherent right of self-defense," because "[t]he handgun ban amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose," and because the "prohibition extend[ed] . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* "Under any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights," the challenged District of Columbia law "would fail constitutional muster." *Id.* at 628–29. The Second Amendment, if nothing else, "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

*Heller* did not offer much guidance to lower courts analyzing future

Second Amendment claims.  There would come a day, the Court explained, for it

to "expound upon the historical justifications for the exceptions [it had]

mentioned if and when those exceptions come before [it]."  *Id.*  But the Court

ruled out the standard of rational-basis review, *id.* at 628 n.27, or an "interest-

balancing inquiry" that assesses the proportionality of the law's burden to the

state's interest, *id.* at 634, because no other enumerated constitutional right is

subject to such standards, *id.* at 628 n.27, 634–35.

**B.**    *McDonald*

Two years later came *McDonald*, which held that the Second Amendment is

"fully applicable to the States."  561 U.S. at 750.  A plurality reached that

conclusion via the Due Process Clause of the Fourteenth Amendment, *id.* at 791

(plurality opinion), while Justice Thomas reached the same conclusion relying on

the Privileges or Immunities Clause of the Fourteenth Amendment, *id.* at 806

(Thomas, *J.*, concurring in part and concurring in the judgment).

Like *Heller*, *McDonald* did not survey the full scope of the Second

Amendment.  But the plurality instructed that the Second Amendment is not

"subject to an entirely different body of rules than the other Bill of Rights

guarantees." *Id.* at 780 (plurality opinion). And incorporating the Second

Amendment to apply to the States, the Supreme Court assured us, would "not

imperil every law regulating firearms":

> It is important to keep in mind that *Heller*, while striking
> down a law that prohibited the possession of handguns
> in the home, recognized that the right to keep and bear
> arms is not "a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever
> purpose." We made it clear in *Heller* that our holding did
> not cast doubt on such longstanding regulatory
> measures as "prohibitions on the possession of firearms
> by felons and the mentally ill," "laws forbidding the
> carrying of firearms in sensitive places such as schools
> and government buildings, or laws imposing conditions
> and qualifications on the commercial sale of arms." We
> repeat those assurances here.

*Id.* at 786 (quoting *Heller*, 554 U.S. at 626–27). *McDonald* also repeated *Heller*'s

clarification that "self-defense [i]s 'the *central component* of the right itself.'" *Id.* at

787 (emphasis in original) (quoting *Heller*, 554 U.S. at 599).

### C. Post-*Heller* and -*McDonald* Circuit Precedent

In the wake of *Heller* and *McDonald*, this Circuit, as well as every other

regional circuit,[7] employed a two-part test to assess Second Amendment

---

[7] *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010); *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 194–95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*,

challenges. *E.g.*, *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 118 (2d Cir. 2020). At step one, we asked whether a challenged law burdened conduct that fell within the scope of the Second Amendment based on its text and history. *Id.* If so, we proceeded to step two, assessing whether the challenged law burdened the core of the Second Amendment, defined by *Heller* as self-defense in the home. *Id.* at 119. If the burden was *de minimis*, the law was subject to intermediate scrutiny; if the burden was substantial and affected the core of the right, the law was subject to strict scrutiny. *Id.* at 119, 128.

For example, applying that two-part test in *Kachalsky v. County of Westchester*, we upheld New York State's proper-cause requirement to obtain a license to carry a concealed firearm outside the home without regard to employment or place of possession. 701 F.3d 81, 101 (2d Cir. 2012). As noted, an applicant had proper cause for such a license if he had "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Klenosky*, 75 A.D.2d at 793. In *Kachalsky*, we assumed the first step of the two-part test in favor of the challenger: specifically,

---

651 F.3d 684, 700–04 (7th Cir. 2011); *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010), *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011).

that the Second Amendment protects the right to keep and bear arms outside the home. 701 F.3d at 89, 93. Indeed, all we could tell from *Heller* and *McDonald* was "that Second Amendment guarantees are at their zenith within the home," and "[w]hat we d[id] not know [wa]s the scope of that right *beyond the home* and the standards for determining when and how the right can be regulated by a government." *Id.* at 89 (emphasis added). Proceeding to step two, we assessed the proper-cause requirement under intermediate scrutiny, because that requirement did not burden the core right of armed self-defense in the home. *Id.* at 94–96. We upheld the requirement under intermediate scrutiny because New York had "substantial, indeed compelling, governmental interests in public safety and crime prevention," *id.* at 97, and because a limitation on "handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related" to that interest, *id.* at 98.

Later, in *Libertarian Party of Erie County*, we upheld New York's character requirement, which at that time was statutorily undefined, against a facial challenge. 970 F.3d at 127–28. We acknowledged that the requirement "affect[ed] the core Second Amendment right" identified in *Heller* because it prohibited individuals lacking good moral character from possessing firearms

38

for self-defense in the home. *Id.* at 127. But the requirement "d[id] not burden the ability of '*law-abiding, responsible* citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Heller*, 554 U.S. at 635). We therefore applied intermediate scrutiny because "the conditions placed on the core Second Amendment right [we]re not onerous." *Id.* at 127–28. Applying intermediate scrutiny, we found that the challenger's complaint itself "reveal[ed] a close relationship between the licensing regime and the State's interests in public safety and crime prevention – as well as solicitude for the Second Amendment rights of citizens who are responsible and law abiding." *Id.* at 128.

### D. *Bruen*

Fourteen years after *Heller* and twelve years after *McDonald*, the Supreme Court decided *Bruen*, abrogating our circuit precedent, both the specific holding of *Kachalsky* and the general approach we took to Second Amendment claims.

*Bruen* rejected step two of "the predominant framework" described above and set out a new "test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. Thus, a court must now consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If so, "the Constitution presumptively protects that conduct." *Id.* at 2130. To

overcome that presumption, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Stated differently, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Like the Fifth, Eighth, and Eleventh Circuits, we read *Bruen* as setting out a two-step framework, with the first step based on text and the second step based on history. *See United States v. Sitladeen*, 64 F.4th 978, 985–86 & n.3 (8th Cir. 2023); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir.), *vacated pending reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023); *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023).

Applying that two-step framework, the Supreme Court struck down New York's proper-cause requirement. First, the Court held that the plain text of the Second Amendment protected the petitioners' right to carry handguns outside the home. *Bruen*, 142 S. Ct. at 2134–35. Like the challengers in *Heller* and *McDonald*, the petitioners were "ordinary, law-abiding, adult citizens" and "part of 'the people' whom the Second Amendment protects," *id.* at 2134 (quoting *Heller*, 554 U.S. at 580), and they wished to carry handguns that were "weapons

'in common use' today for self-defense," *id.* (quoting *Heller*, 554 U.S. at 627).  The

Court also held that the Second Amendment protected their right to carry those

firearms outside the home: the Second Amendment does not draw a

"home/public distinction"; the word "'bear' naturally encompasses public carry"

because even though people "keep" firearms in their homes, they do not

typically "'bear' (*i.e.*, carry) them in the home beyond moments of actual

confrontation"; and "confining the right to 'bear' arms to the home would make

little sense" because self-defense is central to the right and "[m]any Americans

hazard greater danger outside the home than in it."  *Id.* at 2134–35.

Second, New York failed to demonstrate that the proper-cause

requirement was consistent with the Nation's historical tradition of firearm

regulation.  *Id.* at 2156.  In reaching that conclusion, the Court emphasized the

exceptional nature of the proper-cause requirement.  "We know of no other

constitutional right that an individual may exercise only after demonstrating to

government officers some special need."  *Id.*  Historically, only two states, Texas

and West Virginia, had laws in the late-19th century that remotely resembled

New York's proper-cause requirement, and those states "'contradict[ed] the

overwhelming weight of other evidence regarding the right to keep and bear

arms for defense' in public." *Id.* at 2153 (quoting *Heller*, 554 U.S. at 632).  The overwhelming weight of the historical evidence revealed that legislatures did not require a showing of special need to exercise the right to public carry but instead enacted laws that "limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." *Id.* at 2156.  Thus, the Second Amendment does not tolerate a "may issue" licensing regime, like New York's former regime, that conditions the issuance of a concealed-carry license on a discretionary assessment of need or justification.  *Id.*

The Court, however, made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the . . . 'shall-issue' licensing regimes" applicable in 43 States.  *Id.* at 2138 n.9.  In "'shall issue' jurisdictions,'" licensing "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Id.* at 2123.  "Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 2138 n.9

42

(quoting *Heller*, 554 U.S. at 635). "Rather, it appears that these shall-issue

regimes, which often require applicants to undergo a background check or pass a

firearms safety course, are designed to ensure only that those bearing arms in the

jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*,

554 U.S. at 635). And those regimes do so by applying "'narrow, objective, and

definite standards' guiding licensing officials." *Id.* (quoting *Shuttlesworth v.*

*Birmingham*, 394 U.S. 147, 151 (1969)).

The Court also made clear that New York's proper-cause requirement did

not resemble the "[t]hree States – Connecticut, Delaware, and Rhode Island –

[that] have discretionary criteria but appear to operate like 'shall issue'

jurisdictions." *Id.* at 2123 n.1. For example, "[a]lthough Connecticut officials

have discretion to deny a concealed-carry permit to anyone who is not a 'suitable

person,' the 'suitable person' standard precludes permits only to those

'individuals whose conduct has shown them to be lacking the essential character

o[r] temperament necessary to be entrusted with a weapon.'" *Id.* (first quoting

CONN. GEN. STAT. § 29-28(b) (2021); then quoting *Dwyer v. Farrell*, 475 A.2d 257,

260 (1984)). Likewise, the Court explained that, while "Rhode Island has a

suitability requirement, . . . the Rhode Island Supreme Court has flatly denied

that the '[d]emonstration of a proper showing of need' is a component of that requirement." *Id.* (quoting *Gadomski v. Tavares*, 113 A.3d 387, 392 (2015); citing R. I. GEN. LAWS § 11-47-11).

The Supreme Court's simultaneous endorsement of Connecticut and Rhode Island's suitability regimes and criticism of state laws that give licensing officials "discretion to deny licenses based on a perceived lack of need or suitability," *id.* at 2123, suggests that States cannot grant or deny licenses based on suitable need or purpose but may do so based on the applicant having a suitable character or temperament to handle a weapon.[8]

---

[8] Justice Kavanaugh, joined by Chief Justice Roberts, emphasized that "[t]he Court's decision addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by 6 States including New York," under which a licensing official has "open-ended discretion" to deny concealed-carry licenses and may deny a license for a failure to "show some special need apart from self-defense." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, *J.*, concurring). "Those features," Justice Kavanaugh wrote, "in effect deny the right to carry handguns for self-defense to many ordinary, law-abiding citizens." *Id.* (internal quotation marks omitted). Accordingly, the Court did not address "objective shall-issue licensing regimes," under which the State "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162. "Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense." *Id.* Shall-issue regimes are constitutional, Justice Kavanaugh explained, so long as they "operate in [an objective] manner in practice." *Id.*

### E.    History and Tradition

*Bruen* requires courts to engage in two analytical steps when assessing

Second Amendment challenges: first, by interpreting the plain text of the

Amendment as historically understood; and second, by determining whether the

challenged law is consistent with this Nation's historical tradition of firearms

regulation, as "that delimits the outer bounds of the right to keep and bear

arms."  *Id.* at 2127.  We focus here on the history-and-tradition prong.

As we understand it, history and tradition give content to the

indeterminate and underdetermined text of the Second Amendment: "the right

of the people to keep and bear Arms."  U.S. CONST. amend. II. "As James

Madison wrote, 'a regular course of practice' can 'liquidate & settle the meaning

of' disputed or indeterminate 'terms & phrases.'"  *Chiafalo v. Washington*, 140 S.

Ct. 2316, 2326 (2020) (quoting Letter to S. Roane (Sept. 2, 1819), in 8 *Writings of

James Madison* 450 (G. Hunt ed. 1908)).  That is especially true of the Second

Amendment: like the First Amendment, the Second Amendment codifies a *pre-

existing* right, *see Heller*, 554 U.S. at 592, 603; *Bruen*, 142 S. Ct. at 2130, 2135, 2145,

and therefore can fairly be read to incorporate "traditional limitations" that

existed at or around ratification, unless historical context suggests otherwise, *cf.*

45

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (explaining that "'the freedom of speech' . . . does not include a freedom to disregard . . . traditional limitations"). Thus, while the literal text of the Second Amendment, like that of the First Amendment, contains no exception and therefore appears to be "unqualified," *Bruen*, 142 S. Ct. at 2126, 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)), its indeterminate text is "not unlimited," as the Supreme Court has repeatedly observed, *id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Accordingly, "reliance on history" and tradition "inform[s] the meaning of" the "pre-existing right" to keep and bear arms. *Bruen*, 142 S. Ct. at 2130 (emphasis omitted).

That conclusion carries several implications. First, when used to interpret text, "not all history is created equal." *Id.* at 2136. While ancient practices and postenactment history remain "critical tool[s] of constitutional interpretation," *Heller*, 554 U.S. at 605, they must be examined with some care because while history and tradition shed light on the meaning of the right to keep and bear arms – they do not create it. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35). Thus, historical practices that long

46

predate or postdate codification of the relevant constitutional provision may not have much bearing on the provision's scope if the practices were obsolete or anomalous.  *See id.*  For example, a one-off and short-lived territorial law, military decree, or local law, while no doubt relevant, will not carry the day if it contradicts the overwhelming weight of other evidence.  *See id.* at 2152 n.26, 2154–55.  What matters is "our whole experience as a Nation."  *Chiafalo*, 140 S. Ct. at 2326 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014)).

Second, in examining history and tradition, a court must identify the "societal problem" that the challenged regulation seeks to address and then ask whether past generations experienced that same problem and, if so, whether those generations addressed it in similar or different ways.  *Bruen*, 142 S. Ct. at 2131.[9]  "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century," that regulation might more likely be unconstitutional if there is a "lack of a distinctly similar historical regulation addressing that problem," or if "earlier generations addressed the societal problem . . . through materially different means," or if state courts struck

---

[9] The Court left open the question as to how to identify the level of generality at which to compare the problems addressed by contemporary legislatures with those being addressed in 1791 or 1868 to determine whether those problems are the same.

down similar regulations addressing the same problem on "constitutional grounds." *Id.* Conversely, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide [a court's] interpretation of an ambiguous constitutional provision." *Id.* at 2137 (quoting *Noel Canning*, 573 U.S. at 572 (Scalia, *J.*, concurring in the judgment)). And if courts during that period upheld similar governmental practices against similar constitutional challenges, that is strong evidence of constitutionality. *Id.* at 2155 & n.30.

Third, the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much. Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky; it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms.[10] There are many reasons why the historical record may not evince statutory prohibitions on a given practice. For example, lawmakers are

---

[10] *See* Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen, *Gun Rights, and the Shackles of History*, 73 DUKE L.J. 67, 153 (2023) (criticizing such an inference because it "elevates mere unregulated conduct to the status of inviolate constitutional right").

not moved to forbid behavior that is governed by custom, universal practice, or private warning.  No legislation is needed to forbid zoo patrons from entering the lion's enclosure; similarly, a town with only a single daycare facility that privately bans firearms from its premises has no need to pass a regulation prohibiting guns in daycare centers.  Thus, "[t]he paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations." *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (Hardiman, *J.*, concurring in part and concurring in the judgments) (quoting Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1354 (2009)).  Stated differently, "novelty does not mean unconstitutionality."  *Id.* at 368.  That is so even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today.

Fourth, courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction.  To put it plainly, our era does not resemble those.  Thus, the lack of a distinctly similar historical regulation, though (again) no doubt relevant, may not be reliably dispositive in Second Amendment

49

challenges to laws addressing modern concerns.  Such a lack of precedent was, to be sure, dispositive in *Bruen*.  But that was due to the exceptional nature of New York's proper-cause requirement, which conditioned the exercise of a federal constitutional right on the rightsholder's reasons for exercising the right.  As the Supreme Court explained, and as we repeated earlier, "[w]e know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need." *Bruen*, 142 S. Ct. at 2156.  "[A] more nuanced approach" will often be necessary in cases challenging less exceptional regulations.  *Id.* at 2132.  The Supreme Court emphasized in *Bruen* that such a "more nuanced approach" is necessary in cases concerning "new circumstances" or "modern regulations that were unimaginable at the founding," such as regulations addressing "unprecedented societal concerns or dramatic technological changes." *Id.*

Fifth, under the more nuanced approach, the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*  When reasoning by analogy, a court should ask whether the challenged regulation and the proposed historical analogue are "relevantly similar." *Id.* (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).  In making that

determination, a court must identify an appropriate metric by which to compare the two laws. *Id.* Without "provid[ing] an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," *Bruen* identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Thus, under the more nuanced approach, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767).

*Bruen* emphasized that "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* A court should not uphold modern laws simply because they remotely resemble historical outliers. *Id.* Conversely, a court should not search in vain for a "historical *twin*"; "a well-established and representative historical *analogue*" is sufficient. *Id.* Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* As an "example" of how modern regulations can be justified through analogical historical analysis, *Bruen* analogized regulations regarding schools and government buildings to

51

more historically precedented "sensitive place" regulations regarding legislative

assemblies, polling places, and courthouses:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited–*e.g.*, legislative assemblies, polling places, and courthouses–we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id.*

Sixth, just as the existence *vel non* of a *distinctly similar* historical regulation

is not dispositive, it is likewise not dispositive whether *comparable* historical

regulations exist in significant numbers. The *Bruen* court's rejection of certain

historical analogues due to the "miniscule territorial populations who would

have lived under them" occurred in the exceptional context of a regulation that

"'contradic[ted] the overwhelming weight' of other, more contemporaneous historical evidence." *Id*. at 2154–55 (quoting *Heller*, 554 U.S. at 632). In less exceptional contexts lacking such countervailing historical evidence, the absence in other jurisdictions of positive legislation distinctly similar to a proffered historical analogue does not command the inference that legislators there deemed such a regulation inconsistent with the right to bear arms. In a similar vein, while evidence that "some jurisdictions actually attempted to enact analogous regulations" that "were rejected on constitutional grounds . . . surely would provide some probative evidence of constitutionality," *Id*. at 2131, the lack of any "disputes regarding the lawfulness of such prohibitions" may lead to the inference that it was "settled" that states could prohibit or regulate arms in that manner "consistent with the Second Amendment." *Id*. at 2133.

Consider, for example, *Bruen*'s reference to legislative assemblies, polling places, and courthouses. In finding those places supported by the historical record, *Bruen* cited a law review article and amicus curiae brief that cited a few laws existing around the time of the adoption of the Second Amendment. Amicus curiae, for example, cited one law prohibiting arms at legislative assemblies, *see* 1647 Md. Laws 216; two laws prohibiting arms at polling places,

*see* Del. Const. of 1776, art. 28; 1787 N.Y. Laws 345; and one law prohibiting arms

in courthouses, *see* 1786 Va. Acts 33, ch.21. Although the law review article

treated those laws as aberrational, *see* Kopel & Greenlee, *supra*, at 235–36, the

*Bruen* Court examined those few prohibitions in context and explained that it

was "aware of no disputes regarding the lawfulness of such prohibitions," 142 S.

Ct. at 2133.  Thus, depending on the historical context, comparable historical

laws need not proliferate to justify a modern prohibition.[11]

Seventh, as we noted above, the right to keep and bear arms is applicable

to the States through the Fourteenth Amendment, *see McDonald*, 561 U.S. at 750,

which was adopted in 1868.  Acknowledging as much, however, *Bruen* expressly

declined to decide "whether courts should primarily rely on the prevailing

understanding of an individual right when the Fourteenth Amendment was

ratified in 1868 when defining its scope."  142 S. Ct. at 2138.

---

[11] While the law review article also cited several more 19th-century and Reconstruction Era laws supporting prohibitions at polling places and courthouses, *see* Kopel & Greenlee, *supra*, at 245–47, *Bruen*'s analysis was independent of those laws, *cf.* 142 S. Ct. at 2138 (declining to address "whether courts should primarily rely on the prevailing understanding of" the right to keep and bear arms from around 1791 (the Second Amendment's ratification) or 1868 (the Fourteenth Amendment's ratification)).  And, to the extent *Bruen* did rely on those later prohibitions, that confirms our conclusion that courts–rather than ignoring laws because they are "too old" or not "old enough"–should consider this Nation's *whole* tradition.

Because the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis. *See Bruen*, 142 S. Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people *adopted* them." (quoting *Heller*, 554 U.S. at 634–35)); *McDonald*, 561 U.S. at 778 (plurality opinion) ("[I]t is clear that the *Framers and ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." (emphasis added)). The time periods in close proximity to 1791 and 1868 are also relevant to our analysis. True, the farther we depart from these key dates, the greater the chance we stray from the original meaning of the constitutional text. *See Bruen*, 142 S. Ct. at 2137. Nevertheless, it is implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era. [12] And it is implausible that such public understanding would promptly dissipate whenever that era gave way to another. In this way, sources from the time periods close around these dates

---

[12] Although this may suggest that the values articulated in *Bruen* would tolerate reference to a more expansive sweep of time, we are careful to limit our analysis to the two relevant historical moments and the periods close around them. *See* 142 S. Ct. at 2136 ("[W]e must also guard against giving postenactment history more weight than it can rightly bear."). This is a useful discipline, and maybe necessary, for thinking about the Second Amendment in a way that avoids inconsistency, cherry-picking, and special pleading.

"illuminat[e] the understanding of those steeped in the contemporary understanding of a constitutional provision." *Duncan v. Bonta*, 83 F.4th 803, 819 (9th Cir. Oct. 10, 2023) (Butamay, *J.*, dissenting).

"*McDonald* confirms" that understanding. *Ezell*, 651 F.3d 684, 702 (7th Cir. 2011). As some scholars urged the Court to do,[13] the *McDonald* plurality looked to evidence of the pre-Civil War and Reconstruction Eras to hold that right to keep and bear arms was a fundamental right fully applicable to the States. *See* 561 U.S. at 770–78 (plurality opinion). In so holding, the plurality gave particular emphasis to how "the *Framers and ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778 (emphasis added). It would be incongruous to deem the right to keep and bear arms fully applicable to the

---

[13] *See* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 GEO. J.L. & PUB. POL'Y 1, 52 (2010) ("Analyzing the meaning of the right to keep and bear arms in 1791 was proper in *Heller*, because the Second Amendment in that case only applied to the federal government. In *McDonald*, however, the key year is 1868, and the Court should look at evidence from the time of Reconstruction, not the time of the Revolution."); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 TEX. L. REV. 7, 115–16 (2008) ("We think [Akhil] Amar is exactly right that for those wondering about incorporation or judicial protection against the states of unenumerated rights in federal constitutional law, the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868.").

States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards.

We therefore agree with the decisions of our sister circuits – emphasizing "the understanding that prevailed when the States adopted the Fourteenth Amendment" – is, along with the understanding of that right held by the founders in 1791, a relevant consideration. *Bondi*, 61 F.4th at 1322; *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 112 (3d Cir. 2023) (en banc) (Ambro, J., concurring) (observing that if the relevant period extends beyond the Founding era, "then Founding-era regulations remain instructive unless contradicted by something specific in the Reconstruction-era"); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and* Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted." (emphasis added)); *Ezell*, 651 F.3d at 702, 705–06 (explaining that a "wider historical lens" is required for a local—or state—regulation, and considering evidence from both the Founding-era and Reconstruction).

## LICENSING REGIME

Plaintiffs' first set of challenges are to provisions of New York's law governing licensure of firearms. "New York maintains a general prohibition on

the possession of 'firearms' absent a license." *Kachalsky*, 701 F.3d at 85.

Individuals holding a firearm license are exempt from most (but not all) of New

York's criminal prohibitions on firearm possession. N.Y. Penal L. § 265.20(a)(3).

"Section 400.00 of the Penal Law 'is the exclusive statutory mechanism for the

licensing of firearms in New York State.'" *Kachalsky*, 701 F.3d at 85 (quoting

*O'Connor v. Scarpino*, 83 N.Y. 2d 919, 920 (1994)). Section 400.00 provides for

many types of firearm licenses, *see generally* N.Y. Penal L. § 400.00(2), but this case

focuses on "concealed carry licenses," which allow the holder to "have and carry

[a pistol or revolver] concealed, without regard to employment or place of

possession." *Id.* § 400.00(2)(f).

Before us are facial Second Amendment challenges to four components of

New York's firearm licensing regime:

- N.Y. Penal L. § 400.00(1)(b) — To receive a firearm license, the applicant must
  be "of good moral character." Following the enactment of the CCIA, "good
  moral character" means "having the essential character, temperament and
  judgment necessary to be entrusted with a weapon and to use it only in a
  manner that does not endanger oneself or others." We refer to this provision
  as the "character requirement" or "character provision." "Good moral
  character" appears to be a prerequisite for all types of firearm licenses, but
  since both the district court and the Plaintiffs discuss the character
  requirement only with respect to concealed carry licenses, and since the sole
  Plaintiff claiming he is injured by the licensing regime asserts a desire to

obtain only a concealed carry license, we confine our discussion to that context.

- N.Y. Penal L. § 400.00(1)(o)(i) — An applicant for a concealed carry license must "submit to the licensing officer . . . names and contact information for the applicant's current spouse, [] domestic partner, [and] any other adults residing in the applicant's home, including any adult children of the applicant." The applicant must further disclose "whether or not there are minors residing, full time or part time, in the applicant's home." We refer to this provision as the "cohabitants requirement."

- N.Y. Penal L. § 400.00(1)(o)(iv) — An applicant for a concealed carry license must "submit . . . a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicant[']s character and conduct." We refer to this provision as the "social media requirement."

- N.Y. Penal L. § 400.00(1)(o)(v) — An applicant for a concealed carry license must "submit . . . such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application." We refer to this provision as the "catch-all" requirement.

Plaintiffs argue that these requirements interfere with their right to carry a gun publicly and violate the Second Amendment because they lack a sufficient basis in the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The district court agreed and enjoined defendants from enforcing these four requirements.[14]

---

[14] Plaintiffs challenged other aspects of the licensing regime in the district court, including provisions that require concealed carry applicants to attend an in-person interview

59

First, we conclude that at least one Plaintiff has presented a justiciable challenge to the licensing regime. The cohabitants, social media, and "catch-all" requirements have deterred Plaintiff Lawrence Sloane from obtaining a concealed carry license, a cognizable injury traceable to the enforcement of those provisions and redressable by an injunction. And given the close relationship between the disclosure requirements and the character requirement, Sloane's injury is attributable to the character provision itself and redressable by an injunction against enforcement. Although a plaintiff who challenges a rule that renders him ineligible to receive a license must first either seek a license or show that his application would be denied, a plaintiff (like Sloane) who challenges a component of the application process itself is *not* required to subject himself to that process in order to present a justiciable constitutional claim.

Second, on the merits, we affirm the district court's injunction in part and vacate it in part. We reject Sloane's challenges to the character, catch-all, and cohabitants requirements. The character requirement, we conclude, is not *facially*

---

with the licensing officer, submit a list of four character references, and complete 18 hours of in-person firearms training. The district court concluded that Plaintiffs had not demonstrated substantial likelihood of success on these claims and accordingly denied preliminary relief with respect to those provisions. *See Antonyuk*, 639 F. Supp. 3d at 307, 314, 316. Plaintiffs have not cross-appealed from or otherwise challenged those rulings here, so we express no view on them.

unconstitutional.  A reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons.  We do not foreclose as-applied challenges to particular character-based denials, but the provision is not invalid in all of its applications.

Nor does the bounded discretion afforded to licensing officers by the character provision render it invalid.  On the contrary, *Bruen* explains that several licensing regimes with arguably discretionary criteria identical to New York's are *consistent* with its analysis.  Similarly, although it is possible that a licensing officer *could* make an unconstitutional demand for information pursuant to the catch-all, we cannot conclude that there are *no* questions a licensing officer might constitutionally ask an applicant under that provision.  Since the catch-all has a "plainly legitimate sweep," we cannot strike it down on its face.  Finally, the cohabitants requirement is consonant with the long tradition of considering an applicant's character and reputation when deciding whether to issue a firearm license.

But we affirm the preliminary injunction against enforcement of the social media requirement: although the *review* of public social media posts by a

licensing officer poses no constitutional difficulties, requiring applicants to

disclose even pseudonymous names under which they post online imposes an

impermissible infringement on Second Amendment rights that is unsupported

by analogues in the historical record and moreover presents serious First

Amendment concerns.

## I.    Standing

We must first consider our jurisdiction.  *E.g.*, *Sinochem Int'l Co. v. Malaysia*

*Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).  Article III courts have power to

decide only "Cases" or "Controversies."  U.S. CONST. art. III, § 2, cl. 1.  "'The

doctrine of standing gives meaning to these constitutional limits,' by requiring a

plaintiff to 'allege such a personal stake in the outcome of the controversy as to

warrant his invocation of federal-court jurisdiction and to justify exercise of the

court's remedial powers on his behalf.'"  *Knife Rights, Inc. v. Vance*, 802 F.3d 377,

383 (2d Cir. 2015) (alteration adopted) (first quoting *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 157 (2014); then quoting *Warth v. Seldin*, 422 U.S. 490, 498–

99 (1975)).  "To establish Article III standing, a plaintiff must have '(1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"

62

*Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Lawrence Sloane, a Plaintiff in the *Antonyuk* case, is the sole Plaintiff in the cases before us who claims standing to challenge New York's licensing regime. Sloane avers that he has long wanted to obtain a New York concealed carry license and "intended to apply for [his] carry license" after the Supreme Court decided *Bruen.* J.A. 144 (Sloane Decl. ¶¶ 3–4). But the CCIA caused him to reconsider because he is unwilling to "provide the government of New York with information about [his] family[] on the carry license application," *id.* at 146 (Sloane Decl. ¶ 10); to submit "information about [his] associates, so some licensing official can interrogate them about [his] life," *id.* at 147 (Sloane Decl. ¶ 16); or to "turn over [his] 'social media' . . . to the government[] as a condition of applying for a license," lest he be forced to "self-censor . . . knowing that the state's prying anti-gun eye is looking over [his] shoulder," *id.* at 145 (Sloane Decl. ¶¶ 8–9). He also objects to the required interview with the licensing officer "because there do not appear to be any limits on the questions [he can be] asked," an objection we understand as relating also to the officer's ability to request supplemental information pursuant to the catch-all disclosure

63

requirement.  *Id.* at 147 (Sloane Decl. ¶ 17).  Sloane does not have the option to

omit this information, as incomplete applications "will not be processed."  *Id.* at

148 (Sloane Decl. ¶ 21 & n.2) (quoting Onondaga County Sheriff's website).  But

"[i]f these unconstitutional requirements were removed from the application,"

Sloane declares, he "would immediately submit [an] application for a concealed

carry license, something [he] greatly desire[s] to obtain and, but for the CCIA's

unconstitutional demands, [he] would seek to obtain."  *Id.* at 151 (Sloane Decl.

¶ 30).

Sloane has standing to challenge the disclosure requirements (which for

standing purposes we assume to be unconstitutional) based on these averments.

Sloane is deterred from seeking—and thereby prevented from obtaining—a

concealed carry license; he is injured by the consequent inability to exercise his

Second Amendment rights; that injury is traceable to the defendants'

enforcement of these provisions (their refusal to process applications omitting

the required information); and the injury is redressable by the injunction that

Sloane seeks, because he would apply if the requirements were stricken.

True, Sloane's injury stems from his own unwillingness to comply with the

challenged requirements; but so long as the interest at stake is cognizable (as

Sloane's interest in carrying a firearm surely is), a plaintiff suffers an injury-in-fact if the defendant's allegedly unlawful conduct impairs that interest, even if it does so by deterring the plaintiff due to his individual, but reasonable, sensibilities.  In *Friends of the Earth, Inc. v. Laidlaw Environmental Services. (TOC), Inc.*, 528 U.S. 167 (2000), members of an environmental organization had standing to sue the operator of a wastewater treatment plant for discharging contaminants.  Plaintiffs who wanted to visit the river for recreation had become unwilling to do so because of their own anxiety about the defendant's pollution. *See id.* at 181–83.  The Court explained that the plaintiffs had a cognizable interest in their enjoyment and use of the river, and "Laidlaw's discharges . . . directly affected those affiants' recreational, aesthetic, and economic interests" by way of their "reasonable concerns about the effects of those discharges."  *Id.* at 183–84. Since the plaintiffs had alleged that "they would use the [river] for recreation if Laidlaw were not discharging pollutants into it," they had Article III standing. *Id.* at 184.

Sloane has standing with respect to the three disclosure requirements because defendants' enforcement of the (allegedly unlawful) requirements impairs Sloane's interest in obtaining a license by deterring him from applying.

However, the character requirement presents a slightly different question: rather than being a component of the application itself, the character provision determines who can *receive* a concealed carry license. And it is unclear at best whether Sloane is deterred by the character requirement itself, as opposed to the investigation it might prompt.

But the CCIA's character requirement is inextricable from its disclosure requirements. The State explains that the required disclosures are solely "intended to inform a licensing officer's assessment of good moral character"—they merely implement the character requirement. *Antonyuk* Nigrelli Br. at 29.[15] Sloane's injury is thereby traceable to the character requirement itself, even if he is *directly* deterred only by the disclosure requirements. And an injunction against considering "good moral character" would redress Sloane's injury: if character ceased to determine the licensing decision, the State would have no reason for the invasive inquiries that deter Sloane from applying for a license. *See* J.A. 145–47 (Sloane Decl. ¶¶ 9, 10, 15). Thus, in these particular circumstances and on the record before us, we can decide his claims on the merits because we

---

[15] The appellants in *Antonyuk* filed two briefs: one on behalf of former defendant Nigrelli and defendant Doran, and one on behalf of defendant Cecile. We cite the former as "*Antonyuk* Nigrelli Br." and the latter as "*Antonyuk* Cecile Br."

