

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

September 4, 2024

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for
 the Second Circuit
40 Foley Square
New York, NY 10007

    Re: *Antonyuk v. James*, Nos. 22-2908, 22-2972

Dear Ms. Wolfe:

    I submit this letter brief on behalf of defendants-appellants in response to the Court's August 7, 2024, order (ECF No. 429), directing the parties to submit supplemental briefs on the question of how the U.S. Supreme Court's recent opinion in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), should affect the December 8, 2023, judgment of this Court.

    As explained in more detail below, *Rahimi* overwhelmingly supports the constitutionality of the provisions of New York's Concealed Carry Improvement Act (CCIA) at issue on this appeal. Specifically, *Rahimi*

supports this Court's decision vacating preliminary injunctions as to certain licensing requirements and certain prohibitions on firearms in sensitive places. In addition, *Rahimi* counsels modifying the judgment so as to vacate in its entirety the preliminary injunction as to the requirement that a person obtain the consent of the property owner before carrying firearms on private property.

Writing for an eight-justice majority, Chief Justice John Roberts explained that the Second Amendment "was never thought to sweep indiscriminately" and that "the bearing of arms was subject to regulations" of various forms since the founding. 144 S. Ct. at 1897. Accordingly, the role of the judiciary in evaluating Second Amendment challenges is to "consider[] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," rather than to search for a historical "dead ringer" or "twin." *Id.* at 1898. The Court also reiterated the high bar applicable to facial constitutional challenges, explaining that "the [g]overnment need only demonstrate that [the challenged law] is constitutional in some of its applications" to prevail. *Id.* The Court applied these standards to uphold the constitutionality of a federal statute prohibiting persons subject to orders of protection for

domestic violence from possessing firearms, explaining that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.*

The Supreme Court's analytical approach in *Rahimi* parallels the similarly flexible analytical approach this Court applied in *Antonyuk* to evaluate provisions in New York's CCIA against the historical tradition of gun regulation. Moreover, the licensing provisions challenged in this case are justified by the same historical principle recognized in *Rahimi*: the Second Amendment permits restrictions on use of firearms by persons who are found to be dangerous. The sensitive-place provisions at issue here are similarly consistent with other longstanding principles of gun regulation, including, for instance, restrictions on firearms in unusually crowded public places and places where vulnerable people are present. And under the approach endorsed by *Rahimi*, the private-property provision is consistent with the longstanding principle that property owners may require consent before permitting firearms on their property. Moreover, all of plaintiffs' challenges suffer from the same fundamental weaknesses inherent in facial constitutional challenges to state laws.

# BACKGROUND

### A.  This Court's Decision in *Antonyuk*

In its December 2023 opinion, this Court vacated a preliminary injunction against enforcement of several provisions of the CCIA firearm licensing scheme designed to disarm dangerous individuals, as well as several provisions of the CCIA prohibiting firearms in specified sensitive places. *See* 89 F.4th at 305-331, 333-342, 352-79. The Court also affirmed, as modified, a preliminary injunction against enforcement of the CCIA's provision requiring a person to obtain the owner's consent before carrying firearms on private property, though only insofar as that injunction applied to private property held open to the public. *See id.* at 379-87.

At the outset, this Court explained that facial constitutional challenges, such as those brought by plaintiffs, are "disfavored because they often rest on speculation," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 317 (quotation marks omitted). The Court therefore held that plaintiffs' facial Second Amendment challenges must fail so long as the challenged

provisions have, at a minimum, some constitutional applications. *See* 89 F.4th at 312-17, 328-29, 356, 362-63.

