# 22-2908(L)

## 22-2972 (Con)

## United States Court of Appeals
## For the Second Circuit

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, AND LAWRENCE SLOANE,

*Plaintiffs-Appellees*

v.

STEVEN G. JAMES, IN HIS OFFICIAL CAPACITY AS ACTING SUPERINTENDENT OF THE NEW YORK STATE POLICE, MATTHEW J. DORAN, IN HIS OFFICIAL CAPACITY AS THE LICENSING OFFICIAL OF ONONDAGA COUNTY, JOSEPH CECILE, IN HIS OFFICIAL CAPACITY AS THE CHIEF OF POLICE OF SYRACUSE,

*Defendants-Appellants*

KATHLEEN HOCHUL, IN HER OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF NEW YORK, WILLIAM FITZPATRICK, IN HIS OFFICIAL CAPACITY AS THE ONONDAGA COUNTY DISTRICT ATTORNEY, TOBIAS J. SHELLEY, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF ONONDAGA COUNTY, P. DAVID SOARES, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF OSWEGO COUNTY, DON HILTON, IN HIS OFFICIAL CAPACITY AS THE SHERIFF OF OSWEGO COUNTY, JOSEPH STANZIONE, IN HIS OFFICIAL CAPACITY AS THE DISTRICT ATTORNEY OF GREENE COUNTY,

*Defendants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL BRIEF
## ON *UNITED STATES V. RAHIMI*

Robert J. Olson
William J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
Stephen@sdslaw.us

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    *RAHIMI* CONFIRMS THAT "GOOD MORAL CHARACTER" IS NOT A PREREQUISITE TO EXERCISE SECOND AMENDMENT RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

        A. *Rahimi* Rejects the Notion that Only Persons Deemed Virtuous by the State Have the Right to Bear Arms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

        B. New York's Disarmament Process Does Not Meet *Rahimi* Standards . . .6

        C. "Good Moral Character" Is Not Merely a "Proxy for Dangerousness". .10

    II.    *RAHIMI* CONFIRMS THAT 1791 IS THE SINGULAR FOCAL POINT FOR SECOND AMENDMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . . . .12

        A. This Court's Vacated Opinion Conflicts with *Bruen* and *Rahimi* . . . . . . . 13

        B. *Rahimi* Provides Further Confirmation that 1791 Is the Appropriate Focal Point for Second Amendment Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    III.    *RAHIMI* CONFIRMS THAT THIS COURT MUST WRESTLE WITH THE RACIST ORIGINS OF "GOOD MORAL CHARACTER" . . . . . . .17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

# TABLE OF AUTHORITIES

## Cases

*Aldridge v. Commonwealth*, 4 Va. 447 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . .*passim*

*Antonyuk v. Hochul*, 635 F. Supp. 3d 111 (N.D.N.Y. 2022) . . . . . . . . . . . . . . . . . . . . . .18

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) . . . . . . . . . . . . . . . . . . . . . . 7

*Antonyuk v. James*, 2024 U.S. LEXIS 2929 (July 2, 2024) . . . . . . . . . . . . . . . . . . . . . . . . 1

*Apodaca v. Oregon*, 406 U.S. 404 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*In re Benedetti*, 212 N.Y.S.3d 806 (Sup. Ct. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Biganini v. Gallagher*, 293 A.D.2d 603 (N.Y. App. Div. 2002) . . . . . . . . . . . . . . . . . . . . 10

*Dimino v. McGinty*, 210 A.D.3d 1150 (N.Y. App. Div. 2022) . . . . . . . . . . . . . . . . . . . 9, 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . .2, 11, 17

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

*Gamble v. United States*, 587 U.S. 678 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Harper v. Neary*, 225 A.D.3d 595 (N.Y. App. Div. 2024) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Husejnovic v. DeProspo*, 225 A.D.3d 597 (N.Y. App. Div. 2024) . . . . . . . . . . . . . . . . . . .11

*Kamenshchik v. Ryder*, 78 Misc. 3d 646 (Nassau Cnty. 2023) . . . . . . . . . . . . . . . . . . . 9, 12

*Kantarakias v. Hyun Chin Kim*, 226 A.D.3d 1020 (N.Y. App. Div. 2024) . . . . . . . . . . . 11

*Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 5

iii

*Lynch v. Donnelly*, 465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Morse v. Shea*, 2021 N.Y. Misc. LEXIS 874 (Sup. Ct. 2021) . . . . . . . . . . . . . . . . . . . . . 9, 10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) . . . . . . . . . . . . . . . . . . . . . *passim*

*Pelose v. Cnty. Ct. of Westchester Cnty.*, 53 A.D.2d 645 (N.Y. App. Div. 1976) . . . . . . . . . 12

*Ramos v. Louisiana*, 590 U.S. 83, 91 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 19

*Sibley v. Watches*, 501 F. Supp. 3d 210 (W.D.N.Y. 2020) . . . . . . . . . . . . . . . . . . . . . . .11, 12

*Simmons v. Galvin*, 575 F.3d 24 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*State ex rel. Russo v. Parker*, 57 Fla. 170 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Timbs v. Indiana*, 586 U.S. 146 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Virginia v. Moore*, 553 U.S. 164 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Watson v. Stone*, 4 So. 2d 700 (Fla. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