66

are satisfied that Sloane is suffering a cognizable injury that is traceable to the challenged provisions and redressable by the injunction he seeks.

Unsurprisingly, the State sees things differently.  Relying on our decisions in *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), and *Libertarian Party of Erie County*, the State contends that a litigant who wishes to challenge a licensing regime must either apply for a license and be denied or make a substantial showing that his application would be futile.  But challenging a rule that limits *eligibility* for a license is different from challenging a component of the application process itself.  This case is an example of the latter, while the *Decastro* rule governs only the former.

In *Decastro*, the criminal defendant challenged his conviction for unlawful transport of a firearm across state lines: New York's licensing regime was so restrictive, he argued, that the only way he could exercise his Second Amendment rights was to purchase a gun in another state and bring it into New York.  *See* 682 F.3d at 163–64.  We treated his claim as "tantamount to a challenge to [New York's licensing] scheme" on the theory that the New York regime was "constitutionally defective" because it barred too many individuals from gun ownership.  *Id*.  Given the nature of this claim, we concluded that he "lack[ed]

standing to challenge the licensing laws of the state" because he had failed to

show that he was one of those individuals rendered ineligible for a permit, *i.e.*,

that he had been or would have been denied a license under the allegedly-

unconstitutional rules.[16]  *Id.* at 164; *cf. id.* at 163 ("'[A] person to whom a statute

may constitutionally be applied will not be heard to challenge that statute on the

ground that it may conceivably be applied unconstitutionally to others.'"

(quoting *Parker v. Levy*, 417 U.S. 733, 759 (1974)).  We applied *Decastro* to

conceptually identical claims in *Libertarian Party*, in which the plaintiffs argued

that New York had impermissibly restricted eligibility for firearm licenses.  *See*

970 F.3d at 114–15.  But since many of the plaintiffs had neither applied for

licenses nor demonstrated futility, we dismissed their claims for lack of standing.

*Id.* at 121–22.

---

[16] *Decastro* can be read as a case about injury—and failure to apply for a license is sometimes best understood that way—but Decastro's criminal conviction surely qualified as an Article III injury-in-fact.  Instead, we understand his standing to have faltered on traceability: his refusal to use the state's licensing procedure severed the causal chain connecting the challenged rule to his conviction.  Similarly, *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091 (2d Cir. 1997)—a case on which *Decastro* and many other decisions in this area rely—also sounds in traceability.  There, a prison had forbidden an inmate from wearing certain religious garb to his father's funeral.  We acknowledged that while the plaintiff had been *injured*, he lacked standing because he had neither registered his religious affiliation (enabling him to wear the garb) or shown that such registration would have been futile.  Accordingly, any injury was traceable not to the defendants but to "his own decision not to follow the simple procedure of registering his religion."  115 F.3d at 1095.

68

*Decastro* governs only challenges to a licensing rule regarding eligibility. *Bruen* also exemplifies this sort of challenge: the plaintiffs asserted a desire (and right) to carry a gun publicly, sought a license to do so, and were denied based on an eligibility rule—the proper cause requirement—which they alleged was unconstitutionally restrictive. *See Bruen*, 142 S. Ct. at 2125. Since the plaintiff's injury in such a case stems from his personal ineligibility for a license, the plaintiff must prove up that premise either by applying for a license or by making a substantial showing of futility. In this context, then, "futility" refers to the *outcome* of the contemplated application, *i.e.*, whether the result is preordained. *See Decastro*, 682 F.3d at 164 (sufficiency of a futility showing is judged on whether plaintiff has shown that his application would have been denied); *Bach v. Pataki*, 408 F.3d 75, 82–83 (2d Cir. 2005) (application was futile where applicant "was statutorily ineligible for [the] carry license"); *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201–02 (2d Cir. 1977) (bid for contract was futile "since it is obvious that [the potential bidder] could not have been awarded a contract"). The district court therefore erred in concluding that Sloane's application was futile because it would not have been processed in a timely

69

manner.  *See* A*ntonyuk*, 639 F. Supp. 3d at 260.  Futility refers to the denial of an

application; delays in receiving a decision do not render an application futile.

Sloane's challenge is of a different type.  Rather than challenge eligibility

criteria, Sloane argues that a portion of the application *process* is unconstitutional.

His injury flows from the application itself, not from his asserted ineligibility for

a license.  Indeed, he pleads the opposite: "Lawrence Sloane . . . is a law-abiding

person . . . and is (aside from not having a license) eligible to possess and carry

firearms in the state of New York."  J.A. 19 (Compl. ¶ 7).  The State's reliance on

*Decastro* is thus premised on its misapprehension of the nature of Sloane's claim.

The State even asserts that "the license application 'denial . . . is [the] distinct

injury'" *whenever* a plaintiff challenges a licensing regime. [17]  *Antonyuk* Nigrelli Br.

at 26 (alterations in original) (quoting *Parker v. District of Columbia*, 478 F.3d 370,

376 (D.C. Cir. 2007)).  But when the plaintiff challenges the application itself (or

as here, a portion thereof), he is *not* required to first apply for and be refused a

---

[17]  The full quote from *Parker*—which the Supreme Court affirmed as *District of Columbia v. Heller*—makes clear that the D.C. Circuit was opining on Heller's injury, not making a blanket statement about *all* licensing challenges: "[Heller] is not asserting that his injury is only a threatened prosecution, nor is he claiming only a general right to handgun ownership; he is asserting a right to a registration certificate, the denial of which is *his* distinct injury."  478 F.3d at 376 (emphasis added).  And the D.C. Circuit was correct: Heller's constitutional claim centered on his ineligibility for a license and was thus akin to those in *Decastro*, *Libertarian Party*, and *Bruen*.  *See id.* ("[Heller] invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his ownership of a handgun under D.C. law.").

license.  *See Brokamp v. James*, 66 F.4th 374, 387–89 (2d Cir. 2023) (no application

or futility required when mental health counselor challenged licensing

requirement as violation of First Amendment right to give counsel); *Desiderio v.*

*National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999) (would-be

securities dealers' challenge to mandatory arbitration consent as condition to

licensure).[18]

By eliding the distinction between challenges to eligibility rules and to the

application process, the State in effect argues that the only way a plaintiff can

challenge an application process is to do exactly what the plaintiff claims that he

may not be required to do.  Such a rule contravenes common sense.  An applicant

who challenges an application *itself* is not required to first comply with the

---

[18] *Desiderio* and *Sammon* are framed in terms of ripeness rather than standing, but we understand them to apply the same justiciability principles as failure-to-apply cases using a standing framing.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing."); 13B WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. § 3531.12 (3d ed.) ("Although discrete names have been given to the several nominate categories of justiciability, they are tied closely together. . . . The most direct connections run between standing and ripeness.").  We have expressly noted that arguments of this type sound in both standing and ripeness.  *Bach*, 408 F.3d at 82 & n.15 (defendants' "'standing' objection" regarding plaintiff's failure to apply for license "might also be understood as a ripeness challenge"); *see also Image Carrier*, 567 F.2d at 1201–02 (construing argument that plaintiff "should have bid for City work and been turned down in order to present a justiciable claim" as sounding in ripeness instead of standing).

objected-to component before bringing suit.  Therefore, Sloane may challenge the disclosure requirements without first making the required disclosures.

## II.    Merits

Having assured ourselves of our jurisdiction, we consider whether the challenged portions of New York's licensing regime violate the Constitution.

### A.    The Character Requirement

To recapitulate, the character requirement states that "[n]o license shall be issued or renewed except for an applicant . . . of good moral character."  N.Y. Penal L. § 400.00(1)(b).  Since 1913, New York has required concealed carry licensees to possess "good moral character,"[19] but this phrase was left statutorily undefined until the CCIA added the following definition: "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."  *Id.*

Between them, Sloane and the district court put forward three reasons why the character requirement is unconstitutional.  First, Sloane contends that the character requirement is, despite its century-long history, facially inconsistent

---

[19] *See* 1913 N.Y. Laws ch. 608, § 1, p. 1629 ("It shall be lawful for any magistrate, upon proof before him that the person applying therefor is of good moral character . . . to issue to such person a license to have and carry concealed a pistol or revolver . . . .").

with the history and tradition of firearm regulation.  Second, the district court

concluded that the discretion baked into the character provision is unsupported

by history and tradition, and is therefore impermissible.  Finally, Sloane argues

that statements in *Bruen* categorically forbid states from conferring any discretion

on licensing officers.

We reject all three arguments and vacate the district court's injunction

against enforcement of the character requirement.  First, the requirement is not

facially invalid because it is not unconstitutional in *all* its applications.  The

CCIA's definition of "character" is a proxy for dangerousness: whether the

applicant, if licensed to carry a firearm, is likely to pose a danger to himself,

others, or public safety.  And there is widespread consensus (notwithstanding

some disputes at the margins) that restrictions which prevent dangerous

individuals from wielding lethal weapons are part of the nation's tradition of

firearm regulation.  We therefore cannot conclude that *every* denial on grounds of

"good moral character" as defined by New York will violate the Second

Amendment, though various avenues lie open for as-applied challenges.

Next, we disagree with the district court's conclusion that affording

licensing officers a modicum of discretion to grant or deny a concealed carry

permit is inconsistent with the nation's tradition of firearm regulation. For as long as licensing has been used to regulate privately-owned firearms, issuance has been based on discretionary judgments by local officials. Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment.

Finally, *Bruen* does not forbid discretion in licensing regimes—on the contrary, the *Bruen* Court specifically stated that its decision did not imperil the validity of more than a dozen licensing schemes that confer discretion materially identical to the CCIA. At most, the Court indicated that the practical operation of a licensing scheme is relevant to whether it is impermissibly discretionary. It was therefore error to strike down New York's scheme on a facial challenge.

### 1.    Facial Second Amendment Challenge

At the outset, the State argues that the character requirement does not actually implicate the Second Amendment and therefore may be upheld without reference to historical analysis. *Bruen* instructs that history is relevant only if "the Second Amendment's plain text covers an individual's conduct," 142 S. Ct. at 2126, and this threshold inquiry requires courts to consider three issues: whether the conduct at issue is protected, whether the weapon concerned is "in

74

common use," and whether the affected individuals are "ordinary, law-abiding, adult citizens" and thus "part of 'the people' whom the Second Amendment protects."  *See id.* at 2134 (resolving all three of these questions before proceeding to historical analysis).  The State contends that, because the character requirement requires only that licensees can be entrusted to wield a gun responsibly, it does not infringe the rights of "law-abiding, responsible citizens" and so need not be assessed for consistency with history and tradition.

This potentially dispositive argument bears upon the scope of the Second Amendment right.  The State reasons that the character provision impairs the ability to bear arms only of those individuals who *do not have Second Amendment rights* in the first place: the irresponsible.  That is a controversial supposition. Though the Supreme Court has suggested that "law-abiding," "responsible," and/or "ordinary" individuals are protected by the Second Amendment,[20] it is far

---

[20] *See Heller*, 554 U.S. at 635 ("[W]hatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."); *Bruen*, 142 S. Ct. at 2122 (summarizing *Heller* and *McDonald* as "recogniz[ing] that the Second and Fourteenth Amendments protect the right *of an ordinary, law-abiding citizen* to possess a handgun in the home for self-defense," and framing its own holding as extending only *that* right to public carry (emphasis added)); *id.* at 2138 n.9 (suggesting that licensing regimes which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" and instead "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" are consistent with *Bruen*'s analysis); *id.* at 2156 ("Nor . . . have American governments required law-abiding, responsible citizens to [show proper cause] . . . in

from clear whether these adjectives describe individuals who stand *outside* the

Second Amendment or instead those who may be disarmed *consistent with* that

Amendment.  *See Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J.,

dissenting) (summarizing these two positions and explaining that "one uses

history and tradition to identify the scope of the right, and the other uses that

same body of evidence to identify the scope of the legislature's power to take it

away").  Indeed, the Fifth Circuit, the Third Circuit en banc, and then-Judge

Barrett in a Seventh Circuit dissent have advocated the latter view (contrary to

the State's position here).  *See id.* at 453 (Barrett, J., dissenting); *Rahimi*, 61 F.4th at

451–53; *Range*, 69 F.4th at 101–03.

    But we may resolve this appeal without opining on a tricky question with

wide-ranging implications.  The character requirement has not been enforced

against a Plaintiff, nor has any Plaintiff alleged that he would be denied a license

on character grounds—Sloane therefore brings only a facial challenge to the

---

order to carry arms in public."); *see also United States v. Jimenez*, 895 F.3d 228, 234–35 (2d Cir. 2018) ("The Supreme Court thus identified the core of Second Amendment protections by reference not only to particular uses and particular weapons but also to particular persons, namely, those who are 'law-abiding and responsible.'"); *United States v. Bryant*, 711 F.3d 364, 369 (2d Cir. 2013) ("We read [*Heller's*] exegesis as an implicit limitation on the exercise of the Second Amendment right to bear arms for 'lawful purposes,' and a limitation on ownership to that of 'law-abiding, responsible citizens.'" (alteration adopted) (quoting *Heller*, 554 U.S. at 628, 630, 635)).

character provision. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) ("Because plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-applied,' challenge.") And even assuming that the character requirement does impair Second Amendment rights, Sloane has failed to demonstrate that it is unconstitutional on its face.

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . . ." *Bucklew v. Precythe*, 587 U.S. ----, 139 S. Ct. 1112, 1127 (2019). To mount a successful facial challenge, the plaintiff "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. ----, 141 S. Ct. 2373, 2387 (2021) (alteration in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). In other words, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew*, 139 S. Ct. at 1127; *accord Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023). For this reason, facial challenges are "the most

difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (alteration adopted and quotation omitted).

There are applications of the character provision that would be constitutional. The Second Amendment does not preclude states from denying a concealed-carry license based on a reasoned determination that the applicant, if permitted to wield a lethal weapon, would pose a danger to himself, others, or to public safety. There is widespread agreement among both courts of appeals and scholars that restrictions forbidding dangerous individuals from carrying guns comport with "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126. Indeed, the Supreme Court has repeatedly admonished that the Second Amendment protects the rights of law-abiding and responsible citizens[21] and has approved of "shall-issue" licensing regimes that deny firearms licenses to individuals who lack good moral character in the sense that they are not law-abiding and responsible and pose a danger to the community if licensed to carry

---

[21] *See Heller*, 554 U.S. at 635 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."); *Bruen*, 142 S. Ct. at 2122, 2135 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense . . . [and] publicly for their self-defense.").

firearms in public.[22]  The Court's statements reflect a recognition that such

regulations are not inherently inconsistent with the Second Amendment or our

historical traditions.  Whether the relevant tradition is *limited* to dangerousness,

or more broadly permits the disarmament of *all* law-breakers or "unvirtuous"

individuals is the subject of considerable debate, but the use of dangerousness as

a disqualifier does not appear controversial.[23]  However this tradition is

---

[22] *Bruen*, 142 S. Ct. at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" as "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'") (quoting *Heller*, 554 U.S. at 635).

[23] *Compare Kanter*, 919 F.3d at 451, 454–64 (Barrett, *J.*, dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*."); *Binderup*, 836 F.3d at 369 (Hardiman, *J.*, concurring in part and concurring in the judgments) ("[T]he public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed."); *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, *J.*, dissenting) (similar); *Range*, 69 F.4th at 110 (Ambro, *J.*, concurring) (federal prohibition on felons possessing guns is constitutional in almost all applications "because it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020), *with United States v. Jackson*, 69 F.4th 495, 502–05 (8th Cir. 2023) (describing this debate and holding that either view supports the federal prohibition on all felons possessing guns: "[L]egislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons."); *Range v. Att'y Gen. of U.S.*, 53 F.4th 262, 273–74 (3d Cir. 2022), *rev'd en banc* 69 F.4th 96 (3d Cir. 2023) (concluding that the Second Amendment permits disarmament not just of dangerous individuals but also "those who have demonstrated disregard for the rule of law through the

characterized, the Supreme Court's approving references to "good moral character" licensing requirements, as imposed in states with requirements that define "good moral character" essentially as New York now defines it, demonstrate that such requirements are permissible.[24]

Such dangerousness is the core of New York's character requirement, as clarified in the CCIA. The gravamen of the "character" inquiry is whether the

---

commission of felony and felony-equivalent offenses, whether or not those crimes are violent."); *Binderup*, 836 F.3d at 348 (lead opinion) ("People who have committed or are likely to commit 'violent offenses' . . . undoubtedly qualify as 'unvirtuous citizens' who lack Second Amendment rights. . . . The category of 'unvirtuous citizens' is . . . broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or nonviolent."); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (characterizing tradition in terms of "virtuousness"); *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (same); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (same); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 491–92 (2004); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS., Winter 1986, at 143, 146. *See also* Petition for Writ of Certiorari at 8–11, *United States v. Rahimi*, No. 22-915 (S. Ct. Mar. 17, 2023) (expressing the federal government's view that "the Second Amendment allows the government to disarm dangerous individuals—that is, those who would pose a serious risk of harm to themselves or to others if allowed to possess a firearm").

[24] For this reason, we disagree with the Fourth Circuit's conclusion in *Maryland Shall Issue, Inc. v. Moore*, -- F.4th --, 2023 WL 8043827 (4th Cir. Nov. 21, 2023), that firearm licensing regimes based on a determination of "dangerousness" are constitutionally impermissible. The majority's conclusion, by "invalidating an entire shall-issue statute as facially unconstitutional without any discussion [of] whether the statute's requirements infringe every permit applicant's constitutional rights, . . . runs directly against *Bruen*'s clear guidance on shall-issue regimes." *Id*. at *15 (Kennan, J., dissenting). We find it especially difficult to square the court's conclusion that a thirty-day review period is per se an unconstitutional temporary deprivation of Second Amendment rights, *Moore*, 2023 WL 8043827 at *9, with *Bruen*'s contrasting statements that "*lengthy* wait times . . . [would] deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9 (emphasis added).

applicant can "be entrusted with a weapon and to use it only in a manner that does not *endanger oneself or others*."  N.Y. Penal L. § 400.00(1)(b) (emphasis added).  The denial of a license to an individual deemed likely to pose such a danger (by, for instance, using a weapon unlawfully against another or by refusing to take safety precautions) is an application squarely within the provision's heartland.  Such a denial would clearly fall within the historical tradition of preventing dangerous individuals from carrying guns.  Since at least some possible applications of the character requirement would not violate the Constitution, it is not unconstitutional on its face.

The district court effectively acknowledged as much, concluding that it would be constitutional to deny a license to "applicants who have been found, based on their past conduct, to be likely to use the weapon in a manner that would injure themselves or others (other than in self-defense)."  *Antonyuk*, 639 F. Supp. 3d at 305.  The court found that the provision was facially invalid because of the possibility of license denials in *other* situations that the court deemed unconstitutional.  *Id.*  That does not support a facial challenge.  The denials the district court described as constitutional are likely (at least) applications of the character provision as enacted; the prospect that the scheme might *also* permit a

licensing officer to deny a license *un*constitutionally is insufficient to strike the provision down in all of its applications.

The district court's reasoning seems to rely in part on its view that *Bruen* "create[d]" an "exception" to the normal rules regarding facial and as-applied challenges, wherein it would "defy [the *Bruen*] standard for [a court] to find that such a law is inconsistent with history and tradition, just to watch it be saved by the *one* possible application that makes it constitutional." *See id*. at 305. We do not agree. It is highly unlikely that the Court upended longstanding principles of constitutional litigation by mere implication. Indeed, *Bruen* itself recognized the viability of as-applied challenges to licensing regimes, *see* 142 S. C.t at 2138 n.9, a curious statement if the Court meant to eliminate the facial vs. as-applied distinction in Second Amendment cases.

*Bruen* was a facial challenge and proceeded accordingly. But, unlike the character requirement here, the premise of the proper-cause rule at issue in *Bruen* (that "ordinary, law-abiding, adult citizens," 142 S. Ct. at 2134, can be prohibited from carrying a gun if they lack a good reason to do so) was unsupported by history and thus violated the Second Amendment. How that rule was applied in particular cases was irrelevant given its facial constitutional flaw.

82

We recognize that "good moral character" is a spongy concept susceptible to abuse, but such abuses, should they become manifest, can still be vindicated in court as they arise.  A licensing officer who denies an application on character (or any other) grounds must provide "a written notice to the applicant setting forth the reasons for such denial," N.Y. Penal L. § 400.00(4-a).  A notice that does not articulate the evidence underlying the character determination or that fails to connect that evidence to the applicant's untrustworthiness to responsibly carry a gun may well be deemed arbitrary and thus subject to vacatur under Article 78 of the New York Civil Practice Law and Rules, *see* N.Y. C.P.L.R. §§ 7801–06, and possibly the Second Amendment as well.[25]

Likewise, a licensing decision that uses "good moral character" as a smokescreen to deny licenses for impermissible reasons untethered to dangerousness, such as the applicant's lifestyle or political preferences, would violate the Constitution by relying on a ground for disarmament for which there

---

[25] It is worth mentioning that a rejected applicant can file an internal administrative appeal of his denial.  *See* N.Y. Penal L. § 400.00(4-a).  Indeed, such an appeal is likely a prerequisite to an Article 78 proceeding, which does not permit review of "determination[s] [] which . . . can be adequately reviewed by appeal . . . to some other body."  N.Y. C.P.L.R. § 7801(1); *see, e.g., Essex County v. Zagata*, 91 N.Y. 2d 447, 453 (1998).  Similarly, it is doubtful that a plaintiff who brings a federal suit challenging an initial denial before seeking administrative review would present a ripe case or controversy.

is no historical basis.[26]  And we further agree with Sloane (and the district court) that it would violate the Second Amendment to deny a license because the applicant is willing to use a weapon in lawful self-defense (and thereby be said to "endanger . . . others").  *See Antonyuk*, 639 F. Supp. 3d at 299, 303 (noting this problem).  But this observation is insufficient to enjoin the law.  Contrary to the district court's views, *see id.* at 304 (faulting the character provision for "fail[ing] to expressly remind the licensing officer to make an exception for actions taken in self-defense" (emphasis omitted)), so long as the law has a "plainly legitimate sweep"—as this one does—the law need not catalog and expressly forbid potential abuses.

Plaintiffs assume that licensing officers will act in bad faith, but facial challenges require the opposite assumption.  Permissible outcomes are possible (and we think likely) under the statute.  "Facial challenges are disfavored" because they "often rest on speculation," "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records,'" and

---

[26] We also leave open challenges based on a de facto pattern of denials or de jure interpretation of the provision which impermissibly restricts the right to carry a gun in public. *Cf. Bruen*, 142 S. Ct. at 2138 n.9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

84

"threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 450–51 (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). These principles confirm that a facial injunction against the character provision is inappropriate at this stage.

2.    <u>Historical Challenge to Licensing Officer Discretion</u>

The district court deemed the character requirement facially invalid for a further reason: that the statutorily bounded discretion baked into the provision is inconsistent with the history of firearm regulation in the United States and thus violates the Second Amendment. *See Antonyuk*, 639 F. Supp. at 301–02. We disagree as a matter of historical fact. For as long as American jurisdictions have issued concealed-carry-licenses, they have permitted certain individualized, discretionary determinations by decisionmakers.

It is important at the outset to be clear about the possible meanings of the term "discretion." Professor Ronald Dworkin long ago distinguished between strong and weak senses of the term. He emphasized that discretion "does not exist except as an area left open by a surrounding belt of restriction. It is therefore a relative concept. It always makes sense to ask 'Discretion under which standards?'" Ronald Dworkin, *Taking Rights Seriously* 31 (1977). A

85

statutory scheme that gave officials discretion in the strong sense, such that they could grant or deny licenses as they saw fit, would plainly not pass muster. But almost any regime that describes standards that must be applied to a wide variety of individual cases creates a certain bounded area of discretion, in a weaker sense, in determining whether those standards are met. As the Supreme Court recognized in *Bruen*, licensing statutes that require "good moral character," defined in terms of a person's ability to carry weapons without creating danger to themselves or others based on whether they are law abiding and responsible persons, are permissible, even if they inevitably rely on the judgment of the licensing authorities in determining whether than criterion has been met. As we explain below, moreover, statutes that grant that kind of limited discretion in applying defined criteria are consistent with our tradition of firearms regulation.

The State has identified firearm licensing schemes from the years immediately following ratification of the Fourteenth Amendment that authorized a local official to issue permits in his limited discretion without the kind of

objective criteria the district court deemed necessary.[27]  There are a lot of them.[28]

Many schemes omit criteria altogether, requiring only "written permission from

the mayor,"[29] or a "special written permit from the Superior Court."[30]  *See, e.g.*,

Helena, Mont., Ordinance No. 43: Concealed Weapons, § 1 (June 14, 1883), *in The*

*Charter and Ordinances of the City of Helena, Montana* 103–04 (Alexander C. Botkin

ed., 1887); Fresno, Cal., Ordinance No. 6, § 25 (Nov. 5, 1885), *printed in The Fresno*

*Weekly Republican*, Nov. 7, 1885, at 3; Monterey, Cal., Ordinance No. 49: To

Prohibit the Carrying of Concealed Weapons, § 1 (Jan. 5, 1892), *printed in The*

*Ordinances of the City of Monterey* 112 (1913).

---

[27] As we explained *supra*, evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself.  The period of relevance extends past 1868 itself.  Laws enacted in 1878 or even 1888 were likely drafted or voted on by members of the same generation that ratified the Fourteenth Amendment and thus remain probative as to the meaning of that Amendment.

[28] The State—and this Court—relies on and incorporates by reference the catalog of 43 licensing ordinances compiled in an amicus brief filed with the Supreme Court in *Bruen* by historian Patrick J. Charles.  *See* Brief of Amicus Curiae Patrick J. Charles in Support of Neither Party, App'x 1, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843) (hereinafter, "Charles Amicus Br.").  We cite only a sample of Mr. Charles's list, which he in turn represents to be "*only a sample* of the nearly 300 laws governing the carrying of concealed and dangerous weapons that [he] has researched."  *Id.* at App'x 1.  We also note a (partially co-extensive) list of discretionary city licensing regimes in Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 CLEV. ST. L. REV. 373, 419 n.245 (2016).

[29] THE MUNICIPAL CODE OF ST. LOUIS § 8 (1881).

[30] Spokane, Wash., Ordinance No. A544, § 1 (Jan. 2, 1895), *reprinted in* THE MUNICIPAL CODE OF THE CITY OF SPOKANE, WASHINGTON 309–10 (Rose M. Denny ed., 1896).

Other schemes placed limits on eligibility that embedded a certain amount of discretion.  For instance, an influential scheme in California authorized "[t]he Police Commissioners [to] grant written permission to [certain] peaceable person[s] . . . to carry concealed deadly weapons for [their] own protection."  San Francisco, Cal., Order No. 1,226: Prohibiting the Carrying of Concealed Deadly Weapons § 1 (July 9, 1875), *reprinted in* SAN FRANCISCO MUNICIPAL REPORTS 886 (1875); *accord, e.g.*, Sacramento, Cal., Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, *reprinted in* CHARTER AND ORDINANCES OF THE CITY OF SACRAMENTO 173 (R.M. Clarken ed., 1896); Oakland, Cal., Ordinance No. 1141: An Ordinance to Prohibit the Carrying of Concealed Weapons, § 1 (May 15, 1890), *reprinted in* GENERAL MUNICIPAL ORDINANCES OF THE CITY OF OAKLAND, CAL. (Fred L. Burton ed., 1895).  Indeed, the United States Congress enacted a similar scheme in 1892.  *See* An Act to Punish the Carrying or Selling of Deadly or Dangerous Weapons Within the District of Columbia, and for Other Purposes, 27 Stat. 116, 116–17, ch. 159 (1892).

The State draws special attention to the history of discretionary licensing regimes in New York.  Decades before the state-wide Sullivan Act in 1911, localities from around New York were enacting permitting schemes that

depended on individualized assessments by local officials.  *See*, *e.g.*, J.A. 441–42 (New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, § 2 (Feb. 12, 1878), *printed in* PROCEEDINGS OF THE BOARD OF ALDERMEN OF THE CITY OF NEW YORK 612–16 (1878)) ("1878 New York Ordinance") ("Any person . . . who has occasion to carry a pistol for his protection, may apply of the officer in command at the station-house of the precinct where he resides, and such officer, if satisfied that the applicant is a proper and law-abiding person, shall give said person a recommendation to the Superintendent of Police . . . who shall issue a permit to the said person allowing him to carry a pistol of any description."); J.A. 475 (Brooklyn, N.Y., Ordinance to Regulate the Carrying of Pistols, §§ 2, 4 (Oct. 25, 1880), *printed in* BROOKLYN DAILY EAGLE, Oct. 26, 1880) ("1880 Brooklyn Ordinance") (similar); J.A. 482 (Elmira, N.Y., Official Notice (July 18, 1892), *printed in* ELMIRA DAILY GAZETTE AND FREE PRESS, July 22, 1892) (similar); J.A. 478–79 (An Act to Revise the Charter of the City of Buffalo, 1891 N.Y. Laws 127, 176–77, ch. 105, § 209) ("The superintendent [of police] may, upon application in writing, setting forth under oath sufficient reasons, issue to any person a permit in writing to carry any pistol or pistols in the city. . . . No person . . . shall, in the city, carry concealed upon or

about his person, any pistol or revolver . . . without having first obtained a

permit, as hereinbefore provided.").

These regimes were among the earliest concealed-carry-licensing schemes

enacted in the nation.[31] For as long as licenses to carry concealed weapons have

been issued in this country, the officials administering those systems have been

tasked with making individualized assessments of each applicant. *See also*

Clayton E. Cramer & David B. Kopel, *Shall Issue: The New Wave of Concealed*

*Handgun Permit Laws*, 62 TENN. L. REV. 679, 681 (1995) (noting that the first

permitting statutes "were broadly discretionary; while the law might specify

certain minimum standards for obtaining a permit, the decision whether a permit

should be issued was not regulated by express statutory standards"). Nor was

discretionary licensing a transient measure: cities and states continued enacting

such schemes into the early-twentieth century and beyond. *See generally* Charles

---

[31] Licensing schemes were a post-Civil War phenomenon. *E.g.*, Brief of Amici Curiae Profs. of Hist. & L. in Supp. of Resps. at 22, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) (No. 20-843) (hereinafter, "Profs.' Amicus Br.") ("In the latter half of the nineteenth century, many municipalities also began to enact licensing schemes, pursuant to which individuals had to obtain permission to carry dangerous weapons in public."); Charles Amicus Br. at 7–9; Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in* NYSRPA v. Bruen?, 49 HASTINGS CONST. L.Q. 145, 168–71 (2022). *See also infra*.

Amicus Br. at 13–17 & App'x 2.[32]  Indeed, the record thus suggests that the kind of purely "objective" licensing scheme which the district court deemed *required* by history and tradition is in fact a historical outlier.[33]

The geographical breadth of licensing schemes that confer a measure of discretion likewise demonstrates their place in "our whole experience as a

---

[32] Twentieth-century evidence is not as probative as nineteenth century evidence because it is less proximate to the ratification of the 14th Amendment. *Bruen* cautions "against giving postenactment history more weight than it can rightly bear."  142 S. Ct. at 2136.  But such laws are not weightless.  The *Bruen* Court's concern was with temporally distant laws *inconsistent* with prior practices.  *See id.* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quotation omitted); *see also id.* at 2138 ("[T]o the extent later history *contradicts* what the text says, the text controls." (emphasis added)).  In contrast, when laws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation.

[33] "Laws granting the authorities discretion over the issue of concealed carry permits, 'may issue' laws, predominated in the early post-World War II period: by 1960, only two states, Vermont and New Hampshire, had 'shall issue' laws." Richard S. Grossman & Stephen A. Lee, *May Issue Versus Shall Issue: Explaining the Pattern of Concealed Carry Handgun Laws, 1960–2001*, 26 CONTEMP. ECON. POL. 198, 200 (2008); *see also* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 62 (2017) ("[A]s late as 1981, only two states of the union had loose, 'shall issue' carry laws . . . .  Nineteen states barred concealed gun carrying entirely, and twenty-eight states had 'may issue' laws, where states have great discretion as to whether to issue carry permits. (footnotes omitted)); Cramer & Kopel, *supra*, at 680 (noting that in 1995 "[a]bout one-third of all states have adopted laws or practices . . . requir[ing] that after passing a background check (and sometimes a firearms safety class), eligible persons must be granted [a concealed-carry] permit if they apply").
    The district court appears to have based its conclusion that purely objective licensing schemes are required by history on *Bruen*'s statement that non-discretionary licensing regimes are dominant *now*.  *See Antonyuk*, 639 F. Supp. 35 at 302  But *Bruen* made no *historical* claim about discretionary licensing; the fact that a given form of regulation is popular *now* is irrelevant to whether a different regulation is part of the nation's tradition of firearm regulation. In any event, as we explain below, we count at least twenty-three licensing regimes that still call for discretionary judgments by licensing officers.

Nation," *Chiafalo*, 140 S. Ct. at 2326 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014)); *see supra* Background § III.E.  Cities from across the country, from San Francisco and Eureka to New York and Elmira, adopted similar discretionary permitting schemes.  That widespread adoption by diverse and distant localities under varying circumstances suggests that these policies enjoyed broad popular support and were understood at the time to be consistent with the Second and Fourteenth Amendments.  *See* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 33 U.C. DAVIS. L. REV. ONLINE 65, 85 (2021).

Strikingly, moreover, these laws and ordinances did not merely exist – they appear to have existed without constitutional qualms or challenges. Plaintiffs cite, and we are aware of, no case in which laws of this type were found by courts to be inconsistent with federal or state constitutional provisions guaranteeing the right to bear arms before the Supreme Court's 21st century reinvigoration of the Second Amendment in *Heller*.  Indeed, the record not only lacks any successful challenges to licensing schemes on such grounds, but it also lacks any challenges at all.