In its comprehensive analysis of the merits of plaintiffs' Second Amendment claims, this Court cautioned against an overly rigid interpretation of the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, which requires modern restrictions on the Second Amendment right to be "consistent with the Nation's historical tradition of firearm regulation," 597 U.S. 1, 24 (2022). *See* 89 F.4th at 300-05. For instance, this Court noted that "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id.* at 301. That is because "the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction," *id.* at 302, and "[l]egislatures past and present have not generally legislated to their constitutional limits," *id.* at 301. Thus, this Court explained that the government must identify historical analogs sharing common principles with the challenged modern law, rather than "search[ing] in vain for a historical twin." *Id.* at 302-03 (quotation marks and emphasis omitted). The Court applied this methodological framework to conclude

5

that most of the CCIA provisions challenged by plaintiffs are consistent with the Second Amendment, notwithstanding that there may not have been identical historical precursors from the Founding era. *See* 89 F.4th at 311-331, 337-342, 353-69, 373-76.

## B. The Supreme Court's Decision in *Rahimi*

In June 2024, the U.S. Supreme Court upheld against a Second Amendment challenge the federal statute prohibiting individuals subject to domestic violence restraining orders from possessing firearms, 18 U.S.C. 922(g)(8). The Fifth Circuit had rejected the argument that the law was supported by historical precedents including laws disarming persons based on categorical determinations of dangerousness, "going armed" laws that prohibited carrying arms in public to the terror of the people, and surety laws that required individuals deemed dangerous to post a bond to possess a weapon. *See United States v. Rahimi*, 61 F.4th 443, 456-60 (5th Cir. 2023). The Fifth Circuit deemed this entire body of evidence to be insufficiently analogous to the challenged federal statute because the historical laws were not aimed at preventing violence arising out of personal disputes, did not require forfeiture of weapons, and did not prohibit weapon possession altogether. *Id*. Thus, in the Fifth Circuit's

view, a statute prohibiting persons under domestic violence restraining orders from possessing weapons is a regulation "'our ancestors would have never accepted.'" *Id.* at 461 (quotation marks omitted).

The Supreme Court reversed the Fifth Circuit in an 8-1 decision, holding that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 144 S. Ct. at 1896. At the outset, the Supreme Court emphasized that a facial Second Amendment challenge to a firearm law must fail when the plaintiff has not demonstrated that the challenged law is invalid in all applications. Facial challenges cannot succeed based on "hypothetical scenarios" where the challenged law "might raise constitutional concerns," because the law need only be valid in some application. *Id.* at 1903; *see id.* at 1898. As the Court explained, "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." *Id.* at 1903 (quotation and alteration marks omitted).

On the merits, the Supreme Court emphatically rejected the Fifth Circuit's approach to Second Amendment challenges, echoed by Justice Thomas's single-justice dissent, *id.* at 1930-47. The Supreme Court

explained that *Bruen* and other precedents "were not meant to suggest a law trapped in amber." *Id.* at 1897. Rather, these cases require courts to consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898; *see id.* at 1904 (Sotomayor, J., concurring); *id.* at 1925 (Barrett, J., concurring). The principles-based analysis recognizes that contemporary regulations need not be limited by centuries-old policy needs, and relatedly that past legislatures may have had no occasion to "maximally exercise[] their power to regulate." *See id.* at 1925 (Barrett, J., concurring).

Applying this standard to *Rahimi*, the Court concluded that the government's cited historical evidence, including "going armed" laws and surety laws, easily justified the challenged federal statute. *Id.* at 1899-1901. Although the historical laws the Court cited were "by no means identical" to the modern challenged law, they "d[id] not need to be." *Id.* at 1901. That is because the historical laws demonstrate a broader principle of the Second Amendment consistent with "what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.*

As in *Bruen*, the Court found it unnecessary to decide "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868," as opposed to when the Bill of Rights was ratified in 1791. *See* 144 S. Ct. at 1898 n.1 (quoting *Bruen*, 597 U.S. at 37). However, a number of the historical laws on which the Court relied were from the nineteenth century, and multiple concurring opinions discussed the value of post-ratification history in constitutional analysis. *See id.* at 1899-1901, 1915-19 (Kavanaugh, J., concurring), 1924 (Barrett, J., concurring).