**Statutes**

18 U.S.C. § 922(g)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 10

2022 N.Y. Sess. Laws ch. 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

N.Y. Penal Law § 400.00(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

N.Y. Penal Law § 400.00(1)(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

N.Y. Penal Law § 400.00(4-a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Constitutions

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 13

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

U.S. Const. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 20

## Other Authorities

A. Hagstrom, *NY Gov. Hochul Defiant After Supreme Court Gun Decision: 'We're Just Getting Started,'* Fox News (June 23, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

K. Ryan, *"The Spirit of Contradiction": Wife Abuse in New England, 1780-1820*, 13 Early American Studies 586 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

B. Samuels, *Trump: 'Take the Guns First, Go Through Due Process Second,'* Hill (Feb. 28, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

## INTRODUCTION

On June 23, 2022, the Supreme Court struck down New York's requirement that a person demonstrate that "proper cause exists" as a condition of being granted a license to possess and carry a handgun. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 12 (2022). Eight days later, New York enacted the "Concealed Carry Improvement Act" ("CCIA"). *See* 2022 N.Y. Sess. Laws ch. 371. Rather than complying with the Supreme Court's decision, New York called *Bruen* reprehensible, reckless, and politicized,[1] and enacted a new statutory scheme which made the concealed carry of firearms far more restrictive, and the licensing process more onerous, than before *Bruen*.

This Court issued its opinion on December 8, 2023. *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ("Op."). Appellees filed a petition for writ of certiorari in the U.S. Supreme Court, which granted certiorari, vacated this Court's judgment, and remanded for "further consideration in light of *United States v. Rahimi.*" *Antonyuk v. James*, 2024 U.S. LEXIS 2929 (July 2, 2024).[2] This Court then ordered supplemental briefing as to how *Rahimi* "affects the judgment of this Court...." *See* Doc. No. 429.

*United States v. Rahimi*, 144 S. Ct. 1889 (2024), confirms that this Court's singular reliance on mid-to-late 19th-century history was improper. Likewise, *Rahimi* rejects outright that a person "may be disarmed simply because he is not 'responsible[]," *id.* at

---

[1] A. Hagstrom, *NY Gov. Hochul Defiant After Supreme Court Gun Decision: 'We're Just Getting Started,'* FOX NEWS (June 23, 2022), https://fxn.ws/3HPDiHu.

[2] Of the eight cases GVRed in light of *Rahimi*, this case is the only one in an interlocutory posture. https://tinyurl.com/msvnjdcv.

1

1903, repudiating this Court's cabining Second Amendment rights to "law-abiding and responsible citizens...." Op. at 314. Next, *Rahimi* reconfirms the text, history, and tradition framework from *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, undermining this Court's view that less "exceptional cases" permit a "more nuanced approach." Op. at 339. Indeed, the *Rahimi* Court made clear that it was following *Bruen*'s methodology to the letter. *Rahimi* at 1898. Finally, *Rahimi* demonstrates that this Court must wrestle with the *complete* history of "good moral character" – including its uniquely racist pedigree – not just a sanitized version from the late 1800s. For these reasons, *Rahimi* confirms that the district court's preliminary injunction challenged on appeal should be affirmed.[3]

## ARGUMENT

I. *RAHIMI* CONFIRMS THAT "GOOD MORAL CHARACTER" IS NOT A PREREQUISITE TO EXERCISE SECOND AMENDMENT RIGHTS.

A. *Rahimi* Rejects the Notion that Only Persons Deemed Virtuous by the State Have the Right to Bear Arms.

---

[3] As to this Court's affirmance of the district court's injunction of the social media disclosure requirement and the private-property ban, *Rahimi* changes nothing and these issues were rightly decided. Indeed, in affirming the injunction as to social media, this Court noted "the absence of any analogous disclosure requirement from the historical record," *no matter the time period*, "combined with the constitutional interests implicated" under the First Amendment "right to speak anonymously." Op. at 333, 331. Likewise, this Court rightly upheld the district court's injunction as to private properties open to the public because Defendants' analogues all dealt with "enclosed private lands, *i.e.*, private land closed to the public," and not all private properties generally. *Id.* at 385.

This Court called New York's "good moral character" requirement "a proxy for dangerousness." Op. at 312; *see also id.* at 315 ("dangerousness is the core of New York's character requirement."). And since "good moral character" purportedly serves to disarm *at least* dangerous persons, allegedly "part of the nation's tradition of firearm regulation," whether it *also* extends to "*all* law-breakers or 'unvirtuous' individuals" is irrelevant. *Id.* at 314, 312. This Court further asserted that dangerous persons are *not the only ones* who can be disarmed, because "the Supreme Court has repeatedly admonished that the Second Amendment protects the rights of law-abiding and responsible citizens and has approved of[4] … regimes that deny firearms licenses to individuals who lack good moral character in the sense that they are not law-abiding and responsible and pose a danger to the community if licensed.…" *Id.* at 314.