It is unnecessary to consider whether licensing was a uniform practice in this period, nor whether officials' limited discretion was unanimously allowed. *Bruen* instructs us to determine whether a given modern law is *part* of the nation's tradition of firearm regulation, not the sum of it. That tradition is multiplicitous, consisting of many different attempts to balance individual freedom with public safety. And based on the evidence presented here, a branch of the tradition—dating to the years immediately following the ratification of the Fourteenth Amendment—has employed laws that condition the ability to lawfully carry a concealed weapon on obtaining a permit based in part on individualized assessment by a local official, frequently under lesser constraints than those in the CCIA or in the very similar statutes that the *Bruen* Court cited as acceptable. Given the frequency of such regulations, and the absence of successful constitutional challenges to them, we find it impossible to read out of our historical tradition the longstanding and established restriction of concealed carry licenses by those who present a danger to themselves or others, or who otherwise cannot be characterized as "law abiding, responsible citizens" simply because such regulations require some individualized application of a clearly delineated standard.

\*　　\*　　\*

The district court discounted the evidence discussed above based on categorical rules it derived from *Bruen*.  For instance, the district court relied on the "rule" that city ordinances are of lesser weight than state laws, *Antonyuk*, 639 F. Supp. 3d at 300, 306 n.81, and that the relevant laws are those that governed a certain percentage of the nation's population, *id*. at 301.[34]  But *Bruen* merely warns against allowing "the bare existence of . . . localized restrictions" to "overcome the overwhelming evidence of an otherwise enduring American tradition."  142 S. Ct. at 2154.  It does not suggest that local laws are not persuasive in illuminating part of the nation's tradition of firearm regulation. Similarly, the number of people subject to a given law is only one clue to whether said law may have been an outlier unable to refute a contrary tradition.  *See id.* at 2154–56.

The district court also seemed to draw strong and specific inferences from historical silence, reasoning that, if the submitted record lacks legislation from a particular place, it must be because the legislators there deemed such a

---

[34] The district court reasonably sought methodological guidance in *Bruen*, a challenge undertaken only a few short months after that decision was handed down.  We have no doubt that the court's analysis was driven by a desire to apply *Bruen* faithfully—we now play our part by offering further guidance for how to assess the historical record future in cases.

regulation inconsistent with the right to bear arms. That inference is not

commanded by *Bruen*, nor is it sound. There are many reasons why the

historical record may not evince statutory prohibitions on a given practice. *See*

*supra* Background § III.E; *see also Binderup*, 836 F.3d at 369 (Hardiman, *J.*,

concurring in part and concurring in the judgments) ("The paucity of eighteenth

century gun control laws might have reflected a lack of political demand rather

than constitutional limitations." (quoting Nelson Lund, *The Second Amendment,*

Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1354 (2009)).

Moreover, our national tradition of firearms regulation has taken a multiplicity

of forms, and a jurisdiction's use of another type of regulation may have

obviated the need to enact a regulation analogous to the contemporary one at

issue. For example, the city of Oakland operated a permitting system that

restricted armed carriage, under which only seventy Oakland residents, out of a

population of around 48,000, held a license in 1889. *Carry Arms: Those Who Have*

*Permits to Carry Concealed Weapons*, OAKLAND TRIBUNE (Cal.), July 20, 1889, at 1;

Oakland Census Data for 1860–1940, BAY AREA CENSUS,

http://www.bayareacensus.ca.gov/cities/Oakland40.htm [https://perma.cc/JJM2-

3W3T]. Given the relatively small population that was licensed to be armed

within the city's limits, Oakland's legislators likely would not have seen the need to also designate certain locations as sensitive places where armed carriage was absolutely prohibited. *Bruen* calls on courts to undertake an inquiry that sounds fundamentally in history rather than law: a court must ask itself what people of the past thought (or even *assumed*) about the right to bear arms and the regulations that comport with that right. And the Supreme Court understood that such historical analysis is marked by skepticism and nuance, rather than authority and precept. "[H]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald*, 561 U.S. at 803–804 (Scalia, *J.*, concurring)). It proceeded accordingly, declining to establish ironclad rules and instead noting considerations which would be "relevant evidence," *id.* at 2131, or "could be evidence," *id.*, or "may not illuminate the scope of the right if" certain conditions are present, *id.* at 2136.

With that perspective, we are not troubled that many licensing schemes originated in the cities of the post-Civil War period. Licensing was the result of changes in American society in the nineteenth century, including urbanization

96

and concomitant shifts in norms of governance. The post-Civil War world was transformed by rapid urbanization.[35] And city people have long had a different relationship with guns than their rural neighbors, a relationship generally marked by greater concern about interpersonal violence. *See* Joseph Blocher, *Firearm Localism*, 123 YALE L. J. 82, 98–103, 112–21 (2013).

That was true in the Reconstruction era as well: New York's 1878 concealed-carry ordinance made explicit the connection between the new urban environment and the bearing of arms as a potential problem; it warned that the disorderly and the intoxicated were going about carrying pistols, "insult[ing]

---

[35] In 1790, the nation's largest urban area (New York City) had a population of 33,000. In 1880, the census counted 1,206,299 people, not to mention a further half-million across the East River in still-independent Brooklyn. *See* Campbell Gibson, *Population of the 100 Largest Cities and Other Urban Places In The United States: 1790 to 1990*, tbls. 2 & 11 (U.S. Census Working Paper No. POP-WP027), *available at* https://www.census.gov/library/working-papers/1998/demo/POP-twps0027.html#urban [https://perma.cc/KK43-HBEA]. The nation was 5.1% urban in 1790; 28.2% in 1880. Urban expansion was especially concentrated in the Northeast, where 50.8% of people were city-dwellers in 1880. U.S. Census Bureau, *United States Summary: 2010 — Population and Housing Unit Counts*, at 20 tbl. 10 (Sept. 2012), *available at* https://www2.census.gov/library/publications/decennial/2010/cph-2/cph-2-1.pdf [https://perma.cc/ZJF5-976W]. As historian Eric Monkkonen summarized it:

> In both structure and form, the modern American city was born in the nineteenth century, a century of dramatic transformation on practically every front. . . . [T]he century-long period of local economic and population growth from 1830 to 1930 saw a dynamic and historically unprecedented expansion of cities—in absolute size, in proportion, and in number.

ERIC H. MONKKONEN, AMERICA BECOMES URBAN 4–5 (1988).

respectable citizens, and draw[ing] a pistol on any and every occasion, while the better and law-abiding class try to obey the laws and protect themselves with nothing but nature's weapons."  J.A. 443; *see also* J.A. 440 (New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, committee report) ("As to the necessity for the passage of the ordinance there can be no question.  The reckless use of fire-arms by the dangerous classes in this city is proverbial, and this measure of repression seems to be necessary.").  The problem was made more serious by the increased lethality of firearms in the latter decades of the nineteenth century, *see* Profs.' Amicus Br. at 19 ("[T]echnological advances spurred by the Civil War made guns more lethal and available."): one military historian has estimated that firearms became ten times more lethal over the course of the nineteenth century, Trevor Nevitt Dupuy, *The Evolution of Weapons and Warfare* 92, 286–89 (1984).[36]

---

[36] Similarly, historian Jack Rakove has questioned whether the Founders would have even recognized the problem confronting policymakers of today (or of the post-Civil War period):

> [B]ecause eighteenth-century firearms were not nearly as threatening or lethal as those available today, we . . . cannot expect the discussants of the late 1780s to have cast their comments about keeping and bearing arms in the same terms that we would. . . . Guns were so difficult to fire in the eighteenth century that the very idea of being accidentally killed by one was itself hard to conceive. Indeed, anyone wanting either to murder his family or protect his

Accompanying the nineteenth-century explosive growth of cities was the

development of governance institutions that were more tightly organized,

specialized, and bureaucratic than those required by the towns of the late

eighteenth and early nineteenth centuries. "The transformation of the state is

one of the most prominent themes of nineteenth-century American history," and

"[f]or the most part, it is a story of the expansion and increasing complexity of

government and of the professionalization and decreasing popular character of

politics."[37] It is no coincidence that true police forces come into being in this

period, first in London, and then in Boston, New York, and Philadelphia in the

1830s.[38]

---

home in the eighteenth century would have been better advised
(and much more likely) to grab an axe or knife than to load, prime,
and discharge a firearm.

Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV.
103, 110 (2000).

[37] ALLEN STEINBERG, THE TRANSFORMATION OF CRIMINAL JUSTICE: PHILADELPHIA 1800-
1880, at 2 (1989); *see also* Charles Amicus Br at 7 ("It was not until the nineteenth century that the
adaptable and discretionary common law model of criminal law enforcement began to develop
into more tangible, concrete forms." (citing PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY
OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 141–47 (2019)).

[38] *See* SAMUEL WALKER & CHARLES M. KATZ, THE POLICE IN AMERICA: AN INTRODUCTION
33–34 (9th ed., 2018); Eric H. Monkkonen, *History of Urban Police*, 15 CRIME & JUST. 547, 553
(1992) ("Uniformed police spread across the United States to most cities in the three decades
between 1850 and 1880. . . . [I]n general, a city's rank size among American cities determined the
order in which police were adopted, the spread of police innovation following a diffusion curve
typical for all sorts of innovations.").

These new institutions and ideas shaped the response to increasingly-lethal guns in increasingly-populous cities and naturally led to a greater resort to legislation and regulation.[39]  Police-administered licensing schemes evinced a degree of administrative sophistication typical of the late-nineteenth century cities but unusual in the Founding Era.  *Cf.* J.A. 440–41 (1878 New York Ordinance); J.A. 475 (1880 Brooklyn Ordinance).  More generally, the growth of permitting schemes—as opposed to prohibitory laws enforced in the courts[40]—reflected the developing philosophy of proactive local government.[41]  In sum, "[o]ver the course of the nineteenth century, as America modernized and urbanized, professional police forces, police courts, and administrative agencies took over the job of maintaining public order from justice[s] of the peace.  The

---

[39] *See* Charles Amicus Br. at 8–9 ("In the mid-nineteenth century, to meet changing public safety concerns as well as changing social and cultural norms, laws governing the carrying of concealed and dangerous weapons once again began to evolve.").

[40] For those other models of concealed carry restrictions, *see, e.g.*, Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1719–25 (2012); Profs.' Amicus Br. at 14–18; Charles Amicus Br. at 9, App'xs 3 & 4.

[41] *See* Steinberg, *supra*, at 3 (contrasting the late-nineteenth-century's "administrative and policy-making state" with the "reactive, particularistic, and extremely informal" "early-nineteenth-century local state"); Patrick J. Charles, *The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes*, 13 CHARLESTON L. REV. 1285, 146 ("[B]eginning in the 1860s, corresponding with the growth of statutory law, [a surety system] was gradually phased out in favor of two legal alternatives. . . . The first legal alternative was armed carriage licensing laws.").

100

new permit-based scheme emerged in the context of these larger changes in criminal justice."[42]

In context, it makes sense that licensing regimes were instituted by cities rather than states, and that such schemes were not enacted until after the Civil War. We therefore see nothing in either the timing or urban origins of limited discretionary licensing regimes to justify discounting this tradition of American firearm regulation, which can be documented in the aftermath of the ratification of the Fourteenth Amendment.

For the reasons above, we disagree with the district court's conclusion that licensing regimes that afford a modicum of discretion to issuing officers are not part of the nation's tradition of firearm regulation and that the character provision thus violates the Second Amendment. We need not determine at what point a regime grants so much untethered discretion to licensing authorities as to be unconstitutional on its face; it is sufficient to conclude, as we do in the following section, that the CCIA's definition of 'good moral character' in terms of public safety, drawn from statutes that *Bruen* treats as likely constitutional, does not approach that point.

---

[42] Cornell, *supra* at 171 (citing ERIC H. MONKKONEN, AMERICA BECOMES URBAN 98–108 (1988)).

### 3. *Bruen*-Based Challenge to Licensing-Officer Discretion

Plaintiffs also attack the discretionary aspect of the character requirement on a different basis. They assert that *Bruen* announced a freestanding rule of constitutional law that requires states to determine eligibility for a gun license using only a checklist that wholly precludes individualized judgments. This claim is based on an overreading of one footnote in *Bruen*:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit. Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes . . . are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens. *And they likewise appear to contain only narrow, objective, and definite standards guiding licensing officials rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion—features that typify proper-cause standards like New York's.*

142 S. Ct. at 2138 n.9 (emphasis added; alterations adopted; quotation marks, and internal citations omitted).

Plaintiffs' rule precluding all discretion cannot be squared with *Bruen*'s discussion of "shall-issue" regimes, even if one thought that the Court would

announce a sweeping prohibition of discretion in a single sentence of a footnote designed to clarify the *limited* scope of its decision. Of the forty-three licensing regimes that *Bruen* described as consistent with its analysis, more than a dozen confer some measure of discretion on licensing officers, with many using terms that are nearly identical to New York's character provision. If "nothing in [*Bruen*] should be interpreted to suggest the unconstitutionality of" *those* licensing schemes, then *Bruen* did not totally foreclose discretion and does not require invalidation of New York's character requirement. 142 S. Ct. at 2138 n.9.

Earlier in *Bruen*, the Court explained that three states whose licensing regimes use "discretionary criteria"—Connecticut, Delaware, and Rhode Island—are nonetheless "shall-issue" jurisdictions (and thus, per footnote 9, consistent with *Bruen*).[43] Connecticut licensing officers have "discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,'" *Bruen*, 142 S. Ct at 2123 n.1 (quoting CONN. GEN. STAT. § 29-28(b) (2021)), but because Connecticut courts have supplied a narrowing gloss on that broad standard, Connecticut nonetheless qualified as a "shall-issue" state. *Id.* Crucially,

---

[43] Tellingly, other commentators on licensing regimes have categorized these states' regimes as "may-issue." *E.g.*, Noah C. Chauvin, *The Constitutional Incongruity of "May-Issue" Concealed Carry Permit Laws*, 31 UNIV. FLA. J. L. & PUB. POL'Y 227, 230 n.23, 237 (2021).

Connecticut's gloss on the suitability standard is nearly identical to the CCIA's

definition of "good moral character," excluding only those "individuals whose

conduct has shown them to be lacking the essential character o[r] temperament

necessary to be entrusted with a weapon." *Id.* (quoting *Dwyer*, 475 A.2d at 260).

*Bruen* also classifies Delaware as a shall-issue jurisdiction notwithstanding

its inherently discretionary "good moral character" provision, *Bruen*, 142 S. Ct. at

2123 n.1, which (like New York) requires that the applicant be "of . . . good moral

character." Del. Code Ann. tit. 11, § 1441(a) (2022); *see also id.* § 1441(a)(2)

(requiring five character references attesting to the applicant's "sobriety and

good moral character" and "good reputation for peace and good order in the

community"). Finally, the Court explained that, though Rhode Island (like

Connecticut) requires that an applicant be "a suitable person to be so licensed,"

R.I. GEN.. LAWS § 11-47-11(a) (2002), its regime is "shall-issue" because (again like

Connecticut) "suitability" does not require "[d]emonstration of a proper showing

of need.'" *Bruen*, 142 S. Ct. at 2123 n.1 (quoting *Gadomski*, 113 A.3d at 392).

Furthermore, without specific discussion, *Bruen* categorized as "shall-

issue" jurisdictions at least twelve other licensing schemes that call for

discretionary judgments, such as whether the applicant "causes justifiable

concern for public safety," ALA. CODE § 13A-11-75(c)(11) (2021); "is likely to use a weapon unlawfully," IOWA CODE ANN. § 724.8(3) (West 2011); "likely . . . will present a danger to self or others if the applicant receives a permit," COLO. REV. STAT. ANN. § 18-12-203(2) (West 2023), etc.[44] Similarly, many *Bruen*-compliant states forbid issuing a concealed carry license to individuals who, for example, "chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired," ARK. CODE ANN. § 5-73-309(7)(A) (2021);

---

[44] *See also* GA. CODE ANN. § 16-11-129(b.1)(3) (West 2022) (permitting court to grant exception to general rule against issuing a license to individual with history of mental illness if court finds "that the person will not likely act in a manner dangerous to public safety in carrying a weapon and that granting the relief will not be contrary to the public interest"); ME. REV. STAT. ANN., TIT. 25, § 2003(1) (2022) ("good moral character"); MINN. STAT. § 624.714 subd. 6(a)(3) (West 2023) ("substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit"); MONT. CODE ANN. § 45-8-321(2) (West 2023) ("reasonable cause to believe that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community to the extent that the applicant should not be allowed to carry a concealed weapon"); MO. REV. STAT. § 571.101 (2016) (applicant eligible if he "[h]as not engaged in a pattern of behavior . . . that causes the sheriff to have a reasonable belief that the applicant presents a danger to himself or others"); 18 PA. STAT. AND CONS. STAT. ANN. § 6109(e)(1)(i) (West 2016) ("character and reputation is such that the individual would be likely to act in a manner dangerous to public safety"); *id.* § 6109(d)(3) (authorizing the sheriff to "investigate whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety"); TEX. GOV'T CODE ANN. § 411.172(a)(7) (West 2021) ("not incapable of exercising sound judgment with respect to the proper use and storage of a handgun"); UTAH CODE ANN. § 53-5-704(3)(a) (West 2022) ("reasonable cause to believe that the applicant or permit holder has been or is a danger to self or others as demonstrated by evidence" like past violent behavior); WYO. STAT. ANN. § 6-8-104(g) (West 2021) ("reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior"); VA. CODE. ANN. § 18.2-308.09(13) (West 2021) ("likely to use a weapon unlawfully or negligently to endanger others").

"suffer from a physical or mental infirmity that prevents the safe handling of a handgun," N.C. GEN. STAT. ANN. § 14-415.12(a)(3) (West 2022); or exhibit a "condition relating to or indicating mental instability or an unsound mind," OKLA. STAT. ANN. tit. 21, § 1290.10(6) (West 2019). These are plainly determinations that "requir[e] the appraisal of facts, the exercise of judgment, and the formation of an opinion," *Bruen*, 142 S. Ct. at 2138 n.9 (quotation marks omitted).[45]

The same modicum of discretion as New York's character requirement is embedded in the licensing schemes discussed above. Indeed, Delaware uses the very phrase "good moral character," and the CCIA's definition of that term matches Connecticut law nearly verbatim. Yet *Bruen expressly* denominated those states (not to mention the dozen others that call for discretionary judgments) as "shall-issue jurisdictions." It therefore cannot be that *Bruen* even "suggest[s]" —

---

[45] *See also* FLA. STAT. ANN. § 790.06 (2023); IDAHO CODE ANN. § 18-3302(11)(f) (West 2020); LA. STAT. ANN. § 40:1379.3(C)(8) (2023); MISS. CODE. ANN. § 45-9-101(2)(e), (f) (West 2023); N.M. STAT. ANN. § 29-19-4(A)(9) (West 2023); 18 PA. STAT. AND CONS. STAT. ANN. § 6109(e)(1)(v)– (vii); TEX. GOV'T CODE ANN. § 411.172(a)(8); WYO. STAT. ANN. § 6-8-104(b)(vi). Many of these statutes include rebuttable presumptions or other guidance for the licensing officers' determination, *e.g.*, LA. STAT. ANN. § 40:1379.3(C)(8) (establishing presumption that applicant "chronically and habitually uses alcoholic beverages to the extent that his normal faculties are impaired" if he has been convicted of a DUI or admitted to treatment for alcoholism in the past five years), but all ultimately require some exercise of discretion.

let alone holds—that a licensing regime which confers some limited degree of discretion is facially invalid.[46]

Footnote 9 is better read as addressing laws that *combine* discretion with a special-need requirement. That combination—present in the invalid proper-cause regime but absent in the "shall-issue" regimes—separates unconstitutional from permissible licensing regimes. *Bruen* intimated as much in footnote 1: Rhode Island's discretionary scheme was "shall-issue" solely because "[d]emonstration of a proper showing of need" was not required. *Bruen*, 142 S. Ct. at 2123 n.1 (internal quotation omitted). Similarly, the Court described "shall-issue" regimes in the first sentence of footnote 9 as those "under which 'a general desire for self-defense is sufficient to obtain a [permit].'" *Bruen*, 142 S. Ct. at 2138

---

[46] Justice Kavanaugh's concurrence can be read to posit a categorically anti-discretion view. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, *J.*, concurring) (New York "may continue to require licenses for carrying handguns for self-defense so long as [it] employ[s] objective licensing requirements *like those used by the 43 shall-issue states*") (emphasis added). But for the reasons stated above, such a view, if the term "objective" is read strictly literally, is incompatible with footnotes 1 and 9 in the majority opinion (which Justice Kavanaugh joined in full). Further, Justice Kavanaugh's concurring opinion expressly approved of the licensing requirements "used by the 43 shall-issue states," many of which, as discussed above, call for the exercise of discretion by licensing officials. *Id*.

As the district court pointed out, many 18th- century restrictions aimed at keeping firearms away from people perceived as dangerous were based on readily ascertainable – but overbroad and discriminatory – racial, religious, or political categories. S.A. 99. Judgments based on "objective" characteristics are not inherently more fair than individualized determinations.

n.9 (alteration adopted) (quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, *J.*, dissenting)).[47]  And footnote 9 is appended to a sentence which faults New York's prior regime only for "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."  *Id.* at 2138.

At the very least, *Bruen* teaches that mere use of a "good moral character" requirement does not justify facial invalidation.  *Bruen* gave great weight to state court interpretations of the Connecticut and Rhode Island standards, which indicated that the statutes, in practice, operated as "shall-issue" regimes. Whether such a scheme is impermissibly discretionary cannot be decided before it has been implemented and brought before state courts.  Time may disclose whether New York's regime under the CCIA will "operate like a 'shall-issue' jurisdiction," *Bruen*, 142 S. Ct. at 2131 n.1, or whether it will be narrowed in salient ways by the New York courts.  Accordingly, facial invalidation is not appropriate.  *See Wash. State Grange*, 552 U.S. at 450 (warning against invalidating a law before "the State has had [an] opportunity to implement [it] and its courts

---

[47] Although the Court had earlier defined "shall-issue" regimes as those in which officials lack "discretion to deny licenses based on a perceived lack of need or suitability," *Bruen*, 142 S. Ct. at 2123, the Court immediately followed that sentence with footnote 1's explanation that Connecticut and Rhode Island *are* shall-issue jurisdictions, despite their suitability requirements, because "perceived lack of need" is not a valid basis to deny a license in those states.

have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction").

In sum, *Bruen* does not require that New York's character requirement be struck down by virtue of the limited discretion it affords to licensing officers. Given the patent incompatibility between Plaintiffs' proffered reading of footnote 9 with the remainder of the Court's opinion, we are confident that the Court did not establish a new rule forbidding all discretionary judgments in firearm licensing.

\*     \*     \*

For the foregoing reasons, we **VACATE** the district court's preliminary injunction: licensing officers across New York may consider whether an applicant for a firearm license can be trusted to use that gun in a responsible, safe way. Licensing officers nevertheless have a statutory duty to make "character" determinations only with respect to an applicant's potential dangerousness, and a denial on that ground requires a written, reasoned notice of denial supported by evidence. Where necessary, both state and federal courts are empowered to enforce those statutory requirements and consider as-applied constitutional challenges, thereby ensuring that individuals are not prevented from carrying a

gun on the basis of flimsy imputations, unsupported subjective intuitions, or hunches about the applicant's character.  But there is currently no reason to doubt that licensing officers across New York will approach their task with diligence and a respect for the relevant constitutional interests.

**B.     The Catch-All**

We vacate the district court's injunction against the catch-all disclosure provision for the same reason: it is not *facially* unconstitutional.  Though we (along with Plaintiffs and the district court) can think of situations in which the catch-all could be abused, there are plenty of possible applications that would be permissible.

Section 400.00(1)(o)(v) provides that "the applicant . . . shall, in addition to any other information or forms required by the license application[,] submit . . . such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."  Sloane does not challenge a particular request made pursuant to this provision—none has been made.  Instead, he argues that the authority to seek supplemental information is unconstitutional on its face because every application of the catch-all provision —*i.e.*, any request a licensing officer could make—would be an unconstitutional

burden on the right to bear arms. *See, e.g., Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").

However, as the district court recognized in a previous opinion in this litigation, it surely does not violate the Constitution for a licensing officer to request "only very minor follow-up information from an applicant (such as identifying information)." *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 137 (N.D.N.Y. 2022). There seems to be statutory authority in subparagraph (1)(o)(v) for licensing authorities to request the kind of information that one would find required by any government form, such as a driver's license number, social security number, or previous name. *See* N.Y. Penal L. § 400.00(3) (mandating only that the license application state the applicant's name, date of birth, residence, occupation, and citizenship status). The catch-all therefore has a "plainly legitimate sweep."

The district court struck down this provision (as it did the character requirement) as providing licensing officials with "unbridled discretion." *Antonyuk*, 639 F. Supp. 3d at 312. But neither the history of licensing regimes nor *Bruen* itself supports the conclusion that the conferral of some discretion to a

111

licensing officer to request reasonable supplementary information is unconstitutional. Given that allowing discretionary *denials* of a license is part of the nation's tradition of firearm regulation, there can be no constitutional problem with conferring the lesser discretion to ask for reasonable supplementary information.

As-applied challenges to particular requests made pursuant to the catch-all provision remain viable. There surely exist some possible requests which would unconstitutionally burden the right to bear arms: the reader can no doubt conceive of apt hypotheticals. But administrative, state, and federal remedies will be available to an applicant who is denied a license for declining to comply with a supplementary request. A court properly presented with a Second Amendment challenge to such a request will be able to assess whether the information requested is sufficiently analogous to historical restrictions on bearing arms. In addition, a disappointed applicant may argue that the licensing officer's request was not "reasonably necessary and related to the review of the licensing application," and do so either in an administrative appeal or in an Article 78 proceeding. Federal courts generally should be wary about granting facial challenges, which deny the opportunity for agency officials and state

courts to interpret, apply, or limit state laws. As the Supreme Court has instructed, "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about hypothetical or imaginary cases. The State has had no opportunity to implement [the law], and its courts have had no occasion to construe the law in the context of actual disputes . . , or to accord the law a limiting construction . . . ." *Wash. State Grange*, 552 U.S. at 449–50 (internal quotation marks and citations omitted).

But no such request for supplementary information is before us: Sloane chose to challenge the law on its face. And for the reasons stated above, a challenge so framed fails.

## C. The Cohabitant Requirement

N.Y. Penal Law § 400.00(1)(o)(i) requires that an applicant (i) identify and provide contact information for their current spouse or domestic partner and any adult cohabitants, and (ii) disclose whether minors reside in the applicant's home. This provision is intended to "facilitate inquiries to the applicant's close associates for information relevant to the good-moral-character evaluation and assist in identifying red flags that may cast doubt on the applicant's ability to use firearms safely." *Antonyuk* Nigrelli Br. at 40. Plaintiffs argue—and the district

113

court held—that this requirement is unconstitutional on its face. We disagree and vacate the district court's injunction as to that provision.

The district court itself recognized the existence of a "sufficiently established and representative . . . tradition of firearm regulation based on reputation (for example, by a reasonable number of character references)." *Antonyuk*, 639 F. Supp. 3d at 306. It accordingly upheld New York's requirement that applicants provide "four character references who can attest to the applicant's good moral character . . . ." N.Y. Penal L. § 400.00(1)(o)(ii); *see Antonyuk*, 639 F. Supp. 3d at 305–07. Plaintiffs do not challenge either conclusion here. In our view, disclosure of one's cohabitants (in part for the purpose of identifying references regarding the applicant's trustworthiness) is tantamount to the character-reference provision upheld by the district court. If the character-reference requirement is consistent with a historical tradition of firearm regulation, how can the cohabitant provision's requirement of a limited number of *additional* character references be *in*consistent with that tradition?[48]

---

[48] The district court distinguished the cohabitant requirement from a character-reference requirement on the ground that the latter dealt with the applicant's *public* reputation while the former requires disclosure of individuals who may only know about *private* reputation. *See Antonyuk*, 639 F. Supp. 3d at 307. We are not sure such a distinction is a coherent one. Nor is it meaningful in the context of assessing the burden on the applicant's rights. The information

More generally, we have already explained that it is constitutional for a state to make licensing decisions by reference to an applicant's "good moral character," at least where that "character" is defined in terms of dangerousness. It must therefore be constitutional for the licensing authority to investigate the applicant's character, and no one argues that a licensing officer may not inquire into the applicant's trustworthiness beyond the challenged disclosures. It follows that the State can also require modest disclosures of information that are relevant to that investigation and that will make the (permissible) assessment of dangerousness more efficient and more accurate.

This provision serves that end. In addition to providing an alternate means by which the licensing officer can learn of potential character references, the cohabitants themselves can inform the dangerousness inquiry. An assessment of an applicant's "good moral character" requires an evaluation of the whole individual. The identity and characteristics of an applicant's cohabitants are obviously relevant to the dangerousness of the applicant *in situ*. For instance, if an applicant living with multiple young children was unwilling or unable to secure firearms from meddling, surely a licensing officer could

---

demanded—the names and contact information of persons close to the applicant who can speak to his or her fitness to be licensed to wield a lethal weapon—is the same.

115

conclude that the applicant cannot "be entrusted with a weapon and to use it only in a manner that does not endanger [him]self or others," N.Y. Penal L. § 400.00(1)(b).

Of course, conditioning a firearm license on disclosures that are burdensome and historically unprecedented can still violate the Second Amendment—we strike down one such disclosure obligation in the next section—but we conclude that the cohabitant requirement is not within that category. Instead, requiring disclosure of information regarding cohabitants imposes a similar burden as requesting supplemental identifying information, a disclosure that we (and the district court) have already recognized is constitutional. *See supra* Licensing Regime § II.C; *Antonyuk*, 635 F. Supp. 3d at 137. Put most simply, disclosing cohabitants is within the category of disclosures reasonably included in the kind of background check that has long been permissible.

Concluding otherwise, the district court reasoned that the disclosure is a burden "imposed solely for the licensing officers' convenience" because the requested information is theoretically already in the state's possession in the form of "marriage licenses, children's birth certificates, guardianship forms,

116

school forms, adoption paperwork, applications for driver's license or passport, and U.S. census forms." *Antonyuk*, 639 F. Supp. 3d at 307. At the outset, we have our doubts that the relevant agencies would willingly hand over adoption records, census forms, or school paperwork to licensing officers without objection. That aside, we draw the opposite conclusion from the fact that the State will usually already possess the requested information due to the disclosure requirements of its various other agencies: that there is only a minimal privacy interest in the identity of one's cohabitants. Disclosing that information again in another context is that much less burdensome. Unlike the social media provision discussed *infra*, the cohabitants requirement does not demand information with constitutional implications or in which the applicant has any special interest in concealing.

Moreover, the "convenience" of licensing officers, properly understood, is a legitimate consideration that, at least in this context, furthers the relevant constitutional values. See *Bruen*, 142 S. Ct. at 2138 n.9 (suggesting that "lengthy wait times in processing license applications" may "deny ordinary citizens their right to public carry"). Background investigations should be quick and efficient, and should not require licensing officers to engage in burdensome cross-checks

with other government records to learn relevant information that would result in unnecessary delays and backlogs in processing applications, especially where that information is routinely disclosed to the government in other contexts and is readily available to the applicant.

For these reasons, we conclude that Plaintiffs are not likely to succeed in their challenge to the cohabitants requirements and **VACATE** the district court's preliminary injunction against enforcing that provision.

### D.    The Social Media Requirement

Under N.Y. Penal L. § 400.00(1)(o)(iv), an applicant for a concealed carry license must "submit . . . a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicant[']s character and conduct."  The district court rejected the State's proffered analogues, found "the burdensomeness of this modern regulation to be unreasonably disproportionate to the burdensomeness of any historical analogues," and preliminarily enjoined enforcement of the provision.  *Antonyuk*, 639 F. Supp. 3d at 310.  We generally agree.  Disclosing one's social media accounts—including ones that are maintained pseudonymously—forfeits anonymity in that realm.  Conditioning a concealed carry license on such a

118

disclosure imposes a burden on the right to bear arms that is without sufficient analogue in our nation's history or tradition of firearms regulation.

At the outset, it is important to be clear about what the social media provision does and does not require. All that this provision demands is a "list of . . . accounts," N.Y. Penal L. § 400.00(1)(o)(iv), which we understand to mean the platforms the applicants use and the names under which they post (in modern parlance, their "handles"). It does *not* compel applicants to provide a password to their accounts, make their posts accessible to the public, or give a licensing officer permission to view non-public posts (such as by "friending" the officer or accepting a request to "follow" the applicant). No such requirements appear in the statute, and the State has consistently disclaimed any such obligation for applicants. *See Antonyuk* Nigrelli Br. at 45–46 ("The law requires only that applicants identify the existence of recent social-media accounts . . . . The CCIA does not permit a licensing officer to see . . . restricted social-media accounts."); *Antonyuk* Nigrelli Reply Br. at 17–18 ("[T]he social-media provision does not require disclosure of any non-public material from social-media accounts. . . . The provision requires only a list of accounts that would allow a licensing official to review information that applicants have already chosen to

disclose publicly.").  And licensing officers, like anybody else, may review an

applicant's public social media posts at their leisure without the aid of

§ 400.00(1)(o)(iv).  This distinction appears to have been lost on Sloane, who

devotes much attention to the requirement of "access" to social media.  *See*

*Antonyuk* Appellee Nigrelli Br. at 35–38.