Shortly after deciding *Rahimi*, the U.S. Supreme Court granted the petition for certiorari in this case, vacated this Court's December 2023 judgment, and remanded for further consideration in light of *Rahimi*. *See Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (July 2, 2024).[1]

---

[1] The Court also granted petitions, vacated judgments, and remanded for further consideration in light of *Rahimi* in seven other cases. *See Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024); *U.S. v. Daniels*, No. 23-376, 2024 WL 3259662 (July 2, 2024); *U.S. v. Perez-Gallan*, No. 23-455, 2024 WL 3259665 (July 2, 2024); *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (July 2, 2024); *Jackson v. U.S.*, No. 23-6170, 2024 WL 3259675 (July 2, 2024); *Cunningham v. U.S.*, No. 23-6602, 2024 WL 3259687 (July 2, 2024); *Doss v. U.S.*, No. 23-6842, 2024 WL 3259684 (July 2, 2024).

## ARGUMENT

### A. *Rahimi* Supports the Constitutionality of the Firearm-Licensing Statute at Issue Here.

*Rahimi* supports this Court's decision finding that plaintiffs were unlikely to succeed on the merits of their constitutional challenges to several provisions of the CCIA's firearm-licensing law, i.e., the good-moral-character requirement to be able to use a firearm in a manner that does not endanger oneself or others, and certain disclosure requirements for evaluating good moral character, N.Y. Penal Law § 400.00(1)(b), (o).[2]

First, *Rahimi*'s discussion of facial challenges, 144 S. Ct. at 1898, 1903, supports this Court's conclusion that the stringent test for facial challenges would likely be fatal to plaintiffs' challenges to the CCIA's licensing requirements. *Rahimi* supports the conclusion that plaintiffs are unlikely to succeed on the merits of their facial challenge to the CCIA's "good moral character" requirement, as there are numerous "applications of the character provision that would be constitutional," 89 F.4th at 314-15. Likewise, *Rahimi* supports the conclusion that plaintiffs are unlikely

---

[2] This Court declined to uphold a social media account disclosure requirement at the preliminary injunction stage, principally because of First Amendment considerations. *See* 89 F.4th at 331-33. Because *Rahimi* does not affect that holding, the defendants-appellants do not contest it here.

to succeed on the merits of their facial challenge to the CCIA provision requiring applicants to submit "such other information required by the licensing officer that is reasonably necessary and related" to review of the application, as "there are plenty of possible applications that would be permissible." *See id.* at 328-29 (quotation marks omitted).

Second, *Rahimi* supports this Court's determination that the CCIA's good-moral-character requirement as well as the disclosure requirements to evaluate good moral character are likely consistent with established Second Amendment principles. *See id.* at 314-31. This Court in *Antonyuk* relied on the same core principle relied on in *Rahimi*, namely that governments can lawfully disarm dangerous individuals. *Compare* 144 S. Ct. at 1898, 1903, *with* 89 F.4th at 302-03. As this Court explained, the CCIA's definition of "good moral character" "is a proxy for dangerousness," and there is "widespread consensus (notwithstanding some disputes at the margins) that restrictions which prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation." 89 F.4th at 312; *see id.* at 312-31.[3] Moreover, this Court identified

---

[3] Because the CCIA requires a dangerousness showing, *see, e.g.*, 89 F.4th at 312, 315, the paragraph in *Rahimi* rejecting the contention that

many firearm licensing laws from the nineteenth-century period when the Second Amendment was incorporated against the States that closely resemble New York's modern law. *See*, *e.g.*, *id.* at 318-21.[4]

## B. *Rahimi* Supports the Constitutionality of the Sensitive-Place Provisions at Issue Here.

The Supreme Court's reasoning in *Rahimi* also strongly supports this Court's determination that plaintiffs are unlikely to prevail on the merits of their Second Amendment challenges to the CCIA's statutory provisions prohibiting firearms in a number of sensitive places,[5] *see* N.Y. Penal Law § 265.01-e.

---

an individual may be disarmed "simply because he is not 'responsible'" has no application here. *See* 144 S. Ct. at 1903.