---

[4] Plaintiffs disagree that *Bruen*'s footnote 9 "approved" of anything beyond requiring that licensing processes use "narrow, objective, and definite" standards, while flatly prohibiting the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Bruen* at 38 n.9. Indeed, footnote 9 simply contrasted the features of New York's licensing scheme – which *did* prevent some from "exercising their Second Amendment right to public carry" – with other regimes, not at issue, which did "not necessarily prevent" the same because they "appear[ed] to contain" certain features. *Id.* This is not language of approval. Rather, declining to "suggest the unconstitutionality" of a statutory scheme at most indicates neutrality. But more importantly, the vast majority of the "43 … 'shall-issue' licensing regimes" the Court identified do not condition public carry on issuance of a license, with many either being "constitutional carry" jurisdictions, or allowing unlicensed open carry. *Id.* Thus, the constitutionality of these *entirely voluntary* licensing regimes (*e.g.*, in place to allow residents to obtain interstate reciprocity) says nothing about the constitutionality of a licensing scheme with which people *must comply* in order to carry *at all*.

*Rahimi* undermines these conclusions.  At oral argument, Justices Thomas and Roberts questioned the government's claim that it may disarm anyone deemed not "law-abiding and responsible."  *Rahimi* Transcript ("Tr.") at 5 (Thomas); *id.* at 8 (Roberts).  And when the Solicitor General pivoted, downplaying use of "responsible" as nothing more than a "placeholder" for "dangerous[ness]" (*id.* at 10), the Court clearly did not agree.  *Id.* at 11 (Justice Kavanaugh: "no daylight at all then between not responsible and dangerous?"); *id.* at 12 (Justice Barrett: "So it's not a synonym for virtue?"); *id.* at 30 (Justice Roberts: "why did you use the term 'responsible' if what you meant was dangerous?").  *See also Rahimi* at 1945 (Thomas, J., dissenting) ("the Court has never adopted anything akin to the Government's … argu[ment]....'").  *Rahimi*'s rejection of "responsible" and "law-abiding" as a "placeholder" for "dangerous[ness]" (Tr. at 10) cannot be squared with the view that "good moral character" (*i.e.* "not law-abiding and responsible") is a "proxy" for "dangerousness."  Op. at 312.

Additionally, *Rahimi* rejects the notion that a person "may be disarmed simply because he is not 'responsible.'"  *Rahimi* at 1903.  As the Court explained, "'[r]esponsible' is a vague term," "[i]t is unclear what such a rule would entail," and such a standard does not "derive from our case law," which "said nothing about the status of citizens who were not 'responsible.'"  *Id.*; *see also id.* at 1910 (Gorsuch, J., concurring); *id.* at 1944 (Thomas, J., dissenting) ("Not a single Member of the Court adopts th[at] theory....'"); *id.* at 1944 n.7 ("*Bruen* … used the phrase 'ordinary, law-abiding citizens' merely to describe those who were unable to publicly carry....").  Likewise, *Bruen* rejected

the idea that a person could be disarmed because of "a perceived lack of … suitability." *Bruen* at 13; *see also id.* at 14-15 (emphasis added) (identifying impermissible "may issue" regimes by the requirement that applicants "demonstrate[] cause **or** suitability"); *cf.* Op. at 300 (positing "simultaneous endorsement of … suitability regimes"). *Rahimi* thus rejects the conclusion that a person can be disarmed if he is not "law-abiding and responsible…." Op. at 314. *Rahimi*'s rejection of the "vague term … responsible" as a basis for disarmament (*Rahimi* at 1903) is irreconcilable with this Court's sanctioning of "'good moral character' in the sense [of] not law-abiding and responsible" – "a spongy concept susceptible to abuse," as a basis for disarmament. Op. at 314, 316.[5]

---

[5] Both *Rahimi* and *Bruen* undermine this Court's rejection of Plaintiffs' facial challenge to the "good moral character" requirement. *Bruen* invalidated New York's "proper cause" requirement facially, even though some upstate licensing authorities considered self-defense sufficient "proper cause" (*i.e.*, constitutional in some "circumstances" and "applications," Op. at 313, 314). *Bruen* did not limit its ruling on an as-applied basis to those whose applications had been denied, but invalidated "proper cause" facially because the very notion of requiring it was ahistorical. Likewise, *Rahimi* rejected a facial challenge because the individualized-danger disarmament process at issue *was* historical. *Rahimi* at 1902. Here, there is no historical basis for requiring that one affirmatively prove good moral character as a precondition to firearm licensure. The process therefore fails as a historical matter, irrespective of whether individual applicants ultimately succeed in obtaining licenses, or whether the patently unconstitutional standard could be applied 'constitutionally' in some cases. *See Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (citing cases establishing "that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license"). Indeed, this Court's holding that "Sloane's injury is attributable to the character provision itself" is difficult to reconcile with the conclusion that, "[s]ince at least some possible applications of the character requirement would not violate the Constitution, it is not unconstitutional on its face." Op. at 306, 315. Even if the "good moral character" provision could ferret