On the other hand, compelled disclosure of *pseudonymous* social media

handles to a licensing officer is no small burden.  It is uncontroversial that the

First Amendment protects the right to speak anonymously.  *Cornelio v.*

*Connecticut*, 32 F.4th 160, 169–70 (2d Cir. 2022) (reiterating a speaker's First

Amendment interest in anonymity and holding that a requirement that a sex

offender report all online "communication identifier[s]" burdened protected

speech); *see generally McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–43

(1995); *Talley v. California*, 362 U.S. 60, 64–65 (1960).  Anyone familiar with most

social media platforms knows that nearly all handles are pseudonymous, at least

to the extent that the poster's identity is not immediately apparent.  Requiring

disclosure of handles is thus to demand that applicants effectively forfeit their

right to pseudonymous speech on social media (where so much speech now

takes place).

That significant burden on the right to bear arms is not one for which we see persuasive historical analogues. The State points to no historical law conditioning lawful carriage of a firearm on disclosing one's pseudonyms or, more generally, on informing the government about one's history of speech. That historical silence is telling because, as the district court explained at length, the Founders were familiar with pseudonymous publishing, including of "virulent political pamphlets" and other "controversial writings," *Antonyuk*, 639 F. Supp. 3d at 309. Yet neither the Founders nor successive generations required forfeiture of a speaker's anonymity in order to facilitate an inquiry into character or dangerousness. This constitutes "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

The State argues more generally that review of social media is consistent with a tradition of licensing officers "looking to past conduct, associates, and reputation to assess whether an applicant is law-abiding and responsible." *Antonyuk* Nigrelli Br. at 44. That is true, so far as it goes: social media posts can be relevant to assessing character and reputation. But *review* of these posts is not the burden imposed by § 400.00(1)(o)(iv). The burden is the disclosure of

pseudonyms under which applicants have a constitutional right to post their views. That is a burden analytically distinct from (and more severe than) the burden of a licensing officer reviewing applicants' publicly available posts.

The State also asks for flexibility in our historical inquiry because "[t]he development of social media is a quintessential dramatic technological change" which requires "a nuanced analogical approach." *Antonyuk* Nigrelli Br. at 44 (citing *Bruen*, 142 S. Ct. at 2132); *see also supra* Background § III.E. Social media is of course revolutionary because of the ease with which individuals can disseminate their thoughts to a large audience without the traditional barriers to publishing. This is indeed a break from the practice of publishing newspaper pieces as "Publius"—we grant that Facebook likely would have baffled the Founders. But the CCIA's social media requirement does not bear upon the aspects of social media that are new. While social media writ large may have no historical analogue, social media *handles* do. The frequency, formality, and barriers to dissemination of one's views may be different, but the election of a pseudonym to hide one's true identity is not.

The State is not wrong that posting on social media in the twenty-first century is different from publishing on physical media in the nineteenth century.

122

Social media posts are frequently of a very different character from the well-crafted pamphlets known to students of the Ratification debates. And the spontaneity of speech on social media, without editors or filters, may indeed lead to a greater frequency of messages that are relevant to an assessment of character and dangerousness. *See* Amicus Br. of Dr. Jaclyn Schildkraut (discussing social science research indicating that social media posts "provide[] insights into intended behavior, and that an examination of potential social media [content] can provide an early warning sign of potential future violence"). But those considerations of relevance or usefulness cannot overcome the absence of any analogous disclosure requirement from the historical record combined with the constitutional interests implicated by the mandatory disclosure of online pseudonyms.

In sum, we agree with the district court that Plaintiffs are likely to succeed on the merits of their constitutional challenge to this provision, and we **AFFIRM** the district court's preliminary injunction as it applies to the social media requirement.

## SENSITIVE LOCATIONS

We now consider the Plaintiffs' challenges to assorted subsections of N.Y. Penal L. § 265.01-e banning the carriage of firearms in "sensitive locations."

Standing is a live issue with respect to many of the sensitive location challenges. No plaintiff has been arrested or prosecuted under § 265.01-e, but "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Instead, a plaintiff has Article III standing to bring a pre-enforcement challenge to a criminal statute if he or she can "demonstrate: (1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'proscribed by' the challenged law; and (3) that 'there exists a credible threat of prosecution thereunder.'" *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Driehaus*, 573 U.S. at 159).

We discuss many standing issues below as they arise, usually relating to intention and proscription. But we consider at the outset the need for a "credible threat of prosecution," as it cuts across all of plaintiffs' challenges. The various verbal formulations elaborating this standard tend to be unhelpful. We have said that "credible threat" means that the "fear of criminal prosecution . . . is not

imaginary or wholly speculative." *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).  And a credible threat is missing where "plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible."  *Knife Rights*, 802 F.3d at 384.

These statements could be overread to require a rigorous inquiry into the chances that a given plaintiff will be prosecuted.  But Article III is satisfied by much less.  In *Babbitt v. United Farm Workers National Union*, the Supreme Court found pre-enforcement standing without much evidence suggesting that a prosecution was either imminent or particularly likely.  There, a labor group challenged a law criminalizing "dishonest, untruthful, and deceptive publicity." 442 U.S. at 302.  The plaintiff organization "ha[d] actively engaged in consumer publicity campaigns in the past," "alleged . . . an intention to continue to engage in boycott activities," and stated that although it did "not plan to propagate untruths . . . erroneous statement is inevitable in free debate."  *Id.* at 301 (internal quotation marks omitted).  The Court acknowledged that the challenged law "has not yet been applied and may never be applied" but nonetheless found an Article III case or controversy because "the State ha[d] not disavowed any

intention of invoking the criminal penalty provision against unions that commit unfair labor practices." *Id.* at 302. The timorous organization was "thus not without some reason in fearing prosecution," and its fears were "not imaginary or wholly speculative." *Id.*

*Babbitt* demonstrates that the "credible threat of prosecution" is a "quite forgiving" requirement that sets up only a "low threshold" for a plaintiff to surmount. *Hedges*, 724 F.3d at 197 (quoting *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 14–15 (1st Cir. 1996)); *see also id.* at 200 ("[N]either this Court nor the Supreme Court has required much to establish this final step . . . ."). Courts have "not place[d] the burden on the plaintiff to show an intent by the government to enforce the law against it" but rather "presumed such intent in the absence of a disavowal by the government." *Id.* at 197; *accord Vitagliano*, 71 F.4th at 138 ("[W]here a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it." (quoting *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019))). That is, "courts are generally 'willing to presume that the government will enforce the law as long as the

relevant statute is recent and not moribund.'" *Cayuga Nation*, 824 F.3d at 331
(quoting *Hedges*, 724 F.3d at 197).

To be sure, some of our recent decisions regarding pre-enforcement
standing have relied on more specific indications that enforcement can be
expected. For example, in *Silva v. Farrish*, we explained that the plaintiffs had
"already been subject to fines and enforcement proceedings for violating the
fishing regulations" that they challenged. 47 F.4th 78, 87 (2d Cir. 2022). Similarly,
the plaintiffs in *Knife Rights* had previously been charged under the challenged
statute, and one plaintiff had been party to a deferred prosecution agreement
which "expressly threatened future charges if its terms were not satisfied," 802
F.3d at 385–86. And in *Cayuga Nation*, the government had specifically
"announced its intention to enforce the Ordinance against the Nation" as well as
the group headed by the lead individual plaintiff. 824 F.3d at 331 (citation
omitted).

Here, one defendant argues that such indicia of future prosecution are
*required* to show standing and, accordingly, that at least some plaintiffs lack
standing because they have "failed to establish [that they have] been threatened
with certain . . . prosecution pursuant to the CCIA." *Antonyuk* Cecile Br. at 15–16.

The principal support advanced for that position is a summary order that (by its nature) lacks precedential force and that, in any event, lacks *persuasive* force in this case.[49]  But we rejected that very position in *Vitagliano v. County of Westchester*: "While evidence [that a plaintiff faced either previous enforcement actions or a stated threat of future prosecution] is, of course, relevant to assessing the credibility of an enforcement threat, none of these cases suggest that such evidence is *necessary* to make out an injury in fact."  71 F.4th at 139 (citing *Driehaus*, 573 U.S. at 164); *accord id.* ("[R]equiring an 'overt threat to enforce' a criminal prohibition 'would run afoul of the Supreme Court's admonition not to put the challenger to the choice between abandoning his rights or risking prosecution.'" (some quotation marks omitted) (quoting *Tong*, 930 F.3d at 70)).  Instead, we reiterated that, although "the presumption that the government will

---

[49] Cecile relies on *Does 1-10 v. Suffolk County, N.Y.*, No. 21-1658, 2022 WL 2678876 (2d Cir. July 12, 2022) (summary order), to urge this higher bar for standing.  In *Does 1-10*, the defendant county informed the plaintiffs that their guns were prohibited and that they "'may be subject to arrest and criminal charges' if they 'fail to present the weapon'" to the police within fifteen days.  2022 WL 2678876, at *3.  But, since the county did not follow up on those warnings for over a year, and there was no evidence that "*any* purchaser of the [gun in question] ha[d] been arrested or had their firearm forcibly confiscated," we decided by summary order that the plaintiffs failed to "allege[] that they are at an imminent risk of suffering an injury in fact."  *Id.*  However, "[t]he identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue," *Knife Rights*, 802 F.3d at 384, and *Does 1-10* presented significantly different facts than those now before us.

128

enforce its own laws 'in and of itself, is not sufficient to confer standing,'" *id.* (quoting *Adam v. Barr*, 792 F. App'x 20, 23 (2d. Cir. 2019) (summary order)), "we 'presume such intent [to enforce the law] in the absence of a disavowal by the government or another reason to conclude that no such intent existed.'" *Id.* at 138 (quoting *Tong*, 930 F.3d at 71).

     *Babbitt* and *Vitagliano* control this case. In *Babbitt*, the state of Arizona had not specifically threatened the plaintiff organization with criminal sanctions, had never prosecuted anyone under the challenged provision, and had acknowledged it might never do so. *See* 442 U.S. at 301–02. The plaintiff then averred an intention only to *risk* lawbreaking, and the state had not disavowed prosecution. If those facts alone are enough to render a fear of prosecution more than "imaginary or wholly speculative," *id.* at 302, then so must the Plaintiffs' allegations here. *See Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005) ("[*Babbitt*] appeared to find a threat of prosecution credible on the basis that plaintiffs' intended behavior is covered by the statute and the law is generally enforced. Courts have often found that combination enough[.]"). And like the plaintiff in *Vitagliano*, the Plaintiffs here challenge a law "enacted . . . just months before [they] brought this action" which is "designed to curb the very conduct in

which [they] intend[] to engage"; "there is no indication that the [defendants] ha[ve] disavowed enforcement" of the challenged law; and we have "no reason to doubt that the [State] will enforce its recently enacted law against those who violate its terms." 71 F.4th at 138–39.

The Plaintiffs have surmounted the "low" and "quite forgiving" bar for pre-enforcement standing with respect to many of the CCIA's challenged provisions. *Hedges*, 724 F.3d at 197. While the statements by law enforcement officials cited by Plaintiffs may not directly threaten the specific Plaintiffs in these cases with arrest, those statements are, in the context of this case, evidence that Plaintiffs face a realistic threat of arrest and prosecution. Far from disavowing prosecution of Plaintiffs, multiple Defendants have announced their intention to enforce the CCIA,[50] and the Superintendent of State Police has warned that his department will have "zero tolerance" for violations. Although prosecution is not certain, Plaintiffs articulate a plausible chain of events resulting in their arrest and prosecution: the "brazen nature of [their] intended defiance," in the district

---

[50] Many of these announcements explained that enforcement would not be vigorous or proactive, and others suggested that the law was contrary to the speaker's personal preference. But reluctant or not, statements that the law will be enforced cannot be construed as disavowals of enforcement or otherwise used to rebut the presumption that the government enforces its laws.

court's words, makes it likely to be noticed by citizens and then by police.  *E.g.*, *Antonyuk*, 639 F. Supp. 3d at 263.[51]  Plaintiffs "are thus not without some reason in fearing prosecution," and their fears are neither "imaginary [n]or wholly speculative."  *Babbitt*, 442 U.S. at 302.

For those reasons, we conclude that the Plaintiffs here have adequately demonstrated a credible threat of enforcement—each Plaintiff will accordingly have standing if he can also show "an intention to engage in a course of conduct arguably affected with a constitutional interest" and "that the intended conduct is proscribed by the challenged law."  *Vitagliano*, 71 F.4th at 136 (quotation marks omitted).  With that settled, we proceed to Plaintiffs' various challenges to § 265.01-e's sensitive location restrictions.

---

[51] Some Plaintiffs allege specific facts heightening their likelihood of arrest for certain intended violations.  Mann alleges that a member of his congregation is a local law enforcement officer, J.A. 179 (Mann Decl. ¶ 23); Terrille explains that he is particularly likely to be arrested for possessing a gun at airports when he goes through TSA screening, J.A. 189, 194 (Terrille Decl. ¶¶ 9, 22); and Johnson notes that he often encounters state Environmental Conservation Officers while fishing, increasing the chance of arrest for carrying a gun in state parks, J.A. 142 (Johnson Decl. ¶ 24).  Those claims are thus on safer footing, but we need not decide how much safer given our conclusion that, even without those additional allegations, Plaintiffs have stated a credible threat of prosecution.

## I.     Treatment Centers

Section 265.01-e(2)(b) prohibits possession of a gun in any "location providing health, behavioral health, or chemical dep[e]ndance care or services." We first consider standing.

### A.     Standing

The district court found that only Joseph Mann has standing to challenge paragraph (2)(b).[52]  *Antonyuk*, 639 F. Supp. 3d at 265.  Mann, a pastor at Fellowship Baptist Church in Parish, NY, averred that his church "provides an addiction recovery ministry" through an organization called "RU Recovery." J.A. 181 (Mann Decl. ¶ 28).  This ministry "ha[s] brought persons in the program to church property for counseling and care."  *Id.* at 181–82 (Mann Decl. ¶¶ 28–29).  It is not clear whether Mann personally provides counseling in these sessions, but Mann does allege that the church (his workplace) is a "location providing chemical depend[e]nce care or services" when hosting the RU

---

[52] Plaintiff Leslie Leman asserted standing to challenge this provision (and nearly every other sensitive location restriction) on the basis that he regularly carries his personal firearm in his work as a volunteer firefighter and may be called to respond to various sensitive locations. The district court rejected this theory of injury-in-fact as impermissibly speculative.  *See Antonyuk*, 639 F. Supp. 3d at 262.  Since Plaintiffs do not dispute that conclusion, any argument as to Leman's standing is forfeited.  "Although parties cannot waive arguments *against* jurisdiction, they are more than free to waive (or forfeit) arguments *for* it."  *Taylor v. Pilot Corp.*, 955 F.3d 572, 582 (6th Cir. 2020) (Thapar, *J.*, concurring in part) (collecting cases).

Recovery program and that Mann "intend[s] to continue to possess and carry [his] firearm while" at the church, J.A. 177, 181 (Mann Decl. ¶¶ 11, 29).  The State, by contrast, contends that the church is not a qualifying location providing "behavioral health or chemical depend[e]nce care or services," because the RU Recovery program "is intended to encourage [participants] 'to seek help and voluntarily enter treatment'" rather than "to provide treatment."  *Antonyuk Nigrelli* Br. at 49–50 (quoting J.A. 181 (Mann Decl. ¶ 28)).

     In determining Mann's standing, we are not called on to offer a definitive or comprehensive interpretation of the CCIA.[53]  "[C]ourts are to consider whether the plaintiff's intended conduct is '*arguably* proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Driehaus*, 573 U.S. at 162).  Thus, "if a plaintiff's interpretation of a statute is reasonable enough[,] and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the

---

[53] For this reason, nothing we say here purports to bind New York state courts when interpreting § 265.01-e in cases properly before them.  This case presents exclusively federal questions, and we would not presume to tell New York courts what a New York criminal statute means or to ignore a state court's interpretation of the statute if one exists.  But since we know of no relevant New York case law, of necessity we strike out on our own.

statute." *Id.* (internal quotation marks omitted). In making that determination, we do not defer to the government's interpretation of the statute, *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (finding plaintiff's interpretation "reasonable enough" even though contradicted by the state), or to its representations regarding the likelihood of a particular prosecution, *id.* ("The State also argues that . . . [it] has no intention of suing [plaintiff] for its activities. While that may be so, there is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation.").

Mann's allegations suffice under this forgiving standard. Paragraph (2)(b) is intentionally broad: rather than applying only to locations providing "treatment," as the State would have it, the law refers to "care *or services*." The RU Recovery program may not provide "chemical depend[e]nce care," but addiction counseling is at least arguably a "chemical depend[e]nce *service*." Since Mann has alleged an intention to violate the law by carrying a gun at a location that (arguably) "provid[es] . . . chemical depend[e]nce . . . services" (and he faces a "credible threat" of prosecution for the reasons explained above), he has standing to seek an injunction against enforcement of paragraph (2)(b).

B.     Merits

1.     District Court Decision

We now turn to the merits of Mann's challenge to § 265.01-e(2)(b).  The

district court found that the plain text of the Second Amendment covered the

conduct proscribed by § 265.01-e(2)(b)—*i.e.*, licensed carriage of a concealed

firearm for self-defense in a location providing behavioral health, or chemical

dependence care or services—and accordingly placed the burden on the State to

demonstrate the statute's consistency with this Nation's tradition of firearm

regulation.[54]  The State, in turn, offered two categories of historical analogues.

First, the State pointed to an 1837 Massachusetts militia law, an 1837 Maine

militia law, and an 1843 Rhode Island militia law that each excluded people with

intellectual disabilities, mental illnesses, and alcohol addictions from militia

service.  Second, the State generally referenced the tradition of restricting

firearms in locations frequented by vulnerable populations such as children and

provided, as examples, state statutes prohibiting firearms in school rooms.

---

[54] The district court held that the Second Amendment covered the conduct proscribed by § 265.01-e(2)(b) "except to the extent that the places at issue in th[e] regulation" were not open to the public as defined by New York state law.  *Antonyuk*, 639 F. Supp. 3d at 316.  Thus, the district court's injunction did not prohibit the State from enforcing § 265.01-e(2)(b) in non-public areas of behavioral health or substance dependence treatment centers.

135

Assuming, without deciding, that the State's proffered analogues were sufficiently established and representative to constitute a national tradition, the district court nonetheless rejected the two groups of analogues as insufficiently similar to the challenged provision. For one, the district court determined that the purposes of the state militia laws were different from that of § 265.01-e(2)(b) in that the militia laws were concerned with keeping firearms out of the hands of individuals with intellectual disabilities, mental health issues, and alcoholism, whereas § 265.01-e(2)(b) prohibits law-abiding, licensed individuals from carrying their firearms in places providing behavioral health or chemical dependence care or services. Even putting aside this difference in purpose, the district court concluded that § 265.01-e(2)(b) burdened Second Amendment rights more than did the state militia laws because, while the state militia laws took firearms out of the hands of individuals with the above-listed conditions only during wartime, § 265.01-e(2)(b) precludes all licensed carriers from ever bringing their firearm into a behavioral health or chemical dependence service center.

The district court likewise rejected the tradition of regulating firearms in locations frequented by vulnerable populations such as children. Because the

State had not adduced any evidence showing that more children are present in places of behavioral and substance dependence care today than in the 18th and 19th centuries, the court found that the absence of 18th- and 19th-century regulations prohibiting firearms in medical establishments indicated that the historical tradition of regulating firearms out of a concern for children has not traditionally extended so far as to justify regulation in medical establishments.

Finally, because both medical establishments and gun violence existed in the 18th- and 19th-centuries, the district court considered the lack of evidence as to historical firearm bans "in places such as 'almshouses,' hospitals, or physician's offices," as "evidence of th[e] regulation's inconsistency with the Second Amendment." *Antonyuk*, 639 F. Supp. 3d at 318.

2.    <u>The State's Historical Analogues</u>

*a.*    *Well-Established and Representative*

Because the district court only assumed, without deciding, that the State's proposed analogues were representative and established, we begin there. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue." *Bruen*, 142 S. Ct. at 2133 (emphasis removed). Representativeness and establishment ensure against

137

"endorsing outliers that our ancestors would never have accepted." *Id.* (internal quotation marks omitted). On the other hand, as *Bruen* cautioned, these requirements cannot be stretched to require the historical twin or "dead ringer." *Id.*

Despite assuming that the State's proffered analogues were sufficiently well-established and representative, the district court expressed some skepticism as to this conclusion. First, it questioned whether laws from three states could constitute an established tradition. Second, due to the population size of those three states relative to that of the nation, it doubted these laws were representative.[55] We do not share these skepticisms. True, *Bruen* did utilize the number of states with analogous regulations and their relative populations as indicia of the orthodoxy and representativeness of New York's proper-cause requirement, but New York's requirement was exceptional in both the way and the extent to which it burdened Second Amendment rights. As we have already

---

[55] Contrary to the district court's conclusion, the percentage of the national population—six percent—living in Massachusetts, Rhode Island, and Maine at the time of the statutes' passage was significant compared to that deemed unrepresentative in *Bruen*. *See Bruen*, 142 S. Ct. at 2154 ("The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations [about two-thirds of 1%] who would have lived under them.").

noted, less exceptional regulations permit a "more nuanced approach." *Id.* at 2132.

Lacking any evidence that the laws from Maine, Massachusetts, and Rhode Island were historical anomalies, we find them sufficiently established and representative to stand as analogues.[56] *Compare id.* at 2133 ("Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . . we are also aware *of no disputes regarding the lawfulness of such prohibitions*." (emphasis added)), *with id.* at 2154 ("the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an *otherwise* enduring American tradition permitting public carry" (emphasis added)).  Disqualifying proffered analogues based only on strict quantitative measures such as population size absent any other indication of historical deviation would turn *Bruen* into the very "regulatory straightjacket" the Court warned against.  *Id.* at 2133; *see also supra* Licensing Regime § II.A.2 (rejecting view that percentage of population governed is

---

[56] The district court did not question the conventionality or representativeness of the State's other group of analogous regulations—those prohibiting firearms in schools—nor do we. The Supreme Court has already determined that such regulations are well-established and representative.  *See Bruen,* 142 S. Ct. at 2133 (noting "*Heller*'s discussion of 'longstanding' laws forbidding the carrying of firearms in sensitive places such as schools" (internal quotation marks omitted)).

dispositive and instead explaining that this consideration "is only one clue that

said law may have been an outlier unable to overcome a contrary tradition").

### b. *Consistency with Tradition*

Both sets of the State's proffered analogues place § 265.01-e(2)(b) within

this Nation's tradition of firearm regulation in locations where vulnerable

populations are present. We begin by comparing how and why § 265.01-e(2)(b)

and each set of the proffered historical analogues burdens Second Amendment

rights. Section 265.01-e(2)(b) aims to protect "vulnerable or impaired people who

either cannot defend themselves or cannot be trusted to have firearms around

them safely." *Antonyuk* Nigrelli Br. at 62. It does so by prohibiting carriage of

firearms in centers providing behavioral health or substance dependence

services. As to the 19th-century state militia laws, the State argues that the

statutes of Maine, Massachusetts, and Rhode Island, which prohibited those with

mental illness, intellectual disabilities, and alcohol addiction from serving in

militias, were aimed at protecting vulnerable populations from either misusing

arms or having arms used against them.[57] These statutes operated by preventing

such individuals from serving in the militia. *See* J.A. 635 (MASS. GEN. LAWS ch.

---

[57] Though taking issue with these laws' fit as analogues for § 265.01-e(2)(b), Plaintiffs do
not dispute this characterization of the statutes' purpose, and the district court accepted it.

240, § 1 (1837)); J.A. 639 (1837 Me. Laws 424); J.A. 644 (1843 R.I. Pub. Laws 1).

Similarly, the State claims that the tradition of regulating firearms in locations

frequented by children, as exemplified by historical regulations prohibiting guns

in schools, is motivated by the need to protect a vulnerable population.[58]  This

category of laws operated by preventing the carriage of firearms in places of

education or school rooms.  *See, e.g.,* J.A. 602 (1870 Tex. Gen. Laws 63, ch. 46); J.A.

611 (1883 Mo. Sess. Laws 76); J.A. 617 (1889 Ariz. Sess. Laws 17, § 3); J.A. 621

(1890 Okla. Terr. Stats., Art. 47, § 7).

The three militia laws and the tradition of prohibiting firearms in schools

are each "relevantly similar" to § 265.01-e(2)(b).  The relevantly similar features

of those statutes prohibiting firearms in schools are the *burden* they place on

Second Amendment rights and the *reason*: prohibiting firearm carriage for the

protection of vulnerable populations.[59]  The relevantly similar feature of the state

---

[58] Again, though taking issue with their fit as analogues for § 265.01-e(2)(b), Appellees do not dispute that 18th- and 19th-century laws prohibiting guns in schools, which the State provided as examples of the more general tradition of prohibiting firearms in places frequented by vulnerable people, were motivated by the need to protect children. Nor do Plaintiffs dispute that children are a vulnerable population.

[59] We also find historical support for § 265.01-e(2)(b) in the fact that these laws tended to not only prohibit guns in school rooms, *i.e.*, spaces frequented by vulnerable children, but also anywhere people "assemble[] for educational, literary or social purposes."  J.A. 602 (1870 Tex. Gen. Laws 63, ch. 46); *see also* J.A. 611 (1883 Mo. Sess. Laws 76) (same); J.A. 617 (1889 Ariz. Sess. Laws 17, § 3) (same for "amusement or for educational or scientific purposes"); J.A. 620 (1890

militia laws is *who* has historically been considered to make up a vulnerable population justifying firearm regulation on their behalf, *i.e.*, the mentally ill or those with substance use disorders.[60]

In this case, both analogues surely suffice to validate our finding of the likely constitutionality of § 265.01-e(2)(b). Had the State pointed only to those laws prohibiting firearms in schools, the State would have had to demonstrate that individuals with behavioral and substance abuse disorders are sufficiently analogous to children protected by school carriage prohibitions, as the State cannot justify a sensitive location prohibition merely by designating a population as "vulnerable" and enacting a law purporting to protect them. *See Bruen*, 142 S.

---

Okla. Terr. Stats., Art. 47, § 7) (same for "educational purposes"). The modern hospitals that provide some of today's behavioral care and substance disorder services provide "the principal clinical-education settings for medical students enrolled in medical schools." Amicus Br. on behalf of Greater New York Hospital Assoc., at 14.

[60] Our finding that individuals with behavioral and substance abuse disorders have historically been considered a "vulnerable population" who cannot be entrusted near weapons finds further support in the regulation of weapons by many publicly operated asylums for the mentally ill. Such rules appear to have been motivated by the fear that patients would obtain possession of such weapons and thereby injure themselves or others. Utica Asylum and Buffalo State Asylum (both state facilities) prohibited "attendant[s]" from "plac[ing] in the hands of a patient, or leav[ing] within his reach," certain weapons. *See* Rules, Regs. & By-Laws of the N.Y. State Lunatic Asylum at Utica, Duty of Attendants to Patients § 7 (1840); Rules & Regs. Governing the Buffalo State Asylum, Duty of Attendants to Patients § 7 (1888). During Reconstruction and shortly after, many other government-run institutions adopted the same rule. *See* Rules for the Missouri State Lunatic Asylum § 8 (1870); Rules, Regulations, and By-Laws of the Arkansas Lunatic Asylum, Little Rock § 8 (1883); Rules & Regulations of State Lunatic Asylum No. 3, Nevada, Mo. § 129 (1887).

Ct. at 2133 (emphasizing that "analogical reasoning under the Second Amendment" is not a "blank check"). However, the evidence from the state militia laws that individuals with behavioral or substance dependence disorders have historically been viewed as a vulnerable population justifying firearm regulation makes such analogical reasoning unnecessary to our holding.[61] Likewise, had the State pointed only to the militia law analogues, which disarmed the members of the vulnerable population itself rather than others in proximity, it would have borne the burden of demonstrating that § 265.01-e(2)(b)—which disarms everyone in spaces where a vulnerable population is present—is consistent with or distinctly similar to a historical tradition.

In sum, the State's evidence establishes a tradition of prohibiting firearms in locations congregated by vulnerable populations and a concomitant tradition of considering those with behavioral and substance dependence disorders to

---

[61] The state need not always provide evidence that a group has historically been considered vulnerable every time it wishes to regulate firearms to protect that group. An even "more nuanced approach" would be appropriate were the regulation to address a vulnerable group or setting that did not exist at the time of Reconstruction or the Founding. *Bruen*, 142 S. Ct. at 2132. But, as the State itself argues and depends on here, those with behavioral and substance use disorders have long been considered a vulnerable group. *See id.* at 2132 (requiring more where "a challenged regulation addresses a general societal problem that has persisted since the 18th century").

constitute a vulnerable population justifying firearm regulation. Section 265.01-e(2)(b) is consistent with these traditions.

### 3. Proper Analysis of Proffered Analogues

In rejecting the State's evidence as to the tradition of regulating firearms in places frequented by vulnerable populations such as children, the district court misidentified the relevantly similar features of the State's proffered analogues The district court found that the State failed to show that today's treatment centers contain more children than similar locales in the 18th- and 19th-centuries; but the relevantly similar feature of these analogues is the *how* and the *why*: firearm prohibition (how) in places frequented by and for the protection of vulnerable populations (why). The New York legislature need not have attempted to protect the exact same subset of vulnerable persons for its regulation to be relevantly similar to these historical analogues. Similarly, the district court discounted the state militia laws on the ground that they impose a lesser burden on Second Amendment rights than § 265.01-e(2)(b); but the relevantly similar feature of the state militia laws is that the intellectually disabled, mentally ill, or those with substance use disorders have historically been considered a vulnerable population justifying firearm regulation. In

requiring both sets of the State's analogues to burden Second Amendment rights on behalf of the exact same group in the very same way, the district court disregarded *Bruen*'s caution that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

Furthermore, contrary to the district court's conclusion, the State was not required to show that firearms were traditionally banned "in places such as 'almshouses,' hospitals, or physician's offices." *Antonyuk*, 639 F. Supp. 3d at 318. For one, this requirement by the district court was a product of its erroneous conclusion that the State's evidence was insufficiently analogous. Properly construed, that evidence establishes a historical tradition of firearm regulation embracing § 265.01-e(2)(b) — the opposite of historical silence. Yet, even putting that foundational error aside, the district court made too much of *Bruen*'s observation that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. *See also supra* Background § III.E.

*     *     *

For the above stated reasons, the preliminary injunction is **VACATED**

insofar as the State was enjoined from enforcing § 265.01-e(2)(b) in behavioral

health and substance dependence care and service centers.

## II.     Places of Worship

Section 265.01-e(2)(c) of the CCIA criminalizes possession of a firearm in

"any place of worship, except for those persons responsible for security at such

place of worship."  N.Y. Penal L. § 265.01-e(2)(c).  A suite of challenges to this

provision is before us on appeal:

- In *Antonyuk v. Chiumento*, plaintiff Joseph Mann avers that, as pastor, he
  frequently carries a concealed firearm in his church, the Fellowship Baptist
  Church in Parish, New York, and that he intends to continue doing so
  notwithstanding the CCIA's prohibition on carrying firearms in places of
  worship.  *Antonyuk* J.A. 72 ¶¶ 182–83.  The district court (Suddaby, *J.*) held
  that the place of worship provision intruded on Mann's Second Amendment
  right to carry firearms and that the State had failed to produce sufficient
  evidence of a historical tradition of analogous firearm regulations.  It thus
  enjoined the defendants from enforcing the provision.[62]  *Antonyuk*, 639 F.
  Supp. 3d at 321.

---

[62] The district court in *Antonyuk* also enjoined the place of worship provision on the
ground that it was "too close to infringing on one's First Amendment right to participate in
congregate religious services."  *Antonyuk*, 639 F. Supp. 3d at 322.  No Plaintiff had requested
injunctive relief on this ground, nor did the district court make findings as to whether any
Plaintiff's free exercise was inhibited by the place of worship provision; we therefore do not
consider it a basis for the injunction.  *See generally* Mem. of Law in Supp. of Preliminary Inj.,

- In *Hardaway v. Chiumento*, the Plaintiffs Jimmie Hardaway, Jr. and Larry A. Boyd—respectively leaders of Trinity Baptist Church in Niagara Falls, New York and Open Praise Full Gospel Baptist Church in Buffalo, New York—similarly allege that the CCIA infringes on their right to carry firearms in their churches. *Hardaway* J.A. 57 ¶¶ 8–9; *id.* at 73 ¶ 43. The district court (Sinatra, *J.*) held that the historical analogues the State offered were "far too remote, far too anachronistic, and very much outliers," and therefore it also enjoined enforcement of the place of worship provision. *Hardaway*, 639 F. Supp. 3d at 442.

- In *Spencer v. Chiumento*, Plaintiffs Micheal Spencer and His Tabernacle Family Church, Inc. in Horseheads, New York, of which Spencer is senior pastor, allege that the place of worship provision substantially burdens their "right to the free exercise of religion" by forbidding "Pastor Spencer and the Church's members, under threat of criminal penalties, from exercising their religious conviction to carry firearms into the Church to protect themselves and other congregants." *Spencer* J.A. 46–47 ¶¶ 11–12; *id.* at 61 ¶ 62. They also allege that the provision violates the Establishment Clause by "meddling in the internal affairs of houses of worship" by depriving them of "the 'right to control who may enter, and whether that invited guest can be armed.'" *Id.* at 63 ¶¶ 71–72 (quoting *GeorgiaCarry.org, Inc.*, 687 F.3d at 1264). To these arguments they also added a Second Amendment challenge based on Spencer's individual right to carry firearms. *Id.* at 65–66 ¶¶ 78–86. The district court (Sinatra, *J.*) held that the Plaintiffs had shown a likelihood of success in demonstrating that the place of worship provision violates both their First and Second Amendment rights, and enjoined the defendants from enforcing the provision against "Pastor Spencer, the [plaintiff] Church, its members, or their agents and licensees." *Spencer*, 648 F. Supp. 3d at 469–71.