[4] Accordingly, the *en banc* Fourth Circuit recently upheld the constitutionality of a Maryland firearm licensing provision similar to New York's, by a vote of 14-2. The majority found that the licensing provision did not infringe the Second Amendment at all (an issue this Court declined to reach in evaluating New York's licensing provision, *see* 89 F.4th at 312-13), while Judge Rushing's concurrence relied on *Rahimi* to conclude that Maryland's licensing provision is consistent with the historical principle that dangerous individuals could be disarmed. *See Md. Shall Issue v. Moore*, No. 21-2017, 2024 WL 3908548 (Aug. 23, 2024).

[5] This letter discusses only plaintiffs' challenges to sensitive-place provisions governing public parks, zoos, theaters, premises licensed for alcohol consumption, and locations providing behavioral health or chemical dependence care or services, as this Court's opinion did not reach the merits of plaintiffs' challenges to other sensitive-place provisions governing places of worship, conference centers, banquet halls, and First

First, *Rahimi's* discussion of facial challenges, 144 S. Ct. at 1898, 1903, supports this Court's conclusion that several of plaintiffs' facial constitutional challenges are improper. For example, this Court correctly held that plaintiffs' facial challenge to the sensitive-place provision governing firearms in public parks could not succeed merely because there may be hypothetical questions as to whether the provision could be constitutionally applied to rural wilderness parks or reserves, when the provision has many lawful applications, at a minimum, to urban public parks. *See* 89 F.4th at 356, 362-63.

Second, just as the Supreme Court did in *Rahimi*, this Court properly analyzed the challenged provisions by distilling broader principles of the nation's regulatory tradition and evaluating the provisions against those principles, rather than looking for historical "dead ringers," 144 S. Ct. at 1898-99 (quotation marks omitted). This Court recognized several principles supporting the sensitive-place provisions at issue in this case. For

---

Amendment gatherings, either because the plaintiffs lacked standing to challenge them, or because their challenge was moot. *See* 89 F.4th at 343, 369-73, 376-79. *Rahimi* does not provide any basis to reconsider those holdings, which are correct.

instance, the Court recognized the principle that there is a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." 89 F.4th at 356. The Court rightly relied on that principle to support several sensitive-place provisions governing crowded public places, i.e., public parks, zoos, theaters, and bars and restaurants licensed for alcohol consumption. *See id.* at 355-69, 374-76.[6]

This Court also recognized the principles that there are well established traditions of firearm regulation in locations where "vulnerable populations are present," 89 F.4th at 339-41, and where "people with impaired self-control or judgment," and specifically intoxicated people, are present, *id.* at 367. The Court again rightly relied on those principles to support several sensitive-place provisions, including those governing zoos (where vulnerable children are often present), premises licensed for

---

[6] In doing so, this Court relied on historical analogs including the medieval Statute of Northampton, noting that the Supreme Court in *Bruen* had rejected reliance on that statute only in a different context. *See* 89 F.4th at 355-57 & n.74, 374. In *Rahimi*, the Supreme Court likewise relied on that statute, *see* 144 S. Ct. at 1899, 1901, thus confirming this Court's conclusion that *Bruen*'s decision not to rely on that statute was limited to its context, *see* 89 F. 4th at 357 n.74.

alcohol consumption (where intoxicated people are often present), and locations providing behavioral health or chemical dependence care or services (where people with disabilities are often present). *See id.* at 338-41, 363-69. *Rahimi* provides further support for reliance on these traditions; for example, the majority cites "restrictions on gun use by drunken New Year's Eve revelers" as one of the many forms of historical regulation on firearm possession. *See* 144 S. Ct. at 1897.

## C. *Rahimi* Supports the Constitutionality of New York's Private-Property Provision.

The Supreme Court's reasoning in *Rahimi* also makes clear that the CCIA's statutory provision requiring the property owner's consent in order to carry a firearm on the owner's property, *see* N.Y. Penal Law § 265.01-e, is constitutional in its entirety, and this Court's prior judgment should be modified insofar as it affirmed the district court's preliminary injunction against enforcement of that provision as applied to property open to the public.