**B. New York's Disarmament Process Does Not Meet *Rahimi* Standards.**

Even if "good moral character" were not a "spongy concept" that sanctions disarmament for being "unsuitable," "unvirtuous," or not "law-abiding and responsible," the CCIA still fails to measure up to the "significant procedural protections" discussed in *Rahimi*. *Rahimi* at 1900. For starters is the burden. Both Section 922(g)(8), and the historical "surety" and "going armed" analogues to which the Court compared it (*Rahimi* at 1900-01), required accusation of some particular wrongdoing. In *Rahimi*, for example, "C.M. went to court to seek a restraining order." *Id.* at 1895. This was said to be analogous to Founding-era surety statutes, such as where "the wife of a Connecticut judge, appeared … to make a complaint against her husband." *Id.* at 1900. Likewise, pursuant to "going armed" statutes, "a complaint had to be made to a judge or justice of the peace," who then made a "determin[ation] that cause existed…." *Id.* In other words, the burden was on an accuser to demonstrate – and a judge[6] to find – a person dangerous before disarming him. In stark contrast, the CCIA *prohibits firearm possession by everyone*, unless and until each license applicant affirmatively demonstrates his "good moral character" to the satisfaction of licensing

_____

out some dangerous persons, the inquiry itself is unconstitutional. This Court's holding is akin to authorizing warrantless searches of all cars because some might contain drugs.
[6] That New York judges are often licensing officials scores the CCIA no points vis-à-vis *Rahimi*. That is because, when acting in a licensure capacity, "the licensing process [is] quasi-judicial, but not fully judicial. … Thus, the gun licensing process exists in an uneasy and constitutionally murky boundary between the judicial and executive functions." *In re Benedetti*, 212 N.Y.S.3d 806, 809 (Sup. Ct. 2024).

officials.[7]  This includes *proactively* supplying social media accounts to the government, *proactively* meeting with a licensing official, and *proactively* having others "attest to [one's] good moral character."  N.Y. Penal Law § 400.00(1)(o)(ii).  In other words, the "good moral character" requirement burdens an applicant to prove that he has "good moral character," rather than burdening the government to show that he does not.  And yet *Bruen* struck down New York's proper cause requirement precisely because "New York presumes that individuals have *no* public carry right," whereas "the surety statutes *presumed* that individuals had a right to public carry...."  *Bruen* at 56.

As the Supreme Court explained, Section 922(g)(8) and its historical analogues "do[] not broadly restrict arms use by the public generally," such that "the Second Amendment right may *only* be burdened *once* a defendant has been found to pose a credible threat to the physical safety of others."  *Rahimi* at 1902 (emphasis added); *see also Bruen* at 56 ("burdened only if another could make out a specific showing of 'reasonable cause to fear an injury.'").  Referencing "New York's gun licensing scheme," the Supreme Court noted that it had found New York's statute unconstitutional in *Bruen*

---

[7] *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 303 (N.D.N.Y. 2022) (the CCIA imposes the "burden of persuading a license officer that he or she is of 'good moral character'"); *id.* at n.79 ("[t]he need for an affirmative finding of 'good moral character' … presumes a lack of it [which] depart[s] from the historical statutes, which presumed a right to carry."); Op. at 289 (applicant must "show good moral character"); *id.* at 309 ("the character provision determines who can *receive* a concealed carry license"); *see also Benedetti*, 212 N.Y.S.3d at 808 ("the question here is not whether the applicant has a right to a license, but rather, does the court possess the power to grant it."); *Harper v. Neary*, 225 A.D.3d 595, 597 (N.Y. App. Div. 2024) ("Penal Law § 400.00 does not establish a clear legal right to a pistol license....").

because it "effectively presumed that no citizen had such a right [to carry]" while "surety laws 'presumed that individuals had a right to … carry….'" *Rahimi* at 1902. Much like that repudiated "special need" requirement, the CCIA's "good moral character" requirement "presumes" no right to carry, and prohibits the entire population from keeping and bearing arms unless and until granted individual dispensation by the state.

Next, prior to his deprivation of rights under Section 922(g)(8), "Rahimi had received notice and an opportunity to be heard…." *Rahimi* at 1896. Likewise, the historical surety and going-armed laws the Court considered first would "summon the accused, who could respond to the allegations." *Id.* at 1900. In contrast, a "rejected applicant" denied a permit for lack of "good moral character" under the CCIA "can file an internal administrative appeal of his denial," a "prerequisite to an Article 78 proceeding…."[8] Op. at 316 n.25. Thus, only after deprivation may he "be represented by counsel … and [have] an opportunity to present additional evidence…." N.Y. Penal Law § 400.00(4-a). In other words, "[t]ake the guns first … due process second."[9]

The CCIA also lacks specificity. For example, Rahimi was accused by "his girlfriend, C.M." of specific acts of violence, including that he had "grabbed her by the wrist, dragged her back to his car, and shoved her in, causing her to strike her head against the dashboard," and "fired [his gun] as she fled…." *Id.* at 1894, 1895. Likewise,

---

[8] The meeting with licensing officials "for an interview" under N.Y. Penal Law § 400.00(1)(o), which takes place *before* a license is granted or denied.