---

*Antonyuk v. Nigrelli*, No. 22-cv-00986 (Sept. 22, 2022), ECF No. 6-1 (not specifically challenging the place of worship provision); Reply Mem. in Supp. of Preliminary Inj. at 29–31, *supra* (Oct. 22, 2022), ECF No. 69 (advancing only Second Amendment arguments against it).

The State now appeals from the grant of preliminary injunctions in each case.  It does not dispute any Plaintiff's standing to challenge the place of worship provision, and we see no impediment to standing.

### A. *Antonyuk* **and** *Hardaway*

#### 1. Standing and Mootness

The New York legislature amended the place of worship provision after the district courts enjoined it.  Previously, the provision criminalized possession of a firearm in "any place of worship or religious observation."  2023 N.Y. Laws, Ch. 55, pt. F, § 4.  Effective May 3, 2023, however, places of "religious observation" are no longer covered, and the provision has an exception for "those persons responsible for security at such place of worship."  *Id.*  We must consider whether the statutory amendment has mooted any of the Plaintiffs' claims.

With respect to *Hardaway* and *Antonyuk*, it has.  Put simply, the amended statute prohibits none of the Plaintiffs in these cases from doing what they seek to do.  "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Tann v. Bennett*, 807 F.3d 51, 52 (2d Cir. 2015) (internal quotation marks omitted).  It remains live if "a court can

fashion *some* form of meaningful relief to award the complaining party." *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) (internal quotation marks omitted).

The natural-person plaintiffs in *Hardaway*, Jimmie Hardaway, Jr. and Larry Boyd, state directly in their complaint that they would grant themselves permission to carry firearms in order to protect their churches if they could. *See Hardaway* J.A. 71 ¶ 35 ("[A]s Pastor, Reverend Hardaway establishes the firearms policy for Trinity Baptist. In that role, *not only would he grant permission to himself to carry for purposes of keeping the peace in his church* (as he did prior to [the CCIA]) but he would also encourage congregants . . . to carry on church premises for the defense of themselves and other congregants." (emphasis added)); *id.* at 72 ¶ 37 ("Additionally, as Pastor, Bishop Boyd establishes the firearms policy for Open Praise. In that role, prior to [the CCIA], he previously granted permission to himself to carry for purposes of keeping the peace in his church and allowed other licensed congregants to carry. *He would continue to authorize licensed concealed carry by himself* and congregants on church premises for self-defense, but for the enactment and enforcement of [the CCIA]." (emphasis added)). Now, under the amended statute, they are perfectly capable of doing so.

Nor have the two organizational Plaintiffs in *Hardaway* articulated any associational or direct injury sufficient to support the preliminary injunction.[63] To have associational standing, an organization must show, *inter alia*, that "its members would otherwise have standing to sue in their own right." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiffs Firearms Policy Coalition, Inc. and the Second Amendment Foundation premised their representational standing solely on the two named Plaintiffs, without adding supporting declarations from other members. *See Hardaway* J.A. 57–58 ¶¶ 10–11. Having made no submission about any members other than the named Plaintiffs, the organizational Plaintiffs' associational standing therefore collapses alongside that of Hardaway and Boyd.

This does not necessarily defeat the standing of the organizational Plaintiffs; an organization may sue on its own behalf, so long as it can "independently satisfy the requirements of Article III standing." *Knife Rights*, 802 F.3d at 388. The organizational Plaintiffs allege the following theory of direct injury: the passage of the CCIA prompted them to "incur ongoing expenses" to

---

[63] In any event, the injunction in *Hardaway* was premised on the standing of the two individual Plaintiffs. *See Hardaway* J.A. 14–18.

launch and operate a "hotline to answer questions and provide legal information" about New York's gun laws. *See Hardaway* J.A. 59 ¶¶ 13–14. But as we have explained, "expenditures or other activities, if incurred at the organization's own initiative, cannot support a finding of injury" sufficient to create standing "when the expenditures are not reasonably necessary to continue an established core activity of the organization bringing suit." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021). The organizational Plaintiffs allege that they "designed" and "creat[ed]" programs to inform their members about the CCIA, *Hardaway* J.A. 59, ¶¶ 13–14, and they make no allegations about how these concededly new programs are a continuation of their "established core activity," *Russell-Tucker*, 8 F.4th at 174.

Compare this to *Centro de la Comunidad Hispiana de Locust Valley v. Town of Oyster Bay*, which did find independent organizational standing. 868 F.3d 104, 110 (2d Cir. 2017). In *Centro*, the organization argued that a new ordinance would increase the difficulty of its *already* ongoing activities. *Id.* That is different from making the decision to create new programs, as the Plaintiffs in *Hardaway* allege.

Like the Connecticut Parents Union in *Russell-Tucker*, the Firearms Policy Coalition and the Second Amendment Foundation advance a theory of injury that would allow any organization to "establish standing by claiming to have been injured by any law or regulation touching on any issue within the scope of its mission (which the organization itself can define or redefine) so long as it expends resources to oppose that law or regulation." *Id.* at 173. We reject so broad a conception of organizational injury: again, because the organizational Plaintiffs have not shown the kind of "*involuntary* and *material* impacts on *core activities* by which the[ir] organizational mission has historically been carried out," *id.* at 175, they lack standing sufficient to support the preliminary injunction issued against the place of worship provision.

The challenge to the place of worship provision in *Antonyuk* fares similarly. Plaintiff Mann alleges that his church "maintained a church security team, consisting of trusted church members . . . designated to carry their firearms to provide security and protection to the congregation," and that he "intends to continue to possess and carry [his] firearm while on church property" notwithstanding the place of worship provision. *Antonyuk* J.A. 72 ¶¶ 182–83 (alteration in original) (quotation marks omitted). Again, this is exactly what the

amended statute allows Mann to do; he can freely designate himself and the church security team as "persons responsible for security," N.Y. Penal L. § 265.01-e(2)(c), and thereby except them from the scope of the CCIA's criminal prohibition.[64]  No other plaintiff in *Antonyuk* has standing to support the district court's injunction against the place of worship provision.

2.  <u>Vacatur of Preliminary Injunctions</u>

With the subsequent mooting of Plaintiffs' request for a preliminary injunction, the question remains as to the nature of our mandate—whether to vacate or affirm the injunctions.  "In considering whether vacatur is inappropriate, our primary concern is the fault of the parties in causing the appeal to become moot."  *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of Watervliet*, 260 F.3d 114, 121 (2d Cir. 2001).  Vacatur is appropriate "in those cases where review is 'prevented through happenstance' and not through circumstances attributable to any of the parties."  *Haley v. Pataki*, 60 F.3d 137, 142 (2d Cir. 1995) ("Here, mootness resulted neither from happenstance nor from

---

[64] The *Antonyuk* Plaintiffs' post-amendment submission to this Court under Federal Rule of Appellate Procedure 28(j) seems to confirm this analysis.  It calls the new grant of authority to church leaders "a welcome change" and argues only that "other provisions" of the CCIA keep Mann from keeping weapons in the church (and that the statute amounts to compelled speech), objections addressed elsewhere in this opinion.  *See Antonyuk* Appellees' May 10, 2023 Letter at 1–2, ECF No. 378.

settlement from the entire action, but from the Governor's voluntary compliance with the preliminary injunction. Under the circumstances of this case, vacatur of the injunction is proper.").

The amendment of the place of worship provision is not attributable to any named defendant in any of the cases on appeal; it is the product of the New York legislature's intervention. Most importantly, none of the New York officers named as defendants made a voluntary choice to discontinue their enforcement of the prior place of worship provision—which decision could one day be reversed, and the issues thereby revived. The challenged law is gone, and there is no possibility that the defendants could seek to enforce it against the Plaintiffs. Under these circumstances, vacatur of the district courts' injunctions is warranted.

**B.** *Spencer*

The Plaintiffs in *Spencer*—Pastor Spencer and the church he leads—argue that the CCIA's restriction on firearms in places of worship violates the First Amendment's Free Exercise and Establishment Clauses. Spencer avers that he feels a "moral and religious duty to take reasonable measures to protect the safety of those who enter the Church," and that accordingly "before the church

154

carry ban went into effect, [he] regularly carried a concealed pistol on the

Church's New York campuses" and "allowed security volunteers and other

churchgoers with New York carry licenses to carry their own concealed

firearms." *Spencer* J.A. 74 ¶¶ 22–23.  Unlike the Plaintiffs in *Antonyuk* and

*Hardaway*, the claims of the *Spencer* Plaintiffs are not limited to their own carriage

of weapons, but extend to a "desire to allow others to carry concealed firearms

. . . on the Church's New York campuses" because of a belief "that such

concealed carry will protect [Spencer] and other worshippers from the kind of

violence that other houses of worship across the country have suffered, and

because such concealed carry effectuates our religious beliefs . . . that we must

protect the physical safety of the flock." *Id.* at 75 ¶ 29.

The district court accepted both First Amendment arguments.  It held that

the CCIA's explicit targeting of places of worship facially discriminates against

religious activity, and that the law was not neutral to religion because "[c]areful

drafting ensured that carrying of concealed weapons for religious reasons at

place[s] of worship is prohibited, while the same carrying in numerous other

circumstances remains permissible." *Spencer*, 648 F. Supp. 3d at 462.  It

determined that the law was not generally applicable because the CCIA permits

several different types of private businesses to allow weapons on their property while prohibiting religious organizations from doing the same. *Id.* at 463. Further, it concluded that the CCIA violates the Establishment Clause because it interferes in internal matters of the church by "dictat[ing] that protection of the Church may only be provided by . . . individuals fitting into a statutory exemption," instead of members of the congregation writ large. *Id.* at 465.

Separately, the district court concluded that the place of worship provision lacked historical analogues sufficient to show that it imposed a constitutional burden on the exercise of Spencer's Second Amendment right to carry a firearm. *Id.* at 466–68. It therefore enjoined the statute under both the First and Second Amendments, as incorporated by the Fourteenth Amendment.

We affirm the preliminary injunction under the Free Exercise Clause, and express no view as to the other arguments raised by the Plaintiffs.

\*       \*       \*

We consider first whether Plaintiffs have demonstrated a likelihood of success on the merits. "[A] plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally

applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022)

(quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990)).

> 1.  <u>Burden on Religious Practice</u>

As with the Plaintiffs in *Hardaway* and *Antonyuk*, whether the Plaintiffs are

injured by the place of worship provision must be reconsidered following the

amendment to the statute.

The central argument advanced by the *Spencer* Plaintiffs is that the CCIA

impedes their religious duty to protect the congregation by carrying firearms in

their church and inviting congregants to do the same.  A faith organization has a

cognizable interest in eliminating barriers to its religious practice, including

when the barriers primarily impact its adherents' conduct.  *See, e.g, Church of the

Lukumi Babalu Aye, Inc. v.  City of Hialeah*, 508 U.S. 520, 528 (1993) (church and

religious leader may challenge restriction on animal sacrifice); *Roman Cath.

Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 65–66 (2020) (religious organizations

may challenge place-of-worship occupancy restrictions); *Fifth Ave. Presbyterian

Church v. City of New York*, 293 F.3d 570, 574–75 (2d Cir. 2002) (church may

challenge City policy to remove homeless people from church's outdoor

property).

Although the burden on the Plaintiffs' religious practice has been reduced by the intervening amendment, a remediable injury to the Plaintiffs' religious practice subsists. The complaint and affidavits focus on firearms carried by church leadership and security volunteers, but also state that ordinary members of the congregation carry firearms pursuant to a religious calling—and, importantly, are encouraged to do so by Spencer. The complaint states that "numerous church members who hold New York concealed-carry licenses . . . would like to carry firearms on the Church's New York campuses as a means of self-defense," *Spencer* J.A. 56 ¶ 46, and that the Plaintiffs invite this conduct as part of the Plaintiffs' "sincere religious beliefs," *id.* at 61 ¶ 61. Spencer's declaration avers that he "allowed security volunteers *and other churchgoers*" to carry firearms "as an application of" his and the Church's religious beliefs. *Id.* at 74 ¶ 24.

The New York legislature's decision to authorize the *Spencer* Plaintiffs and other church leaders to appoint "persons responsible for security" who may carry firearms in the church therefore gives the Plaintiffs only partial relief. While they may now arm themselves and their security volunteers, they still cannot give general license to their congregants to bring firearms into the church

unless they are willing to designate every congregant as "responsible for security."  The need to make this designation is not an obstacle faced by secular establishments that wish to authorize the carriage of firearms.  Many members of the congregation may feel unwilling to carry firearms in the church if they are required to take such a responsibility, and Spencer and the Church cannot invite congregants to carry firearms without exhorting them to take up a responsibility to protect not only themselves or their families but also the congregation as a whole.

The State argues that the place of worship provision does not meaningfully burden the Plaintiffs' religious practice.  *Spencer* Appellants' Br. at 19–20.  In direct examination during a hearing before the district court, counsel for the State asked Spencer whether he felt that other pastors that he supervises were "failing their religious obligation to protect the flock" by not carrying weapons; Spencer replied: "Each person, I believe, has their right to believe as they will.  I don't dictate even to my staff." *Spencer* J.A. 237–38.  The State takes this, and some similar exchanges in which Spencer acknowledged that he did not police the firearm-carrying practices of his congregants or fellow pastors, to be an

admission that "carrying firearms is not necessary to fulfill a [purported] religious obligation to protect congregants." *Spencer* Appellants' Br. at 20.

The State does not dispute, however, that Spencer used to carry a firearm in the church because of a personal religious belief and encouraged his congregants to do the same. Nor does it dispute that Spencer no longer did so after the CCIA was passed. This is all that is required; the burden element is fulfilled when an individual plaintiff is prevented from engaging in a religious practice by state action. The practice need not form part of an orthodox religious doctrine or be pursued collectively or uniformly. *See Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) ("Neither the Supreme Court nor we . . . have ever held that a burdened practice must be mandated . . . . To confine the protection of the First Amendment to only those religious practices that are mandatory would necessarily lead us down the unnavigable road of attempting to resolve intra-faith disputes over religious law and doctrine."). Spencer's decision not to verify which members of his congregation carry firearms does not impeach his religious beliefs any more than a pastor's failure to check the tax returns of his congregation-members would impeach his belief in the religious virtues of charity.

The State relies on this Court's decision in *Green Haven*, which concerned a constitutional challenge brought by a group of Quakers whose meetings with imprisoned coreligionists had been rescheduled from Saturday to Friday. *Green Haven Prison Preparative Meeting of the Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 85 (2d Cir. 2021). The *Green Haven* plaintiffs failed to show a burden on the group's religious practice because, notwithstanding allegations that rescheduling had caused them "inconveniences," the plaintiffs "failed to establish that scheduling the Quarterly Meetings on Saturdays (as opposed to any other day) bears any religious significance whatsoever." *Id.* at 85–86. Importantly, the state action "did not forbid" the group's meetings. *Id.* at 85. Here, however, Spencer has alleged he places a religious significance in encouraging his congregation to carry firearms in his church, and this encouragement has been made at least partially unlawful by the CCIA. Moreover, *Green Haven* is inapposite because it arises in the setting of a prison, where security and penological concerns impose limits on prisoners' rights that would not be countenanced as to the non-incarcerated population.

To the extent the State disputes the sincerity of Spencer's beliefs, we decline to consider vacatur on these grounds. To assess the sincerity of a

plaintiff's religious belief, "[t]he need for a full exposition of facts is profound," because "determining a man's state of mind is 'an awesome problem,' capable of resolution only by reference to a panoply of subjective factors," including "a litigant's state of mind, motive, sincerity or conscience." *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (quoting *Sittler v. United States*, 316 F.2d 312, 325 (2d Cir. 1963) (Kaufman, *J.*, concurring)). Because "a sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution," we have demanded that "this function . . . be[] entrusted to the jury." *Id.*

The district court accepted the sincerity of Spencer's beliefs, *see Spencer*, 648 F. Supp.3d at 462, and at this preliminary stage we will not supplant its view based on our construction of a few excerpts from Spencer's testimony in a cold record. Affirming this preliminary injunction does nothing to foreclose the parties' dispute as to the Plaintiffs' religious beliefs. It is the State's right to oppose the allegations in the complaint and to make its case—to the factfinder at trial—that Spencer does not genuinely believe in the importance of firearms in his church. At this stage, however, Plaintiffs have sufficiently alleged that the CCIA burdens their sincerely held religious practice.

### 2. Neutrality & General Applicability

However, even if a law burdens a religious practice, it is not

constitutionally suspect if it is "neutral" and "generally applicable." *Kennedy*,

142 S. Ct. at 2422 (citing *Smith*, 494 U.S. at 879–81). "The State 'fails to act

neutrally when it proceeds in a manner intolerant of religious beliefs or restricts

practices because of their religious nature.'" *We the Patriots USA, Inc. v. Hochul*,

17 F.4th 266, 281 (2d Cir. 2021) (quoting *Fulton v. City of Philadelphia*, 141 S. Ct.

1868, 1877 (2021)). A law is "not generally applicable if it is substantially

underinclusive such that it regulates religious conduct while failing to regulate

secular conduct that is at least as harmful to the legitimate government interests

purportedly justifying it." *Cent. Rabbinical Congr. of U.S. & Canada v. N.Y.C. Dep't

of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014).

In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court held that

a law fails the *Smith* test of neutrality when it "single[s] out houses of worship for

especially harsh treatment." 141 S. Ct. at 66. In that case, the Court held that

certain COVID-motivated occupancy restrictions were not neutral because they

limited the number of people who could gather for religious services but left

undisturbed several categories of businesses that were designated as essential.

163

The Court observed that "essential" locations such as "factories and schools" had "contributed to the spread of COVID-19"—the state's rationale for proscribing religious exercise—but that these locations were nonetheless "treated less harshly than the [parties'] churches and . . . synagogues." *Id.* at 67.

Similarly, in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), the Supreme Court granted an injunction pending appeal against a California law that prohibited at-home gatherings of more than three households. The plaintiffs in *Tandon* wanted to gather at home to worship, and the Supreme Court faulted the law for "treat[ing] some comparable secular activities more favorably than at-home religious exercise" by "permitting hair salons, retails stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time." *Id.* at 1297. The Court was emphatic that strict scrutiny applies under the Free Exercise Clause whenever laws "treat *any* comparable secular activity more favorably than religious exercise;" it is therefore "no answer that a State treats some comparable businesses or other activities as poorly or even less favorably than the religious exercise at issue." *Id.* at 1296.

These cases decide the *Spencer* Plaintiffs' challenge to the place of worship provision. The State argues that the CCIA regulates neutrally because it equally prohibits "those who carry firearms into places of worship as . . . those who carry firearms into any of the other enumerated sensitive locations," and because it "does not exempt persons based on their asserted justification [religious or otherwise] for carrying a firearm," *Spencer* Appellants' Br. at 24.  However, *Tandon* demands that the state cannot regulate "*any* comparable secular activity" less restrictively, 141 S. Ct. at 1296.  "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."  *Id.* at 1297.

The State argues that the place of worship designation is justified because such places are (i) loci of constitutionally protected activity, gathering (ii) vulnerable people and (iii) crowds.  *Spencer* Appellants' Br. at 25–26.  It emphasizes that a heightened risk of gun violence in places of worship makes the secular locations referenced by the district court—"hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and countless other private actors hosting secular activities," 648 F. Supp. 3d at 463,—poor comparators for purposes of the First Amendment analysis.

In reply, the *Spencer* Plaintiffs offer the shopping mall as a paradigmatic location—not designated as sensitive under the CCIA—that (like places of worship) has been targeted by shootings and is, at times, a site for constitutionally protected free speech at which both vulnerable persons and children may gather. *Spencer* Appellees' Br. at 28–30. That example alone would perhaps be enough to subject the place of worship provision to strict scrutiny under *Tandon*.

But more broadly, the CCIA is not neutral because it allows the owners of many forms of private property, including many types of retail businesses open to the public, to decide for themselves whether to allow firearms on the premises while denying the same autonomy to places of worship. By adopting a law that applies differently as to places of worship (alongside the other enumerated sensitive places) than to most other privately owned businesses and properties, the CCIA is, on its face, neither neutral nor generally applicable. *See Roman Cath. Diocese*, 141 S. Ct. at 66 (regulations that "single out houses of worship for especially harsh treatment" will "violate the minimum requirement of neutrality to religion" (internal quotation marks omitted)).

3.    <u>Strict Scrutiny</u>

"A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546.

No party disputes that "the State has a compelling interest in protecting the public against gun violence." *Spencer* Appellants' Br. at 32.  Nor do we.  The question is whether the place of worship provision is the "least restrictive means" available to achieve the State's compelling interest.  *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981).  When a plaintiff has demonstrated that a law burdens religious activity in a non-neutral way, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest."  *Tandon*, 141 S. Ct. at 1296– 97; *see also Fulton*, 141 S. Ct. at 1881 ("[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so.").

The State asserts that categorically prohibiting weapons in places of worship "is the least restrictive means of reducing gun violence within this sensitive location" because "many clerical leaders have no desire to jeopardize their safety and undermine their relationships with congregants by attempting to

eject persons carrying firearms."[65] *Spencer* Appellants' Br. at 32. But the State's

focus must be on the "*applicant's* proposed religious exercise" and its impact on

the State's compelling interest, rather than "assert[ing] that certain risk factors

'are always present in worship, or always absent from other secular activities' the

government may allow." *Tandon*, 141 S. Ct. at 1296 (quoting *S. Bay United*

*Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021)).

The State provides no explanation for why leaders of religious groups in

general, and the Plaintiffs specifically, are less able to "eject persons carrying

firearms" than any other property owner who is permitted to make a free choice

whether to allow firearms on their premises. *Spencer* Appellants' Br. at 32. A

place of worship that prohibits guns will be equally reliant on the police and the

criminal law to eject a person carrying a firearm, whether it does so pursuant to a

sensitive place designation or a church policy. Either way, someone will have to

call the cops. And if the State has determined that places of worship must be

designated as sensitive places because criminal trespass law is not enough to

keep out guns, then the decision to regulate places of worship more assiduously

than other locations amounts to an unequal pursuit of the interest in preventing

---

[65] We put aside the fact that the New York legislature has since adopted a *less* restrictive approach to places of worship.

gun violence. Such an approach is understandable, but unconstitutional. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct . . . . The absence of narrow tailoring suffices to establish the invalidity of the ordinances."); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) ("A law does not advance an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." (internal quotation marks omitted)).

And if New York has elected to "permit[] other activities to proceed" with less stringent regulation of firearms, "it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 141 S. Ct. at 1297. At this stage, the State has not demonstrated that allowing church leaders to regulate their congregants' firearms is more dangerous than allowing other property owners to do the same. It hard to see how the law advances the interests of religious organizations, as a whole, by denying them agency to choose for themselves whether to permit firearms. *Cf. Espinoza*, 140 S. Ct. at 2260 ("An infringement of First Amendment rights . . . cannot be justified by a State's alternative view that the infringement advances religious liberty."). The State advances an unsubstantiated assertion

that "there is no way for the State to accommodate those who wish to carry firearms for religious reasons without rendering the entire sensitive-place statute unworkable," *Spencer* Appellants' Br. at 33–34, but does nothing to explain why the assuredly few religious organizations in New York that genuinely believe in armed worship—which we take to include the Plaintiffs in *Spencer* —cannot be accommodated without eviscerating the CCIA.[66]

For these reasons, Plaintiffs have shown a likelihood of success in demonstrating that the place of worship provision is not the most narrowly tailored means to address the State's compelling interest.

### 4. Irreparable Harm & Balance of Equities

We now turn to the remaining preliminary injunction factors. Plaintiffs have shown that they will suffer irreparable harm if the place of worship provision is enforced against them. "The loss of First Amendment freedoms, for

---

[66] Plaintiffs observe that several states have enacted statutes that allow places of worship to establish their own policies about carrying firearms, and criminalize the carriage of weapons in violation of such policy. *Spencer* Appellees' Br. at 33 (citing, *inter alia*, ARK. CODE § 5-73-306(15)(B); LA. CODE § 40:1379.3(N)(8); MICH. COMP. LAWS § 28:425o(1)(e); MO. STAT. § 571.107(1)(14); N.D. CODE § 62.1-02-05(2)(m); OHIO REV. CODE § 2923.126(B)(6); S.C. CODE § 23-31-215(M)(8); UTAH CODE § 76-10-530). Of course, New York is not required by the Constitution to adopt the same approach to firearm regulation as other states. But insofar as these states have adopted an approach that would entail little or no burden to Plaintiffs' religious practice, it is incumbent on the State to better demonstrate why this alternative is not acceptable.

even minimal periods of time, unquestionably constitutes irreparable injury."

*Elrod v. Burns*, 427 U.S. 347, 373 (1976).

As for the balance of equities, because the State has not demonstrated that public safety would be harmed by allowing the *Spencer* Plaintiffs to permit congregants to carry firearms within the church, "it has not been shown that granting the [injunction] will harm the public." *Roman Cath. Diocese*, 141 S. Ct. at 68.

\*    \*    \*

For the reasons set forth above, we **VACATE** the district courts' preliminary injunctions in *Antonyuk* and *Hardaway* against enforcement of § 265.01-e(2)(c) but **AFFIRM** the preliminary injunction issued by the district court in *Spencer*, which prohibits enforcement of § 265.01-e(2)(c) against "Pastor Spencer, the [Tabernacle Family] Church, its members, or their agents and licensees." 648 F. Supp. 3d at 471.[67]

---

[67] As the *Spencer* Plaintiffs did not cross-appeal to broaden the scope of the relief granted by the district court, we affirm the injunction as entered.

III.    **Parks and Zoos**

New York also criminalizes possession of a gun in "public parks[] and zoos." N.Y. Penal L. § 265.01-e(2)(d). Plaintiffs challenge the constitutionality of this prohibition. We first address standing and then the merits of this challenge.

A.      **Standing**

Defendant Joseph Cecile, Chief of the Syracuse Police Department, disputes the district court's conclusion that Plaintiff Corey Johnson has standing with respect to the zoo prohibition, arguing that Johnson (1) did not adequately allege his intention to visit a zoo; and (2) has not shown a credible threat of enforcement *by Cecile* (as opposed to by other law enforcement officials).[68]

Johnson averred in his declaration that he and his wife "frequently visit the Rosamond Gifford Zoo in Syracuse, at least once or twice every fall, so that my wife can see the otters and wolves, which are her favorites." J.A. 139–40 (Johnson Decl. ¶ 17). He then estimated that they would "visit the zoo this fall as well, at least once, within the next 90 days." *Id.* And since he "intend[s] to carry [his] firearm when [they] visit the Rosamond Gifford Zoo," *id.*, he alleges that he faces a credible threat of being prosecuted for violating paragraph (2)(d).

---

[68] The State defendants do not challenge the district court's holding that various Plaintiffs had standing as to public parks, and we see no impediment to standing.

172

Johnson's averments are in line with the kinds of allegations that the Supreme Court has found sufficient to support pre-enforcement standing.  In *Babbitt v. United Farm Workers National Union*, the plaintiff organization did not even allege an intention to violate the law: it merely stated its "intention to continue to engage in [lawful] boycott activities" and that an erroneous statement criminalized by the statute is "inevitable in free debate."  442 U.S. at 301 (internal quotation marks omitted).  The Court has also recognized that plaintiffs who intend to comply with the law solely to avoid prosecution (*i.e.*, who have been deterred) have standing to bring a pre-enforcement challenge.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010) (finding standing based on allegation that plaintiffs would resume proscribed conduct "if the statute's allegedly unconstitutional bar were lifted"); *Steffel v. Thompson*, 415 U.S. 452, 456 (1974) ("Petitioner alleged in his complaint that, although he desired to return to the shopping center to distribute handbills, he had not done so because of his concern that he, too, would be arrested.").  Johnson's averments, while short of pleading the time and date of his intended visit to the zoo, are more specific than the allegations found sufficient in *Babbitt*, *Holder*, and *Steffel*.  He has therefore adequately pled his "intention to engage in a course of conduct

arguably affected with a constitutional interest, but proscribed by a statute."
*Driehaus*, 573 U.S. at 159.

As to a credible threat of enforcement by Defendant Cecile (or, by extension, the Syracuse Police Department), Cecile adduces two arguments. He argues first that he has made no "concrete and particularized statement to the general public regarding the imminence of anyone's arrest, let alone [regarding] Plaintiff Johnson . . . ," *Antonyuk* Cecile Br. at 14 (internal quotation marks omitted), and thus that Johnson's fear of arrest by the Syracuse Police is unduly speculative. But (as explained above) the bar for stating a credible threat of enforcement is "low" and "quite forgiving." *Hedges*, 724 F.3d at 197. It is not necessary that a plaintiff be specifically threatened with prosecution. Moreover, far from "disavow[ing] any intention of invoking" the challenged law, *Babbitt*, 442 U.S. at 302, Cecile has expressly stated that he and his officers *will* enforce the CCIA, albeit not proactively. J.A. 24 (Compl. ¶ 24); *see also* J.A. 237 ("'It will be complaint-driven,' [Cecile] said."). A lack of enthusiasm or initiative does not rebut the presumption "that the government will enforce the law as long as the relevant statute is recent and not moribund." *Cayuga Nation*, 824 F.3d at 331 (quoting *Hedges*, 724 F.3d at 197).

Second, Cecile argues that the Rosamond Gifford Zoo is on county (rather than city) land and thus falls under the jurisdiction of the Onondaga County Sheriff and Park Rangers.  But this fact is not fatal to Johnson's standing: Cecile has conceded that Syracuse police are not *barred* from responding to complaints at the Zoo.  *See* Cecile Mem. of L. in Opp. to Mot. to Dismiss at 9, *Antonyuk*, No. 22-cv-986, ECF No. 47-9.  Like the district court, we "ha[ve] little doubt that, if there were a gun incident reported at the zoo, the Syracuse Police Department would promptly respond (in addition to any County Park Ranger available)." 639 F. Supp. 3d at 272.  While the County's primary jurisdiction over the zoo might alleviate somewhat Johnson's fear of arrest by the Syracuse Police, it does not render the threat of enforcement by Cecile or the Syracuse Police "imaginary or wholly speculative," *Babbitt*, 442 U.S. at 302, and is therefore not of constitutional moment.  Accordingly, Johnson has standing with respect to Cecile's threatened enforcement of the zoo prohibition.

### B.  Merits

#### 1.   District Court Decision

Having determined that the conduct proscribed by § 265.01-e(2)(d), *i.e.*, carriage in public parks and zoos, was within the plain text of the Second

Amendment, the district court placed the burden on the State to establish the

regulation's consistency with the Nation's history and tradition.  The district

court considered the following analogues: (1) an 1870 Texas law prohibiting

firearms in "place[s] where persons are assembled for educational, literary or

scientific purposes," J.A. 602 (1870 Tex. Gen. Laws 63, ch. 46); (2) an 1883

Missouri Law prohibiting carriage in places where people assembled for

"educational, literary or social purposes" and "any other public assemblage of

persons met for any lawful purpose," J.A. 611 (1883 Mo. Sess. Laws 76); (3) an

1889 Arizona law and 1890 Oklahoma law prohibiting carriage in any "place

where persons are assembled for amusement or for educational or scientific

purposes," J.A. 617 (1889 Ariz. Sess. Laws 17, § 3), *see also* J.A. 621 (1890 Okla.

Terr. Stats., Art. 47, § 7); (4) ordinances in New York City, Philadelphia, St. Paul,

Detroit, Chicago, Salt Lake City, St. Louis, and Pittsburgh adopted between 1861

and 1897 prohibiting carriage in public parks;[69] and (5) the tradition of

prohibiting firearms in schools.

---

[69] *See* FOURTH ANNUAL REPORT OF THE BOARD OF COMMISSIONERS OF THE CENTRAL PARK
(Jan. 1861); FIRST ANNUAL REPORT OF THE COMMISSIONERS OF FAIRMOUNT PARK (PHILADELPHIA),
Supplement § 21(II) (1869); RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS OF
THE CITY OF SAINT PAUL (1888); 1895 Mich. Pub. Acts 596; CHICAGO MUNI. CODE art. 43 (1881);
SALT LAKE CITY, REVISED ORDINANCES ch. 27 (1888), Tower Grove Park Bd. of Comm'rs, Rules

Before proceeding to the individual history and analogue test for public parks and zoos,[70] the district court noted that it would afford little weight to territorial laws and city ordinances that did not correspond to sufficiently similar state laws. Likewise, it discounted laws from the last decade of the 19th century because of their distance from the Founding and Reconstruction. Given these parameters, the district court considered: the 1870 Texas law, 1883 Missouri law, and "to a lesser extent" the New York, Philadelphia, Chicago, St. Louis, and St. Paul ordinances. *Antonyuk*, 639 F. Supp. 3d at 324.

The purpose of the analogous regulations, per the district court, "appears to have been to protect people from the danger and disturbance that may accompany firearms." *Id.* The statutes and ordinances accomplished this purpose and accordingly burdened Second Amendment rights by "prohibiting the carrying of firearms (1) where people are assembled for educational or literary purposes, or (2) to a lesser extent, when people frequent an outdoor

---

and Regulations, *in* DAVID H. MACADAM, TOWER GROVE PARK OF THE CITY OF ST. LOUIS (1883); Pittsburgh Gen. Ordinances, *Bureau of Parks*, p. 496 (2d ed. 1897).