As *Rahimi* demonstrates, plaintiffs' Second Amendment challenge to the private-property provision should be analyzed in light of broader historical principles underpinning the nation's regulatory tradition—not as though Second Amendment law was "trapped in amber" in 1791. *See*

144 S. Ct. at 1897-98. The private-property provision is consistent with the longstanding principle that private property owners may require consent before permitting firearm carrying on their property, just as they may require consent before permitting other activities on their property. As the state defendants demonstrated, numerous Founding- and Reconstruction-era laws required property owners' consent to carry firearms on the owners' property. *See* Br. for Appellants Nigrelli & Doran at 74-76, ECF No. 95; Reply Br. for Appellants Nigrelli & Doran at 36-38, ECF No. 347. The private-property provision does the same today. *See* N.Y. Penal Law § 265.01-e.

*Rahimi* makes clear that a modern statute may find support in historical analogs even though the concerns it addresses may not be identical to the concerns addressed by historical analogs. In *Rahimi*, the Supreme Court upheld the constitutionality of a statute disarming individuals subject to domestic violence restraining orders, even though domestic violence was not the concern motivating the historical analogs on which the Court relied. *See* 144 S. Ct. at 1898-1902. So too here, some of the eighteenth- and nineteenth-century laws requiring consent to carry firearms on others' property referenced preventing poaching among their

goals—in an era when widespread hunting made poaching a highly salient concern. The modern private-property provision does not reference poaching—but it "does not need to," 144 S. Ct. at 1901. The fact that consent laws today may be motivated less by poaching and more by gun violence in no way undermines the force of the underlying principle that owners may decide whether to permit firearms on their property.

For similar reasons, if some historical consent laws may have largely focused on property closed to the public, that would not undermine their force as historical analogs for private property open to the public. To the extent historical private property laws were aimed at poaching, they would also have been aimed at property closed to the public, because that is where poaching was typically a problem. By contrast, modern gun violence is a problem both on property closed to the public and—perhaps even more so—property open to the public. Thus, New York's modern law rightly covers both. *Rahimi* instructs that absence of a precise match between the modern law and its historical analogs does not mean the modern law cannot pass constitutional muster, where, as here, both the modern law and its historical analogs are rooted in a common principle

like protecting property owners' right to consent to firearms on their property. *See id.* at 1898.

In any event, the historical analogs for the private-property provision applied not only to property closed to the public, but also to property open to the public.[7] The historical analogs prohibited carrying firearms without the property owner's consent on, for example, any private "Lands" (1771 N.J. law); any "premises or plantations" (1865 La. law); any "inclosed Land whatsoever" (1763 N.Y. law); or "any enclosed premises or lands" (1893 Or. law). (Joint Appendix 706, 712, 721, 733.) Such broad terms cover both property closed to the public and open to the public, and did so at the time the statutes were enacted.

For instance, a leading Founding-era dictionary relied on by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 581, 587-

---

[7] The state defendants did not focus on this issue in the limited space available in their original briefing because the issue was not squarely presented by the district court's opinion on appeal or by plaintiffs' appeal brief, which each focused on the contention that historical analogs the state defendants cited differed from the modern private-property provision in that they addressed poaching. (*See* Special Appendix 167-173; Pls.-Appellees' Answering Br. in Resp. to Defs.-Appellants Nigrelli & Doran at 54-56, ECF No. 277.) The closed-vs.-open-to-the-public issue is developed further in the summary judgment record in *Christian v. James*, No. 22-cv-695 (W.D.N.Y.), ECF Nos. 77, 86.