[9] B. Samuels, *Trump: 'Take the Guns First, Go Through Due Process Second,'* HILL (Feb. 28, 2018), https://tinyurl.com/yvvupne6.

in the 1790 surety case cited by the Court in *Rahimi*, a wife "listed a pattern of abuse" by her husband, with the justice finding "that he had beat her, pulled her hair, kicked her out of bed, and spit in her face, times without number." K. Ryan, *"The Spirit of Contradiction": Wife Abuse in New England, 1780-1820*, 13 Early American Studies 586, 602 (2015); *Rahimi* at 1900. Finally, "going armed" laws "punish[ed] those who had menaced others with firearms." *Id.* at 1900. In contrast, "good moral character" disarms license applicants without any specificity at all, but instead merely that, based on a subjective prediction that a person "would pose a danger to himself, others, or to public safety" broadly, whatever that means.[10] Op. at 314. This rule allowed one person to be denied a license for providing "character references … who were unaware of [his] arrest" as a minor two decades prior. *Dimino v. McGinty*, 210 A.D.3d 1150, 1152 (N.Y. App. Div. 2022). Another court recently found, post-*Bruen*, that "[a] person with numerous traffic infractions is potentially someone with a lesser respect for the law, [relevant to] whether one is fit for a pistol license." *Kamenshchik v. Ryder*, 78 Misc. 3d 646, 656 (Nassau Cnty. 2023); *cf.* Tr. at 8 (Justice Roberts: "Is someone who drives 30 miles an hour in a 25-mile – mile-an-hour zone – does that person qualify as law-abiding or – or not?"). *See also Morse v. Shea*, 2021 N.Y. Misc. LEXIS 874, at *4, *10 (Sup. Ct. 2021) (upholding denial because "[y]our illegal possession of [firearms] evidences your

---

[10] *Rahimi* at 1909 (Gorsuch, J., concurring) ("we do not decide today whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety.").

disregard for the law and complete inability to follow the rules," and "continuing to possess firearms after [a] permit has expired is evidence of lack of good moral character that justifies denying a subsequent application"); *Biganini v. Gallagher*, 293 A.D.2d 603, 603 (N.Y. App. Div. 2002) (no "good moral character" based on crimes committed by one's associates). It is entirely unclear what the "clear threat of physical violence to another" (*Rahimi* at 1901) would have been in these situations.

Finally, *Rahimi* went to great pains to note the *temporary* nature of the disarmament. As the Court explained, "like surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary … only … so long as the defendant 'is' subject to a restraining order…." *Id.* at 1902; *see also id.* at 1900 ("[b]onds could not be required for more than six months at a time"); *id.* at 1908-10 (Gorsuch, J., concurring) ("We do not resolve whether the government may disarm an individual permanently"). In contrast, a finding under the CCIA that an applicant lacks "good moral character" is essentially a lifetime ban. *See Dimino*, 210 A.D.3d at 1150 (considering charges predating an application *by 15 and 20 years*); *Morse*, 2021 N.Y. Misc. LEXIS 874, at *4, *10 (previous firearm possession without a permit justification to deny subsequent application).

## C. "Good Moral Character" Is Not Merely a "Proxy for Dangerousness."

This Court's claim that "good moral character" is merely a "proxy for dangerousness," is undermined by *Rahimi*. Equally problematic is the CCIA's definition of the term, as "having the essential character, temperament and judgement necessary

to be entrusted[11] with a weapon and to use it only in a manner that does not endanger oneself or others." This Court's focus on "dangerousness" may draw inspiration from the second half of that definition – "use [a firearm] only in a manner that does not endanger oneself or others" – but it entirely ignores the predicate "having the essential character, temperament and judgement necessary to be entrusted with a weapon...." N.Y. Penal Law § 400.00(1). Indeed, one federal district court described "good moral character" as "the ideal state of a person's beliefs and values that provides the most benefit to a healthy and worthy society.... [It] is more than having an unblemished criminal record," including "behav[ing] in an ethical manner and provid[ing] … reassurance that he can be trusted to make good decisions … where there are no written rules." *Sibley v. Watches*, 501 F. Supp. 3d 210, 219 (W.D.N.Y. 2020).[12]

In its briefing to the Supreme Court, the State claimed various examples of the abusive application of "good moral character" (*see supra* at I(B)) are outdated because

---

[11] The notion that the government "entrusts" Americans with Second Amendment rights implicitly rejects the Blackstonian position that the right to self-defense predates government, as well as the Declaration of Independence which sources such rights in the Creator. As *Heller* explained, "it has always been widely understood that the Second Amendment … codified a pre-existing right," and it is not "in any manner dependent upon [a state licensing official] for its existence." 554 U.S. at 592.

[12] This Court's assumption that the "good moral character" standard confers only "a modicum of discretion," or at most "bounded discretion" (Op. at 312, 307), is undermined by numerous state cases stating the opposite. *See, e.g., Kantarakias v. Hyun Chin Kim*, 226 A.D.3d 1020, 1021 (N.Y. App. Div. 2024) (licensing officers have "broad discretion in ruling on permit applications"); *Husejnovic v. DeProspo*, 225 A.D.3d 597, 598 (N.Y. App. Div. 2024) (same); *see also Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 262-63 (1957) ("The term 'good moral character' … by itself, is unusually ambiguous. It can be defined in an almost unlimited number of ways....").

of "the CCIA's addition of the … good-moral-character definition," which they claim "narrowed and made more precise the longstanding requirement...." Brief in Opposition at 24 n.12, 6, *Antonyuk v. James*, No. 23-910 (U.S. May 9, 2024). Yet the CCIA adopted the very language used in those earlier decisions. *See Kamenshchik*, 78 Misc. 3d at 651 ("likely to engage in conduct that would result in harm to themselves or others"); *Sibley*, 501 F. Supp. 3d at 219 ("the essential temperament of character which should be present in one entrusted with a dangerous [weapon]"). In other words, the CCIA merely codified what has been the law in New York since at least 1976. *See Pelose v. Cnty. Ct. of Westchester Cnty.*, 53 A.D.2d 645 (N.Y. App. Div. 1976). The CCIA's definition is nothing new and is not merely a "proxy for dangerousness."