[70] The district court determined that § 265.01-e's prohibition on carriage in playgrounds was consistent with history and tradition and did not issue an injunction as to that aspect of the regulation. That determination is not on review in this appeal. No Plaintiff has appealed from that ruling, so it is not before us for review.

location for purpose of recreation or amusement (or travel through such a location), especially when children are present." *Id.*

> a. *Public Parks*

The district court rejected the State's arguments that its historical analogues supported banning carriage in public parks. As an initial matter, the court determined that the 1870 Texas and 1883 Missouri laws demonstrated neither an established tradition — because they were only two statutes — nor a representative one — because the combined population of those two states was only 6.6 percent of the American population at the time. Beyond that, the district court noted that neither statute specifically prohibited carriage in public parks. Because both states "[p]resumably . . . contained at least *some* public parks" at the time of the statutes' passing, the district court found that this lack of a specific prohibition weighed against finding a tradition of firearm regulation in public parks. *Antonyuk*, 639 F. Supp. 3d at 325. The court also observed that statutes banning firearms in analogous places such as "commons" or "greens" were also absent from the historical record. *Id.* Given this, the district court did not take the Texas and Missouri statutes to support a tradition of banning carriage in public parks.

Nor did the city ordinances establish such a tradition, according to the district court. First, the district court stated that, to the extent such ordinances established any tradition of regulation at all, they would do so only for "public parks *in* a city" not those outside of cities. *Id.* Next, notwithstanding the support that the numerous ordinances *did* lend to prohibiting carriage in urban public parks, the district court determined that they did not set forth a well-established or representative tradition because the total population of the five cities in question accounted for only 6.8 percent of the population of the Nation at the time.

Finally, the district court dismissed the idea that the ordinances, when combined with the state statutes, could together demonstrate a well-established and representative tradition of prohibiting firearms in urban public parks, because the combined populations of the cities and states (13.4 percent) was under 15 percent of the national population.

b.      *Zoos*

As with public parks, the district court held that the State's analogues failed to establish a tradition of regulating firearms in zoos. The court began by noting that the State did not offer any statutes explicitly prohibiting carriage in zoos, an absence deemed conspicuous by the district court, given that cities

179

throughout the country appeared to have opened zoos in the latter half of the 19th century between 1864 to 1883.  The district court also rejected the State's argument that, because three of these zoos were located within city parks, the city ordinances prohibiting firearms in public parks also supported regulations in zoos.  According to the district court, the coverage of zoos by public park regulations indicated that zoos did not merit "more protection," and therefore actually cut against finding a tradition of regulating firearms in zoos.  *Id*. at 327.The court reiterated that, in any event, there was no well-established and representative history of regulating firearms in public parks, and thus no such tradition could be extended to zoos by virtue of their location in public parks.

The district court also rejected the State's attempt to liken zoos to playgrounds because of the presence of children.  It found that the regulation in zoos is "more burdensome than the regulation in playgrounds, because adults more commonly frequent zoos without children than they frequent playgrounds without children."  *Id*.

\*       \*       \*

Having found that the State failed to locate § 265.01-e's prohibition on carriage in public parks and zoos within the Nation's tradition of firearm

regulation, the district court enjoined the regulation's enforcement in both locations.

### 2.    Analysis of the Historical Analogues — Public Parks

On appeal, the State offers three arguments for why its analogues show a history and tradition consistent with § 265.01-e.  First, it argues that the regulation aims to protect the spaces where individuals often gather to express "their constitutional rights to protest or assemble" *Antonyuk* Nigrelli Br. at 61 (quoting § 265.01e(2)(s)).  Thus, according to the state, the well-established tradition of regulating firearms in quintessential public forums, such as fairs and markets, justifies regulating firearms in public parks, which today often serve as public forums.[71]  As examples of this tradition, the State reaches as far back as a 1328 British statute forbidding going or riding "armed by night []or by day, in fairs, markets."  Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.).  The State adduces evidence that at least two Founding-era states and several Reconstruction-era states replicated this type of law, *see* J.A. 670 (1786 Va. Acts

---

[71] *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 475–76 (2019) (noting that "First Amendment institution[s]" are designed for the "right to peaceably assemble" and that regulations to ensure such peaceable assembly have both "a long history in Anglo-American jurisprudence," and have historically been "bolstered by general prohibitions on armaments in places like fairs and markets—places one would think part of the 'immemorial' custom of public forums").

35, Ch. 49); Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792) (North Carolina Statute), as well as Reconstruction-era states, *see* J.A. 602 (1870 Tex. Gen. Laws 63, ch. 46); 611 (1883 Mo. Sess. Laws 76), 605–06 (1869 Tenn. Pub. Acts 23–24); 616–18 (1889 Ariz. Sess. Laws 16–18); 621 (1890 Okla. Terr. Stats., Art. 47, § 7), and that, where challenged, these laws and subsequent amendments were upheld as constitutional by state courts. *See, e.g., State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886), *English v. State*, 35 Tex. 473, 478–79 (1871); *Andrews v. State*, 50 Tenn. 165, 182 (1871). And, as it did below, the State offers the same eight city ordinances prohibiting firearms in city parks and notes that these ordinances were passed shortly after the time that parks emerged as municipal institutions.

Second, the State relies on the same state laws establishing a tradition of firearm regulation in public forums to argue that § 265.01-e(2)(d) is within the tradition of regulating firearms in "quintessentially" crowded places such as fairs and markets. *Antonyuk* Nigrelli Br. at 63.

Third, and finally, the State explains that § 265.01-e(2)(d) endeavors to protect children who often frequent public parks from firearms and is thus

consistent with the tradition of regulating firearms in areas frequented by children.

We agree with the State that § 265.01-e is within the Nation's history of regulating firearms in quintessentially crowded areas and public forums, at least insofar as the regulation prohibits firearms in *urban* parks, though not necessarily as to *rural* parks. Considering, then, that the law has a plainly legitimate sweep as to urban parks, the facial challenge fails notwithstanding doubt that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves.

### a.     Well-Established and Representative

Contrary to the district court's conclusion, the State has made a robust showing of a well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond.[72] *See* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 475–76 (2019) (noting that regulations ensuring peaceable assembly have "a long history

---

[72] Insofar as the State relies on the tradition of regulating firearms in places frequented by children as an analogue for § 265.01-e(2)(d), *Bruen* tells us that tradition is well-established and representative. *See* 142 S. Ct. at 2133.

in Anglo-American jurisprudence" and noting a history of "general prohibitions on armaments" in public forums).

Though "[s]ometimes, in interpreting our own Constitution, it is better not to go too far back into antiquity," that is distinctly *not* the case where "evidence shows that medieval law survived to become our Founders' law." *Bruen*, 142 S. Ct. at 2136 (internal quotation marks omitted). Here, the State has shown that at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets,[73] *i.e.*, the traditional, crowded public forum.[74] *See* J.A. 670 (1786 Va. Acts

---

[73] Our own research reveals another such jurisdiction. *See, e.g.*, An Act for Punishment of Crimes and Offences, within the District of Columbia, § 40 (1816), *available at* https://rb.gy/7q0cv [https://perma.cc/88PB-Y654] (prohibiting going or riding "armed by night nor day, in fairs or markets, or in other places, in terror of the county").

[74] Two observations regarding these Founding-era statutes are warranted. First, while the Virginia statute differed from the medieval English Northampton statute in that it prohibited *conduct* and not simply carriage, *i.e.*, bearing arms in "terror" of the county, the North Carolina statute, like the Northampton statute, appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct. And, as we will elaborate below, the tradition of regulating firearms in quintessentially crowded places evolved in the direction of the North Carolina statute, *i.e.*, the prohibition of carriage without any reference to conduct. Thus, despite the Virginia law's "in terror of the county" language, we do not interpret the National tradition of regulating firearms in quintessentially crowded places to require a conduct element. Second, though *Bruen* rejected the medieval Northampton statute, it did so within the context in which that statute was offered: as an analogue supporting a carriage ban in public *generally*. *See Bruen*, 142 S. Ct. at 2139 (explaining that the state had offered the Northampton statute as a "sweeping restriction on public carry of self-defense weapons"). In sum, *Bruen* addressed the statute in a different context; nor was the statute discounted by *Bruen* for the analogical purpose for which we rely upon it here. *See id.* at 2142 (noting that historical evidence establishes that the Northampton statute was "no obstacle to public carry for self-

35, Ch. 49) (prohibiting going or riding "armed by night []or by day, in fairs or markets, . . . in terror of the county"); Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792) (North Carolina law prohibiting "to go nor ride armed by night nor by day, in fairs, markets").

The tradition of regulating firearms in quintessentially crowded places was continued throughout the history of our Nation. In Reconstruction, three states (Texas, Missouri, and Tennessee) passed laws prohibiting weapons in public forums and crowded places such as assemblies for "educational, literary or scientific purposes, or into a ball room, social party or other social gathering." J.A. 602 (1870 Tex. Gen. Laws 63, ch. 46); *see also id.* at 605 (1869 Tenn. Pub. Acts 23) (Tennessee law prohibiting the carriage of deadly weapons by "any person attending any fair, race course, or other public assembly of people"); *id.* at 611 (1883 Mo. Sess. Laws 76) (Missouri law prohibiting weapons "where people are assembled for educational, literary or social purposes"). The territories of Oklahoma and Arizona did the same. *See id.* at 617 (1889 Ariz. Sess. Laws 17)

---

defense" generally but not addressing the more specific prohibitions in the statute such as carriage in fairs and markets). We therefore do not take *Bruen*'s observations regarding the Northampton statute to run contrary to our more limited conclusions here.

(Arizona law prohibiting dangerous weapons "where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); *id.* at 621 (1890 Okla. Terr. Stats., Art. 47, § 7) (Oklahoma law prohibiting carriage in places "where persons are assembled for . . . amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering").

This "long, unbroken line," *Bruen*, 142 S. Ct. as 2136, beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is "part of the 'immemorial' custom" of this nation, Miller, 28 WM. & MARY BILL RTS. J. at 476.

Of particular note, the state courts of all three states that had such laws upheld this type of statute as constitutional. *See Bruen*, 142 S. Ct. at 2155 (stating that where state courts have passed on the constitutionality of a statute, we "know the basis of their perceived legality"). Holding an 1871 amendment to the 1870 Texas statute constitutional in *English v. State*, the Texas Supreme Court observed that "it appears [] little short of ridiculous, that any one should claim

the right to carry upon his person" a firearm "into a peaceable public assembly, as for instance, into a church, a lecture room, a ball room, or any other place where ladies or gentleman are congregated together."[75] 35 Tex. at 478–79. The same year, the Tennessee Supreme Court upheld Tennessee's statute by noting that "the private right to keep and use" arms "is limited by the duties and proprieties of social life" and that "[t]herefore, a man may well be prohibited from carrying his arms" to a "public assemblage." *Andrews*, 50 Tenn. at 181–82. *See also Shelby*, 2 S.W. at 469 (holding that 1883 Mo. law prohibiting carriage "where people are assembled for educational, literary, or social purposes" was constitutional). *English* and *Andrews* tell us that the Nation not only tolerated the regulation of firearms in public forums and crowded spaces, but also found it aberrational that a state would be unable to regulate firearms to protect the "the duties and proprieties of social life" in such spaces. *See* Miller, 28 W$_M$. & M$_{ARY}$

---

[75] Though the Supreme Court discounted *English* as an outlier in *Bruen*, it did so only insofar as *English* held that the state could lawfully restrict carriage to those with "reasonable grounds for fearing an unlawful attack." *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws ch. 34). New York had offered *English* and the underlying statute as an analogue to the special need requirement at issue in *Bruen*. *Id.* Accordingly, we do not understand *Bruen* to have cast doubt on *English*'s holding as to the 1871 Texas statute's separate restriction relating to public assembly. Nor do we find independent reason to doubt that *English*'s holding as to public assembly restrictions is consistent with the Nation's tradition. Whereas Texas's historical "reasonable grounds" requirement was an outlier in that it went against the tradition of a majority of the Nation and was only replicated by one other state, *see id.*, the public assembly restriction is consistent with the national tradition and existed in many states.

BILL. RTS. J. at 475 ("The idea of a right to peaceably assemble presumes . . . that such assemblages must be peaceable, as opposed to disorderly.")

The number of states and territories with such statutes makes clear that this tradition has also been consistently representative of the Nation as a whole. At the time in which they were passed in 1791, Virginia's and North Carolina's statutes prohibiting firearms in fairs and markets applied to over a quarter of the Nation's population.[76] By 1891, an additional three states and two territories had passed similar laws, meaning that such statutes applied to nearly 10 million Americans, a figure equivalent to about 15.3 percent of the Nation's population at that time.[77] *Cf. Bruen*, 142 S. Ct. at 2154 (determining that the proffered analogues were not representative where they applied to only "about two-thirds of 1% of the population").

In addition to showing that there existed a well-established and representative state tradition of such regulation, the State points to eight

---

[76] The 1790 Census counted approximately 3.3 million Americans, of whom 747,610 lived in Virginia and 393,751 in North Carolina. DEPT. OF INTERIOR, COMPENDIUM OF ELEVENTH CENSUS: 1890, 3 tbl. 1 (1892).

[77] The 1890 Census counted approximately 62.6 million Americans. DEPT. OF INTERIOR, COMPENDIUM OF ELEVENTH CENSUS: 1890, 2 tbl. 1 (1892). The combined population of Virginia, North Carolina, Texas, Missouri, Tennessee, Oklahoma, and Arizona was approximately 9.3 million. *Id.*

examples (Chicago, Detroit, New York City, Philadelphia, Pittsburgh, Salt Lake City, St. Paul, St. Louis) establishing a municipal tradition of regulating firearms in urban public parks specifically.  The proliferation of these urban public park regulations between 1861 and 1897 coincides with the rise of public parks as municipal institutions over the latter half of the 19th century.[78]  While only 16 parks were created before 1800,[79] "[f]ollowing the success of [New York's] Central Park, cities across the United States began building parks to meet recreational needs of residents[;] and during the second half of the 19th century, [Frederick Law] Olmsted and his partners [who planned Central Park] designed major parks or park systems in thirty cities."[80]  David Schuyler, Summary of *Parks in Urban America*, OXFORD RESEARCH ENCYCLOPEDIA OF AMERICAN HISTORY (Nov. 3, 2015).  As urban public parks took root as a new type of public forum, cities continued the tradition of regulating firearms in historical public forums, such as fairs and markets, to likewise keep these new public spaces, urban parks,

---

[78] Though the historical analogues here are "relatively simple to draw," the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*.  *See Bruen*, 142 S. Ct. at 2132 (explaining that historical and societal "changes may require a more nuanced approach").

[79] *See* MARGARET WALLS, PARKS AND RECREATION IN THE UNITED STATES: LOCAL PARK SYSTEMS 1, Resources for the Future (June 2009).

[80] *See also* FREDERICK LAW OLMSTED, A CONSIDERATION OF THE JUSTIFYING VALUE OF A PUBLIC PARK 7–8 (1881) ("Twenty-five years ago we had no parks, park-like or otherwise").

peaceable.[81]  None of those city ordinances were invalidated by any court;

indeed, we have not located any constitutional challenges to any of them.  In

other words, the ordinances were not merely adopted by legislative bodies in the

respective cities in which they applied – they were apparently accepted without

any constitutional objection by anyone.  *See Bruen*, 142 S. Ct. at 2133–34 ("We

therefore can assume it settled that these locations were 'sensitive places' where

arms carrying could be prohibited" where we are "aware of no disputes

regarding the lawfulness of such prohibitions.").

The district court mistakenly discounted these city laws because they were

not accompanied by state laws, relying on the *Bruen* majority's statement that

"the bare existence of these localized restrictions cannot overcome the

overwhelming evidence of an otherwise enduring American tradition."

*Antonyuk*, 639 F. Supp. 3d at 323–24 (*quoting Bruen*, 142 S. Ct. at 2154).  We think

this is an overreading of *Bruen*.  *Bruen*'s pronouncement addressed an isolated set

of territorial laws, whose transient and temporary character does not correlate to

---

[81] *See* DAVID SCHUYLER, THE NEW URBAN LANDSCAPE: THE REDEFINITION OF CITY FORM
IN NINETEENTH-CENTURY AMERICA 1–8 (1988) (describing the emergence of a "new urban
landscape" whose proponents urged establishment of public parks to "create[] communal
spaces" where "rural scenery might sooth the 'nerves and mind' of visitors'"); *see also*
Everytown for Gun Safety Br. at 26–27.

the enduring municipal governments whose enactments are before us now.

*Bruen*, 142 S. Ct. at 2154.  And while *Bruen* also relied on the "miniscule"

populations who were governed by the territorial statutes at issue, by 1897, fully

eight percent of the entire population lived in one of the urban areas governed by

the state's analogues here. [82]   *See* Dept. of Interior, *Compendium of Eleventh*

*Census: 1890*, 2-452 tbls. 1–5 (1892).  Moreover, the appropriate figure in this

instance is not the percentage of the nation's *total* population that was affected by

city park firearms restrictions, but rather the percentage of the *urban* population

that was governed by city park restrictions.  By 1890, four of the five most

populous cities prohibited firearms in their urban parks, and Brooklyn's

incorporation into New York City in 1896 would result in all five of the most

populous cities having such prohibitions.  *Id.*, Table 5 (New York, Chicago,

Philadelphia, Brooklyn, and St. Louis).  Those cities alone numbered over 4.9

million people, at a time when only 14 million Americans lived in a city with

---

[82] By 1897, approximately 5.2 million Americans lived in one of these eight cities under municipal regulations that would have prohibited carriage of firearms in a city's public parks. *See* DEPT. OF INTERIOR, COMPENDIUM OF ELEVENTH CENSUS: 1890, 442–52 tbl. 5 (1892).  And, as amici point out, *see* Everytown for Gun Safety Br. at 21–22, it is likely that even more urban park regulations will emerge at a later point in the litigation regarding the CCIA.  *See Christian v. Nigrelli*, No. 22-cv-695 (W.D.N.Y.), ECF Nos. 33, 34, 35 (exhibiting over sixty 19th- and early 20th-century park regulations).  *See also* The City of New York Br. at 15 n.22 (listing additional city ordinances prohibiting firearms in public urban parks).

more than 25,000 inhabitants, resulting in at least 37.7% of the urban population living in cities where firearms were prohibited in their parks.

The upshot of the State's wealth of evidence is a well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded. This tradition comes down to us from medieval England; it was enshrined in the law books of the largest (Virginia) and third largest (North Carolina) Founding-era states, and built on throughout and beyond Reconstruction. With the rise of urban America, cities continued this tradition and began regulating firearms in a newly emerging public forum: the urban park.

We differ with the district court as to the conventionality and representativeness of the State's analogues as to firearm regulation in urban parks because the district court erroneously discounted many of the State's proffered analogues. Critically, the court failed to consider the medieval English law and Founding era laws.[83] This initial error tainted the rest of the district court's analysis by obscuring that the later territorial and municipal laws, far

---

[83] It also failed to consider the 1869 Tennessee Law prohibiting deadly weapons in any "fair, race course, or public assembly of people." J.A. 605 (1869 Tenn. Pub. Acts. 23). Thus the only state laws it considered were the 1870 Texas and 1883 Missouri laws.

192

from being outliers, were consistent with a "long, unbroken line of common-law" and Founding-era precedent. *Bruen*, 142 S. Ct. as 2136. Given the continuity of the tradition of regulating firearms in crowded public forums, there was no reason for the district court to discount territorial laws, municipal laws (insofar as the states in which the cities were located did not have identical state law counterparts), or laws from the late 19th century. Once situated within the line of the English, Founding-era, and Reconstruction state statues cited by the State, the territorial and municipal laws are exactly the opposite of the "few late-19th-century outlier jurisdictions" offered and discounted in *Bruen* and should have been considered by the district court. *Id.* at 2156.

b.   *Consistency with Tradition*

It is not enough for the State to point to well-established and representative analogues; the contemporary regulation it seeks to defend must also be "consistent" with the tradition established by those analogues. *Bruen*, 142 S. Ct. at 2135. We now turn to this aspect of the inquiry.

Whether § 265.01-e's prohibition on firearms in urban parks is consistent with this Nation's tradition is a straightforward inquiry. It is obvious that § 265.01-e burdens Second Amendment rights in a distinctly similar way (*i.e.*, by

prohibiting carriage) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State, many of which specifically applied to urban public parks. This demonstrates § 265.01-e's consistency with the Second Amendment.[84] *Cf. Bruen*, 142 S. Ct. at 2135 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.").

We are unconvinced by the Plaintiffs' argument that the former use of Boston Common and similar spaces as gathering grounds for the militia undermines a tradition of regulating firearms in urban public parks. Though Plaintiffs urge that Boston Common was the Nation's first urban public park, it appears to have gained that distinction only in retrospect. "The modern idea of the park emerged in the nineteenth century," before which "open spaces that were not privately owned . . . consisted of grazing areas open to all," with Boston Common being the "most famous example for this kind of [grazing] park space."

---

[84] Because the tradition of regulating firearms in often-crowded public squares supports the State's burden as to § 265.01-e's regulation of firearms in urban parks, we need not rely on the tradition of regulating firearms in places frequented by children.

Nadav Shoked, *Property Law's Search for a Public*, 97 Wash. U. L. Rev. 1517, 1556–

57 (2020); *see also* Address of L. E. Holden, Cleveland, O., *Bulletin of the American*

*Park and Outdoor Association* 3 (Volume 5 Rep. of the Am. Park and Outdoor Art

Ass'n, June 1901), *available at* rb.gy/0flfx [https://perma.cc/FCU7-V2JW] (noting

that at Boston Common's origin in 1633 there "was little if any idea that  it would

ever be a park . . . [i]t was kept and occupied as a common till a very recent date,

and it was not until 1859 that the question was finally settled . . . that Boston

Common should be a public park").  Moreover, the use of the Boston Common

for organized and disciplined *militia exercises and mustering* hardly supports the

notion that public recreational parks (to the extent the Common can be so

characterized) were considered appropriate places for ordinary citizens to be

armed outside the context of such military purposes.  Thus, though the history of

firearm regulation in the 17th-century Boston Common might tell us about the

National tradition of regulating firearms in militia mustering grounds and

"grazing areas open to all," it tells us little about the history of firearm regulation

in the public square.

The district court committed this same analogical error when it faulted the

State for failing to produce historical statutes "banning the carrying of guns from

older-named places such as 'commons' or 'greens.'"  *Antonyuk*, 639 F. Supp. 3d at 325 (emphasis omitted).  To today's minds, commons, greens, and public parks may seem alike; but, as we have just described, our 18th century forebears would have considered commons and greens to be public grazing areas and not places of social recreation.  *See* Shoked, *supra*, at 1556–57.  Accordingly, though commons, greens, and public parks "are relevantly similar" if one's metric is green spaces in cities, they are not relevantly similar if the "applicable metric" is gun regulation in spaces that, like urban parks do today, have historically acted as public forums and places of social recreation.  *Bruen*, 142 S. Ct. at 2132; *see also id.* ("[B]ecause 'everything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not[.]'" (first quoting Cass Sunstein, *supra*, at 773; then quoting F. Schauer & B. Spellman, *supra*, at 254) (alterations adopted and internal citations omitted).

The State's justification for § 265.01-e appears to be the same for rural as for urban parks, even though rural parks much more resemble the commons of yore than to the historical and often-crowded public squares, *i.e.*, fairs, markets,

and urban public parks, regulated under the State's historical analogues.[85]  Rural

parks do not as neatly resemble quintessential public squares in that they are not

primarily designed for peaceable assembly.

 As opposed to fairs, markets, or the new, urban parks of the mid-19th

century, *i.e.*, quintessential and often-crowded public spaces, the more proper

analogue for rural parks based on the record before us appears to be "commons"

and "wilderness areas." New York describes its Adirondack Park, which

encompasses "one-third of the total land area of New York State," as containing

"vast forests, rolling farmlands, towns and villages, mountains and valleys, lakes,

ponds and free-flowing rivers, private lands and public forest."  Parks,

Recreation and Historic Prevention, *Adirondack Region*, New York State, *available

at* https://parks.ny.gov/regions/adirondack/default.aspx [https://perma.cc/ZNZ2-

Z97B].  This description echoes that of the "New England commons . . . spaces

held by the community for shared utilitarian purposes,"[86]  much more than it

---

[85] The State does not seriously argue that the tradition of regulating firearms in places
frequented by children justifies § 265.01-e's applicability to rural parks.

[86] ROY ROSENZWEIG AND ELIZABETH BLACKMAR, THE PARK AND THE PEOPLE: A HISTORY
OF CENTRAL PARK 4 (1992).

does the "communal spaces"[87] and "quintessential public space[s]"[88] embodied by urban parks.

But we need not resolve this line-drawing issue on a facial challenge. Although we doubt that the evidence presently in the record could set forth a well-established tradition of prohibiting firearm carriage in rural parks, we are mindful that this litigation is still in its early stages and that the State did not distinguish between rural and urban parks in its arguments to this Court or below. All told, the State's proffered analogues, which set forth a well-established and representative tradition of firearm regulation in often-crowded public squares such as urban parks, are sufficient to survive a facial challenge.[89] *See Bonta*, 141 S. Ct. at 2387 (To mount a successful facial challenge, the plaintiff "must 'establish that no set of circumstances exists under which the [law] would

---

[87] DAVID SCHUYLER, THE NEW URBAN LANDSCAPE: THE REDEFINITION OF CITY FORM IN NINETEENTH-CENTURY AMERICA 1–8 (1988)

[88] SHOKED, *supra*, at 1556—57.

[89] Effective May 3, 2023, the New York legislature amended § 265.01-e(2)(d) by adding the following limiting language: "provided that for the purposes of this section a 'public park' shall not include (i) any privately held land within a public park not dedicated to public use or (ii) the forest preserve as defined in subdivision six of section 9-0101 of the environmental conservation law." Although we express no opinion on whether the provision as amended conforms with the Second Amendment principles we have articulated here, we note that the legislature has considered the constitutional implications of the public parks provision and has taken affirmative steps to address them.

be valid,' or show that the law lacks 'a plainly legitimate sweep.'"  (first quoting

*Salerno*, 481 U.S. at 745; then quoting *Wash. State Grange*, 552 U.S. at 449)).

*     *     *

As § 265.01-e(2)(d) applies to urban parks, the State has carried its burden

by placing the regulation within a National tradition of regulating firearms in

often-crowded public squares, including, specifically, city parks.  Accordingly,

we **VACATE** the district court's preliminary injunction as to § 265.01-e(2)(d).

### 3.     Analysis of the Historical Analogues — Zoos

To defend § 265.01-e's regulation of firearms in zoos, the State relies on

two of the same analogical categories as for public parks: prohibiting firearms in

crowded places and in places where children congregate.  The State also points

out that, contrary to the district court's assertion, nearly 70 percent of visitors to

zoos are parties with children.  *See Visitor Demographics*, Ass'n of Zoos and

Aquariums, *available at* https://www.aza.org/partnerships-visitor-demographics

[https://perma.cc/A6FH-W774].

### a.     *Well-Established and Representative*

For the reasons laid out in our discussion of public parks, the State's

evidence demonstrates a well-established and representative tradition of

regulating firearms in densely trafficked public forums. We rely on *Bruen* for the proposition that the tradition of regulating firearms in spaces frequented by children is also well-established and representative. *See Bruen*, 142 S. Ct. at 2133.

###### b.    *Consistent with Tradition*

Section 265.01-e's firearm ban in zoos is consistent with the State's analogues that establish a history of regulating firearms in crowded places and locations frequented by children. Although zoos are relatively modern institutions,[90] the *Bruen* analysis remains valid and useful, subject to the more "nuanced approach" announced in *Bruen*. 142 S. Ct. at 2132.

Given that 70 percent of zoo visitors come accompanied by children, the tradition of prohibiting firearms in places frequented by children straightforwardly supports the regulation of firearms in zoos. For its part, the history of regulating firearms in often-crowded public spaces supports the firearm restriction in zoos in two additional ways. First, the statutes adduced by

---

[90] The Philadelphia Zoo, which bills itself as the first public zoo in the United States, was chartered in 1859, but due to the intervening Civil War, did not open until 1874. *See About the Zoo*, Philadelphia Zoo, *available at* https://www.philadelphiazoo.org/about-the-zoo/ [https://perma.cc/7795-NX2A]. A few other urban zoos, including New York's Central Park Zoo, have claims to have opened sooner than 1874, but we nonetheless have identified no public zoo that claims to have opened before the Civil War. The drafters of the Second Amendment presumably had no particular intentions with respect to the right to carry firearms in any place remotely resembling today's Bronx Zoo.

the State prohibited firearms not only in crowded "public squares" such as fairs, markets, and 19th century urban parks, but also more generally in ballrooms and social gatherings. *See* J.A. 602 (1870 Tex Gen. Laws 63, ch. 46); 605–06 (1869 Tenn. Pub. Acts 23–24); 611 (1883 Mo. Sess. Laws 76); 617 (1889 Ariz. Sess. Laws 17); 621 (1890 Okla. Terr. Stats., Art. 47, § 7). Accordingly, these laws indicate that a high population density in discrete, confined spaces, such as quintessential public squares, has historically justified firearm restrictions. State court cases from this era confirm as much. *See, e.g., English*, 35 Tex. at 478–79 ("it appears [] little short of ridiculous, that any one should claim the right to carry upon his person" a firearm into "a ball room, or any other place where ladies or gentleman are congregated together"). Second, these same laws support firearm restrictions because zoos are spaces that provide educational opportunities. *See* J.A. 602 (1870 Tex Gen. Laws 63, ch. 46); 605–06 (1869 Tenn. Pub. Acts 23–24); 611 (1883 Mo. Sess. Laws 76); 617 (1889 Ariz. Sess. Laws 17); 621 (1890 Okla. Terr. Stats., Art. 47, § 7). That the same laws restricting firearms in public forums would also do so in spaces hosting educational and scientific opportunities makes sense. Both public squares and educational and scientific spaces inherently presume orderly and peaceable assembly.

Contrary to the district court's conclusion, the location of some zoos within public parks, and their consequent automatic coverage by those parks' firearm regulations, does not cut against the State. The district court's conclusion was based on its erroneous notion that the zoos' "enjoy[ment of] their surrounding parks' protections . . . shows that zoos were in need of no more protection than the parks in which they were located." *Antonyuk*, 639 F. Supp. 3d at 327. But the State was under no burden to demonstrate that zoos are especially deserving of firearm regulation, only that such regulation is consistent with Second Amendment tradition. That zoos were unproblematically covered by the firearm regulations of their surrounding parks tends to show that our forebearers took no Second Amendment issue with the regulation of firearms at zoos.

Because the State has demonstrated that prohibiting firearms at zoos is consistent with the country's tradition of regulating firearms in places of educational and scientific opportunity, places heavily trafficked by children, and places that are densely crowded, we reverse the district court's order preliminarily enjoining New York from enforcing § 265.01-e in zoos.

\*　　　\*　　　\*

202

For the reasons set forth above, we **VACATE** the district court's preliminary injunction enjoining enforcement of § 265.01-e(2)(d) as applied to zoos and public parks.

## IV. Premises Licensed for Alcohol Consumption

Section 265.01-e(2)(o) prohibits possession of a firearm in "any establishment holding an active license for on-premise consumption [of alcoholic beverages] . . . where alcohol is consumed." The State does not challenge the district court's determination that one or more Plaintiffs had standing to challenge this provision of the CCIA, and we see no impediment to standing. Accordingly, we proceed directly to reviewing the district court's holding that the State failed to place § 265.01-e(2)(o) within the Nation's history of firearm regulation and vacate the preliminary injunction.

### A. District Court Decision

As with the other regulations at issue in this appeal, the district court first determined that the conduct proscribed by § 265.01-e(2)(o) was within the plain text of the Second Amendment and placed the burden on the State defendants to prove the regulation's consistency with our Nation's history and tradition. The State argued that § 265.01-e(2)(o) is aimed at reducing the threat of gun violence resulting from "intoxicated persons gathered in large groups in confined spaces,"

*Antonyuk*, 639 F. Supp. 3d at 331, and directed the district court to seven historical analogues: (1) an 1867 Kansas law prohibiting carriage by "any person under the influence of intoxicating drink"; (2) an 1881 Missouri law prohibiting the same; (3) an 1889 Wisconsin law prohibiting "any person in a state of intoxication to go armed with any pistol or revolver"; (4) an 1878 Mississippi law prohibiting sale of "any weapon" to "any . . . person intoxicated, knowing him to be . . . in a state of intoxication"; (5) an 1890 Oklahoma law barring carriage by a public officer "while under the influence of intoxicating drinks" and also barring firearms in "any ball room . . . social party or social gathering"; (6) an 1870 Texas law barring firearms in "a ball room, social party or other social gathering composed of ladies and gentlemen"; and (7) an 1889 Arizona law barring firearms in any "place where persons are assembled for amusement . . . or into a ball room, social party or social gathering." *Id.* at 332.

The district court discounted the Oklahoma and Arizona statutes as coming from territories and the 1889 Wisconsin law as being too removed from either the Founding or Reconstruction. The district court then noted that the five remaining analogues appear "to have been aimed at denying the possession of guns to persons who were likely to pose a danger or disturbance to the public"

and did so either by prohibiting carriage to those who were intoxicated or those who were likely to disturb a social party or gathering. *Id*. It then assumed, without deciding, that the five analogues it was considering were both sufficiently well-established and representative to constitute a tradition but held that the tradition established by those laws was not sufficiently analogous to justify § 265.01-e(2)(o).

In the district's court view, "[t]he problem" with § 265.01-e(2)(o) is that it "is not limited to persons who have been served and/or who are consuming alcohol," nor "is it even limited to persons intoxicated in establishments," but rather it "broadly prohibits concealed carry by license holders . . . who will be merely eating at the establishments." *Id*. While the court "acknowledge[d] the historical support" in the State's analogues "for a law prohibiting becoming intoxicated while carrying a firearm," it concluded that those analogues did not justify criminalizing "mere presence" at a liquor-licensed establishment. *Id* at 333. (emphasis removed). This is because the State's historical analogues governed behavior, while § 265.01-e(2)(o) governs places. Meanwhile, the district court appears to have rejected the State's analogues prohibiting the carriage of firearms at social gatherings on the basis that the State had

"adduce[d] no evidence of the approximate number of disturbances to 'social gatherings' at restaurants that were caused each year by those licensed individuals who carry concealed there." *Id* at 332.