88 (2008), explained that "land," "[i]n a general and legal signification," includes "all kinds of grounds" and "all edifices whatsoever"—not just property closed to the public. 2 Timothy Cunningham, *A New and Complete Law-Dictionary* (2d ed. 1771).[8] Likewise, early American dictionaries defined "premises" to include any property, not just property closed to the public. *See, e.g.*, 2 Noah Webster, *An American Dictionary of the English Language* 344 (1828) ("[i]n *law*, land or other things mentioned in the preceding part of a deed").[9] And the same early dictionaries made clear that "inclosed" or "enclosed" land need not be closed to the public, but merely fenced in. *See, e.g.*, 1 Webster, *An American Dictionary* 951,

---

[8] Accordingly, early American case law regularly referred to "land" open to the public. *See, e.g.*, *Gardiner Cotton & Woolen Factory Co. v. Inhabitants of Gardiner*, 5 Me. 133, 134 (1827) ("lot of land . . . with a store upon it"); *Burk v. Huber*, 2 Watts 306, 306 (Pa. 1834) ("land . . . whereon are a tavern and other buildings"); *Deare v. Carr*, 3 N.J. Eq. 513, 513 (N.J. Ch. 1836) ("lot of land . . . with a tavern upon it"); *Atkins v. Chilson*, 50 Mass. 52, 53 (1845) ("parcel of land, with a store thereon"); *Eaton v. Whitaker*, 18 Conn. 222, 222-23 (1846) ("lot of land" for "store, suitable for the grocery business").

[9] Early American case law also regularly referred to "premises" open to the public. *See, e.g.*, *Gates & Colvin v. Green*, 4 Paige Ch. 355, 355 (N.Y. Ch. 1834) ("premises" "on which there was a tavern house and out buildings"); *Norman v. Wells*, 17 Wend. 136, 156 (N.Y. Sup. Ct. 1837) ("premises occupied as a wine tavern"); *People v. Jones*, 54 Barb. 311, 312 (N.Y. Gen. Term 1863) ("premise" used as tavern); *Hendricks' Curator v. Mon*, 11 La. 137, 138 (1837) ("premises" of grocery store).

*supra*; *see also Land*, *Black's Law Dictionary* (12th ed. 2024) (term "enclosed land," dating to seventeenth century, means "[l]and that is actually enclosed and surrounded with fences").[10] Even "plantations" often included areas open to the public.[11]

Accordingly, New York's private-property provision continues a longstanding tradition of protecting the right of owners of property—both closed to the public and open to the public—to determine whether and when firearms are permitted on their property.

## CONCLUSION

For all these reasons and those stated in defendants-appellants' original briefs, this Court should vacate the preliminary injunction.

---

[10] Early case law regularly referred to enclosed land open to the public. *See, e.g.*, *State v. Commissioners of Cross Roads for Charleston Neck*, 21 S.C.L. 149, 153 (S.C. Ct. App. L. 1836) ("[i]n all the cities of this confederacy the custom as to their public squares, is to enclose and plant them, leaving gates for the access of the citizens"); *Beatty v. Kurtz*, 27 U.S. 566, 567, 568, 570, 575, 577, 579-81 (1829) (referring to "enclosed" church, graveyard, and school land); *Farmer v. Commonwealth*, 35 Va. 741, 741 (Va. Gen. Ct. 1837) (tavern house and barn used for public gambling were in separate "enclosures").

[11] *See, e.g.*, *McFarland v. Hughling*, 1 Tenn. 263, 263 (1807) (referencing "plantation and tavern known by the name of New market"); *Farmer*, 35 Va. at 742 (1837) (referencing "plantation" with tavern house and gambling barn).

Respectfully submitted,

SUSAN R. KATZOFF
  *Corporation Counsel*
  *City of Syracuse*
Attorney for Appellant
  Joseph Cecile

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellants

By:   */s/ Philip J. Levitz*
     PHILIP J. LEVITZ

TODD M. LONG
  *Senior Corporation Counsel*
DANIELLE R. SMITH
  *First Assistant Senior*
  *Corporation Counsel*

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
PHILIP J. LEVITZ
  *Senior Assistant Solicitor General*