## II. *RAHIMI* CONFIRMS THAT 1791 IS THE SINGULAR FOCAL POINT FOR SECOND AMENDMENT ANALYSIS.

*Bruen* did not expressly rule whether 1791 or 1868 is the temporal focal point for Second Amendment analysis, because the answer was not necessary to decide the case. *Id.* at 37, 38. *Rahimi* took the same position. *Id.* at 1898 n.1. Even so, *Bruen* "assumed that the scope of the protection applicable to the Federal Government *and States* is pegged to … 1791." *Id.* at 37 (emphasis added). But although the question was technically left open, the answer is clear, because the Court consistently uses 1791 as the focal point for interpreting all manner of constitutional provisions, with subsequent

history serving a merely confirmatory role.[13]  *Rahimi* confirms this methodological approach and undermines this Court's divergent methodology.

## A. This Court's Vacated Opinion Conflicts with *Bruen* and *Rahimi*.

Although purporting to summarize the *Bruen* framework, this Court rewrote it entirely.  Indeed, despite *Bruen*'s instruction that its framework be followed *every time* a challenger's conduct implicates the plain text,[14] this Court concluded that *Bruen*'s "dispositive" factors need not be dispositive here, due to *Bruen*'s purportedly "exceptional context."  Op. at 302, 303; *see also id.* n.10 (citing law review article encouraging courts to "narrow[] Supreme Court precedent from below").

First, *Bruen* required an affirmative showing of historical analogues.  *Id.* at 22, 30; *see also Rahimi* at 1898 (emphasis added) (requiring "consisten[cy] with the principles that underpin our *regulatory tradition*").  But this Court disagreed, positing that "[r]easoning from historical silence is … risky" and "the absence of a distinctly similar

---

[13] *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) (Establishment Clause); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (noting that "a tradition" that "arose in the second half of the 19th century," even in "more than 30 States[,] … cannot by itself establish an early American tradition" as to Free Exercise Clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment); *Gamble v. United States*, 587 U.S. 678, 683 (2019) (Fifth Amendment); *Ramos v. Louisiana*, 590 U.S. 83, 91 (2020) (Sixth Amendment); *Timbs v. Indiana*, 586 U.S. 146, 152-53 (2019) (Eighth Amendment).  The sole exception, *Apodaca v. Oregon*, 406 U.S. 404 (1972), "was the result of an unusual division among the Justices," *McDonald v. City of Chicago*, 561 U.S. 742, 766 n.14 (2010), and the Court overruled that "badly fractured set of opinions."  *Ramos*, 590 U.S. at 93.
[14] *Bruen* at 17, 24 (repeating that "[o]nly if" and "[o]nly then" – once the government proves a "historical tradition of firearm regulation" – "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'").

historical regulation … can only prove so much." Op. at 301. Second, *Bruen* noted that "the lack of a distinctly similar historical regulation" addressing a persistent societal issue "is relevant evidence that the challenged regulation is" unconstitutional. *Id.* at 26; *see also Rahimi* at 1898. But this Court insisted that an absence of any relevant analogues "may not be reliably dispositive." Op. at 302. Third, *Bruen* required analogues to be "well-established and representative," rejecting mere "outliers." *Id.* at 30, 65; *see also Rahimi* at 1900 (finding one type of analogue "[w]ell entrenched in the common law" and with Founding-era codification, with subsequent similar enactments in "[a]t least nine other jurisdictions" providing further confirmation). In contrast, this Court held that "comparable historical laws need not proliferate." Op. at 304. Fourth, *Bruen* made clear that courts are to interpret the Second Amendment's meaning *when* it was ratified, "according to the understandings of those who ratified" the text. *Id.* at 28; *see also Rahimi* at 1907 (Gorsuch, J., concurring) (emphasis added) ("the Second Amendment 'codified a *pre-existing* right' … that carries the same 'scope' … [as] … *when* the people adopted' it."). But this Court disagreed, finding it "implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era." Op. at 304. Fifth, *Bruen* mandated historical analysis focused on the time of ratification, warning that "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36; *see also Rahimi* at 1925 (Barrett, J., concurring) ("evidence of 'tradition' unmoored from original meaning is not binding law."). But

this Court broadened the scope of such analysis to that which "existed at *or around* ratification, *unless historical context suggests otherwise*." Op. at 300 (emphases added).