**B.**    **The State's Historical Analogues**

On appeal, the State relies largely on the same analogues as it did below to argue that § 265.01-e(2)(o) is in harmony with the tradition of regulating firearms in locations frequented by "concentrations of vulnerable or impaired people," here intoxicated individuals, "who either cannot defend themselves or cannot be trusted to have firearms around them safely." *Antonyuk* Nigrelli Br. at 62. The State also argues that the tradition of regulating firearms in "quintessentially crowded places," which they argue liquor-licensed establishments generally are, supports § 265.01-e(2)(o).

As a preliminary matter, we address the district court's erroneous decision to afford little weight to the Arizona and Oklahoma statutes because they were territorial laws, and to the 1889 Wisconsin statute because of its distance from Reconstruction and the Founding.

As we have already explained, the district court's repeated and automatic rejection of any territorial laws and statutes from the latter half of the nineteenth

century is not compelled by *Bruen*. True, *Bruen* counseled that evidence "that long predates either date *may* not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years," and that "[s]imilarly, we must also guard against giving postenactment history more weight than it can rightly bear." 142 S. Ct. at 2136 (emphasis added). That observation, however, does not require courts to reflexively discount evidence from the latter half of the 19th century absent indications that such evidence is inconsistent with the National tradition. Likewise, the district court made too much of the fact that *Bruen* gave "little weight" to territorial laws. *Id.* at 2155. Not only did New York offer only one state law in support of its proper-cause requirement in *Bruen*, the territorial laws on which it relied in *Bruen* were "short lived" and some "were held unconstitutional shortly after passage,"[91] while another "did not survive a Territory's admission to the Union as a State." *Id.*

---

[91] The *only* case cited in *Bruen* for the proposition that "some" territorial laws were held unconstitutional is *In re Brickey*, 8 Idaho 897, 70 P. 609 (1902). That one-paragraph opinion invalidated a statute that apparently prohibited the carriage of deadly weapons within the limits of a city, town, or village (the statute is only paraphrased, not quoted, in the brief decision). Far from suggesting the unconstitutionality even of New York's Sullivan law, let alone laws addressing sensitive places, the Idaho Supreme Court merely noted that the state legislature had the power to *regulate* arms-bearing, but not totally to prohibit it, specifically stating that "[a] statute prohibiting the carriage of *concealed* deadly weapons [which the court characterized as 'a pernicious practice'] would be a proper exercise of the police power of the state." 70 P. at 609 (emphasis added).

The circumstances leading to the Court's cautions in *Bruen* are not present here and did not require the district court to discount the territorial laws of Arizona and Oklahoma nor the 1889 Wisconsin law.  Unlike in *Bruen*, there is no evidence in the record before us that the territorial laws were short-lived, did not survive admission to the Union, or were later held unconstitutional.  Nor were these territorial laws aberrant to the National tradition.  As discussed below, these territorial laws were consistent with five state laws already on the books when the territorial laws were enacted.  Similarly, Wisconsin's 1889 law was not a late-term aberration from the National tradition, but an addition consistent with the older state laws from Kansas, Missouri, and Mississippi.  All three statutes should have been considered by the district court.

1. <u>Well-Established and Representative</u>

We now hold what the district court assumed, that the State's historical analogues establish a consistent and representative tradition of regulating access to firearms by people with impaired self-control or judgment, specifically those who are intoxicated.  Three of the State's analogues—the 1867 Kansas law, 1889 Wisconsin law, and 1883 Missouri law—prohibited intoxicated persons from carrying firearms.  J.A. 691 (1867 Kan. Sess. Laws Ch. 12, p. 25) ("any person

under the influence of intoxicating drink . . . who shall be found . . . carrying on his person a pistol . . . shall be subject to arrest"); *id.* at 694 (WIS. STAT. ANN. § 4379b (1889)) ("It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver."); *id.* at 611 (1883 Mo. Sess. Laws 76) (prohibiting carriage by any person "when intoxicated or under the influence of intoxicating drinks"). The State's three other analogues included a law that prohibited selling firearms to intoxicated persons, *id.* at 633 (1878 Miss. Laws 175); a law that required the keepers of "drinking saloon[s] to keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons," *id.* at 617 (1889 Ariz. Sess. Laws 17); and a law that prohibited carriage in "any place where intoxicating liquors are sold," *id.* at 621 (1890 Okla. Terr. Stats., Art. 47, § 7). These six analogues, which applied to nine-and-a-half percent of Americans by 1889,[92] establish a consistent and representative National tradition of regulating firearms due to the dangers posed by armed intoxicated individuals. This tradition was carried out in various forms: either by disarming intoxicated persons (as in Kansas, Wisconsin, and

---

[92] All of the State's analogues were still in effect in 1889, and the population of the six states from which the State draws its historical analogues was approximately 6 million. DEPT. OF INTERIOR, COMPENDIUM OF ELEVENTH CENSUS: 1890, 2 tbl. 1 (1892). The population of the United States that same year was approximately 62.6 million. *Id.*

Missouri), prohibiting the sale of firearms to intoxicated persons (as in Mississippi), or prohibiting firearms in liquor-serving or -selling establishments (as in Arizona and Oklahoma).

In addition to these statutory analogues, the State points to the Missouri Supreme Court's holding in *State v. Shelby* that the state's prohibition of firearm carriage by intoxicated persons was in "perfect harmony with the constitution" given the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." 2 S.W. at 469; *see also id.* (noting that if the state could constitutionally regulate firearms in "time and place, . . . no good reason is seen why the legislature may not do the same thing with reference to the condition of the person who carries such weapons"). Thus, not only do the six statutory analogues indicate that the Nation's early legislatures understood prohibiting the carriage of firearms by intoxicated persons and in liquor-serving establishments to be constitutional, but at least one state court did so as well. *See Bruen*, 142 S. Ct. at 2155 (explaining that state court decisions help today's courts understand "the basis" of a historical analogue's "perceived legality").[93]

---

[93] As to the State's reliance on the tradition of regulating firearms in crowded places, we have already addressed this regulatory tradition, *see supra* Sensitive Locations §§ III.B.2 & III.B.3, and found that it is well-established and representative. We further note here that the 1889

2.    Consistency with Tradition

We now turn to whether § 265.01-e(2)(o) is consistent with the well-established and representative tradition established by the State's analogues.  We hold that it is consistent with both analogical categories established by the State, as liquor-licensed establishments are both typically crowded milieus and are frequented by intoxicated individuals who cannot necessarily be trusted with firearms and who may also, due to their intoxication, be unable to defend themselves effectively.[94]

Both categories of analogues burdened Second Amendment rights in a similar manner and for similar reasons as § 265.01-e(2)(o).  Contemporaneous state case law reveals that historical regulations prohibiting firearms at social gatherings, parties, and ball rooms were justified by the "duties and proprieties of social life." *Andrews*, 50 Tenn. at 181–82; *see id.* at 170, 181–82 (upholding 1869 Tennessee statute that prohibited carriage at "fair[s], race course[s], or other

---

Arizona and 1890 Oklahoma statutes prohibiting carriage in liquor-serving and -selling establishments likewise prohibited firearms in social parties, gatherings, and ball rooms.  J.A. 617 (1889 Ariz. Sess. Laws 17); *id.* at 621 (1890 Okla. Terr. Stats., Art. 47, § 7); *see also id.* at 602 (1870 Tex. Gen. Laws 73) (prohibiting carriage in social gatherings, parties, and ball rooms).

[94] Because the regulation is consistent with both categories, we need not decide whether the historical analogues for regulating firearms in crowded places would alone justify § 265.01-e(2)(o).

public assembl[ies]"); *see* J.A. 605 (1869 Tenn. Pub. Acts 23).  In a similar vein, the State explains that § 265.01-e(2)(o) is motivated by the need to protect those in crowded social spaces.

And, though the State does not explicitly refer to historical statutes regulating firearms in other crowded spaces such as fairs and markets, those too provide support for regulating firearms in crowded places and keeping such spaces peaceful, as we have already discussed, *see supra* Sensitive Locations § III.B.  As to means, both § 265.01-e(2)(o) and its historical "crowded space" analogues achieve their purpose by prohibiting carriage in heavily-trafficked spaces.  Likewise, contemporaneous state case law reveals that intoxicated-persons statutes were motivated by the need to disarm intoxicated individuals who could not be trusted with weapons.  *See Shelby*, 2 S.W. at 469–70 (holding that the "mischief" posed by intoxicated persons carrying weapons justified a statute prohibiting as much).  As we have noted, these statutes achieved their objective in various ways.  Some did so by disarming intoxicated individuals themselves, others by prohibiting sale to intoxicated persons, and yet others by prohibiting firearms in liquor-serving or -selling establishments altogether.

Section 265.01-e(2)(o), which operates by prohibiting firearms in liquor-serving establishments, is directly parallel to the latter historical statutes.

When paired with the crowded space analogues, even absent the historical statutes prohibiting carriage in liquor-serving establishments, the analogues prohibiting intoxicated persons from carrying or purchasing firearms justify § 265.01-e(2)(o). Whereas the crowded space analogues justify prohibiting firearms in heavily-trafficked places, the intoxicated-persons analogues justify prohibiting firearms to intoxicated persons who cannot be trusted with weapons. Together, these statutes justify regulating firearms in crowded spaces in which intoxicated persons are likely present. *See Bruen*, 142 S. Ct. at 2133 ("[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

The district court made two errors in reaching its holding that § 265.01-e(2)(o) was inconsistent with the Nation's tradition. For one, as described above, it erroneously declined to consider the analogues from Arizona, Oklahoma, and Wisconsin. Like § 265.01-e(2)(o), the Arizona and Oklahoma statutes prohibited firearms carriage in establishments serving liquor. These analogues provide the (admittedly unnecessary) historical twins sought by the district court and

demonstrate that regulating firearms based on liquor-serving places rather than

intoxication is consistent with the National tradition.[95]  Yet, even putting aside

the Arizona and Oklahoma statutes, the district court erred in rejecting the

State's remaining behavior-based historical analogues in search of a place-based

"historical twin."  *Bruen*, 142 S. Ct. at 2133 (emphasis removed).  For the reasons

we describe above, § 265.01-e(2)(o) is "analogous enough" to the State's

behavior-based and crowded location historical analogues to "pass constitutional

muster."  *Id.*

*     *     *

For the aforementioned reasons we **VACATE** the district court's preliminary

injunction enjoining enforcement of § 265.01-e(2)(o).

## V.    Theaters, Conference Centers, and Banquet Halls

N.Y. Penal L. § 265.01-e(2)(p) is a wide-ranging ban on gun carriage in

"any place used for the performance, art entertainment [sic], gaming, or sporting

events" that provides a long list of examples of such locations.  The district court

---

[95] In fact, though the district court made much of the distinction between regulating place versus behavior, 19th century case law reveals that at least some state courts analogized regulating behavior to regulating places in finding behavior-based regulations constitutional. *See Shelby*, 2 S.W. at 469 (observing that "no good reason" exists for distinguishing between the constitutionality of the legislature's regulation of firearms in "time and place" and the regulation "of the person who carries such weapons").

enjoined enforcement of § 265.01-e(2)(p) with respect to three of those locations: "theaters," "conference centers," and "banquet halls." We vacate that injunction, concluding (1) that no plaintiff presented a justiciable challenge to the conference center and banquet hall provisions (and thus that the district court's injunction was entered without subject-matter jurisdiction), and (2) that Plaintiffs have not shown a likelihood that the ban on carrying guns in theaters violates the Second Amendment.

### A. Justiciability

The district court concluded that plaintiff Alfred Terrille had standing with respect to both conference centers and banquet halls, and that plaintiff Joseph Mann also had standing with respect to banquet halls. We disagree on both scores.

We consider first Terrille's claim as to conference centers and banquet halls (there is no dispute that, as the district court found, Terrille has standing with respect to theaters). *See Antonyuk*, 639 F. Supp. 3d at 286. His September 19, 2022, declaration averred that he "plan[s] to attend the . . . NEACA Polish Community Center Gun Show, to occur on October 8–9, 2022, in Albany," and that he "intend[s] to carry [his] firearm" there. J.A. 191–92 (Terrille Decl. ¶ 16). The gun show's host — the Polish Community Center — "describes itself as a

215

conference center, banquet hall & wedding venue," *id.*, an unchallenged self-description that we credit.

This declaration was likely sufficient to establish Terrille's standing *initially*. But "[t]o qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "[I]t is not enough that a dispute was very much alive when suit was filed . . . . The parties must continue to have a personal stake in the outcome of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) (internal quotation marks omitted). "When the plaintiff no longer has a legally cognizable interest in the outcome of the action, the case becomes moot and is no longer a 'case' or 'controversy' for the purposes of Article III." *Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 601 (2d Cir. 2020) (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "The question of standing bears close affinity to the question of mootness, which is whether the occasion for judicial intervention *persists*." *Chevron Corp. v. Donziger*, 833 F.3d 74, 123 (2d Cir. 2016) (emphasis in original) (internal quotation marks omitted).

Even though Terrille likely had standing at the outset of this suit, his claim has become moot. Terrille's alleged injury-in-fact was a threatened prosecution for carrying a gun at a specific conference center/banquet hall on a specific date. But October 8–9 came and went, and there is no record as to whether the gun show took place, let alone whether Terrille attended it while armed.[96] A past but unfulfilled intention to violate the law does not support pre-enforcement standing, and nothing in the record here (or in district court, *see Antonyuk*, 639 F. Supp. 3d at 286 n.52) shows that Terrille followed through on his intention to violate § 265.01-e(2)(p) in October.

Nor did Terrille allege a future intention to visit a banquet hall or conference center while armed—for a gun show or otherwise. Plaintiffs claim that it is "evident from Terrille's affidavit that he regularly attends gun shows, which occur on a routine basis,"[97] *Antonyuk* Appellee Nigrelli Br. at 9 (emphasis

---

[96] A showing that he had done so would likely have supported injury-in-fact: the statute of limitations on violating § 265.01-e will not run for several years, *see* N.Y. C.P.L. § 30.10(2)(b) (establishing five-year limitations period for felonies), so Terrille might still have claimed a credible threat of prosecution. But even though the State argued mootness here and in the district court, Terrille has done nothing to supplement his averments.

[97] The district court seems to have accepted this characterization sub silentio. *Antonyuk*, 639 F. Supp. 3d at 286 ("Plaintiff Terrille has sworn that he has frequently carried concealed in . . . conference centers and banquet halls, and will do so again . . . ."). In fact, as discussed below, Terrille's affidavit made no such statement.

removed), but that is not so.  Terrille discussed his plans to attend conference centers and banquet halls solely by reference to his desire to attend a specific gun show, and did so in a short and discrete section of his declaration (set out in the margin).[98]  We do not see in that averment—or anywhere else, *e.g.*, J.A. 69 (Compl. ¶ 173)—the supposedly "evident" indicia that Terrille regularly visits banquet halls or conference centers while armed.  In contrast, Plaintiff Johnson makes precisely such an assertion in discussing his interest in zoos, by stating that his and his wife's plans to visit the zoo in the coming fall is part of their regular practice of visiting the zoo "at least once or twice every fall."  J.A. 139–40 (Johnson Decl. ¶ 17).

Perhaps Plaintiffs ask us to construe Terrille's declaration generously and to infer from his stated intention to go to *this* gun show at a conference center/banquet hall while armed an unstated intention to attend other, future gun shows at conference centers/banquet halls while armed.  But without more, such an inference is not logically sound.  A person with a ticket to a play next

---

[98] *See* J.A. 191–92 (Terrille Decl. ¶ 16) ("I plan to attend the upcoming NEACA Polish Community Center Gun Show, to occur on October 8-9, 2022, in Albany.  The gun show is hosted by The Polish Community Center, which describes itself as 'a conference center, banquet hall & wedding venue in Albany, NY.' . . . I currently plan to attend the upcoming Albany gun show, and I intend to carry my firearm with me when I do, in violation of the CCIA[.]").

week is not necessarily a theater-goer. Terrille could have alleged something

more—a longstanding interest in and habit of attending gun shows, perhaps—

but he did not, and we will not rewrite his declaration for him: As we have

previously noted, "'a live controversy is not maintained by speculation' that the

party might in the future be prevented from conducting an activity that it

'currently asserts no plan to [conduct].'" *Connecticut Citizens Def. League, Inc. v.*

*Lamont*, 6 F.4th 439, 445 (2d Cir. 2021) (brackets in original) (quoting *City News &*

*Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001)).

Furthermore, "[o]ur sensitivity to [justiciability] concerns is particularly

acute when a litigant invokes the power of judicial review, a power at once

justified and limited by our obligation to decide cases." *Frank v. United States*, 78

F.3d 815, 832 (2d Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *relevant portion re-*

*adopted*, 129 F.3d 273, 275 (2d Cir. 1997); *see also Raines v. Byrd*, 521 U.S. 811, 819–

20 (1997) (The "standing inquiry has been especially rigorous when reaching the

merits of the dispute would force us to decide whether an action taken by one of

the other two branches of the Federal Government was unconstitutional." ).

Though a request for judicial review does not actually modify the requirements

for justiciability, we reiterate that a court must be confident that it is deciding a

true "case or controversy"—rather than issuing an advisory opinion—when

asked to invalidate the action of a co-ordinate branch or of a state. In such

circumstances, courts should be reluctant to draw tenuous inferences from

sparse declarations.

Plaintiffs make two further mootness arguments. First, they argue that any

uncertainty as to what Terrille did on October 8th and 9th is the State's fault for

declining to cross-examine Terrille at the evidentiary hearing in the district court.

But it was not the State's job to adduce facts to sustain Terrille's injury. Plaintiffs

also argue that Terrille should not be required to confess to the felony of going

armed to a conference center. True, he "is not required to [confess to a crime] in

order to establish standing." *Antonyuk*, 639 F. Supp. 3d at 290; *accord Driehaus*,

573 U.S. at 163. But that was not his only option. If Terrille had averred that he

wishes to attend gun shows (or other events) at conference centers or banquet

halls while armed, with sufficient indicia to permit a plausible inference of future

violations of this law, jurisdiction might have been proper. Or Terrille could

have asserted that he wanted to attend other gun shows while armed but was

deterred from doing so by the CCIA. But he did neither.

We are mindful that a plaintiff may fall between stools: allege future conduct too imminent and the claim will become moot, but allege a generic or distant intention and the injury will be insufficiently specific. But as we have explained elsewhere in this opinion, it is simply not all that hard to allege a plausible "intention to engage in a course of conduct arguably affected with a constitutional interest," *Driehaus*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 159). The Supreme Court has repeatedly found plausible allegations of injury based on relatively vague future intentions. *See supra* Sensitive Locations § III.A **[(discussing Johnson's allegations with respect to zoos)]**. A gun owner who alleges a prior visit to a venue, a reason or wish to visit again, and either a plan to do so (thereby subjecting himself to arrest) or a decision to forgo doing so for fear of prosecution will likely have adequately pled standing to seek a pre-enforcement injunction.[99]

Not so a plaintiff who alleges only a single occasion on which he intends to violate the challenged law and then fails to indicate that he followed through, that he was dissuaded by legal prohibition, or that past practice predicts a

---

[99] This is why Terrille's claim is moot but Corey Johnson's claim is not. Johnson averred that he intended to visit the Rosamond Gifford Zoo "within the next 90 days" *and* that he and his wife regularly visit the zoo "once or twice every fall" in order to see certain creatures. J.A. 139–40 (Johnson Decl. ¶ 17).

violation in the future. Since Terrille has done none of the above, it is

insufficiently clear that the injunction he seeks with respect to banquet halls and

conference centers would affect him in any way. He has not demonstrated an

ongoing stake in the outcome of the litigation; his claim is—and was at the time

the district court issued its injunction—moot. *Cf. Palmer v. Amazon.com, Inc.*, 51

F.4th 491, 503 (2d Cir. 2022) ("A case becomes moot when it is impossible for a

court to grant any effectual relief whatever to the prevailing party." (quoting

*Lamont*, 6 F.4th at 444)). And since Terrille was the only plaintiff found to have

standing with respect to conference centers, we vacate that component of the

district court's injunction as having been entered without jurisdiction.

The district court also concluded that Joseph Mann had standing to

challenge the CCIA's prohibition on possessing a gun in banquet halls. Mann's

declaration averred that his church "additionally [is] a 'banquet hall' as

[parishioners] often break bread together." J.A. 183 (Mann Decl. ¶ 34). The

district court accepted Mann's characterization and found that, given Mann's

stated intention to carry a gun at the church, he had established injury-in-fact. *See*

*Antonyuk*, 639 F. Supp. 3d at 387.[100]  We disagree.  Notwithstanding that people "break bread together" there, a church is not even arguably a "banquet hall" within the meaning of § 265.01-e(2)(p).

The Plaintiffs' interpretation of "banquet hall" does not comport with ordinary meaning.  *See Manning v. Barr*, 954 F.3d 477, 482 (2d Cir. 2020) ("[W]ords will be interpreted as taking their ordinary, contemporary, common meaning." (quoting *Arriaga v. Mukasey*, 521 F.3d 219, 225 (2d Cir. 2008)).  Just as "banquet" is not a synonym for "meal,"[101] a "banquet hall" is not any place people eat together.[102]  Instead, the phrase ordinarily refers more specifically to a commercial space made available for special events: weddings, reunions,

---

[100] The district court appears to have slightly misunderstood Mann's claim as being that his church *contains* a "banquet hall."  *See Antonyuk*, 639 F. Supp. 3d at 286.  Instead, Mann alleged that the church itself constitutes a "banquet hall," and Plaintiffs have not advanced the district court's interpretation here.  We do not decide whether a separate "hall" within a church might qualify under the statute.

[101] *See Banquet*, Merriam-Webster.com Dictionary, *available at* https://www.merriam-webster.com/dictionary/banquet [https://perma.cc/H3WV-LKBZ] ("a sumptuous feast, especially [] an elaborate and often ceremonious meal for numerous people often in honor of a person; a meal held in recognition of some occasion or achievement")

[102] *See Hall*, Oxford English Dictionary, *available at* https://doi.org/10.1093/OED/6129098993 [https://perma.cc/G846-QK8V] ("[a] large room or building for the transaction of public business . . .  or any public assemblies, meetings, or entertainments," or in this case, banquets).

fundraisers, etc. Plaintiffs' expansive definition of "banquet hall" would include a cafe, picnic tables in the park, or the dining room of a private residence.

Our intuitive understanding is confirmed by an examination of the company the phrase keeps. *See, e.g.*, *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021) ("[*Noscitur a sociis*] counsels that a word is given more precise content by the neighboring words with which it is associated." (quoting *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012)). As used in paragraph (2)(p), "banquet hall" is only an example of a "place used for the performance, art entertainment [*sic*], gaming, or sporting events." A church—even one hosting collective bread-breaking—is not such a place. The other listed examples immediately preceding "banquet halls" in § 265.01-e(2)(p), such as theaters, stadiums, concerts, amusement parks, and racetracks, further confirm our understanding of the term. Context thus tells us that the legislature could hardly have intended for "banquet hall" to cover all sites of group meals, including churches.

For these reasons, we conclude that Mann's proffered interpretation of the statute is not "reasonable enough" that he "may legitimately fear that [he] will face enforcement of the statute." *Picard*, 42 F.4th at 98 (quoting *Pac. Cap. Bank*,

542 F.3d at 350). He has therefore not alleged an intention to engage in conduct which is "arguably proscribed by the law" he challenges, *Driehaus*, 573 U.S. at 162 (internal quotation marks omitted), and has failed to establish injury-in-fact with respect to § 265.01-e(2)(p)'s application to banquet halls. Given the mootness of Terrille's challenge to the banquet hall provision, the district court lacked jurisdiction to enjoin enforcement of § 265.01-e(2)(p) with respect to banquet halls, and we vacate for that reason.

The State, on the other hand, does not challenge the district court's finding that Plaintiffs Terrille, Mann, and Johnson had standing as to theaters, and we see no impediment to standing. Accordingly, we now turn to the merits of the district court's preliminary injunction of § 265.01-e(2)(p) as applied to theaters.

## B.   Merits

### 1.   District Court Decision

The State once again bore the burden of proving that § 265.01-e(2)(p), the purpose of which is to reduce the threat of gun violence toward large groups in confined locations, was consistent with the National tradition. To carry this burden, the State offered five analogues below, all of which we have already seen: (1) a 1786 Virginia law barring persons from "go[ing] []or rid[ing] armed"

in "fairs or markets, or in other places, in terror of the county"; (2) an 1869 Tennessee law barring carriage in "any fair, race course, or other public assembly of the people"; (3) an 1870 Texas law barring carriage in "a ball room, social party or other social gathering composed of ladies and gentleman"; (4) an 1889 Arizona law and (5) an 1890 Oklahoma law, both of which prohibited carriage in "any places where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering." *Antonyuk*, 639 F. Supp. 3d at 333.

As it did elsewhere, the district court discounted the Oklahoma and Arizona statutes as coming from territories and the latter half of the 19th century. So, it considered only the first three analogues. These laws, determined the court, "appear to have been aimed at denying the possession of guns to persons who were likely to pose a danger or disturbance to the public." *Id* at 334. Per the district court, they did so by denying firearms to persons who were either "riding in terror of the county" or "likely to disturb those attending a gathering of people (usually but not always outdoors) containing a dense population." *Id.*

The district court concluded that neither set of analogues sustained the State's burden. Virginia's law prohibiting "riding in terror" was not on point

because its regulation of "horseback-riding terrorists through fairs or markets" was not analogous to the "modern need to regulate law-abiding New York State citizens" wishing to carry concealed firearms. *Id.* (alterations adopted and internal quotation marks omitted). And whereas the "horseback riders referenced in the Virginia law were, by definition, *brandishing* arms and not carrying them *concealed*," noted the court, "the modern regulation is not limited to instances in which the concealed carry licensees are 'terrorizing' others." *Id.* Nor did the remaining two laws—the 1869 Tennessee and 1870 Texas statutes—carry the State's burden because those laws, by virtue of the relatively small portion of the American population they covered, were neither representative nor established. Yet, even assuming these statutes were representative and established, the district court refused to accept that these two statutes were analogous because the State had not demonstrated "that the modern need for this regulation is comparable to the need for its purported historical analogues" given the CCIA's licensing requirements. *Id.* at 335.

Having determined that none of the State's offered analogues carried its burden of placing § 265.01-e(2)(p) within the Nation's history of firearm regulation, the district court enjoined its enforcement.

2.    The State's Historical Analogues

On appeal, the State argues that § 265.01-e(2)(p) is consistent with the

Nation's tradition of regulating firearms in quintessentially crowded social

places.  As we have already laid out, *supra* Sensitive Locations §§ III.B.2 & IV.B.2,

the State points to the following analogues to establish a tradition of crowded-

place regulations: (1) a 1382 British statute forbidding going or riding "armed by

night []or by day, in fairs, markets," Statute of Northampton 1328, 2 Edw. 3 c.3

(Eng.); (2) a 1792 North Carolina statute replicating the 1328 British statute and

prohibiting firearms in fairs or markets, Collection of Statutes of the Parliament

of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed.

1792); (3) a 1786 Virginia law prohibiting "go[ing] []or rid[ing] armed by night

[]or by day, in fairs or markets, or in other places, in terror of the county," J.A.

670 (1786 Va. Acts 35, ch. 49); (4) laws from 1869 Tennessee, 1870 Texas, 1883

Missouri, 1889 Arizona, and 1890 Oklahoma prohibiting firearms in crowded

places such as assemblies for "educational, literary or scientific purposes, or into

a ball room, social party or social gathering,"  J.A. 602 (1870 Tex. Gen. Laws 63,

228

ch. 46);[103] and (5) Missouri, Tennessee, and Texas state court opinions upholding those states' regulations as constitutional, *see Shelby*, 2 S.W. at 469; *English*, 35 Tex. at 478–79; *Andrews*, 50 Tenn. at 182.

We have already held that the above analogues set forth both a well-established and representative tradition of regulating firearms in quintessentially crowded places, *supra* Sensitive Locations § III.B.2.a. The question to which we turn, therefore, is whether § 265.01-e(2)(p) is consistent with that tradition, *supra* Sensitive Locations § III.B.2.b. We hold that it is and, accordingly, vacate the preliminary injunction.

The State's proffered analogues set forth a tradition of regulating firearms in quintessentially crowded places, particularly those spaces that are (1) discrete in the sense that they contain crowds in physically delineated or enclosed spaces, *e.g.*, circuses, ball rooms, fairs, and markets, and (2) "where persons are

---

[103] J.A. 605–06 (1869 Tenn. Pub. Acts 23–24) (1869 Tennessee law prohibiting carriage of deadly weapons by "any person attending any fair, race course, or other public assembly of people"); *id.* at 611 (1883 Mo. Sess. Laws 76) (1883 Missouri law prohibiting weapons "where people are assembled for educational, literary or social purposes"); *id.* at 617 (1889 Ariz. Sess. Laws 17) (1889 Arizona law prohibiting dangerous weapons "where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); *id.* at 621 (1890 Okla. Terr. Stats., Art. 47, § 7) (1890 Oklahoma law prohibiting carriage in places "where persons are assembled for . . . amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering").

assembled for amusement," J.A. 617 (1889 Ariz. Sess. Laws 17), or for

"educational [or] literary purposes," *id.* at 602 (1870 Tex. Gen. Laws 63, ch. 46).

We need not stretch the analogy far to see that § 265.01-e(2)(p) is consistent with

this tradition in both senses. It regulates firearms in discrete, densely crowded

physical spaces wherein people assemble for amusement, educational, or literary

purposes, which fairly describes theaters.[104]

The district court failed to properly appreciate the National tradition of

which § 265.01-e(2)(p) is a part for several reasons.

First, the court improperly discounted the Oklahoma and Arizona statutes

based on their origins as territorial laws from the late 19th Century. Second, it

improperly discounted the laws from Tennessee and Texas based on those states'

populations relative to that of the Nation at the time.[105] For the reasons we have

already described, *supra* Sensitive Locations § III.B.2, this was error.

---

[104] We do not take the "silence" of the historical record, as it has so far been developed, on carriage restrictions specific to theaters to indicate that regulating firearms in theaters is unconstitutional. For one, the record also lacks any affirmative evidence that gun regulations in theaters were considered unlawful. Second, such regulations may not have been necessary given that the statutes prohibiting carriage at social, amusement, literary, or educational gatherings appear to have naturally covered theaters.

[105] Even if the Tennessee and Texas laws were the only laws cited by the State at this point in the litigation, it is not clear to us that the relative populations of those states would support the district court's conclusion that the laws were neither well-established nor representative. As we have mentioned elsewhere, *Bruen* discounted analogical statutes that

Third, the court dismissed the 1786 Virginia law prohibiting "go[ing[ []or rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the county," J.A. at 670 (1786 Va. Acts 35, ch. 49), as insufficiently analogous because the Virginia law was aimed at "terrorists" and not the type of lawful gun-owners covered by § 265.01-e(2)(p). *Antonyuk*, 639 F. Supp. 3d at 338–39. Even if we accept that the Virginia law was solely aimed at people who terrorize, the district court failed to appreciate that the Founding-era North Carolina statute prohibited firearms in fairs and markets with no reference to terroristic conduct.[106] It also failed to consider that the tradition beginning with the Virginia and North Carolina laws evolved over the years between the Founding and Reconstruction toward the North Carolina model, *i.e.*, to prohibit firearms in quintessentially crowded places notwithstanding behavior. *See, e.g.*, statutes cited *supra* at III.B.2.a n.74. Thus, in the context of regulating firearms in

---

covered less than 1 percent of the American population and ran directly contrary to a majority of the country at the time. *See Bruen*, 142 S. Ct. at 2155. According to the district court itself, the historical analogues from Tennessee and Texas covered 5.3 percent of the population.

[106] The district court considered the North Carolina statute in a footnote and dismissed it for "similar reasons (i.e., the lack of a reasonable analogy to terroristic behavior . . . .)." *Antonyuk*, 639 F. Supp. 3d at 334 n.117. Yet, unlike the Virginia statute, the North Carolina statute did not ban firearms based on terroristic conduct, it banned *all* carriage in fairs and markets. *See* Collection of Statutes of the Parliament of England in Force in the State of North-Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792).

discrete, crowded places, the Virginia law's "terroristic" conduct requirement is the outlier among the national tradition.[107]  In any event, even without the Virginia law, the State's remaining historical analogues, and state case law finding three of those analogues constitutional, are enough.

Fourth, the district court improperly dismissed the remaining two analogues it did consider—the statutes from Tennessee and Texas—because the State failed to show that the need for gun-regulation in crowded places today is comparable to the need for such traditional regulations in the past given the CCIA's extensive background check requirements.  But that was not the State's burden.[108]  The State's burden was to prove that § 265.01-e(2)(p) is consistent with a National tradition.  It did so.

*       *       *

---

[107] As we discussed *supra* Sensitive Locations § III.B.2.a, *Bruen*'s discussion of the Northampton statute is not relevant here because it considered that law when offered as an analogue for a broad prohibition on public carriage generally, not as offered here for a specific prohibition on carriage in confined, crowded spaces.  *Bruen*, 142 S. Ct. at 2139–43.

[108] The district court's logic suggests that, because enhanced licensure requirements purportedly diminish the need for carriage restrictions, carriage restrictions are inconsistent with their historical analogues if those analogues were enacted at times with lesser licensing requirements. By this logic, a state must choose between regulating licensure and regulating carriage even if both carriage and licensure requirements are constitutional.  By its own terms, *Bruen* does not so tie states' hands.  *See* 142. S. Ct.  at 2133 ("[T]he Second Amendment is [not] a regulatory straightjacket[.]").