As for the one question which *Bruen* and *Rahimi* actually left unanswered – 1791 or 1868 – this Court wrongly elevated 1868 beyond its "mere[ly] confirmat[ory]" role. *Bruen* at 37. This error tainted the historical analysis and enabled the synthesis of a 'tradition' which never existed. *See* Op. at 318 n.27 (claiming "evidence from Reconstruction … is *at least as relevant* as evidence from the Founding Era") (emphasis added); *id.* at 304 ("1868 and 1791 are both focal points of our analysis"). Of course, this ignores *Bruen*'s "general[] assum[ption] that the scope of the protection applicable to the Federal Government and States is pegged to … 1791." *Id.* at 37; *see also id.* at 82-83 (Barrett, J., concurring) ("1791 is the benchmark" because "Reconstruction-era history" alone is "simply too late (in addition to too little)," and rejecting "freewheeling reliance on historical practice from the mid-to-late 19th century....").[15] Making matters worse, even after elevating 1868 beyond a merely confirmatory role, this Court upheld the CCIA's "good moral character" requirement not based on historical regulations

---

[15] This Court's citation to *McDonald* was similarly erroneous. Claiming "the plurality gave particular emphasis" to Reconstruction-era evidence, Op. at 305, this Court omitted the fact that *McDonald* started with the Founding, and then noted that Reconstruction-era evidence "*only confirms* that the right to keep and bear arms was considered fundamental." *McDonald*, 561 U.S. at 776 (emphasis added); *cf. Bruen*, 597 U.S. at 37 ("19th-century evidence [i]s 'treated as mere confirmation....'"). Moreover, *McDonald* made clear that the Second Amendment is "'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" 561 U.S. at 765.

contemporaneous with the Fourteenth Amendment's ratification, but rather analogues postdating even that. Op. at 318 (collecting disparate analogues spanning 1875 to 1892). But *Bruen* made clear that such latecomers could not possibly carry the day. *Id.* at 38 (rejecting "a handful of late-19th-century jurisdictions....").[16]

**B. *Rahimi* Provides Further Confirmation that 1791 Is the Appropriate Focal Point for Second Amendment Analysis.**

*Rahimi* provides further confirmation that this Court's focus on Reconstruction-era historical sources was erroneous. *Id.* at 1901 (giving singular reliance to "founding era regimes"). To be sure, *Rahimi* again left the 1791 v. 1868 question open.[17] *Id.* at 1898 n.1; *see also id.* at 1933 n.2 (Thomas, J., dissenting). Nevertheless, *Rahimi*'s analysis forecloses this Court's approach, as *Rahimi*'s singular focus was, once again, 1791. *See, e.g., id.* at 1897 ("arms not limited to those that "were in existence *at the founding*."); *id.* at 1898 (citing "the balance struck by the *founding* generation...."); *id.* (emphases added)

---

[16] Having neglected the Founding as to "good moral character," this Court identified "two Founding-era states" that "replicated" the Statute of Northampton in order to uphold several purportedly "sensitive places." Op. at 356. But *Bruen* already dispensed with medieval Northampton as having "little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. The two states that remain simply cannot form a "Nation's historical tradition" – they are, by definition, "outliers." *Id.* at 17, 65. Indeed, "scattered cases or regulations pulled from history may have little bearing on the meaning of the text." *Rahimi* at 1925 (Barrett, J., concurring).

[17] Although the Court has not yet definitively answered the 1791 v. 1868 question, its Justices recognize that the Court will soon find necessary to answer this important question. *Bruen* at 82 (Barrett, J., concurring) ("The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case."); *Rahimi* at 1929 n.4 (Jackson, J., concurring) ("Extremely pertinent inquiries … await resolution," including the 1791 v. 1868 issue).

16

(examining "laws *at the founding*" and "what was done *at the founding*"). Indeed, *Rahimi* did not consider any proffered analogue which had arisen for the first time during Reconstruction. And not only did the *Rahimi* majority focus on the Founding, but also so did both concurrences and dissent. *See, e.g.*, *id.* at 1905 (Sotomayor, J., concurring) (examining the modern evolution from "guns in the 18th century" and discussing "interpersonal violence – 'that has persisted since the 18th century'"); *id.* at 1908 (Gorsuch, J., concurring) ("admitting only those exceptions established at the time *of the founding*."); *id.* at 1924 (Barrett, J., concurring) (The Second Amendment's "meaning … fixed at the time of its ratification," and the "history that matters most is the history surrounding the ratification of the text."); *id.* at 1932 (Thomas, J., dissenting) (noting a "general societal problem that has persisted *since the 18th century*," which requires "distinctly similar historical regulation"); *id.* (noting *Bruen* and *Heller*'s focus on "*founding-era* historical precedent"). In sum, *Rahimi* did not consider *Bruen*'s methodology or holding to be "exceptional," as this Court claimed. Op. at 299, 302, 303. Rather, "[t]he Court reinforce[d] the focus on text, history, and tradition, following exactly the path [] described in *Bruen*." *Rahimi* at 1910 (Gorsuch, J., concurring).

## III. *RAHIMI* CONFIRMS THAT THIS COURT MUST WRESTLE WITH THE RACIST ORIGINS OF "GOOD MORAL CHARACTER."

Justice Kavanaugh's concurrence further confirms that the racist underpinnings of New York's "good moral character" requirement should cause it to be relegated to the 'dustbin of history.' Indeed, the historical sources offered by New York to justify

good moral character "do establish one general principle. … the selective deprivation of the right to keep and bear arms almost invariably has been used as a weapon by the politically powerful to disarm disfavored groups…." Answering Br. to State at 4, Doc. 262. Plaintiffs previously detailed this history, beginning with the Nation's early immigration and occupational licensing laws, various states' slave codes, through Florida's use of carry licensing to oppress blacks and Italians in the early 1900s. *Antonyuk I*, ECF #40 at 16-21; *see also id.* at 24-25 ("the CCIA's demand that others speak up for the good moral character of a person *does* have historical analogs – but largely grounded in demonstrating the docility of slaves"). *See also Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 135 n.22 (N.D.N.Y. 2022) (referencing 1832 Delaware law requiring "that such free negro or free mulatto is a person of *fair character*….").