For the aforementioned reasons, the order of the district court preliminarily enjoining the State from enforcing § 265.01-e(2)(p) is **VACATED**.

## VI.    **First Amendment Gatherings**

Section 265.01-e(2)(s) makes it a crime to possess a gun at "any gathering of individuals to collectively express their constitutional rights to protest or assemble."  The district court found that Plaintiffs Terrille and Mann both had standing to challenge this restriction.  The State has not argued otherwise, but "it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *accord In re Clinton Nurseries, Inc.*, 53 F.4th 15, 22 (2d Cir. 2022).  Fulfilling that obligation here, we conclude that neither Terrille nor Mann has presented justiciable constitutional challenges to paragraph (2)(s).

### A.    **Mann**

The district court concluded that Mann has standing because paragraph (2)(s) applies to Sunday worship at Mann's church—"expressive religious assemblies," in the district court's words.  *Antonyuk*, 639 F. Supp. 3d at 291.  Since Mann intends to carry a gun during worship services, the district court found that Mann had alleged a credible threat of prosecution for violating paragraph

(2)(s).  *Id.*; *see also* J.A. 182 (Mann Decl. ¶ 32).  However, as a matter of statutory interpretation, neither a worship service nor other "expressive religious assemblies" are even arguably covered by paragraph (2)(s).

The inquiry depends on the provision's purpose: guns are banned only when people gather "to collectively express their constitutional rights to protest or assemble."  It is unreasonable to interpret this text to include every gathering or even every "expressive gathering."  For one thing, that would render wholly superfluous § 265.01-e(2)(c), which specifically prohibits guns in "any place of worship."  Other portions of § 265.01-e would also be swallowed by paragraph (2)(s).  "Theaters" and "performance venues"—included in paragraph (2)(p)—do little else but host gatherings involving expression.  Likewise, many events hosted at "exhibits, conference centers, [and] banquet halls" can be categorized as "expressive gatherings."  *See* N.Y. Penal L. § 265.01-e(2)(p).  The CCIA may be broad, but we will not read it to be redundant.

Paragraph (2)(s)'s placement within § 265.01-e confirms that it was aimed at protests and other demonstrations rather than at an undifferentiated category of gatherings that would include worship services.  Related sensitive locations tend to be grouped together in § 265.01-e(2): childcare and other youth programs

appear back-to-back with "nursery schools, preschools, and summer camps,"

N.Y. Penal L. § 265.01-e(2)(e)–(f); and programs for the vulnerable—persons

suffering from addiction, mental illness, poverty, disability, and homelessness—

all appear in sequence, *see id.* §§ 265.01-e(2)(g)–(k).  It is thus probative that

paragraph (2)(s) immediately follows a ban on guns at:

> any public sidewalk or other public area restricted from
> general public access for a limited time or special event
> that has been issued a permit for such time or event by a
> governmental entity, or subject to specific, heightened
> law enforcement protection . . . .

*Id.* § 256.01-e(2)(r).  This pattern of grouping by affinity suggests that

subparagraph (s) deals with "assemblies" similar to those on a sidewalk or on a

road closed by police.

Although some court decisions have suggested broad First Amendment

protection for "assemblies," *see Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971)

(suggesting a First Amendment right to "gather in public places for social or

political purposes"); *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) (stating that

"peaceable assembly for lawful discussion cannot be made a crime" in part

because of the Assembly Clause), the "constitutional right to assemble" is more

usually discussed as being "cognate to those of free speech and free press," *De

Jonge*, 299 U.S. at 364, and "intimately connected both in origin and in purpose[]

235

with the other First Amendment rights of free speech and free press," *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967).

And the legislature's pairing of "assembl[y]" with "protest" in § 265.01-e(2)(s) strongly suggests that the legislature was concerned with protest-type demonstrations rather than attempting to reach *any* assembly conceivably protected by the First Amendment.  *Cf. McDonnell v. United States*, 579 U.S. 550, 569 (2016) ("[*Noscitur a sociis*] is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." (quoting *Jarecki v. G.D Searle & Co.*, 367 U.S. 303, 307 (1961)).  It is implausible that the New York legislature meant for paragraph (2)(s) to apply wherever people gather for social or political purposes (which is everywhere), or whenever people engage in lawful discussion (which is all the time).  It is highly unlikely that the legislature would slip in a prohibition of such sprawling breadth as one of many entries in an enumeration of twenty sensitive locations. Such a sweeping bar would also offend the Supreme Court's admonition against "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement."  *Bruen*, 142 S. Ct. at 2134.  The CCIA is in conversation with *Bruen*: the legislature may have

overreached in certain respects, but the general point was to revise New York's gun laws to *withstand Bruen*, not to attempt exactly what it forbade.

Moreover, it is easy to infer what the legislature had in mind. Peaceful demonstrations petitioning the government to take or desist from particular actions are a vital part of democratic discourse; demonstrations by armed mobs are something else. Similarly, counter-demonstrations often lead to dangerous confrontations; how much more so if a peaceful protest is met by counter-demonstrators who are armed. It is thus reasonable to assume that the legislature was concerned that carrying firearms in connection with such protests conveys intimidation rather than free expression, a concern that would not extend to ordinary religious or social gatherings at which people exercise their rights to gather and speak with each other.

Accordingly, we conclude that worship services at Mann's church are not arguably "gathering[s] of individuals to collectively express their constitutional rights to protest or assemble" and that he has thus not alleged injury-in-fact with respect to § 265.01-e(2)(s).

## B. Terrille

The district court found that Alfred Terrille had standing to challenge the constitutionality of paragraph (2)(s) based on his intention to attend the Polish

Community Center Gun Show on October 8–9, 2022. But for the reasons explained above with respect to conference centers and banquet halls, Terrille's failure to demonstrate that he attended the gun show while armed, was dissuaded by law from doing so, or intends to attend another gun show in the future means that Terrille's challenge to paragraph (2)(s) is now moot.

Moreover, a gun show is not arguably a "gathering of individuals to collectively express their constitutional rights to protest or assemble" under paragraph (2)(s). Though Terrille states that "one of [his] main reasons for attending [the Polish Community Center Gun Show], and a huge part of any gun show, is the conversations with fellow gun owners, which invariably includes discussion of New York State's tyrannical gun laws," J.A. 191–92 (Terrille Decl. ¶ 16), that does not on its own bring a gun show within paragraph (2)(s). A gun show is a commercial exhibition: that attendees might *also* engage in speech, including on politically-charged topics, does not make it a gathering for the purpose of expressing participants' "constitutional right to protest or assemble." As discussed, the challenged law does not cover every gathering where expression might occur. A book fair is not a qualifying gathering even if

attendees anticipate conversations about censorship.  So, even if Terrille's claim was not moot, it still would not be justiciable.

*     *     *

Since neither Mann nor Terrille present justiciable challenges § 265.01-e(2)(s), the district court was without jurisdiction to enjoin its enforcement.[109]  We accordingly **VACATE** that portion of the district court's preliminary injunction.

**RESTRICTED LOCATIONS**

Under § 265.01-d of the CCIA, a "person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent."  The effect of this "restricted location" provision is to create a default presumption that carriage on any private property is unlawful —whether property is open or closed to the public—unless the

---

[109] Plaintiffs Johnson and Terrille alleged an intention to attend political protests in the future, but the district court found those allegations insufficiently specific and/or imminent for Article III standing.  *See Antonyuk*, 639 F. Supp. 3d at 389–91.  Since Plaintiffs do not challenge this determination on appeal, the argument is forfeited and we do not consider it.

239

property owner has indicated by "clear and conspicuous signage" or express verbal consent that carriage is allowed.

As discussed above, the *Antonyuk* and *Christian* Plaintiffs each moved in their respective cases to preliminarily enjoin enforcement of the restricted locations provision. In *Antonyuk*, all six individual Plaintiffs challenged the provision as violative of the First Amendment and Second Amendment. After finding that each of these Plaintiffs had standing to challenge this provision, the district court enjoined the restricted-locations provision in its entirety on both First Amendment compelled speech and Second Amendment grounds. *See Antonyuk*, 639 F. Supp. 3d at 294, 339–47.

In *Christian*, one individual Plaintiff, Brett Christian, along with two organizational Plaintiffs, FPC and SAF, brought a Second Amendment challenge to the restricted locations provision "with respect to private property 'open to the public.'" *Christian*, 642 F. Supp. 3d at 399 n.5. In its order, the district court held that the individual Plaintiff had standing while the organizational Plaintiffs did not, and proceeded to find that the restricted locations provision facially violated the Second Amendment. Accordingly, the *Christian* court granted the relief

requested by Christian and enjoined enforcement of that provision "with respect to private property open to the public." *Id*. at 411.

## I. Standing

In assessing standing, we need only consider the Second Amendment challenge.

The State argues that none of the Plaintiffs in *Antonyuk* or *Christian* has standing to bring a Second Amendment challenge to § 265.01-d. "[A]n injunction against defendants cannot vindicate plaintiffs' asserted desire to carry guns onto others' property," the State contends, because that "inability . . . would flow not from defendants' enforcement of the CCIA, but rather from decisions by property owners or lessees about whether to allow guns on the premises." *Antonyuk* Nigrelli Br. at 70.

We disagree. Whether or not a property owner or lessee has decided to allow guns on their premises, the relevant injury for standing purposes is the credible threat of arrest and prosecution that Plaintiffs face if they do so without first receiving permission for armed entry, as they claim a right (and willingness) to do. *See, e.g.*, J.A. 140–41 (Johnson Decl. ¶¶ 18–21). Under § 265.01-d, an armed entry without explicit prior permission would be prosecutable even if the

property owner or lessee later discovers the entrant is armed and consents to his carriage. And *that* injury is clearly redressable by an injunction against enforcement of the private-property restriction. Further, although the State contends that this injury is not traceable to the State (and thus not redressable) because Plaintiffs' exclusion occurs due to a decision by a third-party to deny consent, that argument ignores the provision's criminally enforceable presumption against carriage. In other words, absent § 265.01-d, a licensed gun owner could bring his concealed firearm into, for example, a privately owned department store if the store owner did not clearly communicate to the public (or to the gun owner directly) any position on whether guns were permitted, but the passage of the law makes carrying a licensed gun into that store a crime even though no such prohibition had been posted or communicated. That change in the gun licensee's rights is affected by the statute, not by any action of the private property owner. Accordingly, Plaintiffs have standing to challenge § 265.01-d as violating the Second Amendment.

**II.    Merits**

    **A.    The District Court Decisions**

        1.    *Antonyuk*

The district court began its analysis of the restricted location provision by noting that the provision applies both to "*all* privately owned property that is *not* open to the public (and that is not a 'sensitive location' under Section 4 of the CCIA)" as well as to "all privately owned property that *is* open for business to the public (and that is not a 'sensitive location' under Section 4 of the CCIA)." *Antonyuk*, 639 F. Supp. 3d at 339.  The court focused its analysis on those restricted locations open to the public, concluded that the CCIA's restriction of firearms in such locations "finds little historical precedent," *id.* at 340, and enjoined enforcement.

The district court rejected the State's eight proffered analogues, of which six were state laws ranging from the early 18th-century to late 19th-century that prohibited carrying firearms onto private property for the purpose of hunting game.  *Id.* at 340-41.  The remaining two proffered statutes, a 1771 New Jersey statute and an 1865 Louisiana statute, prohibited the carriage of firearms generally on private property without the owner's consent.

The court found that the six "anti-poaching" statutes were inapposite. They were "aimed at preventing hunters (sometimes only hunters who are convicted criminals) from taking game off of other people's lands (usually enclosed) without the owner's permission." *Id* at 340. Barring "*some* people from *openly* carrying rifles on other people's farms and lands in 19th century America," concluded the court, "is hardly analogous to barring *all* license holders from carrying *concealed* handguns in virtually *every commercial building* now." *Id.* at 341. Moreover, the anti-poaching statutes served a disparate purpose. According to the district court, "poaching was a specific and pernicious problem" in each of the six states with anti-poaching laws, whereas § 265.01-d is aimed at "ensu[ring] that property owners and lessees can make informed decision." *Id.* (internal quotation marks omitted). In sum, the court concluded that the need to restrict poaching "appears of little comparable analogousness to the need to restrict law-abiding responsible license holders in establishments that are open for business to the public today." *Id.*

The district court also rejected the State's remaining analogues—the 1771 New Jersey and 1865 Louisiana laws. Even assuming, *arguendo*, that they were well-established, the court found that they were not representative, given that the

populations of New Jersey and Louisiana together was 4.2 percent of the Nation at that time.

As to § 265.01-d's firearm restrictions on private property closed to the public, the district court agreed with the State. With no merits analysis, the court was persuaded "that the Second Amendment is not the best place to look for protection" of carriage rights on property closed to the public because "thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's *own* home or in *public*." *Id.* at 343. Having concluded that regulations of firearms on private property closed to the public are outside the scope of the Second Amendment, the court did not analyze this aspect of the regulation under *Bruen*.

Following its analysis of the Plaintiffs' First Amendment challenge to the restricted locations provision, the district court enjoined § 265.01-d in all of its applications, *i.e.*, as applied to private property that is both open and closed to the public. Importantly, the district court explained that "even if its First Amendment challenge were flawed," the Second Amendment grounds alone were sufficient to "preliminary enjoin *all* of" § 265.01-d. *Id.* at 347. As discussed below, that was error.

2. *Christian*

Christian's pre-enforcement challenge to the restricted location provision was limited to private property open to the public, and the district court's injunction was also so limited. Notwithstanding language in the district court opinion that purports to analyze the entire provision, *i.e.*, as it applies to private property open and closed to the public alike, and the State's defense of the entire provision in the district court, the district court's order is limited to enjoining the provision only as it applies to private property open to the public. Accordingly, our review on appeal is likewise limited. *See Jennings v. Stephens*, 574 U.S. 271, 277 (2015) ("This Court, like all federal appellate courts, does not review lower courts' opinions, but their *judgments*."); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("[S]ince this Court reviews judgments, not opinions, we must determine whether the Court of Appeals' legal [reasoning] error resulted in an erroneous *judgment*" (emphasis added; footnote omitted)).

The district court in *Christian* began its analysis by holding that the restricted location provision fell within the plain text of the Second Amendment by infringing on the right—first announced in *Bruen*—to carry firearms *outside*

246

the home.  Accordingly, the district court placed the burden on the State to prove

§ 265.01-d's consistency with the Nation's tradition of regulation.

To carry its burden, the State cited the same analogues as it did in

*Antonyuk*: (1) a 1715 Maryland law barring people with certain convictions from

hunting or carrying on other peoples' land without their permission, J.A. at 108

(1715 Md. Laws, No. 73 (An Act for the Speedy Tryal of Criminals, and

Ascertaining their Punishment, in the County-Courts, when Prosecuted there;

and for Payment of Fees due from Criminal Persons)); (2) a 1721 Pennsylvania

law and 1722 New Jersey law prohibiting carriage or hunting "on the improved

or inclosed lands of any plantation other than his own, unless have license or

permission," *id.* at 113 (1721 Pa. Laws, ch. 246 (An Act to prevent the killing of

deer out of season, and against carrying of guns, or hunting, by persons not

qualified)); *id.* at 119 (1722 N.J. Laws, ch. 35 (An Act to prevent the killing of deer

out of season, and against carrying of guns and hunting by persons not

qualified)); (3) a 1763 New York law prohibiting "carry[ing], shoot[ing] or

discharg[ing]" any firearm on private land without permission from the

proprietor, *id.* at 124 (1763 N.Y. Laws, ch. 1233 (An Act to prevent hunting with

Fire-Arms in the City of New-York, and the Liberties thereof)); (4) an 1865

Louisiana law and 1866 Texas law prohibiting carriage on plantations without an owner's permission, *id.* at 137 (1865 La. Acts 14); *id.* at 144 (1866 Tex. Gen. Laws ch. 90); and (5) an 1893 Oregon law prohibiting "being armed . . . or trespass[ing] upon any enclosed premises or lands without the consent of the owner," *id.* at 151 (1893 Or. Laws 79).

The *Christian* court, primarily by reference to the reasoning in *Antonyuk*, held that the State's analogues failed to establish a tradition consistent with § 265.01-d. As previously described, *Antonyuk* rejected the State's analogues because they were "aimed at preventing hunters (sometimes only hunters who are convicted criminals) from taking game off of other people's land (usually enclosed) without the owner's permission." *Antonyuk*, 639 F. Supp. 3d at 340. And barring "*some* people from *openly* carrying rifles on other people's farms and lands in 19th century America," concluded the court, "is hardly analogous to barring *all* license holders from carrying *concealed* handguns in virtually *every commercial building* now." *Id.* at 341.

In addition to adopting *Antonyuk*'s rationale, the *Christian* court made a few of its own observations. Though "property owners have always had the right to exclude others from their property and, as such, may exclude those

carrying concealed handguns," the *Christian* court emphasized that "that right has always been one *belonging to the private property owner*—not to the State." *Christian*, 642 F. Supp. 3d at 407.  The district court concluded that "the scope of the right codified in the Second Amendment demonstrates that this society—this nation—has historically" had the default arrangement that carrying firearms on private property is generally permitted absent the owner's prohibition.  *Id.* at 408 (emphasis removed).  Finally, the court observed that because "the vast majority of land in New York is held privately" the effect of the restricted location provision is to render most of the state "presumptively off limits."  *Id.*

**B.  Merits Analysis of *Christian* and *Antonyuk***

We begin our analysis of the two cases in reverse and first address the narrower injunction issued by the *Christian* court.

1.  <u>*Christian*</u>

a.  *Scope of Second Amendment*

We agree with the district court that, to the extent the restricted location provision applies to private property open to the public, the regulated conduct falls within the Second Amendment right to carry firearms in self-defense outside the home.  *See Bruen*, 142 S. Ct. at 2135 ("the Second Amendment guarantees a general right to public carry").  Otherwise, as the district court

observed, because over 91 percent of land in New York state is privately held, the restricted location provision would turn much of the state of New York into a default no-carriage zone. [110]  We need not and do not decide, however, whether the Second Amendment includes a right to carry on private property *not* open to the public.  *See Bruen*, 142 S. Ct. at 2134 (explaining that though there is a general right to *public* carriage "we do not undertake an exhaustive historical analysis of the full scope of the Second Amendment" (ellipses omitted) (quoting *Heller*, 554 U.S. at 626)."

On appeal, the State argues that because the district court failed to consider whether there is a Second Amendment right to carry firearms on private property not open to the public, it short-circuited the first step of the analysis and thus erroneously put the burden on the State to establish § 265.01-e's consistency with the National tradition.  However, the *Christian* Plaintiffs bring an as-applied pre-enforcement challenge to the restricted location provision only insofar as it applies to private property open to the public, so they were only required to show, and the district court was only required to consider, whether carrying a

---

[110] *See* Ruqaiyah Zarouk, *Mapping Private vs. Public Land in the United States*, Am. Geographical Soc'y, *available at* https://ubique.americangeo.org/map-of-the-week/map-of-the-week-mapping-private-vs-public-land-in-the-united-states/ [https://perma.cc/4GFS-UPJL].

firearm for self-defense on private property open to the public was within the plain text of the Second Amendment. This is what the district court did. Guided by *Bruen*'s holding that the Second Amendment protects the right to bear arms for self-defense outside the home, the district court concluded that the conduct regulated by § 265.01-d and challenged by Plaintiffs—carriage on private property open to the public—fell within the Second Amendment's plain text.

We likewise reject the State's argument in reliance on the Eleventh Circuit's pre-*Bruen* decision in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), that the conduct regulated by the restricted locations provision is not within the Second Amendment's plain text. *GeorgiaCarry.Org* involved "both a facial and an as-applied challenge in pre-enforcement review." *Id.* at 1244. Yet, because the plaintiffs "ha[d] not included sufficient allegations to show how the [Georgia law] would be applied in their specific case," *i.e.*, to bring an as-applied pre-enforcement challenge, the *GeorgiaCarry.Org* court addressed only the plaintiff's facial challenge. *Id.* at 1260 & 1260 n.34. As such, the *GeorgiaCarry.Org* plaintiffs were required to advocate for a facial challenge, "tak[ing] the position that the Second Amendment protects a right to bring a firearm on the private property of another against the wishes of the owner." *Id.* at 1261. It was against

251

this background that the Eleventh Circuit concluded that "the Second Amendment does not give an individual a right to carry a firearm on [private property] against the owner's wishes." *Id.* at 1266.

*GeorgiaCarry.Org* has no bearing on the scope of the Second Amendment as it is invoked by Plaintiffs in this case, because these Plaintiffs, unlike those in *GeorgiaCarry.Org,* have properly pleaded an as-applied, pre-enforcement challenge to the restricted location provision's default presumption against carriage on private property open to the public. [111] *See* J.A. 25 (*Christian* Compl. at ¶ 37) (challenging the "default anti-carry rule" with "respect to places open to the public"). Accordingly, they are not required to show that carriage on private

---

[111] Plaintiffs' complaint pleads that the restricted location provision's default rule prevents them from exercising their Second Amendment rights because "the property owner who does not know about the new presumption will fail to post clear and conspicuous signage permitting the carrying of firearms or otherwise fail to give the express consent that the property owner does not know is needed," that an "indifferent" property owner "will fail to post clear and conspicuous signage or provide express consent, even though before the enactment, he would have allowed individuals to carry as a result of being indifferent to ban it," or that "a property owner, who would like to allow the carry of firearms, will fail to post the required signage or give the required consent for fear of stigma." J.A. 33–34 (*Christian* Compl. ¶ 40e). Thus, the Plaintiffs challenge the provision's application only in those cases where the property owner would, were it not for the regulation's default, invite or consent to carriage. Further, the Plaintiffs have sufficiently alleged how the provision would apply in their specific cases. *See id.* at 35–37 (*Christian* Complaint ¶¶ 42, 44); *see, e.g., id.* at 36–37 (*Christian* Compl. ¶ 44) ("Christian typically brings his firearm with him on private property open to the public, such as weekly visits to gas stations and monthly visits to hardware stores, and he intended to continue to do so, but for the enactment and enforcement of [the restricted locations provision]").

property against a property owner's expressed wishes is within the Second Amendment's plain text, and *GeorgiaCarry.Org*'s holding is inapplicable.

Because the conduct at issue in this appeal regulated by § 265.01-d is within the plain text of the Second Amendment, the district court properly placed the burden on the State to demonstrate § 265.01-d's consistency with a well-established and representative National tradition. We now turn to this analysis.

### b. *The State's Analogues on Appeal*

The State relies on the same analogues here as it did in the district court: (1) the 1715 Maryland law barring people "convicted of [certain crimes] . . . or . . . of evil fame, or any vagrant, or dissolute liver," from "shoot[ing], kill[ing], or hunt[ing], or . . . carry[ing] a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave," J.A. 108 (1715 Md. Laws, No. 73); (2) the 1721 Pennsylvania law and 1722 New Jersey law prohibiting carriage or hunting "on the improved or inclosed lands of any plantation other than his own, unless have license or permission," *id.* at 113 (1721 Pa. Laws, ch. 246); *see also id.* at 119 (1722 N.J. Laws, ch. 35); (3) the 1763 New York law prohibiting "carry[ing], shoot[ing] or discharg[ing]" any firearm in any "Orchard, Garden, Corn-Field, or other inclosed Land . . . without License" from the proprietor, *id.*

at 124 (1763 N.Y. Laws, ch. 1233); (4) the 1865 Louisiana law and 1866 Texas law

prohibiting carriage on the "premises plantations of any citizen, without the

consent of the owner or proprietor," *id.* at 137 (1865 La. Acts 14); *see also id.* at 144

(1866 Tex. Gen. Laws ch. 90); and (5) the 1893 Oregon law prohibiting anyone

"other than an officer on lawful business, [from] being armed . . . or trespass[ing]

upon any enclosed premises or lands without the consent of the owner," *id.* at

151 (1893 Or. Laws 79).  The State urges that the restricted locations regulation is

consistent with these historical statutes.  We disagree.

We assume without deciding that the State's analogues demonstrate a

well-established and representative tradition of creating a presumption against

carriage on enclosed private lands, *i.e.*, private land closed to the public.  But we

do not agree that these laws support the broader tradition the State urges.  These

analogues are inconsistent with the restricted location provision's default

presumption against carriage on private property *open* to the public.

The State fails to place § 265.01-d within a National tradition because at

least three of its proffered analogues burdened law-abiding citizens' rights for

different reasons than § 265.01-d, and all of its analogues burden Second

Amendment rights to a significantly lesser extent than § 265.01-d.  *See Bruen*, 142

S. Ct. at 2133 (identifying "how and why the regulations burden a law-abiding citizen's right to armed self-defense" as central considerations in the history-and-analogue test). We address each issue in turn.

At least three of the State's proffered analogues were explicitly motivated by a substantially different reason (deterring unlicensed hunting) than the restricted location regulation (preventing gun violence). As the State's own brief concedes, the 1721 Pennsylvania statute, 1722 New Jersey statute, and 1763 New York statute were all aimed at preventing the "damages and inconveniencies" caused "by persons carrying guns and *presuming to hunt* on other people's land." J.A. at 113 (1721 Pa. Laws, ch. 246) (emphasis added); *id.* at 119 (1722 N.J. Laws) (1722 New Jersey statute driven by the "great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land); *id.* at 123–24 (1763 N.Y. Laws, ch. 1233) (1763 New York statute intended to "more effectually [] punish and prevent" the "Practice of Great Numbers of idle and disorderly persons . . . to hunt with Fire-Arms").[112]  Similarly, the 1715 Maryland statute prohibited only convicted criminals from carrying a firearm on

---

[112] Though the remaining statutes are not by their own terms aimed at deterring poaching, the State has placed no evidence in the record regarding whether the motivation behind these statutes was in line with the motivation behind § 265.01-d.

"any person's land, whereon there shall be a seated plantation, without the owner's leave," *id.* at 108 (1715 Md. Laws, No. 73).  No matter how expansively we analogize, we do not see how a tradition of prohibiting illegal hunting on private lands supports prohibiting the lawful carriage of firearms for self-defense on private property open the public.

What is more, *none* of the State's proffered analogues burdened Second Amendment rights in the same way as § 265.01-d.  All of the State's analogues appear to, by their own terms, have created a default presumption against carriage only on private lands *not open to the public*.  The three analogues just cited above, as well as the 1715 Maryland statute, prevented guns on "land," J.A. at 108 (1715 Md. Laws, No. 73), "improved or inclosed lands," *id.* at 133 (1721 Pa. Laws, ch. 246) and *id.* at 119 (1722 N.J. Laws, ch. 35) (prohibiting same), or on any "Orchard, Garden, Cornfield, or other inclosed Land," *id.* at 124 (1763 N.Y. Laws, ch. 1233).  Meanwhile, even those statutes that were not limited by their terms to hunting prevented carriage on "any Lands not [one's] own," *id.* at 127 (1771 N.J. Laws, ch. 540 (An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns)), "the premises or plantations of any citizen," *id.* at 137 (1865 La. Acts 14) and *id.* at 144 (1866 Tex. Gen. Laws ch. 90) (1866 Texas

statute), or the "enclosed premises or lands" of another, *id.* at 151 (1893 Or. Laws 79). As it has been developed thus far, the historical record indicates that "land," "improved or inclosed land" and "premises or plantations" would have been understood to refer to private land not open to the public.[113] The State has produced no evidence that those terms were in fact otherwise understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public. Given that most spaces in a community that are not private homes will be composed of private property open to the public to which § 265.01-d applies, the restricted location provision functionally creates a universal default presumption against carrying firearms in public places, seriously burdening lawful gun owners' Second Amendment rights. That burden is entirely out of step with that imposed by the proffered

---

[113] *See State v. Hopping*, 18 N.J.L. 423, 424 (1842) ("*improvements* is a legal and technical word, and means inclosures, or inclosed fields: lands fenced in, and thus withdrawn and separated from the wastes or common lands"); *Land*, WEBSTER'S AM. DICTIONARY OF THE ENGLISH LANG. (1828), *available at* https://webstersdictionary1828.com/Dictionary/land [https://perma.cc/3A9Y-SKWQ] ("Any small portion of the superficial part of the earth or ground. We speak of the quantity of *land* in a manor. Five hundred acres of *land* is a large farm."); *Plantation*, WEBSTER'S AM. DICTIONARY OF THE ENGLISH LANG. (1828), *available at* https://webstersdictionary1828.com/Dictionary/plantation [https://perma.cc/6DG8-QTFQ] ("In the United States and the West Indies, a cultivated estate; a farm."); *Premises*, WEBSTER'S AM. DICTIONARY OF THE ENGLISH LANG. (1828), *available at* https://webstersdictionary1828.com/Dictionary/premises [https://perma.cc/AKG7-DEL7] ("In *law*, land or other things mentioned in the preceding part of a deed.").

analogues, which appear to have created a presumption against carriage only on private property not open to the public.

In sum, the State's analogues fail to establish a National tradition motivated by a similar "how" or "why" of regulating firearms in property open to the public in the manner attempted by § 265.01-d. Accordingly, the State has not carried its burden under *Bruen*.

Because the State has failed to situate § 265.01-d's prohibition on carriage on private property open to the public, we affirm the district court's injunction.

### 2.  *Antonyuk*

We now turn to *Antonyuk*, in which the district court issued a broader injunction that enjoined enforcement of § 265.01-d as applied to both private property open to the public and private property not open to the public. For their facial challenge to support the blanket injunction that was issued, the *Antonyuk* Plaintiffs were required to show that § 265.01-d was unconstitutional in all of its applications. *See United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[L]itigants mounting a facial challenge to a statute normally must establish that *no set of circumstances* exists under which the statute would be valid" (internal quotation marks omitted and alterations adopted)). Yet, per the district court's

own analysis, the Plaintiffs secured a blanket injunction without making this necessary showing below.

The district court accepted the State's argument that § 265.01-d could, consistent with the Second Amendment, be applied to restrict carriage on private property closed to the public. *Antonyuk*, 639 F. Supp. 3d at 343 ("[T]o the extent to which [§ 265.01-d] restricts concealed carry on privately owned property that is *not open to the public* . . . the Second Amendment is not the best place to look for protection from that restriction, because thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's own home or in *public*.") (emphasis in original). Having accepted the State's argument that there was at least one set of circumstances in which the statute could be valid under the Second Amendment, it was error for the district court to subsequently enjoin § 265.01-d in all its applications.[114] *See Wash. State*

---

[114] The State's apparent willingness to adopt the district court's approach, by declining to draw a distinction in § 265.01-d or the Second Amendment between property open to the public and property not open to the public, does not alter our analysis. The State cannot waive the rule that courts cannot facially invalidate a statute unless it is unconstitutional in all of its applications because this rule is a necessary "exercis[e] of judicial restraint" without which a facial challenge would "run contrary to the fundamental principle of judicial restraint." *Wash. State Grange*, 552 U.S. at 450. This requirement of total facial invalidity is a salutary and necessary limit on judicial power, not a protection for the defendant in constitutional litigation. *See id.* ("[J]udicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in

259

*Grange*, 552 U.S. at 449–50 ("[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [statute] would be valid, *i.e.,* that the law is unconstitutional in all of its applications" (internal quotation marks omitted and alterations adopted)).[115]

\* \* \*

For the reasons stated above, we **AFFIRM** the *Christian* court's preliminary injunction enjoining enforcement of § 265.01-d's with respect to private property open to the public; we **MODIFY** and **AFFIRM** the injunction issued in *Antonyuk* to conform to that issued in *Christian*, enjoining enforcement of § 265.01-d with respect to private property open to the public; and **REMAND** the preliminary

---

areas where their constitutional application might be cloudy" (internal quotation marks omitted)).

[115] Because we conclude that the restricted locations provision of the CCIA violates the Second Amendment, we need not address Plaintiffs' contention that the provision violates the First Amendment by requiring owners of private property generally open to the public who wish to welcome visitors carrying concealed firearms to say so.

We confess to a certain skepticism about that claim. If private property owners are free either to grant or refuse access to visitors, a default rule that consent is presumed would compel speech on the part of proprietors to forbid firearms just as much as the CCIA requires speech from those who would welcome them. That someone will need to express his wishes regardless of the chosen default rule is just a fact of life, and not a violation of the First Amendment. Plaintiffs' argument, however, points up a further reason why the restricted location default rule impinges on the *Second* Amendment. If that Amendment grants a presumptive right to carry firearms in public places, and the State must — even by its silence — create a default rule as to the presumption to be applied when the owner of property open to the public does not express a preference, the choice of a default rule that discriminates against the Second Amendment right is inherently problematic.

injunction as to § 265.01-d with respect to private property not open to the public for further merits analysis consistent with this opinion.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the injunctions in part, **VACATE** in part, and **REMAND** for proceedings consistent with this opinion. In summary, we uphold the district court's injunctions with respect to N.Y. Penal L. § 400.00(1)(o)(iv) (social media disclosure); N.Y. Penal L. § 265.01-d (restricted locations) as applied to private property held open to the general public; and N.Y. Penal L. § 265.01-e(2)(c) as applied to Pastor Spencer, the Tabernacle Family Church, its members, or their agents and licensees. We vacate the injunctions in all other respects, having concluded either that the district court lacked jurisdiction because no plaintiff had Article III standing to challenge the laws or that the challenged laws do not violate the Constitution on their face.[116]

---

[116] We emphasize that we are here reviewing facial challenges to these provisions at a very early stage of this litigation. A preliminary injunction is not a full merits decision, but rather addresses only the "*likelihood* of success on the merits." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (emphasis added); *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). Our affirmance or vacatur of the district courts' injunctions does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis, both in these cases as they proceed and perhaps in other cases.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit


261