This Court acknowledged in passing the racial undertones of "many 18th-century restrictions" (Op. at 326 n.46), but glossed over these uncomfortable origins to uphold "good moral character" based solely on post-Reconstruction laws.[18] But this is precisely what Justice Kavanaugh explained that courts *should not do*, because "history can be

---

[18] In fact, this Court asserted that "[l]icensing schemes were a post-Civil War phenomenon." Op. 90 n.31. But firearms licensure existed at the Founding. *See* Brief Amicus Curiae of National African American Gun Association, Inc. at 5-11, *NYSRPA v. Bruen*, No. 20-843 (U.S. July 16, 2021) (cataloguing Founding-era bans on slaves and freed blacks keeping and bearing arms without a license). In other words, early forms of firearm licensing applied only to those not considered part of "the people" – or, for that matter, considered people at all. *See Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824) (justifying "numerous restrictions" imposed on "free blacks … which are inconsistent with the letter and spirit of the Constitution … as respects the free whites").

probative of what the Constitution does *not* mean." *Rahimi* at 1914 (Kavanaugh, J., concurring). Indeed, "many provisions of the Constitution [were drafted] precisely to depart from rather than adhere to certain pre-ratification laws, practices, or understandings." *Id.* Thus, Justice Kavanaugh warned, "courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind." *Id.* at 1915.

This Court's narrow focus on post-Reconstruction sources ignored the racist, xenophobic, and theophobic historical origins of "good moral character," which shows "what the Constitution does not mean."[19] *See Simmons v. Galvin*, 575 F.3d 24, 36-37 (1st Cir. 2009) (characterizing "good moral character" as a "historically discriminatory test"). This Court's opinion also glossed over the resurgence of these licensing practices to disenfranchise newly freed slaves after the Civil War. The Court pointed to several licensing ordinances, dating from 1875-1892, but only from northern and western

---

[19] The Supreme Court has consistently held that racist history matters. *See Ramos*, 590 U.S. at 87-89 ("Though it's hard to say why [nonunanimous verdict] laws persist, their origins are clear … the avowed purpose of [one] was to 'establish the supremacy of the white race,' … [including] exempt[ing] white residents from the most onerous of these requirements," tracing them "to the rise of the Ku Klux Klan and efforts to dilute "the influence of racial, ethnic, and religious minorities on Oregon juries."); *Espinoza*, 591 U.S. at 497 (Alito, J., concurring) ("[i]f the original motivation for the laws mattered [in *Ramos*, 590 U.S. 83], it certainly matters here."); *see also* Transcript of Oral Argument at 103-04, *NYSRPA v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021), https://tinyurl.com/4wyf2chz (Justice Alito: "[T]here are those who argue … that a major reason for the enactment of the Sullivan Law was the belief that certain disfavored groups, members of labor unions, Blacks and Italians, were carrying guns and they were dangerous people and they wanted them disarmed.").

United States. Op. at 318. But it is no coincidence that firearm licensing statutes arose in the years immediately following emancipation. *See Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857) (Chief Justice Roger Taney lamenting that, were the slaves freed, it "would give to persons of the negro race" the right "to keep and carry arms wherever they went."). In response to that new reality, states began to restrict the carrying of firearms, and such laws were generally "passed for the purpose of disarming the negro [and] was never intended to be applied to the white population … generally conceded to be in contravention to the Constitution and non-enforceable if contested." *Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941); *see also State ex rel. Russo v. Parker*, 57 Fla. 170 (1909).

Like Founding-era history, this post-Civil War history undermines the constitutionality of "good moral character" requirements because, as Justice Kavanaugh explained, the Fourteenth Amendment sought to "reject the Nation's history of racial discrimination, not to backdoor incorporate racially discriminatory and oppressive historical practices and laws into the Constitution." *Rahimi* at 1915 (Kavanaugh, J., concurring). It is important that this Court address *the full history* of the requirement to prove "good moral character" prior to exercising a constitutional right – especially given that the Second Amendment declares this right "shall not be infringed."

## CONCLUSION

The portions of the district court's opinion under review should be affirmed.

Respectfully submitted,

Dated:  September 4, 2024

|  | _/s/ Stephen D. Stamboulieh_ |
|---|---|
| Robert J. Olson | Stephen D. Stamboulieh |
| William J. Olson | Stamboulieh Law, PLLC |
| William J. Olson, PC | P.O. Box 428 |
| 370 Maple Ave. West, Suite 4 | Olive Branch, MS 38654 |
| Vienna, VA 22180-5615 | (601) 852-3440 (T) |
| (703) 356-5070 (T) | Stephen@sdslaw.us |
| (703) 356-5085 (F) | _Attorneys for Plaintiffs-Appellees_ |
| wjo@mindspring.com | |

## CERTIFICATE OF COMPLIANCE

Pursuant to this Court's Order dated August 7, 2024, I, Stephen D. Stamboulieh, one of the attorneys for Plaintiffs-Appellees, hereby certify that this brief contains 20 pages and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh